FILED

1  Raymond P. Boucher, Esq. (SBN 115364)
2  boucher@kbla.com
3  KIESEL BOUCHER LARSON LLP
4  8648 Wilshire Boulevard
5  Beverly Hills, CA 90211
6  Telephone: (310) 854-4444
7

2009 NOV -2 PM 4: 06

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

8              UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA

10

PSG
(CTX)

11  IN RE WELLPOINT, INC. OUT-OF-      )  Master File No. MDL 09-2074
    NETWORK "UCR" RATES                )
12  LITIGATION                         )  The Hon. Philip S. Gutierrez
                                       )
13                                     )
    **THIS DOCUMENT RELATES TO**       )
14  **ALL ACTIONS**                    )
                                       )
15  _____)

16

17         **FIRST CONSOLIDATED AMENDED COMPLAINT**

18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

JURISDICTION AND VENUE ................................................................1

INTRODUCTION ...............................................................................1

PARTIES.........................................................................................5

    *Subscriber Plaintiffs*.....................................................................5

    *Provider Plaintiffs*.......................................................................7

    *Association Plaintiffs*...................................................................9

    *Defendants*................................................................................15

    *Conspirators*..............................................................................19

OVERVIEW OF THE CONSPIRACY TO DEPRESS
REIMBURSEMENT FOR ONS ..........................................................22

ANTITRUST ALLEGATIONS ............................................................28

    *Interstate Trade and Commerce*...................................................28

    *Relevant Market* .......................................................................30

    *Communication Opportunities* .....................................................33

    *Collective Interests*....................................................................33

    *The Ingenix Database:  Mechanism of the Conspiracy*......................35

    *Ingenix Acquires Existing Databases to Dominate Data Market*...........37

    *Defendants Effectuate Their Conspiracy and Anticompetitive
    Agreement By and Through the Ingenix Database*.............................38

    *Agreements to Provide and Utilize False Data* ................................39

    *The Data Is Received and Distributed Without Verifying Its Accuracy*......44

    *The Truth of the Ingenix Database Is Concealed* .............................46

INVESTIGATIONS INTO THE INGENIX DATABASES .........................48

    *The New York Attorney General's Investigation and Action*.................48

    *Congress' Investigation*...............................................................51

HARM TO SUBSCRIBERS ................................................................53

HARM TO PROVIDERS....................................................................56

First Consolidated Amended Complaint

i

HARM TO THE ASSOCIATIONS ...............................................................57

ERISA ALLEGATIONS.............................................................................58

    *Plaintiff Roberts* ...............................................................................62

    *Plaintiff Cooper*................................................................................64

    *Plaintiff Ivette Rivera-Giusti* .........................................................65

    *Plaintiff Dr. Henry* ..........................................................................65

    *Plaintiff Dr. Schwendig* ..................................................................68

    *Plaintiff Dr. Peck* ............................................................................71

    *Plaintiff Dr. Pariser* ........................................................................73

    *Plaintiff Dr. Melamed* .....................................................................77

    *Plaintiff Dr. Kavali*..........................................................................81

    *Plaintiff NPSC* .................................................................................84

    *An Administrative Appeal to WellPoint of Its UCR Determinations Is Futile, Such that Exhaustion Under ERISA Is Excused* ....................86

RICO ALLEGATIONS...............................................................................92

BREACH OF CONTRACT ALLEGATIONS ............................................102

    *Plaintiff Dr. Higashi*.......................................................................107

FALSE ADVERTISING AND DECEPTIVE CONDUCT ALLEGATIONS....109

CLASS ALLEGATIONS ............................................................................110

    The Subscriber Class........................................................................110

    The Provider Class ...........................................................................110

    The Antitrust Injunctive Relief Class ...............................................110

    The ERISA Subscriber Subclass ......................................................111

    The ERISA Provider Subclass..........................................................111

    The Non-ERISA Subscriber Subclass ..............................................111

    The Non-ERISA Provider Subclass ..................................................111

FRAUDULENT CONCEALMENT.............................................................116

TOLLING OF APPLICABLE STATUTES OF LIMITATION.......................117

First Consolidated Amended Complaint

FIRST CLAIM FOR RELIEF ................................................................ 117

VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST
ACT 15 U.S.C. §1 (Against All Defendants on Behalf of All
Plaintiffs, Including the Association Plaintiffs as well as the
Subscriber and Provider Classes and the Antitrust Injunctive
Relief Class)

SECOND CLAIM FOR RELIEF ........................................................... 119

CLAIM FOR UNPAID BENEFITS UNDER GROUP PLANS
GOVERNED BY ERISA 29 U.S.C. §1132(a)(1)(B) (Against
WellPoint on Behalf of the ERISA Plaintiffs, and the ERISA
Subclasses and by the Association Plaintiffs on Behalf of
Their Members)

THIRD CLAIM FOR RELIEF .............................................................. 120

CLAIM FOR BREACH OF FIDUCIARY DUTY UNDER ERISA
29 U.S.C. §1132(a)(2) (Against WellPoint on Behalf of the
ERISA Plaintiffs, and the ERISA Subclasses and by the
Association Plaintiffs on Behalf of Their Members)

FOURTH CLAIM FOR RELIEF .......................................................... 121

FAILURE TO PROVIDE FULL AND FAIR REVIEW REQUIRED
BY ERISA 29 U.S.C. §1132(a)(3) (Against WellPoint on
Behalf of the ERISA Plaintiffs, and the ERISA Subclasses and
by the Association Plaintiffs on Behalf of Their Members)

FIFTH CLAIM FOR RELIEF ............................................................... 123

FAILURE TO PROVIDE AN ACCURATE EOC AND SPD 29
U.S.C. §1132(c) (Against WellPoint on Behalf of the ERISA
Plaintiffs, and the ERISA Subscriber and Provider Subclasses
and by the Association Plaintiffs on Behalf of Their Members)

SIXTH CLAIM FOR RELIEF ............................................................... 123

VIOLATION OF FIDUCIARY DUTIES OF LOYALTY AND DUE
CARE 29 U.S.C. §1002(21)(A); 29 U.S.C. §1104(a)(1)(B) and
(D) (Against WellPoint on Behalf of the ERISA Plaintiffs, and
the ERISA Subscriber and Provider Subclasses and by the
Association Plaintiffs on Behalf of Their Members)

SEVENTH CLAIM FOR RELIEF ......................................................... 125

FOR VIOLATIONS OF RICO, BASED ON PREDICATE ACTS
OF MAIL AND WIRE FRAUD 18 U.S.C. §1962(c) (Against
All Defendants on Behalf of All Plaintiffs, the Association
Plaintiffs and the Subscriber and Provider Classes)

First Consolidated Amended Complaint

EIGHTH CLAIM FOR RELIEF ...................................................................... 128

    FOR VIOLATIONS OF RICO 18 U.S.C. §1962(c) FOR PREDICATE ACTS 18 U.S.C. §664 (Against Defendants on Behalf of All ERISA Plaintiffs and the ERISA Subscriber and Provider Subclasses and by the Association Plaintiffs on Behalf of Their Members)

NINTH CLAIM FOR RELIEF............................................................................ 131

    FOR VIOLATIONS OF RICO 18 U.S.C. §1962(d) (Against All Defendants on Behalf of All Plaintiffs and the Subscriber and Provider Classes and the Association Plaintiffs)

TENTH CLAIM FOR RELIEF .......................................................................... 132

    BREACH OF CONTRACT (Against WellPoint on Behalf of the Non-ERISA Plaintiffs and the Non-ERISA Subscriber and Provider Subclasses)

ELEVENTH CLAIM FOR RELIEF ................................................................... 133

    BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (Against WellPoint on Behalf of the Non-ERISA Plaintiffs and the Non-ERISA Subscriber and Provider Subclasses)

TWELFTH CLAIM FOR RELIEF...................................................................... 136

    FOR VIOLATIONS OF CALIFORNIA'S UNFAIR AND DECEPTIVE TRADE PRACTICES STATUTES (Against All Defendants on Behalf of Plaintiffs J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, Melamed, the NPSC, the Non-ERISA Subscriber and Provider Subclasses and AMA, CMA, APMA, CCA and CPA

THIRTEENTH CLAIM FOR RELIEF ............................................................... 141

    FOR VIOLATION OF GBL §349 (By Plaintiff Seigle-Epstein and on Behalf of the New York Non-ERISA Subclasses)

FOURTEENTH CLAIM FOR RELIEF .............................................................. 144

    FOR VIOLATION OF THE CARTWRIGHT ACT (Against All Defendants on Behalf of Plaintiffs Roberts, J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, Melamed, Kavali and the NSPC, the AMA, CMA, APMA, CCA and CPA and the Provider and Subscriber Classes)

FIFTEENTH CLAIM FOR RELIEF................................................................... 145

    CONSPIRACY (Against All Defendants on Behalf of All Plaintiffs, the Association Plaintiffs and the Subscriber and Provider Classes, and the Non-ERISA Subscriber and Provider Subclasses)

PRAYER FOR RELIEF ...................................................................................147

DEMAND FOR JURY TRIAL ........................................................................149

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

First Consolidated Amended Complaint

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, in that some of the claims asserted herein are brought under federal statutes and necessarily involve adjudication of one or more federal questions.  For Plaintiffs' Sherman Act and the Racketeer Influenced and Corrupt Organizations Act ("RICO") claims, jurisdiction arises under 28 U.S.C. §1331 and 28 U.S.C. §1337.  For Plaintiffs' Employee Retirement Income Security Act ("ERISA") claims, jurisdiction arises under 28 U.S.C. §1331 and ERISA §502(e), 29 U.S.C. §1132(e).  This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367.  In addition, for all of Plaintiffs' claims, including breach of contract, breach of the covenant of good faith and fair dealing and unfair competition claims, jurisdiction arises under 28 U.S.C. §1332(d)(2) as Plaintiffs seek certification of nationwide classes as set forth herein.  Plaintiffs are located in California, Connecticut, Illinois, Georgia, Maryland, North Carolina, New Jersey, New York and Oregon and Defendants are located in California, Indiana and Minnesota.  The amount in controversy exclusive of interest and costs exceeds $5 million.

2.      This Court has personal jurisdiction over the parties because Plaintiffs submit to the jurisdiction of this Court, and each Defendant systematically and continuously conducts business in this State, and otherwise has minimum contacts with this State sufficient to establish personal jurisdiction over each of them.

3.      Venue is appropriately established in this Court under 28 U.S.C. §1391, 18 U.S.C. §1965, and 29 U.S.C. §1132(e)(2) because Defendants conduct a substantial amount of business in this District, including marketing, advertising and selling insurance products, and administering health plans to residents inside this District.

## INTRODUCTION

4.      Plaintiffs Michael Roberts (individually and guardian for D. Roberts), J.B.W. (a minor, by and through Julz W., his parent and guardian *ad litem*), Darryl and Valerie Samsell (the "Samsells"), Mary Cooper, individually and on behalf of the

estate of Robert Cooper, Ivy Seigle-Epstein and Ivette Rivera-Giusti (the "Subscriber Plaintiffs"), and Plaintiffs Stephen D. Henry, M.D., James G. Schwendig, M.D., James A. Peck, Psy.D., Michael Pariser, Psy.D., Hooman M. Melamed, M.D., Carmen Kavali, M.D., Stephanie Higashi, D.C., d/b/a Mar Vista Institute of Health, and North Peninsula Surgical Center, L.P. (the "Provider Plaintiffs") respectfully bring this action on behalf of classes of themselves and all others similarly situated (described and defined below as the "Subscriber Class" and the "Provider Class" respectively). Plaintiffs American Medical Association ("AMA"), California Medical Association ("CMA"), Medical Association of Georgia ("MAG"), Connecticut State Medical Society ("CSMS"), North Carolina Medical Society ("NCMS"), American Podiatric Medical Association ("APMA"), California Chiropractic Association ("CCA"), and California Psychological Association ("CPA") (collectively the "Association Plaintiffs") bring this action on behalf of themselves and/or on behalf of their membership.

5.      Plaintiffs bring this class action alleging violations of the Sherman Antitrust Act; ERISA; RICO; Breach of Contract, breach of the Implied Covenant of Good Faith and Fair Dealing; conspiracy; and state antitrust and unfair competition laws, including California's Cartwright Act and Sections 17200 and 17500 of the California Business and Professions Code.

6.      Plaintiffs bring their claims against Defendants WellPoint, Inc. and its insurer subsidiaries and divisions, as listed in paragraph 56 (collectively, "WellPoint"); UnitedHealth Group, Inc. and its insurer subsidiaries and divisions (collectively, "UnitedHealth"); and UnitedHealth's wholly-owned subsidiary Ingenix, Inc. ("Ingenix") (collectively, "Defendants"). WellPoint, UnitedHealth and other health insurer Conspirators are collectively referred to herein as the "Insurer Conspirators," as described below in ¶59.   Ingenix, HIAA and the Insurer Conspirators are collectively referred to as the "Conspirators."

**OVERVIEW OF THE ACTION**

7.     Plaintiffs' claims arise from WellPoint's failure to comply with ERISA and its own contractual obligations with regard to payments for out-of-network healthcare services as well as Defendants' undisclosed fraudulent scheme and anticompetitive conspiracy to fix prices that WellPoint, United Health and other Insurer Conspirators pay as reimbursements for out-of-network healthcare services.

8.     Many health insurers, including WellPoint, offer health insurance plans that differentiate between coverage for medical treatment provided by (i) in-network providers who have negotiated discounted rates with the insurer and (ii) out-of-network providers who charge insured consumers their usual, non-discounted rates. Health insurance plans that permit insured individuals (referred to herein and in the health insurance industry as "subscribers," "members," or "insureds") to seek medical care from out-of-network healthcare providers[1] and be reimbursed for those services are more expensive (*i.e.*, require higher premium payments) than plans that limit members' coverage to care provided by in-network providers.

9.     Members, such as the Subscriber Plaintiffs, pay higher premiums in exchange for the flexibility and right to obtain out-of-network benefits.  Doctors and other healthcare providers, such as the Provider Plaintiffs, agree to treat patients who are not insured under a healthcare network with which they affiliate (*i.e.*, who are not in-network patients) based in part on the patient's "assignment" of its healthcare benefits (the out-of-network health insurance services ("ONS") reimbursement) to the provider.

10.     Health insurers, including WellPoint, promise to reimburse for out-of-network services at a percentage of the lesser of either (i) the actual amount of their

---

[1]     As used herein, the term "healthcare provider" refers to physicians, physician groups, other healthcare provider and healthcare provider groups, hospitals, clinics, and ambulatory and surgical centers.

1  medical bills or (ii) the usual, customary and reasonable rate ("UCR") charged by
2  providers in the same or similar geographic area for the substantially the same service.

3      11.    However, in order to save money by paying less for out-of-network
4  services, WellPoint improperly utilizes the Ingenix Database to calculate UCR.

5      12.    WellPoint and other Insurer Conspirators contract with Ingenix (which is
6  owned and operated by UnitedHealth) to (i) provide out-of-network claims data, and
7  pricing information to Ingenix and (ii) receive uniform pricing UCR schedules from
8  Ingenix based on the data they submit.  The uniform pricing schedules provide a price
9  range that purportedly reflects the UCR for the services rendered in the patients'
10  geographic area but which are intentionally less than UCR.  WellPoint and other
11  Insurer Conspirators determine what ONS reimbursement they will pay based on that
12  range.

13      13.    However, the out-of-network claims data and pricing information
14  provided to Ingenix by WellPoint and the other Insurer Conspirators is rigged to
15  artificially deflate average out-of-network charges.  Ingenix then further manipulates
16  the data to additionally depress the average out-of-network charges to create the
17  purported UCR data set forth on the Ingenix generated schedules ("False UCRs").
18  When WellPoint and other Insurer Conspirators utilize the False UCRs to calculate
19  ONS reimbursements, the resulting payments to subscribers and providers are
20  artificially low and substantially below the actual UCR for similar services.

21      14.    WellPoint's utilization of the Ingenix Database for making UCR
22  determinations constitutes a breach of WellPoint's obligations under its healthcare
23  plans and a violation of its fiduciary duties under ERISA.

24      15.    As set forth more fully herein, WellPoint's underpayment scheme has
25  been undertaken in connection with its conduct of a RICO enterprise and in concert
26  with the Defendants, thereby violating 18 U.S.C. §§1962(c) and (d).

27

28

First Consolidated Amended Complaint

16.    As further detailed herein, the agreement between Defendants and other Insurer Conspirators to systematically under-reimburse for out-of-network services through use of the Ingenix Database violates the Sherman Antitrust Act.

17.    Defendants' conduct also violates numerous state antitrust and unfair competition laws, including California's Cartwright Act and §§17200 and 17500 of the California Business and Professions Code and New York GBL §349.

18.    Defendants' actions have resulted in injury to Plaintiffs and Class Members.  The Subscriber Plaintiffs have not received the benefits that WellPoint agreed and promised to pay.  The Provider Plaintiffs have likewise been denied benefits WellPoint agreed and promised to pay.  The Association Plaintiffs are bringing this action on behalf of their Provider members who have been injured, and certain of the Associations have used their resources to combat the illegal and improper actions of the Defendants.

19.    Defendants' conduct is continuing and will not be remedied absent the relief sought herein by Plaintiffs and Class Members.

## PARTIES

### *Subscriber Plaintiffs*

20.    Plaintiff Michael Roberts (individually and as guardian for his daughter, D. Roberts) is a resident of the State of California.  While insured by WellPoint (through WellPoint's Blue Cross of California subsidiary), Plaintiff received an artificially depressed reimbursement for ONS, resulting in Plaintiff incurring more out-of-pocket expense than he would have absent the unlawful conduct alleged herein.

21.    Plaintiff, J.B.W. (a minor by and through his parent and guardian *ad litem*), is a resident of the State of California.  Plaintiff has filed a petition for the appointment of Julz W., his mother, as his guardian *ad litem* in this matter.  While insured by WellPoint *via* Blue Cross of California, Plaintiff received artificially deflated reimbursement for ONS, resulting in Plaintiff incurring more out-of-pocket expense than he would have absent the unlawful conduct alleged herein.

First Consolidated Amended Complaint

22.     Darryl and Valerie Samsell are individuals and residents of the State of North Carolina, residing in Greensboro, North Carolina.  From at least as early as 1998 to the present (hereinafter the "Relevant Time Period"), the Samsells purchased and owned policies of insurance from WellPoint, by and through its predecessor and subsidiary companies including Anthem Blue Cross and Blue Shield, Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield, and Trigon Blue Cross Blue Shield, providing health insurance benefits for themselves and the members of their family.  While insured by WellPoint (through Anthem), Plaintiffs received an artificially depressed reimbursement for ONS, resulting in Plaintiffs incurring more out-of-pocket expense than they would have absent the unlawful conduct alleged herein.

23.     Mary Cooper is an individual and resident of the State of New Jersey, residing in Andover, New Jersey.  During the Relevant Time Period, Ms. Cooper and her (now deceased) husband, Robert Cooper, received policies of insurance from WellPoint, by and through its predecessor and subsidiary company, WellChoice Insurance of New Jersey, Inc., providing health insurance benefits for themselves and the members of their family.   The Coopers received this insurance through Mr. Cooper's employer.  While insured by WellPoint (through WellChoice Insurance of New Jersey), Plaintiff incurred more out-of-pocket expense than she would have absent the unlawful conduct alleged herein.

24.     Ivy Seigle-Epstein is an individual and resident of the State of New York, residing in Brooklyn, New York.  During the Relevant Time Period, through her employment, Ms. Seigle-Epstein received policies of insurance from WellPoint, by and through its predecessor and subsidiary company Empire Blue Cross Blue Shield, providing health insurance benefits for herself.  While insured by WellPoint (through Empire), Plaintiff received an artificially depressed reimbursement for ONS, resulting in Plaintiff incurring more out-of-pocket expense than she would have absent the unlawful conduct alleged herein.

First Consolidated Amended Complaint

25.     Ivette Rivera-Giusti is a resident of the State of Oregon.  During the Relevant Time Period, through her employer, Ivette Rivera-Giusti received policies of insurance from WellPoint (through WellPoint's Empire HealthChoice Assurance, Inc. and Empire Blue Cross Blue Shield subsidiaries).  While insured by WellPoint (through Empire), Plaintiff received an artificially depressed reimbursement for ONS, resulting in Plaintiff incurring more out-of-pocket expense than she would have absent the unlawful conduct alleged herein.

### Provider Plaintiffs

26.     Plaintiff Dr. Stephen D. Henry is an internist providing primary care, with a specialty in HIV treatment, at a private solo practice in Pasadena, California. Dr. Henry is a resident of the State of California and is licensed to practice medicine in California. Dr. Henry has provided ONS to subscribers enrolled in plans insured or administered by WellPoint and has been damaged thereby as described herein. Dr. Henry is included in the definition of each of the Provider classes and subclasses alleged herein.

27.     Plaintiff Dr. James G. Schwendig is a trauma surgeon at Scripps Memorial Hospital in La Jolla, California. Dr. Schwendig is a resident of the State of California and is licensed to practice medicine in California.  Dr. Schwendig has provided ONS to subscribers enrolled in plans insured or administered by WellPoint and has been damaged thereby as described herein. Dr. Schwendig is included in the definition of each of the Provider classes and subclasses alleged herein.

28.     Plaintiff Dr. James Peck, Psy.D., is a clinical psychologist who specializes in treating individuals with co-occurring mental health and substance abuse disorders, and individuals with HIV/AIDS and co-occurring mental health and/or substance abuse disorders.  In addition to his work at UCLA, Dr. Peck also maintains a separate private practice in Santa Monica, California. He is a resident of the State of California and is licensed to practice psychology in California. Dr. Peck has provided ONS to subscribers enrolled in plans insured or administered by

First Consolidated Amended Complaint

1  WellPoint and has been damaged thereby as described herein. Dr. Peck is included in
2  the definition of each of the Provider classes and subclasses herein.

3    29. Plaintiff Michael Pariser, Psy.D., is a resident of the State of California
4  who resides in Los Angeles County, California.  At all relevant times since 2004,
5  Dr. Pariser has been and continues to be a licensed psychologist practicing in Los
6  Angeles County who has never been part of WellPoint's network of healthcare
7  providers and therefore has and continues to be deemed an out-of-network provider to
8  insureds covered by employee welfare benefit plans within the meaning of Section 3
9  of ERISA, 29 U.S.C. §1002(1) and non-ERISA plans which were insured and/or
10  administered by WellPoint.  During that time, Dr. Pariser has provided ONS to people
11  enrolled in plans insured or administered by WellPoint and has been damaged thereby
12  as described herein.  Dr. Pariser is included in the definition of each of the Provider
13  classes and subclasses alleged herein.

14    30. Plaintiff Hooman M. Melamed, M.D., is a board-certified orthopedic
15  surgeon, specializing in spinal surgery.  Dr. Melamed practices as part of the D.I.S.C.
16  Group in Marina del Rey, California.  Dr. Melamed is a resident of the State of
17  California and is licensed to practice medicine in California.  Dr. Melamed has
18  provided ONS to subscribers enrolled in plans insured or administered by WellPoint
19  and has been damaged thereby as described herein.  Dr. Melamed is included in the
20  definition of each of the Provider classes and subclasses alleged herein.

21    31. Plaintiff Carmen Kavali, M.D., is a plastic surgeon with a private practice
22  in Atlanta, Georgia.  Dr. Kavali is board certified by the American Board of Plastic
23  Surgery and serves on the staff of Northside Hospital and the Center for Plastic
24  Surgery.  She is a resident of the state of Georgia and is licensed to practice medicine
25  in Georgia.  Dr. Kavali has provided ONS to subscribers enrolled in plans insured or
26  administered by WellPoint and has been damaged thereby as described herein.
27  Dr. Kavali is included in the definition of each of the Provider classes and subclasses
28  alleged herein except for the California subclass.

First Consolidated Amended Complaint

32.     Plaintiff Stephanie Higashi, D.C., is a chiropractic doctor with a private practice ("Mar Vista Institute of Health") in Los Angeles, California. Dr. Higashi is a resident of the State of California and is licensed to practice medicine in California. Dr. Higashi has provided ONS to subscribers enrolled in plans insured or administered by WellPoint and has been damaged thereby as described herein. Dr. Higashi is included in the definition of the non-ERISA Provider classes and subclasses alleged herein.

33.     Plaintiff North Peninsula Surgical Center, L.P. ("NPSC") is a non-physician out-of-network healthcare provider doing business as Torrance Outpatient Surgery Center. NPSC is a healthcare facility or ambulatory surgical center ("ASC") that specializes in providing surgery, pain management and diagnostic procedures on an outpatient basis. NPSC currently serves the following specialties: Orthopaedics; Gastroenterology/Endoscopy; Ear, Nose & Throat; Pain Management; Gynecology; Spine Surgery; Podiatry; Bariatric Surgery; and Plastic Surgery. NPSC has provided ONS to subscribers enrolled in plans insured or administered by WellPoint and has been damaged thereby as described herein. NPSC is included in the definition of each of the Provider classes ad subclasses alleged herein.

34.     NPSC's surgical facility is located in Torrance, California and is, and at all relative time periods has been, accredited by the Accreditation Association for Ambulatory Health Care ("AAAHC"). The AAAHC presently accredits over 4,000 ASCs. According to the Ambulatory Surgery Center Association ("ASC Association"), over 8 million surgeries are performed yearly at ASCs in the United States.

### *Association Plaintiffs*

35.     Plaintiff American Medical Association ("AMA") is headquartered in Chicago, Illinois. The AMA is a national tax-exempt membership organization that represents the interests of approximately 240,000 physicians, residents and medical students, as well as their patients located in California and throughout the United

States.  Plaintiffs Dr. Henry and Dr. Melamed are active members of the AMA.  As the largest medical association in the United States and as the owner of Current Procedural Terminology ("CPT"), the AMA works to represent its members with respect to payment practices by payors, such as WellPoint, to healthcare providers, particularly physicians.  Both AMA physicians and the AMA in its own capacity have been injured by the egregious acts and practices of Defendants as set forth in this Complaint.

36.    The AMA appears on behalf of itself and its members, and also as a representative of the Litigation Center of the AMA and State Medical Societies.  The Litigation Center was formed in 1995 as a coalition of the AMA and private, voluntary, non-profit state medical societies to represent the views of organized medicine in the courts.  The AMA has individual standing as it has been injured by Defendants' wrongful conduct as described herein.  The AMA also has standing in a representative capacity because the AMA's members have been harmed by Defendants' conduct in the same manner as the Provider Plaintiffs and a strong likelihood exists that AMA members will be harmed in the future.  In addition to the redress it seeks for its own injury, the AMA seeks declaratory and injunctive relief on behalf of its members.

37.    Plaintiff California Medical Association ("CMA") is a non-profit, incorporated professional association of California physicians established in 1856, with its principal place of business in Sacramento, California.  CMA is comprised of more than 35,000 physicians practicing medicine in all specialties and serving patients in all demographics throughout the State of California.   Plaintiffs Dr. Henry, Dr. Melamed and Dr. Schwendig are active members of CMA.  CMA's mission is to promote the art and science of medicine, the care and well-being of patients, the protection of the public health and the betterment of the medical profession.  CMA actively engages in the legislative, judicial, political and regulatory processes to carry

out its mission.  Additionally, CMA regularly engages government and private health plans to advocate for the interests of its members.

38.   CMA has individual standing as it has been injured by WellPoint's wrongful conduct as described herein, including, without limitation, by devoting resources from its Center for Economic Services to help members deal with out-of-network reimbursement practices.  CMA also has standing in a representative capacity because CMA's members have been harmed by Defendants' conduct in the same manner as the Provider Plaintiffs and a strong likelihood exists that CMA members will be harmed in the future.  In addition to the redress it seeks for its own injury, CMA seeks declaratory and injunctive relief on behalf of its members.

39.   Plaintiff Medical Association of Georgia ("MAG") is a non-profit, voluntary professional association of Georgia physicians.  MAG, founded in 1849, is an affiliate of the American Medical Association, and is the largest physician association in Georgia.  Presently, MAG has over 4,200 physician members – most of whom are physicians actively practicing medicine in the State of Georgia.  Dr. Kavali is an active member of MAG.  MAG was founded to promote the art and science of medicine and the improvement of public health.  With these ends in mind, MAG actively works to advocate physician and patient positions in the United States Congress, the Georgia General Assembly, before state and federal courts, and in the private sector with large health plans, hospitals and other entities that significantly affect patient care.

40.   MAG has individual standing because it has been injured by WellPoint's wrongful conduct as alleged herein.  MAG has expended considerable time and resources helping its members deal with issues concerning WellPoint's improper UCR reimbursements.

41.   MAG also has standing in a representative capacity because MAG's members have been harmed by Defendants' conduct in the same manner as the Provider Plaintiffs and a strong likelihood exists that MAG's members will be harmed

First Consolidated Amended Complaint

in the future.   In addition to the redress it seeks for its own injury, MAG seeks declaratory and injunctive relief on behalf of its members.

42.   Plaintiff Connecticut State Medical Society ("CSMS") is a federation of eight component county medical associations, with a total membership exceeding 7,000 physicians and medical students. CSMS itself is a constituent state entity of the American Medical Association.  Founded by the physician-patriots of the American Revolution, the Society operates from a heritage of democratic principles embodied in its Charter and Bylaws.  The philosophy and purpose of the CSMS is to promote the highest standards of medical care in the State of Connecticut, to work to preserve the integrity and independence of physicians, and to support the sanctity of the physician-patient relationship for the benefit of the public by, among other things, facilitating and assisting its physicians in providing top quality care to their patients, providing them with a unified voice and enabling them to take concerted action on behalf of their profession and of their patients, and acting and advocating on their behalf to preserve the ability, independence and freedom of physicians to render the best possible care to every patient.  CSMS physicians have been injured by the acts and practices of Defendants as set forth in this Complaint.  CSMS has standing in a representative capacity because CSMS's members have been harmed by Defendants' conduct in the same manner as the Provider Plaintiffs and a strong likelihood exists that CSMS's members will be harmed in the future.  CSMS seeks declaratory and injunctive relief on behalf of its members.

43.   Plaintiff North Carolina Medical Society ("NCMS") is a North Carolina non-profit corporation organized and existing under the laws of North Carolina since 1849, with its headquarters in Raleigh, North Carolina. NCMS represents over 11,000 members in North Carolina, including licensed physicians, physician assistants, medical interns and residents, medical students and retired physicians.   The philosophy and purpose of NCMS is to promote medical science, medical knowledge, and the highest standards of medical care in North Carolina.  NCMS strives to

First Consolidated Amended Complaint

enhance access to medical care of high quality to all subscribers in North Carolina and to promote high standards in the practice of medicine in an effort to ensure that quality medical care is available to the public by, *inter alia*, promoting competence in the art of medical practice, making the medical profession more useful to the public in the prevention and care of disease and improving the quality of life. NCMS is the largest physician organization in North Carolina. NCMS unifies doctors across North Carolina in all specialties and work settings on issues related to, *inter alia*, the physician-patient relationship, health and insurance regulation, and patient safety. NCMS devotes significant resources to advocating physician viewpoints in the public policy arena. Specifically, NCMS and its member physicians take an active role in issues raised by private companies, institutions, administrative agencies and the North Carolina General Assembly and work to assure that the views of the medical community are presented in an organized and effective fashion.

44.    NCMS has individual standing as it has been injured by Defendants' wrongful conduct as described herein. NCMS also has standing in a representative capacity because NCMS's members have been harmed by Defendants' conduct in the same manner as the Provider Plaintiffs and a strong likelihood exists that NCMS's members will be harmed in the future. In addition to the redress it seeks for its own injury, NCMS seeks declaratory and injunctive relief.

45.    Plaintiff American Podiatric Medical Association ("APMA") was founded in 1912 and is headquartered in Bethesda, Maryland. The APMA is a national non-profit membership organization that represents the interests of the vast majority of the estimated 15,000 podiatrists in the United States as well as their patients located in California and throughout the country. APMA engages in the legislative, judicial, political and regulatory processes to carry out its mission.

46.    APMA has individual standing as it has been injured by Defendants' wrongful conduct as described herein. APMA also has standing in a representative capacity because APMA's members have been harmed by Defendants' conduct in the

1   same manner as the Provider Plaintiffs and a strong likelihood exists that APMA's
2   members will be harmed in the future.  In addition to the redress it seeks for its own
3   injury, APMA seeks declaratory and injunctive relief on behalf of its members.

4        47.    Plaintiff California Chiropractic Association ("CCA") is headquartered in
5   Sacramento, California.  The CCA is a statewide non-profit membership organization
6   established in 1928 that represents the interests of chiropractic doctors and allied
7   industries as well as their patients located in California.  Its mission is to "[p]romote
8   high standards of professionalism and patient care through education, advocacy and
9   accountability."  CCA engages in the legislative, educational, political and regulatory
10  processes to carry out that mission.

11       48.    CCA has individual standing as it has been injured by Defendants'
12  wrongful conduct as described herein.  CCA also has standing in a representative
13  capacity because CCA's members have been harmed by Defendants' conduct in the
14  same manner as the Provider Plaintiffs and a strong likelihood exists that CCA's
15  members will be harmed in the future.  In addition to the redress it seeks for its own
16  injury, CCA seeks declaratory and injunctive relief on behalf of its members.

17       49.    Plaintiff California Psychological Association ("CPA") is headquartered
18  in Sacramento, California.   The CPA is a statewide non-profit membership
19  organization established in 1948 that represents the interests of psychologists and their
20  patients in California.  CPA appears herein on behalf of its membership and has
21  associational standing on behalf of its members who have claims against WellPoint
22  for the violations alleged in this complaint and on their behalf seeks declaratory and
23  injunctive relief.  CPA is an advocate for its members and their patients and engages
24  in the necessary legislative, judicial, political and regulatory processes to carry out its
25  mission.  CPA has sponsored many legislative proposals that have resulted in greater
26  access to mental healthcare services for patients and extended protection of the rights
27  of psychologists to practice to the full extent allowed by law.  Individual Plaintiff
28  Dr. Peck is an active member of CPA.

First Consolidated Amended Complaint

50.     CPA has individual standing as it has been injured by Defendants' wrongful conduct as described herein.  CPA also has standing in a representative capacity because CPA's members have been harmed by Defendants' conduct in the same manner as the Provider Plaintiffs and a strong likelihood exists that CPA's members will be harmed in the future.  Individual Plaintiff Dr. Peck is an active member of CPA.  In addition to the redress it seeks for its own injury, CPA seeks declaratory and injunctive relief on behalf of its members.

### *Defendants*

51.     Defendant UnitedHealth offers, among other things, health insurance products and services.  UnitedHealth is the second largest health insurer in the United States, insuring 29.5 million people nationwide in the second quarter of 2009.  A Minnesota corporation, UnitedHealth's principal place of business is at 9900 Bren Road East, Minnetonka, Minnesota 55343.

52.     Defendant Ingenix is a wholly-owned subsidiary of UnitedHealth and offers a comprehensive line of clinical and cost management solutions for healthcare payers, providers, employers, pharmaceutical manufacturers, government agencies and others.  The company's products and services are represented by four business groups:  (i) software and data services; (ii) publishing; (iii) pharmaceutical services; and (iv) consulting.  Ingenix licenses the use of its proprietary Ingenix Database to insurers who use it to set reimbursement schedules for out-of-network, non-negotiated medical services.  A Minnesota corporation, Ingenix's principal place of business is at 12125 Technology Drive, Eden Prairie, Minnesota 55344.

53.     UnitedHealth and Ingenix are sometimes referred to herein as the "UnitedHealth Defendants."  The UnitedHealth Defendants at all times throughout the Class Period actively participated in the conspiratorial activity alleged herein and are legally responsible for the unlawful conduct because their directors, members, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition.  Alternatively, the

First Consolidated Amended Complaint

15

UnitedHealth Defendants are legally responsible because they acted through, facilitated, dominated, or controlled the actions of each other in furtherance of the unlawful conspiratorial activity alleged herein.

54.     Defendant WellPoint is the country's largest health insurer, insuring more than 34 million persons across the United States as of the second quarter of 2009, including WellPoint-insured Plaintiffs *via* its "Blue Cross of California" Division.  An Indiana corporation, WellPoint has its corporate headquarters at 120 Monument Circle, Indianapolis, Indiana 46204, and is licensed to conduct business in all fifty states.

55.     Blue Cross of California operates through the trade name Anthem Blue Cross and is a subsidiary of Defendant WellPoint.  WellPoint, through Blue Cross of California, issued Evidence of Coverage and Disclosure Forms that were provided to Plaintiffs.  Such Evidence of Coverage and Disclosure Forms provide that Blue Cross of California's customer service departments are located in Oxnard and Los Angeles, California and that claims must be submitted to Blue Cross of California's Los Angeles office.  Blue Cross of California is located at 21555 Oxnard Street, Woodland Hills, California 91367.

56.     WellPoint was created in or around 2004 by the merger of WellPoint Health Networks, Inc. with Anthem, Inc.  The merged companies changed their name to WellPoint, Inc. on or about November 30, 2004.  As the successor entity to Anthem, Inc., WellPoint, Inc., is liable for Anthem's actions both before and after the merger between the two companies.  "WellPoint" is used herein to refer to both the current WellPoint entity and its predecessor entities.

57.     WellPoint serves customers throughout the United States, including California, under various names such as HealthLink, Unicare, and Blue Cross Blue Shield.  WellPoint also serves California insureds through its subsidiary, Blue Cross of California.  While WellPoint operates throughout the United States, nearly 25% of its subscribers reside in California.  WellPoint operates, trades or otherwise does or

First Consolidated Amended Complaint

did business through a variety of subsidiary companies and/or affiliates including, but not limited to, the following:

- Anthem Blue Cross and Blue Shield Plan Administrator, LLC
- Anthem Blue Cross Blue Shield Partnership Plan, Inc.
- Anthem Blue Cross Life and Health Insurance Company
- Anthem Health Plans of Kentucky, Inc., d/b/a/ Anthem Blue Cross and Blue Shield
- Anthem Health Plans of Maine, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Health Plans of New Hampshire, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Health Plans of Virginia, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Health Plans, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Insurance Companies, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Life Insurance Company
- Anthem Life & Disability Insurance Company
- Blue Cross and Blue Shield of Georgia, Inc.
- Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.
- Blue Cross Blue Shield of Wisconsin, d/b/a Anthem Blue Cross and Blue Shield
- Blue Cross of California, d/b/a Anthem Blue Cross
- Blue Cross of California Partnership Plan, Inc., d/b/a Anthem Blue Cross Partnership Plan
- Claim Management Services, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Community Insurance Company, d/b/a Anthem Blue Cross and Blue Shield
- Compcare Health Services Insurance Corporation, d/b/a Anthem Blue Cross and Blue Shield
- Empire HealthChoice Assurance, Inc., d/b/a Empire Blue Cross Blue Shield.
- Empire HealthChoice HMO, Inc., d/b/a Empire Blue Cross Blue Shield HMO

First Consolidated Amended Complaint

- Golden West Health Plan, Inc.
- HealthKeepers, Inc.
- Healthy Alliance Life Insurance Company, d/b/a Anthem Blue Cross and Blue Shield
- HMO Colorado, Inc.
- HMO Colorado, Inc., d/b/a HMO Nevada
- HMO Missouri, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Machigonne, Inc.
- Matthew Thornton Health Plan, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Peninsula Health Care, Inc.
- Priority Health Care, Inc.
- RightCHOICE Managed Care, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield
- UNICARE Health Insurance Company of Texas
- UNICARE Health Insurance Company of the Midwest
- UNICARE Health Plan of Kansas, Inc.
- UNICARE Health Plan of West Virginia, Inc.
- UNICARE Health Plans of Texas, Inc.
- UNICARE Health Plans of the Midwest, Inc.
- UniCare Life & Health Insurance Company
- UNICARE of Texas Health Plans, Inc.
- WellChoice Insurance of New Jersey, Inc.

58. In 2005, WellPoint merged with Defendant WellChoice, Inc. Before that time, WellChoice was the parent company of Defendant WellChoice Insurance of New Jersey and Defendant Empire Blue Cross Blue Shield. Since the 2005 merger, WellPoint, Inc. has served insureds in New York and New Jersey through its subsidiaries, Defendants WellChoice Insurance of New Jersey, Inc. and Empire Blue Cross Blue Shield. As the successor entity to WellChoice, WellChoice Insurance of

New Jersey and Empire Blue Cross Blue Shield, WellPoint is liable for these entities' actions both before and after the merger between WellPoint and WellChoice.

### *Conspirators*

59.     Other natural persons, corporations and entities not named as defendants in this action participated as Conspirators with Defendants, including without limitation:

(a)     Aetna, Inc. ("Aetna") provides health insurance products and related services, including medical, pharmacy, dental, behavioral health, group life, long-term care and disability plans, and medical management capabilities, primarily in the United States.  As of 2009, Aetna is the third largest health insurer in the United States with 16 million members nationwide.  Aetna participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to establish its database of costs for out-of-network healthcare services and/or by using the False UCRs produced by Ingenix to pay claims made by insureds under its health plans.  A Pennsylvania corporation, Aetna's principal place of business is at 151 Farmington Avenue, Hartford, Connecticut 06156.

(b)     Cigna Corporation ("Cigna"), through its subsidiaries, provides healthcare and related benefits in the United States and internationally.  Cigna's healthcare segment offers consumer-directed health plans, health maintenance organizations, network only and point-of-service medical plans, preferred provider plans, and traditional medical indemnity coverage.  As of 2009, Cigna is one of the ten largest health insurers in the United States, insuring 12 million people nationwide. Cigna participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to establish its database of costs for out-of-network healthcare services and/or by using the False UCRs produced by Ingenix to pay claims made by insureds under its health plans.  Cigna is headquartered at Two Liberty Place, 1601 Chestnut Street, Philadelphia, Pennsylvania 19192.

First Consolidated Amended Complaint

(c)      Oxford Health Plans' ("Oxford"), a subsidiary of UnitedHealth, products include its Freedom Network and Liberty Network HMOs, as well as the Freedom Plan and Liberty Plan point-of-service plans.  Oxford participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to establish its database of costs for out-of-network healthcare services and/or by using the False UCRs produced by Ingenix to pay claims made by insureds under its health plans.  Oxford is headquartered at 48 Monroe Turnpike, Trumbull, Connecticut 06611.

(d)      Health Net, Inc. ("Health Net") is among the United States' largest publicly-traded managed healthcare companies.  Health Net offers, among other things, health insurance products and services.  As of 2009, Health Net insures more than two million consumers in the United States.  Health Net participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to establish its database of costs for ONS and/or by using the False UCRs produced by Ingenix to pay claims made by insureds under its health plans.  The company's headquarters is located at 21650 Oxnard St., Woodland Hills, California 91367.

(e)      Health Insurance Association of America ("HIAA"), now known as America's Health Insurance Plans ("AHIP"), is a trade group for the health insurance industry. (AHIP was formed in September 2003 when HIAA merged with the American Association of Health Plans.)  HIAA/AHIP is a national association comprised of a variety of medical entities, including major insurance companies and many of its fellow Insurance Conspirators.  It claims to provide "a unified voice for the community of health insurance plans" by representing the interests of its members on legislative and regulatory issues at the federal and state levels, and by providing conferences and publications for its members.  In 1973, HIAA created a database known as the Prevailing Health Charges System ("PHCS") by obtaining historical charge data for surgical and anesthesia procedures from numerous data contributors, including health insurance companies, third-party payors, and self-insured companies. HIAA later expanded PHCS to include data regarding dental (1977), medical services

First Consolidated Amended Complaint

(1988) and drug and medical equipment sales (1998).  HIAA had committees and advisory groups comprised of various insurance company members that were responsible for PHCS's development and management and which caused the PHCS database to become populated with flawed data.  In October 1998, HIAA sold PHCS to Ingenix, and PHCS is now part of the Ingenix Database.

60.    In addition to Aetna, Cigna, Oxford and Health Net, other health insurance companies, not named as defendants, have participated in the alleged unlawful conspiratorial activity in violation of federal and state law.  Such violations include, among other things, knowingly providing flawed and misleading data to Ingenix for use in developing the Ingenix Database; knowingly acquiescing to flawed and improper manipulation of cost data provided by Ingenix; and knowingly using False UCRs produced by Ingenix in determining ONS reimbursements.

61.    Whenever reference is made to an act, statement, or transaction of any corporation or entity in this Complaint, including each of the Defendants and Conspirators, the allegation means the corporation or entity acted, stated or transacted by or though its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

62.    At all times mentioned in the allegations herein, each and every Defendant and Conspirator was an agent or representative of and aided and abetted the unlawful conduct of each of the other Defendants and Conspirators.  In doing the things alleged herein, each and every Defendant and Conspirator was acting within the course of such agency or representation and was acting with the consent, permission and authorization of the other Defendants and Conspirators.  All actions of each Defendant and Conspirators as alleged herein were ratified and approved by the other Defendants and Conspirators.

## OVERVIEW OF THE CONSPIRACY TO DEPRESS REIMBURSEMENT FOR ONS

63.     The selection and purchase of health insurance is of vital importance to consumers.   According to a recent survey by the New York Attorney General ("NYAG"), obtaining affordable healthcare is the number one concern for purchasing consumers.   The conduct of health insurance companies is vitally important to consumers, as well as physicians.  Defendants and the Conspirators entered into secret and intentionally concealed agreements to depress reimbursements for ONS.  The conspiracy and illegal conduct result in invoicing of inflated and improper charges to and out-of-pocket payments made by and for healthcare consumers.  The conspiracy and illegal conduct also results in underpayment of healthcare providers for services rendered, and in damages to certain of the Association Plaintiffs which devote resources to identify, dispute and combat the improperly low reimbursements to healthcare providers.

64.     Many health insurers, including WellPoint and the Insurer Conspirators, offer health insurance plans that differentiate between coverage for medical treatment provided by (i) in-network providers who have negotiated discounted rates with the insurer and (ii) out-of-network providers who charge insured consumers their usual, non-discounted rates.  Health insurance plans that permit subscribers to seek medical care from out-of-network providers, and be reimbursed for those services, are more expensive (*i.e.*, require higher premium payments) than plans that limit members' coverage to care provided by in-network providers, leave the consumer obligated to pay any shortfall in insurer reimbursements to healthcare providers for ONS, and are more expensive than plans that limit members' coverage to care provided by in-network providers and require higher premium payments.

65.     For members, such as the Subscriber Plaintiffs, who have paid higher premiums in exchange for the flexibility and right to obtain out-of-network benefits, health insurers including WellPoint and the Insurer Conspirators promise to reimburse

First Consolidated Amended Complaint

for ONS at a percentage of the lesser of either (i) the actual amount of their medical bills or (ii) the UCR charged by providers in the same or similar geographic area for substantially the same service. Physicians and other healthcare providers, such as the Provider Plaintiffs, agree to treat patients who are not insured under a healthcare network with which they affiliate (*i.e.*, who are not in-network patients) based in part on the patient's "assignment" of its healthcare benefits (the ONS reimbursement) to the provider. However, the Insurer Conspirators actually reimburse their members and (where the patient has assigned benefits), healthcare providers, at a rate that is much lower than the UCR for the services rendered.

66.     Plaintiffs' claims in this case are directed at a secret, illegal agreement and deceptive scheme involving Defendants and most of the country's largest health insurers to systemically under-reimburse for ONS. During the Relevant Time Period), the Insurer Conspirators agreed to fix the UCRs used to reimburse for ONS at artificially low levels. Pursuant to this agreement, Defendants and their Conspirators knowingly created a flawed system that uses limited amounts of manipulated data to artificially depress reimbursement rates for ONS.

67.     Defendants' conduct affects millions of consumers and healthcare providers nationwide, including the Subscriber, Provider and Association Plaintiffs and the Subscriber and Provider Classes. The instrument used to accomplish their conspiracy is the Prevailing Healthcare Charges System (PHCS) database, and a related platform known as the Medical Data Research (MDR) database – together, these data services platforms are owned and maintained by Ingenix, Inc. The PHCS and MDR databases are described hereinafter as the "Ingenix Database." WellPoint and the Insurer Conspirators contract with Ingenix (which is owned and operated by insurer UnitedHealth) to (i) provide ONS data claims to Ingenix and (ii) receive uniform pricing UCR schedules from Ingenix based on the data they submit. The uniform pricing schedules provide a price range that purportedly reflects the UCR for

First Consolidated Amended Complaint

1    the services rendered in the patients' geographic area.  The Insurer Conspirators then

2    determine what ONS reimbursement they will pay based on that range.

3        68.    Unbeknownst to Plaintiffs, healthcare consumers and providers

4    nationwide, Defendants and the Conspirators have conspired to ensure that the UCR

5    pricing schedules generated by Ingenix are artificially low ("False UCRs").  When the

6    Insurer Conspirators then use those schedules to calculate ONS reimbursements, the

7    resulting payments to subscribers and providers are artificially low and substantially

8    below the actual UCR for similar services in the relevant geographic area.  After an

9    extensive investigation of ONS, the NYAG's office concluded that Ingenix under-

10   reported UCRs for doctor visits in New York State by 10%-28%.  The effect of

11   artificially low UCRs on healthcare consumers was then magnified by insurers

12   applying these artificially low UCRs in the ONS reimbursement process.  For

13   example, assume that the actual UCR for a particular ONS is $125 and the insurer has

14   agreed to reimburse 80% of the UCR.  In this scenario, the insurer would reimburse

15   $100 to the provider, and the healthcare consumer would be responsible for the

16   remaining 20%, or $25.  If the UCR is artificially depressed by 10%, then it drops

17   from $125 to $112.50 (the False UCR) and the insurer reimburses 80% of that lower

18   amount, which is $90.  The consumer is then responsible for 100% of the difference

19   between the actual UCR and the False UCR, which in this scenario is $12.50, plus

20   20% of the False UCR remaining after the insurer calculates its 80% reimbursement,

21   which is $22.50.  This raises the amount the healthcare consumer paid for this

22   particular ONS from $25 to $35.  As a result, WellPoint and the Insurer Conspirators'

23   ability to artificially depress the UCR by 10% on a $125 medical service results is a

24   40% increase in cost to the healthcare consumer in this example.  If the UCR is

25   depressed by 28%, the cost to the consumer for this example, ONS rises from $25 to

26   $53, an increase of 112%.

27       69.    Ingenix serves as the conduit for the conspiracy and is the hidden profit

28   engine of the health insurance business.  Ingenix contracts with most of the country's

First Consolidated Amended Complaint

largest health insurers, including the Insurer Conspirators, to provide UCR claims data. WellPoint, along with the Insurer Conspirators, contributes over 70% of the billing information included in the Ingenix Database. After Ingenix collects the data, it aggregates and manipulates the data, and creates False UCR schedules that are sold to the same health insurers that provided the data in the first place. Defendants and the Conspirators know the Ingenix data collection, aggregation and manipulation process is, and has been, seriously and systemically flawed, and that the result must be artificially low UCR schedules. By using False UCR schedules, the Insurer Conspirators were able to under-reimburse the Subscriber and Provider Plaintiffs and the Classes for ONS.

70. The Insurer Conspirators hid this scheme, including the existence and purpose of the Ingenix Database, through a series of material misrepresentations and omissions. Neither WellPoint, nor any of the other Insurer Conspirators, disclose to their insureds that the database used to determine reimbursement rates for ONS is owned and operated as a for-profit business enterprise by one of the country's largest health insurers. There is an inherent and irreconcilable conflict of interest in using a price-setting mechanism (the Ingenix Database) that is owned by UnitedHealth, controlled by Defendants and the Conspirators, and based entirely on information provided by them. The Insurer Conspirators have an incentive to artificially deflate the amounts they have to reimburse for ONS; their use of the Ingenix Database results in systematic under-reimbursement of charges incurred by their members for ONS.

71. Until recent news reports detailed the NYAG's investigation, the process of setting UCRs used to determine ONS reimbursement was effectively hidden from consumers who purchase and/or participate in health insurance programs and from their healthcare providers. This lack of transparency was facilitated by the following practices:

- In their healthcare plans, Defendants and the Insurer Conspirators affirmatively represented they would accurately reimburse ONS based on UCRs;

- Defendants and the Insurer Conspirators did not disclose a fundamental conflict of interest, *i.e.*, the Ingenix Database is owned and controlled by UnitedHealth and produces UCRs based entirely on an intentionally limited set of unverified data provided by Defendants and the Insurer Conspirators identified herein;

- Defendants concealed they and the other Insurer Conspirators regularly and intentionally excluded certain data points representing higher charges before submitting their data to Ingenix, with the intention and consequence of depressing the resulting UCRs and thus enabling them to under-reimburse for ONS; and

- Defendants concealed that Ingenix further manipulates the data it receives from the Insurer Conspirators to disproportionately remove from its calculations data points that would result in higher reimbursement rates for ONS.

72. The Subscriber and Provider Plaintiffs and the other members of the Classes who purchased or provided ONS from WellPoint were not aware of the foregoing.

73. The effect of Defendants' unlawful conduct and misrepresentations on healthcare subscribers, including the Subscriber Plaintiffs herein, is profound and multifaceted. The overall out-of-pocket costs of healthcare insurance and the ability to choose providers are the two most important and material aspects of healthcare to consumers. Defendants' conspiracy and misrepresentations materially affect both of these aspects of healthcare since Defendants represent through their advertising and plan contracts that they will permit their members to choose between in-network and out-of-network providers, and that members will be reimbursed for ONS based on the

26

First Consolidated Amended Complaint

UCR. But Defendants do not reimburse for ONS based on the true UCR, instead they utilize False UCRs; thereby dramatically increasing the costs to consumers of using ONS (*i.e.*, causing the Subscriber Plaintiffs to pay any increased amount between the actual charges for ONS and the amount reduced based on the False UCRs. Defendants' actions result in Subscriber Plaintiffs seeking services from in-network physicians or other healthcare providers who charge rates the relevant insurance network (including WellPoint and the Insurer Conspirators) has previously agreed to pay.

74.    The involvement of virtually all of the leading players in the health insurance industry, including WellPoint and the Insurer Conspirators, in the scheme has also eliminated the possibility that health insurers would compete on the basis of ONS reimbursement. WellPoint and the Insurer Conspirators' collective participation in the scheme to fix UCRs and ONS reimbursements through the Ingenix Database has ensured Ingenix's dominance in the UCR data market.

75.    Defendants' conspiracy and deceitful business practices also forced the Provider Plaintiffs to expend significant time and resources identifying, disputing, appealing and negotiating over improper ONS reimbursement determinations. Frequently, healthcare providers, such as the Provider Plaintiffs, are unable to collect the balance of their market-based fee for services rendered from their insured patients, resulting in underpayment. Artificially suppressed reimbursement rates for ONS also exert pressure on healthcare providers, including the Provider Plaintiffs, to become in-network participating providers. By joining an insurer's network, a provider locks in contracted (albeit, much lower) rates for their services, and eliminates the substantial costs and uncertainties associated with providing ONS. Additionally, out-of-network patients are less likely to be long-term customers because of the artificially high costs of receiving ONS – usually not discovered by the patient until after an ONS has been rendered and payment becomes due. Patients surprised by the high bills remaining for them to pay out of pocket due to artificially low insurer reimbursements on ONS, have

First Consolidated Amended Complaint

1   a significant incentive to seek care from an in-network provider the next time they

2   require medical services, thereby leaving ONS providers at a competitive

3   disadvantage.

4        76.    The Association Plaintiffs represent thousands of physicians and other

5   healthcare providers throughout the country who are similarly injured by Defendants'

6   conspiratorial misconduct. Certain of the Association Plaintiffs themselves are also

7   directly injured because they expend their money, time and resources dealing with the

8   many issues created by Defendants' practices.

9        77.    Plaintiffs allege (i) direct agreements in the form of contracts between

10   Ingenix and many of the country's largest health insurers, including WellPoint, to

11   obtain and/or provide UCR pricing information and (ii) a lengthy chronology of facts

12   that demonstrates a conspiracy between and among the Insurer Conspirators to use

13   Ingenix to develop False UCRs, which in turn are used to determine the amount to

14   reimburse subscribers and/or assignee-providers for ONS. Rather than compete

15   against each other with respect to ONS reimbursement rates, the Insurer Conspirators

16   operated collectively to suppress UCRs, thus lowering the cost to each insurer when

17   paying ONS claims and depriving their insureds of the benefits for which they had

18   subscribed and paid premiums. The pressure on providers to become participating "in

19   network" providers reduced the total number of providers offering care on an out-of-

20   network basis and increases the number of providers who have agreed to be bound by

21   the health insurers' fee schedules. By conspiring to artificially lower UCRs, the

22   Insurer Conspirators reduced competition both for their insurance products and for

23   medical services provided to their plan members on an out-of-network basis.

24                              **ANTITRUST ALLEGATIONS**

25                            ***Interstate Trade and Commerce***

26        78.    Defendants market, distribute, sell or otherwise provide health insurance

27   coverage and administer and/or operate health insurance coverage plans, including

28   plans that provide ONS coverage, to persons throughout the United States, using the

First Consolidated Amended Complaint

means and instrumentalities of interstate trade and commerce. Accordingly, Defendants' unlawful activity had and has a direct, substantial, and reasonably foreseeable effect upon interstate trade and commerce.

79.     Defendants have committed, and conspired to commit, with their direct competitors including, *inter alia*, the Insurer Conspirators, and/or with other third parties, numerous violations of the Sherman Antitrust Act, 15 U.S.C. §1 *et seq*. Defendants have combined, conspired and/or agreed with other parties to unreasonably restrain trade in violation of Section 1 of the Sherman Act by price fixing with regard to paying reasonable and customary rates for non-party transactions. Defendants' conduct alleged herein constitutes both a *per se* and Rule of Reason claim under the Sherman Act.

80.     WellPoint reached an agreement with the Insurance Conspirators, who are direct competitors, including UnitedHealth *via* its alter ego Ingenix to determine maximum UCRs using primarily the Ingenix Database, as described herein, even while knowing that use of the database would result in artificially low reimbursements to Subscriber and Provider Class members. The concerted action among these "competitors," including Defendants and the Insurance Conspirators, has resulted in unlawful and anticompetitive price fixing agreements, and other horizontal restraints of trade and anticompetitive behavior. This unreasonable horizontal restraint on trade is a *per se* violation of §1 of the Sherman Act.

81.     Defendants engaged in price fixing when they agreed with their Conspirators to utilize precisely the same flawed database to determine the UCR amounts for out-of-network medical services, which lead to them paying substantially the same reduced amounts for services rendered to their subscribers.

82.     Defendants' agreement also gives them, collectively with their competitors, tremendous power to set UCRs well below those which would exist in a competitive marketplace. In fact, no competitive pressure to raise UCRs exists while all the Conspirators act collectively to reduce prices. Without agreement and

First Consolidated Amended Complaint

1  collective action between them, including the exchange and compilation of relevant
2  pricing data, WellPoint and the Insurer Conspirators would be unable to
3  systematically and across the board reduce their UCRs paid.  This agreement to fix
4  prices is an unreasonable restraint on trade and a *per se* violation of §1 of the Sherman
5  Act.

6      83.    The Department of Justice Antitrust Division notes in its Price Fixing
7  "Primer" that price fixing agreement can take many forms.  "[A]ny agreement that
8  restricts price competitions violates the law."  It adds that "examples of price-fixing
9  agreements" include those to:

10          (a)    establish or adhere to price discounts;

11          (b)    hold prices firm;

12          (c)    adopt a standard formula for computing prices; and

13          (d)    adhere to a minimum fee or price schedule.

14  http://www.usdoj.gov/atr/public/guidelines/211578.htm.

15      84.    Defendants, along with the Conspirators, adopted a standard formula for
16  making UCR determinations, based on a database that is designed and intended to
17  reduce reported charges artificially, and each has agreed to a method of determining
18  the maximum price or fee, *via* database schedule, that it will pay for out-of-network
19  charges.  This alone amounts to a horizontal agreement to fix prices which is *per se*
20  illegal.

21                          ***Relevant Market***

22      85.    The relevant product market is the market for data used to calculate
23  UCRs for reimbursement of claims by health insurance beneficiaries for out-of-
24  network, non-negotiated medical services (the "Data Market").  The Data Market is
25  directly and inextricably linked to the market for ONS (the "Linked ONS Market") in
26  that the Data Market constitutes the primary input to the Linked ONS Market, and the
27  Insurer Conspirators use the Data Market to control and depress amounts reimbursed
28  in the Linked ONS Market.

First Consolidated Amended Complaint

86.     The relevant geographic market is the United States.

87.     UCR constitutes the critical element in the reimbursement formula applied under each insurance plan and operates as a ceiling to cap the amount that will be reimbursed to Subscribers.  Subscribers in the Linked ONS Market are obligated to pay whatever portion of the fee charged for ONS is over and above the False UCR chosen by the Insurer Conspirators.  As a result, and as noted above (*see* Harm to Subscribers, Providers and Association, *infra*), for every dollar the Insurer Conspirators are able to decrease their reimbursement cost through their unlawful conspiracy, there is a corresponding dollar of increase to the affected Subscriber's healthcare costs.  Thus, although the Plaintiffs and Classes were not competitors of the Insurer Conspirators in the Data Market when the False UCRs were set by WellPoint and the Conspirators, the injury they suffered was inextricably linked with the competitive harm arising from the Insurer Conspirators' agreement to use False UCRs to depress and set a ceiling for ONS reimbursements.

88.     Healthcare consumers are unable to protect themselves from the increased costs except by giving up the benefit of the bargain they made with their insurer – *i.e.*, that they pay higher monthly premiums in exchange for the right to seek out-of-network treatment and receive reimbursements for a percentage of the "usual and customary" cost of the out-of-network provider's services.  Additionally, ONS providers suffer a competitive disadvantage compared with in-network providers; inevitably, the injury caused by that competitive disadvantage is borne by insured healthcare consumers, including members of the Classes.  These facts, in turn, reinforce the competitive harm created in the Linked ONS Market by forcing out-of-network providers to become participating, in-network providers with the Insurer Conspirators in order to maintain patients.

89.     By agreeing to joint control and administration of the Data Market, the Insurer Conspirators are able to assure that the reimbursements they pay in the Linked ONS Market will be artificially depressed, leading to collective cost-savings with the

First Consolidated Amended Complaint

corresponding increased costs borne by insured consumers (who are the purchasers of ONS) and providers.

90.   The majority of major health insurers, including WellPoint and the Insurer Conspirators, have agreed to use the Ingenix Database to determine UCRs for reimbursing ONS claims.   The UnitedHealth Defendants promote the Ingenix Database as the "industry standard" for determining UCRs.  Insurance companies use this marketing line to imbue their artificially low reimbursements for ONS with the appearance of legitimacy and accuracy.  Given the Ingenix Database's broad-based adoption by the largest health insurers, including the Insurer Conspirators named herein who collectively cover approximately 93.5 million privately insured healthcare consumers in the United States, Ingenix clearly possesses market power in the Data Market.

91.   The Data Market is conducive to the collusion alleged herein.  The Data Market has high barriers to entry that make it difficult for any non-conspiring firm to provide a service that competes with Ingenix, despite the fact that Ingenix has proven to be highly profitable.  Ingenix's profit margins are approximately 20%, compared to 10% for UnitedHealth as a whole.  Such barriers to entry in the Data Market include: the costs of obtaining historical and current insurers' data; the costs of constructing, developing, and maintaining hardware and software platforms necessary to analyze, aggregate and disseminate the data; and the costs of successfully convincing insurers to adopt the services.  Absent a conspiracy, it would be in the best interest of each of the Insurer Conspirators to encourage a competing data provider in order to lower their own cost of procuring UCR information.  However, if such a competitor existed and objectively and accurately reported customary charges, UCRs would materially increase, which would materially increase reimbursements insurers would have to pay to consumers, thus wiping out any potential cost savings normally achieved by competition.  Accordingly, the Insurer Conspirators have agreed to refrain from

supplying their own charge data to other potential vendors.  This conduct would be greatly against their individual self interest, barring the existence of the conspiracy.

92.    The NYAG settlement agreements discussed below confirm the high barriers to entry in the Data Market.  To free consumers and healthcare providers from the trap of the Ingenix conspiracy, the NYAG obtained pledges of nearly $100 million from many of the Insurer Conspirators, including WellPoint, UnitedHealth, Aetna, CIGNA, and Health Net, to build a new, independent database to be run by a non-profit organization.

93.    The Data Market is a mature market, having been in existence for decades.  There are few competitors and, as described herein, the market has been marked by consolidation among those few competitors, such that Ingenix now provides the vast majority of data in this market.

### Communication Opportunities

94.    Defendants and the Insurance Conspirators had, and continue to have, ample opportunities to communicate, and have communicated, among themselves about the conspiracy and combination alleged herein, including the collection and dissemination of data used to establish the UCRs for calculating reimbursement for ONS.  These communications occurred routinely, including, but not limited to, at HIAA/AHIP conferences and board meetings where Defendant WellPoint was, and is, a board member and participated in meetings about the Data Market and the use of Ingenix by the Insurance Conspirators.  Under the terms of the licensing agreements that govern the use of the Ingenix Database, UnitedHealth, WellPoint and other Insurer Conspirators are in almost constant communication with Ingenix.

### Collective Interests

95.    Given the existence of the conspiracy, it is in the collective interest of the Insurer Conspirators to agree to provide inaccurate, artificially low healthcare provider charge information to Ingenix for use in its database.  As cartel members, it is contrary to their collective interests to provide accurate reimbursement rates

First Consolidated Amended Complaint

because each of the Insurer Conspirators uses the Ingenix Database for the calculation of ONS reimbursement. If any Insurer Conspirator were to cheat on the cartel and provide transparent pricing information that accurately reported healthcare provider charges, that accurate information would precipitate competition for ONS reimbursement, resulting in a loss of market share, revenue, and customers by cartel members.

96. Absent the conspiracy, the Insurer Conspirators would each have an incentive to set UCRs accurately and competitively in order to make their insurance products with ONS coverage more attractive to consumers and thus sell a larger number of policies. Their failure to do so is an action against individual self-interest but in favor of their collective conspiratorial interest and provides further evidence of the conspiracy. In purchasing health insurance products, consumers are able to compare virtually all plan provisions to determine which offers the most attractive mix of benefits. Plans are routinely compared based upon co-pay levels, deductibles, out-of-pocket maximums, numbers of covered visits, pre-existing condition coverage, drug benefits, availability of mental health benefits and numerous other provisions. But when it comes to UCRs, the Insurer Conspirators hide their price terms, which are based on the uniform pricing schedules disseminated by Ingenix. The Insurer Conspirators provide no information about either the amount of their established UCRs, the manner in which those UCRs are calculated and determined, the relationship between those UCRs and amounts actually charged by healthcare providers in the consumer's locale, or the fact that the UCRs are set in cooperation with other insurers through the use of a shared platform. Instead of providing such information, which would allow consumers to compare the value of ONS benefits, including pricing, in the same way they compare other plan provisions, the Insurer Conspirators routinely mislead consumers by including language to the effect that reimbursement will be based on the lesser of the UCR or the actual charge imposed by the healthcare provider, when they are aware that the False UCR has been artificially

First Consolidated Amended Complaint

1  deflated by them such that the False UCR will almost always be far lower than the
2  actual charges imposed by ONS providers.

3      97.    Due to the lack of transparency in the determination of UCRs and ONS
4  reimbursement as alleged herein, as well as non-disclosure agreements by the Insurer
5  Conspirators not to provide data to potential competitors of Ingenix, there is no
6  competition among the Insurer Conspirators with respect to the determination of
7  UCRs or the ONS reimbursement. Members of the Insurer Conspirators' health plans
8  themselves have no reasonable alternative other than to accept whatever ONS
9  reimbursement is offered by their insurer.

10                ***The Ingenix Database: Mechanism of the Conspiracy***

11      98.    The roots of the Ingenix Database lie in the PHCS database formerly
12  owned and operated by HIAA.

13      99.    From 1973 to the present, those HIAA/AHIP members included, and
14  continue to include, virtually every major health insurer in the United States. At the
15  time of drafting this complaint, the Board of Directors of AHIP includes executives of
16  Defendants and the Conspirators, including, but not limited to, the President and CEO
17  of WellPoint and at least two executive vice presidents at UnitedHealth.

18      100.    Upon its inception in 1973, various committees within HIAA, composed
19  of HIAA members, developed and managed the PHCS database making decisions
20  concerning the operation and design of the database. HIAA initially created the PHCS
21  as a way to aggregate and compile physician charge data as a service to its members.
22  HIAA compiled information from its vast pool of member-insurers to create the
23  PHCS, which initially pertained to surgical and anesthesia procedures, but within five
24  years began to include dental, medical and drug/medical equipment rates.

25      101.    Once created, the PHCS became the largest pool of charge data for
26  medical services in the country and was considered to be the nation's largest database
27  of provider charges for private healthcare services – *i.e.*, the rates charged by
28  physicians and other private healthcare providers. It contained data from more than

First Consolidated Amended Complaint

150 contributors from 50 states, the District of Columbia, Puerto Rico and the Virgin Islands. The information HIAA compiled (collected from its member-insurers), however, consisted of only four data points: the date of service, the Current Procedure Terminology ("CPT") code, the amount of the billed charge, and the geo-zip. CPT codes are a system by which the Plaintiff American Medical Association categorizes all medical services by five-digit codes. "Geo-zips" are portions of states comprised of cities and towns sharing three digits of postal zip codes, which Ingenix grouped together because of geographic proximity and what it arbitrarily decided were "data similarities."

102. The four data points were the only information that HIAA sought from its members to create the PHCS. HIAA (*via* its committees and Board of Directors) consciously decided to limit the amount of information it received from contributors to create the PHCS. In its own documents, HIAA stated that the data was limited and that even the quality of the data was "questionable." Once HIAA obtained the "questionable" data, it compiled the various submissions and created the PHCS which it then submitted to its members as a service. HIAA expressly informed insurers the PHCS was not intended to be used to establish UCRs.

103. Thus, the PHCS was built on submissions from health insurance companies, but was not designed to determine precise reimbursement amounts. Rather, it was intended only to provide a general idea about prevailing charges in a given area based upon the admittedly limited data HIAA collected to create the initial PHCS.

104. Indeed, HIAA submitted the following disclaimer with the PHCS data it provided insurers:

> The DATA, whether actual charge data, derived charge data conversion factor data or length of stay data, are provided to the LICENSEE for information purposes only. The HIAA disclaims any endorsement, approval or recommendation of the DATA. There is neither a stated nor

First Consolidated Amended Complaint

an implied 'reasonable and customary' charge, either actual or derived; neither is there a stated nor an implied 'reasonable and customary' conversion factor or length of stay. Any interpretation and/or use of the DATA by the LICENSEE is solely and exclusively at the discretion of the LICENSEE. THE LICENSEE MUST NOT represent the DATA in any way other than as expressed in this paragraph.

### Ingenix Acquires Existing Databases to Dominate Data Market

105. In October 1998, the members of HIAA (including WellPoint) agreed to sell the PHCS to Ingenix for an undisclosed amount. This was part of a plan by Ingenix and its parent company, UnitedHealth, to acquire a dominant position in the market for the provision of data services used to calculate UCR that included over 50 acquisitions. Just prior to the PHCS purchase, in December 1997, Ingenix purchased the Medical Data Research ("MDR") database of derived data from Medicode, Inc. Ingenix would later effectively merge those two databases to form what has herein been referred to as the Ingenix Database.

106. Under the terms of the 1998 sale of PHCS to Ingenix, HIAA and Ingenix agreed to have member companies participate in an ongoing Ingenix PHCS Advisory Committee, of which WellPoint is and was a member, which would have input as to what data Ingenix used and how Ingenix used it. All HIAA staffers who then worked on the PHCS were offered positions with Ingenix.

107. Accompanying the sale to Ingenix, HIAA and Ingenix agreed to a 10-year Cooperation Agreement which provided HIAA with continued input in the development and operation of the PHCS and provided for lasting co-mingling of the two entities in the form of a "Liaison Committee" to advise and evaluate Ingenix. The Cooperation Agreement further provided that Ingenix would charge HIAA members 50% less than non-HIAA members for use of the database and Ingenix, an otherwise highly profitable arm of UnitedHealth, and would waive all fees for HIAA members that contributed twice the required minimum annual data input. This conduct is

First Consolidated Amended Complaint

contrary to the individual self-interest of a profit-maximizing firm such as UnitedHealth and was a *quid pro quo* for members of the cartel in return for their agreeing not to provide the data they submitted to Ingenix to another potential database developer.

108.   Ingenix, upon purchasing the PHCS, entered into a Confidentiality Agreement mandating that it shield from disclosure the identity of entities (*i.e.*, the Defendants and Insurer Conspirators in this action) that had submitted or would submit information for use in the database.  At the time of the sale of the PHCS to Ingenix, and as a condition thereto, UnitedHealth agreed to become a member of HIAA, but did not have to pay any membership dues during the duration of the 10-year Cooperation Agreement.

109.   By and through the creation and eventual domination of the Data Market by Ingenix, Defendants and the Conspirators conspired and agreed to create, expand, continue, promote and use the Ingenix Database to control and set False UCRs among and between purported horizontal competitors in the health insurance market (including WellPoint and the Insurer Conspirators) with the ultimate aim of reimbursing ONS below market levels.

### Defendants Effectuate Their Conspiracy and Anticompetitive Agreement By and Through the Ingenix Database

110.   The way in which the Ingenix Database has operated and continues to operate, and the manner in which the Insurer Conspirators utilize the Ingenix Database, demonstrate the anticompetitive agreement to establish False UCRs persists to the present.

111.   Ingenix is a self-styled nationwide "healthcare information company" that sells "customized fee analyzers" to medical providers, healthcare insurers and automobile liability insurance companies.  Essentially, Ingenix creates "modules" or uniform pricing schedules, which provide whole dollar-payment ranges for given medical procedures in various locations.  The UnitedHealth Defendants market the

Ingenix Database as the "industry standard," and all users of the database, *i.e.*, the Insurer Conspirators, are given schedules containing precisely the same dollar amount ranges for each particular procedure and area.   Defendants and the Insurer Conspirators all then use the same Ingenix-established UCR schedules to reimburse for ONS.

### Agreements to Provide and Utilize False Data

112.   To create the database, Ingenix first enters into contracts/licensing agreements with health insurers, including Defendants WellPoint and UnitedHealth, as well as the other Insurer Conspirators, to (i) obtain data regarding billing rates and information *from those health insurers* and/or (ii) provide UCR uniform pricing schedules *to those same health insurers*, including the Insurer Conspirators, for their use in reimbursing for ONS.   Ingenix offers the Ingenix Database and its uniform UCR pricing schedules to health insurers at a discounted rate if those insurers agree to provide data to Ingenix to create that very database.   The amount of discount received by each data contributor is based on how much of their information is accepted and used by Ingenix.   All of the Insurer Conspirators provide raw pricing data to Ingenix and receive UCR pricing data in return.   Ingenix uses the billing data provided by the Insurer Conspirators to create False UCR schedules, and those False UCR schedules in turn are used by the Insurer Conspirators to determine how much to reimburse their members for ONS.

113.   For the creation and continued updating of its database, Ingenix relies entirely on accumulating data from its various information providers (including Defendants and their Insurer Conspirators) *via* its "data contribution program" where those health insurers that are Ingenix clients submit information about the amounts they purport to have been billed by an undisclosed number of unidentified healthcare providers for specific CPT codes.   The data Ingenix receives has been termed a "convenience sample."

114.   For example, when a WellPoint subscriber is provided ONS by a healthcare provider, that provider submits a standardized claims procedure form to WellPoint.   WellPoint then extracts information from that form and purportedly submits it to Ingenix.   However, the only information that Ingenix accepts on its claims forms are the following four data points:  (i) the date of service; (ii) the CPT code; (iii) the zip code where the service was provided; and (iv) the amount billed by the provider.

115.   In or around 2005, members of HIAA (which by then had changed its name to AHIP), including WellPoint, discussed submitting more than these four data points to Ingenix because they expressly recognized the four data points were inadequate to calculate accurate UCRs.   Despite this express acknowledgement, Defendants and the Conspirators agreed to continue only to submit the four above-listed elements to Ingenix.   Defendants and the Conspirators understood and agreed that Ingenix would continue to base UCRs on the same insufficient data points it had always been using.  By that decision, Defendants and their Conspirators affirmatively determined to continue to only enter and submit the four data points.  In doing so, they also affirmatively determined to continue to ignore other material information relevant (and indeed crucial to) pricing, including, but not limited to:

(a)   where the services were rendered (*i.e.*, doctor's office, trauma center, clinic, hospital, nursing home, *etc.*);

(b)   what type of provider performed the service (*i.e.*, licensed specialist, general practitioner, nurse practitioner, *etc.*);

(c)   the number of providers of the service in the specific geographic area at issue;

(d)   the level of experience or training of the provider;

(e)   the complexity of the procedure under the circumstances or the existence of special circumstances;

(f)   the resources expended to perform the procedure;

First Consolidated Amended Complaint

40

1            (g)    age or condition of the patient; and

2            (h)    cost of living adjustments, if any.

3      116.   None of the Insurer Conspirators ever advised their members of the
4 inadequacy of the four data points or of their failure and refusal to expand those data
5 points.

6      117.   The Ingenix Database also is manipulated by the health insurance
7 companies (including WellPoint and the Insurer Conspirators) that submit data to
8 Ingenix.   Prior to submission to Ingenix, health insurers first "scrub" claims
9 submissions forms to remove the highest charges, thereby submitting only the lowest
10 claims amounts.  This results in a lower reported average cost.  In 2005, Ingenix
11 changed its data contribution forms to require data contributors to certify with each
12 submission that the contributed data was complete and was not pre-edited or otherwise
13 manipulated. At this point, WellPoint began to provide those required certifications to
14 Ingenix attesting to the fact that its data submission was complete and not pre-edited.
15 WellPoint knew, and continues to know, that those certifications are false and
16 misleading because it, like other Insurer Conspirators, continues to "scrub," pre-edit or
17 otherwise manipulate the data it contributes to Ingenix.

18      118.   Once Ingenix receives the data contribution forms, it then combines
19 information from all the contributing health insurers (including the Insurer
20 Conspirators).   Thereafter, Ingenix further **decreases** the amount of specificity
21 provided on the data contribution forms by removing any "modifiers" contained on
22 those forms. Modifiers are two-digit numbers that providers add to a five-digit CPT
23 code to signify an alteration of the stated service or otherwise identify the
24 circumstances in which the service was provided.  Once Ingenix removes the
25 modifier, the charge is then given equal weight to the charge corresponding to that
26 unmodified CPT code, notwithstanding that the service was provided under altered
27 conditions.

28

119.   Ingenix next edits the pooled data to remove high-end values.  Ingenix does so by using formulaic edits to identify purported statistical outliers and automatically removes them without factual basis or further investigation to determine if they are truly incorrect data points (and should be removed) or are simply valid, high charges.  The incorrect removal of valid high charges further biases the data set downward.  Ingenix also excludes any data it deems "unreliable," but no information is available about what factors Ingenix uses to determine when a billed charge is deemed unreliable.

120.   The Ingenix Database does not tabulate data according to the specific geographic area where a UCR actually would apply.  Instead, Ingenix divides all states into geo-zips.  Geo-zips are not medical service areas amenable to cost comparison.  Ingenix makes no effort to determine what areas should be treated as equivalent or comparable medical service market areas.

121.   Ingenix purports to "warn" its customers, including the other Defendants here, that its geo-zips do not represent a medical service market area:

> Because the fee ranges in the Analyzer are based on the first three digits
> of your geo-zip, you need to assess where your locale stands in relation
> to others in this three-digit area.  For example, many different three digit
> areas contain both urban and rural locales with different charging
> patterns.  Use your judgment to determine how to interpret the fee range
> for your particular community.

122.   As Ingenix is fully aware, WellPoint and the Insurer Conspirators never exercise independent judgment in determining whether the specific geo-zip applicable to a particular UCR determination is valid, including whether it may contain "urban and rural locales with different charging patterns."  Instead, the Insurer Conspirators rely strictly on the False UCRs that reflect the unspecific geographic groupings provided by the Ingenix Database, without taking into account possible different charging patterns within each geo-zip.

First Consolidated Amended Complaint

42

123.   Based on these procedures, Ingenix produces two cycles of uniform pricing schedules per year that include medical, surgical, anesthesia and coding system service rates for a given "geo-zip" and applicable CPT code in the form of a price range that shows the charges at various percentage intervals, *e.g.*, 50th, 75th and 90th. For any CPT code and geo-zip combination with less than nine billed charges remaining in the database after deletions by both the contributing insurers and Ingenix, Ingenix instead determines and reports "derived charges." According to Ingenix, "derived charges" are calculated by pooling billed charges for similar services in the same geographic area, and then adjusting that data using values assigned by Ingenix to account for differences in the complexity and expense of the procedure at issue. The version of the MDR Database offered by Ingenix consists entirely of the resulting "derived charges," which are offered in a similar percentile price range format, ranging from the 25th to the 95th percentiles.

124.   Once WellPoint receives these uniform pricing schedules, they are uploaded onto a computerized claims platform and automatically accessed by WellPoint to determine reimbursement amounts for ONS within the range provided by the Ingenix UCR schedules. WellPoint's computer systems then automatically generate reimbursement amounts for ONS claims. In other words, the Ingenix Database is automatically applied and no human intervention is utilized to evaluate the accuracy of the pricing data provided by Ingenix.

125.   Similar to its "warning" about the geo-zips, Ingenix also "warns" its customers, including the other Defendants here, it does not formally endorse, approve or recommend the use of the Ingenix data for UCRs. With each production, Ingenix includes the following disclaimer:

> The Ingenix data are provided to subscribers for informational purposes only.   Ingenix, Inc. disclaims any endorsements, approval, or recommendation or particular uses of the data. There is neither a stated nor an implied "reasonable and customary charge . . . ."

126.   Despite this disclaimer, twice a year, Ingenix provides WellPoint and the Insurer Conspirators with uniform UCR pricing schedules (*i.e.*, False UCRs). Ingenix knows the Ingenix Database is being used by health insurers for the purpose of determining UCRs and ONS reimbursements. Indeed, the UnitedHealth Defendants promise that Ingenix Database users will achieve substantial cost savings, including a promised 16:1 return on investment. This promise makes sense only if the Ingenix Database is being used to determine ONS reimbursement amounts. The only purpose of the uniform pricing schedule is to establish an artificially low range upon which subscribing insurers base their ONS reimbursement. The False UCR range in the Ingenix schedules thereby serves as an absolute ceiling on the amount the Insurer Conspirators will pay in ONS reimbursement for particular procedures across the country and also as a mechanism to depress ONS reimbursements throughout the insurance industry (*i.e.*, if the entire range reflects artificially low UCRs, then ONS reimbursements based on that range are necessarily artificially low also).

### The Data Is Received and Distributed Without Verifying Its Accuracy

127.   There is no review procedure in place at WellPoint to verify the accuracy of the twice-yearly uniform pricing schedules generated by the Ingenix Database. Instead, the uniform pricing schedules created by the Ingenix Database are automatically relied upon to determine and establish UCRs.

128.   Likewise, Ingenix cannot guarantee that all claims received for a particular CPT code service at any given time have been reported, much less accurately reported, by its contributing insurers. Nor does Ingenix ascertain if the bills that are listed constitute the unnamed providers' usual and customary charges for the service, or, instead, a discounted rate required by the agreements one or more of the providers may have had with healthcare insurers. While Ingenix requests the CPT code billing data be accurate and complete, Ingenix employs no mechanism to enforce or validate accuracy or completeness of the client certificates and billing data.

129.   Ingenix does not – and has never – tested its results to determine if its statistical conclusions bear any relationship to the actual high, low, median or any particular percentile of actual marketplace CPT code service rates charged by healthcare providers in any given area, even though the very purpose for its UCR product is to determine ONS reimbursements.  Ingenix knew, or should have known, the Ingenix Database it distributed to WellPoint and the Insurer Conspirators resulted in artificially low ONS reimbursements.

130.   The end result of this cycle of collusion is a database that produces flawed uniform pricing schedules (the False UCRs) that systematically result in the under-reimbursement for ONS by WellPoint and the Insurer Conspirators.  The flaws in the Ingenix Database are pervasive and, *inter alia*, include:

(a)   questionable accuracy of underlying data;

(b)   failing to inquire whether all of the contributors are using the same criteria and coding (as well as aggregating) accurately and consistently;

(c)   aggregating data from similar codes to create a larger sample when there is not enough charge data to provide a statistically valid sample for a CPT code;

(d)   combining geo-zips to determine what Ingenix considers to be a "sociodemographic region" for which there is no verification;

(e)   scrubbing data in such a manner that only removes outliers in a subjective manner, *i.e.*, Ingenix removes high-end values but not low-end outliers;

(f)   failing to incorporate an appropriate statistical methodology (including sampling, data editing or data estimation), resulting in data that is inappropriate and biased downward;

(g)   using cumulated data that has already been scrubbed by the individual contributors to remove high-end values;

(h)   including charges for procedures in non-comparable geographic areas;

1             (i)     failing to segregate procedures performed by providers of the same

2  or similar skill or licensure, instead, combining all CPT codes together;

3             (j)     combining ONS charges with "in-network" providers who have

4  already agreed to a discounted contracted rate – thus further skewing the data

5  downward;

6             (k)     failing to distinguish the data based on the number of healthcare

7  providers whose charges are reflected; and

8             (l)     failing to edit any data that reflect negotiated or discounted

9  charges.

10                ***The Truth of the Ingenix Database Is Concealed***

11     131.  As a condition of obtaining uniform UCR pricing schedules from

12  Ingenix, WellPoint and the Insurer Conspirators entered into confidentiality and non-

13  disclosure agreements whereby the Insurer Conspirators agreed not to reproduce any

14  of the data submitted to Ingenix to any other group that seeks to develop a competing

15  database for use in determining UCRs for ONS.  These confidentiality and non-

16  disclosure agreements restrain potential competition in the relevant market and help

17  conceal the agreement to fix prices as well as the role each Insurer Conspirator has in

18  that agreement.

19     132.  WellPoint and the Insurer Conspirators have ample opportunity to, and

20  do, communicate through HIAA/AHIP and regularly share UCR pricing information

21  using Ingenix as a conduit to distribute agreed-upon pricing memos to each Insurer

22  Conspirator for the purpose of artificially lowering ONS reimbursements to Plaintiffs

23  and the Classes.  WellPoint and the Insurer Conspirators know the data being provided

24  to Ingenix is flawed and have communicated this fact to one another and to Ingenix.

25  The Insurer Conspirators understand that, as a consequence, the pricing schedules

26  received from Ingenix are flawed and cause them to under-reimburse for ONS.

27  Nevertheless, the Insurer Conspirators continue to have input into the type of data

28  used by Ingenix and jointly produce provider cost data and utilize Ingenix's False

First Consolidated Amended Complaint

UCRs to coordinate and centrally set a pricing schedule for the purpose of calculating ONS reimbursement.

133.   WellPoint and the Insurer Conspirators' scheme to manipulate UCRs for the purpose of under-reimbursing for ONS is predicated, in part, on keeping the Ingenix Database, and its inherent flaws, a complete secret from subscribers and providers. As a result, Defendants and the Insurer Conspirators actively conceal the true UCRs, knowing the success of the scheme will be jeopardized if true UCRs are known to the healthcare-purchasing public. To prevent transparency and inhibit price competition, neither WellPoint nor any of the Insurer Conspirators makes its False UCRs available to its insureds or ONS providers until after an ONS has been rendered.   The Insurer Conspirators likewise do not disclose to Plaintiffs or the general public that they contract with Ingenix, provide Ingenix with data, and use False UCRs provided by Ingenix to determine ONS reimbursement amounts. They do not disclose how they and Ingenix arrive at False UCRs, or that Ingenix disseminates the False UCRs they all use for calculating ONS reimbursement. They further do not disclose they have agreed not to provide data to potential competitors of Ingenix.

134.   Rather than disclose the defective nature of the Ingenix Database and the participation by WellPoint and the Insurer Conspirators in creating False UCRs, the Insurer Conspirators shield these facts from subscribers and providers through misrepresentations and material omissions designed to lead them to believe they are using fair and accurate UCR schedules to reimburse for ONS.  Further, as part of the database licensing arrangements between Ingenix and the Insurer Conspirators, those parties have agreed to act together to help the Insurer Conspirators enforce the False UCRs reported in the periodic uniform pricing schedules and used by the Insurer Conspirators in calculating reimbursements, against both provider and subscriber challenges.

135.   None of the Insurer Conspirators has attempted to set up a rival database despite Ingenix's profitability and the fact that it is owned by a competitor (Ingenix's

First Consolidated Amended Complaint

1   profit margins are 20%, compared to 10% for UnitedHealth as a whole).  Rather, as
2   members of HIAA/AHIP, the Insurer Conspirators acted together to transfer the
3   Ingenix Database to Ingenix, to administer and maintain it, and agreed among
4   themselves and with Ingenix that none of them would provide billed claims data to a
5   potential competitor database.  By agreeing not to disclose any of the data they have
6   submitted to Ingenix for inclusion in its database to any other potential database
7   developer, the Insurer Conspirators have rendered it entirely impracticable for other
8   members of the cartel to create a competing database for use in determining UCRs for
9   ONS.

10              **INVESTIGATIONS INTO THE INGENIX DATABASES**
11            *The New York Attorney General's Investigation and Action*

12              136.   During 2007 and 2008, the NYAG performed a preliminary investigation
13   into how health insurers computed ONS reimbursement rates.  On February 13, 2008,
14   the NYAG "Healthcare Industry Taskforce" launched an industry-wide investigation
15   into allegations that insurers were under-reimbursing for ONS.  The investigation
16   centered on Defendants and several of the Insurer Conspirators, and particularly on
17   Ingenix.

18              137.   After six months of investigation that included document review, data
19   analysis, and interviews, the NYAG found that the Ingenix Database systematically
20   reduces the rate at which insurers paid for out-of-network care.  As a result, the
21   NYAG's office expanded its investigation by issuing subpoenas seeking documents
22   from more than a dozen health insurers, including Defendants UnitedHealth and
23   WellPoint as well as several of the Insurer Conspirators.

24              138.   The NYAG found those documents revealed a shocking lack of
25   transparency and accuracy in the industry's use of the Ingenix Database.  The NYAG
26   found insurers such as WellPoint obfuscate their policy language by promising to
27   reimburse based on usual and customary rates but instead reimbursing based on
28   schedules compiled by one of their own:  UnitedHealth *via* Ingenix.

139.   The NYAG further found this conflict of interest is entirely hidden from consumers because Defendants and the Conspirators pretend an independent database underlies their UCRs for ONS when, in reality, the schedules themselves, created in a well of conflicts, are unreliable and inadequate.  The end result is that consumers are "tricked" into having to pay more for medical care than they had anticipated, leading to unexpected healthcare debts.

140.   The NYAG determined health insurers, who have a financial incentive to do so, first provide flawed data and then receive flawed data to determine UCRs for ONS that are understated and artificially low.  Or, as the head of the NYAG's investigative task force stated, "*garbage in, garbage out*."

141.   To test the accuracy of the Ingenix Database, the NYAG's office collected and analyzed millions of healthcare bills from a variety of sources, including over a million bills from ordinary doctors' office visits within the state of New York. It then compared these actual bills to the UCRs produced by the Ingenix Database for that geographic area.  This enabled the NYAG's office to compare the rate that the Ingenix Database indicated should be paid for a particular medical service in a particular region with the rate that the doctors in that region actually charged.  The comparison ultimately revealed that insurers systematically under-reimburse their insured patients for doctors' office visits in New York state by 10%-28%, and that up to 110 million Americans have been harmed by Defendants' conspiracy to the tune of hundreds of millions of dollars in losses for consumers and providers nationwide.

142.   Upon completing its investigation, the NYAG's office summarized its central findings in a January 13, 2009 document entitled "Health Care Report: The Consumer Reimbursement System is Code Blue" ("the NYAG Report").  The NYAG Report found that the Ingenix Database and the insurers' participation in and use of Ingenix was:

> (a)   "an industry-wide problem";
>
> (b)   "a *rigged system*";

First Consolidated Amended Complaint

(c)  "fraudulent";

(d)  used to advance the interests of the insurers;

(e)  "critically ill"; and

(f)  operated as a "**black box**" to consumers, who are left in the dark as to "what reimbursement rate to expect from the insurer."

143.  According to the Attorney General:

the responsible consumer reads the plan documents and sees a thicket of words. One term seems intelligible: the "usual and customary rate" of a similar physician for a similar service in a similar area. That sounds reasonable. The consumer makes the leap out-of-network and submits the bill to the insurer, only to be told the consumer will not be fully reimbursed because the doctor's charge exceeded the usual and customary rate. The fog of ignorance continues, thanks to the insurer. The physician-patient relationship is undermined, as the physician has been branded a charlatan whose bills are inflated. No one's interests here are advanced, except perhaps when next time, the consumer decides to stay in network for fear of what bills may accrue for out-of-network care. The interests advanced in that event are those of the insurer, whether by accident or design.

144.  The NYAG left little doubt that this industry-wide problem needed an industry-wide solution because all industry members benefitted unfairly and at the expense of consumers over at least the past ten years.

145.  Following issuance of its Report, the NYAG entered into several "Assurances of Discontinuance" with UnitedHealth, WellPoint, and certain of the Insurer Conspirators named in this case (Cigna, Aetna and Health Net). Those assurances provided that the Ingenix Database would cease to exist and a new unbiased database would be created. Specifically, the agreements provided that:

      (a)    An independent third party that is free from conflicts and uses a fair, objective and reliable database is needed to replace Ingenix;

      (b)    An independent database would be created and operated through a not-for-profit corporation that will own the new database and collect data from contributors and publish rate information in a public and transparent way;

      (c)    The not-for-profit corporation will create a website available to the public to disclose out-of-network reimbursement rates.  The website will include a search function that will clearly indicate the prevailing charge in a given area;

      (d)    Insurers will provide information to their members explaining the method of determining reimbursement rates including that Ingenix is owned by UnitedHealth, and will explain that a new database is being created;

      (e)    Insurers will contribute to fund the creation of the new database. Defendant UnitedHealth agreed to pay $50 million; Defendant WellPoint agreed to pay $10 million; Conspirator Aetna agreed to pay $20 million; Conspirator Health Net agreed to pay $2 Million and Conspirator Cigna agreed to pay $10 million; and

      (f)    Once the new database is created, insurers will have 60 days to cease operating and using the Ingenix Database.

### *Congress' Investigation*

146.   Congress also is actively investigating the use of the Ingenix Database in setting UCRs.  Earlier this year, the Senate Committee on Commerce, Science, and Transportation held full committee hearings on "Deceptive Health Insurance Industry Practices – Are Consumers Getting What They Paid For?"  The Committee held two such hearings, the first on March 26 and the second on March 31, 2009, examining how the health insurance industry reimburses consumers for out-of-network healthcare services; specifically, how the industry calculates the UCR for out-of-network non-MD healthcare providers.  The statements and archived webcast are available                                          at http://commerce.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearin

1   g_ID=4edbd03a-bf22-4783-87db-dfd57d980123 (March 26, 2009 Hearing) and

2   http://commerce.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&

3   Hearing_ID=63b0f558-ec43-4ab8-82f0-070bcc699e38 (March 31, 2009 Hearing)

4   (SR-253).

5       147.   At the March 31, 2009 hearing, Senator and Committee Chairman John

6   D. Rockefeller, IV, speaking for the majority of the Senate Committee, explained why

7   they believed the insurance industry's practices were "deceptive." Mr. Rockefeller

8   noted that more than 100 million Americans paid for health insurance that would give

9   "them the option of going outside of their provider networks for care," but that the

10  insurance companies were not living up to their end of the bargain:

11           Let's be very clear about this.   The insurers aren't letting their

12           policyholders see non-network doctors out of the goodness of their

13           hearts. Consumers are paying for this option - through higher premiums

14           and higher cost sharing.  There are many reasons American consumers

15           decide to pay the extra money for health insurance with an out-of-

16           network option. One New York consumer we heard from last week, Dr.

17           Mary Jerome, said she paid extra for the "peace of mind" that she could

18           get the best care available when she really needed it.

19           What we learned at our first hearing was that while consumers held up

20           their side of the bargain, the insurers did not.  The insurance industry

21           promised to base their out-of-network payments on what they call the

22           "usual, customary, and reasonable" cost of medical care in a particular

23           area. Thanks to the New York investigation and other lawsuits, we now

24           know that the insurance companies were not delivering what they

25           promised.

26      148.   Senator Rockefeller specifically addressed the NYAG's findings as to the

27  insurance industry's use of the Ingenix Database to pay far less than the UCR

28  amounts:

First Consolidated Amended Complaint

In Erie County, New York, for example, insurance companies were reimbursing their policyholders for doctor visits at rates that were 15 to 25% below the local prevailing rates.   A federal judge recently concluded that the reasonable and customary data insurers used in New Jersey was 14.5% lower than the prevailing market rates.   Everywhere experts have looked at this data, they have found what statisticians call a "downward skew" in the numbers.   For ten years or even longer, this skewed data was used to stick consumers with billions of dollars that the insurance industry should have been paying.   The source of the skewed data was Dr. Slavitt's company, Ingenix.

149.   In light of the insurance industry's fraudulent use of the Ingenix Database in setting UCRs, the Senate Committee is currently evaluating whether more federal oversight and regulation of the insurance industry is necessary.   For now, however, the only avenue of redress for subscribers and providers, such as Plaintiffs and the Classes, is through the courts.

## HARM TO SUBSCRIBERS

150.   By scheming to fix UCRs at below-market levels as a means to artificially depress ONS rates, the Defendants shifted the actual costs of paying for healthcare services and health insurance to the subscribers, including Subscriber Plaintiffs and Class.   When a health plan subscriber (or his/her healthcare provider pursuant to an "assignment of benefits" when such an assignment has occurred) submits a claim for reimbursement, the Insurer Conspirators use the false UCR schedules produced by the Ingenix Database to pay less than the "usual and customary rate" for the services rendered, thereby requiring the subscriber to make up the difference to the ONS provider by way of out-of-pocket payments, whether or not there has been an assignment of **benefits**.   This hidden, undisclosed cost thereby increases the cost of care, and, commensurately, the cost of receiving healthcare pursuant to the Insurer Conspirators' health plans. Rather than merely pay a premium

that includes ONS coverage, subscribers pay both the higher premium and the difference between the False UCR and their actual costs. Thus, the Defendants rob their subscribers of the benefits of their healthcare plan (reimbursement at the full, correct amount) while also still charging the subscriber the higher premium they pay for the ability to seek ONS from their provider of choice, regardless of network affiliation.

151. The Insurer Conspirators agreed through contracts, licenses and oral understandings to provide flawed pricing information to Ingenix; to obtain and use the resulting flawed Ingenix uniform pricing schedules to determine ONS reimbursements, thereby depriving subscribers of a competitive market for obtaining ONS and to keep Ingenix UCR data secret from subscribers, providers, and potential Ingenix competitors. As a result of the structure of the sale of the PCHS database by HIAA and agreements among the leading health insurers that tie them to Ingenix, there is no viable competitor in the market for data services used to calculate UCRs. Defendants' anticompetitive scheme ensured there would be no viable competitor in the market for data services used to calculate UCRs.

152. Due to the agreement by the Defendants and the Conspirators to manipulate a limited number of data points, which are used to set the False UCRs that Ingenix disseminates and WellPoint and others deploy, competition in the market for the provision of data services used to calculate UCRs was harmed and constrained. In turn, competition in the inextricably linked market for the provision of ONS was also harmed and constrained, and subscribers wishing to reduce their out-of-pocket costs by artificially reducing reimbursements for out-of-network providers thereby resulted in services being shifted to in-network Providers. By refusing to disclose any information about their UCRs, the Defendants make it impossible for health insurance consumers to make informed competitive choices about ONS based on actual reimbursement rates. If the Insurer Conspirators had provided such information to consumers, including Plaintiffs, members of the Classes could have made decisions

1  about their purchasing of insurance plans and their procurement of ONS based, in
2  part, on actual costs. Defendants' conduct, however, has made it impossible for them
3  to do so.

4  153.  As a result of the Defendants' anticompetitive and deceptive conduct, the
5  Subscriber Plaintiffs and Classes pay increased out-of-pocket costs due to the
6  artificially low reimbursement amounts, thus, paying more for ONS than they would
7  have in a competitive market free from collusion and price fixing:  each dollar the
8  Insurer Conspirators were able to lower ONS reimbursements is one additional dollar
9  Plaintiffs and Class members were, and are, obligated to pay out of pocket.

10  154.  As discussed herein, the Subscriber Plaintiffs' contractual relationships
11  with WellPoint require that they be ultimately responsible for any payments to
12  Providers.  As such the Subscriber Plaintiffs and the Classes they represent have
13  standing to pursue their claims even if they have assigned their claims for out-of-
14  network benefits to providers.  When a subscriber assigns his or her claim for benefits,
15  he or she is still contractually responsible and financially responsible for full payment
16  to the provider.  Moreover, Providers generally seek to recoup the balance of any
17  amount beyond what is paid by WellPoint from the subscriber (known as "balance
18  billing').  Since Subscribers are ultimately responsible for payment for the services,
19  have paid the difference between what WellPoint reimbursed as UCR and the billed
20  charge by Providers' balancing billing, All Subscriber Plaintiffs, including those who
21  have assigned their claims to Providers, have standing and have been injured by
22  WellPoint's conduct.

23  155.  The Subscriber Plaintiffs allege that their contractual relationships with
24  WellPoint require that they be ultimately responsible for any payments to Providers.
25  As such the Subscriber Plaintiffs and the Classes they represent have standing to
26  pursue their claims even if they have assigned their out-of-network benefits to
27  providers.  When a subscriber assigns his or her benefits, he or she is still
28  contractually responsible and financially responsible for full payment to the provider.

Since Subscribers are ultimately responsible for payment for the services and have paid the difference between what WellPoint reimbursed as UCR and the billed charge by Providers, All Subscriber Plaintiffs, including those who have assigned their benefits to Providers, have standing and have been injured by WellPoint's conduct.

## HARM TO PROVIDERS

156.   Defendants' scheme to fix UCRs at below-market levels as a means by which to artificially depress rates for ONS injures the Provider Plaintiffs and Class in several ways.

157.   By limiting payment to the False UCR, the Defendants cause the Providers financial harm by not paying them the full amount to which they are entitled – their full billed charge or their actual usual, customary and reasonable rate for their services.

158.   When ONS reimbursements are less than the Provider Plaintiffs' usual and customary rate for the service rendered, the Provider Plaintiffs systematically bear the financial loss because they cannot otherwise collect the full amount to which they are entitled.

159.   WellPoint and the Insurer Conspirators' systematic improper ONS reimbursement determinations also cause Providers to needlessly expend valuable time and resources identifying and then appealing unlawful determinations through a process deliberately designed to deny, delay and impede providers from obtaining proper ONS reimbursements (providers frequently submit claims for reimbursement themselves when patients execute "assignments of benefits" that make the provider the beneficiary of the ONS reimbursement).  When Provider Plaintiffs and members of the Provider Class submit claims, they typically receive "Explanations of Benefits" ("EOBs") that claim the charge submitted exceeds the UCR, but without any explanation of how the UCR was calculated.  Providers then face a futile appeal procedure, where accurate UCR determinations are impossible as the Insurer

First Consolidated Amended Complaint

Conspirators rely solely upon Ingenix's False UCRs. The Insurer Conspirators frustrate the purposes and mission of the Association Plaintiffs.

160. These injuries coerce Providers to become participating, "in network" providers. By agreeing to be bound by insurer fee schedules that apply so-called "negotiated fees" for services, providers can eliminate the uncertainty and hassle of ONS fee collection and the potential loss of business from patients who receive bills with surprisingly high balances remaining after insurer reimbursement, but only at the cost of significantly lower fees for their services. Insurer Conspirators then receive the benefit of lower payments to providers on their insureds' claims through the "negotiated fee" schedules to which in-network providers are required to adhere and which strictly cap what providers may charge for their services.

161. The Provider Plaintiffs and the Class allege they have standing to pursue these claims as assignees of their patients' out-of-network benefits and/or as third-party beneficiaries of the patient's out-of-network benefits.

162. WellPoint acknowledges this when they pay the Provider directly or otherwise recognize the Provider's valid assignment of benefits.

## HARM TO THE ASSOCIATIONS

163. The impact of the Insurer Conspirators' non-transparent ONS reimbursement scheme and pervasive under-reimbursements causes the Association Plaintiffs to expend significant time, energy and money to, *inter alia*, counsel members on how to counteract the practices at issue, monitor the Insurer Conspirators' practices, advocate on their members' behalf, and/or lobby for legislative or other insurance reform. Each of these efforts requires staff, time and money that would not be expended but for Defendants and the Conspirators' fraudulent scheme and price-fixing conspiracy.

164. One of the core missions of the Association Plaintiffs is to advance and safeguard the provider-patient relationship. The Defendants' scheme undermines the relationship between providers and their patients. Subscribers believe they are

First Consolidated Amended Complaint

1  covered for the "usual and customary" charge for medical services, yet when they
2  receive ONS, they are frequently left with a surprisingly large bill because the ONS
3  reimbursement has covered only a portion of the providers' fees.  Because the
4  subscribers do not (and cannot) know that the low ONS reimbursement is due to the
5  Insurer Conspirators' price-fixing scheme, blame is laid at the feet of the provider,
6  whose rates are made to look exorbitant by the Insurer Conspirators' explanation that
7  the charges exceed the "usual and customary rate."  The conspiracy thereby introduces
8  mistrust and friction into the relationship between subscribers and their care providers.
9  This phenomenon adversely affects thousands of the Association Plaintiffs' members,
10  including the Provider Plaintiffs.

11      165.   The Association Plaintiffs have standing to pursue these claims both
12  individually and/or on behalf of their members through associational standing.

13                        **ERISA ALLEGATIONS**

14      166.   Under the terms of their healthcare plans, WellPoint is obligated to
15  provide specific healthcare benefits and reimbursements to subscribers.  Under federal
16  law, WellPoint is an ERISA fiduciary for the ERISA health plan at issue.  As such,
17  WellPoint owes its plan members (including the Subscriber Plaintiffs) the fiduciary
18  duties of care and loyalty, and they must apply their respective plan provisions in
19  good faith and as required under ERISA.  When subscribers assign their ERISA
20  benefits to healthcare providers (including the Provider Plaintiffs), WellPoint also
21  owes such fiduciary duties and obligations to act in good faith to the assignee
22  healthcare providers.  As set forth below, WellPoint has breached, and continues to
23  breach, its obligations to the Subscriber and Provider Plaintiffs and the ERISA
24  Provider and Subscriber Subclasses, and in so doing has violated ERISA.

25      167.   Under ERISA, WellPoint is required, among other things, to comply with
26  the terms and conditions of its healthcare plans; to afford plan subscribers and
27  assignees an opportunity to obtain a "full and fair review" of any denied or reduced
28  reimbursements; and to make certain disclosures to plan subscribers, such as

First Consolidated Amended Complaint

accurately setting forth plan terms, explaining the specific reasons why a claim is denied and the internal rules and evidence that underlie such determinations, disclosing the basis for their interpretation of plan terms, and providing appropriate data and documentation concerning coverage decisions.

168.   The federal common law of trusts, which is applicable to ERISA fiduciaries such as WellPoint, further requires that fiduciaries deal honestly with plan subscribers and their assignees, and adhere to certain specific fiduciary standards in their dealings.

169.   In offering and administering its healthcare plans, WellPoint assumes the role of "Plan Administrator," as that term is defined under ERISA, in that WellPoint interprets and applies the plan terms, makes all coverage decisions, and provides for payment in the form of medical reimbursements to plan subscribers and/or their assignee-providers.   As the Plan Administrator, WellPoint assumes various obligations specified under ERISA.   These obligations include providing its plan members with a "summary plan description" ("SPD"), a document designed to describe in layperson's language the material terms, conditions and limitations of the healthcare plan.   The full details of the plan, which are summarized in the SPD, are contained in the Evidence of Coverage ("EOC").

170.   Alternatively, in those instances where WellPoint has not explicitly assumed the role of "Plan Administrator," it has acted as the *de facto* Plan Administrator by, among other things, providing Plan documents to participants, receiving claims for medical reimbursements, evaluating the claims and making medical reimbursement determinations, interpreting the terms of the Plan and making and administering medical reimbursement payments.   In carrying out these Plan Administrator functions, WellPoint has preeminent authority to manage and administer their medical reimbursement Plans.

171.   WellPoint is obligated under ERISA to make coverage determinations in a manner consistent with the disclosures contained in their respective SPDs.   To the

First Consolidated Amended Complaint

extent there is a disparity or conflict between the SPDs and an applicable EOC, the SPD governs, so long as the plan member benefits from the application of the SPD. If the employer, rather than WellPoint, is deemed to be the Plan Administrator, WellPoint, as co-fiduciary, remains responsible for ensuring the SPD complies with the law as provided in ERISA, 29 U.S.C. §1105. Such is the case even if the employer prepares or disseminates the SPD.

172.   WellPoint breached its fiduciary duties by failing to disclose the actual and true reimbursement rules used to pay ONS benefits by knowingly using inaccurate, flawed and fabricated data from the Ingenix Database to calculate UCRs, by knowingly delegating their duty to collect accurate information regarding UCRs to Ingenix (whom WellPoint knew was collecting inadequate and inaccurate data regarding UCRs), and by failing to fulfill its obligations of good faith, due care and loyalty. Moreover, WellPoint and its Insurer Conspirators breached their duties by manipulating the data they each, individually and collectively, contributed to Ingenix so as to artificially depress the data Ingenix relied upon in creating UCR schedules for ONS reimbursements.

173.   WellPoint issued EOCs to the Subscriber Plaintiffs and all subscribers and beneficiaries that set forth the benefits that WellPoint promised to pay its subscribers. According to the Subscriber Plaintiffs' EOCs, benefits were to be conferred to each subscriber and his enrolled family members.

174.   Like most insurance plans, WellPoint's plans typically at issue here differentiate between (i) coverage for medical treatment from "in-network" providers who have negotiated discount rates with the insurer and (ii) coverage for treatment from "out-of-network" providers who charge insureds their usual, non-discounted rates. WellPoint refers to such providers as "non-participating," "non-contracting," "non-network," and/or "out-of-network" providers (collectively, "out-of-network"). As part of their contracts with WellPoint, in-network providers agree to not bill insured patients or WellPoint more than the contracted amounts for in-network

First Consolidated Amended Complaint

services.  Conversely, out-of-network providers have no service contracts with the insurance company and thus are not precluded from billing at their usual rates.  In cases where the out-of-network provider's bills exceed more than the insurance company will pay, the balance is the WellPoint subscriber's responsibility.

175.   Under the Subscriber Plaintiffs' plans, subscribers have an express right to receive treatment from out-of-network providers.  When WellPoint plan members receive ONS, payments are based on a percentage of the lesser of (i) the billed charge or (ii) what WellPoint describes as the "usual and customary" rate for that service.  Health insurers, including WellPoint, use the terms "UCR," "usual and customary" and "reasonable charge" interchangeably.

176.   WellPoint often refers to the UCR as the "amount allowed" or "allowable charge."  WellPoint makes clear in its respective EOCs, as well as in other written communications with its subscribers, that the plan member is financially responsible for the difference between the UCR (amount allowed) and the provider's billed charge for ONS.  For example, EOCs state that the amount the ONS provider charged for the service, the amount allowed, the percentage and portion of the amount allowed that WellPoint will pay, and the balance owed by the subscriber, which WellPoint describes as "Your Responsibility."  Other EOCs refer to this amount as "What You May Owe Providers" or similar language conveying WellPoint's position that the portion of an ONS that WellPoint has not paid is the plan member's obligation.

177.   The portions of ONS charges not paid by WellPoint are not credited toward deductibles or out-of-pocket maximums that limit the total amount a plan member has to pay for medical services over a given time period.  Thus, these out-of-pocket expenses are charges wholly in addition to the amount that the subscriber has agreed to pay for healthcare coverage.

178.   In processing claims for ONS charges, WellPoint is obligated under ERISA to calculate accurate UCRs and reimburse subscribers accurately UCRs in a manner consistent with the definition of UCR used by WellPoint to describe its health

First Consolidated Amended Complaint

1  plans to its plan subscribers. WellPoint does not fulfill this obligation because it fails
2  to pay benefits based on accurate UCRs.

3  ***Plaintiff Roberts***

4  179. Plaintiff Michael A. Roberts (individually, and as guardian for D.
5  Roberts) alleges that WellPoint breached its fiduciary duties under ERISA. He further
6  seeks unpaid benefits from WellPoint arising from the reduced UCR payment
7  described below for which he exhausted his administrative remedies.

8  180. Plaintiff's daughter, D. Roberts, during the Relevant Time Period, was
9  either under the age of 19 or a full-time student attending an accredited college in the
10  state of Massachusetts. Plaintiff submitted the requisite written certification of student
11  status to WellPoint. Plaintiff's daughter was thus directly insured under Plaintiff's
12  plan.

13  181. Plaintiff Roberts' employer sponsored an "Employee Elect Medical Plan"
14  for its employees, including Plaintiff Roberts, which was directly insured by
15  WellPoint *via* Blue Cross of California. Plaintiff Roberts and his family were thereby
16  directly insured by WellPoint under this plan during the Relevant Time Period.

17  182. Upon subscribing to his employer-sponsored plan, Plaintiff Roberts
18  received his "Combined Evidence of Coverage and Disclosure Form" ("Plaintiff's
19  EOC"). Plaintiff Roberts' EOC provides that Plaintiff Roberts and his eligible family
20  members are directly insured under the Plan and lists within "family member" any of
21  Plaintiff Roberts' children including:

22      Unmarried children of the Subscriber, the Subscriber's enrolled Spouse,
23      or the Subscriber's enrolled Domestic Partner from the nineteenth (19th)
24      to twenty-fourth (24th) birthday who qualify as dependents for federal
25      income tax purposes and who are full-time students (for twelve (12) or
26      more credits) attending an accredited college, university, vocational or
27      technical school. Blue Cross requires written proof of student status
28      annually.

First Consolidated Amended Complaint

183. Plaintiff Roberts' EOC specifies a set deductible, and that once this deductible is satisfied, WellPoint is required to reimburse its subscribers, including Plaintiff Roberts, according to a chart contained within Plaintiff Roberts' EOC. Pursuant to the chart, medical procedures are classified as either being undertaken by a participating provider or by a non-participating provider. "Non-Participating Provider" is defined as an entity (hospital, physician or otherwise) "which does NOT have a Prudent Buyer Plan Participating Provider agreement with Blue Cross in effect at the time services are rendered . . . ."

184. The chart in Plaintiff Roberts' EOC contains various medical procedures and corresponding reimbursement amounts/subscriber payment responsibilities. For example, Plaintiff Roberts' EOC lists "Outpatient Hospital and Emergency Room" procedures at a non-participating provider (in or out of the State of California) and provides that the consumer, Plaintiff Roberts, must pay "40% of the Customary and Reasonable charge." WellPoint is obligated to pay the remaining 60% of the Customary and Reasonable charge.

185. The EOC defines "Customary and Reasonable Charge" as "the average price that a majority of providers charge for a particular procedure, supply, piece of equipment or service, based on where the procedure, supply, piece of equipment or service is performed or obtained."

186. On or about December 4, 2007, Plaintiff Roberts' daughter underwent an outpatient hospital procedure at a Non-Participating Provider hospital. Plaintiff Roberts submitted a claim with WellPoint regarding this procedure. WellPoint made a UCR determination on this claim that reimbursed Plaintiff Roberts less than the stated percentage of the provider's actual charges. This UCR determination resulted in Plaintiff Roberts being obligated to pay not only his deductible, but also that part of the provider's billed charge that exceeded the UCR amount determined by WellPoint.

187.   WellPoint failed to comply with the terms of Plaintiff Roberts' group plan by making a UCR determination that reduced the stated percentage of the provider's charges without valid data to support such a determination.

188.   On May 12, 2008, Plaintiff Roberts appealed WellPoint's decision by specifically requesting relief from WellPoint regarding this claim.   However, WellPoint never provided Plaintiff Roberts with any data or other documentation for its UCR determination.   Plaintiff Roberts repeatedly requested, in writing and otherwise, that WellPoint provide specifics about its UCR determination and about why the provider's charges had been determined to exceed the UCR.   Plaintiff Roberts did not receive data, documentation, or adequate redress from WellPoint (or otherwise), and continues to be liable for the remainder of the medical bill (to the tune of thousands of dollars).   Plaintiff Roberts thereby exhausted his administrative remedies.

### *Plaintiff Cooper*

189.   Plaintiff Mary Cooper and her (now deceased) husband, Robert Cooper, obtained health insurance through their employer, Landmark I Appraisal, L.L.C., a WellPoint policyholder, by and through its predecessor and subsidiary company WellChoice Insurance of New Jersey, Inc. ("WellChoice") – Group Health Insurance Policy No. 401486.

190.   Under said policy, Plaintiffs Mary and Robert Cooper were contractually entitled to choose care from ONS providers.   WellChoice inhibited the Coopers' use of ONS providers by using artificially low UCRs thereby increasing unpaid amounts for which the Coopers were liable.

191.   During the Relevant Time Period, the Coopers utilized ONS.   The providers of these services charged rates greater than the UCRs set by WellChoice. The Coopers paid for portions of the ONS that were not reimbursed by WellChoice. For example, in 2005, the Coopers paid thousands of dollars in out-of-pocket expenditures for ONS that WellChoice refused to fully pay.

192.   During the Relevant Time Period, the Coopers received ONS for which WellChoice paid less than the billed charges, based on UCRs which, on information and belief, were calculated from one or both Ingenix Databases.  The Coopers were unaware that the UCR, allowable charge, and reimbursements in the EOBs had been calculated on flawed Ingenix data.

193.   As alleged below, an administrative appeal to WellPoint of its UCR determinations as they pertain to Plaintiff Cooper and other WellPoint Subscribers is futile such that demonstrating exhaustion of administrative appeals under ERISA is excused.

### *Plaintiff Ivette Rivera-Giusti*

194.   Plaintiff Ivette Rivera-Giusti is a citizen of the State of Oregon.  While insured by WellPoint (through WellPoint's Empire HealthChoice Assurance, Inc. and Empire Blue Cross Blue Shield subsidiaries), Ivette Rivera-Giusti received an artificially depressed reimbursement of ONS, resulting in Ivette Rivera-Giusti incurring more out-of-pocket expenses than she would have absent the unlawful conduct alleged herein.

195.   As alleged below, an administrative appeal to WellPoint of its UCR determinations as they pertain to Plaintiff Rivera-Giusti and other WellPoint Subscribers is futile such that demonstrating exhaustion of administrative appeals under ERISA is excused.

### *Plaintiff Dr. Henry*

196.   Plaintiff Dr. Henry is an internist with a private practice in Pasadena, California.  He is licensed to practice medicine in the State of California, and has been certified by the American Board of Internal Medicine, American Board of Emergency Medicine, American Board of Medical Specialties, Subspecialty in Geriatrics, and American Academy of HIV Medicine, HIV Specialist.  During the relevant time, Dr. Henry provided ONS to WellPoint's subscribers.   ONS fees account for approximately 30-35% of Dr. Henry's annual revenue.

197.   Because patients find it difficult to pay out of pocket for medical treatment at the time of service, they rely on their health plans to reimburse their physicians for their services.  While this arrangement is generally beneficial for the patient who does not have to pay for his treatment at the time of service, it leaves the Provider Plaintiffs and members of the Provider Class to advance the cost of such medical treatment until they receive payment from their patients' insurers.  To facilitate direct payment from insurers, Dr. Henry's patients sign a form assigning their health benefits to him before treatment.   This form includes an express authorization by the patient for insurers, such as WellPoint, to remit payment for "professional services otherwise payable to [the patient] or the holder of the policy" directly to Dr. Henry.

198.   At all relevant times, Dr. Henry utilized a HCFA 1500 form, or more recently, a CMS 1500 form, to submit claims to WellPoint for payment. Dr. Henry's claims are routinely submitted electronically. Once an electronic claim is submitted it passes through a clearinghouse before reaching WellPoint. All of Dr. Henry's claims are submitted to WellPoint using CPT codes, Healthcare Common Procedure Coding System ("HCPCS") and modifiers, as necessary. Dr. Henry does not find out his compensation from WellPoint for services rendered until after a procedure is performed and a claim for payment is submitted.

199.   At all relevant times, Dr. Henry expected to be reimbursed by WellPoint at the lesser of his billed charges or the current UCR.  WellPoint defines UCR as follows:

A "usual" charge is the amount that is most consistently charged by an individual physician for a given service.  A "customary" charge is the amount that falls within a specified range of usual charges for a given service billed by most physicians with similar training and experience within a given geographic area.  A "reasonable" charge is a charge that meets the Usual and Customary criteria, or is otherwise reasonable in

First Consolidated Amended Complaint

light of the complexity of treatment of the particular case. Under a UCR Program, the payment is the lowest of the actual billed charge, the physician's usual charge or the area customary charge for any given covered service.

200.   On September 8, 2008, Dr. Henry provided covered medical services to a patient subscriber of Blue Cross of California, a plan administered by Defendant WellPoint.  Dr. Henry submitted the appropriate CMS 1500 (or its equivalent) to WellPoint for payment for these services.  On September 19, 2008, Blue Cross of California sent an EOB by U.S. mail to Dr. Henry, informing him that for each of the procedure codes that he submitted "[t]his is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed expense."  In other words, out of the $289.00 of billed charges submitted by Dr. Henry, Blue Cross of California did not allow payment of $150.60, leaving Dr. Henry out of pocket for his services.

201.   On June 19 and 26 of 2008, Dr. Henry provided covered medical services to a patient subscriber of Blue Cross of California, a plan administered by Defendant WellPoint.  Dr. Henry submitted the appropriate CMS 1500 (or its equivalent) to WellPoint for payment for these services.  On July 7, 2008, Blue Cross of California sent an EOB by U.S. mail to Dr. Henry, informing Dr. Henry that for each of the procedure codes that he submitted "[t]his is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed expense."  In other words, out of the $286.00 of billed charges submitted by Dr. Henry, Blue Cross of California did not allow payment of $129.95, leaving Dr. Henry out of pocket for his services.

202.   At various times, WellPoint unlawfully diminished Dr. Henry's compensation by improperly calculating UCRs and then misapplying these rates to his claims.  Dr. Henry's EOBs and Remittance Advices often state that his billed charges purportedly are "in excess of the allowed expense for a non-participating provider,"

First Consolidated Amended Complaint

and that the "Health Plan is not responsible for any amounts in excess of this allowed expense." Nowhere on the EOBs, Remittance Advices or elsewhere in any other correspondence sent to Dr. Henry does WellPoint or its Blue Cross of California subsidiary discuss or identify how it actually calculates UCRs. The EOBs do not even specify whether Ingenix data or some other methodology was used in these calculations.

203. WellPoint's EOBs are intentionally uninformative, false and misleading regarding the use of UCRs. This ambiguity has resulted in the inconsistent ONS reimbursements. WellPoint has repeatedly reimbursed Dr. Henry differently for identical procedures performed within the same timeframe, with no explanation for the discrepancy.

### Plaintiff Dr. Schwendig

204. Plaintiff Dr. Schwendig is a trauma surgeon at Scripps Memorial Hospital in La Jolla, California. He is licensed to practice medicine in the State of California, and has been certified by the American Board of Surgery and National Board of Medical Examiners. At all relevant times, Dr. Schwendig provided ONS (in the form of emergency and trauma healthcare services) to WellPoint subscribers.

205. As an emergency department-based trauma surgeon, Dr. Schwendig is responsible for the initial resuscitation and stabilization of patients. Under California's Health and Safety Code, emergency room doctors are obligated to treat all emergency room patients without regard to whether they are insured or able to pay. Calif. Health & Safety Code §1317. The Code further provides that health plans must pay for emergency medical services (by implication and judicial interpretation at UCRs). Calif. Health & Safety Code §1371.4(b). This is necessary because emergency room patients are in need of immediate care and generally are not in a position to choose their physicians as routine patients do – in other words, in-network or out-of-network considerations do not apply under such circumstances.

206.   On September 10 through 18, 2007, Dr. Schwendig provided emergency healthcare services to a patient subscriber of Blue Cross of California, a plan administered by Defendant WellPoint. Dr. Schwendig, through his billing service, submitted the appropriate CMS 1500 (or its equivalent) to WellPoint for payment for these services. On September 29, 2007, Blue Cross of California sent an EOB by U.S. mail to Dr. Schwendig informing him that for each of the procedure codes that he submitted "[t]his is the amount in excess of the allowed expense for a non-participating provider."   In other words, out of the $2,234.00 in billed charges submitted by Dr. Schwendig, Blue Cross of California did not allow $708.23. On October 19, 2007, Dr. Schwendig appealed this underpayment by letter sent by U.S. mail, which stated that "[t]here is an amount of $708.23, denied as 'over allowed amount', that remains to be paid.  According to our records, no contract exists between Dr. James Schwendig and Blue Cross that would obligate him to accept your "allowed amount" as payment in full for his services. Please re-process this claim for payment of the full billed charge amount as soon as possible.  Please also keep in mind that this was a Trauma/Emergency situation and the patient had no choice of physicians." On November 19, 2007, Blue Cross of California reprocessed the claims and sent a second EOB by U.S. mail to Dr. Schwendig.  This time, Blue Cross of California paid an additional amount for the patient's co-insurance, but nothing more for the disallowed amounts, stating the same basis for the underpayment determination.   As a result of WellPoint's improper ONS determination, Dr. Schwendig was forced to send his patient to collections to recover the $708.23 of his billed charges, but the patient has not paid this amount and Dr. Schwendig remains out of pocket for this amount.

207.   Dr. Schwendig's patients are typically unable to make an "assignment of benefits" prior to treatment.  Nevertheless, WellPoint routinely acknowledges an assignment of benefits by sending EOBs and remitting payment directly to Dr. Schwendig for services rendered. At times, however, and for no apparent reason,

WellPoint will send payment to the patient instead, forcing Dr. Schwendig to attempt to recoup his lawful reimbursement from the patient. This presents a significant hardship for trauma surgeons like Dr. Schwendig who rarely treat their patients on a long-term basis; continued treatment is generally delivered by specialists or the patient's primary care physician. Trauma surgeons like Dr. Schwendig may never see their patients after discharge.

208.   At all relevant times, Dr. Schwendig utilized a HCFA 1500 form, or more recently, a CMS 1500 form, to submit claims for payment to WellPoint. Dr. Schwendig's claims are routinely submitted electronically. Once an electronic claim is submitted, it passes through a clearinghouse before reaching WellPoint. All of Dr. Schwendig's claims are submitted using CPT codes, HCPCS and modifiers, as necessary. Dr. Schwendig does not find out his compensation from WellPoint for services rendered until after a procedure is performed and a claim for payment is submitted.

209.   Rather than simply pay Dr. Schwendig the lesser of his billed charges or UCRs, WellPoint routinely and deliberately reimbursed his claims at the False UCR levels, requiring him to expend significant amounts of time and energy identifying and appealing improperly reimbursed claims. As a result, WellPoint unlawfully diminished Dr. Schwendig's compensation by improperly calculating UCRs and misapplying these faulty rates to his claims. Dr. Schwendig's EOBs and Remittance Advices often state that his billed charges purportedly are "in excess of the allowed expense for a non-participating provider." Nowhere on the EOBs, Remittance Advices or elsewhere in any other correspondence sent to Dr. Schwendig does WellPoint discuss or identify how it actually calculates UCR. The EOBs do not even specify whether Ingenix data or some other methodology was used in these calculations.

210.   Upon identifying improper payment of a claim by WellPoint, Dr. Schwendig – through his medical billing service, Practice Development Strategies

First Consolidated Amended Complaint

("PDS") – promptly appealed the determination by sending a formal letter asking WellPoint to reprocess the claim for additional payment. Dr. Schwendig has appealed several of WellPoint's claims determinations in this regard. Each appeal letter sent by PDS on Dr. Schwendig's behalf states that "no contract exists between Doctor James Schwendig and Blue Cross that would obligate him to accept WellPoint's 'allowed amount' as payment in full for his services," and further explains that "this was a Trauma/Emergency situation and the patient had no choice of physicians." In addition to sending these appeals letters, PDS made telephone calls on Dr. Schwendig's behalf to WellPoint to appeal the insurer's wrongful determinations. Dr. Schwendig has repeatedly exhausted any administrative appeals available through WellPoint without succeeding in obtaining full and proper reimbursement for his services.

### *Plaintiff Dr. Peck*

211.   Plaintiff Dr. James Peck, Psy.D., is a clinical psychologist who resides in Marina Del Rey, California and maintains a private practice in Santa Monica, California.   Dr. Peck also works at UCLA in Los Angeles, California.   One of Dr. Peck's areas of focus is in substance abuse treatment.  He completed a three-year National Institute of Health/National Institute on Drug Abuse (NIH/NIDA) Postdoctoral Fellowship at UCLA and holds the American Psychological Association/College of Professional Psychology Certificate of Proficiency in the Treatment of Alcohol and other Psychoactive Substance Use Disorders.  Dr. Peck is also a member of an internationally recognized substance abuse research group at the David Geffen School of Medicine at UCLA.  He also specializes in HIV prevention for high-risk populations and served as the Principal Investigator of a NIDA-funded study of an intervention for methamphetamine-abusing HIV-positive patients at the UCLA CARE Clinic.

212.   As part of his private practice, Dr. Peck has obtained assignments of benefit payment rights from insureds covered under WellPoint employer sponsored

First Consolidated Amended Complaint

1  and non-employer sponsored healthcare plans, and for such plans where WellPoint
2  functions as a plan administrator under ERISA.

3       213.   During the relevant time, Dr. Peck was an ONS Provider to insureds
4  covered by WellPoint's plans, and remained free to charge his patients his actual
5  charges for medical services rendered.   During that time, Dr. Peck had no direct
6  contractual relationship with WellPoint.

7       214.   Because he was not in WellPoint's network of preferred providers,
8  Dr. Peck, like other Class Members, obtained assignments from his patients, through
9  which he was paid directly by WellPoint for providing healthcare to its insureds.
10  These assignments did not alter the legal relationship between WellPoint and its
11  insureds, but rather provided the convenience of allowing its insureds to obtain needed
12  healthcare on the implicit promise of later payment by WellPoint to Dr. Peck.

13       215.   The assignment of benefit forms that Dr. Peck and Provider Class
14  members obtain from their WellPoint patients are security for future payment by
15  WellPoint and direct WellPoint, as the patient's insurer, to pay the benefit claim
16  directly to the out-of-network healthcare provider.   Dr. Peck could and did check
17  claim coverage and obtain pre-authorization from WellPoint before performing
18  services for WellPoint's insureds, but like other Class Members, Dr. Peck was not told
19  WellPoint's intended UCR reimbursement amount.  Payment amount was unknown in
20  advance and payment was frequently not automatic, unlike the services WellPoint has
21  obtained for its insureds.

22       216.   Dr. Peck, like other Class Members, submitted his claims to WellPoint
23  using standardized procedural codes such as CPT Codes, HCPCS (Healthcare
24  Common Procedure Coding System) Codes, and modifiers, as needed, on a HCFA
25  form 1500 (n/k/a CMS 1500).   These claims were submitted to WellPoint either in
26  paper form or electronically and may or may not have been immediately processed by
27  an electronic clearinghouse before reaching WellPoint.  Dr. Peck could submit larger
28  claims to WellPoint on paper using the U.S. mail.

217.   Dr. Peck received EOBs from WellPoint indicating that his bills and his patients' claims were processed and/or administered by Anthem Blue Cross.  For example, Dr. Peck billed Anthem Blue Cross $150 on April 1, again on April 11 and again on April 29, 2009, for Procedure Code 90806 services he performed on each of those three days.  Anthem Blue Cross did not pay him $150 for each such service.  Instead, on May 21, 2009, Anthem Blue Cross issued an EOB indicating that it reduced the allowable amount down to $107.13 on the false premise that it represented the UCR amount for out-of-network providers.

218.   With respect to the False UCRs WellPoint and its subsidiary Anthem Blue Cross imposed on Dr. Peck, any exhaustion of administrative remedies with respect to those UCR determinations would be futile, because WellPoint, as a matter of policy, refuses to alter or reprocess claims that have been processed pursuant to the Ingenix Database.  Regardless, Dr. Peck has satisfied any applicable exhaustion requirements.

219.   Dr. Peck has called Anthem Blue Cross at the number provided on its EOBs and challenged the $107.13 "allowed amount" as unreasonable and below the UCR amount for the Los Angeles metropolitan area.  Anthem Blue Cross advised Dr. Peck that the "allowable amount" was all he was entitled to be paid as an out-of-network provider in that geographical area.  Dr. Peck also submitted a written dispute challenging the UCR determination, which was received by Anthem Blue Cross on June 20, 2009.  On August 14, 2009, Anthem Blue Cross sent Dr. Peck a letter denying his appeal, stating that Dr. Peck's claim "was appropriately paid based upon the 'reasonable and customary' value of the services [he] rendered" and that the "decision is final and all levels of [its] appeal process have been exhausted."

### Plaintiff Dr. Pariser

220.   Plaintiff Michael Pariser is a licensed psychologist and certified psychoanalyst who practices and resides in Los Angeles, California.  He previously held teaching positions at the California Graduate Institute and the Institute for

Contemporary Psychoanalysis. Currently, in addition to his psychotherapy practice, Plaintiff Pariser supervises psychology interns at the Chicago School Counseling Center.  In his private practice, Dr. Pariser specializes in providing individual psychotherapy. Dr. Pariser is, and throughout the relevant time alleged herein has been, an out-of-network healthcare provider to insureds covered by plans insured and/or administered by WellPoint, and remained and continues to remain free to charge his patients his actual charges for medical services rendered.  During the relevant time, Dr. Pariser has had no direct contractual relationship with WellPoint. His experience with WellPoint is typical of other Class Members' experience during the relevant time.

221.    Because he has been and continues to be a non-MD healthcare provider not in WellPoint's network of preferred providers, Dr. Pariser, as with other Class Members, typically has, and continues to obtain, a claim assignment from his patients, through which WellPoint has, and continues to, pay him for providing healthcare to its subscribers.  These claim assignments do not alter the legal relationship between WellPoint and its subscribers, but rather provide the convenience of allowing these subscribers to obtain needed healthcare on the implicit promise of later payment by WellPoint. ONS fees from WellPoint subscribers account for approximately 25% of Dr. Pariser's income.

222.    The assignment of benefits that Dr. Pariser and Class Members obtain from their WellPoint patients are security for future payment by WellPoint and direct WellPoint, as the patient's insurer or as the administrator of the patient's insurer, to pay the claim directly to the out-of-network healthcare provider.  The assignment of benefits form Dr. Pariser receives from his patients and relied on for the claims he submits to WellPoint has an express authorization by the subscriber for insurers, including Anthem Blue Cross and Blue Cross of California, to assign "any benefits to be received for services performed and submitted on my behalf by Dr. Michael Pariser to be paid directly to Dr. Pariser."

74

223. As with all other Class Members, Dr. Pariser was not told WellPoint's intended UCR reimbursement amount prior to the completion of his service. Indeed, as with all other Class Members, WellPoint would not have disclosed or advised Dr. Pariser of the UCR reimbursement amount before he treated the subscriber even if Dr. Pariser verified claim coverage and obtained pre-authorization from WellPoint before treating WellPoint's subscribers. Payment was unknown and frequently not automatic – unlike the services WellPoint obtained for its subscribers.

224. Dr. Pariser, like other Class Members, submitted and continues to submit his claims to WellPoint using standardized procedural codes such as CPT Codes, as needed, on a HCFA 1500 form (n/k/a CMS 1500). These claims are submitted to WellPoint either in paper form or electronically and may or may not have been immediately processed by an electronic clearinghouse before reaching WellPoint. Dr. Pariser could submit larger claims to WellPoint on paper using the U.S. mail.

225. At all relevant times, Dr. Pariser expected to be reimbursed by WellPoint at the lesser of his billed charge or the current UCR.

226. WellPoint unlawfully diminished Dr. Pariser's compensation by improperly calculating UCRs and then misapplying these rates to his claims, as described herein. Dr. Pariser received EOBs and Remittance Advices from WellPoint. Dr. Pariser's EOBs and Remittance Advices often stated that his billed charges purportedly were "in excess of the allowed expense for a non-participating provider," and that the "Health Plan is not responsible for any amounts in excess of this allowed expense." However, nowhere in the EOBs, Remittance Advices or any other correspondence sent to Dr. Pariser does WellPoint discuss or identify how it actually calculates UCR. The EOBs do not even specify whether Ingenix data or some other methodology was used in these calculations. For example, when Dr. Pariser billed WellPoint his usual $200 rate for Procedure Code 90806, WellPoint did not pay him $200, but rather imposed an "allowed amount" of $107.13 on the false premise that it represented the UCR amount and then paid him the percentage of the UCR amount

provided under the patient's plan. Dr. Pariser's patients are responsible for amounts owed to him in excess of WellPoint's allowed UCR reimbursement amount.

227.   With its methods for calculating UCRs shrouded in a veil of secrecy, WellPoint has been able to derive improper rates using faulty data, and apply them to out-of-network provider claims to diminish lawful reimbursements to Dr. Pariser and the Classes.

228.   Dr. Pariser contacted WellPoint approximately one year ago and complained about WellPoint's decreasing the UCR for his service and to learn about his avenues of redress. WellPoint informed Dr. Pariser that the UCR amount stated on its EOBs for his service was correct and was given the impression that there was nothing he could do to further challenge the UCR.

229.   With respect to UCR reductions WellPoint imposed on Dr. Pariser, any exhaustion of administrative remedies with respect to the UCR determinations would be futile for several reasons, including: (i) WellPoint, as a matter of policy, refuses to alter or reprocess claims that have been processed pursuant to the Ingenix Database or other faulty data it uses; (ii) other out-of-network providers have already submitted and completed claims through WellPoint's administrative process seeking to increase their reimbursements based on WellPoint's faulty UCRs and WellPoint has denied each of those claims; and (iii) WellPoint, as described herein, has expressed its intent to continue using Ingenix and other faulty data for UCR determinations by expressly agreeing with the NYAG that it will not stop using the faulty data until 60 days after it is notified that a new database has been developed.

230.   Alternatively, Dr. Pariser should be deemed to have exhausted any claims that otherwise were not exhausted, due to WellPoint's inadequate disclosure concerning grievance procedures and its violation of ERISA and the applicable ERISA regulations.

*Plaintiff Dr. Melamed*

231.   Dr. Melamed is an out-of-network provider with regard to WellPoint. On numerous occasions he has provided healthcare services to subscribers to WellPoint plans, including plans insured or administered by WellPoint subsidiaries Blue Cross of California, BC Life & Health Insurance Company and Anthem Blue Cross, for which he has billed his usual and customary charges for such services.

232.   As a matter of course, Dr. Melamed obtains written assignments from his patients who are WellPoint insureds pursuant to which they authorize him to submit claims directly to, and receive payments directly from, WellPoint.   Moreover, Dr. Melamed's patients agree to be financially responsible for any portion of his bills that are not covered by WellPoint.   Pursuant to his assignment, Dr. Melamed has standing to pursue directly any claims for denied or reduced benefits.

233.   When Dr. Melamed submits a claim for benefits to WellPoint pursuant to his assignments from his WellPoint patients, he receives an EOB from the applicable WellPoint entity.  The EOBs report the benefits that are being paid to him pursuant to the terms and conditions of his patients' WellPoint healthcare policy.

234.   On numerous occasions, Dr. Melamed has received EOBs from Anthem which report that a portion of his usual and customary billed charges are being excluded from coverage based on the explanation that "this is the amount in excess of the allowed expense for a non-participating provider."  WellPoint further frequently states that it "is not responsible for any amounts in excess of this allowed amount."

235.   The following is a summary of some of the reductions Dr. Melamed has been subjected to by WellPoint, along with the explanations provided by WellPoint in its EOBs:

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per BC of Cal. EOB dated 02/10/06) | | | |
| 01/06/06 | $100 | $12.44 (01) | $87.56 |
| | | 01 – This is the amount in excess of the allowed expense for a non-participating provider. | |

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per BC of Cal. EOB dated 08/08/06) | | | |
| 01/06/06 | $500<br>$500 | $409.12 (02)<br>$470.73(02) | $90.88<br>$29.27 |
| Total: | $1,000 | $879.85 | $120.15 |
| | | 02 – This is the amount in excess of the allowed expense for a non-participating provider. | |

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per BC of Cal. EOB dated 9/14/06) | | | |
| 01/17/06 | $2,350<br>$2,350<br>$1,000<br>$1,000<br>$1,000<br>$1,800<br>$500<br>$350 | $1,957.22 (01)<br>$1,957.22 (01)<br>$676.54 (01)<br>$676.54 (01)<br>$676.54 (01)<br>$1,800 (01)<br>$500 (01)<br>$278.50 (01) | $392.78<br>$392.78<br>$323.46<br>$323.46<br>$323.46<br>$0<br>$0<br>$10.15 |
| Total: | $10,350 | $8,522.56 | $1,766.09 |
| | | 01 – This is the amount in excess of the allowed expense for a non-participating provider. | |

First Consolidated Amended Complaint

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per BC of Cal. EOB dated 02/13/08) | | | |
| 11/12/07 | $5,750<br>$1,800<br>$750 | $4,106.55 (01)<br>$1,471.60 (01)<br>$509.09 (01) | $1,643.45<br>$328.40<br>$240.91 |
| Total: | $8,300 | $6,087.24 | $2,212.76 |
| | 01 – This is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed amount. | | |

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per Anthem EOB dated 09/26/08) | | | |
| 09/16/08 | $100<br>$480 | $40.07 (01)<br>$408.14 (01) | $59.93<br>$71.86 |
| Total: | $580 | $448.21 | $131.79 |
| | 01 – This is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed amount. | | |

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per Anthem EOB dated 10/18/08) | | | |
| 09/29/08 | $350 | $137.86 (01) | $212.14 |
| | 01 – This is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed amount. | | |

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per Anthem EOB dated 12/04/08) | | | |
| 07/23/08 | $350<br>$480 | $137.86 (01)<br>$402.04 (01) | $212.14<br>$77.96 |
| Total: | $830 | $539.90 | $290.10 |
| | 01 – This is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed amount. | | |

First Consolidated Amended Complaint

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per Anthem EOB dated 12/04/08) | | | |
| 08/01/08 | $3,500<br>$350 | $3,383.09 (01)<br>$240.69 (01) | $116.91<br>$109.31 |
| Total: | $3,850 | $3,623.78 | $226.22 |
| | | 01 – This is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed amount | |

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per Anthem EOB dated 01/07/09) | | | |
| 11/04/08 | $11,260<br>$2,100<br>$350<br>$1,380 | $9,537.11 (01)<br>$1,716.62 (01)<br>$315.23 (01)<br>$1,139.09 | $1,712.89<br>$383.38<br>$34.77<br>$240.91 |
| Total: | $15,090 | $12,708.05 | $2,371.95 |
| | | 01 – This is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed amount. | |

236.   Dr. Melamed did not appeal these reductions in benefits because, from the EOB, it did not appear that he had a basis for doing so.  The EOB did not provide any explanation as to why the benefit had been reduced other than to say it was in "excess of the allowed expense," which suggested that its decision was based on the terms and conditions of his patients' healthcare policies.  To the extent the patients' policy established an explicit "allowed expense" for non-par providers, there would be no valid basis for appealing the coverage determination.

237.   WellPoint's EOBs violate ERISA regulations with regard to proper disclosures of its adverse benefit determinations.  As a result, "deemed exhaustion" applies, whereby Dr. Melamed is not required to exhaust any administrative remedies that would otherwise be available.  Further, for the reasons detailed below, such an administrative appeal would be futile in any event.

First Consolidated Amended Complaint

238.   Based on information and belief, when WellPoint reduces benefits based on its finding that the billed charges were "in excess of the allowed expense for a non-participating provider," it is applying the UCR exclusion from its healthcare policies. Similarly, based on information and belief, WellPoint relies on the Ingenix Database to determine the "allowed expenses," notwithstanding that this was never disclosed to Dr. Melamed.

239.   As a result of the assignments he has received from his WellPoint insureds, and on WellPoint's acceptance of such assignments as reflected in its payment to him directly of any benefits it determines to be available under its healthcare plans, Dr. Melamed has standing to pursue this claim for benefits.

### *Plaintiff Dr. Kavali*

240.   Plaintiff Carmen Kavali, M.D., is a plastic surgeon with a private practice in Atlanta, Georgia. Dr. Kavali is board certified by the American Board of Plastic Surgery and serves on the staff of Northside Hospital and the Center for Plastic Surgery. She is a citizen of the state of Georgia and is licensed to practice medicine in Georgia. Dr. Kavali does not currently participate in the WellPoint physician network and sees WellPoint patients only on a non-participating basis.

241.   Dr. Kavali previously entered into a Provider Agreement with WellPoint entity Blue Cross Blue Shield of Georgia and, as a result, became a member of the WellPoint provider network. On July 25, 2007, Dr. Kavali sent both a fax and a certified letter notifying WellPoint that she was terminating the contract and that she understood the termination would become effective as soon as possible but no later than ninety days after WellPoint's receipt of the letter. As a result, on or before October 23, 2007, Dr. Kavali was no longer a participant in the WellPoint network and thus, with respect to WellPoint, had the status of a non-participating physician thereafter.

242.   Throughout the relevant time, Dr. Kavali provided out-of-network healthcare services to WellPoint plan enrollees. Dr. Kavali's experience with

1    WellPoint's unlawful business practices is typical of what has happened to the
2    Provider Class as a whole.

3        243.   Before and no later than October 23, 2007, Dr. Kavali treated patients
4    with coverage under plans covered or administered by WellPoint on an out-of-
5    network basis.   In each case, Dr. Kavali has obtained from the patient signed
6    Assignment of Benefits form. Customarily, before Dr. Kavali performs a procedure
7    for these patients, her office staff will contact WellPoint to confirm coverage, the lack
8    of a pre-certification requirement, inquire about the basis upon which payment to her
9    will be made, and ask for the amount of the payment so that the patient's share of the
10   cost can be calculated.  WellPoint, however, customarily refuses to explain the basis
11   upon which payment will be made and will not disclose the amount that Dr. Kavali
12   will receive.  The only information that WellPoint typically will disclose is the amount
13   of the patient's co-insurance, the out-of-network deductible, and how much of the
14   deductible has already been met.

15       244.   After receipt of Dr. Kavali's claim for medical services, WellPoint
16   customarily will send to her or to her patient an EOB (such as a "Provider Explanation
17   of Medical Benefits Report," "Remittance Advice" or similar explanation of benefits)
18   that specifies the amount being paid for each of the services that were provided.  In
19   each instance, the EOB shows that the amount paid by WellPoint has been less than
20   the billed charge.  WellPoint has given various explanations for its decision not to pay
21   the full amount, such as "this charge has been processed based upon the provider's
22   participation status and your contract terms."

23       245.   On November 6, 2007, Dr. Kavali provided covered medical services to
24   patient E.P.  Dr. Kavali obtained an Assignment of Benefits from the patient before
25   providing treatment. On December 13, 2007 Dr. Kavali mailed through the U.S. mail
26   to BCBS of Georgia, a WellPoint subsidiary, a complete and clean HCFA form
27   submitting CPT 19357.  CPT Code 19357 indicates that the procedure involved a
28   "breast reconstruction, immediate or delayed, with tissue expander, including

First Consolidated Amended Complaint

subsequent expansion." Her submitted charge was $6,240.  After applying the patient's $31.82 deductible and $32.01 coinsurance amounts, BCBS reduced Dr. Kavali's $6,240 submitted charge by $4,586.28.  BCBS allowed payment of $1,589.89 rather than $6,176.17.

246.  On or about January 10, 2008, BCBS sent through the U.S. mail to Dr. Kavali and/or her patient an EOB for services provided on November 6, 2007 for patient E.P.  The EOB provided no explanation for the reduction of benefits.  Dr. Kavali did not bill patient E.P. for said service.

247.  On December 4, 2007, Dr. Kavali provided covered medical services to patient S.B.  Dr. Kavali obtained an Assignment of Benefits from the patient before providing treatment.  On or about December 4, 2007, Dr. Kavali mailed through the U.S. mail to BCBS of Georgia, a WellPoint subsidiary, a complete and clean HCFA form submitting CPT Code 19370-50.  CPT Code 19370 indicates that the procedure involved an "open periprosthetic capsulotomy, breast."  Modifier 50 was used to indicate that the procedure was bilateral.  Her submitted charge was $6,500.  After applying the patient's $370.31 coinsurance amount, BCBS reduced Dr. Kavali's $6,500 submitted charge by $5,265.65.  BCBS allowed payment of $864.04 rather than $4,550.

248.  On or about January 4, 2008, BCBS sent through the U.S. mail to Dr. Kavali and/or her patient an EOB for services provided on December 4, 2007 for patient S.B.  The EOB did not provide an explanation for the reduction of benefits.  Dr. Kavali did not balance-bill patient S.B. for said service.

249.  By using the Ingenix Database to calculate the amount she receives for her services, WellPoint and its subsidiaries improperly and unlawfully diminished the compensation to which Dr. Kavali is entitled.  Because she typically is unable to collect from her patients the full amount of her billed charges, Dr. Kavali has been injured monetarily as a direct and proximate result of WellPoint's improper conduct.

250.   The EOBs issued by WellPoint relating to the out-of-network patients treated by Dr. Kavali do not provide any procedures or process by which to appeal the amount of compensation.   Even if the EOBs are received by Dr. Kavali, which typically they are not, it is unclear if the adjudication may be appealed or if so, how. The EOB-related documents simply contain a statement that "if you have any questions, please call" and a toll free telephone number is given.  A website to "view eligibility, benefits or claim details online" is provided.

251.   Dr. Kavali understands from the information she does receive from WellPoint that, as an out-of-network provider, it is not necessary to file a written appeal to WellPoint. WellPoint only provides appeal procedures to participating providers. Dr. Kavali or her staff has telephoned WellPoint entities to complain about the amounts of compensation paid for a particular service without any success in obtaining additional payment.

252.  Any further appeal to WellPoint regarding the amount of her compensation would have been futile as WellPoint did not disclose and, indeed, concealed its use of the Ingenix Database to diminish payments based upon UCRs and routinely asserted that it was paying the proper amount due under the patient's plan. Further, it would have been inconsistent with WellPoint's scheme to disclose to physicians such as Dr. Kavali as part of any appeal process that it was manipulating the calculation of UCRs or to provide additional compensation to physicians as such additional payments would have constituted an admission of its improper conduct.

### Plaintiff NPSC

253.   NPSC's surgical facility is located in Torrance, California and is and at all relative times has been accredited by the Accreditation Association for Ambulatory Health Care ("AAAHC").   The AAAHC presently accredits over 4,000 ASCs. According to the Ambulatory Surgery Center Association ("ASC Association"), over 8 million surgeries are performed yearly at ACSs in the United States.

First Consolidated Amended Complaint

254. To facilitate direct payment from insurers such as WellPoint, NPSC has each patient execute an assignment form that assigns their health benefits to NPSC in advance of any procedure performed at its facility and, further, permits NPSC to communicate directly with the insurer concerning payment of those health benefits and facilities fees. As part of this process, NPSC also attempts to obtain pre-approval of its claims from insurers whenever possible.

255. All of NPSC's claims for payments are submitted to WellPoint using ICD-9 codes and CPT codes and modifiers, if necessary. NPSC is not advised of the facilities fees to be paid by WellPoint for services provided until after a procedure is performed and a claim for payment is submitted.

256. At all relevant times, NPSC expected to be reimbursed by WellPoint at the lesser of its billed charges or the current UCR. WellPoint defines UCR as follows:

> A "usual" charge is the amount that is most consistently charged by an individual physician for a given service. A "customary" charge is the amount that falls within a specified range of usual charges for a given service billed by most physicians with similar training and experience within a given geographic area. A "reasonable" charge is a charge that meets the Usual and Customary criteria, or is otherwise reasonable in light of the complexity of treatment of the particular case. Under a UCR Program, the payment is the lowest of the actual billed charge, the physician's usual charge or the area customary charge for any given covered service.

257. At various times, WellPoint unlawfully diminished NPSC's compensation by improperly calculating UCRs and then misapplying these rates to its claims. NPSC has also expended considerable time and resources dealing with issues concerning Defendants' improper UCR reimbursements and, as a result, has suffered direct and actual harm. NPSC seeks damages and other appropriate relief on behalf of itself and as a representative of other similarly situated facilities.

First Consolidated Amended Complaint

258.   With regard to the specific experiences of Plaintiffs Roberts, Cooper, Rivera-Giusti, Henry, Schwendig, Peck, Pariser, Melamed, Kavali and the NPSC, WellPoint failed to comply with the terms of the operative healthcare plan by making UCR determinations based on Ingenix's False UCR schedules, which had the effect of covering less than the percentage of providers' charges that WellPoint had agreed to pay.   As a consequence of these actions, even after Plaintiffs appealed, they were reimbursed less than what should have been paid under terms of applicable health plans.   WellPoint pursued its standard and uniform policies in making UCR determinations in a fashion that conflicted with its contractual obligations under the relevant plans, and doing so violated its fiduciary obligations to the Provider Plaintiffs.   In addition, WellPoint misrepresented to the Provider Plaintiffs and its subscribers that the UCR amounts were calculated on the basis of valid and accurate data.

### An Administrative Appeal to WellPoint of Its UCR Determinations Is Futile, Such that Exhaustion Under ERISA Is Excused

259.   The manner in which WellPoint responds to appeals to its UCR determinations establishes clearly that pursuing an administrative appeal of such benefit determinations would be futile.

260.   Plaintiffs Henry's, Schwendig's, Peck's, Pariser's, Melamed's, Kavali's and NPSC's experiences with WellPoint are typical of the treatment endured by the Association Plaintiffs' tens of thousands of members who provide ONS services and consistently are not only underpaid, but must expend significant time and energy fighting an intransigent corporate bureaucracy that purposefully obfuscates and frustrates out-of-network providers into accepting lower fees for their services.

261.   With regard to the specific experiences of Plaintiffs Roberts, Cooper, Rivera-Giusti, Henry, Schwendig, Peck, Pariser, Melamed, Kavali and the NPSC's WellPoint failed to comply with the terms of the operative healthcare plan by making UCR determinations based on Ingenix's False UCR schedules, which had the effect of

First Consolidated Amended Complaint

covering less than the percentage of providers' charges than WellPoint had agreed to pay. As a consequence of these actions, even after appealing, Plaintiffs Roberts, Henry, Schwendig, Peck and Pariser were reimbursed less than what should have been paid under terms of applicable health plans. WellPoint pursued its standard and uniform policies in making UCR determinations in a fashion that conflicted with its contractual obligations under the relevant plans, and by doing so violated its fiduciary obligations to the Provider Plaintiffs. In addition, WellPoint misrepresented to the Provider Plaintiffs and its subscribers that the UCR amounts were calculated on the basis of valid and accurate data.

262. One example is a WellPoint insured (referred to here as "Subscriber X" to maintain confidentiality) who was insured by WellPoint under a self-funded plan based in California. Pursuant to the Certificate of Coverage provided to Subscriber X by his employer, claims were administered by WellPoint subsidiary Blue Cross of California on behalf of BC Life & Health Insurance Company.

263. Under the terms of the WellPoint plan, Subscriber X was entitled to obtain healthcare services from non-par providers, and benefits would be "the lesser of the billed charge or (1) for a physician, the customary and reasonable charge or (2) for other than a physician, the reasonable charge."

264. "Customary and reasonable charge" was defined in the plan as follows:

> **Customary and reasonable charge**, as determined annually by the claims administrator, is a charge which falls within the common range of fees billed by a majority of physicians for a procedure in a given geographic region. If it exceeds that range, the expense must be justified based on the complexity or severity of treatment for a specific case.

265. Subscriber X received complicated surgery from a non-par provider in September 2008. The non-par provider billed for two services, one for $10,424 and a second for $4,872. WellPoint (through Anthem Blue Cross) issued an EOB to

Subscriber X in December 2008 in which it excluded $9,999.71 from the first bill and $4,014.36 for the second, based on the following explanatory code:

> This is the amount in excess of the allowed expense for a non-participating provider. The Health Plan is not responsible for any amounts in excess of this allowed expense. Refer to your plan of coverage booklet for details regarding the schedule of benefits.

266. Based on the healthcare plan covering Subscriber X, it is self-evident that WellPoint reduced the benefits by a total of 91.6% based on its "customary and reasonable charge" exclusion, but used, as its explanation, its reference to "the amount in excess of the allowed expense for a non-participating provider." This is the identical explanation used to explain the reduced benefits for Plaintiff Melamed, as detailed above.

267. After receiving the EOB reflecting such a substantial reduction in benefits, Subscriber X sought to appeal the denial. She first wrote to her employer, which served as the designated plan administrator, but her administrator denied the appeal. She also had a telephone conference with the plan administrator as well as with a representative from WellPoint to pursue her appeal, but she was informed that no change would be made. In that call, WellPoint confirmed that it relied on the Ingenix Database for determining its benefit levels for non-par providers and that it would not reconsider its decision.

268. When faced with the denials of her appeals, Subscriber X submitted a specific request for additional information to both her employer and WellPoint concerning WellPoint's UCR determinations. In particular, on January 8, 2009, Subscriber X requested the following information from her employer:

> Documentation you have to support your position that their customary and reasonable determination complies with the terms of my health care plan. To the extent that Anthem Blue Cross and Stanford relied on the Ingenix database to set customary and reasonable rates,

please provide me details concerning how it determines customary and reasonable and, moreover, any back-up data upon which the Ingenix database is based for purposes of my claims. I therefore want to see what evidence you have (including all supporting or back-up data) which shows that my providers' charges were in excess of what most other providers would charge for similar services or supplies. I need this information to enable me to facilitate my appeal and to enable me to attempt to demonstrate to you that your customary and reasonable determination is improper.

269. Subscriber X's employer refused to provide further information, explaining on January 9, 2009, that WellPoint was the responsible party, stating:

Regarding your request for additional information, . . . [the Plan] has delegated the responsibility for the processing and payment of claims for participants enrolled in the Blue Cross Prudent Buyer Plan to Blue Cross. Furthermore, Blue Cross is the fiduciary for and has the authority and control over benefit determinations and, as such, would be in the best position to respond to your requests. Toward that end, I will ask them to respond to you directly and to notify me that they have done so.

270. Shortly thereafter, Subscriber X learned that the NYAG had entered into a settlement agreement with United Health Group, the parent company for Ingenix, pursuant to which United agreed to give up its Ingenix Database and to pay $50 million toward funding the creation of a new and independent UCR database. Subscriber X informed her employer of the settlement, which highlighted the problems with the Ingenix Database and how it was being changed in the future. Again, however, Subscriber X's employer took no further action, but continued to defer to WellPoint, stating in an e-mail dated January 20, 2009:

We all fully appreciate the frustration you have with what you perceive to be inadequate reimbursement of the providers who supplied

First Consolidated Amended Complaint

89

services related to your hip surgeries this past summer and your corresponding financial responsibility. As we know you understand, the reimbursement of providers who render care to our employees and their eligible dependents enrolled in the [Plan] is handled by Anthem Blue Cross, to which the Plan has delegated the responsibility for administering the processing and payment of claims and for determining the disposition of any appeals for denials of benefits under the Plan. As a result of the delegation of this fiduciary obligation, [the Plan] has no authority to determine the disposition of any claims . . .

\* \* \* \*

Having said this, we also acknowledge the uncertainty surrounding the use of reasonable and customary charge databases and receipt of your email about the settlement of the investigation undertaken by the Attorney General of the State of New York. We have been told by Anthem Blue Cross that they remain committed to appropriately processing all claims, including those for out-of-network services, fairly reimbursing providers for covered services, and protecting members and employers from excessive charges from certain non-participating providers. We are aware that you have contacted Anthem Blue Cross about your database questions and that they will respond to you directly about the information you have requested. Any further concerns you have about the database and how it is used by Anthem Blue Cross to reimburse non-participating providers should be addressed to them.

271. In light of the employer's response, Subscriber X had to rely entirely on WellPoint (through Anthem) as the sole party that was responsible for making UCR determinations. By letter dated January 29, 2009, WellPoint denied Subscriber X's appeal in full, and refused to provide any further information. In explaining its decision, WellPoint confirmed its use of Ingenix, stating:

A review of your claims history showed that you received services from . . . a non-contracting, non-participating provider with Anthem. The claim and medical records were reviewed by a general surgeon and a board-certified orthopedic surgeon. The review most favorable to you was performed by the general surgeon. . . . Anthem paid [the non-par provider] ***using the Professional Customary and Reasonable fee schedule methodology from an internal database known as Ingenix.***

(Emphasis added.)

272.   WellPoint further explained that it refused to provide any details concerning its UCR determinations or its reliance on Ingenix, stating:

273.   Your appeal letter addressed to [the Plan], requesting additional information on how customary and reasonable payments were calculated on your claims, was forwarded to me for response. Your letter requested "all supporting back-up documentation" upon which the Ingenix database is based. I have been advised that the information you requested is proprietary and confidential. Accordingly, Anthem will not be able to release the information to you.

Finally, WellPoint made clear that its denial of Subscriber X's appeal was final. It stated that "if you continue to disagree with Anthem's payment on the claims . . . you may have received from a non-contracting provider, your SPD provides for binding arbitration if the amount of the dispute is not within the jurisdictional limits of small claims court." WellPoint then concluded that, "[i]f you wish to pursue arbitration or small claims court, please forward your written demand or small claims action to [the Plan]."

274.   Given the experience of Subscriber X, it is clear that the pursuit of an administrative appeal to WellPoint of its UCR determinations would be futile. WellPoint relies exclusively on Ingenix for making UCR determinations and refused to reconsider that reliance, even when confronted with the investigation and settlement

First Consolidated Amended Complaint

1   reached by the NYAG concerning Ingenix.   Moreover, WellPoint precludes an
2   effective appeal of its reliance on Ingenix by refusing to provide any of the
3   "supporting back-up documentation" relating to the Ingenix findings, deeming such
4   information to be "proprietary and confidential."   Under these circumstances, the
5   exhaustion requirement under ERISA should be excused.

6   ## RICO ALLEGATIONS

7   275.   All of the factual allegations set forth above are incorporated by reference
8   as though set forth herein.

9   276.   As described herein, Defendants have undertaken an elaborate fraudulent
10  scheme to underpay for out-of-network services rendered to WellPoint Subscribers by
11  healthcare providers.   This scheme has involved the use of the Ingenix Database to
12  provide false, artificially low reimbursement amounts for ONS, and material
13  misrepresentations and omissions with regard to the source and accuracy of the UCR
14  amounts arrived at by the Defendants.

15  277.   At all relevant times, and as described in this Complaint, Defendants
16  carried out their underpayment scheme to defraud Plaintiffs, the Provider and
17  Subscriber Classes, in connection with the conduct of an "enterprise," within the
18  meaning of 18 U.S.C. §1961(4).

19  278.   Plaintiffs allege that the Defendants' fraudulent scheme was conducted
20  through an association in fact enterprise comprised of WellPoint, UnitedHealth and
21  Ingenix (the "WellPoint-Ingenix Enterprise" or the "Enterprise").

22  279.   The WellPoint-Ingenix Enterprise was formed in 1998, at the time of the
23  sale of the PHCS database by HIAA to Ingenix.

24  280.   Through the Enterprise described above, Defendants undertook a
25  fraudulent scheme to underpay Subscribers and Providers for the ONS provided to
26  WellPoint subscribers.   Through the fraudulent underpayment scheme, WellPoint,
27  UnitedHealth and others agreed to utilize the flawed Ingenix Database for their UCR
28  determinations in an effort to depress the prices paid for ONS by the conspiring

First Consolidated Amended Complaint

healthcare companies.  WellPoint and UnitedHealth knowingly participated in the formation and maintenance of, purchased and utilized the Ingenix Database with the express purpose of depressing their ONS payments and in fact supplied "scrubbed" and otherwise flawed and incomplete data to Ingenix with the purpose of lowering payments for ONS.  Defendants agreed to conceal the flaws in the Ingenix data as well as the scheme to depress ONS payments achieved by use of the Ingenix Database for UCR determinations.  In furtherance of the scheme, WellPoint engaged in thousands, if not millions, of acts of mail and wire fraud.

281.  WellPoint, UnitedHealth and Ingenix were all participants in the Enterprise.

282.  At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. §1962(c).

283.  The WellPoint-Ingenix Enterprise was at all relevant times a continuing unit involving WellPoint, UnitedHealth and Ingenix functioning with a common purpose of reducing the price paid for ONS, and increasing the profits of the Enterprise participants and the Insurer Conspirators.  The Enterprise described above was utilized to create a mechanism or vehicle by which Defendants could reduce payments to Plaintiffs and the Classes for ONS through the use of flawed and invalid data that could not be challenged effectively.  In particular, as described herein, the Enterprise was used to create and administer what appeared to be an appropriate and unassailable database which reported actual charge data; the Ingenix Database was designed to appear valid as a basis for UCR when, in fact, it is and was, invalid.

284.  Throughout the Class Period, WellPoint, UnitedHealth and Ingenix remained members of the Enterprise, undertaking countless and nearly constant acts of mail and wire fraud for their common purpose reducing the price paid for ONS.

285.  The Enterprise had and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which it has engaged.  Decision making within the Enterprise with regard to the inclusion of data

First Consolidated Amended Complaint

within the Ingenix Database that would reduce ONS payments was consensual. The members of the Enterprise functioned as a continuous unit, and performed roles consistent with this structure. WellPoint, UnitedHealth and Ingenix, and the Enterprise, performed certain legitimate and lawful activities that are not being challenged in this Complaint, including the provision of health insurance and plan and claims administration services by WellPoint, UnitedHealth and Ingenix, which was done for many claims lawfully and without resort to unlawful practices. Ingenix also legally administers and sells a number of other products which are legitimate and not related to the claims described in this complaint. However, the collection and dissemination of health insurance information by Ingenix was not legitimate when it involved the creation, use and dissemination of invalid data for use in making UCR determinations. Aside from legitimate activities carried out by the members of the Enterprise, its members used the Enterprise's structure to carry out the fraudulent scheme and unlawful activities alleged in this Complaint including, but not limited to, intentional underpayment of benefits to Subscriber Plaintiffs and the Subscribers Class and Provider Plaintiffs and the Provider Class resulting from Defendants' use of flawed and invalid data for UCR determinations.

286. Through its role in the Enterprise and the scheme, Ingenix benefited directly by enhancing its ability to earn licensing fees through the sale of the Ingenix Database, including other databases which used WellPoint and UnitedHealth data. WellPoint and UnitedHealth benefited by reducing the amount they paid to Providers or reimbursed to Subscribers for their ONS through the use of the Ingenix Database to price UCR.

287. In furtherance of the fraudulent scheme, Ingenix provided extensive "litigation support," including vouching for data used to price UCR by its data users. Ingenix employed staff to assist data users, including testifying in court, testifying in depositions, supplying documentation and otherwise bolstering the users' use of Ingenix data to price UCR. WellPoint and UnitedHealth provided data to Ingenix

First Consolidated Amended Complaint

1 which they knew would be edited by Ingenix in a manner which precluded its use for
2 UCR.

3     288. Ingenix not only knowingly sought and accepted WellPoint's and the
4 Insurer Conspirators' incomplete data, but it continued to provide a significant
5 discount to them as well. Ingenix also failed to conduct any audits or reviews of the
6 data it received from data contributors, including WellPoint. These actions were taken
7 in furtherance of Ingenix's effort to understate UCR amounts for the benefit of the
8 WellPoint-Ingenix Enterprise.

9     289. During the Class Period, Defendants participated in the conduct of the
10 Enterprise in order to shift the costs of medical treatment to their Subscribers and
11 Providers and therefore to Plaintiffs and the Classes, to reduce UCR payments and to
12 create an appearance of legitimacy for their out-of-network benefit reductions. Using
13 U.S. mail and interstate wire facilities, Defendants provided false and misleading
14 information to the Plaintiffs and the Classes to convert those withheld funds for the
15 Enterprise's own direct and indirect financial gain, and to discourage their Members
16 from using out-of-network healthcare providers. Likewise, through its role in the
17 Enterprise, WellPoint exercised decision-making authority with regard to which data
18 was ultimately used in the Ingenix Database. WellPoint also selected and
19 intentionally provided false and misleading data to Ingenix itself for use in the Ingenix
20 Database.

21     290. The Enterprise benefited from the pattern of racketeering activity through
22 the reduction of UCR costs by WellPoint and other users of the Ingenix Database,
23 which would not have been obtained absent entry into the Enterprise and was, in
24 addition to the conduct of WellPoint alleged above, the shared goal of the Enterprise
25 for which its Members functioned as a continuous unit.

26     291. WellPoint further used the Enterprise to facilitate its goal of reducing out-
27 of-network benefits paid to Plaintiffs and the Classes by submitting incomplete and
28 inadequate data to Ingenix, thereby artificially reducing the numbers that would be

1  reported in the final Ingenix Database and which WellPoint relied upon to make UCR
2  determinations.  As part of this fraudulent scheme, as alleged herein, WellPoint
3  intentionally submitted, *via* U.S. mail and interstate wire facilities, data which it knew
4  would be used to create false databases used to price UCR for its Members and
5  members of other healthcare plans.  Ingenix was aware of the inadequacy of data
6  contributed by data contributors such as WellPoint, but allowed it to occur, since it
7  was consistent with the Enterprise's purpose of reducing the cost of out-of-network
8  healthcare services.

9       292.  WellPoint's and UnitedHealth's submission of data to Ingenix benefited
10  Ingenix, and users of the Ingenix Database.  The inclusion of WellPoint's and
11  UnitedHealth's data was critical to both the appearance of legitimacy of the Ingenix
12  PHCS database, and the usefulness of that data for depressing the price paid for ONS.
13  Further, WellPoint and UnitedHealth knew the data they contributed to Ingenix was
14  flawed and incomplete and its use by the Enterprise and Ingenix would depress the
15  price of ONS for all the Insurer Conspirators.  WellPoint and UnitedHealth
16  participated and conducted the affairs of the Enterprise not only by submitting false
17  and incomplete data to Ingenix, but by being involved in decision making regarding
18  the database and by utilizing the flawed data for illicit purpose of determining UCR.

19       293.  If WellPoint had not participated in the conduct of the Enterprise by
20  participating in the decision making regarding the database, by submitting flawed data
21  to Ingenix, and by using the Ingenix Database, it would not have been able to obtain
22  the benefits it did from the Enterprise.  Ingenix needed sufficient data to allow it to
23  represent to its customers that the Ingenix Database was the largest available and had
24  sufficient numbers to remove any doubt as to their validity.  WellPoint knew such
25  representations were being made by Ingenix and used Ingenix's representations for the
26  identical purpose of removing doubt as to their validity.  Ingenix needed the data to
27  provide databases to its users to save them money on ONS claims.  Without data from
28  WellPoint, UnitedHealth and other large data contributors, the Ingenix Database could

First Consolidated Amended Complaint

96

not have been successfully marketed as the "industry standard" for UCR pricing. Similarly, WellPoint and UnitedHealth could not have saved the millions of dollars they did if they had not used the Ingenix Database for making UCR determinations even though they knew that they were flawed and invalid.  By using the Ingenix Database for making UCR determinations, misrepresenting them, through use of the U.S. mail and interstate wire facilities, as providing a valid and unassailable basis for such decisions, and deterring its subscribers as well as members of the Provider Class from challenging or otherwise raising questions over how it set UCR, WellPoint was able to benefit substantially from its role in assisting the control and direction of the Enterprise, along with Ingenix.

294.   Each of the members of the Enterprise benefitted from its successful operation.  Ingenix benefited directly by enhancing its ability to earn licensing fees through the sale of the Ingenix Database.  As the parent company of Ingenix, UnitedHealth benefitted from the Ingenix fees as well as by reducing the amount it paid for ONS reimbursements, incentivizing subscribers to see in-network providers and reducing competition.   WellPoint benefitted from reduced competition and because it also reduced the amount it was required to pay for ONS reimbursements and incentivized its subscribers to see providers in their respective networks.  Thus, members of the Enterprise benefitted from the pattern of racketeering activity at the expense of the Subscriber and Provider Plaintiffs and Classes. Absent participation in the Enterprise, the members of the WellPoint-Ingenix Enterprise would not have so benefitted.

295.   Through their wrongful conduct as alleged herein, Defendants, in violation of 18 U.S.C. §1962(c), conducted and participated in the conduct of each of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5).  These acts of racketeering activity have continued throughout the Class Period to the present.

First Consolidated Amended Complaint

296. Defendants, acting through their officers, agents, employees and affiliates, committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. §1961(5), prior to and during the Class Period, and continue to commit such predicate acts, in furtherance of their underpayment scheme for ONS, including (a) mail fraud, in violation of 18 U.S.C. §1341, and (b) wire fraud, in violation of 18 U.S.C. §1343. Each use of the mail or wire in furtherance of the fraudulent scheme described above is a predicate act of mail and wire fraud. Such predicate acts include the following:

(a)    mailing, causing to be mailed and/or knowingly agreeing to the mailing of various materials and information including, but not limited to, letters regarding preauthorization approval(s) and/or appeals, materially false or misleading information regarding the use of Ingenix or UCR reimbursement methods to plan sponsors, materially false or misleading data for use in the Ingenix Database, materially false and misleading UCR determinations, EOBs and Remittance Advices for the purpose of saving money at the expense of Subscriber and Provider Plaintiffs and the Subscriber and Provider Classes, and mailing materially false data for use in the Ingenix Database, for the purpose of effectuating the above-described fraudulent scheme, with each such mailing constituting a separate and distinct violation of 18 U.S.C. §1341; and

(b)    transmitting, causing to be transmitted and/or knowingly agreeing to the transmittal of various materials and information including, but not limited to, preauthorization approvals; materially false UCR determinations and related explanation of such determinations, materially false or misleading information regarding Ingenix or UCR reimbursement methods to plan sponsors, and materially false or misleading data for use in the Ingenix Database, by means of telephone, facsimile and the Internet, in interstate commerce, for the purpose of effectuating the above-described false payment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. §1343.

297.   WellPoint issued false and misleading letters to Subscribers and Providers regarding benefits, as well as false and misleading EOBs and Explanations of Payment.  WellPoint knew that the data it contributed to Ingenix was inadequate and lacked required data fields essential for Ingenix to evaluate the data and include (or exclude) it in final UCR fee schedules, but WellPoint continued to use the Ingenix Database to make UCR determinations anyway.

298.   Defendants knew that the Ingenix Databases were being used without Plaintiffs and the Classes ever being informed that the Ingenix Database was unsuitable for determining UCR and other inherent flaws in the Ingenix Database.  For example, WellPoint falsely reported to Plaintiffs and Class members, *via* U.S. mail and interstate wire communications, that its reductions in amounts paid for ONS were based on UCR when, in fact, WellPoint knew that its reductions were based on flawed and invalid numbers obtained from the Ingenix Database that substantially underreported UCR.

299.   In furtherance of their underpayment scheme for ONS, Defendants, in violation of 18 U.S.C. §§1341, 1343, 1961 and 1962, repeatedly and regularly used the U.S. mail and interstate wire facilities to further all aspects of the intentional underpayment scheme to Plaintiffs and the Classes by delivering and/or receiving materials necessary to carry out the scheme to defraud Plaintiffs and the Classes.  Each Defendant intended, knew and/or should have reasonably anticipated that the U.S. mail and interstate wire facilities would be utilized in furtherance of the scheme.  Each use of the mail or wire in furtherance of the scheme was a violation of the above statutes.

300.   The foregoing communications, sent *via* U.S. mail and interstate wire facilities, contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR determinations, and/or otherwise were incident to an essential part of Defendants' scheme to defraud Plaintiffs and the Classes described in

First Consolidated Amended Complaint

this Complaint. Further, such written communications were used by Defendants to provide the underpayment scheme for ONS with an appearance of legitimacy and regularity, to conceal the scheme and/or postpone ultimate discovery and complaint of the underpayment scheme for ONS, thereby making their discovery less likely than if no such mailings or wire transmissions had taken place.

301. As named fiduciaries and claims administrators of various of the WellPoint plans, WellPoint occupied and occupies a position of trust and it had, and has, a special relationship with the Subscribers, and therefore with Provider Plaintiffs and the Classes, that requires it to accurately represent the terms and conditions of the WellPoint plans, and to disclose all facts, the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

302. Each such use of the U.S. mail and interstate wire facilities in furtherance of the scheme alleged in this Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity."

303. The above-described pattern of racketeering activity is related because it involves the same fraudulent scheme, enterprise, common persons, common out-of-network claim practices, common results impacting upon common victims, and is continuous because it occurred over several years, and constitutes the usual practice of WellPoint and each of Enterprise, such that it amounts to and poses a threat of continued racketeering activity. WellPoint's scheme to defraud Plaintiffs and the Classes is open-ended and on-going.

304. The direct and intended victims of the pattern of racketeering activity described previously herein harmed the Providers and Subscribers, whom WellPoint has underpaid for ONS. The Associations were also direct and intended victims of the pattern of racketeering activity, as set forth herein.

305. As a result of Defendants' fraudulent scheme, Plaintiffs and the Classes were injured in their business or property by reason of Defendants' RICO violations

First Consolidated Amended Complaint

because they were underpaid or under-reimbursed for ONS rendered to WellPoint's subscribers and were forced to exhaust significant time and resources addressing WellPoint's wrongful practices.

306.   In addition, Provider Plaintiffs and the Provider Class reasonably relied on the fraudulent scheme by providing ONS to WellPoint subscribers.

307.   WellPoint further deprived Plaintiffs and the Classes of the knowledge necessary to discover or challenge the underpayments.

308.   WellPoint also undertook additional predicate acts in violation of 18 U.S.C. §664 in addition to the acts of mail and wire fraud alleged above in order to achieve the same ends described above.

309.   Section 1961(1)(B) of RICO specifically identifies as a predicate act "any act which is indictable under . . . [§]664 (relating to embezzlement from pension and welfare funds)" as a predicate act. 18 U.S.C. §1961(l)(B).  Section 664 of Title 18 provides:

> **Theft   or   embezzlement   from   employee   benefit   plan**
> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

310.   For fully insured healthcare plans, in which WellPoint both administered the plans and paid the benefits from its own assets, WellPoint benefited from the conversion of assets from its ERISA plans.  Whereas these assets should have been held by WellPoint in its fiduciary capacity under ERISA plans and paid to its Members, WellPoint improperly withheld such funds and maintained them as part of its own assets for WellPoint's own benefit.  For self-funded healthcare plans, WellPoint made final appeal decisions and intentionally caused underpayment of

1  benefits to Plaintiffs and the ERISA Subclasses in order to justify its receipt of
2  administrative fees.

3      311.   Defendants acted with specific intent to deprive ERISA Plaintiffs and the
4  ERISA Subclasses of guaranteed benefits, and were sufficiently aware of the facts to
5  know that they were acting unlawfully and contrary to the trust placed in them by the
6  Plaintiffs, the ERISA Subclass members and the plan sponsors whose plans they were
7  administering.

8      312.   Each false payment on a claim constitutes a separate and distinct
9  predicate act, in violation of 18 U.S.C. §664, of converting or misappropriating funds
10 specifically earmarked within the applicable plan as a guaranteed benefit for the
11 intended member, for Defendants' direct or indirect benefit.

12     313.   Plaintiffs' injuries were proximately caused by Defendants' violations of
13 18 U.S.C. §1962(c) because these injuries were the foreseeable, direct, intended and
14 natural consequence of Defendants' RICO violations (and commission of underlying
15 predicate acts) and, but for Defendants' RICO violations (and commission of
16 underlying predicate acts), they would not have suffered these injuries.

17     314.   The Provider Class and ERISA Subclass allege they have standing to
18 pursue these claims as assignees of their patients' out-of-network benefits and as third
19 party-beneficiaries of their patients' out-of-network benefits.

20     315.   The Association Plaintiffs have standing to pursue these RICO claims
21 both individually and/or on behalf of their members.

22              **BREACH OF CONTRACT ALLEGATIONS**

23     316.   During times relevant to the Complaint and continuing through the
24 present, Plaintiff J.B.W. has been, and is, a member of an individual and family health
25 plan issued and administered by defendant WellPoint *via* its Blue Cross of California
26 subsidiary that is not governed by ERISA.  Plaintiff J.B.W. enrolled in the Blue Cross
27 Individual PPO $3,500 deductible plan effective November 1, 2008.  During the
28 relevant time, Plaintiff J.B.W. paid his plan premiums directly to Blue Cross of

California.  According to Plaintiff J.B.W.'s Agreement, benefits were to be paid to the subscriber and his enrolled family members.

317.   Moreover, during times relevant to the Complaint, Plaintiff Darryl and Valerie Samsell have been members of an individual and family health plan issued and administered by Defendant WellPoint, *via* its Anthem Blue Cross and Blue Shield, Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield, and/or Trigon Blue Cross Blue Shield predecessor and/or subsidiary companies.  During the relevant time, the Samsells paid their premiums to WellPoint or said aforementioned predecessor or subsidiary entities.  According to the Samsells' Agreement, benefits were to be paid to the subscriber and enrolled family members.

318.   WellPoint issues Combined Evidence of Coverage and Disclosure Forms for individual and family plans (the "Agreements") to Plaintiffs J.B.W., the Samsells, Seigle-Epstein and its other members setting forth the benefits WellPoint agrees to provide members as well as the costs to the members of the plans.  For example, upon subscribing to the Individual PPO $3,500 Deductible Plan, Plaintiff J.B.W. received his Agreement from WellPoint.

319.   The Agreements are uniform contracts that utilize the same definitions across different health plans.  The Agreements are one-sided adhesion contracts.  Such contracts are presented on a take-it-or-leave-it basis and are not subject to negotiation or alteration by individual members.

320.   The Agreements provide members like Plaintiff J.B.W., the Samsells and Seigle-Epstein with an express right to receive treatment from out-of-network providers.   WellPoint refers to these providers as "non-participating," "non-contracting," "non-network," "non-PPO" and/or "out-of-network" providers.  Services by "in-network" providers are reimbursed at discounted rates negotiated between the healthcare provider and WellPoint.   WellPoint promises in the Agreements to reimburse its members for services by out-of-network providers at a percentage of the lesser of (i) the actual, billed charge or (ii) the UCR for the services in the geographic

area in which the services were performed.  For example, the Agreements state that for "Non-PPO Providers" (*i.e.*, ONS) "the maximum covered expense for services provided by a non-PPO provider or other healthcare provider will always be the lesser of the billed charge or (1) for a physician, the customary and reasonable charge . . . ." The "customary and reasonable charge" is defined by the Agreements as a "charge which falls within the common range of fees billed by a majority of physicians for a procedure in a given geographic region."  WellPoint uses the terms "UCR," "usual and customary" and "customary and reasonable charge" interchangeably.  WellPoint often refers to the amount it will reimburse for ONS as the "amount allowed," "allowed expense" or "allowable charge."

321.   As an example, Plaintiff J.B.W.'s Agreement specifies that there is a set deductible, and that once this deductible is satisfied, WellPoint is required to reimburse its subscribers, including Plaintiff J.B.W., according to a chart contained within the Agreement.  Pursuant to the chart, medical procedures are classified as either being undertaken by a participating or preferred participating provider or by a non-participating provider.  "Non-Participating Provider" is defined as an entity (hospital, physician or otherwise) "which does NOT have a Prudent Buyer Plan Participating Provider agreement with [Blue Cross] in effect at the time services are rendered . . . ."

322.   Moreover, the coverage matrix in Plaintiff J.B.W.'s Agreement contains various medical procedures and the corresponding reimbursement amounts and subscriber payment responsibilities. For Medical Emergencies in California, Plaintiff J.B.W.'s Agreement states that, for a non-participating provider, the consumer, Plaintiff J.B.W., must pay "[a]ll charges in excess of Customary and Reasonable charges."   Like the other Agreements, Plaintiff J.B.W.'s Agreement defines "Customary and Reasonable Charge" as a "charge which falls within the common range of fees billed by a majority of physicians for a procedure in a given geographic region."

First Consolidated Amended Complaint

323.   WellPoint makes clear in its Agreements, as well as in other written communications with its plan members, that the plan member is financially responsible for the difference between the allowed expense and the provider's billed charge for ONS.   WellPoint's Agreements explicitly state that "You will be responsible for any billed charge which exceeds the customary and reasonable charge" for ONS.   Once a member receives ONS, WellPoint and/or Blue Cross of California provide an explanation of benefits ("EOB") that describes the division of payment for the service.   The EOBs state the amount the out-of-network provider charged for the service, the amount allowed, and after stating the percentage and portion of the amount allowed that WellPoint will pay, states the balance, which the EOBs describe as "Your Responsibility."

324.   The portions of ONS charges not paid by WellPoint are not credited toward deductibles or out-of-pocket maximums that limit the total amount a plan member has to pay for medical services over a given time period. Thus, such costs are borne entirely by the plan members.

325.   Beginning on or about January 23, 2009, Plaintiff J.B.W. began a series of outpatient medical visits with a Non-Participating Provider.   Plaintiff J.B.W. submitted a claim with WellPoint regarding these visits.   WellPoint made a reimbursement determination on Plaintiff J.B.W.'s claim that reimbursed Plaintiff J.B.W. less than the agreed-upon percentage of either the provider's actual charges or the UCR.   This reimbursement determination resulted in Plaintiff J.B.W. being obligated to pay not only his deductible, but also that part of the provider's billed charge that exceeded the reimbursement amount determined by WellPoint.

326.   In processing claims for ONS charges, WellPoint is obligated by the terms of its Agreements to reimburse plan members for ONS based on either the actual billed charge or the objective criteria for UCRs set forth in the Agreements. WellPoint, however, fails to honor the terms of the Agreements by basing its reimbursements for ONS on the False UCRs.

327.  In making ONS reimbursements, WellPoint uses the Ingenix Database. As detailed above, the Ingenix Database produces False UCRs which, when used by WellPoint to calculate reimbursements result in the systematic under-reimbursement of Plaintiffs J.B.W., the Samsells, Seigle-Epstein and the Non-ERISA Subscriber Class.

328.  Plaintiffs J.B.W., the Samsells, Seigle-Epstein and the other members of the Non-ERISA Subscriber Class complied with their obligations under their Agreements with WellPoint.

329.  WellPoint failed to comply with the terms of its Agreements with Plaintiffs J.B.W., the Samsells, Seigle-Epstein and the other members of the Non-ERISA Subscriber Class by making reimbursement determinations for ONS that had the effect of covering less than the stated percentage of either the Providers' actual charges or the UCR without valid data to support such determinations.

330.  Rather than reimbursing for ONS based on either the actual charge or the customary and reasonable charge for a particular service as promised in the Agreements, WellPoint reimbursed Plaintiffs J.B.W., the Samsells, Seigle-Epstein and the other members of the Non-ERISA Subscriber Class based on the flawed and artificially deflated data provided by Ingenix.  WellPoint's conduct thus contravenes the express terms of the Agreements and constitutes a breach of its contracts with its members.  Such conduct also, in violation of the covenant of good faith and fair dealing, prevents its members from obtaining the benefits of the reimbursements they reasonably expect to receive pursuant to the terms of the Agreements.

331.  Although Plaintiffs J.B.W., the Samsells, Seigle-Epstein and the other members of the Non-ERISA Subscriber Class are contractually entitled to choose care for ONS, WellPoint inhibited the use of ONS providers by using False UCRs that increased the unpaid amounts for which Plaintiffs J.B.W., the Samsells, Seigle-Epstein and the other members of the Non-ERISA Subscriber Class were liable, thereby deterring their members' use of ONS.

332.   As a consequence of WellPoint's and the Conspirators' actions, Plaintiffs J.B.W., the Samsells, Seigle-Epstein and the other members of the Non-ERISA Subscriber Class were reimbursed for ONS in amounts less than what they should have been paid under their Agreements.  WellPoint pursued its standard and uniform policies in making reimbursement determinations for ONS in a fashion that conflicted with its contractual obligations under its Agreements and that violated its fiduciary duties to Plaintiffs J.B.W., the Samsells, Seigle-Epstein and the other members of the Non-ERISA Subscriber Class.

333.   The Provider Plaintiffs and members of the Provider Class allege they have obtained assignments and otherwise obtained the right to "stand in the shoes" of the Subscriber Plaintiffs and have the right to enforce the contracts with WellPoint.

### Plaintiff Dr. Higashi

334.   Plaintiff Dr. Higashi is a chiropractor with a private practice in Los Angeles, California.  She is licensed to and does in fact practice in the State of California, and has been certified by the California Chiropractic Board.  During the relevant time, Dr. Higashi provided ONS to WellPoint's subscribers.

335.   Because patients find it difficult to pay out of pocket for medical treatment at the time of service, they rely on their health plans to reimburse their physicians for their services.  While this arrangement is generally beneficial for the patient who does not have to pay for treatment at the time of service, it leaves the Provider Plaintiffs and members of the Provider Class to advance the cost of such medical treatment until they receive payment from their patients' insurers.  To facilitate direct payment from insurers, Dr. Higashi's patients sign a form assigning their health benefits to her before treatment.  This form includes an express authorization by the patient for insurers, such as WellPoint, to remit payment for "professional and medical expense benefits allowable under my current insurance policy for services rendered to me or my dependent" directly to Mar Vista Institute of Health.

First Consolidated Amended Complaint

336.   At all relevant times, Dr. Higashi utilized a HCFA 1500 form (n/k/a, CMS 1500) to submit claims to WellPoint for payment.  Dr. Higashi's claims are often submitted electronically.   Once an electronic claim is submitted, it passes through a clearinghouse before reaching WellPoint. All of Dr. Higashi's claims are submitted to WellPoint using CPT codes, HCPCS, and modifiers, as necessary.  Dr. Higashi does not find out her compensation from WellPoint for services rendered until after a procedure is performed and a claim for payment is submitted.

337.   At all relevant times, Dr. Higashi expected to be reimbursed by WellPoint at the lesser of her billed charges or the current UCR.  WellPoint defines UCR as follows:

> A "usual" charge is the amount that is most consistently charged by an individual physician for a given service.  A "customary" charge is the amount that falls within a specified range of usual charges for a given service billed by most physicians with similar training and experience within a given geographic area.  A "reasonable" charge is a charge that meets the Usual and Customary criteria, or is otherwise reasonable in light of the complexity of treatment of the particular case.  Under a UCR Program, the payment is the lowest of the actual billed charge, the physician's usual charge or the area customary charge for any given covered service.

338.   At various times, WellPoint, through both Anthem and Blue Cross of California, unlawfully diminished Dr. Higashi's compensation by improperly calculating UCRs and then misapplying these rates to her claims. Dr. Higashi's EOBs often state that her billed charges purportedly are "in excess of the allowed expense for a non-participating provider," and that the "Health Plan is not responsible for any amounts in excess of this allowed expense."  Nowhere on the EOBs or elsewhere in any other correspondence sent to Dr. Higashi does WellPoint or its Anthem or Blue Cross of California subsidiary discuss or identify how it actually calculates UCR. The

1  EOBs do not even specify whether Ingenix data or some other methodology was used
2  in these calculations.

3      339.   WellPoint's EOBs are intentionally uninformative, false, and misleading
4  regarding the use of UCRs.

**FALSE ADVERTISING AND DECEPTIVE CONDUCT ALLEGATIONS**

6      340.   WellPoint represents through its advertising, promotional pamphlets and
7  plan contracts that it will permit its members to choose between in-network and out-
8  of-network providers and that its members will be reimbursed for ONS based on
9  either the actual billed cost or the UCR.  WellPoint publishes and widely disseminates
10 on its website and through other media a summary description of its plans entitled
11 "Benefits-at-a-glance" in which it represents that its members will be reimbursed for
12 ONS for certain procedures based on a specified percentage of the "customary and
13 reasonable fees."

14     341.   WellPoint does not reimburse for ONS based on either the actual cost or
15 the UCR, instead utilizing reimbursement rates it knows are artificially deflated.
16 Based on WellPoint's advertising and plan contracts, Plaintiffs J.B.W., the Samsells,
17 Seigle-Epstein and the other members of the Non-ERISA Subscriber Class reasonably
18 believed that they would be reimbursed for ONS based on valid, objective criteria and
19 that such criteria would result in reimbursements that reflected the actual costs of
20 ONS in their area.  By affirmatively misrepresenting the extent to which it will
21 reimburse for ONS and the extent to which consumers can choose between in-network
22 and out-of-network providers, failing to disclose that reimbursement for ONS is
23 calculated based on False UCRs, and failing to disclose that the False UCRs are
24 developed pursuant to a secret conspiracy amongst health insurers as detailed above,
25 WellPoint deceived Plaintiff J.B.W., the Samsells, Seigle-Epstein and the other
26 members of the Non-ERISA Subclass.  Had Plaintiffs J.B.W., the Samsells, Seigle-
27 Epstein and the other members of the Non-ERISA Subscriber Subclass been made
28 aware of the true cost of ONS, they would have chosen less expensive in-network care

instead.  On information and belief, Plaintiffs allege that WellPoint also reimbursed Provider Plaintiffs and members of the Non-ERISA Provider Class less than WellPoint was obligated to reimburse them.

**CLASS ALLEGATIONS**

342.  Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.  Plaintiffs seek to represent the following Classes:

**The Subscriber Class**

All persons or entities enrolled in a health plan administered or insured by WellPoint who paid for ONS from a non-participating Physician or other healthcare provider and received reimbursement in an amount less than the billed charges on or after January 1, 1999.

**The Provider Class**

All non-participating physicians who provided ONS to any member of any health plan administered or insured by WellPoint, other than through the Empire subsidiaries, at any time since September 29, 2006, and were paid less than their billed charges for such services; and all other non-participating healthcare providers who provided ONS, to any member of any health plan administered or insured by WellPoint, who were paid less than their billed charges for such services on or after January 1, 1999.

**The Antitrust Injunctive Relief Class**

All persons or entities enrolled in a health plan that includes out-of-network health insurance coverage and is administered or insured by WellPoint and all non-participating physicians and other non-participating healthcare providers who provide or have provided ONS to any such persons or entities.

**The ERISA Subscriber Subclass**

All persons or entities enrolled in ERISA-governed health insurance plans administered by WellPoint who paid for ONS and received reimbursement in an amount less than the billed charges on or after January 1, 1999.

**The ERISA Provider Subclass**

All Physicians who provided services to and accepted a valid assignment from any person enrolled in an ERISA-governed health insurance plan administered or insured by WellPoint, other than through the Empire subsidiaries, and were paid less than their billed charges for such services on or after September 29, 2006; and Other Healthcare Providers who provided services to and accepted a valid assignment from any person enrolled in an ERISA-governed health insurance plan administered or insured by WellPoint and were paid less than their billed charges for such services on or after January 1, 1999.

**The Non-ERISA Subscriber Subclass**

All persons enrolled in a non-ERISA individual and/or family health plan administered or insured by WellPoint who paid for ONS from a Physician or Healthcare Provider and received in an amount less than the billed charges on or after January 1, 1999.

**The Non-ERISA Provider Subclass**

All Physicians who provided services to a member of the Non-ERISA Subscriber Subclass, other than those who were enrolled in a plan administered or insured by an Empire subsidiaries, and who accepted an assignment of benefits and were paid less than their billed charges for such services on or after September 29, 2006; and all other healthcare Providers who provided services to a member of the Non-ERISA

1   Subscriber Subclass, accepted an assignment of benefits and were paid
2   less than their billed charges on or after January 1, 1999.

3   343.   Excluded from each of the above Classes are the Court and its officers,
4   employees and relatives, each Defendant and Conspirator and any entity in which any
5   Defendant or con-conspirator has a controlling interest, and their respective directors,
6   officers, employees, and relatives; any governmental entities; and counsel for
7   Plaintiffs and the Classes, including their partners, employees, and agents.

8   344.   The Subscriber and Provider Classes seek compensatory damages against
9   all Defendants, appropriate equitable, injunctive and declaratory relief and treble
10   damages, under the Sherman Act and RICO.

11   345.   The ERISA Subscriber and Provider Subclasses seek equitable,
12   injunctive and declaratory relief against WellPoint for breaches of its fiduciary duties
13   under ERISA as well as unpaid benefits under ERISA for WellPoint's breach of the
14   terms of its group health plans.

15   346.   The Non-ERISA Subclasses seek compensatory damages and declaratory
16   relief against WellPoint for breaches of its individual and family health plan contracts
17   as well as restitution and injunctive relief against all Defendants.

18   347.   Each of the above Classes consists of thousands of individuals and
19   entities throughout the United States, making individual joinder impractical, in
20   satisfaction of Rule 23(a)(1).   The disposition of the claims in each of the above
21   Classes in a single class action will provide substantial benefits to all parties and to the
22   Court.

23   348.   Plaintiffs' claims are typical of the claims of each of the above Classes,
24   as required by Rule 23(a)(3), in that the representative Plaintiffs, like all members of
25   each of the above Classes, paid premiums or received an assignment for out-of-
26   network health insurance benefits from WellPoint and/or received reimbursement for
27   out-of-network medical services that was based on a UCR provided by Ingenix.
28   Plaintiffs, like all members of the above Classes and Subclasses, have been damaged

1  by Defendants' and the Conspirators' misconduct because, among other things,
2  Plaintiffs were misled as to the reimbursement rates for out-of-network health
3  insurance coverage provided by WellPoint and have been under-reimbursed or
4  underpaid for out-of-network medical expenses.

5      349.   The factual and legal bases of Defendants' and the Conspirators'
6  misconduct are common to the members of each of the above Classes and Subclasses
7  and represent a common thread of misconduct resulting in injury to Plaintiffs and
8  members of each of the above Classes and Subclasses.

9      350.   Many questions of law and fact are common to Plaintiffs and each of the
10 above Classes and Subclasses, and those questions predominate over any questions
11 that may affect individuals in each of the above Classes and Subclasses, within the
12 meaning of and fulfilling the requirements of Rules 23(a)(2) and 23(b)(3). Common
13 questions of law and fact include, but are not limited to, the following:

14         (a)   whether Defendants and the Conspirators engaged in a deceptive
15 scheme by improperly manipulating UCRs and/or using improperly manipulated
16 UCRs as the basis for out-of-network reimbursement;

17         (b)   whether Defendants and the Conspirators artificially lowered
18 reimbursements for out-of-network medical services;

19         (c)   whether it was the policy and practice of Defendants and the
20 Conspirators to prepare marketing and sales materials that contained false and
21 misleading information regarding the extent of out-of-network coverage provided
22 under their plans;

23         (d)   whether Defendants and the Conspirators engaged in a pattern and
24 practice that caused Subscriber Plaintiffs and members of the Classes to incur
25 excessive out-of-pocket expenses under their plans;

26         (e)   whether Defendants and the Conspirators engaged in a pattern and
27 practice that caused Provider Plaintiffs and members of the Classes to be underpaid
28 for their ONS;

First Consolidated Amended Complaint

1             (f)     whether Defendants and the Conspirators engaged in a pattern of

2 deceptive conduct as to Plaintiffs and the members of the Classes;

3             (g)     whether Defendants and the Conspirators engaged in a contract,

4 combination or conspiracy to fix UCRs;

5             (h)     the duration and extent of the combination or conspiracy alleged

6 herein;

7             (i)     whether the alleged combination and conspiracy violated Section 1

8 of the Sherman Act;

9             (j)     whether Defendants' and the Conspirators' scheme to use Ingenix

10 as a means by which to depress UCRs violated RICO;

11             (k)     whether WellPoint's use of the Ingenix Database to calculate

12 UCRs for ONS breached legal obligations to plan members in group health plans;

13             (l)     whether WellPoint's ONS adverse benefit determinations

14 ("ABDs") violated ERISA;

15             (m)     whether WellPoint violated its fiduciary duties under ERISA;

16             (n)     whether WellPoint's claims review procedures comply with

17 ERISA;

18             (o)     whether, in addition to unpaid benefits, interest should be added to

19 the payment of unpaid benefits under ERISA;

20             (p)     whether the Agreements for all WellPoint individual and family

21 health plans utilize the same uniform definitions for UCRs for ONS;

22             (q)     whether WellPoint's use of the Ingenix Database to calculate

23 UCRs for ONS breaches its contractual obligations to its plan members in its health

24 plans;

25             (r)     whether WellPoint's use of the Ingenix Database to calculate

26 UCRs for ONS contravenes the reasonable expectations of its plan members such as

27 to violate the covenant of good faith and fair dealing;

28

(s)     whether Defendants' conspiracy to depress reimbursement rates for ONS violates California's Unfair Competition Laws as well as of New York;

(t)     whether healthcare costs and the flexibility to choose medical providers are material to consumers;

(u)     whether Defendants misrepresented the extent to which they would reimburse their plan members for ONS costs;

(v)     whether Defendants omitted material information regarding the manner in which they calculate ONS reimbursements and regarding the extent to which they will provide such reimbursements;

(w)     whether Plaintiffs and the other members of the above Classes and Subclasses have all suffered harm and damages as a result of the unlawful and wrongful conduct alleged herein; and

(x)     whether Plaintiffs and the other members of the above Classes and Subclasses are entitled to the relief sought herein.

351.   Plaintiffs will fairly and adequately represent and protect the interests of the above Classes and Subclasses, as required by Rule 23(a)(4).   Plaintiffs have retained counsel with substantial experience in prosecuting nationwide consumer class actions.   Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and Subclasses, and have the financial resources to do so.   Neither Plaintiffs nor their counsel have any interest adverse to those of the Classes and Subclasses.

352.   Plaintiffs and members of the above Classes and Subclasses have all suffered, and will continue to suffer, harm and damages as a result of the unlawful and wrongful conduct alleged herein.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3).   Absent a class action, most members of the above Classes and Subclasses likely would find the cost of litigating their claims to be prohibitive, and would have no effective remedy at law.   The class treatment of common questions of law and fact is also

1  superior to multiple individual actions or piecemeal litigation in that it conserves the

2  resources of the Courts and the litigants, and promotes consistency and efficiency of

3  adjudication.  Defendants and the Conspirators have acted and failed to act on grounds

4  generally applicable to Plaintiffs and the above Classes and Subclasses.  Therefore,

5  Court imposition of uniform relief is required to ensure compatible standards of

6  conduct toward the above Classes and Subclasses, thereby making appropriate

7  equitable relief to the above Classes and Subclasses as a whole within the meaning of

8  Rules 23(b)(1) and (b)(2).

9  ## FRAUDULENT CONCEALMENT

10  353.   Each Defendant and Conspirator concealed its fraudulent conduct from

11  Plaintiffs and the members of the Classes and Subclasses by conspiring to manipulate

12  the process by which reimbursement rates were set.  Defendants and the Conspirators

13  also prevented Plaintiffs and the members of the Classes and Subclasses from

14  knowing or discovering the actual methodology used by Ingenix to determine the

15  False UCRs.  The fraudulent conduct alleged herein was of such a nature as to be self-

16  concealing.

17  354.   Each Defendant's and Conspirator's efforts to conceal its source and

18  methodology of determining the False UCRs indicate it knew its conduct was

19  fraudulent.

20  355.   Each Defendant and Conspirator participated in the Ingenix scheme by

21  concealing that it was providing flawed data to Ingenix and/or knew the methodology

22  used by the Ingenix Database to calculate False UCRs was inherently flawed.  As a

23  result, each Defendant and Conspirator knew that the False UCRs it used to set its

24  reimbursement rates were lower than the actual costs of medical services.

25  356.   Plaintiffs were diligent in pursuing an investigation of the claims asserted

26  in this Complaint.  Through no fault of their own, they did not receive inquiry notice

27  nor learn of the factual basis for their claims in this Complaint and the injuries

28  suffered until the recent disclosures in the press and media.

First Consolidated Amended Complaint

## TOLLING OF APPLICABLE STATUTES OF LIMITATION

357.   Any applicable statutes of limitations have been tolled by Defendants' and their Conspirators' knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and members of the Classes have been kept in ignorance of vital information essential to knowledge of and the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiffs and members of the Classes could not reasonably have discovered the fraudulent scheme to manipulate the reimbursement rates paid by Defendants and the Conspirators to insureds for out-of-network claims.

358.   Defendants and the Conspirators were, and continue to be, under a continuing duty to disclose to Plaintiffs and the Classes the fact that their reimbursement rates for out-of-network medical expenses were based on False UCRs that bore, and continue to bear, no relationship to the actual charges for those medical expenses.  Because of their knowing, affirmative, and/or active concealment of the fraudulent nature of the False UCRs, Defendants and the Conspirators are estopped from relying on any statutes of limitations.

## <u>FIRST CLAIM FOR RELIEF</u>

### VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT
### 15 U.S.C. §1
**(Against All Defendants on Behalf of All Plaintiffs, Including the Association Plaintiffs as well as the Subscriber and Provider Classes and the Antitrust Injunctive Relief Class)**

359.   Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.  Plaintiffs bring this claim on behalf of the Subscriber, Provider and Antitrust Injunctive Relief Classes as a *per se* claim and under the Rule of Reason.

360.   From a date unknown, but beginning at least as early as January 1, 1998, and continuing through the present, Defendants and the Conspirators have combined, conspired and/or contracted to restrain interstate trade in violation of 15 U.S.C. §1.

361.   The combination or conspiracy alleged in this Complaint consisted of a continuing agreement, understanding or concert of action by the Defendants and their other Conspirators, the substantial terms of which were to create, maintain and use the Ingenix Database to produce artificially low UCRs for ONS reimbursement.

362.   This agreement among horizontal competitors to utilize the same pricing schedule to fix maximum UCR reimbursement amounts is a *per se* violation of Section 1 of the Sherman Act.

363.   The conspiracy was intended to directly affect the end payors of the medical services covered by out-of-network insurance plans.  The intent, purpose and effect of the conspiracy to cap ONS reimbursement rates, was to cause under-reimbursement for medical services, and thereby minimize reimbursement payments made on such claims among Defendants and the Conspirators.

364.   Through the conspiracy, Defendants and the Conspirators have in fact set reimbursement ceilings and caused a decrease in reimbursement or payments for out-of-network medical services that would not have occurred but for their anticompetitive conduct.

365.   As a result of the wrongful conduct alleged herein, Plaintiffs who were subscribers and the Subscriber Class paid higher out-of-pocket payments and Plaintiffs who were providers and the Provider Class received lower reimbursements for out-of-network medical services than they would have paid or received but for Defendants' and the Conspirators' anticompetitive conduct.  These Plaintiffs and Classes have been injured in their business or property, and have suffered damages in an amount to be determined at trial.

366.   The conduct of Defendants and the Conspirators constitutes a *per se* and Rule of Reason violation of Section 1 of the Sherman Act, 15 U.S.C. §1.  Plaintiffs and the Subscriber, Provider and the Antitrust Injunctive Relief Classes are entitled to recover all damages and treble damages allowed under Section 1 of the Sherman Act against Defendants, jointly and severally, together with their costs of suit, including

1 reasonable attorneys' fees, as well as any necessary injunctions to bar or abate
2 Defendants' anticompetitive acts.

3       Wherefore, Plaintiffs pray for judgment against Defendants, as set forth
4 hereafter.

5                    **SECOND CLAIM FOR RELIEF**

6             **CLAIM FOR UNPAID BENEFITS UNDER GROUP**
                    **PLANS GOVERNED BY ERISA**
7                     **29 U.S.C. §1132(a)(1)(B)**
             **(Against WellPoint on Behalf of the ERISA Plaintiffs, and the ERISA**
8        **Subclasses and by the Association Plaintiffs on Behalf of Their Members)**

9       367.   Plaintiffs repeat the allegations contained in the prior paragraphs of the
10 Complaint as if fully set forth herein.

11      368.   Where a benefits plan is insured by, funded by or administered by
12 WellPoint, WellPoint must pay benefits plan subscribers, or their assignees, pursuant
13 to the terms of their ERISA plans.

14      369.   WellPoint violated its legal obligations under ERISA and federal
15 common law when it made the ONS ABDs described in this Complaint.

16      370.   WellPoint's lack of disclosure to its respective plan members, including
17 Plaintiffs Roberts, Cooper, Rivera-Giusti, Henry, Schwendig, Peck, Pariser Melamed,
18 Kavali, the NPSC and the members of the Association Plaintiffs, violated WellPoint's
19 legal obligations.

20      371.   WellPoint violated its obligations each time it engaged in conduct that
21 discouraged or penalized plan members' use of ONS providers, such as by making
22 ONS ABDs.

23      372.   Plaintiffs Roberts, Cooper, Rivera-Giusti, Henry, Schwendig, Peck,
24 Pariser, Melamed, Kavali and the NPSC, on their own behalf and on behalf of the
25 members of the ERISA Subscriber and Provider Subclasses, and the Association
26 Plaintiffs, on behalf of their members, seek unpaid benefits, re-calculated deductible
27 and co-insurance amounts and interest back to the date their claims were originally
28 submitted to WellPoint.

373.   In addition, Plaintiffs requests attorneys' fees, costs, prejudgment interest and other appropriate relief against WellPoint.

### THIRD CLAIM FOR RELIEF

### CLAIM FOR BREACH OF FIDUCIARY DUTY UNDER ERISA
### 29 U.S.C. §1132(a)(2)
### (Against WellPoint on Behalf of the ERISA Plaintiffs, and the ERISA Subclasses and by the Association Plaintiffs on Behalf of Their Members)

374.   Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as if set forth fully herein. ERISA §502(a)(2) authorizes a plan participants to bring a suit a suit for appropriate relief under 29 U.S.C. §1109.   29 U.S.C. §1132(a)(2).   Section 1109 of ERISA provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

375.   Here, WellPoint served as a fiduciary for the ERISA plans.  As such, it owed the plans and the plans' participants a duty to act with undivided loyalty when managing and administering the plans.  WellPoint also owed the plans and the plans' participants a duty of prudence.

376.   WellPoint breached its duties of loyalty and prudence under ERISA by engaging in the conduct described in detail in this Complaint.  Among other things, WellPoint breached its duty of loyalty and prudence by failing to disclose and taking affirmative steps to conceal that its reimbursement rates for out-of-network medical

First Consolidated Amended Complaint

expenses were based on False UCRs that bore, and continue to bear, no relationship to the actual charges for those medical expenses

377. WellPoint further breached its duties of loyalty and prudence by participating in a continuing agreement, understanding or concert of action with the other Conspirators named in this Complaint, the substantial terms of which were to create, maintain and use the Ingenix Database to produce artificially low UCRs for ONS reimbursement.

378. Through these actions, WellPoint has set reimbursement ceilings and caused a decrease in reimbursement or payments for out-of-network medical services.

379. As a result of the wrongful conduct alleged herein, Plaintiffs and the Subscriber ERISA Class paid higher out-of-pocket payments and Plaintiffs who were providers and the Provider ERISA Class received lower reimbursement for their out-of-network medical services and suffered other injuries and damages, causing them to suffer damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### FAILURE TO PROVIDE FULL AND FAIR REVIEW REQUIRED BY ERISA
### 29 U.S.C. §1132(a)(3)
**(Against WellPoint on Behalf of the ERISA Plaintiffs, and the ERISA Subclasses and by the Association Plaintiffs on Behalf of Their Members)**

380. Plaintiffs repeat the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein.

381. WellPoint functioned, and continues to function, as a "Plan Administrator" within the meaning of such term under ERISA. During the Class Period, Plaintiffs and the ERISA Subclasses were entitled to receive a "full and fair review" of all claims denied by WellPoint, and are entitled to assert a claim under 29 U.S.C. §1132(a)(3) for failure to comply with these requirements.

382. Although WellPoint was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to 29 U.S.C. §1133 (and the regulations promulgated thereunder) for Plaintiffs and the ERISA Subclasses by making ONS

ABDs that are inconsistent with, or unauthorized by, the terms of members' EOCs and SPDs, as well as by failing to disclose data, their methodology and other critical information relating to ONS ABDs.

383.   The law and implementing regulations set forth minimum standards for claim procedures, appeals, notice to members and the like.  In engaging in the conduct described herein, including use of an invalid database for calculating UCRs, WellPoint failed to comply with ERISA, its regulations and federal common law.  As a result, WellPoint failed to provide a "full and fair review," failed to provide reasonable claims procedures, and failed to make necessary disclosures to its plan members.

384.   Plaintiffs Roberts, Cooper, Rivera-Giusti, Henry, Schwendig, Peck, Pariser, Melamed, Kavali and the NPSC appealed or attempted to appeal their claims review and thus exhausted their administrative remedies.  Members of the Association Plaintiffs, including Plaintiffs Henry, Schwendig, Peck, Pariser, Melamed, Kavali and the NPSC have pursued extensive claims reviews during the Class Period and exhausted their administrative remedies.

385.   Furthermore, appeal of Plaintiff Roberts', Cooper's, Rivera-Giusti's, Henry's, Schwendig's, Peck's, Pariser's, Melamed's, Kavali's, the NPSC's, the Association Plaintiff's and the ERISA Provider and Subscriber Subclasses' claims should be deemed exhausted or excused by virtue of, among other things, WellPoint's numerous and systematic procedural and substantive violations.

386.   During the Class Period, Plaintiffs and the ERISA Provider and Subscriber Subclasses have been harmed by WellPoint's failure to provide a "full and fair review" of appeals under 29 U.S.C. §1133, and by WellPoint's failure to disclose relevant information in violation of ERISA and the federal common law.

## FIFTH CLAIM FOR RELIEF

### FAILURE TO PROVIDE AN ACCURATE EOC AND SPD
### 29 U.S.C. §1132(c)
**(Against WellPoint on Behalf of the ERISA Plaintiffs, and the ERISA Subscriber and Provider Subclasses by the Association Plaintiffs on Behalf of Their Members)**

387.   Plaintiffs repeat the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein.

388.   WellPoint's disclosure obligations under ERISA include furnishing accurate materials summarizing its group health plans, known as SPD materials, under 29 U.S.C. §1022.   WellPoint's failure to supply accurate EOCs, SPDs and other required information is actionable under 29 U.S.C. §1132(c).

389.   WellPoint's failure to disclose material information about its ONS ABDs, and their contribution of flawed data to Ingenix and use of such data, violated ERISA, federal regulations and federal common law.

390.   During the Class Period, Plaintiffs and the ERISA Subscriber and Provider Subclasses have been proximately harmed by WellPoint's failure to comply with 29 U.S.C. §1022, federal regulations, and federal common law, in an amount to be determined at trial, and are also entitled to injunctive and declaratory relief to remedy WellPoint's continuing violation of these provisions.

## SIXTH CLAIM FOR RELIEF

### VIOLATION OF FIDUCIARY DUTIES OF LOYALTY AND DUE CARE
### 29 U.S.C. §1002(21)(A); 29 U.S.C. §1104(a)(1)(B) and (D)
**(Against WellPoint on Behalf of the ERISA Plaintiffs, and the ERISA Subscriber and Provider Subclasses and by the Association Plaintiffs on Behalf of Their Members)**

391.   Plaintiffs repeat the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein.

392.   During the Class Period, WellPoint acted as a "fiduciary" to Plaintiffs Roberts, Cooper, Rivera-Giusti, Henry, Schwendig, Peck, Melamed, Kavali, the NPSC, members of the Association Plaintiffs and members of the ERISA Subscriber and Provider Subclasses as such term is understood under 29 U.S.C. §1002(21)(A).

393. As an ERISA fiduciary, WellPoint owed, and owes, its plan members a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent administrator would use in the conduct of a like enterprise. ERISA fiduciaries must act in accordance with the documents and instruments governing the group plan. *See* 29 U.S.C. §1104(a)(1)(B) and (D). In failing to act prudently, and in failing to act in accordance with the documents and instruments governing the plan, WellPoint violated its fiduciary duty of care.

394. As an ERISA fiduciary, WellPoint owed, and owes, its plan members a duty of loyalty, defined as an obligation to make decisions in the interest of its plan members, and to avoid self-dealing or financial arrangements that benefit it at the expense of its plan members under 29 U.S.C. §1106. WellPoint cannot, for example, make benefit determinations for the purpose of saving money at the expense of its respective plan subscribers.

395. WellPoint violated its fiduciary duties of loyalty and due care by, among other things, making ONS ABDs that were unauthorized by EOCs and SPDs and which benefited WellPoint at the expense of its plan subscribers or their provider assignees; failing to inform WellPoint plan subscribers or their provider assignees of flaws in the Ingenix Database that make its use inappropriate to calculate UCR reimbursement; making false representations and explanations for its ONS ABDs; misrepresenting material facts to regulators, sending baseless overpayment actions to collection, failing to disclose in pre-authorizing action appeals that WellPoint's ONS ABDs would leave the member financially responsible for the bulk of the "approved" ONS; and for violating federal and state law.

396. WellPoint also violated its fiduciary duties by using noncompliant SPDs required by federal law.

397. WellPoint breached its fiduciary duties by sending non-compliant EOCs and other communications to Plaintiffs Roberts, Cooper, Rivera-Giusti, Henry,

First Consolidated Amended Complaint

Schwendig, the members of the Association Plaintiffs, and the ERISA Subscriber and Provider Subclasses.

398.   Plaintiffs and the ERISA Subscriber and Provider Subclasses are entitled to assert a claim for relief for WellPoint's violation of its fiduciary duties under 29 U.S.C. §1132(a)(3), including injunctive and declaratory relief, and its removal as a breaching fiduciary.

## SEVENTH CLAIM FOR RELIEF

### FOR VIOLATIONS OF RICO, BASED ON PREDICATE ACTS OF MAIL AND WIRE FRAUD
### 18 U.S.C. §1962(c)
### (Against All Defendants on Behalf of All Plaintiffs, the Association Plaintiffs and the Subscriber and Provider Classes)

399.   Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

400.   At all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§1961(3) and 1964(c).

401.   At all relevant times, and as described in this Complaint, Defendants carried out their underpayment scheme to defraud Plaintiffs and the Class in connection with the conduct of an "enterprise," within the meaning of 18 U.S.C. §1961(4), as described above in the RICO Allegations section.

402.   At all relevant times, the enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. §1962(c).

403.   Through the wrongful conduct as alleged herein, Defendants, in violation of 18 U.S.C. §1962(c), conducted and participated in the conduct of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5).

404.   WellPoint, acting through its officers, agents, employees and affiliates, has committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. §1961(5), prior to and during the Class Period, and continues to commit such

First Consolidated Amended Complaint

predicate acts, in furtherance of its underpayment scheme for ONS, including (a) mail fraud, in violation of 18 U.S.C. §1341, and (b) wire fraud, in violation of 18 U.S.C. §1343.  Such predicate acts include the following:

(a) mailing, causing to be mailed and/or knowingly agreeing to the mailing of various materials and information including, but not limited to, letters regarding preauthorization approvals and/or appeals; materially false and misleading UCR determinations, EOBs and Remittance Advices for the purpose of saving WellPoint money at the expense of Plaintiffs and the Class, and mailing materially false data for use in the Ingenix Database, with each such mailing constituting a separate and distinct violation of 18 U.S.C. §1341; and

(b) transmitting, causing to be transmitted and/or knowingly agreeing to the transmittal of various materials and information including, but not limited to, preauthorization approvals; materially false UCR determinations and related explanation of such determinations, and materially false data for use in the Ingenix Database, by means of telephone, facsimile and the Internet, in interstate commerce, for the purpose of effectuating the above-described false payment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. §1343.

405.  In furtherance of its underpayment scheme for ONS, Defendants, in violation of 18 U.S.C. §§1341, 1343, 1961 and 1962, repeatedly and regularly used the U.S. mail and interstate wire facilities to further all aspects of the intentional underpayment to Plaintiffs and the Subscriber and Provider Classes by delivering and/or receiving materials necessary to carry out the scheme to defraud.

406.  The foregoing communications, sent *via* U.S. mail and interstate wire facilities, contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR determinations, and/or otherwise were incident to an essential part of Defendants' scheme to defraud as described in this Complaint.  Such written communications were used to provide the underpayment scheme for ONS with

an appearance of legitimacy and regularity, and/or postpone ultimate discovery and complaint of the underpayment scheme for ONS, thereby making their discovery less likely than if no such mailings or wire transmissions had taken place.

407. As named fiduciaries and claims administrators of various of the WellPoint plans, WellPoint occupied and occupies a position of trust and it had, and has, a special relationship with its members, and therefore with Plaintiffs and the Subscriber and Provider Classes, that requires it to accurately represent the terms and conditions of the WellPoint plans, and to disclose all facts, the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

408. Each such use of the U.S. mail and interstate wire facilities alleged in this Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity."

409. The above-described pattern of racketeering activity is related because it involves common persons (namely, Plaintiffs and the Subscriber and Provider Classes), common out-of-network claim practices, common results impacting upon common victims, and is continuous because it occurred over several years, and constitutes the usual practice of the Enterprise, such that it amounts to and poses a threat of continued racketeering activity. Defendants' scheme to defraud Plaintiffs and class members is open-ended and on-going.

410. The direct and intended victims of the pattern of racketeering activity described previously herein are Plaintiffs and the Subscriber and Provider Classes, who were underpaid for ONS.

411. Plaintiffs and the Subscriber and Provider Classes were injured by reason of Defendants' RICO violations because they were under-reimbursed or underpaid for services rendered to WellPoint healthplan subscribers and were forced to exhaust significant time and resources addressing Defendants' wrongful practices. Defendants' further deprived them of the knowledge necessary to adequately

First Consolidated Amended Complaint

127

challenge the underpayments.  Their injuries were proximately caused by Defendants' violations of 18 U.S.C. §1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Defendants' RICO violations (and commission of underlying predicate acts) and, but for Defendants' RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

412.   Pursuant to Section 1964(c) of RICO, 18 U.S.C. §1964(c), Plaintiffs and the Subscriber and Provider Classes are entitled to recover threefold their damages, costs and attorneys' fees from Defendants and other appropriate relief.

## EIGHTH CLAIM FOR RELIEF

### FOR VIOLATIONS OF RICO
### 18 U.S.C. §1962(c)
### FOR PREDICATE ACTS
### 18 U.S.C. §664
### (Against Defendants on Behalf of All ERISA Plaintiffs and the ERISA Subscriber and Provider Subclasses and by the Association Plaintiffs on Behalf of Their Members)

413.   Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.  This claim is asserted by the ERISA Plaintiffs on behalf of themselves and on behalf of the members of the ERISA Provider and Subscriber Subclasses and Association Plaintiffs, on behalf of their members.

414.   Section 1961(1)(B) of RICO specifically identifies as a predicate act "any act which is indictable under . . . [§]664 (relating to embezzlement from pension and welfare funds)" as a predicate act. 18 U.S.C. §1961(1)(B).  Section 664 of Title 18 provides:

> **Theft   or   embezzlement   from   employee   benefit   plan**
>
> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of

any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

415.   Each of the WellPoint healthcare plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. §1002(1)(A), and otherwise is subject to "any provision" of Section 3 of ERISA is included in this Count.

416.   Each of the WellPoint healthcare plans that are subject to ERISA or are a non-ERISA plan funded by insurance coverage WellPoint provides or administers, are subject to Section 664 of Title 18. The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

417.   The governing plan documents warrant that all benefits due under the plans will be paid.  By improperly reducing payments on out-of-network claims, WellPoint intentionally caused Plaintiffs and the members of the ERISA Subscriber and Provider Subclasses to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of their group health plans.

418.   For fully insured healthcare plans, in which WellPoint both administered the plans and paid the benefits from their own assets, Defendants benefited from the conversion of assets from their ERISA plans.  Whereas these assets should have been held by WellPoint in its fiduciary capacities under ERISA and non-ERISA plans and paid to its members, WellPoint improperly withheld such funds and maintained them as part of its own assets for its own benefit. For self-funded healthcare plans, WellPoint made final appeal decisions and intentionally caused underpayment of benefits to Plaintiffs and the ERISA Subscriber and Provider Subclasses in order to justify receipt of administrative fees.

419.   The pattern of racketeering activity described above was undertaken by and through the Enterprise described above.  The use of the Enterprise was necessary for the underpayment scheme and these predicate acts to be successfully undertaken. Defendants controlled and directed the affairs of the Enterprise as described above.

420.   Defendants acted with specific intent to deprive Plaintiffs and ERISA Subscriber and Provider Subclasses of guaranteed benefits, and were sufficiently aware of the facts to know that they were acting unlawfully and contrary to the trust placed in them and the plan sponsors whose plans they were administering.

421.   Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. §664, of converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended member, for WellPoint's direct or indirect benefit.   These intentional underpayments numbered in the millions and continuous through the various class periods continuing to the present.

422.   As set forth in this Complaint, Defendants concocted multiple and multi-faceted underpayment schemes, including use of the Ingenix Database, to make improperly reduced payments for ONS.

423.   As named fiduciaries and claims administrators of the WellPoint healthcare plans, WellPoint occupied and occupies a position of trust and it had, and has, a special relationship with Plaintiffs and the ERISA Subscribers and Provider Subclasses.

424.   The above-described acts of conversion of employee benefit plan funds, and mail and wire fraud, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the under payment scheme, and are continuous because they occurred over a significant period of years, and constitute the usual practice of WellPoint such that they amount to and pose a threat of continued racketeering activity.

425.   The purpose of WellPoint's scheme was to underpay the guaranteed benefits to the Subscriber Plaintiffs and the ERISA Subscriber Subclass, as well as those which were assigned to the Provider Plaintiffs and the ERISA Provider Subclass, and convert those withheld funds for its own direct or indirect financial

gain. WellPoint created an appearance of regularity and legitimacy by providing false and incomplete information to Plaintiffs and ERISA Subclass members, in order to increase revenue through its plan and claims administration business.

426. The direct and intended victims of the pattern of racketeering activity described previously herein are Plaintiffs and ERISA Provider and Subscriber Subclasses, who Defendants deprived of the complete guaranteed benefits to which they are entitled for ONS.

427. Defendants' RICO violations injured Plaintiffs and the ERISA Subscriber and Provider Subclasses in their business and property by depriving them of hundreds of millions of dollars in guaranteed benefits on their claims for reimbursement of out-of-network charges, as well as the knowledge necessary to challenge false and manipulative UCR determinations, and their injuries were proximately caused by the violations of 18 U.S.C. §1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of WellPoint's RICO violations (and commission of underlying predicate acts), and but for their RICO violations (and commission of underlying predicate acts), ERISA Plaintiffs, Association Plaintiffs and ERISA Subclass members would not have suffered the injuries suffered by them.

428. As a result of their misconduct, Defendants are liable to the ERISA Plaintiffs, the ERISA Provider and Subscriber Subclasses, and the Association Plaintiffs in an amount to be determined at trial. Pursuant to Section 1964(c) of RICO, 18 U.S.C. §1964(c), ERISA Plaintiffs and the ERISA Subclass members are entitled to recover threefold their damages, and costs and attorneys' fees from Defendants.

## NINTH CLAIM FOR RELIEF

### FOR VIOLATIONS OF RICO
### 18 U.S.C. §1962(d)
**(Against All Defendants on Behalf of All Plaintiffs and the Subscriber and Provider Classes and the Association Plaintiffs)**

429. Plaintiffs hereby repeat the allegations of the prior paragraphs of the Complaint as if fully set forth herein.

First Consolidated Amended Complaint

131

430.   WellPoint conspired with Ingenix and UnitedHealth, among others, to conduct or participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity as described in this Complaint in violation of 18 U.S.C. §1962(d).   This conspiracy to violate 18 U.S.C. §1962(c) constitutes a violation of 18 U.S.C. §1962(d).

431.   In furtherance of this conspiracy, Defendants and others known and unknown to Plaintiffs committed numerous overt acts as alleged above in the pattern of racketeering described above.

432.   As a direct and proximate result of, and by reason of, the activities of Defendants and their conduct in violation of 18 U.S.C. §1962(d), Plaintiffs and the Subscriber and Provider Classes have been injured within the meaning 18 U.S.C. §1964(c).

433.   Plaintiffs seek treble damages together with the costs of this lawsuit, expenses and reasonable attorneys' fees on behalf of themselves and the Subscriber and Provider Classes.

## TENTH CLAIM FOR RELIEF
### BREACH OF CONTRACT
**(Against WellPoint on Behalf of the Non-ERISA Plaintiffs and the Non-ERISA Subscriber and Provider Subclasses)**

434.   Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint. Plaintiffs bring this claim on behalf of the Non-ERISA Subscriber and Provider.

435.   The Agreement constitutes a contract whereby members of the Non-ERISA Subscriber Class agree to pay dues, deductibles, and co-payments, on one hand, and WellPoint agrees to provide healthcare benefits, including ONS reimbursements based on either the actual charges or the customary rates charged by healthcare professionals in the region where the ONS was obtained, on the other hand. On information and belief, Plaintiffs J.B.W., the Samsells and Seigle-Epstein entered into substantially similar Agreements.  Plaintiffs Henry, Schwendig, Peck, Pariser,

Melamed, Kavali, Higashi and the NPSC were assigned the benefits of such Agreements by some WellPoint insureds, for whom they provided ONS.

436. Plaintiffs J.B.W., the Samsells and Seigle-Epstein and members of the Non-ERISA Subscriber Subclass performed their obligations under such Agreements. WellPoint unjustifiably breached its Agreements by failing to reimburse ONS based on the UCR, instead, using the flawed and depressed rate information obtained from Ingenix.

437. Plaintiffs J.B.W., the Samsells and Seigle-Epstein and members of the Non-ERISA Subscriber Subclass were damaged by WellPoint's breach of its Agreements in that either their out-of-pocket costs for ONS were increased and/or their deductibles were not paid down as quickly as they should have been as a direct result of WellPoint's breach, or they under-reimbursed for ONS. To the extent they did not bill and receive full payment, Plaintiffs Henry, Schwendig, Peck, Pariser, Melamed, Kavali, Higashi, the NPSC and members of the Non-ERISA Provider Subclass received less reimbursement than they were entitled to for providing ONS for non-ERISA subscribers from when they obtained assignments. Plaintiffs J.B.W., the Samsells, Seigle-Epstein, Henry, Schwendig, Peck, Pariser, Melamed, Kavali, Higashi, the NPSC and members of the Non-ERISA Subscriber and Provider Subclasses are therefore entitled to damages according to proof at trial.

## ELEVENTH CLAIM FOR RELIEF
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
**(Against WellPoint on Behalf of the Non-ERISA Plaintiffs and the Non-ERISA Subscriber and Provider Subclasses)**

438. Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint. Plaintiffs bring this claim on behalf of the Non-ERISA Subscriber and Provider Subclasses.

439. Plaintiffs J.B.W., the Samsells, Seigle-Epstein, Henry, Schwendig, Peck, Pariser, Melamed, Kavali, Higashi and the NPSC are informed and believe and

thereon allege that since at least 1998 and continuing thereafter through the present, WellPoint has been calculating UCRs based on the flawed data obtained from Ingenix resulting in its failure to reimburse ONS in accordance with the terms of its Agreements.

440.   WellPoint utilized the flawed data thereby under-reimbursing its members in order to obtain additional revenues to unlawfully enrich WellPoint to the detriment of Plaintiffs J.B.W., the Samsells, Seigle-Epstein, Henry, Schwendig, Peck, Pariser, Melamed, Kavali, Higashi, the NPSC and the other members of the Non-ERISA Subscriber and Provider Subclasses.

441.   Plaintiffs J.B.W., the Samsells, Seigle-Epstein, Henry, Schwendig, Peck, Pariser, Melamed, Kavali, Higashi, the NPSC and members of the Non-ERISA Subscriber and Provider Subclasses purchased the health service plans and/or provided services to WellPoint insureds with the reasonable expectation that they would be reimbursed for ONS based upon the actual charge or the reasonable charge for the particular healthcare service in the region where that service is obtained.

442.   Plaintiffs J.B.W., the Samsells, Seigle-Epstein, Henry, Schwendig, Peck, Pariser, Melamed, Kavali, Higashi, the NPSC and members of the Non-ERISA Subscriber and Provider Subclasses, purchased the health services plans and/or provided services with the reasonable expectation that WellPoint would deal with them honestly, fairly, equitably, in good faith and in full conformity with the fundamental and implied terms of the Agreements.  WellPoint brought about and intended this expectation through the contractual language in the Agreements, through its advertising, and through the express representations of its employees, agents and representatives.

443.   In breach of the covenant of good faith and fair dealing, WellPoint has failed to reimburse ONS based on actual UCRs and has not provided any additional benefits to Plaintiffs J.B.W., the Samsells, Seigle-Epstein, Henry, Schwendig, Peck, Pariser, Melamed, Kavali, Higashi, the NPSC and the Non-ERISA Subscriber and

First Consolidated Amended Complaint

Provider Subclasses, for the increased charges resulting from their under-reimbursement for ONS. WellPoint has unreasonably denied Class members the benefit of their bargain and/or the benefits owed pursuant to assignment of benefits executed by WellPoint insureds.

444. WellPoint has materially and fundamentally breached the duty of good faith and fair dealing owed to Plaintiffs J.B.W., the Samsells, Seigle-Epstein, Henry, Schwendig, Peck, Pariser, Melamed, Kavali, Higashi, the NPSC and the Non-ERISA Subscriber and Provider Subclasses, in at least the following respects:

(a)   unreasonably, secretly, and in bad faith conspiring to utilize flawed data to calculate depressed UCRs and under-reimburse plan members for ONS to unlawfully enrich themselves;

(b)   unreasonably and in bad faith failing to clearly and definitely provide notice of the fact that WellPoint utilizes flawed data to calculate False UCRs, which results in higher payments for ONS;

(c)   unreasonably and in bad faith continuing to misrepresent that WellPoint insureds were being reimbursed for ONS based on the UCR when WellPoint continues to utilize flawed Ingenix data to calculate False UCRs;

(d)   unreasonably, secretly, and in bad faith providing intentionally flawed and manipulated data to Ingenix for use in the Ingenix Database with the knowledge that such data would produce artificially low False UCRs from Ingenix; and

(e)   unreasonably and in bad faith putting the interests of WellPoint ahead of those of the Subscriber and Provider Non-ERISA Subclasses.

445. WellPoint's conduct represents a failure or refusal to discharge its contractual responsibilities, prompted by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of Plaintiffs J.B.W., the Samsells, Seigle-Epstein, Henry, Schwendig, Peck, Pariser, Melamed, Kavali, Higashi, the NPSC and the Non-ERISA Subscriber

and Provider Subclasses, and thereby deprives the same of the benefits of the Agreements in accordance with their agreed-upon terms.

446.   Plaintiffs J.B.W. and the Non-ERISA Subscriber and Provider Subclasses, performed their obligations under the Agreements by paying WellPoint the dues, deductibles, and co-payments required by the Agreements.

447.   Upon information and belief, Plaintiffs J.B.W., the Samsells, Seigle-Epstein, Henry, Schwendig, Peck, Pariser, Melamed, Kavali, Higashi, the NPSC and the Non-ERISA Subscriber and Provider Subclasses, were damaged by WellPoint's breach of the covenant of good faith and fair dealing in that they made out-of-pocket, direct payments and/or were under-reimbursed for ONS, ONS that the Non-ERISA Subscriber Subclass would not even have purchased had they been adequately informed of its true cost, thereby resulting in increased out-of-pocket costs and/or they were unable to pay down their deductibles as quickly as they should have, and are therefore entitled to damages according to proof at trial.

## TWELFTH CLAIM FOR RELIEF

### FOR VIOLATIONS OF CALIFORNIA'S UNFAIR AND DECEPTIVE TRADE PRACTICES STATUTES

**(Against All Defendants on Behalf of Plaintiffs J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, Melamed, the NPSC, the Non-ERISA Subscriber and Provider Subclasses and AMA, CMA, APMA, CCA and CPA**

448.   Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.  Plaintiffs J.B.W., Henry, Schwendig, Peck, Pariser, Melamed, Higashi, the NPSC, and the AMA, CMA, APMA, CCA and CPA bring this claim on behalf of the members of the Non-ERISA Subscriber and Provider Subclasses residing in or providing services in California (the "California Non-ERISA Subclasses").

449.   Plaintiffs J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, Melamed, Kavali and the NPSC have suffered injury in fact and lost money as a result of the unfair competition alleged.

450.   The California Unfair Competition Law ("UCL"), Business and Professions Code §17200, *et seq.*, defines unfair competition to include any unlawful, unfair or fraudulent (within the meaning of the UCL) business act or practice and unfair, deceptive, untrue or misleading advertising.

451.   From at least as early as January 1, 1999, Defendants have committed acts of unfair competition proscribed by Business and Professions Code §17200 *et seq.*, including the acts and practices alleged herein.

452.   Defendants also have engaged in unfair business practices by failing to reimburse for ONS based on the actual price or the UCR as promised in their Agreements.  Such conduct is unlawful as a breach of contract and a breach of the implied covenant of good faith and fair dealing found in insurance agreements.  Such conduct represents a failure or refusal to discharge their contractual responsibilities, prompted by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the policyholders and thereby deprives the policyholders of the benefits of the agreement according to the agreed-upon terms.  The policyholders have fully performed and are entitled to full performance by Defendants.  The policyholders have suffered losses including under-reimbursement for ONS by Defendants due to their unlawful and secret conspiracy; Providers suffered the same losses as well as injuries to their business due to Defendants' actions and unlawful conspiracy as beneficiaries of assignments of benefits from insureds.

453.   Defendants' business acts and practices constitute unlawful and fraudulent business practices in that Defendants advertise, promote and sell their health plans based on false, widely disseminated representations on their website and other standard promotional materials that their insureds will have the right to freely choose between in-network and out-of-network providers, and that ONS will be reimbursed based on the actual billed cost or based on UCRs.  In reliance upon these materials, Plaintiffs J.B.W. and the members of the Non-ERISA Subscriber Subclass

subscribed to WellPoint healthcare plans with the reasonable understanding and belief that they would have a free choice of providers, and that they would be reimbursed for ONS based on the actual billed cost or based on UCRs. Overall out-of-pocket costs of healthcare, including the cost of ONS, and choice of providers are extremely important to Plaintiffs J.B.W. and the other members of the Non-ERISA Subscriber Subclass. As described herein, Defendants do not use the actual cost or UCRs to calculate ONS, but, rather, use the False UCRs obtained from Ingenix to calculate reimbursements for ONS. By using False UCRs as a basis for reimbursing Plaintiffs J.B.W. and the other Non-ERISA Subscriber Subclass members, Defendants increased their own out-of-pocket costs for ONS and deterred the California Non-ERISA Subscriber Subclass members from freely choosing between in-network and out-of-network providers.

454.    A business practice is "unlawful" under the Unfair Competition Law if it is forbidden by law, including state or federal laws or regulations.

455.    California Health and Safety Code, title 28, Sect. 1300.71, subd. (a) (3) (B) provides:

> (3) "Reimbursement of a Claim" means:
>
> (B) For contracted providers without a written contract and non-contracted providers, except those providing services described in paragraph (C) below: the payment of the reasonable and customary value for the health care services rendered based upon statistically credible information that is updated at least annually and takes into consideration:(i) the provider's training, qualifications, and length of time in practice; (ii) the nature of the services provided; (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case.

456. As described throughout this Complaint, WellPoint's use of Ingenix and other faulty data to determine UCRs for reimbursements was not based on statistically credible information as required by the California regulation quoted above. Rather, it was based on unreliable data that skewed UCRs and reimbursements to the California Non-ERISA Subscriber and Provider Subclasses to lower amounts than they should have been. WellPoint's conduct violated the "unlawful" prong of the Unfair Competition Law.

457. WellPoint's conduct also violated the "unlawful" prong of the Unfair Competition Law by violating its duty of disclosure under Section 332 of the California Insurance Code and its accompanying sections to the California Non-ERISA Subscriber Subclass and, as assignees of insureds under their health insurance plans, the California Non-ERISA Provider Subclass. Section 332 entitled "Required Disclosure" provides that: "Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining." As described throughout this Complaint, WellPoint concealed, misrepresented and failed to disclose to Plaintiffs and members of the California Non-ERISA Subclasses its use of faulty and unreliable data to determine UCR amounts or that it was under-reimbursing them, which was material information known only to WellPoint and the Conspirators.

458. Moreover, as the violation of any law may serve as the predicate for a violation of the "unlawful" prong of the Unfair Competition Law, Plaintiffs further allege that WellPoint, in violating RICO, the Sherman Act, the common law of contract, and entering into a trust that impairs competition in violation of California's Cartwright Act, California Business and Professions Code §16700 *et seq.*, violated the Unfair Competition Law. By committing the acts alleged above, Defendants have engaged in unlawful business practices and acts of unfair competition within the meaning of California Business and Professions Code §17200. Defendants' conduct,

which is ongoing, is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers. The gravity of harm caused by Defendants' conduct far outweighs the utility, if any, of such conduct.

459. In addition, California Business & Professions Code §17500 makes it unlawful for any corporation to knowingly make, by means of any advertising device or otherwise, any untrue or misleading statement with the intent to sell anything of any nature, or to induce the public to purchase anything of any nature. Defendants' advertising described herein, violated California Bus. & Prof. Code §§17200 and 17500 because it is likely to deceive, and in fact has deceived Plaintiffs J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, Melamed, the NPSC and the members of the Non-ERISA Subclasses, including members of the Association Plaintiffs in violation of Calif. Bus. & Prof. Code §17500.

460. Defendants have disseminated, and continue to disseminate advertising, and other materials to potential customers, their insureds and healthcare providers, which they know or should reasonably know is false and misleading.

461. Defendants advertise, promote and sell their health plans based on widely disseminated and uniform representations on their website and other standard form promotional materials that ONS will be reimbursed based on the actual billed cost or based on UCRs. Defendants nevertheless do not use either actual costs or UCRs to calculate ONS, but rather, use the False UCRs obtained from Ingenix to calculate reimbursements for ONS.

462. By committing the acts alleged above, Defendants have knowingly disseminated untrue and/or misleading statements in an advertising or other device in order to sell or induce members of the public to purchase their health benefit plans and induce providers to administer healthcare services to Defendants' insureds, in violation of Calif. Bus. & Prof. Code §17500.

463. Plaintiffs J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, Melamed, Higashi, the NPSC and the California Non-ERISA Subclasses, including members of

the Association Plaintiffs who reside in or who provide services in California, have suffered injury in fact to their businesses and persons and lost money or property as a result of Defendants' false and misleading statements.  Among other things, Plaintiff J.B.W. and the other members of the California Non-ERISA Subscriber Subclass who subscribed to Defendants' health plans have been forced to pay higher out-of-pocket costs for ONS as a result of Defendants' conduct alleged herein, ONS that they would not even have purchased had they been adequately informed of its true cost, while providers received lower payments for their services as beneficiaries of their patients' assignments of benefits than they should or otherwise would have.

464.   Defendants hold, retain and have derived benefits from money properly belonging to Plaintiffs J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, Melamed, the NPSC and the Non-ERISA Subclasses, including members of the Association Plaintiffs.

465.   Defendants' unfair, unlawful and misleading business acts and practices described herein present a continuing threat to the California Non-ERISA Subscriber and Provider Subclasses in that Defendants are currently engaging in such acts and practices, and will persist and continue to do so unless and until this Court issues appropriate injunctive and declaratory relief.

## THIRTEENTH CLAIM FOR RELIEF

### FOR VIOLATION OF GBL §349
**(By Plaintiff Seigle-Epstein and on Behalf of the New York Non-ERISA Subclasses)**

466.   Plaintiff Seigle-Epstein incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

467.   Plaintiff Seigle-Epstein seeks relief on behalf of herself and the members of the Non-ERISA Subscriber Subclass residing in New York (the "New York Non-ERISA Subscriber Subclass") under New York's General Business Law §349.  GBL §349 prohibits deceptive acts or practices in the conduct of any business or in the furnishing of any service in the state of New York.

First Consolidated Amended Complaint

468.   WellPoint represented that it reimbursed members or caused members to be reimbursed for ONS based on UCR rates, but intentionally failed to disclose the true basis on which it determined its members' out-of-network reimbursements.

469.   WellPoint caused and causes harm to its members including Plaintiff Seigle-Epstein and the New York Non-ERISA Subscriber Subclass through its aforementioned schemes, including increasing members' out-of-pocket payments, or forcing them to forego such ONS entirely to avoid such expense.

470.   WellPoint knew full well that its reimbursements to its members derived from the Ingenix Database were understated.  It engaged in extensive schemes to preclude subscribers from learning that they had been duped.

471.   Among the acts contrary to GBL §349:

(a)   WellPoint repeatedly represented in plan documents, insurance policies, summary plan descriptions, certificates of coverage and other materials that it would cause claims for out-of-network medical services to be reimbursed on UCR amounts, but failed to disclose that it intended to reimburse these claims based on the Ingenix Database, which it knew or should have known unjustifiably understated UCR amounts; and

(b)   never disclosed the underlying data and methodology upon which the Ingenix Database was designed and constructed and precluded all of the users of the Ingenix Database from disclosing any PHCS or MDR-related information through confidentiality and non-disclosure agreements in order to prevent discovery of and complaints about the false payment schemes, and thereby make the discovery of the false payment schemes less likely than if the underlying data and methodology were disclosed.

472.   Plaintiff Seigle-Epstein and members of the New York Non-ERISA Subscriber Subclass have paid premiums to WellPoint for health insurance including out-of-network coverage.  Plaintiff Seigle-Epstein and members of the New York Non-ERISA Subscriber Subclass used ONS and sought reimbursement from

First Consolidated Amended Complaint

WellPoint.   WellPoint provided reimbursement to Plaintiff Seigle-Epstein and members of the New York Non-ERISA Subscriber Subclass based upon the defective Ingenix Database, including its flawed UCR rates.

473.   WellPoint's provision and use of Ingenix's UCR rates to determine reimbursement to Plaintiff Seigle-Epstein and the members of the New York Non-ERISA Subclass for ONS constitutes an unfair or deceptive act or practice in the conduct of trade or commerce in violation of GBL §349, because WellPoint knew that the UCR rates provided by Ingenix were either defective, unreliable or collusively created.

474.   Defendants' concealment of the true nature of the Ingenix Database from Plaintiff Seigle-Epstein and the members of the New York Non-ERISA Subclass constitutes the concealment of a material fact, because this is precisely the type of information upon which Plaintiff Seigle-Epstein and members of the New York Non-ERISA Subscriber Subclass could reasonably be expected to rely upon when making the decision whether to purchase and/or use out-of-network coverage from WellPoint, especially since Plaintiff Seigle-Epstein alleges that the UCR rates calculated by Ingenix and used by WellPoint in many cases bear no relationship to the true, market UCR rates for ONS. Defendants' concealment from Plaintiff Seigle-Epstein and other members of the New York Non-ERISA Subscriber Subclass of the true nature of the Ingenix Database, including its UCR rates, constitutes an unfair or deceptive act or practice in violation of GBL §349.

475.   As a direct and proximate result of WellPoint's deceptive and unfair conduct, Weintraub and members of the New York Non-ERISA Subscriber Subclass have suffered and continue to suffer injury, including in particular, the overpayment of out-of-pocket expenses related to ONS.

476.   Accordingly, Plaintiff Seigle-Epstein and members of the New York Non-ERISA Subscriber Subclass are entitled to actual damages, punitive damages and equitable relief pursuant to GBL §349.

# FOURTEENTH CLAIM FOR RELIEF

## FOR VIOLATION OF THE CARTWRIGHT ACT
### (Against All Defendants on Behalf of Plaintiffs Roberts, J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, Melamed, Kavali and the NSPC, the AMA, CMA, APMA, CCA and CPA and the Provider and Subscriber Classes)

477.   Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint. Plaintiffs, Roberts, J.B.W., Henry, Higashi, Schwendig, Peck, Pariser, Melamed, Kavali, the NSPC, and the AMA, CMA, APMA, CCA and CPA bring this claim on behalf of members of the Subscriber and Provider Classes residing in or providing services in California.

478.   From a date unknown, but beginning at least as early as January 1, 1999, Defendants and the Conspirators engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of the Cartwright Act (Cal. Bus. & Prof. Code §16700 *et seq.*). These unlawful contracts, combinations, and conspiracies were entered into and effectuated within the State of California and within each of the states whose antitrust laws Plaintiffs have alleged Defendants have violated.

479.   The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among WellPoint, UnitedHealth, Ingenix and the other Conspirators, the substantial terms of which were to illegally fix UCRs. Defendants' illegal conspiracy was intended to directly affect the end payors of the medical services covered by ONS insurance plans. The intent, purpose and effect of the conspiracy were to cap ONS reimbursement rates for the purpose of under-reimbursing patients and providers who submitted claims for ONS services. Defendants and the Conspirators set reimbursement ceilings and caused a decrease in reimbursements and/or payments for ONS medical services that would not have existed but for their anticompetitive conduct. As a result of the wrongful conduct alleged herein, Plaintiffs Roberts, J.B.W., Henry, Schwendig, Peck Pariser, Melamed, Kavali, the NPSC, as well as members of the AMA, CMA, APMA,

First Consolidated Amended Complaint

CCA and CPA who are residents of or who provided services within California and the Subscriber and Provider Classes paid more for ONS services and/or received less for providing ONS services than they would have but for Defendants' and the Conspirators' anticompetitive conduct.

**FIFTEENTH CLAIM FOR RELIEF**

**CONSPIRACY**

**(Against All Defendants on Behalf of All Plaintiffs, the Association Plaintiffs and the Subscriber and Provider Classes, and the Non-ERISA Subscriber and Provider Subclasses)**

480.   Plaintiffs repeat the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein.

481.   As set forth more fully above, beginning at least as early as January 1, 1999, the exact date being unknown to Plaintiffs and the Classes, and continuing thereafter, Defendants entered into an agreement and/or otherwise engaged in a continuing conspiracy to defraud the Plaintiffs and the Classes by causing Plaintiffs and the Classes to pay more for ONS than they otherwise would have in the absence of Defendants' conspiracy.

482.   WellPoint conspired and agreed with Ingenix to defraud WellPoint subscribers by underpaying ONS charged based on artificially depressed UCRs.

483.   Pursuant to their fraudulent scheme and conspiracy alleged herein and in furtherance thereof, Defendants engaged in a wide range of activities, the purpose and effect of which was to defraud the Plaintiffs and the Classes and to act or take substantial steps in furtherance of the conspiracy.  Those activities include the following:

(a)   Defendants discussed and agreed among themselves and with their Conspirators that they would manipulate the rates by which they reimbursed out-of-network medical providers for their services.

(b)     Defendants discussed and agreed among themselves and with their Conspirators that they would create and use flawed data which was maintained in a database owned by Ingenix, Inc. to set artificially low reimbursement rates for ONS.

(c)     Defendants discussed and agreed among themselves and with their Conspirators that they would work together to cause WellPoint to breach its obligation to provide coverage and/or reimbursement to pay for ONS charges by, *inter alia*:

i.      relying upon flawed and inappropriate data for making UCO determinations for ONS;

ii.     issuing EOBs reflecting ONS ABDs and reimbursement reductions which did not adequately disclose the basis for, nor the reasons behind, the reductions;

iii.    failing to disclose whether WellPoint used any particular database (including the Ingenix Databases) or some other methodology for calculating UCRs;

iv.     "pre-scrubbing" data submitted to Ingenix which WellPoint knew would be used by it to calculate UCRs for ONS;

v.      refusing to pay the full amount of ONS charges incurred by ERISA Class Members, based on artificially reduced UCR calculations;

vi.     failing to disclose to Non-ERISA Class Members WellPoint's knowledge of the flaws in the Ingenix Databases; and

vii.    failing to disclose to Non-ERISA Class Members WellPoint's knowledge of Ingenix's disclaimer of a "reasonable and customary" charge to be derived from its data; and

(d)     Defendants discussed and agreed among themselves and with the Conspirators that they would conceal their provision and/or knowing use of the flawed Ingenix Database, despite consumer complaints about low reimbursement for ONS.

First Consolidated Amended Complaint

484.   As a direct and proximate result of Defendants' conspiracy as alleged herein, Plaintiffs and the Classes have been injured and damaged, and Defendants are jointly and severally liable for such injuries and damages.

WHEREFORE, Plaintiffs pray for judgment against Defendants, as set forth hereafter.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray as follows:

A.   The Court determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and declare Plaintiffs as representative of the Classes and their counsel as counsel for those Classes;

B.   The Court declare the conduct alleged herein be unlawful;

C.   The Court enjoin Defendants from continuing the unlawful activities alleged herein;

D.   The Court order WellPoint to recalculate and issue unpaid benefits to Plaintiffs and members of the Classes that were underpaid as a result of Defendants' unlawful activities alleged herein;

E.   The Court declare that WellPoint has breached the terms of its EOCs and SPDs and awarding unpaid benefits to Plaintiffs and the ERISA Subscriber and Provider Subclasses, as well as awarding injunctive and declaratory relief to prevent WellPoint's continuing ONS ABDs that are undisclosed and unauthorized by EOCs and SPDs;

F.   The Court declare that WellPoint has violated its fiduciary duties including the duties of loyalty and care to Plaintiffs and the Classes, and awarding appropriate relief, including unpaid benefits, restitution, interest, declaratory and injunctive relief to Plaintiffs and the Classes, and removing WellPoint and any of its agents, divisions, subsidiaries, or other affiliates as fiduciaries;

G.    The Court declare that WellPoint has failed to provide a "full and fair review" to Plaintiff Roberts, Cooper, Rivera-Giusti, Schwendig, Henry, Peck, Melamed, Kavali, the NPSC and the ERISA Subscriber and Provider Subclasses under 29 U.S.C. §1133, and awarding injunctive, declaratory and other equitable relief to Plaintiff Roberts and the members of the ERISA Damages Class to ensure compliance with ERISA and its regulations;

H.    The Court declare that WellPoint has violated its disclosure and related obligations under ERISA and federal common law, including under 29 U.S.C. §1022, for which Plaintiffs Roberts, Cooper, Rivera-Giusti, Henry, Schwendig, Peck, Kavali, Melamed and Pariser and the ERISA Subscriber and Provider Subclasses are entitled to injunctive, declaratory and other equitable relief;

I.    The Court declare that WellPoint breached the terms of its Agreements and award unpaid benefits to Plaintiffs J.B.W., the Samsells, Seigle-Epstein, the Non-ERISA Subscriber Subclass, Provider Plaintiffs and the Non-ERISA Provider Subclass;

J.    The Court award injunctive and declaratory relief to prevent continuation or recurrence of Defendants' undisclosed and unauthorized scheme;

K.    The Court award Plaintiffs and the Classes monetary damages as provided for under law, including any trebling or special damages allowable under law;

L.    The Court award the Association Plaintiffs monetary damages, declaratory and injunctive relief as allowed under law, including trebling or special damage, and award injunctive and declaratory relief as appropriate to those Associations;

M.    The Court award Plaintiffs and the Classes restitution as provided for under law;

N.    The Court award Plaintiffs and the Classes their costs of suit, including reasonable attorneys' fees, experts' fees and all other expenses as provided by law;

O.    The Court award pre and post judgment interest; and

P.    The Court grant such other and further relief as is just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial of all issues so triable.

DATED: November 2, 2009

**SCOTT+SCOTT LLP**

*FOR*

Christopher M. Burke, SBN 214799
Joseph P. Guglielmo, *pro hac vice*
Amelia F. Burroughs, SBN 221490
6424 Santa Monica Blvd.
Los Angeles, CA 90038
Tel: (213) 985-1274
Fax: (213) 985-1278
cburke@scott-scott.com
jguglielmo@scott-scott.com
amburroughs@scott-scott.com

Christopher A Seeger
Stephen A Weiss
**SEEGER WEISS LLP**
1 William Street
New York , NY 10004-2502
Tel: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com
sweiss@seegerweiss.com

*Interim Co-Lead Counsel for
Subscriber Class Counsel for
Plaintiff Michael Roberts*

Mark N. Todzo, SBN 168389
Lisa Burger, SBN 239676
**LEXINGTON LAW GROUP**
1627 Irving Street
San Francisco, CA 94122
Tel: (415) 759-4111
Fax: (415) 759-4112
mtodzo@lexlawgroup.com
lburger@lexlawgroup.com

*Attorneys for Plaintiff J.B.W., a
minor, by and through Julz W.,
parent and guardian ad litem*

**WHATLEY DRAKE & KALLAS, LLC**

*FOR*

Edith M. Kallas
Joe R. Whatley, Jr.
W. Tucker Brown
Laurence J. Hasson
1540 Broadway, 37th Floor
New York, NY 10036
Tel: (212) 447-7070
Fax: (212) 447-7077
ekallas@wdklaw.com
jwhatley@wdklaw.com

D. Brian Hufford
Robert J. Axelrod
**POMERANTZ HAUDEK GROSSMAN
& GROSS LLP**
100 Park Avenue
New York, NY 10017
Tel: (212) 661-1100
Fax: (212) 661-8665
dbhufford@pomlaw.com
rjaxelrod@pomlaw.com

Raymond P. Boucher, SBN 115364
Helen Zukin, SBN 117933
Michael Everly, SBN 178693
**KIESEL BOUCHER LARSON LLP**
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Tel: (310) 854-4444
Fax: (310) 854-0812
boucher@kbla.com
zukin@kbla.com
eyerly@kbla.com

*Interim Co-Lead Counsel for Provider
Class and Attorneys for American Medical
Association, California Medical
Association, Medical Association of
Georgia, Connecticut State Medical
Society and North Carolina Medical
Society, Stephen D. Henry, M.D. and*

First Consolidated Amended Complaint

149

1   Brian S. Kabateck, SBN 152054
    Richard L. Kellner, SBN 171416
2   Joshua H. Haffner, SBN 188652
    Artin Gholian, SBN 258280
3   **KABETECK KELLNER LLP**
    644 South Figueroa Street
4   Los Angeles, CA 90017
    Tel : (213) 217-5000
5   Fax: (213) 217-5010
    ag@kbklawyers.com
6   bsk@kbklawyers.com
    jhh@kbklawyers.com
7   rlk@kbklawyers.com

8   Eric D. Freed, SBN 164523
    George K. Lang
9   Jeffrey A. Leon
    **FREED & WEISS LLC**
10  111 West Washington Street, Ste 1331
11  Chicago, IL 60602
    Tel (312) 220-0000
12  Fax: (312) 220-7777
    eric@freedweiss.com
13  george@freedweiss.com

14  David M. Sternfield
    **DAVID M. STERNFIELD LAW**
15  **OFFICES**
    33 North Dearbon Street, Suite 300
16  Chicago, IL 60602

17  Richard J. Burke
    **RICHARD J. BURKE LLC**
18  1010 Market Street, Suite 650
    St Louis, MO 63101
19  Tel: (314) 880-7000
    rich@richardjburke.com
20
    *Attorneys for Plaintiff S. Higashi*
21

22  Ellen M. Doyle
    William T. Payne
23  **STEMBER FEINSTEIN DOYLE**
    **& PAYNE**
24  429 Forbes Avenue, 17th floor
    Pittsburgh, PA 15219
25  Tel: 412-281-8400
    Fax: 412-281-1007
26  edoyle@stemberfeinstein.com
    wpayne@stemberfeinstein.com
27

28

*James G. Schwendig, M.D. Carmen Kavali, M.D.*

Christopher P Ridout, SBN 143931
Devon Marie Lyon, SBN 218293
**RIDOUT AND LYON LLP**
555 East Ocean Boulevard, Suite 500
Long Beach, CA 90802
Tel: (562) 216-7380
Fax: (562) 216-7385
c.ridout@ridoutlyonlaw.com
d.lyon@ridoutlyonlaw.com

Maury A. Herman
Stephen J. Herman
**HERMAN GEREL LLP**
230 Peachtree Street NW, Suite 2260
Atlanta, GA 30303
Tel: (404) 880-9500
Fax: (404) 880-9605
mherman@hermangerel.com
sherman@hermangerel.com

*Attorneys for Plaintiff North Peninsula Surgical Center, L.P., et al.*

Donald E. Haviland, Jr.
**THE HAVILAND LAW FIRM LLC**
111 South Independence Mall East
Suite 1000
Philadelphia, PA 19106
Tel: 215-609-4661
Fax: 215-392-4400
haviland@havilandlaw.com

*Designated Counsel for Issues Relating to Empire Blue Cross Blue Shield, a Subsidiary of WellPoint and Attorney for Plaintiffs D. Samsell, V. Samsell, M. Cooper, and I. Seigle-Epstein*

First Consolidated Amended Complaint

| | | |
|---|---|---|
| 1 | Janet Lindner Spielberg<br>**LAW OFFICES OF JANET L**<br>**SPIELBERG**<br>12400 Wilshire Boulevard, Suite 400<br>Los Angeles, CA 90025<br>Tel: 310-392-8801<br>Fax: 310-278-5938<br>jlspielberg@jlslp.com | Barbara G. Quackenbos<br>Barry M. Epstein<br>Kevin P. Roddy<br>**WILENTZ, GOLDMAN & SPIZER PA**<br>90 Woodbridge Center Drive, Suite 900<br>Box 10<br>Woodbridge, NJ 07095<br>Tel: 732-636-8000<br>Fax: 732-855-6117 |

1 Janet Lindner Spielberg
**LAW OFFICES OF JANET L**
2 **SPIELBERG**
12400 Wilshire Boulevard, Suite 400
3 Los Angeles, CA 90025
Tel: 310-392-8801
4 Fax: 310-278-5938
jlspielberg@jlslp.com
5
Joseph N. Kravec, Jr.
6 **SPECTER SPECTER EVANS &**
**MANOGUE PC**
7 436 Seventh Avenue, 26th Floor
Pittsburg, PA 15219
8 Tel: 412-642-2300
Fax: 412-642-2309
9 jnk@ssem.com

10 Michael D. Braun
**BRAUN LAW GROUP PC**
11 10680 W Pico Boulevard, Suite 280
Los Angeles, CA 90064
12 Tel: 310-836-6000
Fax: 310-836-6010
13 service@braunlawgroup.com

14 *Attorneys for Plaintiff M. Pariser*

15

16 Richard B. Brualdi
Sue Lee
17 **THE BRUALDI LAW FIRM**
29 Broadway, Suite 2400
18 New York, NY 10006
Tel: 212-952-0602
19 Fax: 212-952-0608
rbrualdi@brualdilawfirm.com
20 slee@brualdilawfirm.com

21 *Attorneys for Plaintiff H. Bernard*

22

23

24

25

26

27

28

Barbara G. Quackenbos
Barry M. Epstein
Kevin P. Roddy
**WILENTZ, GOLDMAN & SPIZER PA**
90 Woodbridge Center Drive, Suite 900
Box 10
Woodbridge, NJ 07095
Tel: 732-636-8000
Fax: 732-855-6117

*Attorneys for Plaintiffs D. Samsell, V.*
*Samsell, M. Cooper, and I. Seigle-Epstein*

Robert J. Rohrberger
**FOX ROTHSCHILD LLP**
75 Eisenhower Parkway
Roseland, NJ 07068
Tel: 973-922-7543
Fax: 973-922-9125
rrohrberger@foxrothschild.com

*Attorney for V. O'Brien, I. Rivera-Giusti,*
*and K. O'Brien*

Andrew S. Friedman
Elaine A. Ryan
**BONNETT FAIRBOURN FREIDMAN**
**AND BALINT**
2901 North Central Avenue, Suite 1000
Phoenix, AZ 85012-3311
Tel: 602-274-1100
Fax: 602-274-1199
afriedman@bffb.com

Tonna K. Farrar
**BONNETT FAIRBOURN FREIDMAN**
**AND BALINT**
600 West Broadway, Suite 900
San Diego, CA 92101
Tel: 619-756-7095
Fax: 602-274-1199

*Designated Counsel for Issues Relating to*
*Non-Physician and Non-Dental Providers*
*and Attorneys for Plaintiffs American*
*Podiatric Medical Association, California*
*Chiropractic Association, California*
*Psychological Association, and J. Peck*

151