1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

11

IN RE WELLPOINT, INC. OUT-OF-
NETWORK "UCR" RATES
LITIGATION

)
)
)
)

Master File No. MDL 09-2074

The Hon. Philip S. Gutierrez

12

13

14

**PLAINTIFFS' RICO CASE STATEMENT**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.       INTRODUCTION

Plaintiffs Michael Roberts (individually and as guardian for D. Roberts), J.B.W. (a minor, by and through Julz W., his parent and guardian *ad litem*), Darryl and Valerie Samsell (the "Samsells"), Mary Cooper, individually and on behalf of the estate of Robert Cooper, Ivy Seigle-Epstein and Ivette Rivera-Giusti (collectively, the "Subscriber Plaintiffs"), and Plaintiffs Stephen D. Henry, M.D., James G. Schwendig, M.D., James A. Peck, Psy.D., Michael Pariser, Psy.D., Hooman M. Melamed, M.D., Carmen Kavali, M.D., Stephanie Higashi, D.C., d/b/a Mar Vista Institute of Health, and North Peninsula Surgical Center, L.P. (collectively, the "Provider Plaintiffs") who bring this action on behalf of themselves and all others similarly situated (described and defined below as the "Subscriber Class" and the "Provider Class" respectively), and Plaintiffs American Medical Association ("AMA"), California Medical Association ("CMA"), Medical Association of Georgia ("MAG"), Connecticut State Medical Society ("CSMS"), North Carolina Medical Society ("NCMS"), American Podiatric Medical Association ("APMA"), California Chiropractic Association ("CCA"), and California Psychological Association ("CPA") (collectively the "Association Plaintiffs"), by and through their counsel and pursuant to this Court's November 2 and 9, 2009 Order, hereby file their RICO Case Statement, which addresses federal civil racketeering claims alleged in Plaintiffs' Consolidated Amended Class Action Complaint (the "Amended Complaint ¶ "), filed on November 2, 2009.

**QUESTION NO. 1:**

**State whether the alleged unlawful conduct is in violation of 18 U.S.C. § 1962 (a), (b), (c) and/or (d).**

**RESPONSE TO QUESTION NO. 1:**

The alleged wrongful conduct is in violation of 18 U.S.C. §§ 1962 (c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§

Plaintiffs' RICO Case Statement

1961-1968.  In Counts VII-IX of the Amended Complaint, Plaintiffs assert claims against Defendants, for violations of RICO.

In Count VII of the Amended Complaint (¶¶ 399-412), the Subscriber, Provider and Association Plaintiffs assert RICO claims on behalf of themselves and the members of the RICO Classes (defined in ¶ 342).  In these counts, Plaintiffs allege that in violation of § 1962 (c) of RICO, WellPoint carried out its underpayment scheme in connection with the conduct of an association-in-fact "enterprise" comprised of WellPoint, United and Ingenix – the "WellPoint-Ingenix Enterprise" – through a "pattern of racketeering activity."  In Count VIII of the Amended Complaint (¶¶ 413-428), the Subscriber and Provider Plaintiffs, on behalf of themselves and the members of the RICO Section 664 Subclass and the members of the ERISA Subclass, similarly allege violations of § 1962(c) of RICO based upon predicate violations of 18 U.S.C. § 664.  As with Count VII, WellPoint, United and Ingenix carried out the underpayment scheme and its predicate violations of § 664 in connection with the conduct of the "WellPoint-Ingenix Enterprise" and through a "pattern of racketeering activity."

Each element of Plaintiffs' claims for WellPoint, United and Ingenix's violations of § 1962 (c) of RICO is properly alleged in Counts VII and VIII of the Amended Complaint.  Likewise, each element of Plaintiffs' claims for WellPoint, United and Ingenix's violations of § 1962(d) of RICO is also properly alleged in IX of the Amended Complaint.

**QUESTION NO. 2:**

**List each defendant and state the alleged misconduct and basis of liability of each defendant.**

**RESPONSE TO QUESTION NO. 2:**

Plaintiffs bring their RICO claims against Defendants WellPoint, Inc. and its insurer subsidiaries and divisions, as listed in paragraphs 56 and 57 (collectively, "WellPoint"); UnitedHealth Group, Inc. and its insurer subsidiaries and divisions

Plaintiffs' RICO Case Statement

(collectively, "United"); and United's wholly-owned subsidiary Ingenix, Inc. ("Ingenix") (Wellpoint, United, and Ingenix are collectively referred to as "Defendants"). Plaintiffs' claims arise from Defendants' fraudulent scheme to reduce the amount WellPoint, United Health and other Insurer Conspirators pay as reimbursements for out-of-network healthcare services ("ONS"). Defendants have undertaken an elaborate fraudulent scheme to underpay for out-of-network services rendered to WellPoint Subscribers by healthcare providers. This scheme has involved the use of the Ingenix Database to provide false, artificially low reimbursement amounts for ONS, and material misrepresentations and omissions with regard to the source and accuracy of the usual, customary, and reasonable ("UCR") amounts arrived at by the Defendants.

As set forth above (*see* Response to Question No. 1), in Counts VII, VIII and IX of the Amended Complaint, civil RICO claims are asserted against Defendants for carrying out an underpayment scheme in connection with the conduct of the WellPoint-Ingenix Enterprise through a pattern of racketeering activity. Many of the Subscriber and Provider Plaintiffs and the Classes are members and/or beneficiaries (either directly or through an assignment of benefits) of group health insurance plans that were offered as employee benefits. WellPoint, the company that offers, insures or administers those plans, is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Under the health care plans either directly insured or administered by WellPoint, plan members are entitled to obtain health care services from "out-of-network" ("ONET") or "non-participating" health care providers, that is, providers who have not entered into contracts with WellPoint to serve as part of its provider network. Under WellPoint's health care plans, subscribers are reimbursed, and providers are paid a certain percentage of the "usual, customary and reasonable" ("UCR") fees for such services based on WellPoint's calculation of the UCR rates. *See Am. Med. Ass'n v. United Healthcare Corp.,* No. 00 Civ. 2800 (LMM), 2006 WL 3833440, at *1, *3, *8-16, 2006 U.S. Dist. LEXIS 93864, at *1, *8, *25-52 (S.D.N.Y.

Plaintiffs' RICO Case Statement

Dec. 29, 2006) (sustaining civil RICO claims arising out of same underpayment scheme and brought against health care plan insurer and administrator).

Many health insurers, including WellPoint, offer health insurance plans that differentiate between coverage for medical treatment from in-network providers who have negotiated discounted rates with the insurer and ONET providers who charge insured consumers their usual, non-discounted rates.  Health insurance plans that permit insured individuals ("Subscribers" or "Members") to seek medical care from ONET providers are more expensive than plans that limit Members to care provided by in-network providers – *i.e.*, they require higher premium payments.

For Members who have contracted for the right to obtain ONET benefits, and agreed to pay higher premiums in exchange for that flexibility, health insurers including WellPoint promise to reimburse Members for ONET benefits at a percentage of the lesser of either (a) the actual amount of their medical bills, or (b) the UCR rate charged by providers providing such services in the same or similar geographic area for substantially the same service.  However, as set forth in the Amended Complaint, during the Subscriber and Provider Class Periods, WellPoint actually reimbursed its Members at a much ***lower*** rate.

WellPoint's wrongful conduct affects millions of consumers nationwide who have had to pay more for services rendered by Nonparticipating providers ("Nonpars") as a result of WellPoint's illegal agreement, and it affects hundreds of thousands of Providers that have been paid less for ONET services.  The instrument to accomplish this conspiracy is a data services platform known as the Prevailing Health Care Systems ("PHCS") or the Ingenix Database, and a related platform known as the Medical Data Research ("MDR") database, maintained by Ingenix, which is wholly-owned and operated by UHG, the second largest insurer in the country.  During the Subscriber and Provider Class Periods, WellPoint contracted with Ingenix to provide ONET data claims and receive uniform pricing schedules that are used to calculate reimbursements for services provided by Nonpars at artificially low rates (herein

Plaintiffs' RICO Case Statement

"False UCRs").  These low rates are then presented as legitimate UCR rates but are, in fact, substantially below the actual UCR.

Ingenix contracts with most of the country's largest health insurers, including WellPoint, to collect ONET claims data.  After Ingenix collects the data, it aggregates, manipulates and "scrubs" the data to create False UCR schedules that it sells back to most of the country's largest health insurers, including WellPoint.  Using the False UCR schedules, WellPoint was able to under-reimburse the Subscriber and Provider Plaintiffs for services rendered by Nonpars.

During the Class Periods, WellPoint, United and Ingenix hid this scheme or artifice to defraud, including the existence and purpose of the Ingenix Database, through a series of material omissions and misrepresentations.  There is an inherent and irreconcilable conflict of interest in using a price-setting mechanism, the Ingenix Database, which is controlled by WellPoint, and Ingenix's parent company United, to create uniform pricing schedules.  Because these health insurers have an incentive to artificially deflate the amounts of money they reimburse Subscribers and Providers for ONET services, it is not surprising that their use of the Ingenix Database in fact results in the systematic under-reimbursement of Subscribers and Providers for ONET services.

Until recent news reports detailed the investigation by the Office of the Attorney General of the State of New York, the process of setting UCR rates used to determine reimbursement for ONET services was effectively hidden from consumers who purchase and/or participate in health insurance programs, and from providers who provide health care to plan Members.  This lack of transparency was facilitated by the following practices:

- In their healthcare plans that cover ONET services, WellPoint and other insurers affirmatively represented that they will reimburse in accordance with the UCR rate, which the reasonable consumer would understand to literally mean the "usual and customary rate" charged for such services;

Plaintiffs' RICO Case Statement

- WellPoint did not disclose a conflict of interest, *i.e.*, that the Ingenix Database, which is owned and controlled by UHG in agreement with WellPoint and other insurers, is used to determine False UCRs;

- WellPoint concealed the fact that the health insurers regularly and intentionally exclude important data points to depress UCR rates and under-reimburse for ONET services;

- WellPoint concealed that Ingenix "scrubs" the data it receives from WellPoint and other insurers to remove information that would result in higher reimbursement rates; and

- WellPoint concealed that it scrubs the data it provides to Ingenix to remove information that would result in higher reimbursement rates.

Plaintiffs allege the existence of (a) direct agreements in the form of contracts between Ingenix and many of the country's largest healthcare insurers, including WellPoint, to obtain and/or provide UCR pricing information; and (b) a lengthy chronology of facts that demonstrates a conspiracy between and among WellPoint, United and Ingenix to use Ingenix to develop False UCRs that are, in turn, used to determine the amount to reimburse Members for ONET services.

The Amended Complaint alleges that WellPoint intentionally underpaid UCR rates based on the Ingenix Database to which it contributed falsified data. WellPoint knew that its falsified data contributions to Ingenix would decrease UCR data and save it money at the expense of Plaintiffs and Class members. Ingenix, among others, joined the conspiratorial activity as alleged in the Amended Complaint.

**QUESTION NO. 3:**

**List each of the alleged wrongdoers, other than the defendants listed above, and state the alleged misconduct of each wrongdoer.**

Plaintiffs' RICO Case Statement

**RESPONSE TO QUESTION NO. 3:**

The Amended Complaint identifies additional wrongdoers other than WellPoint, United and Ingenix (¶¶ 59-62). Among these wrongdoers are Aetna; CIGNA; Health Net, Inc; Oxford Health Plans; and the Health Insurance Association of America ("HIAA") (collectively, with the Defendants the "Conspirators"). As alleged in the Amended Complaint, the Conspirators have participated in the alleged unlawful conspiratorial activity in violation of federal and state law. Such violations include, *inter alia*, knowingly providing flawed and misleading data to Ingenix for use in determining UCR rates; knowingly acquiescing to flawed and improper manipulation of data provided by Ingenix; and knowingly using artificially low UCR rates produced by Ingenix in determining reimbursements for ONET services.

**QUESTION NO. 4:**

**List the alleged victims and state how each victim was allegedly injured.**

**RESPONSE TO QUESTION NO. 4:**

Plaintiffs and members of the RICO Classes and the ERISA Subclasses describe how WellPoint's underpayment scheme injured them in ¶¶ 150-165 and 313 of the Amended Complaint. Under § 1964(c) of RICO, Plaintiffs and Class members allege that they have been injured in their "business or property." Count VII of the Amended Complaint alleges:

> Plaintiffs and the Subscriber and Provider Classes were injured by reason of Defendants' RICO violations because they were under-reimbursed or underpaid for services rendered to WellPoint healthplan subscribers and were forced to exhaust significant time and resources addressing Defendants' wrongful practices. Defendants' further deprived them of the knowledge necessary to adequately challenge the underpayments. Their injuries were proximately caused by Defendants' violations of 18 U.S.C. §1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Defendants' RICO violations (and commission of underlying predicate acts) and, but for Defendants' RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

1    Amended Complaint ¶ 411.

2        Count VIII alleges:

3         Defendants' RICO violations injured Plaintiffs and the ERISA
        Subscriber and Provider Subclasses in their business and property by
4        depriving them of hundreds of millions of dollars in guaranteed benefits
        on their claims for reimbursement of out-of-network charges, as well as
5        the knowledge necessary to challenge false and manipulative UCR
        determinations, and their injuries were proximately caused by the
6        violations of 18 U.S.C. §1962(c) because these injuries were the
        foreseeable, direct, intended and natural consequence of WellPoint's
7        RICO violations (and commission of underlying predicate acts), and but
        for their RICO violations (and commission of underlying predicate acts),
8        ERISA Plaintiffs, Association Plaintiffs and ERISA Subclass members
        would not have suffered the injuries suffered by them.
9
10
11

12    Amended Complaint ¶ 427.

13        In addition to the underpayments described in the Amended Complaint, the

14    Subscriber Plaintiffs and the RICO class members may have sustained ancillary out-

15    of-pocket damages.

16        The named Provider Plaintiffs have each sustained injury in their business or

17    property as a result of WellPoint's improper ONET reimbursements.  In addition to

18    receiving underpayments and/or the complete denial of payments from WellPoint for

19    their ONET services, examples of which are set forth below in response to Question

20    No. 5, the Provider Plaintiffs have exhausted a significant amount of time and

21    resources towards identifying and then appealing WellPoint's improper ONET

22    determinations.

23        Finally, as a result of WellPoint's unlawful practices, the Association Plaintiffs

24    have been required to devote substantial time and resources counseling their members

25    on how to deal with the practices at issue, monitoring the payment practices of

26    WellPoint, corresponding with WellPoint, advocating on their members' behalf, and

27    communicating with regulators concerning WellPoint, United and Ingenix's

28

misconduct, among other things.  The Association Plaintiffs allege violations of RICO, on behalf of themselves and/or their membership, against WellPoint.

**QUESTION NO. 5:**

Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim.  A description of the pattern of racketeering activity shall include the following information:

(a)    List the alleged predicate acts and the specific statutes which are allegedly violated;

(b)    Provide the dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts;

(c)    If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of the securities, provide the "circumstances constituting fraud or mistake [which] shall be stated with particularity." Fed. R. Civ. P. 9(b).    Identify the time, place and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made;

(d)    State whether there has been a criminal conviction in regard to the predicate acts;

(e)    State whether civil litigation has resulted in a judgment in regard to the predicate acts;

(f)    Describe how the predicate acts form a "pattern of racketeering activity"; and

(g)    State whether the alleged predicate acts relate to each other as part of a common plan.  If so, describe in detail.

**RESPONSE TO QUESTION NO. 5:**

a.-c.   **Defendants' Predicate Acts**

In Counts VIII and IX, Plaintiffs allege that WellPoint, United and Ingenix violated § 1962(c) of RICO by conducting the affairs of the WellPoint-Ingenix

Enterprise through a "pattern of racketeering activity."  Amended Complaint ¶¶ 275-315, 403, 408-09, 419, 430.  For purposes of Count VII, the alleged "racketeering activity" consisted of violations of the federal mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.  For example, Count VII alleges:

> Through the wrongful conduct as alleged herein, Defendants, in violation of 18 U.S.C. §1962(c), conducted and participated in the conduct of the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5).

> WellPoint, acting through its officers, agents, employees and affiliates, has committed numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. §1961(5), prior to and during the Class Period, and continues to commit such predicate acts, in furtherance of its underpayment scheme for ONS, including (a) mail fraud, in violation of 18 U.S.C. §1341, and (b) wire fraud, in violation of 18 U.S.C. §1343.  Such predicate acts include the following:

> (a)     mailing, causing to be mailed and/or knowingly agreeing to the mailing of various materials and information including, but not limited to, letters regarding preauthorization approvals and/or appeals; materially false and misleading UCR determinations, EOBs and Remittance Advices for the purpose of saving WellPoint money at the expense of Plaintiffs and the Class, and mailing materially false data for use in the Ingenix Database, with each such mailing constituting a separate and distinct violation of 18 U.S.C. §1341; and

> (b)     transmitting, causing to be transmitted and/or knowingly agreeing to the transmittal of various materials and information including, but not limited to, preauthorization approvals; materially false UCR

Plaintiffs' RICO Case Statement

determinations and related explanation of such determinations, and materially false data for use in the Ingenix Database, by means of telephone, facsimile and the Internet, in interstate commerce, for the purpose of effectuating the above-described false payment schemes, and each such transmission constituting a separate and distinct violation of 18 U.S.C. §1343.

In furtherance of its underpayment scheme for ONS, Defendants, in violation of 18 U.S.C. §§1341, 1343, 1961 and 1962, repeatedly and regularly used the U.S. mail and interstate wire facilities to further all aspects of the intentional underpayment to Plaintiffs and the Subscriber and Provider Classes by delivering and/or receiving materials necessary to carry out the scheme to defraud.

The foregoing communications, sent *via* U.S. mail and interstate wire facilities, contained false and fraudulent misrepresentations and/or omissions of material facts, had the design and effect of preventing a meaningful evaluation and review of the Enterprise's UCR determinations, and/or otherwise were incident to an essential part of Defendants' scheme to defraud as described in this Complaint. Such written communications were used to provide the underpayment scheme for ONS with an appearance of legitimacy and regularity, and/or postpone ultimate discovery and complaint of the underpayment scheme for ONS, thereby making their discovery less likely than if no such mailings or wire transmissions had taken place.

As named fiduciaries and claims administrators of various of the WellPoint plans, WellPoint occupied and occupies a position of trust and it had, and has, a special relationship with its members, and therefore

Plaintiffs' RICO Case Statement

with Plaintiffs and the Subscriber and Provider Classes, that requires it to accurately represent the terms and conditions of the WellPoint plans, and to disclose all facts, the omission of which would be reasonably calculated to deceive persons of ordinary prudence and comprehension.

Each such use of the U.S. mail and interstate wire facilities alleged in this Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity."

The above-described pattern of racketeering activity is related because it involves common persons (namely, Plaintiffs and the Subscriber and Provider Classes), common out-of-network claim practices, common results impacting upon common victims, and is continuous because it occurred over several years, and constitutes the usual practice of the Enterprise, such that it amounts to and poses a threat of continued racketeering activity. Defendants' scheme to defraud Plaintiffs and class members is open-ended and on-going.

The direct and intended victims of the pattern of racketeering activity described previously herein are Plaintiffs and the Subscriber and Provider Classes, who were underpaid for ONS.

Amended Complaint ¶¶ 403-410.

WellPoint, United and Ingenix participated in the fraudulent scheme described in the Amended Complaint. Each use of the mail or wire in furtherance of the scheme constitutes a predicate act in violation of 18 U.S.C. §§ 1341 or 1343. WellPoint's EOBs or other communications regarding Plaintiffs' reimbursements for ONS and/or any stated reason for the reduction in reimbursement included in those uses of mail and wire was fraudulent, false and/or improper because WellPoint wrongfully relied

Plaintiffs' RICO Case Statement

1  on the Ingenix or substantially similar database or methodology to diminish the

2  compensation or reimbursement to which the Plaintiffs were entitled.

3       For purposes of Count VIII, the predicate acts consist of false payment

4  violations of 18 U.S.C. § 664. "Each false payment on a claim constitutes a separate

5  and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or

6  misappropriating funds specifically earmarked within the applicable plan as a

7  guaranteed benefit for the intended member, for WellPoint's direct or indirect

8  benefit." Amended Complaint ¶ 421. WellPoint, United and Ingenix participated in

9  the fraudulent scheme described in the Amended Complaint.

10       **SUBSCRIBER PLAINTIFFS**

11       Allegations detailing Defendants' predicate acts of mail and wire fraud are

12  contained in the Amended Complaint, which allege how the Subscriber Plaintiffs were

13  underpaid by WellPoint.  As detailed in the Amended Complaint, WellPoint sent

14  various fraudulent documents to Subscriber Plaintiffs by wire or mail, including,

15  preauthorizations, EOBs, responses to appeals, and others.  Amended Complaint ¶¶

16  179-188, 189-193, 316-325.

17       In addition, Defendants furthered the WellPoint-Ingenix Enterprise through use

18  of the U.S. mail and interstate wire facilities.  ¶¶ 280, 283, 285, 296(a), (b), 297-300.

19  Data contribution cover sheets were sent to Ingenix at varying times by fax, overnight

20  delivery and email.  At varying times, WellPoint would send tapes containing the

21  contributed data to Ingenix by overnight delivery and FTP data transfer.  Other

22  communications between WellPoint, United and Ingenix in furtherance of the

23  Enterprise would generally occur using email.  Amended Complaint ¶¶123, 126, 340.

24       Additionally, the following allegations further support each Plaintiff's predicate

25  acts of mail and wire fraud:

26  **Subscriber Allegations**

27       **Mr. J.B.W.**

28

Plaintiffs' RICO Case Statement

1    Plaintiff J.B.W. is a resident of the State of California.  At all times relevant to

2  this Amended Complaint, Plaintiff J.B.W. was a Member of the Blue Cross Individual

3  PPO $3,500 Deductible plan administered by Anthem Blue Cross Life and Health

4  Insurance Company, a division of WellPoint.  Plaintiff J.B.W. was the only person

5  receiving health care services through his WellPoint health plan.

6    In conjunction with Plaintiff J.B.W.'s health plan, he received certain health

7  plan documents, including a SPD.  That document contains a particular section

8  entitled "Benefit Copayment/Coinsurance List," which explains that, after the set

9  deductible is satisfied, Members of the plan are covered at either the reasonable and

10  customary charges or 50% of the negotiated fee for ONS.

11    The SPD defines "Customary and Reasonable Charge" as "a charge

12  which falls within the common range of fees billed by a majority of physicians for a

13  procedure in a given geographic region or which is justified based on the complexity

14  or severity of treatment for a specific case."  The SPD further defines the "Negotiated

15  Fee Rate" as "the rate of payment that Anthem has negotiated with the Participating

16  Provider under a Prudent Buyer Participating Agreement for Covered Services."

17  Because out-of-network providers by definition have not negotiated rates under a

18  Prudent Buyer Participating Agreement or any other agreement, there is no Negotiated

19  Fee Rate for out-of-network providers.  Accordingly, it is difficult to comprehend

20  how, if at all, reimbursements are calculated without reference to the Customary and

21  Reasonable Charge.

22    Plaintiff J.B.W. expected to be reimbursed by WellPoint based on a true UCR

23  rate.  WellPoint instead deliberately reimbursed Plaintiff J.B.W.'s claims at below

24  UCR levels.  At all relevant times, and in furtherance of its underpayment scheme,

25  WellPoint committed predicate acts of racketeering activity including mail and wire

26  fraud.  These acts include, but are not limited to the following:

27    Beginning on or about January 23, 2009, Plaintiff J.B.W. began receiving

28  routine medical treatments twice a month which are medically necessary and covered

14    Plaintiffs' RICO Case Statement

1  services performed by Dr. Ted Sneed, who is not a participating physician with
2  WellPoint.  On the date of each appointment with Dr. Sneed, Plaintiff J.B.W. paid out
3  of pocket the full cost of Dr. Sneed's medical bill.  Plaintiff J.B.W. used the mails to
4  submit to WellPoint his bills for such ONS from Dr. Sneed for reimbursement.

5      In response to each request for reimbursement, WellPoint submitted to Plaintiff
6  J.B.W. an Explanation of Benefits through the mails and the wires, the first of which
7  was dated January 26, 2009, with Claim Number 09026AT9876.  Each of these
8  reimbursement determinations by WellPoint resulted in Plaintiff J.B.W. being
9  obligated to pay not only his deductible, but also, once Plaintiff J.B.W.'s deductible
10  was paid in full, that part of Dr. Sneed's billed charge that exceeded the
11  reimbursement amount determined by WellPoint, i.e. the "reasonable and customary"
12  charge provided in the fee schedules of the Ingenix Database.  Plaintiff J.B.W. was
13  therefore under-reimbursed by WellPoint based upon the flawed fee schedules
14  provided by Ingenix.  Plaintiff J.B.W. continues to pay out of pocket for these
15  services.

16  **<u>Ms. Ivette Rivera-Giusti</u>**

17      Plaintiff Ivette Rivera Giusti is a resident of the State of Oregon.  At all times
18  relevant to this Amended Complaint, Plaintiff maintained health insurance through her
19  employer, Fordham University.  Fordham University offered health insurance plans to
20  its employees and their families, including Empire Blue Cross Blue Shield PPO, of
21  which Plaintiff was a Member.

22      The Empire Blue Cross Blue Shield PPO plan offered by Fordham University
23  was, at all times relevant to the Amended Complaint, administered by WellPoint.
24  Plaintiff paid premiums to WellPoint.

25      In conjunction with its health plans, Fordham University provided its
26  employees with health plan documents.  That document contains a particular section
27  entitled "Choosing In-Network or Out-of-Network Services" which states that
28  members of the plan are covered at 80% of the allowed amount for ONET.

Plaintiffs' RICO Case Statement

1    The plan documents further contain a definition of the "allowed amount" as
2    "The maximum Empire will pay for a covered service out-of-network. The allowed
3    amount is based on an agreement between Empire and the provider, or if there is no
4    agreement, then on the customary charge or the average market charge in your
5    geographic area for a similar service. You are responsible for paying the entire portion
6    above the allowed amount."

7        According to the plan documents, Empire Blue Cross Blue Shield administers
8    the claims process.

9        Plaintiff Ivette Rivera-Giusti expected to be reimbursed by Empire Blue Cross
10   Blue Shield at the true allowed amount or UCR rate.  Empire Blue Cross Blue Shield
11   instead deliberately reimbursed her claims at below the allowed amount or UCR
12   levels, requiring her to exhaust significant amounts of time and energy identifying
13   those improperly reimbursed claims.  At all relevant times, and in furtherance of its
14   underpayment scheme, Empire Blue Cross Blue Shield and WellPoint committed
15   predicate acts of racketeering activity including mail and wire fraud.  These acts
16   include, but are not limited to the following:

17       On September 13, 2006, Plaintiff Ivette Rivera-Giusti visited her doctor's office
18   for pre-natal services that were medically necessary and covered services which were
19   preformed by Simone Cinque CNM, who is non-participating with Empire Blue Cross
20   Blue Shield.  Plaintiff Ivette Rivera-Giusti used the mails to submit to Empire Blue
21   Cross Blue Shield her bills for such out of network services from Simone Cinque for
22   reimbursement.

23       Empire Blue Cross Blue Shield submitted an Explanation of Benefits dated
24   October 19, 2006 with the claim number 62928007620 through the mails and the
25   wires whereby it purportedly reimbursed Plaintiff Ivette Rivera-Giusti  80% of the
26   "the customary charge or the average market charge" for Simone Cinque's services as
27   provided in the fee schedules of the Ingenix Database.  That amount was less than the
28   actual charge incurred by Plaintiff for the medical services.  Plaintiff Ivette Rivera-

Plaintiffs' RICO Case Statement

1   Giusti was therefore under-reimbursed by Empire Blue Cross Blue Shield based upon

2   the flawed fee schedules provided by Ingenix.  Plaintiff Ivette Rivera-Giusti remains

3   out of pocket for these services.

4        On March 9, 2007, Plaintiff Ivette Rivera-Giusti received maternity services

5   that were medically necessary and covered services which were preformed by Simone

6   Cinque, CNM, who is non-participating with Empire Blue Cross Blue Shield.

7   Plaintiff Ivette Rivera-Giusti used the mails to submit to Empire Blue Cross Blue

8   Shield her bills for such out of network services from Simone Cinque for

9   reimbursement.

10       Empire Blue Cross Blue Shield submitted an Explanation of Benefits dated

11  April 16, 2007 with the claim number 71068053620 through the mails and the wires

12  whereby it purportedly reimbursed Plaintiff Ivette Rivera-Giusti  80% of the "the

13  customary charge or the average market charge" for Simone Cinque's services as

14  provided in the fee schedules of the Ingenix Database.  That amount was less than the

15  actual charge incurred by Plaintiff for the medical services.  Plaintiff Ivette Rivera-

16  Giusti was therefore under-reimbursed by Empire Blue Cross Blue Shield based upon

17  the flawed fee schedules provided by Ingenix.  Plaintiff Ivette Rivera-Giusti remains

18  out of pocket for these services.

19       On March 9, 2007, Plaintiff Ivette Rivera-Giusti received well baby and child

20  care services that were medically necessary and covered services which were

21  preformed by Simone Cinque, CNM, who is non-participating with Empire Blue

22  Cross Blue Shield.  Plaintiff Ivette Rivera-Giusti used the mails to submit to Empire

23  Blue Cross Blue Shield her bills for such out of network services from Dr. Simone

24  Cinque for reimbursement.

25       Empire Blue Cross Blue Shield submitted an Explanation of Benefits dated

26  April 16, 2007 with the claim number 71068053640 through the mails and the wires

27  whereby it purportedly reimbursed Plaintiff Ivette Rivera-Giusti  80% of the "the

28  customary charge or the average market charge" of Simone Cinque's services as

Plaintiffs' RICO Case Statement

1    provided in the fee schedules of the Ingenix Database.  That amount was less than the

2    actual charge incurred by Plaintiff for the medical services.  Plaintiff Ivette Rivera-

3    Giusti was therefore under-reimbursed by Empire Blue Cross Blue Shield based upon

4    the flawed fee schedules provided by Ingenix.  Plaintiff Ivette Rivera-Giusti remains

5    out of pocket for these services.

6          On May 5, 15 and 22, 2008, Plaintiff Ivette Rivera-Giusti received medical

7    services that were medically necessary and covered services which were preformed by

8    Mimi Renchner, CSW, who is non-participating with Empire Blue Cross Blue Shield.

9    Plaintiff Ivette Rivera-Giusti used the mails to submit to Empire Blue Cross Blue

10   Shield her bills for such out of network services from Mimi Renchner for

11   reimbursement.

12         Empire Blue Cross Blue Shield submitted an Explanation of Benefits dated

13   October 31, 2008 with the claim number 81620306870 through the mails and the

14   wires whereby it purportedly reimbursed Plaintiff Ivette Rivera-Giusti  80% of the

15   "the customary charge or the average market charge" for Mimi Renchner's services as

16   provided in the fee schedules of the Ingenix Database.  That amount was less than the

17   actual charge incurred by Plaintiff for the medical services.  Plaintiff Ivette Rivera-

18   Giusti was therefore under-reimbursed by Empire Blue Cross Blue Shield based upon

19   the flawed fee schedules provided by Ingenix.  Plaintiff Ivette Rivera-Giusti remains

20   out of pocket for these services.

21         On July 16 and 30, 2008, Plaintiff Ivette Rivera-Giusti received medical

22   services that were medically necessary and covered services which were preformed by

23   Mimi Renchner, CSW, who is non-participating with Empire Blue Cross Blue Shield.

24   Plaintiff Ivette Rivera-Giusti used the mails to submit to Empire Blue Cross Blue

25   Shield her bills for such out of network services from Mimi Renchner for

26   reimbursement.

27         Empire Blue Cross Blue Shield submitted an Explanation of Benefits dated

28   August 14, 2008 with the claim number 82240305840 through the mails and the wires

1   whereby it purportedly reimbursed Plaintiff Ivette Rivera-Giusti  80% of the "the

2   customary charge or the average market charge" for Mimi Renchner's services as

3   provided in the fee schedules of the Ingenix Database.  That amount was less than the

4   actual charge incurred by Plaintiff for the medical services.  Plaintiff Ivette Rivera-

5   Giusti was therefore under-reimbursed by Empire Blue Cross Blue Shield based upon

6   the flawed fee schedules provided by Ingenix.  Plaintiff Ivette Rivera-Giusti remains

7   out of pocket for these services.

8        On August 13, 2008, Plaintiff Ivette Rivera-Giusti received medical services

9   that were medically necessary and covered services which were preformed by Mimi

10  Renchner, CSW, who is non-participating with Empire Blue Cross Blue Shield.

11  Plaintiff Ivette Rivera-Giusti used the mails to submit to Empire Blue Cross Blue

12  Shield her bills for such out of network services from Mimi Renchner for

13  reimbursement.

14       Empire Blue Cross Blue Shield submitted an Explanation of Benefits dated

15  December 3, 2008 with the claim number 83370225730 through the mails and the

16  wires whereby it purportedly reimbursed Plaintiff Ivette Rivera-Giusti  80% of the

17  "the customary charge or the average market charge" for Mimi Renchner's services as

18  provided in the fee schedules of the Ingenix Database.  That amount was less than the

19  actual charge incurred by Plaintiff for the medical services.  Plaintiff Ivette Rivera-

20  Giusti was therefore under-reimbursed by Empire Blue Cross Blue Shield based upon

21  the flawed fee schedules provided by Ingenix.  Plaintiff Ivette Rivera-Giusti remains

22  out of pocket for these services.

23       On October 22 and November 19 and 26, 2008 Plaintiff Ivette Rivera-Giusti

24  received medical services that were medically necessary and covered services which

25  were preformed by Mimi Renchner, CSW, who is non-participating with Empire Blue

26  Cross Blue Shield.  Plaintiff Ivette Rivera-Giusti used the mails to submit to Empire

27  Blue Cross Blue Shield her bills for such out of network services from Mimi Renchner

28  for reimbursement.

Plaintiffs' RICO Case Statement

1   Empire Blue Cross Blue Shield submitted an Explanation of Benefits dated

2   December 3, 2008 with the claim number 83370225720 through the mails and the

3   wires whereby it reimbursed Plaintiff Ivette Rivera-Giusti 80% of the "the customary

4   charge or the average market charge" for Mimi Renchner's services as provided in the

5   fee schedules of the Ingenix Database.  That amount was less than the actual charge

6   incurred by Plaintiff for the medical services.  Plaintiff Ivette Rivera-Giusti was

7   therefore under-reimbursed by Empire Blue Cross Blue Shield based upon the flawed

8   fee schedules provided by Ingenix.  Plaintiff Ivette Rivera-Giusti remains out of

9   pocket for these services.

10   **<u>Mrs. Mary Cooper on behalf of herself and the Estate of Robert Cooper</u>**

11   Plaintiff Mary Cooper is a resident of the State of New Jersey.  At all times

12   relevant to this Amended Complaint, the Coopers maintained health insurance through

13   their employer, Landmark I Appraisal, LLC.  The name of the employer group health

14   plan of which the Coopers were members was Landmark I Appraisal, LLC.

15   The Landmark I Appraisal, LLC Plan offered by Landmark I Appraisal was, at

16   all times relevant to the Amended Complaint, administered by Wellchoice Insurance

17   of New Jersey, Inc.

18   In conjunction with its health plans, Wellchoice provided the Coopers with

19   health plan documents, including a "SCHEDULE OF INSURANCE."  That document

20   contains a particular section entitled "COINSURANCE" and which provides that

21   "Coinsurance is the percentage of a Covered Charge that must be paid by a Covered

22   Person."  The Coinsurance for the Coopers' policy is 30% "if treatment, services or

23   supplies are given by a Non-Network Provider."  In other words, Wellchoice only

24   covered 70% of the charges associated with out of network care.

25   Moreover, the Coopers' health plan documents included the Small Group

26   Health Benefits Certificate.  This certificate contains the following "Reasonable and

27   Customary" an amount that is not more than the usual or customary charge for the

28   service or supply as determined by Wellchoice, based on a standard approved by the

20                    Plaintiffs' RICO Case Statement

1   Board; or the negotiated fee schedule.  The Board will decide a standard for what is

2   Reasonable and Customary under the Policy.  The chosen standard is an amount

3   which is most often charged for a given service by a provider within the same

4   geographic area.  For charges that are not determined by a negotiated fee schedule, the

5   Covered Person may be billed for the difference between the Reasonable and

6   Customary charge and the charge billed by the Provider."

7       The Coopers expected to be reimbursed by Wellchoice at the true UCR rate.

8   Wellchoice instead deliberately reimbursed the Coopers' claims at below UCR levels,

9   requiring them to exhaust significant amounts of time and energy first identifying and

10  then appealing improperly reimbursed claims.   At all relevant times, and in

11  furtherance of its underpayment scheme, Wellchoice committed predicate acts of

12  racketeering activity including mail and wire fraud.

13      In the year 2005, Robert Cooper received thousands of dollars out of network

14  treatment, of which he paid $1,967.08 out of pocket.  Wellchoice submitted numerous

15  evidences of coverage through the mails where it reimbursed the Coopers the

16  "reasonable and customary" charge provided in the fee schedules of the Ingenix

17  Database.  That amount was less than the actual charge incurred by the Coopers for

18  the medical services.  Plaintiff Cooper was therefore under reimbursed by Wellchoice

19  based upon the flawed fee schedules provide by Ingenix.

20      Examples, on June 29, 2006 and June 30, 2006, Plaintiff Robert Cooper

21  underwent surgery that was medically necessary and were covered services as

22  performed by Dr. Robert Pink M.D.; a non-participating physician with Wellchoice.

23  Additionally, said surgery was performed at Ridgedale Surgery Center Associates,

24  Inc. which is a non-participating hospital and/or facility with Wellchoice.   The

25  Coopers used the mails to submit to Wellchoice for reimbursement the bills they

26  received for such out of network services from Dr. Pink and/or the hospital/facility.

27      Wellchoice submitted an evidence of coverage through the mails where it

28  reimbursed the Coopers the "reasonable and customary" charge provided in the fee

Plaintiffs' RICO Case Statement

1   schedules of the Ingenix Database.  That amount was less than the actual charge

2   incurred by Plaintiff for the medical services.  Plaintiff Cooper was therefore under

3   reimbursed by Wellchoice based upon the flawed fee schedules provided by Ingenix.

4   **Ms. Ivy Seigle-Epstein**

5   Plaintiff Ivy Seigle-Epstein is a resident of the State of New York.  At all times

6   relevant to this Amended Complaint, Plaintiff Seigle-Epstein received her health

7   benefits through the City of New York, Department of Education, an ERISA plan.

8   The City of New York, Department of Education offered health benefits to its

9   employees and their families.

10   Plaintiff Seigle-Epstein has been and continues to be of limited availability as a

11   result of a significant, adverse medical condition.  Her statement will be supplemented

12   upon her recovery and resultant availability.

13   The health benefits offered by the City of New York, Department of Education,

14   in particular, but not necessarily limited to, the hospitalization benefit, was at all times

15   relevant to the Amended Complaint, administered by Wellpoint by and through its

16   predecessor and subsidiary company Empire Blue Cross Blue Shield.

17   In conjunction with Plaintiff's health benefits, she received certain health plan

18   documents.  Moreover, other health plan related documents were issued directly to the

19   City of New York and/or her employer and included a contract between the City of

20   New York and Empire Blue Cross and Blue Shield.

21   The contract document contains information regarding "participating" and

22   "non- participating" providers and/or hospitals which states that members of the plan

23   are covered for services at some negotiated or reasonable charge.

24   The contract further contains a definition of "Allowed Amount" as the

25   maximum available benefit for each covered service under this Contract when such

26   services are determined by Empire to be medically necessary and appropriate.  For

27   hospital and/or facility services, the Allowed Amount is based on an agreement

28   between Empire and the hospital and/or facility.  If there is no agreement, then the

Plaintiffs' RICO Case Statement

1  Allowed Amount will be based on the hospital's reasonable charges.  In no event will
2  the Allowed Amount be more than the hospital or facility charges.

3      Upon information and belief, and according to the contract document, Empire
4  Blue Cross Blue Shield administers the claim process.

5      Plaintiff Ivy Seigle-Epstein expected to be reimbursed by the Empire Blue
6  Cross Blue Shield at the true reasonable and/or usual and customary rate.  Empire
7  Blue Cross Blue Shield instead deliberately reimbursed Plaintiff Seigle-Epstein's
8  claims at below UCR levels, requiring her to exhaust significant amounts of time and
9  energy identifying the improperly reimbursed claims.

10     At all relevant times, and in furtherance of its underpayment scheme, Empire
11 Blue Cross Blue Shield committed predicate acts of racketeering activity including
12 mail and wire fraud.  These acts will be detailed upon Ivy Seigle-Epstein recovery and
13 resultant availability.

14 **Darryl and Valerie Samsell**

15     Plaintiffs Darryl and Valerie Samsell are residents of the State of North
16 Carolina.  At all times relevant to this Amended Complaint, Plaintiffs Darryl and
17 Valerie Samsell purchased and owned health insurance policies from Wellpoint, by
18 and through its predecessor and subsidiary companies including Anthem Blue Cross
19 and Blue Shield, Anthem Health Plans of Virginia, Inc., d/b/a Anthem Blue Cross and
20 Blue Shield, and Trigon Blue Cross Blue Shield, to provide health insurance for
21 themselves and members of their family.

22     The Samsells' health plan documents, including the , contain a
23 definition of "Allowable Charges" as "the Allowance for Covered Services, as
24 determined by the Company, outside the Company's Services Area, Your Allowable
25 Charge will be determined by the Blue Cross and/or Blue Shield Company serving the
26 area in which the Covered Service is rendered.  If Covered Services are rendered in an
27 area which does not have a Blue Cross and/or Blue Shield company, the allowance
28 will be determined by the Company.

23                           Plaintiffs' RICO Case Statement

According to the plan documents, Wellpoint, via its various subsidiaries, Anthem Blue Cross and Blue Shield, Anthem Health Plans of Virginia, Inc., d/b/a Anthem Blue Cross and Blue Shield, and Trigon Blue Cross Blue Shield, administered the claim process.

    a. The Samsells expected to be reimbursed by Wellpoint at the true UCR rate. Wellpoint instead deliberately reimbursed the Samsells claims at below UCR levels, requiring them to exhaust significant amounts of time and energy identifying improperly reimbursed claims. At all relevant times, and in furtherance of its underpayment scheme, Wellpoint committed predicate acts of racketeering activity including mail and wire fraud. These acts include, but are not limited to the following: November 26, 1996, medical services provided to Brian Samsell by Plastic Surgery Associates, Inc. a non-participating provider. The Samsells made payment for the out of network care. Wellpoint mailed an Explanation of Claims Processed form detailing the "Program Allowable Charge";

    b. May 14, 2005, medical care provided to Alexandra Samsell by Dr. James E. Krochmal, DDS, a non-participating provider. The Samsells made payment for the out of network care. Wellpoint mailed an Explanation of Benefits detailing the "Allowable Charge";

    c. July 30, 2004, surgical services provided to Alexandra Samsell by Dr. James E. Krochmal, DDS, a non-participating provider. The Samsells made payment for the out of network care. Wellpoint mailed an Explanation of Benefits detailing the "Allowable Charge";

Plaintiffs' RICO Case Statement

d. August 6, 2002, surgical services provided to Brian Samsell by Dr. James E. Krochmal, DDS, a non-participating provider.  The Samsells made payment for the out of network care.  Wellpoint mailed an Explanation of Benefits detailing the "Allowable Charge".

For example, on July 30, 2004 Plaintiffs' daughter Alexandra underwent surgery for medically necessary and covered service which was performed by Dr. James E. Krochmal, DDS, who is non-participating with Wellpoint.  The Samsells used the mails, and/or wires for payment of services to Dr. Krochmal, and Dr. Krochmal submitted Plaintiffs' bills for the above-described out of network services for reimbursement to Wellpoint.  Wellpoint submitted an evidence of coverage through the mails and the wires whereby it reimbursed Plaintiff 80% of Dr. Krochmal's allowable charges, i.e. the "reasonable and customary" charge provided in the fee schedules of the Ingenix Database.  That amount was less than the actual charge incurred by Plaintiffs for the surgery.  Plaintiffs Darryl and Valerie Samsell were therefore under-reimbursed by Wellpoint based upon the flawed fee schedules provided by Ingenix.  Plaintiffs Darryl and Valerie Samsell remain out of pocket for these services.

### **Mr. Michael Roberts**

Plaintiff Michael A. Roberts is a resident of the State of California.  At all times relevant to this Consolidated Amended Complaint, Plaintiff Roberts maintained health insurance through his employer, Hi-Q Engineering, Inc. which offered only the Blue Cross Health insurance plans to its employees and their families.

The "Employee Elect Medical Plan" offered by Hi-Q Engineering, Inc., at all times relevant to the Consolidated Amended Complaint, was administered by WellPoint via Blue Cross of California.  Plaintiff Roberts' employer paid $1,431 per month for the Blue Cross medical coverage.

Plaintiffs' RICO Case Statement

In conjunction with its health plans, Hi-Q Engineering, Inc. provided its employees with health plan documents, including a "Combined Evidence of Coverage and Disclosure Form" ("EOC"). That document contains a particular section entitled "Health Plan Benefits and Coverage Matrix" which states that members of the plan are responsible for "40% of Customary and Reasonable plus any charges in excess of Customary and Reasonable." Part IV of the EOC states that the member's responsibility for professional charges for non-participating Physicians are "40% of the Customary and Reasonable charge plus any charges in excess of Customary and Reasonable unless Special Circumstances* apply."

The EOC further contains a definition of "Reasonable and Customary charge" as "the average price that a majority of providers charge for a particular procedure, supply, piece of equipment or service, based on where the procedure, supply, piece of equipment or service is performed or obtained."

Plaintiff Roberts expected to be reimbursed by WellPoint at the true UCR rate. WellPoint instead deliberately reimbursed Plaintiff Roberts' claims at below UCR levels, requiring him to exhaust significant amounts of time and energy first identifying and then appealing improperly reimbursed claims. At all relevant times, and in furtherance of its underpayment scheme, WellPoint committed predicate acts of racketeering activity including mail and wire fraud. These acts include, but are not limited to the following:

On or about December 4, 2007, Plaintiff Roberts' daughter underwent a surgery in New York performed by Dr. David Altchek, who is non-participating with WellPoint. Plaintiff Roberts submitted a claim with WellPoint regarding this procedure. Dr. Altchek's fee for the surgery was $8,000. WellPoint made a UCR determination on this claim that paid $3,540, less than 60% of the provider's actual charges. Plaintiff Roberts' paid the remaining $4,460 to Dr. Altchek via $250/month installment payments, which concluded in August 2009.

Plaintiffs' RICO Case Statement

On May 12, 2008, Plaintiff Roberts appealed WellPoint's decision by specifically requesting relief from WellPoint regarding this claim. WellPoint never provided Plaintiff Roberts with any data or other documentation for its UCR determination. WellPoint submitted an Explanation of Benefits through the mails and the wires whereby it stated and that Plaintiff Roberts' responsibility was $4,720 that it paid Dr. Altchek $3,540, of Dr. Altchek's $8,000 charges, i.e. 60% of $5,900, the "reasonable and customary" charge provided in the fee schedules of the Ingenix Database. That amount was $2,100 less than the actual charge incurred by Plaintiff for the surgery. Plaintiff Roberts was therefore under-reimbursed by WellPoint based upon the flawed fee schedules provided by Ingenix. Plaintiff Roberts should have been responsible for 40% of the $8,000 fee ($3,200) but paid Dr. Altchek $4,460. Plaintiff remains $1,260 out of pocket for the surgery.

**PROVIDER PLAINTIFFS**

**Dr. James G. Schwendig**

As detailed in the Amended Complaint, Dr. Schwendig is a trauma surgeon responsible for the initial resuscitation and stabilization of patients at Scripps Memorial Hospital in La Jolla, California. He is a resident of the state of California and is licensed to practice medicine in California. Dr. Schwendig is a Nonpar in WellPoint's physician networks, and at all times relevant, has provided ONS to subscribers enrolled in plans insured or administered by WellPoint. Dr. Schwendig's claims are routinely submitted to WellPoint electronically.

WellPoint routinely and deliberately reimbursed Dr. Schwendig's claims at below UCR levels, requiring him – through the efforts of his medical billing service, Practice Development Strategies ("PDS") – to exhaust significant amounts of time and energy first identifying and then appealing improperly reimbursed claims. At all relevant times, and in furtherance of its underpayment scheme, WellPoint committed predicate acts of racketeering activity including mail and wire fraud. These acts include, but are not limited to, the following:

1        On January 8th through the 10th of 2007, Dr. Schwendig provided covered

2   medical services to patient T.H.  After treating the patient, Dr. Schwendig – through

3   PDS – promptly transmitted a CMS 1500 form to WellPoint by electronic wire.  The

4   CMS 1500 form indicated that the following services had been performed in treating

5   the patient: CPT Code 99255, 35701, 37615 with modifier 51, and 99233 with

6   modifier 24 (this last code was submitted twice for separate dates of service).  Dr.

7   Schwendig's submitted charges to WellPoint for these services were $643, $1,823,

8   $625.50, and $260 (x2) respectively, for a total of $3,611.50.

9        On or around January 24, 2007, WellPoint sent through the U.S. Mail to Dr.

10  Schwendig an EOB for his services provided on January 8 through 10, 2007.

11  According to the EOB, WellPoint reduced its reimbursement for the treatment of T.H.

12  because "[t]his is the amount in excess of the allowed expense for a non-participating

13  provider."  WellPoint remitted payment of $1,421.46 for Dr. Schwendig's billed

14  charge of $3,611.50.

15       Following WellPoint's EOB and underpayment, on November 9, 2007, Dr.

16  Schwendig – through PDS – sent by U.S. Mail an initial letter of appeal to Blue Cross

17  Provider Appeals.  The letter stated, in relevant part, as follows: "[t]here is an amount

18  of $1,580.84, denied as 'over allowed amount', that remain to be paid.  According to

19  our records, no contract exists between Doctor James Schwendig and Blue Cross that

20  would obligate him to accept your "allowed amount" as payment in full for his

21  services.  Please re-process this claim for payment of the full billed charge amount as

22  soon as possible.  Please also keep in mind that this was a Trauma/Emergency

23  situation and the patient had no choice of physicians."

24       On or around December 21, 2007, WellPoint sent by U.S. Mail a letter to Dr.

25  Schwendig, which stated, in relevant part, as follows: "We have researched your

26  concerns and have adjusted the claim according to the members plan benefits for

27  services billed . . . Please note that this letter serves to inform you that this decision is

28  final and all levels of Blue Cross of California appeal process have now been

Plaintiffs' RICO Case Statement

exhausted."  WellPoint also sent by U.S. Mail a reprocessed EOB to Dr. Schwendig, remitting an additional $410.47 to Dr. Schwendig for his services.  The EOB further stated that WellPoint reduced its reimbursement for the treatment of T.H. because "[t]his is the amount in excess of the allowed expense for a non-participating provider."  No additional payments were made by WellPoint for this claim, leaving Dr. Schwendig out-of-pocket approximately $1,600 for the ONS he performed on the WellPoint subscriber.

On May 11th through the 14th of 2007, Dr. Schwendig provided covered medical services to patient O.C.  After treating the patient, Dr. Schwendig – through PDS – promptly transmitted a CMS 1500 form to WellPoint by electronic wire.  The CMS 1500 form indicated that the following services had been performed in treating the patient: CPT Code 99255 with modifier 25, 32020, 36600, 12004, and 99233 with modifier 24 (this last code was submitted three times for three separate dates of service).  Dr. Schwendig's submitted charges to WellPoint for these services were $643, $706, $105, $599, and $260 (x3) respectively, for a total of $2,833.

On or around June 21, 2007, WellPoint sent through the U.S. Mail to Dr. Schwendig an Explanation of Benefits (EOB) for his services provided on May 11th through the 14th of 2007.   According to the EOB, WellPoint reduced its reimbursement for the treatment of O.C. because "[t]his is the amount in excess of the allowed expense for a non-participating provider."  WellPoint remitted payment of $1,860.11 for Dr. Schwendig's billed charge of $2,833.

Following WellPoint's EOB and underpayment, on July 6, 2007, Dr. Schwendig – through PDS – sent by U.S. Mail an initial letter of appeal to Blue Cross Provider Appeals.  The letter stated, in relevant part, as follows: "[t]here are amounts of $529.25 and $240.91, denied as 'over allowable amount', that remain to be paid. According to our records, no contract exists between Doctor James Schwendig and Blue Cross that would obligate him to accept your "allowable amount" as payment in full for his services.  Please re-process these claims for payment of the full billed

Plaintiffs' RICO Case Statement

1  charge amounts as soon as possible.   Please keep in mind that this was an
2  Emergency/Trauma situation and the patient had no choice of physicians."

3      On or around July 11, 2007, WellPoint sent by U.S. Mail a letter to Dr.
4  Schwendig, which stated, in relevant part, as follows: "BC Life & Health Insurance
5  received a provider dispute regarding the above referenced matter.   The dispute will
6  be reviewed and a resolution will be sent."

7      On or around September 6, 2007, WellPoint sent two additional substantively
8  similar letters by U.S. Mail to Dr. Schwendig, both of which stated, in relevant part, as
9  follows: "[t]his letter is in reference to your Provider Dispute which we received on
10 7/10/07, in which you assert, additional payment . . . BC Life & Health Insurance has
11 reviewed the claim you are disputing, and based upon the information you provided
12 concludes that the claim was appropriately paid based upon the "reasonable and
13 customary value" of the services you rendered.   When BC Life & Health Insurance
14 bases its compensation on customary and reasonable allowable amounts to non-
15 contracted providers who provide approved covered services and/or emergency
16 services to enrollees, it uses the methodology referenced below."   No additional
17 payments were made by WellPoint on this claim, leaving Dr. Schwendig out-of-
18 pocket approximately $900 for the ONS he performed on the WellPoint subscriber.

19     On September 10th through the 18th of 2007, Dr. Schwendig provided covered
20 medical services to patient M.E.  After treating the patient, Dr. Schwendig – through
21 PDS – promptly transmitted a CMS 1500 form to WellPoint by electronic wire.   The
22 CMS 1500 form indicated that the following services had been performed in treating
23 the patient: CPT Code 99255, 99233, 99232 (this code was submitted six times for six
24 separate dates of service), and 99238.   Dr. Schwendig's submitted charges to
25 WellPoint for these services were $643, $260, $183 (x6), and $233 respectively, for a
26 total of $2,234.

27     On or around September 29, 2007, WellPoint sent through the U.S. Mail to Dr.
28 Schwendig an EOB for his services provided on September 10th through the 18th of

Plaintiffs' RICO Case Statement

2007.  According to the EOB, WellPoint reduced its reimbursement for the treatment of M.E. because "[t]his is the amount in excess of the allowed expense for a non-participating provider."   WellPoint remitted payment of $1,087.15 for Dr. Schwendig's billed charge of $2,234.

Following WellPoint's EOB and underpayment, on October 19, 2007, Dr. Schwendig – through PDS – sent by U.S. Mail an initial letter of appeal to Blue Cross Provider Appeals.  The letter stated, in relevant part, as follows: "[t]here is an amount of $708.23, denied as 'over allowed amount', that remain to be paid.  According to our records, no contract exists between Doctor James Schwendig and Blue Cross that would obligate him to accept your "allowed amount" as payment in full for his services.  Please re-process these claims for payment of the full billed charge amounts as soon as possible.  Please keep in mind that this was a Trauma/Emergency situation and the patient had no choice of physicians."

On or around October 24, 2007, WellPoint sent by U.S. Mail a letter to Dr. Schwendig, which stated, in relevant part, as follows: "Blue Cross of California received a provider dispute regarding the above referenced matter.  The dispute will be reviewed and a resolution will be sent."

On or around November 19, 2007, WellPoint sent a reprocessed EOB by U.S. Mail to Dr. Schwendig, remitting an additional $443.49 to Dr. Schwendig for his services.  The EOB further stated that WellPoint reduced its reimbursement for the treatment of M.E. because "[t]his is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed expense."  No additional payments were made by WellPoint on this claim, leaving Dr. Schwendig out-of-pocket approximately $708.23 for the ONS he performed on the WellPoint subscriber.

On August 8th and 9th of 2008, Dr. Schwendig provided covered medical services to patient E.F.  After treating the patient, Dr. Schwendig – through PDS – promptly transmitted a CMS 1500 form to WellPoint by electronic wire.  The CMS

1   1500 form indicated that the following services had been performed in treating the

2   patient: CPT Code 99255 with modifier 25, 12051, and 99238 with modifier 24.  Dr.

3   Schwendig's submitted charges to WellPoint for these services were $643, $750, and

4   $233 respectively, for a total of $1,626.

5          On or around August 23, 2008, WellPoint sent through the U.S. Mail to Dr.

6   Schwendig an EOB for his services provided on August 8 through 9, 2008.  According

7   to the EOB, WellPoint reduced its reimbursement for the treatment of E.F. because

8   "[t]his is the amount in excess of the allowed expense for a non-participating provider.

9   The Health Plan is not responsible for any amounts in excess of this allowed

10  expense."  WellPoint remitted payment of $172.68 for Dr. Schwendig's billed charge

11  of $1,626.

12         Following WellPoint's EOB and underpayment, on September 5, 2008, Dr.

13  Schwendig – through PDS – sent by U.S. Mail an initial letter of appeal to Anthem

14  Blue Cross Provider Dispute Resolution Dept.  The letter stated, in relevant part, as

15  follows: "I am writing to appeal the partial payment I received from your institution

16  for the emergent medical care I provided to the above named patient . . . As with any

17  medical emergency, the patient was in no position to make choices as to which facility

18  to be taken to, nor preference as to the service-rendering physician.  Out-of-network

19  charges or policy restrictions should not apply in this case.  As a courtesy to the

20  patient, I ask that you reconsider your payment amount, as the patient is ultimately

21  responsible for the remaining balance.  **PLEASE BE ADVISED THAT AS A NON-**

22  **CONTRACTED TRAUMA PHYSICIAN ON DUTY AT THE TIME THE**

23  **PATIENT PRESENTED FOR TREATMENT, I AM LEGALLY PERMITTED**

24  **TO AND WILL BILL YOUR POLICYHOLDER FOR THE BALANCE DUE IF**

25  **YOU HAVE FAILED TO PAY IT WITHIN 30 DAYS FROM THE DATE OF**

26  **THIS NOTICE**.  In addition, the policyholder is simultaneously being notified that as

27  a courtesy the balance due is under appeal, with any unpaid portion to become their

28  financial responsibility at the end of the 30-day grace period."  (emphasis in original)

On or around January 9, 2009, WellPoint sent by U.S. Mail a letter to Dr. Schwendig, which stated, in relevant part, as follows: "Anthem Blue Cross Life and Health Insurance CO received a provider dispute regarding the above referenced matter.  The dispute will be reviewed and a resolution will be sent."

On or around January 21, 2009, WellPoint sent by U.S. Mail a letter to Dr. Schwendig, which stated, in relevant part, as follows: "We have researched your concerns and have adjusted the claim according to the members plan benefits for services billed . . . Please note that this letter serves to inform you that this decision is final and all levels of Blue Cross of California appeal process have now been exhausted."  WellPoint also sent by U.S. Mail a reprocessed EOB to Dr. Schwendig, remitting an additional $636.94 to Dr. Schwendig for his services.  The EOB further stated that WellPoint reduced its reimbursement for the treatment of E.F. because "[t]his is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed expense."  No additional payments were made by WellPoint on this claim, leaving Dr. Schwendig out-of-pocket approximately $837 for the ONS he performed on the WellPoint subscriber.  As a result of WellPoint's improper ONS reimbursement, Dr. Schwendig remains out-of-pocket for these services.

**Dr. Stephen Henry**

As detailed in the Amended Complaint, Dr. Henry is an internist providing primary care to patients, with a specialty in HIV treatment, at a private solo practice in Pasadena, California.  He is a resident of the state of California and is licensed to practice medicine in California.  Dr. Henry is a Nonpar in WellPoint's physician networks, and at all times relevant, has provided ONS to subscribers enrolled in plans insured or administered by WellPoint.  Dr. Henry's claims are routinely submitted to WellPoint electronically.

WellPoint routinely and deliberately reimbursed Dr. Henry's claims at below UCR levels.  At all relevant times, and in furtherance of its underpayment scheme,

Plaintiffs' RICO Case Statement

1   WellPoint committed predicate acts of racketeering activity including mail and wire

2   fraud.  These acts include, but are not limited to, the following:

3          On March 27, 2009, Dr. Henry provided covered medical services to patient

4   R.E.  After treating the patient, Dr. Henry promptly transmitted a CMS 1500 form or

5   its equivalent to WellPoint by electronic wire.  The CMS 1500 form indicated that the

6   following services had been performed in treating the patient: CPT Code 99213,

7   99195, 80053, 82550, 82977, and 83615.  Dr. Henry's submitted charges to WellPoint

8   for these services were $70, $22, $54, $24, $23, and $21 respectively, for a total of

9   $214.

10          On or around June 17, 2009, WellPoint sent through the U.S. Mail to Dr. Henry

11   an EOB for his services provided on March 27, 2009.  According to the EOB,

12   WellPoint reduced its reimbursement for the treatment of R.E. because "[t]his is the

13   amount in excess of the allowed expense for a non-participating provider.  The Health

14   Plan is not responsible for any amounts in excess of this allowed expense."  WellPoint

15   remitted no payment for Dr. Henry's billed charges for codes 80053, 82550, 82977,

16   and 83615, because of WellPoint's improper ONS reimbursement policies, and in part

17   because of the patient's medical deductible.  As a result, Dr. Henry was left out of

18   pocket for his services.

19          On June 11, 2009, Dr. Henry provided covered medical services to patient G.G.

20   After treating the patient, Dr. Henry promptly transmitted a CMS 1500 form or its

21   equivalent to WellPoint by U.S. Mail.  The CMS 1500 form indicated that the

22   following services had been performed in treating the patient: CPT Code 20551,

23   20552, J0670, J3301, 20553, and 20551.  Dr. Henry's submitted charges to WellPoint

24   for these services were $112, $114, $30, $40, $115, and $112 respectively, for a total

25   of $523.

26          On or around August 26, 2009, WellPoint sent through the U.S. Mail to Dr.

27   Henry an EOB for his services provided on June 11, 2009.  According to the EOB,

28   WellPoint reduced its reimbursement for the treatment of G.G. (codes 20552 and

34                    Plaintiffs' RICO Case Statement

1   20553) because "[t]his is the amount in excess of the allowed expense for a non-

2   participating provider.  The Health Plan is not responsible for any amounts in excess

3   of this allowed expense."  WellPoint remitted only partial payment for Dr. Henry's

4   billed charges for these codes, leaving Dr. Henry out of pocket for his services.

5          On April 1, 2009, Dr. Henry provided covered medical services to patient N.M.

6   After treating the patient, Dr. Henry promptly transmitted a CMS 1500 form or its

7   equivalent to WellPoint by U.S. Mail.  The CMS 1500 form indicated that the

8   following services had been performed in treating the patient: CPT Code 99214,

9   71020, J0278, and 96372 with modifier 59.  Dr. Henry's submitted charges to

10  WellPoint for these services were $106, $80, $75, and $27 respectively, for a total of

11  $288.

12         On or around April 16, 2009, WellPoint sent through the U.S. Mail to Dr.

13  Henry an EOB for his services provided on April 1, 2009.  According to the EOB,

14  WellPoint reduced its reimbursement for the treatment of N.M. (codes J0278 and

15  96372) because "[t]his is the amount in excess of the allowed expense for a non-

16  participating provider.  The Health Plan is not responsible for any amounts in excess

17  of this allowed expense."  WellPoint remitted no payment for Dr. Henry's billed

18  charges for these codes, leaving Dr. Henry out of pocket for his services.

19         On or around August 17, 2009, Dr. Henry resubmitted a CMS 1500 form or its

20  equivalent to WellPoint by U.S. Mail for the ONS services that WellPoint denied

21  payment on for patient N.M.  On or around August 24, 2009, WellPoint sent through

22  the U.S. Mail to Dr. Henry a second EOB for these resubmitted claims.  Once again,

23  WellPoint denied reimbursement for the treatment of N.M.  The EOB stated, in

24  relevant part, as follows: "[t]his is a duplicate claim.  To inquire on the status of the

25  original claim, please contact the customer service number located on the back of the

26  member's ID card or access our website at the address listed below."  WellPoint

27  remitted no additional payment for Dr. Henry's billed charges for these ONS services,

28

1    leaving Dr. Henry out of pocket for these claims.  As a result of WellPoint's improper

2    ONS reimbursement, Dr. Henry was left out of pocket for his services.

3       On May 12, 2009, Dr. Henry provided covered medical services to patient

4    D.M.  After treating the patient, Dr. Henry promptly transmitted a CMS 1500 form or

5    its equivalent to WellPoint by electronic wire.  The CMS 1500 form indicated that the

6    following services had been performed in treating the patient: CPT Code 99214,

7    99196, 82150, 84100, 82307, 87536, 82397, 88182, 86360, 80053, 82550, 82977,

8    83615, 80061, 83736, 84550, 83719, and 82729.  Dr. Henry's submitted charges to

9    WellPoint for these services were $106, $22, $45, $39, $135, $369, $146, $190, $150,

10    $84, $54, $43, $41, $80, $46, $40, $49, and $71 respectively, for a total of $1,710.

11       On or around June 1, 2009, WellPoint sent through the U.S. Mail to Dr. Henry

12    an EOB for his services provided on May 12, 2009.  According to the EOB, WellPoint

13    reduced its reimbursement for the treatment of D.M. (codes 82150, 84100, 82307, and

14    87536) because "[t]his is the amount in excess of the allowed expense for a non-

15    participating provider.  The Health Plan is not responsible for any amounts in excess

16    of this allowed expense."   WellPoint remitted no payment for Dr. Henry's billed

17    charges for these codes because of WellPoint's improper ONS reimbursement

18    policies, and in part because of the patient's medical deductible.  As a result, Dr.

19    Henry was out of pocket for his services.

20       On or around June 4, 2009, WellPoint sent through the U.S. Mail to Dr. Henry a

21    second EOB for his services provided on May 12, 2009.  According to the EOB,

22    WellPoint reduced its reimbursement for the treatment of D.M. (codes 82397, 80053,

23    82550, 82977, 83615, 80061, 83736, 84550, 83719, and 82728) because "[t]his is the

24    amount in excess of the allowed expense for a non-participating provider.  The Health

25    Plan is not responsible for any amounts in excess of this allowed expense."  WellPoint

26    remitted partial payment for Dr. Henry's billed charges for these codes because of

27    WellPoint's improper ONS reimbursement policies, and in part because of the

28

Plaintiffs' RICO Case Statement

1   patient's medical deductible.  As a result, Dr. Henry was left out of pocket for his

2   services.

3          On June 8th and 12th of 2009, Dr. Henry provided covered medical services to

4   patient F.S.  After treating the patient, Dr. Henry promptly transmitted a CMS 1500

5   form or its equivalent to WellPoint by electronic wire.  The CMS 1500 form indicated

6   that the following services had been performed in treating the patient: Office Visit,

7   Blood Drawn, Office Visit, Injection/Infusion, and Drug Non-Oral Admin.   Dr.

8   Henry's submitted charges to WellPoint for these services were $70, $22, $70, $27,

9   and $75 respectively, for a total of $264.

10          On or around June 23, 2009, WellPoint sent through the U.S. Mail to Dr. Henry

11   an EOB for his services provided on June 8th and 12th, 2009.  According to the EOB,

12   WellPoint reduced its reimbursement for the treatment of F.S. (Injection/Infusion)

13   because "[t]his is the amount in excess of the allowed expense for a non-participating

14   provider.  The Health Plan is not responsible for any amounts in excess of this allowed

15   expense.  Refer to your plan of coverage booklet for details regarding the schedule of

16   benefits."   WellPoint remitted no payment for Dr. Henry's billed charges for this

17   procedure, leaving Dr. Henry out of pocket for his services.

18          On or around July 10, 2009, Dr. Henry submitted a Claim Follow-Up Form to

19   WellPoint by U.S. Mail for reconsideration of payment for the services that WellPoint

20   denied payment on for patient F.S.  This form stated, in relevant part, as follows:

21   "PLEASE REVIEW CLAIM.   HOW CAN INJECTIBLE ANTIBIOTIC BE

22   ADMINISTERED WITHOUT INJECTION . . . CLAIM SUBMITTED WITH

23   APPROPRIATE MODIFIER AT FIRST SUBMISSION.   DO NOT DENY AS

24   DUPLICATE."  On or around July 15, 2009, WellPoint sent through the U.S. Mail to

25   Dr. Henry a second EOB concerning the claims submitted for reconsideration.  Again,

26   WellPoint denied reimbursement for the treatment of F.S.  The EOB stated, in relevant

27   part, as follows: "[t]his is a duplicate claim.  To inquire on the status of the original

28   claim, please contact the customer service number located on the back of the

member's ID card or access our website at the address listed below."  WellPoint remitted no payment for Dr. Henry's billed charges for these services, leaving Dr. Henry out of pocket for his services.

On June 19th and 26th of 2008, Dr. Henry provided covered medical services to a patient subscriber of Blue Cross of California, a plan administered by Defendant WellPoint.  Dr. Henry submitted the appropriate CMS 1500 (or its equivalent) through electronic wire to WellPoint for payment for these services.  On July 7, 2008, Blue Cross of California sent an EOB by U.S. Mail to Dr. Henry, informing Dr. Henry that for each of the procedure codes that he submitted "[t]his is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed expense."  In other words, out of the $286.00 of billed charges submitted by Dr. Henry, Blue Cross of California did not allow payment of $129.95, leaving Dr. Henry out of pocket for his services.

On September 8, 2008, Dr. Henry provided covered medical services to a patient subscriber of Blue Cross of California, a plan administered by Defendant WellPoint.  Dr. Henry submitted the appropriate CMS 1500 (or its equivalent) by electronic wire to WellPoint for payment for these services.  On September 19, 2008, Blue Cross of California sent an EOB by U.S. Mail to Dr. Henry, informing him that for each of the procedure codes that he submitted "[t]his is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed expense."  In other words, out of the $289.00 of billed charges submitted by Dr. Henry, Blue Cross of California did not allow payment of $150.60, leaving Dr. Henry out of pocket for his services.

**Dr. Carmen Kavali**

On July 31, 2008, Dr. Kavali provided covered medical services to patient D.A. (#16).  Dr. Kavali obtained an Assignment of Benefits from patient D.A. (#16) before providing treatment.  On or about July 31, 2008, Dr. Kavali mailed through the U.S. Mail to Blue Cross Blue Shield of Georgia ("BCBS") a WellPoint subsidiary, a

Plaintiffs' RICO Case Statement

1   complete and clean HCFA form submitting CPT Code 99204.  CPT Code 99204

2   indicates that the procedure involved an "office or other outpatient visit for the

3   evaluation and management of a new patient" requiring 3 components.  Her submitted

4   charge was $364.00.  After applying the patient's $66.49 coinsurance amount, BCBS

5   reduced Dr. Kavali's $364.00 submitted charge by $197.78.  BCBS allowed payment

6   of $99.73 rather than $218.40.

7        On or about August 13, 2008, BCBS sent through the U.S. Mail to Dr. Kavali

8   and/or her patient an Explanation of Benefits (EOB) for services provided on July 31,

9   2008 for patient D.A. (#16).  The EOB did not provide an explanation for the

10  reduction of the submitted charge.  BCBS's reimbursement and/or any stated reason

11  for the reduction was fraudulent, false and/or improper because BCBS wrongfully

12  used the Ingenix or substantially similar database to diminish the compensation to

13  which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient D.A. (#16) for

14  said service and thus has suffered monetary damages.

15       On August 4, 2008, Dr. Kavali provided covered medical services to patient

16  D.A. (#16).  Dr. Kavali obtained an Assignment of Benefits from patient D.A. (#16)

17  before providing treatment.  On or about August 4, 2008, Dr. Kavali mailed through

18  the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code

19  14021.  CPT Code 14021 indicates that the procedure involved an "adjacent tissue

20  transfer or rearrangement, scalp, arms and/or legs."  Her submitted charge was

21  $2,100.00.  After applying the patient's $360.96 coinsurance amount, BCBS reduced

22  Dr. Kavali's $2,100.00 submitted charge by $1,197.61.  BCBS allowed payment of

23  $541.43 rather than $1,260.00.

24       On or about September 10, 2008, BCBS sent through the U.S. Mail to Dr.

25  Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on

26  August 4, 2008 for patient D.A. (#16).  The EOB did not provide an explanation for

27  the reduction of the submitted charge.  BCBS's reimbursement and/or any stated

28  reason for the reduction was fraudulent, false and/or improper because BCBS

1   wrongfully used the Ingenix or substantially similar database to diminish the

2   compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill

3   patient D.A. (#16) for said service and thus has suffered monetary damages.

4   On April 15, 2009, Dr. Kavali provided covered medical services to patient J.B. (#58).

5   Dr. Kavali obtained an Assignment of Benefits from patient J.B. (#58) before

6   providing treatment.  On April 15, 2009, Dr. Kavali mailed through the U.S. Mail to

7   BCBS a complete and clean HCFA form submitting CPT Code 99205.  CPT Code

8   99205 indicates that the procedure involved an "office or other outpatient visit for the

9   evaluation and management of a new patient" requiring 3 components.  Her submitted

10  charge was $499.00.  After applying the patient's $212.50 deductible amount, BCBS

11  reduced Dr. Kavali's $499.00 submitted charge by $286.50.  BCBS's reduced

12  permissible payment was $212.50 but by application of said patient's deductible, no

13  payment was made to Dr. Kavali.

14        On or about April 27, 2009, BCBS sent through the U.S. Mail to Dr. Kavali

15  and/or her patient an Explanation of Benefits (EOB) for services provided on April 15,

16  2009 for patient J.B. (#58).  The EOB did not provide an explanation for the reduction

17  of the submitted charge.  BCBS's reimbursement and/or any stated reason for the

18  reduction was fraudulent, false and/or improper because BCBS wrongfully used the

19  Ingenix or substantially similar database to diminish the compensation to which Dr.

20  Kavali was entitled.  Dr. Kavali did not balance-bill patient J.B. (#58) for said service

21  and thus has suffered monetary damages.

22        On December 4, 2007, Dr. Kavali provided covered medical services to patient

23  S.B. (#18).  Dr. Kavali obtained an Assignment of Benefits from patient S.B. (#18)

24  before providing treatment.  On or about December 4, 2007, Dr. Kavali mailed

25  through the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT

26  Code 19370-50.  CPT Code 19370-50 indicates that the procedure involved an "open

27  periprosthetic capsulotomy, breast."  Her submitted charge was $6,500.00.  After

28  applying the patient's $370.31 coinsurance amount, BCBS reduced Dr. Kavali's

1  $6,500.00 submitted charge by $5,265.65.  BCBS allowed payment of $864.04 rather

2  than $4,550.00.

3      On or about January 4, 2008, BCBS sent through the U.S. Mail to Dr. Kavali

4  and/or her patient an Explanation of Benefits (EOB) for services provided on

5  December 4, 2007 for patient S.B. (#18).  The EOB did not provide an explanation for

6  the reduction of the submitted charge.  BCBS's reimbursement and/or any stated

7  reason for the reduction was fraudulent, false and/or improper because BCBS

8  wrongfully used the Ingenix or substantially similar database to diminish the

9  compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill

10  patient S.B. (#18) for said service and thus has suffered monetary damages.

11      On July 9, 2008, Dr. Kavali provided covered medical services to patient S.B.

12  (#18).  Dr. Kavali obtained an Assignment of Benefits from patient S.B. (#18) before

13  providing treatment.  On or about July 9, 2008, Dr. Kavali mailed through the U.S.

14  Mail to BCBS a complete and clean HCFA form submitting CPT Code 99213.  CPT

15  Code 99213 indicates that the procedure involved an "office or other outpatient visit

16  for the evaluation and management of an established patient" requiring 2 of 3

17  components.  Her submitted charge was $200.00.  After applying the patient's $63.93

18  deductible amount, BCBS reduced Dr. Kavali's $200.00 submitted charge by $136.07.

19  BCBS's permissible payment was $63.93 but by application of said patient's

20  deductible, no payment was made to Dr. Kavali.

21      On or about July 14, 2008, BCBS sent through the U.S. Mail to Dr. Kavali

22  and/or her patient an Explanation of Benefits (EOB) for services provided on July 9,

23  2008 for patient S.B. (#18).  The EOB did not provide an explanation for the reduction

24  of the submitted charge.  BCBS's reimbursement and/or any stated reason for the

25  reduction was fraudulent, false and/or improper because BCBS wrongfully used the

26  Ingenix or substantially similar database to diminish the compensation to which Dr.

27  Kavali was entitled.  Dr. Kavali did not balance-bill patient S.B. (#18) for said service

28  and thus has suffered monetary damages.

Plaintiffs' RICO Case Statement

On January 28, 2009, Dr. Kavali provided covered medical services to patient C.C. (#30).  Dr. Kavali obtained an Assignment of Benefits from patient C.C. (#30) before providing treatment.  On or about January 28, 2009, Dr. Kavali mailed through the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code 99205.  CPT Code 99205 indicates that the procedure involved an "office or other outpatient visit for the evaluation and management of a new patient" requiring 3 components.  Her submitted charge was $499.00.  After applying the patient's $212.50 deductible amount, BCBS reduced Dr. Kavali's $499.00 submitted charge by $286.50.  BCBS's reduced permissible payment was $212.50 but by application of said patient's deductible, no payment was made to Dr. Kavali.

On or about February 9, 2009, BCBS sent through the U.S. Mail to Dr. Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on January 28, 2009 for patient C.C. (#30).  The EOB did not provide an explanation for the reduction of the submitted charge. BCBS's reimbursement and/or any stated reason for the reduction was fraudulent, false and/or improper because BCBS wrongfully used the Ingenix or substantially similar database to diminish the compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient C.C. (#30) for said service and thus has suffered monetary damages.

On February 25, 2009, Dr. Kavali provided covered medical services to patient C.C. (#30).  Dr. Kavali obtained an Assignment of Benefits from patient C.C. (#30) before providing treatment.  On or about February 25, 2009, Dr. Kavali mailed through the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code 99214.  CPT Code 99214 indicates that the procedure involved an "office or other outpatient visit for the evaluation and management of an established patient" requiring 2 of 3 components.  Her submitted charge was $280.00.  After applying the patient's $100.01 deductible amount, BCBS reduced Dr. Kavali's $280.00 submitted charge by $179.99.  BCBS's reduced permissible payment was $100.01 but by application of said patient's deductible, no payment was made to Dr. Kavali.

Plaintiffs' RICO Case Statement

On or about March 9, 2009, BCBS sent through the U.S. Mail to Dr. Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on February 25, 2009 for patient C.C. (#30).  The EOB did not provide an explanation for the reduction of the submitted charge. BCBS's reimbursement and/or any stated reason for the reduction was fraudulent, false and/or improper because BCBS wrongfully used the Ingenix or substantially similar database to diminish the compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient C.C. (#30) for said service and thus has suffered monetary damages.

On March 3, 2009, Dr. Kavali provided covered medical services to patient C.C. (#30).  Dr. Kavali obtained an Assignment of Benefits from patient C.C. (#30) before providing treatment.  On or about March 3, 2009, Dr. Kavali mailed through the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Codes 19371-50 and 19330.  CPT Code 19371-50 indicates that the procedure involved a "periprosthetic capsulotomy, breast."  CPT Code 19330 indicates that the procedure involved "removal of mammary implant material." Her respective submitted charges were $4,160.00 and $2,080.00.  After applying the patient's $90.41 coinsurance and $1,215.50 deductible amounts, BCBS reduced Dr. Kavali's $4,160.00 submitted charge by $2,718.48. BCBS did not allow any payment of Dr. Kavali's $2,080.00 charge. BCBS allowed payment of $135.61 rather than $3,014.70.

On or about March 30, 2009, BCBS sent through the U.S. Mail to Dr. Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on March 3, 2009 for patient C.C. (#30).  The EOB did not provide an explanation for the reduction of the $4,160.00 submitted charge. BCBS reduced payment on CPT code 19330 for said patient for the stated reason that "reimbursement for this service is considered to be a portion of another service which has been allowed or the service cannot be billed separately." BCBS's reimbursement and/or any stated reason for the reduction was fraudulent, false and/or improper because BCBS wrongfully used the Ingenix or substantially similar database to diminish the compensation to which Dr.

Plaintiffs' RICO Case Statement

1   Kavali was entitled.  Dr. Kavali did not balance-bill patient C.C. (#30) for said service

2   and thus has suffered monetary damages.

3          On May 14, 2008, Dr. Kavali provided covered medical services to patient A.C.

4   (#62).  Dr. Kavali obtained an Assignment of Benefits from patient A.C. (#62) before

5   providing treatment.  On May 14, 2008, Dr. Kavali mailed through the U.S. Mail to

6   BCBS a complete and clean HCFA form submitting CPT Code 99203.  CPT Code

7   99203 indicates that the procedure involved an "office or other outpatient visit for the

8   evaluation and management of a new patient" requiring 3 components.  Her submitted

9   charge was $208.00.  After applying the patient's $116.45 deductible amount, BCBS

10  reduced Dr. Kavali's $208.00 submitted charge by $91.55.  BCBS's reduced

11  permissible payment was $116.45 but by application of said patient's deductible, no

12  payment was made to Dr. Kavali.

13         On or about May 27, 2008, BCBS sent through the U.S. Mail to Dr. Kavali

14  and/or her patient an Explanation of Benefits (EOB) for services provided on May 14,

15  2008 for patient A.C. (#62).  The EOB did not provide an explanation for the

16  reduction of the submitted charge.  BCBS's reimbursement and/or any stated reason

17  for the reduction was fraudulent, false and/or improper because BCBS wrongfully

18  used the Ingenix or substantially similar database to diminish the compensation to

19  which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient A.C. (#62) for

20  said service and thus has suffered monetary damages.

21         On May 15, 2008, Dr. Kavali provided covered medical services to patient A.C.

22  (#62).  Dr. Kavali obtained an Assignment of Benefits from patient A.C. (#62) before

23  providing treatment.  On May 15, 2008, Dr. Kavali mailed through the U.S. Mail to

24  BCBS a complete and clean HCFA form submitting CPT Codes 11403 and 12032.

25  CPT Code 11403 indicates that the procedure involved an "excision, benign lesion

26  including margins, except skin tag (unless listed elsewhere), trunk, arms or legs."

27  CPT Code 12032 indicates that the procedure involved a "repair, intermediate, wounds

28  of scalp, axillae, trunk and/or extremities (excluding hands and feet); 2.6 cm to 7.5

Plaintiffs' RICO Case Statement

1   cm." Her respective submitted charges were $468.00 and $303.00. After applying

2   the patient's $346.19 deductible amount, BCBS reduced Dr. Kavali's $468.00

3   submitted charge by $369.76. BCBS reduced Dr. Kavali's $303.00 charge by $55.05.

4   BCBS's reduced permissible payment was $346.19 but by application of said patient's

5   deductible, no payment was made to Dr. Kavali.

6        On or about May 27, 2008, BCBS sent through the U.S. Mail to Dr. Kavali

7   and/or her patient an Explanation of Benefits (EOB) for services provided on May 15,

8   2008 for patient A.C. (#62). The EOB did not provide an explanation for the

9   reduction of the submitted charge. BCBS's reimbursement and/or any stated reason

10   for the reduction was fraudulent, false and/or improper because BCBS wrongfully

11   used the Ingenix or substantially similar database to diminish the compensation to

12   which Dr. Kavali was entitled. Dr. Kavali did not balance-bill patient A.C. (#62) for

13   said service and thus has suffered monetary damages.

14   On June 2, 2008, Dr. Kavali provided covered medical services to patient A.C. (#62).

15   Dr. Kavali obtained an Assignment of Benefits from patient A.C. (#62) before

16   providing treatment. On June 2, 2008, Dr. Kavali mailed through the U.S. Mail to

17   BCBS a complete and clean HCFA form submitting CPT Codes 12021 and 99213.

18   CPT Code 12021 indicates that the procedure involved a "treatment of superficial

19   wound dehiscence; with packing." CPT Code 99213 indicates that the procedure

20   involved an "office or other outpatient visit for the evaluation and management of an

21   established patient" requiring 2 of 3 components. Her total submitted charges were

22   $675.00. After applying the patient's $166.07 deductible amount, BCBS reduced Dr.

23   Kavali's $675.00 submitted charges by $508.93. BCBS's reduced permissible

24   payment was $166.07 but by application of said patient's deductible, no payment was

25   made to Dr. Kavali.

26        On or about June 9, 2008, BCBS sent through the U.S. Mail to Dr. Kavali

27   and/or her patient an Explanation of Benefits (EOB) for services provided on June 2,

28   2008 for patient A.C. (#62). BCBS reduced payment for treatment for said patient for

Plaintiffs' RICO Case Statement

1  the stated reasons that 1) "separately billed procedure(s) have been combined under a

2  single procedure because the service(s) are considered part of the same procedure.

3  Separate payment is not allowed." and 2) "line rebundled. Detailed information can be

4  found in the limitations and exclusions section of your certificate booklet."  BCBS's

5  reimbursement and/or any stated reason for the reduction was fraudulent, false and/or

6  improper because BCBS wrongfully used the Ingenix or substantially similar database

7  to diminish the compensation to which Dr. Kavali was entitled.  Dr. Kavali did not

8  balance-bill patient A.C. (#62) for said service and thus has suffered monetary

9  damages.

10        On June 11, 2008, Dr. Kavali provided covered medical services to patient A.C.

11  (#62).  Dr. Kavali obtained an Assignment of Benefits from patient A.C. (#62) before

12  providing treatment.  On June 11, 2008, Dr. Kavali mailed through the U.S. Mail to

13  BCBS a complete and clean HCFA form submitting CPT Code 12021-58.  CPT Code

14  12021 indicates that the procedure involved a "treatment of superficial wound

15  dehiscence; with packing."  Modifier 58 was used to identify a "staged or related

16  procedure or service by the same physician during the postoperative period."  Her

17  submitted charge was $475.00.  After applying the patient's $166.07 deductible

18  amount, BCBS reduced Dr. Kavali's $475.00 submitted charge by $308.93.  BCBS's

19  reduced permissible payment was $166.07 but by application of said patient's

20  deductible, no payment was made to Dr. Kavali.

21        On or about June 16, 2008, BCBS sent through the U.S. Mail to Dr. Kavali

22  and/or her patient an Explanation of Benefits (EOB) for services provided on June 11,

23  2008 for patient A.C. (#62).  The EOB did not provide an explanation for the

24  reduction of the submitted charge.  BCBS's reimbursement and/or any stated reason

25  for the reduction was fraudulent, false and/or improper because BCBS wrongfully

26  used the Ingenix or substantially similar database to diminish the compensation to

27  which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient A.C. (#62) for

28  said service and thus has suffered monetary damages.

Plaintiffs' RICO Case Statement

1   On February 20, 2009, Dr. Kavali provided covered medical services to patient A.C.

2   (#62).  Dr. Kavali obtained an Assignment of Benefits from patient A.C. (#62) before

3   providing treatment.  On or about February 20, 2009, Dr. Kavali mailed through the

4   U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code 99213.

5   CPT Code 99213 indicates that the procedure involved an "office or other outpatient

6   visit for the evaluation and management of an established patient" requiring 2 of 3

7   components."  Her submitted charge was $200.00.  After applying the patient's $63.93

8   deductible amount, BCBS reduced Dr. Kavali's $200.00 submitted charge by $136.07.

9   BCBS's reduced permissible payment was $63.93 but by application of said patient's

10  deductible, no payment was made to Dr. Kavali.

11         On or about March 2, 2009, BCBS sent through the U.S. Mail to Dr. Kavali

12  and/or her patient an Explanation of Benefits (EOB) for services provided on February

13  20, 2009 for patient A.C. (#62).  The EOB did not provide an explanation for the

14  reduction of the submitted charge.  BCBS's reimbursement and/or any stated reason

15  for the reduction was fraudulent, false and/or improper because BCBS wrongfully

16  used the Ingenix or substantially similar database to diminish the compensation to

17  which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient A.C. (#62) for

18  said service and thus has suffered monetary damages.

19         On March 3, 2009, Dr. Kavali provided covered medical services to patient

20  A.C. (#62).  Dr. Kavali obtained an Assignment of Benefits from patient A.C. (#62)

21  before providing treatment.  On or about March 17, 2009, Dr. Kavali mailed through

22  the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Codes

23  11401 and 12001.  CPT Code 11401 indicates that the procedure involved an

24  "excision, benign lesion including margins, except skin tag (unless listed elsewhere),

25  trunk, arms or legs; excised diameter 0.6 to 1.0 cm." CPT Code 12001 indicates that

26  the procedure involved a "simple repair of superficial wounds of scalp, neck, axillae,

27  external genitalia, trunk and/or extremities (including hands and feet); 2.5 cm or less."

28  Her respective submitted charges were $208.00 and $185.00.  After applying the

patient's $151.24 deductible amount, BCBS reduced Dr. Kavali's $208.00 submitted charge by $56.76.   BCBS did not allow any payment for Dr. Kavali's $185.00 submitted charge. BCBS's reduced permissible payment was $151.24 but by application of said patient's deductible, no payment was made to Dr. Kavali.

On or about March 23, 2009, BCBS sent through the U.S. Mail to Dr. Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on March 3, 2009 for patient A.C. (#62).  BCBS did not allow payment for the $185.00 charge for CPT Code 12001 for the stated reason that "reimbursement for this service is considered to be a portion of another service which has been allowed or the service cannot be billed separately." The EOB did not provide an explanation for the reduction of the submitted charge for CPT Code 11401.  BCBS's reimbursement and/or any stated reason for the reduction was fraudulent, false and/or improper because BCBS wrongfully used the Ingenix or substantially similar database to diminish the compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient A.C. (#62) for said service and thus has suffered monetary damages.

On September 17, 2008, Dr. Kavali provided covered medical services to patient T.G. (#24).  Dr. Kavali obtained an Assignment of Benefits from patient T.G. (#24) before providing treatment.  On September 17, 2008, Dr. Kavali mailed through the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code 99205.  CPT Code 99205 indicates that the procedure involved an "office or other outpatient visit for the evaluation and management of a new patient" requiring 3 components.  Her submitted charge was $499.00.  After applying the patient's $212.50 deductible amount, BCBS reduced Dr. Kavali's $499.00 submitted charge by $286.50.  BCBS's reduced permissible payment was $212.50 but by application of said patient's deductible, no payment was made to Dr. Kavali.

On or about October 7, 2008, BCBS sent through the U.S. Mail to Dr. Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on

1   September 17, 2008 for patient T.G. (#24).  The EOB did not provide an explanation
2   for the reduction of the submitted charge. BCBS's reimbursement and/or any stated
3   reason for the reduction was fraudulent, false and/or improper because BCBS
4   wrongfully used the Ingenix or substantially similar database to diminish the
5   compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill
6   patient T.G. (#24) for said service and thus has suffered monetary damages.
7   On October 30, 2008, Dr. Kavali provided covered medical services to patient T.G.
8   (#24).  Dr. Kavali obtained an Assignment of Benefits from patient T.G. (#24) before
9   providing treatment.  On October 30, 2008, Dr. Kavali mailed through the U.S. Mail
10  to BCBS a complete and clean HCFA form submitting CPT Code 99213.  CPT Code
11  99213 indicates that the procedure involved an "office or other outpatient visit for the
12  evaluation and management of an established patient" requiring 2 of 3 components.
13  Her submitted charge was $200.00.  After applying the patient's $63.93 deductible
14  amount, BCBS reduced Dr. Kavali's $200.00 submitted charge by $136.07.  BCBS's
15  reduced permissible payment was $63.93 but by application of said patient's
16  deductible, no payment was made to Dr. Kavali.
17       On or about November 10, 2008, BCBS sent through the U.S. Mail to Dr.
18  Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on
19  October 30, 2008 for patient T.G. (#24).  The EOB did not provide an explanation for
20  the reduction of the submitted charge. BCBS's reimbursement and/or any stated
21  reason for the reduction was fraudulent, false and/or improper because BCBS
22  wrongfully used the Ingenix or substantially similar database to diminish the
23  compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill
24  patient T.G. (#24) for said service and thus has suffered monetary damages.
25  On November 13, 2008, Dr. Kavali provided covered medical services to patient T.G.
26  (#24).  Dr. Kavali obtained an Assignment of Benefits from patient T.G. (#24) before
27  providing treatment.  On November 18, 2008, Dr. Kavali mailed through the U.S.
28  Mail to BCBS a complete and clean HCFA form submitting CPT Code 19318-50.

1   CPT Code 19318 indicates that the procedure involved a "reduction mammaplasty."

2   Modifier 50 was used to identify that the procedure was bilateral.  Her submitted

3   charge was $11,200.00.  BCBS reduced Dr. Kavali's $11,200.00 submitted charge by

4   $6,418.48.  BCBS allowed payment of $4,781.52 rather than $11,200.00

5        On or about January 23, 2009, BCBS sent through the U.S. Mail to Dr. Kavali

6   and/or her patient an Explanation of Benefits (EOB) for services provided on

7   November 13, 2008 for patient T.G. (#24).  The EOB did not provide an explanation

8   for the reduction of the submitted charge. BCBS's reimbursement and/or any stated

9   reason for the reduction was fraudulent, false and/or improper because BCBS

10  wrongfully used the Ingenix or substantially similar database to diminish the

11  compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill

12  patient T.G. (#24) for said service and thus has suffered monetary damages.

13  On October 1, 2007, Dr. Kavali provided covered medical services to patient J.H.

14  (#70).  Dr. Kavali obtained an Assignment of Benefits from patient J.H. (#70) before

15  providing treatment.  On or about October 1, 2007, Dr. Kavali mailed through the U.S.

16  Mail to BCBS a complete and clean HCFA form submitting CPT Code 11442.  CPT

17  Code 11442 indicates that the procedure involved an "excision, other benign lesion

18  including margins, except skin tag (unless listed elsewhere), face, ears, eyelids, nose,

19  lips, mucous membrane; excised diameter 1.1 to 2.0 cm."  Her submitted charge was

20  $520.00.  After applying the patient's $199.15 deductible amount, BCBS reduced Dr.

21  Kavali's $520.00 submitted charge by $320.85.   BCBS's reduced permissible

22  payment was $199.15 but by application of said patient's deductible, no payment was

23  made to Dr. Kavali.

24        On or about December 26, 2007, BCBS sent through the U.S. Mail to Dr.

25  Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on

26  October 1, 2007 for patient J.H. (#70).  The EOB did not provide an explanation for

27  the reduction of the submitted charge. BCBS's reimbursement and/or any stated

28  reason for the reduction was fraudulent, false and/or improper because BCBS

1   wrongfully used the Ingenix or substantially similar database to diminish the

2   compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill

3   patient J.H. (#70) for said service and thus has suffered monetary damages.

4   On October 26, 2007, Dr. Kavali provided covered medical services to patient J.H.

5   (#70).  Dr. Kavali obtained an Assignment of Benefits from patient J.H. (#70) before

6   providing treatment.  On or about October 26, 2007, Dr. Kavali mailed through the

7   U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code 11443.

8   CPT Code 11443 indicates that the procedure involved an "excision, other benign

9   lesion including margins, except skin tag (unless listed elsewhere), face, ears, eyelids,

10  nose, lips, mucous membrane; excised diameter 2.1 to 3.0 cm." Her submitted charge

11  was $474.00.  After applying the patient's $243.51 deductible amount, BCBS reduced

12  Dr. Kavali's $474.00 submitted charge by $230.49.  BCBS's reduced permissible

13  payment was $243.51 but by application of said patient's deductible, no payment was

14  made to Dr. Kavali.

15      On or about November 5, 2007, BCBS sent through the U.S. Mail to Dr. Kavali

16  and/or her patient an Explanation of Benefits (EOB) for services provided on October

17  26, 2007 for patient J.H. (#70).  The EOB did not provide an explanation for the

18  reduction of the submitted charge. BCBS's reimbursement and/or any stated reason

19  for the reduction was fraudulent, false and/or improper because BCBS wrongfully

20  used the Ingenix or substantially similar database to diminish the compensation to

21  which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient J.H. (#70) for

22  said service and thus has suffered monetary damages.

23      On November 7, 2007, Dr. Kavali provided covered medical services to patient

24  A.J. (#73).  Dr. Kavali obtained an Assignment of Benefits from patient A.J. (#73)

25  before providing treatment.  On November 9, 2007, Dr. Kavali mailed through the

26  U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code 99213.

27  CPT Code 99213 indicates that the procedure involved an "office or other outpatient

28  visit for the evaluation and management of an established patient" requiring 2 of 3

Plaintiffs' RICO Case Statement

components. Her submitted charge was $200.00. After applying the patient's $63.93
deductible amount, BCBS reduced Dr. Kavali's $200.00 submitted charge by $136.07.
BCBS's reduced permissible payment was $63.93 but by application of said patient's
deductible, no payment was made to Dr. Kavali.

On or about November 19, 2007, BCBS sent through the U.S. Mail to Dr.
Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on
November 7, 2007 for patient A.J. (#73). The EOB did not provide an explanation for
the reduction of the submitted charge. BCBS's reimbursement and/or any stated
reason for the reduction was fraudulent, false and/or improper because BCBS
wrongfully used the Ingenix or substantially similar database to diminish the
compensation to which Dr. Kavali was entitled. Dr. Kavali did not balance-bill
patient A.J. (#73) for said service and thus has suffered monetary damages.

On September 26, 2008, Dr. Kavali provided covered medical services to patient E.J.
(#76). Dr. Kavali obtained an Assignment of Benefits from patient E.J. (#76) before
providing treatment. On September 26, 2008, Dr. Kavali mailed through the U.S.
Mail to BCBS a complete and clean HCFA form submitting CPT Code 99203. CPT
Code 99203 indicates that the procedure involved an "office or other outpatient visit
for the evaluation and management of a new patient" requiring 3 components. Her
submitted charge was $208.00. After applying the patient's $46.58 coinsurance
amount, BCBS reduced Dr. Kavali's $208.00 submitted charge by $91.55. BCBS
allowed payment of $69.87 rather than $124.80.

On or about October 6, 2008, BCBS sent through the U.S. Mail to Dr. Kavali
and/or her patient an Explanation of Benefits (EOB) for services provided on
September 26, 2008 for patient E.J. (#76). The EOB did not provide an explanation
for the reduction of the submitted charge. BCBS's reimbursement and/or any stated
reason for the reduction was fraudulent, false and/or improper because BCBS
wrongfully used the Ingenix or substantially similar database to diminish the

Plaintiffs' RICO Case Statement

1   compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill

2   patient E.J. (#76) for said service and thus has suffered monetary damages.

3        On February 10, 2009, Dr. Kavali provided covered medical services to patient

4   L.J. (#29).  Dr. Kavali obtained an Assignment of Benefits from patient L.J. (#29)

5   before providing treatment.  On or about February 10, 2009, Dr. Kavali mailed

6   through the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT

7   Code 99203.  CPT Code 99203 indicates that the procedure involved an "office or

8   other outpatient visit for the evaluation and management of a new patient" requiring 3

9   components.  Her submitted charge was $208.00.  After applying the patient's $20.00

10  co-pay amount, BCBS reduced Dr. Kavali's $208.00 submitted charge by $107.99.

11  BCBS allowed payment of $80.01 rather than $188.00

12       On or about February 14, 2009, BCBS sent through the U.S. Mail to Dr. Kavali

13  and/or her patient an Explanation of Benefits (EOB) for services provided on February

14  10, 2009 for patient L.J. (#29).  The EOB did not provide an explanation for the

15  reduction of the submitted charge. BCBS's reimbursement and/or any stated reason

16  for the reduction was fraudulent, false and/or improper because BCBS wrongfully

17  used the Ingenix or substantially similar database to diminish the compensation to

18  which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient L.J. (#29) for

19  said service and thus has suffered monetary damages.

20       On February 19, 2009, Dr. Kavali provided covered medical services to patient

21  L.J. (#29).  Dr. Kavali obtained an Assignment of Benefits from patient L.J. (#29)

22  before providing treatment.  On March 3, 2009, Dr. Kavali mailed through the U.S.

23  Mail to BCBS a complete and clean HCFA form submitting CPT Codes 19318-50,

24  11403 and 12032.  CPT Code 19318-50 indicates that the procedure involved a

25  "reduction mammaplasty."   Modifier 50 identifies the procedure as a bilateral

26  procedure. CPT Code 11403 indicates that the procedure involved an "excision,

27  benign lesion including margins, except skin tags (unless elsewhere listed), trunk,

28  arms or legs; excised diameter 2.1 to 3.0 cm." CPT Code 12032 indicates that the

Plaintiffs' RICO Case Statement

1  procedure involved a "repair, intermediate, wounds of scalp, axillae, trunk and/or

2  extremities (excluding hands and feet); 2.6 cm to 7.5 cm." Her respective submitted

3  charges were $11,200.00, $468.00 and $303.00 for a total of $11,971.00.   After

4  applying the patient's $502.60 coinsurance and $100.00 deductible amounts, BCBS

5  reduced Dr. Kavali's $11,200.00 submitted charge by $8,809.24. BCBS reduced Dr.

6  Kavali's $468.00 submitted charge by $369.76. BCBS reduced Dr. Kavali's $303.00

7  submitted charge by 179.02. BCBS allowed payment of $2,392.91 rather than

8  $9,496.80.

9       On or about March 13, 2009, BCBS sent through the U.S. Mail to Dr. Kavali

10 and/or her patient an Explanation of Benefits (EOB) for services provided on February

11 19, 2009 for patient L.J. (#29).   The EOB did not provide an explanation for the

12 reduction of the $4,160.00 submitted charge.   BCBS's reimbursement and/or any

13 stated reason for the reduction was fraudulent, false and/or improper because BCBS

14 wrongfully used the Ingenix or substantially similar database to diminish the

15 compensation to which Dr. Kavali was entitled.   Dr. Kavali did not balance-bill

16 patient L.J. (#29) for said service and thus has suffered monetary damages.

17      On March 4, 2009, Dr. Kavali provided covered medical services to patient L.J.

18 (#29). Dr. Kavali obtained an Assignment of Benefits from patient L.J. (#29) before

19 providing treatment.  On March 4, 2009, Dr. Kavali mailed through the U.S. Mail to

20 BCBS a complete and clean HCFA form submitting CPT Code 12021.   CPT Code

21 12021 indicates that the procedure involved a "treatment of superficial wound

22 dehiscence; with packing." Her submitted charge was $475.00. After applying the

23 patient's $20.00 co-pay amount, BCBS reduced Dr. Kavali's $475.00 submitted

24 charge by $308.93.  BCBS allowed payment of $146.07 rather than $455.00.

25      On or about March 10, 2009, BCBS sent through the U.S. Mail to Dr. Kavali

26 and/or her patient an Explanation of Benefits (EOB) for services provided on March 4,

27 2009 for patient L.J. (#29).   The EOB did not provide an explanation for the reduction

28 of the submitted charge. BCBS's reimbursement and/or any stated reason for the

1    reduction was fraudulent, false and/or improper because BCBS wrongfully used the

2    Ingenix or substantially similar database to diminish the compensation to which Dr.

3    Kavali was entitled.  Dr. Kavali did not balance-bill patient L.J. (#29) for said service

4    and thus has suffered monetary damages.

5         On March 13 2009, Dr. Kavali provided covered medical services to patient L.J.

6    (#29).  Dr. Kavali obtained an Assignment of Benefits from patient L.J. (#29) before

7    providing treatment.  On March 13, 2009, Dr. Kavali mailed through the U.S. Mail to

8    BCBS a complete and clean HCFA form submitting CPT Code 12021.  CPT Code

9    12021 indicates that the procedure involved a "treatment of superficial wound

10   dehiscence; with packing."  Her submitted charge was $475.00.  After applying the

11   patient's $20.00 co-pay amount, BCBS reduced Dr. Kavali's $475.00 submitted

12   charge by $308.93.  BCBS allowed payment of $146.07 rather than $455.00.

13        On or about March 18, 2009, BCBS sent through the U.S. Mail to Dr. Kavali

14   and/or her patient an Explanation of Benefits (EOB) for services provided on March 4,

15   2009 for patient L.J. (#29).  The EOB did not provide an explanation for the reduction

16   of the submitted charge.  BCBS's reimbursement and/or any stated reason for the

17   reduction was fraudulent, false and/or improper because BCBS wrongfully used the

18   Ingenix or substantially similar database to diminish the compensation to which Dr.

19   Kavali was entitled.  Dr. Kavali did not balance-bill patient L.J. (#29) for said service

20   and thus has suffered monetary damages.

21        On October 10, 2007, Dr. Kavali provided covered medical services to patient

22   A.M. (#78).  Dr. Kavali obtained an Assignment of Benefits from patient A.M. (#78)

23   before providing treatment.  On or around October 10, 2007, Dr. Kavali mailed

24   through the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT

25   Code 99213.  CPT Code 99213 indicates that the procedure involved an "office or

26   other outpatient visit for the evaluation and management of an established patient"

27   requiring 2 of 3 components.  Her submitted charge was $200.00.  After applying the

28   patient's $63.93 deductible amount, BCBS reduced Dr. Kavali's $200.00 submitted

1  charge by $136.07.  BCBS's reduced permissible payment was $63.93 but by

2  application of said patient's deductible, no payment was made to Dr. Kavali.

3  On or about November 5, 2007, BCBS sent through the U.S. Mail to Dr. Kavali

4  and/or her patient an Explanation of Benefits (EOB) for services provided on October

5  10, 2007 for patient A.M. (#78).  The EOB did not provide an explanation for the

6  reduction of the submitted charge. BCBS's reimbursement and/or any stated reason

7  for the reduction was fraudulent, false and/or improper because BCBS wrongfully

8  used the Ingenix or substantially similar database to diminish the compensation to

9  which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient A.M. (#78) for

10 said service and thus has suffered monetary damages.

11 On January 2, 2008, Dr. Kavali provided covered medical services to patient

12 A.M. (#78).  Dr. Kavali obtained an Assignment of Benefits from patient A.M. (#78)

13 before providing treatment.  On or around January 2, 2008 Dr. Kavali mailed through

14 the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code

15 99213.  CPT Code 99213 indicates that the procedure involved an "office or other

16 outpatient visit for the evaluation and management of an established patient" requiring

17 2 of 3 components.  Her submitted charge was $200.00.  After applying the patient's

18 $63.93 deductible amount, BCBS reduced Dr. Kavali's $200.00 submitted charge by

19 $136.07.  BCBS's reduced permissible payment was $63.93 but by application of said

20 patient's deductible, no payment was made to Dr. Kavali.

21 On or about July 7, 2008, BCBS sent through the U.S. Mail to Dr. Kavali

22 and/or her patient an Explanation of Benefits (EOB) for services provided on January

23 2, 2008 for patient A.M. (#78).  The EOB did not provide an explanation for the

24 reduction of the submitted charge. BCBS's reimbursement and/or any stated reason

25 for the reduction was fraudulent, false and/or improper because BCBS wrongfully

26 used the Ingenix or substantially similar database to diminish the compensation to

27 which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient A.M. (#78) for

28 said service and thus has suffered monetary damages.

Plaintiffs' RICO Case Statement

On April 2, 2008, Dr. Kavali provided covered medical services to patient A.M. (#78).  Dr. Kavali obtained an Assignment of Benefits from patient A.M. (#78) before providing treatment.  On or around April 2, 2008, Dr. Kavali mailed through the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code 99213.  CPT Code 99213 indicates that the procedure involved an "office or other outpatient visit for the evaluation and management of an established patient" requiring 2 of 3 components.  Her submitted charge was $200.00.  After applying the patient's $63.93 deductible amount, BCBS reduced Dr. Kavali's $200.00 submitted charge by $136.07.  BCBS's reduced permissible payment was $63.93 but by application of said patient's deductible, no payment was made to Dr. Kavali.

On or about April 21, 2008, BCBS sent through the U.S. Mail to Dr. Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on April 2, 2008 for patient A.M. (#78).  The EOB did not provide an explanation for the reduction of the submitted charge.  BCBS's reimbursement and/or any stated reason for the reduction was fraudulent, false and/or improper because BCBS wrongfully used the Ingenix or substantially similar database to diminish the compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient A.M. (#78) for said service and thus has suffered monetary damages.

On October 30, 2008, Dr. Kavali provided covered medical services to patient A.M. (#78).  Dr. Kavali obtained an Assignment of Benefits from patient A.M. (#78) before providing treatment.  On or around October 30, 2008, Dr. Kavali mailed through the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code 99213.  CPT Code 99213 indicates that the procedure involved an "office or other outpatient visit for the evaluation and management of an established patient" requiring 2 of 3 components.  Her submitted charge was $200.00.  After applying the patient's $63.93 deductible amount, BCBS reduced Dr. Kavali's $200.00 submitted charge by $136.07.  BCBS's reduced permissible payment was $63.93 but by application of said patient's deductible, no payment was made to Dr. Kavali.

Plaintiffs' RICO Case Statement

On or about March 30, 2009, BCBS sent through the U.S. Mail to Dr. Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on October 30, 2008 for patient A.M. (#78).  The EOB did not provide an explanation for the reduction of the submitted charge. BCBS's reimbursement and/or any stated reason for the reduction was fraudulent, false and/or improper because BCBS wrongfully used the Ingenix or substantially similar database to diminish the compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient A.M. (#78) for said service and thus has suffered monetary damages.

On November 11, 2008, Dr. Kavali provided covered medical services to patient A.M. (#78).  Dr. Kavali obtained an Assignment of Benefits from patient A.M. (#78) before providing treatment.  On or around November 11, 2008, Dr. Kavali mailed through the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code 19380.  CPT Code 19380 indicates that the procedure involved a "revision of reconstructed breast."  Her submitted charge was $2,500.00.  After applying the patient's $942.19 deductible amount, BCBS reduced Dr. Kavali's $2,500.00 submitted charge by $1,557.81.  BCBS's reduced permissible payment was $942.19 but by application of said patient's deductible, no payment was made to Dr. Kavali.

On or about December 9, 2008 BCBS sent through the U.S. Mail to Dr. Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on November 11, 2008 for patient A.M. (#78).  The EOB did not provide an explanation for the reduction of the submitted charge. BCBS's reimbursement and/or any stated reason for the reduction was fraudulent, false and/or improper because BCBS wrongfully used the Ingenix or substantially similar database to diminish the compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient A.M. (#78) for said service and thus has suffered monetary damages.

On April 27, 2009, Dr. Kavali provided covered medical services to patient C.M. (#31).  Dr. Kavali obtained an Assignment of Benefits from patient C.M. (#31) before providing treatment.  On or around April 27, 2009, Dr. Kavali mailed through

the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code 99214. CPT Code 99214 indicates that the procedure involved an "office or other outpatient visit for the evaluation and management of an established patient" requiring 2 of 3 components. Her submitted charge was $280.00. After applying the patient's $20.00 co-payment amount, BCBS reduced Dr. Kavali's $280.00 submitted charge by $179.99. BCBS allowed payment of $80.01 rather than $260.00

On or about May 13, 2009, BCBS sent through the U.S. Mail to Dr. Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on April 27, 2009 for patient C.M. (#31). BCBS reduced payment for treatment of said patient for the stated reason that "this charge has been processed based upon the provider's participation status and your contract terms." BCBS's reimbursement and/or any stated reason for the reduction was fraudulent, false and/or improper because BCBS wrongfully used the Ingenix or substantially similar database to diminish the compensation to which Dr. Kavali was entitled. Dr. Kavali did not balance-bill patient C.M. (#31) for said service and thus has suffered monetary damages.

On May 11, 2009, Dr. Kavali provided covered medical services to patient C.M. (#31). Dr. Kavali obtained an Assignment of Benefits from patient C.M. (#31) before providing treatment. On or around May 15, 2009, Dr. Kavali mailed through the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code 19318-50. CPT Code 19318 indicates that the procedure involved an "reduction mammaplasty." Modifier 50 identifies the procedure as bilateral. Her submitted charge was $11,200.00. After applying the patient's $478.15 coinsurance amount, BCBS reduced Dr. Kavali's $11,200.00 submitted charge by $8,809.24. BCBS allowed payment of $1,912.61 rather than $8,960.00.

On or about June 1, 2009, BCBS sent through the U.S. Mail to Dr. Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on May 11, 2009 for patient C.M. (#31). BCBS reduced payment for treatment of said patient for the stated reason that "this charge has been processed based upon the provider's

1   participation status and your contract terms." BCBS's reimbursement and/or any

2   stated reason for the reduction was fraudulent, false and/or improper because BCBS

3   wrongfully used the Ingenix or substantially similar database to diminish the

4   compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill

5   patient C.M. (#31) for said service and thus has suffered monetary damages.

6         On April 15, 2009, Dr. Kavali provided covered medical services to patient

7   M.N. (#79).  Dr. Kavali obtained an Assignment of Benefits from patient M.N. (#79)

8   before providing treatment.  On April 15, 2009, Dr. Kavali mailed through the U.S.

9   Mail to BCBS a complete and clean HCFA form submitting CPT Code 99213.  CPT

10  Code 99213 indicates that the procedure involved an "office or other outpatient visit

11  for the evaluation and management of an established patient" requiring 2 of 3

12  components.  Her submitted charge was $200.00.  After applying the patient's $63.93

13  deductible amount, BCBS reduced Dr. Kavali's $200.00 submitted charge by $136.07.

14  BCBS's reduced permissible payment was $63.93 but by application of said patient's

15  deductible, no payment was made to Dr. Kavali.

16        On or about July 7, 2009, BCBS sent through the U.S. Mail to Dr. Kavali

17  and/or her patient an Explanation of Benefits (EOB) for services provided on April 15,

18  2009 for patient M.N. (#79).  The EOB did not provide an explanation for the

19  reduction of the submitted charge. BCBS's reimbursement and/or any stated reason

20  for the reduction was fraudulent, false and/or improper because BCBS wrongfully

21  used the Ingenix or substantially similar database to diminish the compensation to

22  which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient M.N. (#79) for

23  said service and thus has suffered monetary damages.

24        On June 4, 2009, Dr. Kavali provided covered medical services to patient M.N.

25  (#79).  Dr. Kavali obtained an Assignment of Benefits from patient M.N. (#79) before

26  providing treatment.  On June 4, 2009, Dr. Kavali mailed through the U.S. Mail to

27  BCBS a complete and clean HCFA form submitting CPT Code 11442.  CPT Code

28  11442 indicates that the procedure involved an "excision, other benign lesion

Plaintiffs' RICO Case Statement

1   including margins, except skin tag (unless listed elsewhere), face, ears, eyelids, nose,

2   lips, mucous membrane; excised diameter 1.1 to 2.0 cm." Her submitted charge was

3   $520.00.   After applying the patient's $136.07 deductible and $18.92 coinsurance

4   amounts, BCBS reduced Dr. Kavali's $520.00 submitted charge by $320.85.   BCBS

5   allowed payment of $44.16 rather than $267.75.

6       On or about July 7, 2009, BCBS sent through the U.S. Mail to Dr. Kavali

7   and/or her patient an Explanation of Benefits (EOB) for services provided on June 4,

8   2009 for patient M.N. (#79).   The EOB did not provide an explanation for the

9   reduction of the submitted charge. BCBS's reimbursement and/or any stated reason

10   for the reduction was fraudulent, false and/or improper because BCBS wrongfully

11   used the Ingenix or substantially similar database to diminish the compensation to

12   which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient M.N. (#79) for

13   said service and thus has suffered monetary damages.

14       On November 26, 2007, Dr. Kavali provided covered medical services to

15   patient S.N. (#3).  Dr. Kavali obtained an Assignment of Benefits from patient S.N.

16   (#3) before providing treatment.  On December 7, 2007, Dr. Kavali mailed through

17   the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code

18   19318-50.   CPT Code 19318 indicates that the procedure involved a "reduction

19   mammaplasty." Modifier 50 identifies the procedure as bilateral. Her submitted

20   charge was $11,200.00.  BCBS reduced Dr. Kavali's $11,200.00 submitted charge by

21   $8,809.24.  BCBS allowed payment of $2,390.76 rather than $11,200.00

22   On or about January 14, 2008, BCBS sent through the U.S. Mail to Dr. Kavali and/or

23   her patient an Explanation of Benefits (EOB) for services provided on November 26,

24   2007 for patient S.N. (#3).  The EOB did not provide an explanation for the reduction

25   of the submitted charge. BCBS's reimbursement and/or any stated reason for the

26   reduction was fraudulent, false and/or improper because BCBS wrongfully used the

27   Ingenix or substantially similar database to diminish the compensation to which Dr.

28

61        Plaintiffs' RICO Case Statement

1    Kavali was entitled.  Dr. Kavali did not balance-bill patient S.N. (#3) for said service

2    and thus has suffered monetary damages.

3          On December 10, 2007, Dr. Kavali provided covered medical services to patient

4    S.N. (#3).  Dr. Kavali obtained an Assignment of Benefits from patient S.N. (#3)

5    before providing treatment.  On December 11, 2007, Dr. Kavali mailed through the

6    U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code 12021.

7    CPT Code 12021 indicates that the procedure involved a "treatment of superficial

8    wound, dehiscence; with packing."  Her submitted charge was $475.00.   After

9    applying the patient's $4.82 coinsurance and $149.99 deductible amounts, BCBS

10   reduced Dr. Kavali's $475.00 submitted charge by $308.93.  BCBS allowed payment

11   of $11.26 rather than $227.51.

12         On or about January 2, 2008, BCBS sent through the U.S. Mail to Dr. Kavali

13   and/or her patient an Explanation of Benefits (EOB) for services provided on

14   December 10, 2007 for patient S.N. (#3).  BCBS reduced payment for treatment of

15   said patient for the stated reason that "our maximum payment has been made based on

16   the coverage available under your benefit plan or policy."  BCBS's reimbursement

17   and/or any stated reason for the reduction was fraudulent, false and/or improper

18   because BCBS wrongfully used the Ingenix or substantially similar database to

19   diminish the compensation to which Dr. Kavali was entitled.  Dr. Kavali did not

20   balance-bill patient S.N. (#3) for said service and thus has suffered monetary

21   damages.

22         On December 19, 2007, Dr. Kavali provided covered medical services to patient

23   S.N. (#3).  Dr. Kavali obtained an Assignment of Benefits from patient S.N. (#3)

24   before providing treatment.  On January 4, 2008, Dr. Kavali mailed through the U.S.

25   Mail to BCBS a complete and clean HCFA form submitting CPT Code 12021.  CPT

26   Code 12021 indicates that the procedure involved a "treatment of superficial wound,

27   dehiscence; with packing."  Her submitted charge was $475.00.  After applying the

28

1    patient's $49.82 coinsurance amount, BCBS reduced Dr. Kavali's $475.00 submitted

2    charge by $308.93.  BCBS allowed payment of $116.25 rather than $332.50.

3        On or about July 9, 2008, BCBS sent through the U.S. Mail to Dr. Kavali

4    and/or her patient an Explanation of Benefits (EOB) for services provided on

5    December 19, 2007 for patient S.N. (#3).  The EOB did not provide an explanation for

6    the reduction of the submitted charge.  BCBS's reimbursement and/or any stated

7    reason for the reduction was fraudulent, false and/or improper because BCBS

8    wrongfully used the Ingenix or substantially similar database to diminish the

9    compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill

10   patient S.N. (#3) for said service and thus has suffered monetary damages.

11       On January 4, 2008, Dr. Kavali provided covered medical services to patient

12   S.N. (#3).  Dr. Kavali obtained an Assignment of Benefits from patient S.N. (#3)

13   before providing treatment.  On January 4, 2008, Dr. Kavali mailed through the U.S.

14   Mail to BCBS a complete and clean HCFA form submitting CPT Code 12021.  CPT

15   Code 12021 indicates that the procedure involved a "treatment of superficial wound,

16   dehiscence; with packing."  Her submitted charge was $475.00.  After applying the

17   patient's $166.07 deductible amount, BCBS reduced Dr. Kavali's $475.00 submitted

18   charge by $308.93.  By application of said patient's deductible, no payment was made

19   to Dr. Kavali.

20       On or about July 9, 2008, BCBS sent through the U.S. Mail to Dr. Kavali

21   and/or her patient an Explanation of Benefits (EOB) for services provided on January

22   4, 2008 for patient S.N. (#3).  The EOB did not provide an explanation for the

23   reduction of the submitted charges.  BCBS's reimbursement and/or any stated reason

24   for the reduction was fraudulent, false and/or improper because BCBS wrongfully

25   used the Ingenix or substantially similar database to diminish the compensation to

26   which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient S.N. (#3) for

27   said service and thus has suffered monetary damages.

28

1   On June 20, 2008, Dr. Kavali provided covered medical services to patient C.P. (#80).

2   Dr. Kavali obtained an Assignment of Benefits from patient C.P. (#80) before

3   providing treatment.  On June 20, 2008, Dr. Kavali mailed through the U.S. Mail to

4   BCBS a complete and clean HCFA form submitting CPT Code 99245.  CPT Code

5   99213 indicates that the procedure involved an "office consultation for a new or

6   established patient" requiring 3 components.  Her submitted charge was $500.00.

7   After applying the patient's $108.60 coinsurance amount, BCBS reduced Dr. Kavali's

8   $500.00 submitted charge by $228.49.  BCBS allowed payment of $162.91 rather than

9   $300.00.

10   On or about November 17, 2008, BCBS sent through the U.S. Mail to Dr.

11   Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on

12   June 20, 2008 for patient C.P. (#80).  The EOB did not provide an explanation for the

13   reduction of the submitted charge. BCBS's reimbursement and/or any stated reason

14   for the reduction was fraudulent, false and/or improper because BCBS wrongfully

15   used the Ingenix or substantially similar database to diminish the compensation to

16   which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient C.P. (#80) for

17   said service and thus has suffered monetary damages.

18   On October 15, 2007, Dr. Kavali provided covered medical services to patient

19   E.P. (#1).  Dr. Kavali obtained an Assignment of Benefits from patient E.P. (#1)

20   before providing treatment.  On or around October 15, 2007 Dr. Kavali mailed

21   through the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT

22   Codes 15330, 15331, and two distinct charges for 19357.  CPT Code 15330 indicates

23   that the procedure involved an "acellular dermal allograft, trunk, arms, legs; first 100

24   sq cm or less, or 1% of body area of infants and children."  CPT Code 15331 indicates

25   that the procedure involved an "acellular dermal allograft, trunk, arms, legs; each

26   additional 100 sq cm each additional 1% of body area of infants and children or part

27   thereof."   CPT Code 19357 indicates that the procedure involved a "breast

28   reconstruction, immediate or delayed, with tissue expander, including subsequent

expansion."  Her respective submitted charges were $750.00, $250.00, $6,240.00 and $6,240.00.  After applying the patient's $819.16 coinsurance amount, BCBS reduced Dr. Kavali's $13,480.00 total submitted charges by $10,749.51.  BCBS allowed payment of $1,911.33 rather than $9,436.00.

On or about December 11, 2007, BCBS sent through the U.S. Mail to Dr. Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on October 15, 2007 for patient E.P. (#1).  The EOB did not provide an explanation for the reduction of the submitted charge.  BCBS's reimbursement and/or any stated reason for the reduction was fraudulent, false and/or improper because BCBS wrongfully used the Ingenix or substantially similar database to diminish the compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient E.P. (#1) for said service and thus has suffered monetary damages.

On November 6, 2007, Dr. Kavali provided covered medical services to patient E.P. (#1).  Dr. Kavali obtained an Assignment of Benefits from patient E.P. (#1) before providing treatment.  On December 13, 2007 Dr. Kavali mailed through the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT 19357.  CPT Code 19357 indicates that the procedure involved a "breast reconstruction, immediate or delayed, with tissue expander, including subsequent expansion."  Her submitted charge was $6,240.00.  After applying the patient's $31.82 and $32.01 coinsurance amounts, BCBS reduced Dr. Kavali's $6,240.00 submitted charge by $4,586.28. BCBS allowed payment of $1,589.89 rather than $6,176.17.

On or about January 10, 2008, BCBS sent through the U.S. Mail to Dr. Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on November 6, 2007 for patient E.P. (#1).  The EOB did not provide an explanation for the reduction of the submitted charge.  BCBS's reimbursement and/or any stated reason for the reduction was fraudulent, false and/or improper because BCBS wrongfully used the Ingenix or substantially similar database to diminish the

Plaintiffs' RICO Case Statement

1   compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill

2   patient E.P. (#1) for said service and thus has suffered monetary damages.

3   On May 27, 2008, Dr. Kavali provided covered medical services to patient E.P.

4   (#1).  Dr. Kavali obtained an Assignment of Benefits from patient E.P. (#1) before

5   providing treatment.  On May 28, 2008 Dr. Kavali mailed through the U.S. Mail to

6   BCBS a complete and clean HCFA form submitting CPT Codes 19342-50 and 19371-

7   50.  CPT Code 19342 indicates that the procedure involved a "delayed insertion of

8   breast prosthesis following mastopexy, mastectomy, or in reconstruction."  CPT Code

9   19371 indicates that the procedure involved a "periprosthetic capsulotomy, breast."

10  Modifier 50 identifies the procedure as bilateral. Her respective submitted charges

11  were $5,000.00 and $4,160.00 for total charges of $9,160.00.  After applying the

12  patient's $1,000.00 coinsurance amount, BCBS reduced Dr. Kavali's submitted

13  charge by $5,821.78.  BCBS allowed payment of $2,333.22 rather than $8,160.00.

14  On or about June 21 2008, BCBS sent through the U.S. Mail to Dr. Kavali

15  and/or her patient an Explanation of Benefits (EOB) for services provided on May 27,

16  2008 for patient E.P. (#1).  The EOB did not provide an explanation for the reduction

17  of the submitted charge.  BCBS's reimbursement and/or any stated reason for the

18  reduction was fraudulent, false and/or improper because BCBS wrongfully used the

19  Ingenix or substantially similar database to diminish the compensation to which Dr.

20  Kavali was entitled.  Dr. Kavali did not balance-bill patient E.P. (#1) for said service

21  and thus has suffered monetary damages.

22  On July 16, 2008, Dr. Kavali provided covered medical services to patient J.R.

23  (#83).  Dr. Kavali obtained an Assignment of Benefits from patient J.R. (#83) before

24  providing treatment.  On July 16, 2008, Dr. Kavali mailed through the U.S. Mail to

25  BCBS a complete and clean HCFA form submitting CPT Code 99205.  CPT Code

26  99205 indicates that the procedure involved an "office or other outpatient visit for the

27  evaluation and management of a new patient" requiring 3 components. Her submitted

28  charge was $499.00.  After applying the patient's $212.50 deductible amount, BCBS

Plaintiffs' RICO Case Statement

1   reduced Dr. Kavali's $499.00 submitted charge by $286.50.   BCBS's reduced

2   permissible payment was $212.50 but by application of said patient's deductible, no

3   payment was made to Dr. Kavali.

4          On or about July 28, 2008, BCBS sent through the U.S. Mail to Dr. Kavali

5   and/or her patient an Explanation of Benefits (EOB) for services provided on July 16,

6   2008 for patient J.R. (#83).  The EOB did not provide an explanation for the reduction

7   of the submitted charge. BCBS's reimbursement and/or any stated reason for the

8   reduction was fraudulent, false and/or improper because BCBS wrongfully used the

9   Ingenix or substantially similar database to diminish the compensation to which Dr.

10  Kavali was entitled.  Dr. Kavali did not balance-bill patient J.R. (#83) for said service

11  and thus has suffered monetary damages.

12         On March 4, 2009, Dr. Kavali provided covered medical services to patient

13  D.S. (#85).  Dr. Kavali obtained an Assignment of Benefits from patient D.S. (#85)

14  before providing treatment.  On or about March 4, 2009, Dr. Kavali mailed through

15  the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code

16  99205.  CPT Code 99205 indicates that the procedure involved an "office or other

17  outpatient visit for the evaluation and management of a new patient" requiring 3

18  components.   Her submitted charge was $499.00.   After applying the patient's

19  $212.50 deductible amount, BCBS reduced Dr. Kavali's $499.00 submitted charge by

20  $286.50.  BCBS's reduced permissible payment was $212.50 but by application of

21  said patient's deductible, no payment was made to Dr. Kavali.

22         On or about March 11, 2009, BCBS sent through the U.S. Mail to Dr. Kavali

23  and/or her patient an Explanation of Benefits (EOB) for services provided on March 4,

24  2009 for patient D.S. (#85).   The EOB did not provide an explanation for the

25  reduction of the submitted charge. BCBS's reimbursement and/or any stated reason

26  for the reduction was fraudulent, false and/or improper because BCBS wrongfully

27  used the Ingenix or substantially similar database to diminish the compensation to

28

Plaintiffs' RICO Case Statement

1   which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient D.S. (#85) for

2   said service and thus has suffered monetary damages.

3         On October 11, 2007, Dr. Kavali provided covered medical services to patient

4   N.S. (#8).  Dr. Kavali obtained an Assignment of Benefits from patient N.S. (#8)

5   before providing treatment.  On or about October 11, 2007, Dr. Kavali mailed through

6   the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code

7   14060.  CPT Code 14060 indicates that the procedure involved an "adjacent tissue

8   transfer or rearrangement, eyelids, nose, ears and/or lips; defect 10 sq cm or less."

9   Her submitted charge was $1,500.00.  BCBS reduced Dr. Kavali's submitted charge

10  by $150.00.  BCBS allowed payment of $1,350.00 rather than $1,500.00.

11  On or about December 3, 2007, BCBS sent through the U.S. Mail to Dr. Kavali and/or

12  her patient an Explanation of Benefits (EOB) for services provided on October 11,

13  2007 for patient N.S. (#8).  BCBS reduced payment for treatment of said patient for

14  the stated reason that "per plan section 4.20; a benefit differential has been applied."

15  BCBS's reimbursement and/or any stated reason for the reduction was fraudulent,

16  false and/or improper because BCBS wrongfully used the Ingenix or substantially

17  similar database to diminish the compensation to which Dr. Kavali was entitled.  Dr.

18  Kavali did not balance-bill patient N.S. (#8) for said service and thus has suffered

19  monetary damages.

20        On October 4, 2007, Dr. Kavali provided covered medical services to patient

21  K.S. (#55).  Dr. Kavali obtained an Assignment of Benefits from patient K.S. (#55)

22  before providing treatment.  On October 5, 2007, Dr. Kavali mailed through the U.S.

23  Mail to BCBS a complete and clean HCFA form submitting CPT Code 11042-58.

24  CPT Code 11042 indicates that the procedure involved a "debridement; skin, and

25  subcutaneous tissue." Modifier 58 was used to identify a "staged or related procedure

26  or service by the same physician during the postoperative period."   Her submitted

27  charge was $312.00.  After applying the patient's $29.15 coinsurance amount, BCBS

28

1  reduced Dr. Kavali's $312.00 submitted charge by $214.82.  BCBS allowed payment

2  of $68.03 rather than $218.40.

3          On or about November 5, 2007, BCBS sent through the U.S. Mail to Dr. Kavali

4  and/or her patient an Explanation of Benefits (EOB) for services provided on October

5  4, 2007 for patient K.S. (#55).  BCBS reduced payment for treatment of said patient

6  for the stated reason that "our maximum payment has been made based on the

7  coverage available under your plan or policy."  BCBS's reimbursement and/or any

8  stated reason for the reduction was fraudulent, false and/or improper because BCBS

9  wrongfully used the Ingenix or substantially similar database to diminish the

10  compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill

11  patient K.S. (#55) for said service and thus has suffered monetary damages.

12          On October 1, 2007, Dr. Kavali provided covered medical services to patient

13  K.S. (#55).  Dr. Kavali obtained an Assignment of Benefits from patient K.S. (#55)

14  before providing treatment.  On October 3, 2007, Dr. Kavali mailed through the U.S.

15  Mail to BCBS a complete and clean HCFA form submitting CPT Code 12021.  CPT

16  Code 12021 indicates that the procedure involved a "treatment of superficial wound

17  dehiscence; with packing."   Her submitted charge was $400.00.  After applying the

18  patient's $49.82 coinsurance amount, BCBS reduced Dr. Kavali's $400.00 submitted

19  charge by $233.93.  BCBS allowed payment of $116.25 rather than $280.00.

20          On or about November 5, 2007, BCBS sent through the U.S. Mail to Dr. Kavali

21  and/or her patient an Explanation of Benefits (EOB) for services provided on October

22  1, 2007 for patient K.S. (#55).  BCBS reduced payment for treatment of said patient

23  for the stated reason that "our maximum payment has been made based on the

24  coverage available under your plan or policy."  BCBS's reimbursement and/or any

25  stated reason for the reduction was fraudulent, false and/or improper because BCBS

26  wrongfully used the Ingenix or substantially similar database to diminish the

27  compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill

28  patient K.S. (#55) for said service and thus has suffered monetary damages.

1    On October 5, 2007, Dr. Kavali provided covered medical services to patient

2   K.S. (#55).  Dr. Kavali obtained an Assignment of Benefits from patient K.S. (#55)

3   before providing treatment.  On October 8, 2007, Dr. Kavali mailed through the U.S.

4   Mail to BCBS a complete and clean HCFA form submitting CPT Code 12020-58.

5   CPT Code 12020 indicates that the procedure involved a "treatment of superficial

6   wound dehiscence; simple closure." Modifier 58 was used to identify a "staged or

7   related procedure or service by the same physician during the postoperative period."

8   Her submitted charge was $575.00.  After applying the patient's $25.00 co-payment

9   amount, BCBS reduced Dr. Kavali's $575.00 submitted charge by $454.69.  BCBS

10  allowed payment of $95.31 rather than $550.00.

11    On or about November 5, 2007, BCBS sent through the U.S. Mail to Dr. Kavali

12  and/or her patient an Explanation of Benefits (EOB) for services provided on October

13  5, 2007 for patient K.S. (#55).  BCBS reduced payment for treatment of said patient

14  for the stated reason that "our maximum payment has been made based on the

15  coverage available under your plan or policy."  BCBS's reimbursement and/or any

16  stated reason for the reduction was fraudulent, false and/or improper because BCBS

17  wrongfully used the Ingenix or substantially similar database to diminish the

18  compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill

19  patient K.S. (#55) for said service and thus has suffered monetary damages.

20    On October 8, 2007, Dr. Kavali provided covered medical services to patient

21  K.S. (#55).  Dr. Kavali obtained an Assignment of Benefits from patient K.S. (#55)

22  before providing treatment.  On October 9, 2007, Dr. Kavali mailed through the U.S.

23  Mail to BCBS a complete and clean HCFA form submitting CPT Code12021-58.

24  CPT Code 12021 indicates that the procedure involved a "treatment of superficial

25  wound dehiscence; with packing." Modifier 58 was used to identify a "staged or

26  related procedure or service by the same physician during the postoperative period."

27  Her submitted charge was $400.00.  After applying the patient's $166.07 deductible

28  amount, BCBS reduced Dr. Kavali's $400.00 submitted charge by $233.93.  BCBS's

Plaintiffs' RICO Case Statement

1  reduced permissible payment was $166.07 but by application of said patient's
2  deductible, no payment was made to Dr. Kavali.

3      On or about November 6, 2007, BCBS sent through the U.S. Mail to Dr. Kavali
4  and/or her patient an Explanation of Benefits (EOB) for services provided on October
5  8, 2007 for patient K.S. (#55).  BCBS reduced payment for treatment of said patient
6  for the stated reason that "our maximum payment has been made based on the
7  coverage available under your plan or policy."  BCBS's reimbursement and/or any
8  stated reason for the reduction was fraudulent, false and/or improper because BCBS
9  wrongfully used the Ingenix or substantially similar database to diminish the
10 compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill
11 patient K.S. (#55) for said service and thus has suffered monetary damages.

12     On October 19, 2007, Dr. Kavali provided covered medical services to patient
13 K.S. (#55).  Dr. Kavali obtained an Assignment of Benefits from patient K.S. (#55)
14 before providing treatment.  On October 22, 2007, Dr. Kavali mailed through the U.S.
15 Mail to BCBS a complete and clean HCFA form submitting CPT Code 12021-58.
16 CPT Code 12021 indicates that the procedure involved a "treatment of superficial
17 wound dehiscence; with packing." Modifier 58 was used to identify a "staged or
18 related procedure or service by the same physician during the postoperative period."
19 Her submitted charge was $400.00.  After applying the patient's $83.93 deductible
20 amount, BCBS reduced Dr. Kavali's $400.00 submitted charge by $233.93.  BCBS
21 allowed payment of $57.50 rather than $316.07.

22     On or about November 6, 2007, BCBS sent through the U.S. Mail to Dr. Kavali
23 and/or her patient an Explanation of Benefits (EOB) for services provided on October
24 19, 2007 for patient K.S. (#55).  BCBS reduced payment for treatment of said patient
25 for the stated reason that "our maximum payment has been made based on the
26 coverage available under your plan or policy."  BCBS's reimbursement and/or any
27 stated reason for the reduction was fraudulent, false and/or improper because BCBS
28 wrongfully used the Ingenix or substantially similar database to diminish the

Plaintiffs' RICO Case Statement

1   compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill

2   patient K.S. (#55) for said service and thus has suffered monetary damages.

3       On November 30, 2007, Dr. Kavali provided covered medical services to

4   patient S.S. (#89).  Dr. Kavali obtained an Assignment of Benefits from patient S.S.

5   (#89) before providing treatment.  On November 30, 2007, Dr. Kavali mailed through

6   the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code

7   99213.  CPT Code 99213 indicates that the procedure involved an "office or other

8   outpatient visit for the evaluation and management of an established patient" requiring

9   2 of 3 components.  Her submitted charge was $200.00.  After applying the patient's

10  $19.18 coinsurance amount, BCBS reduced Dr. Kavali's $200.00 submitted charge by

11  $136.07.  BCBS allowed payment of $44.75 rather than $140.00.

12  On or about December 19, 2007, BCBS sent through the U.S. Mail to Dr. Kavali

13  and/or her patient an Explanation of Benefits (EOB) for services provided on

14  November 30, 2007 for patient S.S. (#89).  **The EOB did not provide an**

15  **explanation for the reduction of the submitted charge.**  BCBS's reimbursement

16  and/or any stated reason for the reduction was fraudulent, false and/or improper

17  because BCBS wrongfully used the Ingenix or substantially similar database to

18  diminish the compensation to which Dr. Kavali was entitled.  Dr. Kavali did not

19  balance-bill patient S.S. (#89) for said service and thus has suffered monetary

20  damages.

21      On April 17, 2009, Dr. Kavali provided covered medical services to patient

22  S.W. (#4).  Dr. Kavali obtained an Assignment of Benefits from patient S.W. (#4)

23  before providing treatment.  On May 6, 2009, Dr. Kavali mailed through the U.S. Mail

24  to BCBS a complete and clean HCFA form submitting CPT Code 19318-50.  CPT

25  Code 19318 indicates that the procedure involved a "reduction mammaplasty."

26  Modifier 50 identifies the procedure as bilateral.  Her submitted charge was

27  $11,200.00.  After applying the patient's $19.35 deductible and $948.56 coinsurance

28

1  amounts, BCBS reduced Dr. Kavali's $11,200.00 submitted charge by $8,809.24.

2  BCBS allowed payment of $1,422.85 rather than $6,708.39.

3      On or about May 27, 2009, BCBS sent through the U.S. Mail to Dr. Kavali

4  and/or her patient an Explanation of Benefits (EOB) for services provided on April 17,

5  2009 for patient S.W. (#4).  BCBS reduced payment for treatment of said patient for

6  the stated reason that "this charge exceeds the maximum allowable under this

7  member's coverage. BCBS's reimbursement and/or any stated reason for the

8  reduction was fraudulent, false and/or improper because BCBS wrongfully used the

9  Ingenix or substantially similar database to diminish the compensation to which Dr.

10  Kavali was entitled.  Dr. Kavali did not balance-bill patient S.W. (#4) for said service

11  and thus has suffered monetary damages.

12      On April 17, 2009, Dr. Kavali provided covered medical services to patient

13  S.W. (#92).  Dr. Kavali obtained an Assignment of Benefits from patient S.W. (#92)

14  before providing treatment.  On or about April 17, 2009, Dr. Kavali mailed through

15  the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code

16  99205.  CPT Code 99205 indicates that the procedure involved an "office or other

17  outpatient visit for the evaluation and management of a new patient" requiring 3

18  components.  Her submitted charge was $499.00.  After applying the patient's

19  $212.50 deductible amount, BCBS reduced Dr. Kavali's $499.00 submitted charge by

20  $286.50.  BCBS's reduced permissible payment was $212.50 but by application of

21  said patient's deductible, no payment was made to Dr. Kavali.

22      On or about May 7, 2009 BCBS sent through the U.S. Mail to Dr. Kavali and/or

23  her patient an Explanation of Benefits (EOB) for services provided on April 17, 2009

24  for patient S.W. (#92).  The EOB did not provide an explanation for the reduction of

25  the submitted charge.  BCBS's reimbursement and/or any stated reason for the

26  reduction was fraudulent, false and/or improper because BCBS wrongfully used the

27  Ingenix or substantially similar database to diminish the compensation to which Dr.

28

Plaintiffs' RICO Case Statement

Kavali was entitled.  Dr. Kavali did not balance-bill patient S.W. (#92) for said service and thus has suffered monetary damages.

On November 7, 2007, Dr. Kavali provided covered medical services to patient T.W. (#94).  Dr. Kavali obtained an Assignment of Benefits from patient TW. (#94) before providing treatment.  On November 9, 2007, Dr. Kavali mailed through the U.S. Mail to BCBS a complete and clean HCFA form submitting CPT Code 99205.  CPT Code 99205 indicates that the procedure involved an "office or other outpatient visit for the evaluation and management of a new patient" requiring 3 components.  Her submitted charge was $499.00.  After applying the patient's $42.50 coinsurance amount, BCBS reduced Dr. Kavali's $499.00 submitted charge by $286.50.  BCBS allowed payment of $170.00 rather than $399.20.

On or about December 11, 2007 BCBS sent through the U.S. Mail to Dr. Kavali and/or her patient an Explanation of Benefits (EOB) for services provided on November 7, 2007 for patient T.W. (#94).  The EOB did not provide an explanation for the reduction of the submitted charge.  BCBS's reimbursement and/or any stated reason for the reduction was fraudulent, false and/or improper because BCBS wrongfully used the Ingenix or substantially similar database to diminish the compensation to which Dr. Kavali was entitled.  Dr. Kavali did not balance-bill patient T.W. (#94) for said service and thus has suffered monetary damages.

**Dr. Hoorman Melamed**

Dr. Melamed is an out-of-network provider with regard to WellPoint.  On numerous occasions he has provided healthcare services to subscribers to WellPoint plans, including plans insured or administered by WellPoint subsidiaries Blue Cross of California, BC Life & Health Insurance Company and Anthem Blue Cross, for which he has billed his usual and customary charges for such services.

As a matter of course, Dr. Melamed obtains written assignments from his patients who are WellPoint insureds pursuant to which they authorize him to submit claims directly to, and receive payments directly from, WellPoint.  Moreover,

Plaintiffs' RICO Case Statement

1   Dr. Melamed's patients agree to be financially responsible for any portion of his bills

2   that are not covered by WellPoint.  Pursuant to his assignment, Dr. Melamed has

3   standing to pursue directly any claims for denied or reduced benefits.

4        When Dr. Melamed submits a claim for benefits to WellPoint pursuant to his

5   assignments from his WellPoint patients, he receives an EOB from the applicable

6   WellPoint entity.  The EOBs report the benefits that are being paid to him pursuant to

7   the terms and conditions of his patients' WellPoint healthcare policy.

8        On numerous occasions, Dr. Melamed has received EOBs from Anthem which

9   report that a portion of his usual and customary billed charges are being excluded

10  from coverage based on the explanation that "this is the amount in excess of the

11  allowed expense for a non-participating provider."  WellPoint further frequently states

12  that it "is not responsible for any amounts in excess of this allowed amount."

13       The following is a summary of some of the reductions Dr. Melamed has been

14  subjected to by WellPoint, along with the explanations provided by WellPoint in its

15  EOBs:

16

17
| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
| --- | --- | --- | --- |
| (per BC of Cal. EOB dated 02/10/06) | | | |
| 01/06/06 | $100 | $12.44 (01) | $87.56 |
| | | 01 – This is the amount in excess of the allowed expense for a non-participating provider. | |

22

23

24
| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
| --- | --- | --- | --- |
| (per BC of Cal. EOB dated 08/08/06) | | | |
| 01/06/06 | $500 | $409.12 (02) | $90.88 |
| | $500 | $470.73(02) | $29.27 |

28

| Total: | $1,000 | $879.85 | $120.15 |
|---|---|---|---|
| | 02 – This is the amount in excess of the allowed expense for a non-participating provider. | | |

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per BC of Cal. EOB dated 9/14/06) | | | |
| 01/17/06 | $2,350 | $1,957.22 (01) | $392.78 |
| | $2,350 | $1,957.22 (01) | $392.78 |
| | $1,000 | $676.54 (01) | $323.46 |
| | $1,000 | $676.54 (01) | $323.46 |
| | $1,000 | $676.54 (01) | $323.46 |
| | $1,800 | $1,800 (01) | $0 |
| | $500 | $500 (01) | $0 |
| | $350 | $278.50 (01) | $10.15 |
| Total: | $10,350 | $8,522.56 | $1,766.09 |
| | 01 – This is the amount in excess of the allowed expense for a non-participating provider. | | |

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per BC of Cal. EOB dated 02/13/08) | | | |
| 11/12/07 | $5,750 | $4,106.55 (01) | $1,643.45 |
| | $1,800 | $1,471.60 (01) | $328.40 |
| | $750 | $509.09 (01) | $240.91 |
| Total: | $8,300 | $6,087.24 | $2,212.76 |
| | | 01 – This is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed amount. | |

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per Anthem EOB dated 09/26/08) | | | |
| 09/16/08 | $100 | $40.07 (01) | $59.93 |
| | $480 | $408.14 (01) | $71.86 |
| Total: | $580 | $448.21 | $131.79 |
| | | 01 – This is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed amount. | |

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per Anthem EOB dated 10/18/08) | | | |
| 09/29/08 | $350 | $137.86 (01) | $212.14 |
| | | 01 – This is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed amount. | |

Plaintiffs' RICO Case Statement

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per Anthem EOB dated 12/04/08) | | | |
| 07/23/08 | $350 | $137.86 (01) | $212.14 |
| | $480 | $402.04 (01) | $77.96 |
| Total: | $830 | $539.90 | $290.10 |
| | | 01 – This is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed amount. | |

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per Anthem EOB dated 12/04/08) | | | |
| 08/01/08 | $3,500 | $3,383.09 (01) | $116.91 |
| | $350 | $240.69 (01) | $109.31 |
| Total: | $3,850 | $3,623.78 | $226.22 |
| | | 01 – This is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed amount | |

| DOS (Surgery) | Billed Amt. | Excluded (UCR)/Code | Allowed Amt. |
|---|---|---|---|
| (per Anthem EOB dated 01/07/09) | | | |
| 11/04/08 | $11,260 | $9,537.11 (01) | $1,712.89 |
| | $2,100 | $1,716.62 (01) | $383.38 |
| | $350 | $315.23 (01) | $34.77 |

Plaintiffs' RICO Case Statement

| | | $1,380 | $1,139.09 | $240.91 |
| --- | --- | --- | --- | --- |
| | Total: | $15,090 | $12,708.05 | $2,371.95 |

01 – This is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed amount.

Dr. Melamed did not appeal these reductions in benefits because, from the EOB, it did not appear that he had a basis for doing so.  The EOB did not provide any explanation as to why the benefit had been reduced other than to say it was in "excess of the allowed expense," which suggested that its decision was based on the terms and conditions of his patients' healthcare policies.  To the extent the patients' policy established an explicit "allowed expense" for non-par providers, there would be no valid basis for appealing the coverage determination.

WellPoint's EOBs violate ERISA regulations with regard to proper disclosures of its adverse benefit determinations.  As a result, "deemed exhaustion" applies, whereby Dr. Melamed is not required to exhaust any administrative remedies that would otherwise be available.  Further, for the reasons detailed below, such an administrative appeal would be futile in any event.

Based on information and belief, when WellPoint reduces benefits based on its finding that the billed charges were "in excess of the allowed expense for a non-participating provider," it is applying the UCR exclusion from its healthcare policies.  Similarly, based on information and belief, WellPoint relies on the Ingenix Database to determine the "allowed expenses," notwithstanding that this was never disclosed to Dr. Melamed.

As a result of the assignments he has received from his WellPoint insureds, and on WellPoint's acceptance of such assignments as reflected in its payment to him

Plaintiffs' RICO Case Statement

1   directly of any benefits it determines to be available under its healthcare plans, Dr.

2   Melamed has standing to pursue this claim for benefits.

3   **Dr. Michael Pariser**

4   As detailed in the Complaint, Dr. Michael Pariser is an a psychologist with a

5   private practice in Los Angeles, California.   Dr. Pariser's claims are routinely

6   submitted to Blue Cross of California and Anthem Blue Cross ("Anthem"), a

7   WellPoint subsidiary, electronically.   Anthem instead routinely and deliberately

8   reimbursed Dr. Pariser's claims at below UCR levels, requiring him to exhaust

9   significant amounts of time and energy first identifying and then complaining about

10   improperly reimbursed claims.   At all relevant times, and in furtherance of its

11   underpayment scheme, Anthem committed predicate acts of racketeering activity

12   including mail and wire fraud.   These acts include, but are not limited to the

13   following:

14   On August 28, 2008, September 4, 2008, September 11, 2008, Dr. Pariser

15   provided covered medical services to patient S.Q.  Shortly after treating the patient on

16   the aforementioned dates, Dr. Pariser promptly transmitted a CMS 1500 form to

17   Anthem by electronic wire.  The CMS 1500 form indicated that the following services

18   had been performed in treating the patient: CPT Code 90806.   CPT Code 90806

19   references "individual psychotherapy sessions 45-50 minutes in length."  Dr. Pariser's

20   submitted charges to Anthem for these services were $140 for each session - for a

21   total of $420.

22   During the time period covered by the September 19, 2008 EOB, Dr. Pariser's

23   fee for individual psychotherapy sessions with a duration of between 45 and 50

24   minutes was $175.00 per session.  Due to Dr. Pariser's prior experience with patients

25   for whom he provided the same service and who had Blue Cross of California as their

26   insurer, Dr. Pariser expected the allowable charge would be $140.00 per individual

27   psychotherapy session since that is what Blue Cross of California's EOBs stated was

28   the   UCR   for   that   same   service.     To   accommodate   his   patient's   financial

circumstances, rather than billing for the services he provided at $175.00 per session, he instead agreed to lower his fee to $140.00 per session.  His expectation being that Anthem would then reimburse him 50% of $140.00 per session and that his patient, S.Q., would make up the difference paying Dr. Pariser the additional $70.00 per session.

On or around September 19, 2008, Anthem sent through the U.S. Mail to Dr. Pariser an Explanation of Benefits ("EOB") for his services provided on August 28, 2008, September 4, 2008, and September 11, 2008.  According to the EOB, Anthem reduced its reimbursement for the treatment of S.Q. because the amount charged by Dr. Pariser exceeded Anthem's "allowed amount."  The EOB indicated the allowed amount was $103.16 per individual psychotherapy session.   Of the $140 charged for each psychotherapy session, rather than paying $70.00 to Dr. Pariser, Anthem remitted payment of $51.58 to Dr. Pariser. This resulted in S.Q. paying Dr. Pariser $15.00 additional for each session - $85.00 instead of $70.00.

Within a few weeks of receiving Anthem's EOB dated September 19, 2008 and underpayment, Dr. Pariser made a telephone call to the Anthem Claims' Department. He explained to the Anthem representative that he believed the EOB was in error in regards to the allowable amount.   He explained that the allowed amount was significantly lower than previous allowable amounts.  The Anthem representative stated to Dr. Pariser over the course of the telephone conversation that the allowable rate was based upon usual and customary rates.   Dr. Pariser further stated his belief that the allowed amount underestimated the usual and customary charges for psychologists practicing in his geographical area.  The Anthem representative again stated that the allowable rate was based upon usual and customary rates.  Dr. Pariser was unsuccessful at either getting Anthem to acknowledge it had made an error on the EOB or that its usual and customary rates were incorrect – falsely lowering the true usual and customary rates.  Dr. Pariser was unable to make up the difference between

Plaintiffs' RICO Case Statement

the total amount he received for each individual psychotherapy session - $136.58 – and his fee of 175.00.

### Dr. Stephanie Higashi

As detailed in the Complaint, Stephanie Higashi, D.C. is a chiropractic doctor with a private practice ("Mar Vista Institute of Health") in Los Angeles, California. Dr. Higashi's claims are routinely submitted to Blue Cross of California and Anthem Blue Cross ("Anthem"),  WellPoint subsidiaries, electronically.  Blue Cross of California and Anthem instead routinely and deliberately reimbursed Dr. Higashi's claims at below UCR levels, requiring her to exhaust significant amounts of time and energy first identifying and then complaining about improperly reimbursed claims. Generally, Dr. Higashi does not charge her patients' the balance remaining on their bill after insurance reimbursement; as a result, the bills that Blue Cross of California and Anthem reimbursed at below UCR rates remain outstanding.  At all relevant times, and in furtherance of its underpayment scheme, Anthem committed predicate acts of racketeering activity including mail and wire fraud.  These acts include, but are not limited to the following:

On November 11, 2006, Dr. Higashi provided covered medical services to patient E.R.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to Blue Cross of California.  The form indicated that Dr. Higashi had performed procedure number 97110 one time and procedure number 97140 two times in treating the patient.  Procedure number 97110 indicates a therapeutic exercise.  Procedure number 97140 indicates myofascial release.  Dr. Higashi submitted to Blue Cross of California charges of $65.00 for procedure number 97110 and $130.00 for two services of procedure number 97140, making the total $195.00.

On or around April 4, 2008, Blue Cross of California sent through the U.S. Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on November 11, 2006.  According to the EOB, Blue Cross of California reduced its reimbursement for the treatment of E.R. because the amount was "in excess of the

Plaintiffs' RICO Case Statement

1   allowed expense for a non-participating provider" and "[t]he Health Plan is not

2   responsible for any amounts in excess of this allowed amount."   Blue Cross of

3   California paid $3.82 for procedure number 97110 and $102.71 for the two services of

4   procedure number 97140, refusing to pay $88.47 of the billed amount.

5        On May 25, 2007, Dr. Higashi provided covered medical services to patient

6   H.S.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement

7   form to Blue Cross of California.  The form indicated that Dr. Higashi had performed

8   procedure number 99203 in treating the patient.  Procedure number 99203 indicates a

9   comprehensive new patient overview.  Dr. Higashi submitted to Blue Cross of

10   California charges of $200.00.

11        On or around May 1, 2008, Blue Cross of California sent through the U.S. Mail

12   to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on May

13   25, 2007.  According to the EOB, Blue Cross of California reduced its reimbursement

14   for the treatment of H.S. because the amount was "in excess of the allowed expense

15   for a non-participating provider" and "[t]he Health Plan is not responsible for any

16   amounts in excess of this allowed amount."  Blue Cross of California paid $158.46,

17   refusing to pay $41.54 of the billed amount.

18        On June 15, 2007, Dr. Higashi provided covered medical services to patient

19   K.M.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement

20   form to Blue Cross of California.  The form indicated that Dr. Higashi had performed

21   procedure number E0855 in treating the patient.  Procedure number E0855 indicates a

22   cervical traction unit.  Dr. Higashi submitted to Blue Cross of California charges of

23   $500.00.

24        On or around May 12, 2008, Blue Cross of California sent through the U.S.

25   Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on

26   June 15, 2007.  According to the EOB, Blue Cross of California reduced its

27   reimbursement for the treatment of K.M. because the amount was "in excess of the

28   allowed expense for a non-participating provider" and "[t]he Health Plan is not

      Plaintiffs' RICO Case Statement

responsible for any amounts in excess of this allowed amount."   Blue Cross of California paid $494.22, refusing to pay $5.78 of the billed amount.

On September 18, 2007, Dr. Higashi provided covered medical services to patient K.M.   After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to Blue Cross of California.   The form indicated that Dr. Higashi had performed procedure number L3020 two times in treating the patient, and procedure number 97504 once in treating the patient.   Procedure number L3020 indicates an orthotic shoe insert.   Procedure number 97504 indicates fitting/training 15'.   Dr. Higashi submitted to Blue Cross of California charges of $300.00 for each procedure number L3020 ($600.00) and $40.00 for procedure number 97504, making the total $640.00.

On or around May 12, 2008, Blue Cross of California sent through the U.S. Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on September 18, 2007.   According to the EOB, Blue Cross of California reduced its reimbursement for the treatment of K.M. because the amount was "in excess of the allowed expense for a non-participating provider" and "[t]he Health Plan is not responsible for any amounts in excess of this allowed amount."   Blue Cross of California paid $195.00 for each procedure number L3020, and $0 for procedure number 97504, refusing to pay a total of $250.00 of the billed amount ($105 for each procedure number L3020 and $40 for procedure number 97504).

On December 28, 2007, Dr. Higashi provided covered medical services to patient E.M.   After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to Blue Cross of California.   The form indicated that Dr. Higashi had performed procedure number 72040, procedure number 72070, and procedure number 72100 in treating the patient.   Procedure number 72040 indicates 2-3 X-ray views of the cervical spine.   Procedure number 72070 indicates 2-3 X-ray views of the thoracic spine.   Procedure number 72100 indicates 2-3 X-ray views of the lateral L/S. Dr. Higashi submitted to Blue Cross of California charges of $75.00 for procedure

Plaintiffs' RICO Case Statement

1  number 72040, $75.00 for procedure number 72070, and $75.00 for procedure number

2  72100, making the total $225.00.

3       On or around April 10, 2008, Blue Cross of California sent through the U.S.

4  Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on

5  December 28, 2007.  According to the EOB, Blue Cross of California reduced its

6  reimbursement for the treatment of E.M. because the amount was "in excess of the

7  allowed expense for a non-participating provider" and "[t]he Health Plan is not

8  responsible for any amounts in excess of this allowed amount."  Blue Cross of

9  California paid $36.72 for procedure number 72040, $37.09 for procedure number

10  72070, and $40.26 for procedure number 72100, refusing to pay a total of $110.93 of

11  the billed amount.

12       On March 15, 2008, Dr. Higashi provided covered medical services to patient

13  C.R.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement

14  form to Blue Cross of California.  The form indicated that Dr. Higashi had performed

15  procedure number 72040, procedure number 72070, and procedure number 72100 in

16  treating the patient.   Procedure number 72040 indicates 2-3 X-ray views of the

17  cervical spine.  Procedure number 72070 indicates 2-3 X-ray views of the thoracic

18  spine.  Procedure number 72100 indicates 2-3 X-ray views of the lateral L/S.  Dr.

19  Higashi submitted to Blue Cross of California charges of $75.00 for procedure

20  number 72040, $75.00 for procedure number 72070, and $75.00 for procedure number

21  72100, making the total $225.00.

22       On or around March 27, 2008, Blue Cross of California sent through the U.S.

23  Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on

24  March 15, 2008.  According to the EOB, Blue Cross of California reduced its

25  reimbursement for the treatment of C.R. because the amount was "in excess of the

26  allowed expense for a non-participating provider" and "[t]he Health Plan is not

27  responsible for any amounts in excess of this allowed amount."  Blue Cross of

28  California paid $36.72 for procedure number 72040, $37.09 for procedure number

Plaintiffs' RICO Case Statement

1  72070, and $40.26 for procedure number 72100, refusing to pay a total of $110.93 of

2  the billed amount.

3        On March 21, 2008, Dr. Higashi provided covered medical services to patient

4  A.S.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement

5  form to Blue Cross of California.  The form indicated that Dr. Higashi had performed

6  procedure number L3020 two times in treating the patient.  Procedure number L3020

7  indicates an orthotic shoe insert.  Dr. Higashi submitted to Blue Cross of California

8  charges of $300.00 for each procedure number L3020, totaling $600.00.

9        On or around March 27, 2008, Blue Cross of California sent through the U.S.

10 Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on

11 March 21, 2008.   According to the EOB, Blue Cross of California reduced its

12 reimbursement for the treatment of A.S. because the amount was "in excess of the

13 allowed expense for a non-participating provider" and "[t]he Health Plan is not

14 responsible for any amounts in excess of this allowed amount."   Blue Cross of

15 California paid $195.00 for each procedure number L3020, refusing to pay a total of

16 $210.00 of the billed amount.

17       On March 27, 2008, Dr. Higashi provided covered medical services to patient

18 A.B.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement

19 form to Blue Cross of California.  The form indicated that Dr. Higashi had performed

20 procedure number E0855 in treating the patient.  Procedure number E0855 indicates a

21 cervical traction unit.  Dr. Higashi submitted to Blue Cross of California charges of

22 $500.00.

23       On or around April 18, 2008, Blue Cross of California sent through the U.S.

24 Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on

25 March 27, 2008.   According to the EOB, Blue Cross of California reduced its

26 reimbursement for the treatment of A.B. because the amount was "in excess of the

27 allowed expense for a non-participating provider" and "[t]he Health Plan is not

28

Plaintiffs' RICO Case Statement

responsible for any amounts in excess of this allowed amount." Blue Cross of California paid $494.22, refusing to pay $5.78 of the billed amount.

On March 31, 2008, Dr. Higashi provided covered medical services to patient J.S. After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to Blue Cross of California. The form indicated that Dr. Higashi had performed procedure number 98941 in treating the patient. Procedure number 98941 indicates manipulation. Dr. Higashi submitted to Blue Cross of California charges of $70.00.

On or around April 10, 2008, Blue Cross of California sent through the U.S. Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on March 31, 2008. According to the EOB, Blue Cross of California reduced its reimbursement for the treatment of J.S. because the amount was "in excess of the allowed expense for a non-participating provider" and "[t]he Health Plan is not responsible for any amounts in excess of this allowed amount." Blue Cross of California paid $62.92, refusing to pay $7.08 of the billed amount.

On April 2, 2008, Dr. Higashi provided covered medical services to patient N.P. After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to Blue Cross of California. The form indicated that Dr. Higashi had performed procedure number 97110 and procedure number 97140 in treating the patient. Procedure number 97110 indicates a therapeutic exercise. Procedure number 97140 indicates myofascial release. Dr. Higashi submitted to Blue Cross of California charges of $65.00 for procedure number 97110 and $195.00 for procedure number 97140, totaling $260.00.

On or around April 7, 2008, Blue Cross of California sent through the U.S. Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on April 2, 2008. According to the EOB, Blue Cross of California reduced its reimbursement for the treatment of N.P. because the amount was "in excess of the allowed expense for a non-participating provider" and "[t]he Health Plan is not responsible for any amounts in excess of this allowed amount." Blue Cross of California paid $14.81 for

Plaintiffs' RICO Case Statement

1   procedure number 97110 and $61.97 for procedure number 97140, refusing to pay

2   $183.22 of the billed amount.

3        On April 8, 2008, Dr. Higashi provided covered medical services to patient J.S.

4   After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to

5   Blue Cross of California.   The form indicated that Dr. Higashi had performed

6   procedure number 98941 and procedure number 97110 in treating the patient.

7   Procedure number 98941 indicates manipulation.  Procedure number 97110 indicates

8   a therapeutic exercise.  Dr. Higashi submitted to Blue Cross of California charges of

9   $70.00 for procedure number 98941 and $65.00 for procedure number 97110, totaling

10  $135.00.

11       On or around April 14, 2008, Blue Cross of California sent through the U.S.

12  Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on

13  April 8, 2008.   According to the EOB, Blue Cross of California reduced its

14  reimbursement for the treatment of J.S. because the amount was "in excess of the

15  allowed expense for a non-participating provider" and "[t]he Health Plan is not

16  responsible for any amounts in excess of this allowed amount."   Blue Cross of

17  California paid $62.92 for procedure number 98941 and $49.33 for procedure number

18  97110, refusing to pay $22.75 of the billed amount.

19       On April 9, 2008, Dr. Higashi provided covered medical services to patient

20  A.B.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement

21  form to Blue Cross of California.  The form indicated that Dr. Higashi had performed

22  procedure number E0855 in treating the patient.  Procedure number E0855 indicates a

23  cervical traction unit.  Dr. Higashi submitted to Blue Cross of California charges of

24  $500.00.

25       On or around April 18, 2008, Blue Cross of California sent through the U.S.

26  Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on

27  April 9, 2008.   According to the EOB, Blue Cross of California reduced its

28  reimbursement for the treatment of A.B. because the amount was "in excess of the

Plaintiffs' RICO Case Statement

allowed expense for a non-participating provider" and "[t]he Health Plan is not responsible for any amounts in excess of this allowed amount."   Blue Cross of California paid $494.22, refusing to pay $5.78 of the billed amount.

On April 11, 2008, Dr. Higashi provided covered medical services to patient N.P.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to Blue Cross of California.  The form indicated that Dr. Higashi had performed procedure number 97110 in treating the patient.  Procedure number 97110 indicates a therapeutic exercise.  Dr. Higashi submitted to Blue Cross of California charges of $65.00.

On or around April 18, 2008, Blue Cross of California sent through the U.S. Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on April 11, 2008.   According to the EOB, Blue Cross of California reduced its reimbursement for the treatment of N.P. because the amount was "in excess of the allowed expense for a non-participating provider" and "[t]he Health Plan is not responsible for any amounts in excess of this allowed amount."   Blue Cross of California paid $14.81, refusing to pay $50.19 of the billed amount.

On April 16, 2008, Dr. Higashi provided covered medical services to patient N.P.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to Blue Cross of California.  The form indicated that Dr. Higashi had performed procedure number 97110 in treating the patient.  Procedure number 97110 indicates a therapeutic exercise.  Dr. Higashi submitted to Blue Cross of California charges of $65.00.

On or around April 24, 2008, Blue Cross of California sent through the U.S. Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on April 16, 2008.   According to the EOB, Blue Cross of California reduced its reimbursement for the treatment of N.P. because the amount was "in excess of the allowed expense for a non-participating provider" and "[t]he Health Plan is not

Plaintiffs' RICO Case Statement

1   responsible for any amounts in excess of this allowed amount."   Blue Cross of
2   California paid $49.33, refusing to pay $15.67 of the billed amount.

3         On April 28, 2008, Dr. Higashi provided covered medical services to patient
4   J.O.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement
5   form to Blue Cross of California.  The form indicated that Dr. Higashi had performed
6   procedure number 98941 and procedure number 98943 in treating the patient.
7   Procedure number 98941 indicates manipulation.  Procedure number 98943 indicates
8   extra spinal manipulation.  Dr. Higashi submitted to Blue Cross of California charges
9   of $70.00 for procedure number 98941 and $60.00 for procedure number 98943,
10  totaling $130.00.

11        On or around May 2, 2008, Blue Cross of California sent through the U.S. Mail
12  to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on April
13  28, 2008.  According to the EOB, Blue Cross of California reduced its reimbursement
14  for the treatment of J.O. because the amount was "in excess of the allowed expense
15  for a non-participating provider" and "[t]he Health Plan is not responsible for any
16  amounts in excess of this allowed amount."  Blue Cross of California paid $66.02 for
17  procedure number 98941 and $51.76 for procedure number 98943, refusing to pay
18  $12.22 of the billed amount.

19        On May 6, 2009, Dr. Higashi provided covered medical services to patient L.L.
20  After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to
21  Anthem.  The form indicated that Dr. Higashi had performed procedure number 97110
22  once and procedure number 97140 four times in treating the patient.   Procedure
23  number 97110 indicates a therapeutic exercise.  Procedure number 97140 indicates
24  myofascial release.  Dr. Higashi submitted to Anthem charges of $65.00 for procedure
25  number 97110 and $195.00 for the four services of procedure number 97140, totaling
26  $260.00.

27        On or around July 14, 2009, Anthem sent through the U.S. Mail to Dr. Higashi
28  an Explanation of Benefits ("EOB") for her services provided on May 6, 2009.

Plaintiffs' RICO Case Statement

1   According to the EOB, Anthem reduced its reimbursement for the treatment of L.L.

2   because the amount was "in excess of the allowed expense for a non-participating

3   provider" and "[t]he Health Plan is not responsible for any amounts in excess of this

4   allowed expense."  Anthem paid $54.05 for procedure number 98941 and $49.68 for

5   the four services of procedure number 97140, refusing to pay $156.27 of the billed

6   amount.

7        On May 11, 2009, Dr. Higashi provided covered medical services to patient

8   L.L.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement

9   form to Anthem.  The form indicated that Dr. Higashi had performed procedure

10  number 98941, procedure number 98943, and procedure number 97110 in treating the

11  patient.  Procedure number 98941 indicates manipulation.  Procedure number 98943

12  indicates extra spinal manipulation.  Procedure number 97110 indicates a therapeutic

13  exercise.  Dr. Higashi submitted to Anthem charges of $70.00 for procedure number

14  98941, $60.00 for procedure number 98943, and $65.00 for procedure number 97110,

15  totaling $195.00.

16       On or around July 14, 2009, Anthem sent through the U.S. Mail to Dr. Higashi

17  an Explanation of Benefits ("EOB") for her services provided on May 11, 2009.

18  According to the EOB, Anthem reduced its reimbursement for the treatment of L.L.

19  because the amount was "in excess of the allowed expense for a non-participating

20  provider" and "[t]he Health Plan is not responsible for any amounts in excess of this

21  allowed expense."  Anthem paid $66.42 for procedure number 98941, $44.28 for

22  procedure number 98943, and $54.05 for procedure number 97110, refusing to pay

23  $30.25 of the billed amount.

24       On May 18, 2009, Dr. Higashi provided covered medical services to patient

25  L.L.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement

26  form to Anthem.  The form indicated that Dr. Higashi had performed procedure

27  number 98941 in treating the patient.   Procedure number 98941 indicates

28  manipulation.  Dr. Higashi submitted to Anthem charges of $70.00.

On or around July 14, 2009, Anthem sent through the U.S. Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on May 18, 2009. According to the EOB, Anthem reduced its reimbursement for the treatment of L.L. because the amount was "in excess of the allowed expense for a non-participating provider" and "[t]he Health Plan is not responsible for any amounts in excess of this allowed expense." Anthem paid $66.42 for procedure number 98941, refusing to pay $3.58 of the billed amount.

Also on May 18, 2009, Dr. Higashi provided covered medical services to patient N.P. After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to Anthem. The form indicated that Dr. Higashi had performed procedure number 97014 in treating the patient. Procedure number 97014 indicates electrical stimulation. Dr. Higashi submitted to Anthem charges of $45.00.

On or around August 10, 2009, Anthem sent through the U.S. Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on May 18, 2009. According to the EOB, Anthem reduced its reimbursement for the treatment of N.P. because the amount was "in excess of the allowed expense for a non-participating provider" and "[t]he Health Plan is not responsible for any amounts in excess of this allowed expense." Anthem paid $28.51, refusing to pay $16.49 of the billed amount.

On June 3, 2009, Dr. Higashi provided covered medical services to patient N.P. After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to Anthem. The form indicated that Dr. Higashi had performed procedure number 98941 in treating the patient. Procedure number 98941 indicates manipulation. Dr. Higashi submitted to Anthem charges of $70.00.

On or around August 10, 2009, Anthem sent through the U.S. Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on June 3, 2009. According to the EOB, Anthem reduced its reimbursement for the treatment of N.P. because the amount was "in excess of the allowed expense for a non-

Plaintiffs' RICO Case Statement

1    participating provider" and "[t]he Health Plan is not responsible for any amounts in

2    excess of this allowed expense."   Anthem paid $66.42, refusing to pay $3.58 of the

3    billed amount.

4          On June 8, 2009, Dr. Higashi provided covered medical services to patient L.L.

5    After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to

6    Anthem.  The form indicated that Dr. Higashi had performed procedure number 98941

7    one time, procedure number 98943 one time, and procedure number 97140 four times

8    in treating the patient.  Procedure number 98941 indicates manipulation.  Procedure

9    number 98943 indicates extra spinal manipulation.  Procedure number 97140 indicates

10   myofascial release.  Dr. Higashi submitted to Anthem charges of $70.00 for procedure

11   number 98941, $60.00 for procedure number 98943, and $195.00 for the four services

12   of procedure number 97140, totaling $325.00.

13         On or around July 14, 2009, Anthem sent through the U.S. Mail to Dr. Higashi

14   an Explanation of Benefits ("EOB") for her services provided on June 8, 2009.

15   According to the EOB, Anthem reduced its reimbursement for the treatment of L.L.

16   because the amount was "in excess of the allowed expense for a non-participating

17   provider" and "[t]he Health Plan is not responsible for any amounts in excess of this

18   allowed expense."   Anthem paid $66.42 for procedure number 98941, $44.28 for

19   procedure number 98943, and $165.60 for the four services of procedure number

20   97140, refusing to pay $48.70 of the billed amount.

21         On June 10, 2009, Dr. Higashi provided covered medical services to patient

22   N.P.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement

23   form to Anthem.  The form indicated that Dr. Higashi had performed procedure

24   number 98941 once and procedure number 97140 four times in treating the patient.

25   Procedure number 98941 indicates manipulation.  Procedure number 97140 indicates

26   myofascial release.  Dr. Higashi submitted to Anthem charges of $70.00 for procedure

27   number 98941 and $195.00 for the four services of procedure number 97140, totaling

28   $265.00.

Plaintiffs' RICO Case Statement

On or around August 10, 2009, Anthem sent through the U.S. Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on June 10, 2009.  According to the EOB, Anthem reduced its reimbursement for the treatment of N.P. because the amount was "in excess of the allowed expense for a non-participating provider" and "[t]he Health Plan is not responsible for any amounts in excess of this allowed expense."  Anthem paid $66.42 for procedure number 98941 and $165.60 for the four services of procedure number 97140, refusing to pay $32.98 of the billed amount.

On June 17, 2009, Dr. Higashi provided covered medical services to patient L.L.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to Anthem.  The form indicated that Dr. Higashi had performed procedure number 97012, procedure number 98941, procedure number 98943, and procedure number 97140 in treating the patient.  Procedure number 97012 indicates mechanical traction.  Procedure number 98941 indicates manipulation.  Procedure number 98943 indicates extra spinal manipulation.  Procedure number 97140 indicates myofascial release.  Dr. Higashi submitted to Anthem charges of $45.00 for procedure number 97012, $70.00 for procedure number 98941, $60.00 for procedure number 98943, and $65.00 for procedure number 97140, totaling $240.00.

On or around July 14, 2009, Anthem sent through the U.S. Mail to Dr. Higashi an Explanation of Benefits ("EOB") for her services provided on June 17, 2009. According to the EOB, Anthem reduced its reimbursement for the treatment of L.L because the amount was "in excess of the allowed expense for a non-participating provider" and "[t]he Health Plan is not responsible for any amounts in excess of this allowed expense."  Anthem paid $28.96 for procedure number 97012, $66.42 for procedure number 98941, $44.28 for procedure number 98943, and $41.40 for procedure number 97140, refusing to pay $58.94 of the billed amount.

On July 15, 2009, Dr. Higashi provided covered medical services to patient J.S.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to

Plaintiffs' RICO Case Statement

1    Anthem.  The form indicated that Dr. Higashi had performed procedure number 98943

2    and procedure number 97140 in treating the patient.  Procedure number 98943

3    indicates extra spinal manipulation.  Procedure number 97140 indicates myofascial

4    release.  Dr. Higashi submitted to Anthem charges of $60.00 for procedure number

5    98943 and $65.00 for procedure number 97140, totaling $125.00.

6         On or around August 10, 2009, Anthem sent through the U.S. Mail to Dr.

7    Higashi an Explanation of Benefits ("EOB") for her services provided on July 15,

8    2009.  According to the EOB, Anthem reduced its reimbursement for the treatment of

9    J.S. because the amount was "in excess of the allowed expense for a non-participating

10   provider" and "[t]he Health Plan is not responsible for any amounts in excess of this

11   allowed expense."  Anthem paid $47.34 for procedure number 98943 and $43.02 for

12   procedure number 97140, refusing to pay $34.64 of the billed amount.

13        On July 31, 2009, Dr. Higashi provided covered medical services to patient L.L.

14   After treating the patient, Dr. Higashi promptly transmitted a reimbursement form to

15   Anthem.  The form indicated that Dr. Higashi had performed procedure number 97012

16   and procedure number 98943 in treating the patient.  Procedure number 97012

17   indicates mechanical traction.  Procedure number 98943 indicates extra spinal

18   manipulation.  Dr. Higashi submitted to Anthem charges of $45.00 for procedure

19   number 97012 and $60.00 for procedure number 98943, totaling $105.00.

20        On or around August 10, 2009, Anthem sent through the U.S. Mail to Dr.

21   Higashi an Explanation of Benefits ("EOB") for her services provided on July 31,

22   2009.  According to the EOB, Anthem reduced its reimbursement for the treatment of

23   L.L. because the amount was "in excess of the allowed expense for a non-participating

24   provider" and "[t]he Health Plan is not responsible for any amounts in excess of this

25   allowed expense."  Anthem paid $31.36 for procedure number 97012 and $47.34 for

26   procedure number 98943, refusing to pay $26.30 of the billed amount.

27        On August 5, 2009, Dr. Higashi provided covered medical services to patient

28   N.P.  After treating the patient, Dr. Higashi promptly transmitted a reimbursement

1  form to Anthem.  The form indicated that Dr. Higashi had performed procedure

2  number 98943, procedure number 97140, and procedure number 97014 in treating the

3  patient.  Procedure number 98943 indicates extra spinal manipulation.  Procedure

4  number 97140 indicates myofascial release.  Procedure number 97014 indicates

5  electrical stimulation.  Dr. Higashi submitted to Anthem charges of $60.00 for

6  procedure number 98943, $65.00 for procedure number 97140, and $45.00 for

7  procedure number 97014, totaling $170.00.

8       On or around August 10, 2009, Anthem sent through the U.S. Mail to Dr.

9  Higashi an Explanation of Benefits ("EOB") for her services provided on August 5,

10  2009.  According to the EOB, Anthem reduced its reimbursement for the treatment of

11  N.P. because the amount was "in excess of the allowed expense for a non-

12  participating provider" and "[t]he Health Plan is not responsible for any amounts in

13  excess of this allowed expense."  Anthem paid $47.34 for procedure number 98943,

14  $43.02 for procedure number 97140, and $30.87 for procedure number 97014,

15  refusing to pay $48.77 of the billed amount.

16       Based on information and belief, when WellPoint reduces benefits based on

17  its finding that the billed charges were "in excess of the allowed expense for a non-

18  participating provider," it is applying the UCR exclusion from its healthcare

19  policies.  Similarly, based on information and belief, WellPoint relies on the

20  Ingenix Database to determine the "allowed expenses," notwithstanding that this

21  was never disclosed to Dr. Higashi.

22  **Dr. James A. Peck**

23       As detailed in the Amended Complaint, Dr. Peck is a clinical psychologist with

24  a private practice in Santa Monica, California.  Dr. Peck's claims are routinely

25  submitted to WellPoint electronically.  WellPoint routinely and deliberately

26  reimbursed Dr. Peck's claims at below UCR levels, requiring him to exhaust

27  significant amounts of time and energy dealing with improperly reimbursed claims.

28  At all relevant times, and in furtherance of its underpayment scheme, WellPoint

Plaintiffs' RICO Case Statement

committed predicate acts of racketeering activity including mail and wire fraud. These acts include, but are not limited to the following:

On July 23, 2007, and August 1, 2007, Dr. Peck provided covered medical services to patient S.H.  After treating the patient, on or around August 11, 2007, Dr. Peck transmitted a CMS 1500 form to WellPoint by electronic wire.  The CMS 1500 form indicated that the following services had been performed in treating the patient on these dates: CPT Code 90801 and 90806.  CPT Code 90801 indicates that the procedure involved a "psychiatric interview examination" and CPT Code 90806 indicates that the procedure involved "individual psychotherapy, insight-oriented, behavior modifying and/or supportive" lasting 45-50 minutes.  Dr. Peck's submitted charges to WellPoint for CPT Code 90801 was $200 and for CPT Code 90806 was $150 for a total of $350.00.

On or around August 21, 2007, WellPoint sent through the U.S. Mail to Dr. Peck an Explanation of Benefits ("EOB") for his services provided on July 23 and August 1, 2007.  According to the EOB, WellPoint reduced its reimbursement for the treatment of S. H. because "[t]his is the amount in excess of the allowed expense for a non-participating provider."  After applying the patient's $76.56 coinsurance amount for the service reflected by CPT Code 90801 and $55.37 coinsurance amount for the serviced reflected by CPT Code 90806 for a total coinsurance deduction of $131.93, WellPoint reduced Dr. Peck's $200 submitted charge by $46.89 and his $150 submitted charge by $39.27.  WellPoint remitted a total payment of $131.91 rather than $218.07.  WellPoint's statement and reimbursement amount were fraudulent because WellPoint improperly and unlawfully used the Ingenix Database to diminish the compensation to which Dr. Peck was entitled.  Dr. Peck did not balance-bill patient S.H. for said services and thus has suffered monetary damages.

On August 8, 2007, August 22, 2007, and August 29, 2007, Dr. Peck provided covered medical services to patient S.H.  After treating the patient, on or around September 4, 2007, Dr. Peck transmitted a CMS 1500 form to WellPoint by electronic

Plaintiffs' RICO Case Statement

wire.  The CMS 1500 form indicated that the following services had been performed in treating the patient on these dates: CPT Code 90806.  CPT Code 90806 indicates that the procedure involved "individual psychotherapy, insight-oriented, behavior modifying and/or supportive" lasting 45-50 minutes.  Dr. Peck's submitted charges to WellPoint for this service was $150 per session for a total of $450.00.

On or around September 11, 2007, WellPoint sent through the U.S. Mail to Dr. Peck an Explanation of Benefits ("EOB") for his services provided on August 8, August 22, and August 29, 2007.  According to the EOB, WellPoint reduced its reimbursement for the treatment of S.H. because "[t]his is the amount in excess of the allowed expense for a non-participating provider."  After applying the patient's $55.36 coinsurance amount for each service for a total deduction of $166.08, WellPoint reduced Dr. Peck's $150 submitted charge for each date of service by $39.27.   WellPoint remitted a total payment of $166.08 rather than $283.89.  WellPoint's statement and reimbursement amount were fraudulent because WellPoint improperly and unlawfully used the Ingenix Database to diminish the compensation to which Dr. Peck was entitled.  Dr. Peck did not balance-bill patient S.H. for said services and thus has suffered monetary damages.

On September 6, 2007, September 12, 2007, and September 19, 2007, Dr. Peck provided covered medical services to patient S.H.  After treating the patient, on or around September 24, 2007, Dr. Peck transmitted a CMS 1500 form to WellPoint by electronic wire.  The CMS 1500 form indicated that the following services had been performed in treating the patient on these dates: CPT Code 90806.  CPT Code 90806 indicates that the procedure involved "individual psychotherapy, insight-oriented, behavior modifying and/or supportive" lasting 45-50 minutes.  Dr. Peck's submitted charges to WellPoint for this service was $150 per session for a total of $450.00.

On or around October 5, 2007, WellPoint sent through the U.S. Mail to Dr. Peck an Explanation of Benefits ("EOB") for his services provided on September 6, September 12, and September 19, 2007.  According to the EOB, WellPoint reduced its

reimbursement for the treatment of S.H. because "[t]his is the amount in excess of the allowed expense for a non-participating provider."   After applying the patient's $55.36 coinsurance amount for each service for a total deduction of $166.08, WellPoint reduced Dr. Peck's $150 submitted charge for each date of service by $39.27.   WellPoint remitted a total payment of $166.08 rather than $283.89. WellPoint's statement and reimbursement amount were fraudulent because WellPoint improperly and unlawfully used the Ingenix Database to diminish the compensation to which Dr. Peck was entitled.   Dr. Peck did not balance-bill patient S.H. for said services and thus has suffered monetary damages.

On September 26, 2007, and October 31, 2007, Dr. Peck provided covered medical services to patient S.H.   After treating the patient, Dr. Peck transmitted a CMS 1500 form to WellPoint by electronic wire.   The CMS 1500 form indicated that the following services had been performed in treating the patient on these dates: CPT Code 90806.   CPT Code 90806 indicates that the procedure involved "individual psychotherapy, insight-oriented, behavior modifying and/or supportive" lasting 45-50 minutes.   Dr. Peck's submitted charges to WellPoint for this service was $150 per session for a total of $300.00.

On or around December 17, 2007, WellPoint sent through the U.S. Mail to Dr. Peck an Explanation of Benefits ("EOB") for his services provided on September 26, and October 31, 2007.   According to the EOB, WellPoint reduced its reimbursement for the treatment of S.H. because "[t]his is the amount in excess of the allowed expense for a non-participating provider.   The Health Plan is not responsible for any amounts in excess of this allowed expense."   After applying the patient's $51.58 coinsurance amount for each service for a total deduction of $103.16, WellPoint reduced Dr. Peck's $150 submitted charge for each date of service by $46.84. WellPoint remitted a total payment of $103.16 rather than $196.84.   WellPoint's statement and reimbursement amount were fraudulent because WellPoint improperly and unlawfully used the Ingenix Database to diminish the compensation to which Dr.

1   Peck was entitled.  Dr. Peck did not balance-bill patient S.H. for said services and thus

2   has suffered monetary damages.

3          On June 11, 2008, and June 21, 2008, Dr. Peck provided covered medical

4   services to patient A.M.  After treating the patient, on or around July 2, 2008, Dr. Peck

5   transmitted a CMS 1500 form to WellPoint by electronic wire.  The CMS 1500 form

6   indicated that the following services had been performed in treating the patient on

7   both dates: CPT Code 90806.  CPT Code 90806 indicates that the procedure involved

8   "individual psychotherapy, insight-oriented, behavior modifying and/or supportive"

9   lasting 45-50 minutes.  Dr. Peck's submitted charges to WellPoint for this service was

10  $150 per session for a total of $300.00.

11         On or around July 7, 2008, WellPoint sent through the U.S. Mail to Dr. Peck an

12  Explanation of Benefits ("EOB") for his services provided on June 13, and June 24,

13  2008.  According to the EOB, WellPoint reduced its reimbursement for the treatment

14  of A.M. because "[t]his is the amount in excess of the allowed expense for a non-

15  participating provider.  The Health Plan is not responsible for any amounts in excess

16  of this allowed expense."  After applying the patient's $51.58 coinsurance amount for

17  each service for a total deduction of $103.16, WellPoint reduced Dr. Peck's $150

18  submitted charge for each date of service by $46.84.  WellPoint remitted a total

19  payment of $103.16 rather than $196.84.  WellPoint's statement and reimbursement

20  amount were fraudulent because WellPoint improperly and unlawfully used the

21  Ingenix Database to diminish the compensation to which Dr. Peck was entitled.  Dr.

22  Peck did not balance-bill patient A.M. for said services and thus has suffered

23  monetary damages.

24         On September 2, 2008, and September 13, 2008, Dr. Peck provided covered

25  medical services to patient A.M.  After treating the patient, on or around September

26  30, 2008, Dr. Peck transmitted a CMS 1500 form to WellPoint by electronic wire.

27  The CMS 1500 form indicated that the following services had been performed in

28  treating the patient on both dates: CPT Code 90806.  CPT Code 90806 indicates that

Plaintiffs' RICO Case Statement

1   the procedure involved "individual psychotherapy, insight-oriented, behavior

2   modifying and/or supportive" lasting 45-50 minutes.  Dr. Peck's submitted charges to

3   WellPoint for this service was $150 per session for a total of $300.00.

4        On or around October 8, 2008, WellPoint sent through the U.S. Mail to Dr.

5   Peck an Explanation of Benefits ("EOB") for his services provided on September 2,

6   and September 13, 2008.   According to the EOB, WellPoint reduced its

7   reimbursement for the treatment of A.M. because "[t]his is the amount in excess of the

8   allowed expense for a non-participating provider.  The Health Plan is not responsible

9   for any amounts in excess of this allowed expense."  After applying the patient's

10  $51.58 coinsurance amount for each service for a total deduction of $103.16,

11  WellPoint reduced Dr. Peck's $150 submitted charge for each date of service by

12  $46.84.   WellPoint remitted a total payment of $103.16 rather than $196.84.

13  WellPoint's statement and reimbursement amount were fraudulent because WellPoint

14  improperly and unlawfully used the Ingenix Database to diminish the compensation to

15  which Dr. Peck was entitled.  Dr. Peck did not balance-bill patient A.M. for said

16  services and thus has suffered monetary damages.

17       On October 11, 2008, and October 20, 2008, Dr. Peck provided covered

18  medical services to patient A.M.  After treating the patient, on or around November 3,

19  2008, Dr. Peck transmitted a CMS 1500 form to WellPoint by electronic wire.  The

20  CMS 1500 form indicated that the following services had been performed in treating

21  the patient on both dates: CPT Code 90806.  CPT Code 90806 indicates that the

22  procedure involved "individual psychotherapy, insight-oriented, behavior modifying

23  and/or supportive" lasting 45-50 minutes.  Dr. Peck's submitted charges to WellPoint

24  for this service was $150 per session for a total of $300.00.

25       On or around November 11, 2008, WellPoint sent through the U.S. Mail to Dr.

26  Peck an Explanation of Benefits ("EOB") for his services provided on October 11, and

27  October 20, 2008.  According to the EOB, WellPoint reduced its reimbursement for

28  the treatment of A.M. because "[t]his is the amount in excess of the allowed expense

Plaintiffs' RICO Case Statement

for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed expense."  After applying the patient's $51.58 coinsurance amount for each service for a total deduction of $103.16, WellPoint reduced Dr. Peck's $150 submitted charge for each date of service by $46.84.  WellPoint remitted a total payment of $103.16 rather than $196.84.  WellPoint's statement and reimbursement amount were fraudulent because WellPoint improperly and unlawfully used the Ingenix Database to diminish the compensation to which Dr. Peck was entitled.  Dr. Peck did not balance-bill patient A.M. for said services and thus has suffered monetary damages.

On November 19, 2008, Dr. Peck provided covered medical services to patient A.M.  After treating the patient, on or around December 9, 2008, Dr. Peck transmitted a CMS 1500 form to WellPoint by electronic wire.  The CMS 1500 form indicated that the following services had been performed in treating the patient on that date: CPT Code 90806.  CPT Code 90806 indicates that the procedure involved "individual psychotherapy, insight-oriented, behavior modifying and/or supportive" lasting 45-50 minutes.  Dr. Peck's submitted charges to WellPoint for this service was $150.

On or around December 17, 2008, WellPoint sent through the U.S. Mail to Dr. Peck an Explanation of Benefits ("EOB") for his services provided on November 19, 2008.  According to the EOB, WellPoint reduced its reimbursement for the treatment of A.M. because "[t]his is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed expense."  After applying the patient's $51.58 coinsurance amount, WellPoint reduced Dr. Peck's $150 submitted charge by $46.84 and remitted a total payment in the amount of $51.58. WellPoint's statement and reimbursement amount were fraudulent because WellPoint improperly and unlawfully used the Ingenix Database to diminish the compensation to which Dr. Peck was entitled.  Dr. Peck did not balance-bill patient A.M. for said services and thus has suffered monetary damages.

Plaintiffs' RICO Case Statement

On December 23, 2008, and December 27, 2008, Dr. Peck provided covered medical services to patient A.M.  After treating the patient, on or around January 6, 2009, Dr. Peck transmitted a CMS 1500 form to WellPoint by electronic wire.  The CMS 1500 form indicated that the following services had been performed in treating the patient on both dates: CPT Code 90806.  CPT Code 90806 indicates that the procedure involved "individual psychotherapy, insight-oriented, behavior modifying and/or supportive" lasting 45-50 minutes.  Dr. Peck's submitted charges to WellPoint for this service was $150 per session for a total of $300.00.

On or around January 14, 2009, WellPoint sent through the U.S. Mail to Dr. Peck an Explanation of Benefits ("EOB") for his services provided on December 23, and December 27, 2008.  According to the EOB, WellPoint reduced its reimbursement for the treatment of A.M. because "[t]his is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed expense." After applying the patient's $51.58 coinsurance amount for each service for a total deduction of $103.16, WellPoint reduced Dr. Peck's $150 submitted charge for each date of service by $46.84.  WellPoint remitted a total payment of $103.16 rather than $196.84.  WellPoint's statement and reimbursement amount were fraudulent because WellPoint improperly and unlawfully used the Ingenix Database to diminish the compensation to which Dr. Peck was entitled.  Dr. Peck did not balance-bill patient A.M. for said services and thus has suffered monetary damages.

On January 7, 2009, and January 17, 2009, Dr. Peck provided covered medical services to patient A.M.  After treating the patient, on or around February 3, 2009, Dr. Peck transmitted a CMS 1500 form to WellPoint by electronic wire.  The CMS 1500 form indicated that the following services had been performed in treating the patient on both dates: CPT Code 90806.  CPT Code 90806 indicates that the procedure involved "individual psychotherapy, insight-oriented, behavior modifying and/or

Plaintiffs' RICO Case Statement

1  supportive" lasting 45-50 minutes.  Dr. Peck's submitted charges to WellPoint for this

2  service was $150 per session for a total of $300.00.

3      On or around February 11, 2009, WellPoint sent through the U.S. Mail to Dr.

4  Peck an Explanation of Benefits ("EOB") for his services provided on January 7, and

5  January 17, 2009.  According to the EOB, WellPoint reduced its reimbursement for

6  the treatment of A.M. because "[t]his is the amount in excess of the allowed expense

7  for a non-participating provider.  The Health Plan is not responsible for any amounts

8  in excess of this allowed expense."  After applying the patient's $51.58 coinsurance

9  amount for each service for a total deduction of $103.16, WellPoint reduced Dr.

10  Peck's $150 submitted charge for each date of service by $46.84.  WellPoint remitted

11  a total payment of $103.16 rather than $196.84.   WellPoint's statement and

12  reimbursement amount were fraudulent because WellPoint improperly and unlawfully

13  used the Ingenix Database to diminish the compensation to which Dr. Peck was

14  entitled.  Dr. Peck did not balance-bill patient A.M. for said services and thus has

15  suffered monetary damages.

16      On February 7, 2009, February 11, 2009, February 18, 2009, and February 28,

17  2009, Dr. Peck provided covered medical services to patient A.M.  After treating the

18  patient, on or around March 3, 2009, Dr. Peck transmitted a CMS 1500 form to

19  WellPoint by electronic wire.  The CMS 1500 form indicated that the following

20  services had been performed in treating the patient on these dates: CPT Code 90806.

21  CPT Code 90806 indicates that the procedure involved "individual psychotherapy,

22  insight-oriented, behavior modifying and/or supportive" lasting 45-50 minutes.  Dr.

23  Peck's submitted charges to WellPoint for this service was $150 per session for a total

24  of $600.00.

25      On or around March 11, 2009, WellPoint sent through the U.S. Mail to Dr. Peck

26  an Explanation of Benefits ("EOB") for his services provided on February 7, February

27  11, February 18, and February 28, 2009.  According to the EOB, WellPoint reduced

28  its reimbursement for the treatment of A.M. because "[t]his is the amount in excess of

104

Plaintiffs' RICO Case Statement

the allowed expense for a non-participating provider.   The Health Plan is not responsible for any amounts in excess of this allowed expense."   After applying the patient's $51.58 coinsurance amount for each service for a total deduction of $206.32, WellPoint reduced the remainder of Dr. Peck's $150 submitted charge ($98.42) for each date of service by $46.84.  WellPoint remitted a total payment of $206.32 rather than $393.68.  WellPoint's statement and reimbursement amount were fraudulent because WellPoint improperly and unlawfully used the Ingenix Database to diminish the compensation to which Dr. Peck was entitled.   Dr. Peck did not balance-bill patient A.M. for said services and thus has suffered monetary damages.

On March 7, 2009, March 11, 2009, and March 18, 2009, Dr. Peck provided covered medical services to patient A.M.  After treating the patient, on or around April 2, 2009, Dr. Peck transmitted a CMS 1500 form to WellPoint by electronic wire. The CMS 1500 form indicated that the following services had been performed in treating the patient on these dates: CPT Code 90806.  CPT Code 90806 indicates that the procedure involved "individual psychotherapy, insight-oriented, behavior modifying and/or supportive" lasting 45-50 minutes.  Dr. Peck's submitted charges to WellPoint for this service was $150 per session for a total of $450.00.

On or around April 10, 2009, WellPoint sent through the U.S. Mail to Dr. Peck an Explanation of Benefits ("EOB") for his services provided on March 7, March 11, and March 18, 2009.  According to the EOB, WellPoint reduced its reimbursement for the treatment of A.M. because "[t]his is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed expense."  After applying the patient's $53.56 coinsurance amount for each service for a total deduction of $160.68, WellPoint reduced Dr. Peck's $150 submitted charge for each date of service by $42.87.  WellPoint remitted a total payment of $160.71 rather than $289.32.   WellPoint's statement and reimbursement amount were fraudulent because WellPoint improperly and unlawfully used the Ingenix Database to diminish the compensation to which Dr. Peck was

Plaintiffs' RICO Case Statement

1  entitled.  Dr. Peck did not balance-bill patient A.M. for said services and thus has

2  suffered monetary damages.

3        On April 1, 2009, April 11, 2009, and April 29, 2009, Dr. Peck provided

4  covered medical services to patient A.M.  After treating the patient, on or around May

5  13, 2009, Dr. Peck transmitted a CMS 1500 form to WellPoint by electronic wire.

6  The CMS 1500 form indicated that the following services had been performed in

7  treating the patient on these dates: CPT Code 90806.  CPT Code 90806 indicates that

8  the procedure involved "individual psychotherapy, insight-oriented, behavior

9  modifying and/or supportive" lasting 45-50 minutes.  Dr. Peck's submitted charges to

10 WellPoint for this service was $150 per session for a total of $450.00.

11       On or around May 21, 2009, WellPoint sent through the U.S. Mail to Dr. Peck

12 an Explanation of Benefits ("EOB") for his services provided on April 1, April 11,

13 and April 29, 2009.  According to the EOB, WellPoint reduced its reimbursement for

14 the treatment of A.M. because "[t]his is the amount in excess of the allowed expense

15 for a non-participating provider.  The Health Plan is not responsible for any amounts

16 in excess of this allowed expense."  After applying the patient's $53.56 coinsurance

17 amount for each service for a total deduction of $160.68, WellPoint reduced Dr.

18 Peck's $150 submitted charge for each date of service by $42.87.  WellPoint remitted

19 a total payment of $160.71 rather than $289.32.   WellPoint's statement and

20 reimbursement amount were fraudulent because WellPoint improperly and unlawfully

21 used the Ingenix Database to diminish the compensation to which Dr. Peck was

22 entitled.  Dr. Peck did not balance-bill patient A.M. for said services and thus has

23 suffered monetary damages.

24       After receiving the EOB from WellPoint on or around May 21, 2009, Dr. Peck

25 called Anthem Blue Cross challenged the $107.13 "allowed amount" as unreasonable

26 and below the UCR amount for the Los Angeles metropolitan area.  Anthem Blue

27 Cross advised Dr. Peck that the "allowable amount" was all he was entitled to be paid

28 as an out-of-network provider in that geographical area.  Dr. Peck also submitted a

Plaintiffs' RICO Case Statement

1  written dispute challenging the UCR determination, which was received by Anthem

2  Blue Cross on June 20, 2009.  On August 14, 2009, Anthem Blue Cross sent Dr. Peck

3  a letter denying his appeal, stating that Dr. Peck's claim "was appropriately paid based

4  upon the 'reasonable and customary' value of the services [he] rendered" and that the

5  "decision is final and all levels of [its] appeal process have been exhausted."

6       On May 13, 2009, and May 27, 2009, Dr. Peck provided covered medical

7  services to patient A.M.  After treating the patient, on or around June 2, 2009, Dr.

8  Peck transmitted a CMS 1500 form to WellPoint by electronic wire.  The CMS 1500

9  form indicated that the following services had been performed in treating the patient

10 on both dates: CPT Code 90806.  CPT Code 90806 indicates that the procedure

11 involved "individual psychotherapy, insight-oriented, behavior modifying and/or

12 supportive" lasting 45-50 minutes.  Dr. Peck's submitted charges to WellPoint for this

13 service was $150 per session for a total of $300.00.

14      On or around June 10, 2009, WellPoint sent through the U.S. Mail to Dr. Peck

15 an Explanation of Benefits ("EOB") for his services provided on May 13 and May 27,

16 2009.  According to the EOB, WellPoint reduced its reimbursement for the treatment

17 of A.M. because "[t]his is the amount in excess of the allowed expense for a non-

18 participating provider.  The Health Plan is not responsible for any amounts in excess

19 of this allowed expense."  After applying the patient's $53.56 coinsurance amount for

20 each service for a total deduction of $107.12, WellPoint reduced Dr. Peck's $150

21 submitted charge for each date of service by $42.87.  WellPoint remitted a total

22 payment of $107.14 rather than $192.88.  WellPoint's statement and reimbursement

23 amount were fraudulent because WellPoint improperly and unlawfully used the

24 Ingenix Database to diminish the compensation to which Dr. Peck was entitled.  Dr.

25 Peck did not balance-bill patient A.M. for said services and thus has suffered

26 monetary damages.

27      On June 13, 2009, and June 24, 2009, Dr. Peck provided covered medical

28 services to patient A.M.  After treating the patient, on or around July 6, 2009, Dr. Peck

Plaintiffs' RICO Case Statement

transmitted a CMS 1500 form to WellPoint by electronic wire.  The CMS 1500 form indicated that the following services had been performed in treating the patient on both dates: CPT Code 90806.  CPT Code 90806 indicates that the procedure involved "individual psychotherapy, insight-oriented, behavior modifying and/or supportive" lasting 45-50 minutes.  Dr. Peck's submitted charges to WellPoint for this service was $150 per session for a total of $300.00.

On or around July 14, 2009, WellPoint sent through the U.S. Mail to Dr. Peck an Explanation of Benefits ("EOB") for his services provided on June 13 and June 24, 2009.  According to the EOB, WellPoint reduced its reimbursement for the treatment of A.M. because "[t]his is the amount in excess of the allowed expense for a non-participating provider.  The Health Plan is not responsible for any amounts in excess of this allowed expense."  After applying the patient's $53.56 coinsurance amount for each service for a total deduction of $107.12, WellPoint reduced Dr. Peck's $150 submitted charge for each date of service by $42.87.  WellPoint remitted a total payment of $107.14 rather than $192.88.  WellPoint's statement and reimbursement amount were fraudulent because WellPoint improperly and unlawfully used the Ingenix Database to diminish the compensation to which Dr. Peck was entitled.  Dr. Peck did not balance-bill patient A.M. for said services and thus has suffered monetary damages.

On July 11, 2009, and July 25, 2009, Dr. Peck provided covered medical services to patient A.M.  After treating the patient, on or around August 8, 2009, Dr. Peck transmitted a CMS 1500 form to WellPoint by electronic wire.  The CMS 1500 form indicated that the following services had been performed in treating the patient on both dates: CPT Code 90806.  CPT Code 90806 indicates that the procedure involved "individual psychotherapy, insight-oriented, behavior modifying and/or supportive" lasting 45-50 minutes.  Dr. Peck's submitted charges to WellPoint for this service was $150 per session for a total of $300.00.

Plaintiffs' RICO Case Statement

On or around August 14, 2009, WellPoint sent through the U.S. Mail to Dr. Peck an Explanation of Benefits ("EOB") for his services provided on July 11 and July 25, 2009. According to the EOB, WellPoint reduced its reimbursement for the treatment of A.M. because "[t]his is the amount in excess of the allowed expense for a non-participating provider. The Health Plan is not responsible for any amounts in excess of this allowed expense." After applying the patient's $53.56 coinsurance amount for each service for a total deduction of $107.12, WellPoint reduced Dr. Peck's $150 submitted charge for each date of service by $42.87. WellPoint remitted a total payment of $107.14 rather than $192.88. WellPoint's statement and reimbursement amount were fraudulent because WellPoint improperly and unlawfully used the Ingenix Database to diminish the compensation to which Dr. Peck was entitled. Dr. Peck did not balance-bill patient A.M. for said services and thus has suffered monetary damages.

On August 15, 2009, and August 22, 2009, Dr. Peck provided covered medical services to patient A.M. After treating the patient, on or around September 14, 2009, Dr. Peck transmitted a CMS 1500 form to WellPoint by electronic wire. The CMS 1500 form indicated that the following services had been performed in treating the patient on both dates: CPT Code 90806. CPT Code 90806 indicates that the procedure involved "individual psychotherapy, insight-oriented, behavior modifying and/or supportive" lasting 45-50 minutes. Dr. Peck's submitted charges to WellPoint for this service was $150 per session for a total of $300.00.

On or around September 23, 2009, WellPoint sent through the U.S. Mail to Dr. Peck an Explanation of Benefits ("EOB") for his services provided on August 15, and August 22, 2009. According to the EOB, WellPoint reduced its reimbursement for the treatment of A.M. because "[t]his is the amount in excess of the allowed expense for a non-participating provider. The Health Plan is not responsible for any amounts in excess of this allowed expense." After applying the patient's $53.56 coinsurance amount for each service for a total deduction of $107.12, WellPoint reduced Dr.

Plaintiffs' RICO Case Statement

1   Peck's $150 submitted charge for each date of service by $42.87. WellPoint remitted

2   a total payment of $107.14 rather than $192.88. WellPoint's statement and

3   reimbursement amount were fraudulent because WellPoint improperly and unlawfully

4   used the Ingenix Database to diminish the compensation to which Dr. Peck was

5   entitled. Dr. Peck did not balance-bill patient A.M. for said services and thus has

6   suffered monetary damages.

7        On September 16, 2009, Dr. Peck provided covered medical services to patient

8   A.M. After treating the patient, on or around October 14, 2009, Dr. Peck transmitted

9   a CMS 1500 form to WellPoint by electronic wire. The CMS 1500 form indicated

10   that the following services had been performed in treating the patient on that date:

11   CPT Code 90806. CPT Code 90806 indicates that the procedure involved "individual

12   psychotherapy, insight-oriented, behavior modifying and/or supportive" lasting 45-50

13   minutes. Dr. Peck's submitted charges to WellPoint for this service was $150.00.

14        On or around October 22, 2009, WellPoint sent through the U.S. Mail to Dr.

15   Peck an Explanation of Benefits ("EOB") for his services provided on September 16,

16   2009. According to the EOB, WellPoint reduced its reimbursement for the treatment

17   of A.M. because "[t]his is the amount in excess of the allowed expense for a non-

18   participating provider. The Health Plan is not responsible for any amounts in excess

19   of this allowed expense." After applying the patient's $53.56 coinsurance amount,

20   WellPoint reduced Dr. Peck's $150 submitted charge by $42.87 and remitted payment

21   of $53.57. WellPoint's statement and reimbursement amount were fraudulent because

22   WellPoint improperly and unlawfully used the Ingenix Database to diminish the

23   compensation to which Dr. Peck was entitled. Dr. Peck did not balance-bill patient

24   A.M. for said services and thus has suffered monetary damages.

25      **North Peninsula Surgical Center, L.P.**

26        As detailed in the First Consolidated Amended Complaint, plaintiff North

27   Peninsula Surgical Center, L.P. ("NPSC") is a non-physician out-of-network health

28   care provider doing business as Torrance Outpatient Surgery Center. NPSC is a heath

care facility or ambulatory surgical center ("ASC") that specializes in providing surgery, pain management and diagnostic procedures on an outpatient basis.   In compliance with FRCP 9(b), allegations detailing Defendants' predicate acts of mail and wire fraud are contained in the First Consolidated Amended Complaint, which allege how the Provider Plaintiffs, including health care facilities such as NPSC, were underpaid by WellPoint.   As further detailed in the First Consolidated Amended Complaint, WellPoint sent various fraudulent documents to Provider Plaintiffs, including health care facilities such as NPSC, by wire or mail including, but not limited to preauthorizations, EOBs, remittance advices, responses to appeals, and others.

WellPoint routinely and deliberately reimbursed NPSC's claims at below UCR levels, requiring NPSC to exhaust significant amounts of time, effort and cost to identify and then appeal improperly reimbursed claims.   At all relevant times, and in furtherance of the Enterprise, WellPoint committed predicate acts of racketeering activity including mail fraud and wire fraud.   Specific predicate acts of racketeering activity committed by WellPoint in connection with NPSC include, but are not limited to, the following.

On August 7, 2008, certain covered surgical procedures were provided to patient R.C. at NPSC.   On August 6, 2008, NPSC verified the benefits available to patient R.C.   Following the August 7, 2008 procedure, NPSC transmitted to WellPoint a complete and clean CMS form submitting facilities charges including the appropriate CPT codes.   The total submitted charges were $4,810.

On or about October 6, 2008, WellPoint sent through the U.S. Mail to NPSC an EOB for services provided on August 7, 2008.   WellPoint reduced NPSC's submitted charges by $391.00.   WellPoint reduced reimbursement for treatment of said patient for the stated reason that "[t]his is the amount which reflects services that are not a benefit of your program, amounts over the usual and customary charge billed by a non-participating provider, and/or amounts in excess of the benefit maximum."

Plaintiffs' RICO Case Statement

WellPoint's reimbursement and/or any stated reason for the reduction was fraudulent, false and/or improper because WellPoint wrongfully used the Ingenix or substantially similar database to diminish the compensation to which NPSC was entitled. NPSC did not balance bill patient R.C. for said facilities fees and thus has suffered monetary damages.

On December 19, 2007, certain covered surgical procedures were provided to patient E.W. at NPSC. On December 3, 2007, NPSC verified the benefits available to patient E.W. Following the December 19, 2007 procedure, NPSC transmitted to WellPoint a complete and clean CMS form submitting facilities charges including the appropriate CPT codes. The total submitted charges were $9,872.50.

On or about January 31, 2008, WellPoint sent through the U.S. Mail to NPSC an EOB for services provided on December 19, 2007. WellPoint reduced NPSC's submitted charges by $3,834.48. WellPoint reduced reimbursement for treatment of said patient for the stated reason that "[n]on-covered charge(s)." WellPoint's reimbursement and/or any stated reason for the reduction was fraudulent, false and/or improper because WellPoint wrongfully used the Ingenix or substantially similar database to diminish the compensation to which NPSC was entitled. NPSC did not balance bill patient E.W. for said facilities fees and thus has suffered monetary damages.

On February 8, 2008, certain covered surgical procedures were provided to patient A.P. at NPSC. On January 14, 2008, NPSC verified the benefits available to patient A.P. Following the February 8, 2008 procedure, NPSC transmitted to WellPoint a complete and clean CMS form submitting facilities charges including the appropriate CPT codes. The total submitted charges were $9,872.50.

On or about February 29, 2008, WellPoint sent through the U.S. Mail to NPSC a "Provider Voucher" for services provided on February 8, 2008. WellPoint reduced NPSC's submitted charges by $1,260.03. WellPoint reduced reimbursement for treatment of said patient for the stated reason that "The patient's total responsibility

Plaintiffs' RICO Case Statement

1  for this claim is $2,373.90." WellPoint's reimbursement and/or any stated reason for

2  the reduction was fraudulent, false and/or improper because WellPoint wrongfully

3  used the Ingenix or substantially similar database to diminish the compensation to

4  which NPSC was entitled.  NPSC did not balance bill patient A.P. for said facilities

5  fees and thus has suffered monetary damages.

6    On February 8, 2008, certain covered surgical procedures were provided to

7  patient F.T. at NPSC.  On January 23, 2008, NPSC verified the benefits available to

8  patient F.T.   Following the February 8, 2008 procedure, NPSC transmitted to

9  WellPoint a complete and clean CMS form submitting facilities charges including the

10  appropriate CPT codes.  The total submitted charges were $19,745.00.

11    On or about March 7, 2008, WellPoint sent through the U.S. Mail to NPSC a

12  "Provider Voucher" for services provided on February 8, 2008.  WellPoint reduced

13  NPSC's submitted charges by $10,349.58.  WellPoint reduced reimbursement for

14  treatment of said patient for the stated reason that "This service is not a benefit of the

15  subscriber's health plan" and "The patient's total responsibility for this claim is

16  $10,949.39." WellPoint's reimbursement and/or any stated reason for the reduction

17  was fraudulent, false and/or improper because WellPoint wrongfully used the Ingenix

18  or substantially similar database to diminish the compensation to which NPSC was

19  entitled.  NPSC did not balance bill patient F.T. for said facilities fees and thus has

20  suffered monetary damages.

21    On February 21, 2008, certain covered surgical procedures were provided to

22  patient A.A. at NPSC.  On February 19, 2008, NPSC verified the benefits available to

23  patient A.A.  Following the February 21, 2008 procedure, NPSC transmitted to

24  WellPoint a complete and clean CMS form submitting facilities charges including the

25  appropriate CPT codes.  The total submitted charges were $4,372.50.

26    On or about March 17, 2008, WellPoint sent through the U.S. Mail to NPSC an

27  EOB for services provided on February 21, 2008.  WellPoint reduced NPSC's

28  submitted charges by $1,279.28. WellPoint reduced reimbursement for treatment of

Plaintiffs' RICO Case Statement

said patient for the stated reason that "[n]on-covered charge(s)"   WellPoint's reimbursement and/or any stated reason for the reduction was fraudulent, false and/or improper because WellPoint wrongfully used the Ingenix or substantially similar database to diminish the compensation to which NPSC was entitled.   NPSC did not balance bill patient A.A. for said facilities fees and thus has suffered monetary damages.

**RICO 664 PREDICATE ACTS**

In Count VIII, Plaintiffs allege that WellPoint, United and Ingenix also engaged in predicate act violations of 18 U.S.C. § 664 that constitute "racketeering activity" and are separate violations of §1962(c):

Section 1961(1)(B) of RICO specifically identifies as a predicate act "any act which is indictable under . . . [§] 664 (relating to embezzlement from pension and welfare funds)" as a predicate act. 18 U.S.C. §1961(l)(B).  Section 664 of Title 18 provides:

**Theft or embezzlement from employee benefit plan** Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

Each of the WellPoint healthcare plans which is an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. §1002(1)(A), and otherwise is subject to "any provision" of Section 3 of ERISA is included in this Count.

Each of the WellPoint healthcare plans that are subject to ERISA or are a non-ERISA plan funded by insurance coverage WellPoint provides or administers, are subject to Section 664 of Title 18.  The applicable plan documents expressly state that all benefits due under the plan terms will be paid and that the underlying benefits they expressly guarantee are plan assets.

The governing plan documents warrant that all benefits due under the plans will be paid.  By improperly reducing payments on out-of-network

Plaintiffs' RICO Case Statement

claims, WellPoint intentionally caused Plaintiffs and the members of the ERISA Subscriber and Provider Subclasses to be underpaid guaranteed benefits to which they were otherwise entitled in accordance with the terms of their group health plans.

For fully insured healthcare plans, in which WellPoint both administered the plans and paid the benefits from their own assets, Defendants benefited from the conversion of assets from their ERISA plans. Whereas these assets should have been held by WellPoint in its fiduciary capacities under ERISA and non-ERISA plans and paid to its members, WellPoint improperly withheld such funds and maintained them as part of its own assets for its own benefit. For self-funded healthcare plans, WellPoint made final appeal decisions and intentionally caused underpayment of benefits to Plaintiffs and the ERISA Subscriber and Provider Subclasses in order to justify receipt of administrative fees.

The pattern of racketeering activity described above was undertaken by and through the Enterprise described above. The use of the Enterprise was necessary for the underpayment scheme and these predicate acts to be successfully undertaken. Defendants controlled and directed the affairs of the Enterprise as described above.

Defendants acted with specific intent to deprive Plaintiffs and ERISA Subscriber and Provider Subclasses of guaranteed benefits, and were sufficiently aware of the facts to know that they were acting unlawfully and contrary to the trust placed in them and the plan sponsors whose plans they were administering.

Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended member, for WellPoint's direct or indirect benefit. These intentional underpayments numbered in the millions and continuous through the various class periods continuing to the present.

As set forth in this Complaint, Defendants concocted multiple and multi-faceted underpayment schemes, including use of the Ingenix Database, to make improperly reduced payments for ONS.

As named fiduciaries and claims administrators of the WellPoint healthcare plans, WellPoint occupied and occupies a position of trust and

Plaintiffs' RICO Case Statement

it had, and has, a special relationship with Plaintiffs and the ERISA Subscribers and Provider Subclasses.

The above-described acts of conversion of employee benefit plan funds, and mail and wire fraud, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the under payment scheme, and are continuous because they occurred over a significant period of years, and constitute the usual practice of WellPoint such that they amount to and pose a threat of continued racketeering activity.

The purpose of WellPoint's scheme was to underpay the guaranteed benefits to the Subscriber Plaintiffs and the ERISA Subscriber Subclass, as well as those which were assigned to the Provider Plaintiffs and the ERISA Provider Subclass, and convert those withheld funds for its own direct or indirect financial gain.  WellPoint created an appearance of regularity and legitimacy by providing false and incomplete information to Plaintiffs and ERISA Subclass members, in order to increase revenue through its plan and claims administration business.

The direct and intended victims of the pattern of racketeering activity described previously herein are Plaintiffs and ERISA Provider and Subscriber Subclasses, who Defendants deprived of the complete guaranteed benefits to which they are entitled for ONS.

Defendants' RICO violations injured Plaintiffs and the ERISA Subscriber and Provider Subclasses in their business and property by depriving them of hundreds of millions of dollars in guaranteed benefits on their claims for reimbursement of out-of-network charges, as well as the knowledge necessary to challenge false and manipulative UCR determinations, and their injuries were proximately caused by the violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of WellPoint's RICO violations (and commission of underlying predicate acts), and but for their RICO violations (and commission of underlying predicate acts), ERISA Plaintiffs, Association Plaintiffs and ERISA Subclass members would not have suffered the injuries suffered by them.

Amended Complaint ¶¶ 414-427.

Plaintiffs' RICO Case Statement

1    To the extent that the dates of, participants in and description of facts

2    surrounding the above-referenced predicate acts of "racketeering activity" are known

3    to Plaintiffs, the specifics are alleged in the above-referenced paragraphs of the

4    Amended Complaint.

5    **d.    Criminal Conviction**

6    Plaintiffs are not aware of any criminal convictions in federal or state court

7    arising out of Defendants' underpayment scheme and/or its commission of the above-

8    referenced RICO predicate acts.  However, as described in the Amended Complaint

9    (¶¶ 266-274), WellPoint has settled with the New York Attorney General ("NYAG")

10   claims stemming from an investigation of its use of the Ingenix Database for paying

11   ONET claims, as has United.  Indeed, the use of Ingenix is so widespread that many

12   insurers, including Aetna and CIGNA settled similar claims with the NYAG in what

13   has become an historic effort to overhaul the nation's out-of-network healthcare

14   reimbursement system.  Specifically, on February 18, 2009, the NYAG announced a

15   settlement with WellPoint, Inc. for $10 million; after having earlier announced

16   settlements on January 13, 2009 with UHG for $50 million; on January 15, 2009, with

17   Aetna for $20 million; on February 4, 2009, with MVP Health Care, Inc. for

18   $535,000; on February 10, 2009, with Independent Health for $475,000 and

19   HealthNow New York, Inc. for $212,500; and on February 17, 2009, with CIGNA for

20   $10 million; on February 18, 2009 with WellPoint, Inc. for $10 million; on March 3,

21   2009, with Guardian Life Insurance Company of America for $500,000; and on March

22   5, 2009 with Excellus Health Plan for $775,000; and Capital District's Physician

23   Health Plan for $300,000.  Amended Complaint ¶¶ 136-145.

24   In addition, the United States Congress is actively investigating the use of the

25   Ingenix Database in setting UCR amounts.  In March 2009, the Senate Committee on

26   Commerce, Science, and Transportation held full committee hearings on "Deceptive

27   Health Insurance Industry Practices – Are Consumers Getting What They Paid For?"

28   Amended Complaint ¶¶ 146-149.

e.     **Civil Litigation**

As this Court is aware, related civil litigation involving the Ingenix Databases is pending in the Southern District of New York and the District of New Jersey.

f.     **Pattern of Racketeering Activity**

As set forth in the Amended Complaint and this RICO Case Statement, the predicate acts alleged above evidence a recurring, systematic means by which WellPoint diminishes payments to physicians and reimbursements to subscribers. Defendants have engaged in a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5), by committing, conspiring and aiding and abetting in the commission of at least two acts of racketeering activity – indictable violations of 18 U.S.C. §§ 664, 1341, and/or 1343.  In Counts VII and VIII, Plaintiffs allege that Defendants' above-referenced predicate acts constitute a "pattern of racketeering activity":

> Each such use of the U.S. mail and interstate wire facilities in furtherance of the scheme alleged in this Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity."
>
> The above-described pattern of racketeering activity is related because it involves the same fraudulent scheme, enterprise, common persons, common out-of-network claim practices, common results impacting upon common victims, and is continuous because it occurred over several years, and constitutes the usual practice of WellPoint and each of Enterprise, such that it amounts to and poses a threat of continued racketeering activity.  WellPoint's scheme to defraud Plaintiffs and the Classes is open-ended and on-going.
>
> Each such use of the U.S. mail and interstate wire facilities alleged in this Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity."
>
> The above-described pattern of racketeering activity is related because it involves common persons (namely, Plaintiffs and the Subscriber and Provider Classes), common out-of-network claim practices, common results impacting upon common victims, and is continuous because it

Plaintiffs' RICO Case Statement

occurred over several years, and constitutes the usual practice of the Enterprise, such that it amounts to and poses a threat of continued racketeering activity. Defendants' scheme to defraud Plaintiffs and class members is open-ended and on-going.

The above-described acts of conversion of employee benefit plan funds, and mail and wire fraud, are related because they each involved common participants, common methodologies, common results impacting upon common victims and a common purpose of executing the under payment scheme, and are continuous because they occurred over a significant period of years, and constitute the usual practice of WellPoint such that they amount to and pose a threat of continued racketeering activity.

Amended Complaint, ¶¶ 302-303, 408-409, 424. WellPoint, United and Ingenix (members of the WellPoint-Ingenix Enterprise) have continually committed countless related predicate acts, and the commission of those related predicate acts continues to the present.

### g.   **Common Plan**

The Amended Complaint alleges that all the predicate acts were part of common plan and fraudulent scheme – the underpayment scheme – undertaken with the common purpose "of reducing the price paid for ONS, and increasing the profits of the Enterprise participants and the Insurer Conspirators." Amended Complaint ¶ 283.

Counts VII and VIII allege that Defendants engaged in a "pattern of racketeering activity" during the Class Period undertaken as part of the common fraudulent scheme. *See* Answers to Question 5(f) above.

**QUESTION NO. 6:**

**State whether the existence of an "enterprise" is alleged within the meaning of 18 U.S.C. § 1961(4). If so, for each such enterprise, provide the following information:**

Plaintiffs' RICO Case Statement

1     **(a)**    **State the names of the individuals, partnerships, corporations,**

2    **associations or other legal entities, which allegedly constitute the enterprise;**

3     **(b)**    **Describe the structure, purpose, function and course of conduct of**

4    **the enterprise;**

5     **(c)**    **State whether any defendants are employees, officers or directors of**

6    **the alleged enterprise;**

7     **(d)**    **State whether any defendants are associated with the alleged**

8    **enterprise;**

9     **(e)**    **State whether you are alleging that the defendants are individuals or**

10    **entities separate from the alleged enterprise, or that the defendants are the**

11    **enterprise itself, or members of the enterprise; and**

12     **(f)**    **If any defendants are alleged to be the enterprise itself, or members**

13    **of the enterprise, explain whether such defendants are perpetrators, passive**

14    **instruments, or victims of the alleged racketeering activity.**

15    **RESPONSE TO QUESTION NO. 6:**

16     **a-b.**  **<u>Constituency, Structure, Function and Course of Conduct of</u>**

17    **<u>WellPoint-Ingenix Enterprise</u>**

18    The WellPoint-Ingenix Enterprise is an "enterprise" as defined in § 1961(4) of

19    RICO.  Amended Complaint ¶¶ 277, 401.  The constituency, structure, function and

20    course of conduct of the WellPoint-Ingenix Enterprise are described in the Amended

21    Complaint as follows:

22       At all relevant times, and as described in this Complaint, Defendants
carried out their underpayment scheme to defraud Plaintiffs, the Provider

23       and Subscriber Classes, in connection with the conduct of an

24       "enterprise," within the meaning of 18 U.S.C. §1961(4).

25       Plaintiffs allege that the Defendants' fraudulent scheme was conducted

26       through an association in fact enterprise comprised of WellPoint,

27       UnitedHealth and Ingenix (the "WellPoint-Ingenix Enterprise" or the
"Enterprise").

28

    Plaintiffs' RICO Case Statement

The WellPoint-Ingenix Enterprise was formed in 1998, at the time of the sale of the PHCS database by HIAA to Ingenix.

Through the Enterprise described above, Defendants undertook a fraudulent scheme to underpay Subscribers and Providers for the ONS provided to WellPoint subscribers.    Through the fraudulent underpayment scheme, WellPoint, UnitedHealth and others agreed to utilize the flawed Ingenix Database for their UCR determinations in an effort to depress the prices paid for ONS by the conspiring healthcare companies.  WellPoint and UnitedHealth knowingly participated in the formation and maintenance of, purchased and utilized the Ingenix Database with the express purpose of depressing their ONS payments and in fact supplied "scrubbed" and otherwise flawed and incomplete data to Ingenix with the purpose of lowering payments for ONS. Defendants agreed to conceal the flaws in the Ingenix data as well as the scheme to depress ONS payments achieved by use of the Ingenix Database for UCR determinations.   In furtherance of the scheme, WellPoint engaged in thousands, if not millions, of acts of mail and wire fraud.

WellPoint, UnitedHealth and Ingenix were all participants in the Enterprise.

At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. §1962(c).

The WellPoint-Ingenix Enterprise was at all relevant times a continuing unit involving WellPoint, UnitedHealth and Ingenix functioning with a common purpose of reducing the price paid for ONS, and increasing the profits of the Enterprise participants and the Insurer Conspirators.  The Enterprise described above was utilized to create a mechanism or vehicle by which Defendants could reduce payments to Plaintiffs and the Classes for ONS through the use of flawed and invalid data that could not be challenged effectively.  In particular, as described herein, the Enterprise was used to create and administer what appeared to be an appropriate and unassailable database which reported actual charge data; the Ingenix Database was designed to appear valid as a basis for UCR when, in fact, it is and was, invalid.

Plaintiffs' RICO Case Statement

Throughout the Class Period, WellPoint, UnitedHealth and Ingenix remained members of the Enterprise, undertaking countless and nearly constant acts of mail and wire fraud for their common purpose reducing the price paid for ONS.

The Enterprise had and continues to have an ascertainable structure and function separate and apart from the pattern of racketeering activity in which it has engaged.  Decision making within the Enterprise with regard to the inclusion of data within the Ingenix Database that would reduce ONS payments was consensual.  The members of the Enterprise functioned as a continuous unit, and performed roles consistent with this structure.  WellPoint, UnitedHealth and Ingenix, and the Enterprise, performed certain legitimate and lawful activities that are not being challenged in this Complaint, including the provision of health insurance and plan and claims administration services by WellPoint, UnitedHealth and Ingenix, which was done for many claims lawfully and without resort to unlawful practices.  Ingenix also legally administers and sells a number of other products which are legitimate and not related to the claims described in this complaint.  However, the collection and dissemination of health insurance information by Ingenix was not legitimate when it involved the creation, use and dissemination of invalid data for use in making UCR determinations.  Aside from legitimate activities carried out by the members of the Enterprise, its members used the Enterprise's structure to carry out the fraudulent scheme and unlawful activities alleged in this Complaint including, but not limited to, intentional underpayment of benefits to Subscriber Plaintiffs and the Subscribers Class and Provider Plaintiffs and the Provider Class resulting from Defendants' use of flawed and invalid data for UCR determinations.

Through its role in the Enterprise and the scheme, Ingenix benefited directly by enhancing its ability to earn licensing fees through the sale of the Ingenix Database, including other databases which used WellPoint and UnitedHealth data.  WellPoint and UnitedHealth benefited by reducing the amount they paid to Providers or reimbursed to Subscribers for their ONS through the use of the Ingenix Database to price UCR.

In furtherance of the fraudulent scheme, Ingenix provided extensive "litigation support," including vouching for data used to price UCR by its data users.  Ingenix employed staff to assist data users, including testifying in court, testifying in depositions, supplying documentation and otherwise bolstering the users' use of Ingenix data to price UCR.

Plaintiffs' RICO Case Statement

WellPoint and UnitedHealth provided data to Ingenix which they knew would be edited by Ingenix in a manner which precluded its use for UCR.

Ingenix not only knowingly sought and accepted WellPoint's and the Insurer Conspirators' incomplete data, but it continued to provide a significant discount to them as well.  Ingenix also failed to conduct any audits or reviews of the data it received from data contributors, including WellPoint.  These actions were taken in furtherance of Ingenix's effort to understate UCR amounts for the benefit of the WellPoint-Ingenix Enterprise.

During the Class Period, Defendants participated in the conduct of the Enterprise in order to shift the costs of medical treatment to their Subscribers and Providers and therefore to Plaintiffs and the Classes, to reduce UCR payments and to create an appearance of legitimacy for their out-of-network benefit reductions.  Using U.S. mail and interstate wire facilities, Defendants provided false and misleading information to the Plaintiffs and the Classes to convert those withheld funds for the Enterprise's own direct and indirect financial gain, and to discourage their Members from using out-of-network healthcare providers.  Likewise, through its role in the Enterprise, WellPoint exercised decision-making authority with regard to which data was ultimately used in the Ingenix Database.  WellPoint also selected and intentionally provided false and misleading data to Ingenix itself for use in the Ingenix Database.

The Enterprise benefited from the pattern of racketeering activity through the reduction of UCR costs by WellPoint and other users of the Ingenix Database, which would not have been obtained absent entry into the Enterprise and was, in addition to the conduct of WellPoint alleged above, the shared goal of the Enterprise for which its Members functioned as a continuous unit.

WellPoint further used the Enterprise to facilitate its goal of reducing out-of-network benefits paid to Plaintiffs and the Classes by submitting incomplete and inadequate data to Ingenix, thereby artificially reducing the numbers that would be reported in the final Ingenix Database and which WellPoint relied upon to make UCR determinations.  As part of this fraudulent scheme, as alleged herein, WellPoint intentionally submitted, *via* U.S. mail and interstate wire facilities, data which it knew

Plaintiffs' RICO Case Statement

would be used to create false databases used to price UCR for its Members and members of other healthcare plans. Ingenix was aware of the inadequacy of data contributed by data contributors such as WellPoint, but allowed it to occur, since it was consistent with the Enterprise's purpose of reducing the cost of out-of-network healthcare services.

Amended Complaint ¶¶ 278-291; s*ee also* Counts VII and VIII.

### c.      Defendant as Employee, Officer, or Director of Enterprise

Defendants are neither employees, officers, or directors of the WellPoint-Ingenix Enterprise; rather, WellPoint, United and Ingenix are members of that association-in-fact enterprise.

### d.      Defendant as Associated with the Enterprise

As alleged in the Amended Complaint, WellPoint, United and Ingenix are associated with the WellPoint-Ingenix Enterprise and each of them participate in, and control, the affairs of the Enterprise. WellPoint's control of and participation in the Enterprise is necessary for the successful operation of WellPoint's fraudulent reimbursement scheme. Although WellPoint, United and Ingenix participate in the Enterprise and are a part of it, each of them also has an existence separate and distinct from the Enterprise.

### e.      Relationship Between Defendant and Enterprise

As alleged in the Amended Complaint, WellPoint, United and Ingenix are the members of the WellPoint-Ingenix Enterprise.

### f.      Perpetrators, Passive Instruments, or Victims of Racketeering Activity

As alleged in the Amended Complaint, WellPoint, United and Ingenix are members of the WellPoint-Ingenix Enterprise and are alleged to be perpetrators of racketeering activity.

Plaintiffs' RICO Case Statement

**QUESTION NO. 7:**

**State and describe in detail whether you are alleging that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

**RESPONSE TO QUESTION NO. 7:**

As alleged in the Amended Complaint, in accordance with *Boyle v. United States*, 129 S. Ct. 2237 (2009), and *United States v. Turkette,* 452 U.S. 576, 583 (1981), and as set forth herein, the WellPoint-Ingenix Enterprise is an association in fact that has an ascertainable structure separate and apart from the pattern or racketeering activity in which WellPoint and Ingenix engage.

**QUESTION NO. 8:**

**Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity.  Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.**

**RESPONSE TO QUESTION NO. 8:**

Plaintiffs' allegations as to how Defendants' "pattern of racketeering activity" is distinct from the usual and daily activities of the WellPoint-Ingenix Enterprise and its members are contained in ¶¶ 285, which are quoted in the Response to Question No. 6(a)-(b).

The pattern of racketeering activity differs from the legitimate activities of the WellPoint-Ingenix Enterprise.  WellPoint, UnitedHealth and Ingenix, and the Enterprise, performed certain legitimate and lawful activities that are not being challenged in this Amended Complaint, including the provision of health insurance and plan and claims administration services for many claims lawfully and without resort to unlawful practices.  Ingenix also legally administers and sells a number of other products which are legitimate and not related to the claims described in this complaint.  However, the collection and dissemination of health insurance information

Plaintiffs' RICO Case Statement

1  by Ingenix was not legitimate when it involved the creation, use and dissemination of

2  invalid data for use in making UCR determinations.

3  **QUESTION NO. 9:**

4        **Describe what benefits, if any, the alleged enterprise receives from the**

5  **alleged pattern of racketeering activity.**

6  **RESPONSE TO QUESTION NO. 9:**

7        The benefits received by WellPoint, United and Ingenix – the members of the

8  WellPoint-Ingenix Enterprise – are described in the Amended Complaint as follows:

9        Through its role in the Enterprise and the scheme, Ingenix benefited

10  directly by enhancing its ability to earn licensing fees through the sale of
the Ingenix Database, including other databases which used WellPoint

11  and UnitedHealth data.  WellPoint and UnitedHealth benefited by
reducing the amount they paid to Providers or reimbursed to Subscribers

12  for their ONS through the use of the Ingenix Database to price UCR.

13

14        During the Class Period, Defendants participated in the conduct of the
Enterprise in order to shift the costs of medical treatment to their

15  Subscribers and Providers and therefore to Plaintiffs and the Classes, to
reduce UCR payments and to create an appearance of legitimacy for

16  their out-of-network benefit reductions.  Using U.S. mail and interstate

17  wire facilities, Defendants provided false and misleading information to
the Plaintiffs and the Classes to convert those withheld funds for the

18  Enterprise's own direct and indirect financial gain, and to discourage

19  their Members from using out-of-network healthcare providers.
Likewise, through its role in the Enterprise, WellPoint exercised

20  decision-making authority with regard to which data was ultimately used

21  in the Ingenix Database.  WellPoint also selected and intentionally
provided false and misleading data to Ingenix itself for use in the Ingenix

22  Database.

23

24        The Enterprise benefited from the pattern of racketeering activity
through the reduction of UCR costs by WellPoint and other users of the

25  Ingenix Database, which would not have been obtained absent entry into

26  the Enterprise and was, in addition to the conduct of WellPoint alleged
above, the shared goal of the Enterprise for which its Members

27  functioned as a continuous unit.

28

Plaintiffs' RICO Case Statement

WellPoint further used the Enterprise to facilitate its goal of reducing out-of-network benefits paid to Plaintiffs and the Classes by submitting incomplete and inadequate data to Ingenix, thereby artificially reducing the numbers that would be reported in the final Ingenix Database and which WellPoint relied upon to make UCR determinations. As part of this fraudulent scheme, as alleged herein, WellPoint intentionally submitted, *via* U.S. mail and interstate wire facilities, data which it knew would be used to create false databases used to price UCR for its Members and members of other healthcare plans. Ingenix was aware of the inadequacy of data contributed by data contributors such as WellPoint, but allowed it to occur, since it was consistent with the Enterprise's purpose of reducing the cost of out-of-network healthcare services.

WellPoint's and UnitedHealth's submission of data to Ingenix benefited Ingenix, and users of the Ingenix Database. The inclusion of WellPoint's and UnitedHealth's data was critical to both the appearance of legitimacy of the Ingenix PHCS database, and the usefulness of that data for depressing the price paid for ONS. Further, WellPoint and UnitedHealth knew the data they contributed to Ingenix was flawed and incomplete and its use by the Enterprise and Ingenix would depress the price of ONS for all the Insurer Conspirators. WellPoint and UnitedHealth participated and conducted the affairs of the Enterprise not only by submitting false and incomplete data to Ingenix, but by being involved in decision making regarding the database and by utilizing the flawed data for illicit purpose of determining UCR.

If WellPoint had not participated in the conduct of the Enterprise by participating in the decision making regarding the database, by submitting flawed data to Ingenix, and by using the Ingenix Database, it would not have been able to obtain the benefits it did from the Enterprise. Ingenix needed sufficient data to allow it to represent to its customers that the Ingenix Database was the largest available and had sufficient numbers to remove any doubt as to their validity. WellPoint knew such representations were being made by Ingenix and used Ingenix's representations for the identical purpose of removing doubt as to their validity. Ingenix needed the data to provide databases to its users to save them money on ONS claims. Without data from WellPoint, UnitedHealth and other large data contributors, the Ingenix Database could not have been successfully marketed as the "industry standard" for UCR pricing. Similarly, WellPoint and UnitedHealth could not have

Plaintiffs' RICO Case Statement

saved the millions of dollars they did if they had not used the Ingenix Database for making UCR determinations even though they knew that they were flawed and invalid.  By using the Ingenix Database for making UCR determinations, misrepresenting them, through use of the U.S. mail and interstate wire facilities, as providing a valid and unassailable basis for such decisions, and deterring its subscribers as well as members of the Provider Class from challenging or otherwise raising questions over how it set UCR, WellPoint was able to benefit substantially from its role in assisting the control and direction of the Enterprise, along with Ingenix.

Each of the members of the Enterprise benefitted from its successful operation.  Ingenix benefited directly by enhancing its ability to earn licensing fees through the sale of the Ingenix Database.  As the parent company of Ingenix, UnitedHealth benefited from the Ingenix fees as well as by reducing the amount it paid for ONS reimbursements, incentivizing subscribers to see in-network providers and reducing competition.  WellPoint benefitted from reduced competition and because it also reduced the amount it was required to pay for ONS reimbursements and incentivized its subscribers to see providers in their respective networks.  Thus, members of the Enterprise benefitted from the pattern of racketeering activity at the expense of the Subscriber and Provider Plaintiffs and Classes.  Absent participation in the Enterprise, the members of the WellPoint-Ingenix Enterprise would not have so benefited.

For fully insured healthcare plans, in which WellPoint both administered the plans and paid the benefits from its own assets, WellPoint benefited from the conversion of assets from its ERISA plans.  Whereas these assets should have been held by WellPoint in its fiduciary capacity under ERISA plans and paid to its Members, WellPoint improperly withheld such funds and maintained them as part of its own assets for WellPoint's own benefit.  For self-funded healthcare plans, WellPoint made final appeal decisions and intentionally caused underpayment of benefits to Plaintiffs and the ERISA Subclasses in order to justify its receipt of administrative fees.

Amended Complaint ¶¶ 286, 289-94, 310, 418.

Plaintiffs' RICO Case Statement

**QUESTION NO. 10:**

  **Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

**RESPONSE TO QUESTION NO. 10:**

  Paragraphs 282 and 402 of the Amended Complaint allege that, at all relevant times, "the WellPoint-Ingenix Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO."  The activities of the WellPoint-Ingenix Enterprise are national in scope.  One of the purposes of the fraudulent underpayment scheme was to allow WellPoint to compete in all markets, even those where its network did not extend.  The WellPoint-Ingenix Enterprise has a substantial impact upon the economy and upon interstate commerce.  As alleged in the Amended Complaint, WellPoint, United and Ingenix also use the mail and other facilities of interstate commerce.

**QUESTION NO. 11:**

  **If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

  **a. State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**

  **b. Describe the use or investment of such income.**

**RESPONSE TO QUESTION NO. 11:**

  The Amended Complaint does not allege a violation of 18 U.S.C. § 1962(a).

**QUESTION NO. 12:**

  **If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

**RESPONSE TO QUESTION NO. 12:**

  The Amended Complaint does not allege a violation of 18 U.S.C. § 1962(b).

   Plaintiffs' RICO Case Statement

**QUESTION NO. 13:**

   **If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

   **a.     State who is employed by or associated with the enterprise; and**

   **b.     State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

   **c.     Describe specifically how the defendant(s) participated in the operation or management of the enterprise.**

**RESPONSE TO QUESTION NO. 13:**

   **a.     <u>Employed by or Associated with Enterprises</u>:**

   Plaintiffs allege that WellPoint, United and Ingenix are associated with the WellPoint-Ingenix Enterprise.

   **b.     <u>"Person"/"Enterprise" Distinction</u>**

   Defendant WellPoint, which is identified as a liable RICO "person" in Counts VII, VIII, and IX of the Amended Complaint, is not the same as the WellPoint-Ingenix Enterprise; rather, WellPoint is a member of the WellPoint-Ingenix Enterprise.  Likewise, Ingenix is a "person" within the meaning of RICO, and is separate and distinct from the WellPoint-Ingenix Enterprise itself.  Finally, United is a "person" within the meaning of RICO, and is separate and distinct from the WellPoint-Ingenix Enterprise itself.

   **c.     <u>Operation or Management of Enterprise</u>**

   Plaintiffs allege that WellPoint, United and Ingenix each participated in the operation or management of the WellPoint-Ingenix Enterprise by controlling and manipulating the Ingenix Databases and the underlying data submitted to the databases.  Indeed, the Ingenix Database itself relied on WellPoint and United's submission of data (and flawed data) to achieve its purposes of creating artificially low UCR reimbursement figures.  *See* ¶¶ 289, 291-93; *see also* Responses to Question Nos. 2, 3, 5 and 6; *Am. Med. Ass'n*, 2006 WL 3833440, at *13-14.

**QUESTION NO. 14:**

      **If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.**

**RESPONSE TO QUESTION NO. 14:**

      1.    The conspiracy is specifically alleged (in addition to being alleged throughout the Amended Complaint) in detail in the Amended Complaint (*see, e.g.*, ¶¶ 98-155), and, in particular, in Count IX thereof.  Beginning at least as early as January 1, 1999, the exact date being unknown to Plaintiffs and the Classes, and continuing thereafter, Defendants entered into an agreement and/or otherwise engaged in a continuing conspiracy to defraud the Plaintiffs and the Classes by causing Plaintiffs and the Classes to pay more for ONS than they otherwise would have in the absence of Defendants' conspiracy.  The Amended Complaint also alleges:

> The roots of the Ingenix Database lie in the PHCS database formerly owned and operated by HIAA.

> From 1973 to the present, those HIAA/AHIP members included, and continue to include, virtually every major health insurer in the United States.  At the time of drafting this complaint, the Board of Directors of AHIP includes executives of Defendants and the Conspirators, including, but not limited to, the President and CEO of WellPoint and at least two executive vice presidents at UnitedHealth.

> Upon its inception in 1973, various committees within HIAA, composed of HIAA members, developed and managed the PHCS database making decisions concerning the operation and design of the database.  HIAA initially created the PHCS as a way to aggregate and compile physician charge data as a service to its members.  HIAA compiled information from its vast pool of member-insurers to create the PHCS, which initially pertained to surgical and anesthesia procedures, but within five years began to include dental, medical and drug/medical equipment rates.

> Once created, the PHCS became the largest pool of charge data for medical services in the country and was considered to be the nation's

Plaintiffs' RICO Case Statement

largest database of provider charges for private healthcare services – *i.e.*, the rates charged by physicians and other private healthcare providers. It contained data from more than 150 contributors from 50 states, the District of Columbia, Puerto Rico and the Virgin Islands. The information HIAA compiled (collected from its member-insurers), however, consisted of only four data points:  the date of service, the Current Procedure Terminology ("CPT") code, the amount of the billed charge, and the geo-zip. CPT codes are a system by which the Plaintiff American Medical Association categorizes all medical services by five-digit codes. "Geo-zips" are portions of states comprised of cities and towns sharing three digits of postal zip codes, which Ingenix grouped together because of geographic proximity and what it arbitrarily decided were "data similarities."

The four data points were the only information that HIAA sought from its members to create the PHCS. HIAA (*via* its committees and Board of Directors) consciously decided to limit the amount of information it received from contributors to create the PHCS. In its own documents, HIAA stated that the data was limited and that even the quality of the data was "questionable." Once HIAA obtained the "questionable" data, it compiled the various submissions and created the PHCS which it then submitted to its members as a service. HIAA expressly informed insurers the PHCS was not intended to be used to establish UCRs.

Thus, the PHCS was built on submissions from health insurance companies, but was not designed to determine precise reimbursement amounts. Rather, it was intended only to provide a general idea about prevailing charges in a given area based upon the admittedly limited data HIAA collected to create the initial PHCS.

Indeed, HIAA submitted the following disclaimer with the PHCS data it provided insurers:

> The DATA, whether actual charge data, derived charge data conversion factor data or length of stay data, are provided to the LICENSEE for information purposes only. The HIAA disclaims any endorsement, approval or recommendation of the DATA. There is neither a stated nor an implied 'reasonable and customary' charge, either actual or derived; neither is there a stated nor an implied 'reasonable and customary' conversion factor or length of stay. Any interpretation and/or use of the DATA by the LICENSEE is solely and exclusively at the

Plaintiffs' RICO Case Statement

discretion of the LICENSEE.  THE LICENSEE MUST NOT represent the DATA in any way other than as expressed in this paragraph.

### *Ingenix Acquires Existing Databases to Dominate Data Market*

In October 1998, the members of HIAA (including WellPoint) agreed to sell the PHCS to Ingenix for an undisclosed amount.  This was part of a plan by Ingenix and its parent company, UnitedHealth, to acquire a dominant position in the market for the provision of data services used to calculate UCR that included over 50 acquisitions.  Just prior to the PHCS purchase, in December 1997, Ingenix purchased the Medical Data Research ("MDR") database of derived data from Medicode, Inc.  Ingenix would later effectively merge those two databases to form what has herein been referred to as the Ingenix Database.

Under the terms of the 1998 sale of PHCS to Ingenix, HIAA and Ingenix agreed to have member companies participate in an ongoing Ingenix PHCS Advisory Committee, of which WellPoint is and was a member, which would have input as to what data Ingenix used and how Ingenix used it.  All HIAA staffers who then worked on the PHCS were offered positions with Ingenix.

Accompanying the sale to Ingenix, HIAA and Ingenix agreed to a 10-year Cooperation Agreement which provided HIAA with continued input in the development and operation of the PHCS and provided for lasting co-mingling of the two entities in the form of a "Liaison Committee" to advise and evaluate Ingenix.  The Cooperation Agreement further provided that Ingenix would charge HIAA members 50% less than non-HIAA members for use of the database and Ingenix, an otherwise highly profitable arm of UnitedHealth, and would waive all fees for HIAA members that contributed twice the required minimum annual data input.  This conduct is contrary to the individual self-interest of a profit-maximizing firm such as UnitedHealth and was a *quid pro quo* for members of the cartel in return for their agreeing not to provide the data they submitted to Ingenix to another potential database developer.

Ingenix, upon purchasing the PHCS, entered into a Confidentiality Agreement mandating that it shield from disclosure the identity of entities (*i.e.*, the Defendants and Insurer Conspirators in this action) that had submitted or would submit information for use in the database.  At

Plaintiffs' RICO Case Statement

the time of the sale of the PHCS to Ingenix, and as a condition thereto, UnitedHealth agreed to become a member of HIAA, but did not have to pay any membership dues during the duration of the 10-year Cooperation Agreement.

Amended Complaint ¶¶ 98-108.

WellPoint and the Insurer Conspirators have ample opportunity to, and do, communicate through HIAA/AHIP and regularly share UCR pricing information using Ingenix as a conduit to distribute agreed-upon pricing memos to each Insurer Conspirator for the purpose of artificially lowering ONS reimbursements to Plaintiffs and the Classes. WellPoint and the Insurer Conspirators know the data being provided to Ingenix is flawed and have communicated this fact to one another and to Ingenix. The Insurer Conspirators understand that, as a consequence, the pricing schedules received from Ingenix are flawed and cause them to under-reimburse for ONS. Nevertheless, the Insurer Conspirators continue to have input into the type of data used by Ingenix and jointly produce provider cost data and utilize Ingenix's False UCRs to coordinate and centrally set a pricing schedule for the purpose of calculating ONS reimbursement.

WellPoint and the Insurer Conspirators' scheme to manipulate UCRs for the purpose of under-reimbursing for ONS is predicated, in part, on keeping the Ingenix Database, and its inherent flaws, a complete secret from subscribers and providers. As a result, Defendants and the Insurer Conspirators actively conceal the true UCRs, knowing the success of the scheme will be jeopardized if true UCRs are known to the healthcare-purchasing public. To prevent transparency and inhibit price competition, neither WellPoint nor any of the Insurer Conspirators makes its False UCRs available to its insureds or ONS providers until after an ONS has been rendered. The Insurer Conspirators likewise do not disclose to Plaintiffs or the general public that they contract with Ingenix, provide Ingenix with data, and use False UCRs provided by Ingenix to determine ONS reimbursement amounts. They do not disclose how they and Ingenix arrive at False UCRs, or that Ingenix disseminates the False UCRs they all use for calculating ONS reimbursement. They further do not disclose they have agreed not to provide data to potential competitors of Ingenix.

Amended Complaint ¶¶ 132-133.

134                    Plaintiffs' RICO Case Statement

Count IX also alleges:

> WellPoint conspired with Ingenix and UnitedHealth, among others, to conduct or participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity as described in this Complaint in violation of 18 U.S.C. §1962(d). This conspiracy to violate 18 U.S.C. §1962(c) constitutes a violation of 18 U.S.C. §1962(d). In furtherance of this conspiracy, Defendants and others known and unknown to Plaintiffs committed numerous overt acts as alleged above in the pattern of racketeering described above.

> As a direct and proximate result of, and by reason of, the activities of Defendants and their conduct in violation of 18 U.S.C. §1962(d), Plaintiffs and the Subscriber and Provider Classes have been injured within the meaning 18 U.S.C. §1964(c).

Amended Complaint, ¶¶ 430-432.

Count XV alleging Civil Conspiracy also provides:

> As set forth more fully above, beginning at least as early as January 1, 1999, the exact date being unknown to Plaintiffs and the Classes, and continuing thereafter, Defendants entered into an agreement and/or otherwise engaged in a continuing conspiracy to defraud the Plaintiffs and the Classes by causing Plaintiffs and the Classes to pay more for ONS than they otherwise would have in the absence of Defendants' conspiracy.

> WellPoint conspired and agreed with Ingenix to defraud WellPoint subscribers by underpaying ONS charged based on artificially depressed UCRs.

> Pursuant to their fraudulent scheme and conspiracy alleged herein and in furtherance thereof, Defendants engaged in a wide range of activities, the purpose and effect of which was to defraud the Plaintiffs and the Classes and to act or take substantial steps in furtherance of the conspiracy. Those activities include the following:
>
> (a)     Defendants discussed and agreed among themselves and with their Conspirators that they would manipulate the rates by which they reimbursed out-of-network medical providers for their services.

Plaintiffs' RICO Case Statement

(b)     Defendants discussed and agreed among themselves and with their Conspirators that they would create and use flawed data which was maintained in a database owned by Ingenix, Inc. to set artificially low reimbursement rates for ONS.

(c)     Defendants discussed and agreed among themselves and with their Conspirators that they would work together to cause WellPoint to breach its obligation to provide coverage and/or reimbursement to pay for ONS charges by, *inter alia*:

i.     relying upon flawed and inappropriate data for making UCO determinations for ONS;

ii.     issuing EOBs reflecting ONS ABDs and reimbursement reductions which did not adequately disclose the basis for, nor the reasons behind, the reductions;

iii.     failing to disclose whether WellPoint used any particular database (including the Ingenix Databases) or some other methodology for calculating UCRs;

iv.     "pre-scrubbing" data submitted to Ingenix which WellPoint knew would be used by it to calculate UCRs for ONS;

v.     refusing to pay the full amount of ONS charges incurred by ERISA Class Members, based on artificially reduced UCR calculations;

vi.     failing to disclose to Non-ERISA Class Members WellPoint's knowledge of the flaws in the Ingenix Databases; and

vii.     failing to disclose to Non-ERISA Class Members WellPoint's knowledge of Ingenix's disclaimer of a "reasonable and customary" charge to be derived from its data; and

(d)     Defendants discussed and agreed among themselves and with the Conspirators that they would conceal their provision and/or knowing use of the flawed Ingenix Database, despite consumer complaints about low reimbursement for ONS.

Amended Complaint ¶¶ 480-82.

**QUESTION NO. 15:**

**Describe the alleged injury to business or property.**

**RESPONSE TO QUESTION NO. 15:**

*See* Responses to Question Nos. 1, 2 and 4.

Plaintiffs' RICO Case Statement

1      In addition, Subscriber Plaintiffs, Provider Plaintiffs and Class Members have

2 been and continue to be proximately and directly injured economically by Defendant's

3 fraudulent underpayment scheme and conspiracy through diminished payments for

4 ONET.  Likewise, the Association Plaintiffs have been required to devote substantial

5 time and resources in counseling their members on how to deal with the practices at

6 issue, monitoring the payment practices of WellPoint, corresponding with WellPoint,

7 advocating on their members' behalf, and communicating with regulators concerning

8 WellPoint, United and Ingenix's misconduct, among other things.

9 **QUESTION NO. 16:**

10     **Describe the direct causal relationship between the alleged injury and the**

11 **violation of the RICO statutes.**

12 **RESPONSE TO QUESTION NO. 16:**

13     *See* Responses to Question Nos. 1, 2, 4 and 15.

14     In addition, Subscriber and Provider Plaintiffs and Class Members are injured

15 each time they obtained ONS services, submitted a request for payment for ONS and

16 WellPoint fraudulently reduced payments to the Subscriber and Provider Plaintiffs and

17 Class Members for such ONS.  Moreover, although Subscriber and Provider Plaintiffs

18 are not required to prove reliance, Subscriber and Provider Plaintiffs and Class

19 Members have reasonably relied on the misrepresentations and omissions of

20 WellPoint, concerning, inter alia, the accuracy and integrity of its UCR determinations

21 and the sources relied upon for those determinations for ONS, to their detriment.  For

22 purposes of the Association Plaintiffs, their injuries were caused each time they were

23 forced to expend resources as a result of Defendants' fraudulent scheme and/or on

24 behalf of their members.

25 **QUESTION NO. 17:**

26     **List the damages sustained by reason of the violation of § 1962, including**

27 **the amount for which each defendant is allegedly liable.**

28

137          Plaintiffs' RICO Case Statement

**RESPONSE TO QUESTION NO. 17:**

As discovery has only recently begun, Plaintiffs are not currently in a position to make an accurate calculation of the damages attributable to Defendants' RICO violations in this case. *See also* Responses to Question Nos. 1, 2, 4, 15 and 16.

**QUESTION NO. 18:**

**List all other Federal causes of action, if any, and provide the relevant statute numbers.**

**RESPONSE TO QUESTION NO. 18:**

Counts II-VI of the Amended Complaint assert claims arising out of WellPoint's violations of ERISA, including violation of 29 U.S.C. § 1132(a)(l)(B), among others.  Additionally, Count I alleges violations of the Sherman Act, 15 U.S.C. § 1.

**QUESTION NO. 19:**

**List all pendent state claims if any.**

**RESPONSE TO QUESTION NO. 19:**

Counts X-XV of the Amended Complaint assert pendent state claims for common law Breach of Contract, common law Breach of the Duty of Good Faith and Fair Dealing, Violation of State Unfair and Deceptive Trade Practices laws, violation of New York General Business Law § 349, violations of California's Cartwright Act, and common law Civil Conspiracy.

**QUESTION NO. 20:**

**Provide any additional information that you feel would be helpful to the Court in processing your RICO claim.**

**RESPONSE TO QUESTION NO. 20:**

The Amended Complaint is based upon facts and information available to Subscriber, Provider and Association Plaintiffs and their counsel at this time.  More precise factual details regarding the misconduct and predicate acts of Defendants remain hidden and exclusively in their possession, custody and control.  Because the

Plaintiffs' RICO Case Statement

1   misconduct and many RICO predicate acts relate to the internal affairs of WellPoint,

2   United and Ingenix (namely, their underpayment scheme), Plaintiffs cannot provide

3   additional factual details of the fraudulent scheme at this stage in the litigation.

4   Dated: November 16, 2009                    Respectfully submitted,

5   **SCOTT+SCOTT LLP**                         **WHATLEY DRAKE & KALLAS, LLC**

6   */s/ Christopher M. Burke*                  */s/ Edith M. Kallas*

7   Christopher M. Burke, SBN 214799            Edith M. Kallas
    Joseph P. Guglielmo, *pro hac vice*         Joe R. Whatley, Jr.
8   Amelia F. Burroughs, SBN 221490             W. Tucker Brown
    6424 Santa Monica Blvd.                     Laurence J. Hasson
9   Los Angeles, CA 90038                       1540 Broadway, 37th Floor
    Tel:  (213) 985-1274                        New York, NY 10036
10  Fax: (213) 985-1278                         Tel: (212) 447-7070
    cburke@scott-scott.com                      Fax: (212) 447-7077
11  jguglielmo@scott-scott.com                  ekallas@wdklaw.com
    amburroughs@scott-scott.com                 jwhatley@wdklaw.com

12

13  Christopher A Seeger                        D. Brian Hufford
    Stephen A Weiss                             Robert J. Axelrod
    **SEEGER WEISS LLP**                        **POMERANTZ HAUDEK GROSSMAN**
14  1 William Street                            **& GROSS LLP**
    New York , NY 10004-2502                    100 Park Avenue
15  Tel: (212) 584-0700                         New York, NY 10017
    Fax: (212) 584-0799                         Tel: (212) 661-1100
16  cseeger@seegerweiss.com                     Fax: (212) 661-8665
    sweiss@seegerweiss.com                      dbhufford@pomlaw.com
17                                              rjaxelrod@pomlaw.com

18  *Interim Co-Lead Counsel for*
    *Subscriber Class Counsel for*              Raymond P. Boucher, SBN 115364
    *Plaintiff Michael Roberts*                 Helen Zukin, SBN 117933
19                                              Michael Eyerly, SBN 178693
                                                **KIESEL BOUCHER LARSON LLP**
20  Mark N. Todzo, SBN 168389                   8648 Wilshire Boulevard
    Lisa Burger, SBN 239676                     Beverly Hills, CA 90211-2910
21  **LEXINGTON LAW GROUP**                     Tel: (310) 854-4444
    1627 Irving Street                          Fax: (310) 854-0812
22  San Francisco, CA 94122                     boucher@kbla.com
    Tel:  (415) 759-4111                        zukin@kbla.com
23  Fax:  (415) 759-4112                        eyerly@kbla.com
    mtodzo@lexlawgroup.com
24  lburger@lexlawgroup.com                     *Interim Co-Lead Counsel for Provider*
                                                *Class and Attorneys for American Medical*
25  *Attorneys for Plaintiff J.B.W., a*         *Association, California Medical*
    *minor, by and through Julz W.,*            *Association, Medical Association of*
26  *parent and guardian ad litem*              *Georgia, Connecticut State Medical*
                                                *Society and North Carolina Medical*
27                                              *Society, Stephen D. Henry, M.D. and*
                                                *James G. Schwendig, M.D. Carmen*
28                                              *Kavali, M.D.*

1   Brian S. Kabateck, SBN 152054
    Richard L. Kellner, SBN 171416
2   Joshua H. Haffner, SBN 188652
    Artin Gholian, SBN 258280
3   **KABETECK KELLNER LLP**
    644 South Figueroa Street
4   Los Angeles, CA 90017
    Tel : (213) 217-5000
5   Fax: (213) 217-5010
    ag@kbklawyers.com
6   bsk@kbklawyers.com
    jhh@kbklawyers.com
7   rlk@kbklawyers.com

8

9   Eric D. Freed, SBN 164523
    George K. Lang
10  Jeffrey A. Leon
    **FREED & WEISS LLC**
11  111 West Washington Street,
    Ste 1331
12  Chicago, IL 60602
    Tel (312) 220-0000
13  Fax: (312) 220-7777
    eric@freedweiss.com
14  george@freedweiss.com

15

16  David M. Sternfield
    **DAVID M. STERNFIELD LAW**
    **OFFICES**
17  33 North Dearbon Street, Suite 300
    Chicago, IL 60602
18

19  Richard J. Burke
    **RICHARD J. BURKE LLC**
    1010 Market Street, Suite 650
20  St Louis, MO 63101
    Tel: (314) 880-7000
21  rich@richardjburke.com

22  *Attorneys for Plaintiff S. Higashi*

23  Ellen M. Doyle
24  William T. Payne
    **STEMBER FEINSTEIN DOYLE**
25  **& PAYNE**
    429 Forbes Avenue, 17th floor
26  Pittsburgh, PA 15219
    Tel: 412-281-8400
27  Fax: 412-281-1007
    edoyle@stemberfeinstein.com
28  wpayne@stemberfeinstein.com

Christopher P Ridout, SBN 143931
Devon Marie Lyon, SBN 218293
**RIDOUT AND LYON LLP**
555 East Ocean Boulevard, Suite 500
Long Beach, CA 90802
Tel: (562) 216-7380
Fax: (562) 216-7385
c.ridout@ridoutlyonlaw.com
d.lyon@ridoutlyonlaw.com

Maury A. Herman
Stephen J. Herman
**HERMAN GEREL LLP**
230 Peachtree Street NW, Suite 2260
Atlanta, GA 30303
Tel: (404) 880-9500
Fax: (404) 880-9605
mherman@hermangerel.com
sherman@hermangerel.com

*Attorneys for Plaintiff North Peninsula*
*Surgical Center, L.P., et al.*

Donald E. Haviland, Jr.
**THE HAVILAND LAW FIRM LLC**
111 South Independence Mall East
Suite 1000
Philadelphia, PA 19106
Tel: 215-609-4661
Fax: 215-392-4400
haviland@havilandlaw.com

*Designated Counsel for Issues Relating to*
*Empire Blue Cross Blue Shield, a*
*Subsidiary of WellPoint and Attorney for*
*Plaintiffs D. Samsell, V. Samsell, M.*
*Cooper, and I. Seigle-Epstein*

Barbara G. Quackenbos
Barry M. Epstein
Kevin P. Roddy
**WILENTZ, GOLDMAN & SPIZER PA**
90 Woodbridge Center Drive, Suite 900
Box 10
Woodbridge, NJ 07095
Tel: 732-636-8000
Fax: 732-855-6117

Plaintiffs' RICO Case Statement

| | | |
|---|---|---|
| 1 | Janet Lindner Spielberg<br>**LAW OFFICES OF JANET L** | Marc I. Machiz<br>Brent Johnson |
| 2 | **SPIELBERG**<br>12400 Wilshire Boulevard, Suite 400 | **COHEN MILSTEIN**<br>1100 New York Avenue, Suite 500 West |
| 3 | Los Angeles, CA 90025<br>Tel: 310-392-8801 | Washington, DC  20005<br>Tel: 202-408-4600 |
| 4 | Fax: 310-278-5938<br>jlspielberg@jlslp.com | *Attorneys for Plaintiffs D. Samsell, V.*<br>*Samsell, M. Cooper, and I. Seigle-Epstein* |
| 5 | | |
| 6 | | |
| 7 | Joseph N. Kravec, Jr.<br>**SPECTER SPECTER EVANS &** | Robert J. Rohrberger<br>**FOX ROTHSCHILD LLP** |
| 8 | **MANOGUE PC**<br>436 Seventh Avenue, 26th Floor | 75 Eisenhower Parkway<br>Roseland, NJ 07068 |
| 9 | Pittsburg, PA 15219<br>Tel: 412-642-2300 | Tel: 973-922-7543<br>Fax: 973-922-9125 |
| 10 | Fax: 412-642-2309<br>jnk@ssem.com | rrohrberger@foxrothschild.com |
| 11 | | *Attorney for V. O'Brien, I. Rivera-Giusti,*<br>*and K. O'Brien* |
| 12 | | |
| 13 | Michael D. Braun<br>**BRAUN LAW GROUP PC** | Andrew S. Friedman<br>Elaine A. Ryan |
| 14 | 10680 W Pico Boulevard, Suite 280<br>Los Angeles, CA 90064 | **BONNETT FAIRBOURN FREIDMAN**<br>**AND BALINT** |
| 15 | Tel: 310-836-6000<br>Fax: 310-836-6010 | 2901 North Central Avenue, Suite 1000<br>Phoenix, AZ 85012-3311 |
| 16 | service@braunlawgroup.com | Tel: 602-274-1100<br>Fax: 602-274-1199 |
| 17 | *Attorneys for Plaintiff M. Pariser* | afriedman@bffb.com |
| 18 | | |
| 19 | Richard B. Brualdi<br>Sue Lee | Tonna K. Farrar<br>**BONNETT FAIRBOURN FREIDMAN** |
| 20 | **THE BRUALDI LAW FIRM**<br>29 Broadway, Suite 2400 | **AND BALINT**<br>600 West Broadway, Suite 900 |
| 21 | New York, NY 10006<br>Tel: 212-952-0602 | San Diego, CA 92101<br>Tel: 619-756-7095 |
| 22 | Fax: 212-952-0608<br>rbrualdi@brualdilawfirm.com | Fax: 602-274-1199 |
| 23 | slee@brualdilawfirm.com | *Designated Counsel for Issues Relating to*<br>*Non-Physician and Non-Dental Providers* |
| 24 | *Attorneys for Plaintiff H. Bernard* | *and Attorneys for Plaintiffs American*<br>*Podiatric Medical Association, California* |
| 25 | | *Chiropractic Association, California*<br>*Psychological Association, and J. Peck* |
| 26 | | |
| 27 | | |
| 28 | | |

Plaintiffs' RICO Case Statement