O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

## CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

| Present: | The Honorable Philip S. Gutierrez, United States District Judge |
|---|---|

| Wendy K. Hernandez | Not Present | n/a |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
|---|---|
| Not Present | Not Present |

**Proceedings:**   **(In Chambers) Order Granting in Part and Denying in Part Defendants WellPoint, Inc., United HealthGroup, Inc., and Ingenix, Inc.'s Motions to Dismiss**

Pending before the Court are Defendants WellPoint, Inc., United HealthGroup, Inc., and Ingenix, Inc.'s Motions to Dismiss the Second Amended Multi-District Litigation Complaint. The Court heard argument on the motions on November 22, 2011. Having read and considered the moving and opposing papers, as well as the arguments presented at the hearing, the Court GRANTS in part and DENIES in part the motions to dismiss.

I.    Background

This case concerns insurance subscribers and healthcare providers who claim that the nation's largest healthcare insurer failed to properly reimburse them for out-of-network services ("ONS"). They were allegedly promised a "usual, customary, and reasonable" ("UCR") rate of reimbursement, but were underpaid due to flawed UCR data provided by the country's largest database.

A.    WellPoint's ONS Coverage

Defendant WellPoint, Inc. ("WellPoint") is the largest health insurer in the United States. WellPoint and its many subsidiaries and affiliates (collectively, the "WellPoint Defendants")[1]

---

[1] The WellPoint Defendants include the following WellPoint subsidiaries and affiliates: Anthem Benefit Administrators, Inc.; Anthem Blue Cross and Blue Shield Plan Administrator, LLC; Anthem

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|----------|------------------------|------|-----------------|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

offer insurance coverage for medical treatment provided by various healthcare providers, including physicians, physician groups, hospitals, clinics, and ambulatory and surgical centers. *See Second Consolidated Am. Compl. ("SAC").* ¶ 8, n.1.  Healthcare providers are classified as either (a) "in-network" providers who have negotiated discounted rates with WellPoint or (b) out-of-network providers who charge their normal rates.  *See id.* ¶ 8.  WellPoint allegedly promises to reimburse subscribers for ONS obtained from out-of-network providers at a percentage of the lesser of either (1) the actual amount of the subscribers' medical bills or (2) the UCR rate charged by providers "in the same or similar geographic area" for "substantially the

---

Blue Cross Blue Shield Partnership Plan, Inc.; Anthem Blue Cross Life and Health Insurance Company; Anthem Health Plans of Kentucky, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Maine, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of New Hampshire, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Insurance Company of Nevada, Inc.; Anthem Health Plans of Virginia, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans, Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem Insurance Companies , Inc., d/b/a Anthem Blue Cross and Blue Shield; Anthem HMO of Nevada; Anthem Life Insurance Company; Anthem Life & Disability Insurance Company; Anthem East, Inc.; Anthem Southeast, Inc.; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross Blue Shield Healthcare Plan of George, Inc.; Blue Cross Blue Shield of Wisconsin, d/b/a Anthem Blue Cross and Blue Shield; Blue Cross of California, d/b/a Anthem Blue Cross; Blue Cross of California Partnership Plan, Inc., d/b/a Anthem Blue Cross Partnership Plan; Claim Management Services, Inc., d/b/a Anthem Blue Cross and Blue Shield; Community Insurance Company, d/b/a Anthem Blue Cross and Blue Shield; Compcare Health Services Insurance Corporation, d/b/a Anthem Blue Cross and Blue Shield; Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross Blue Shield; Empire HealthChoice HMO, Inc., d/b/a Empire Blue Cross Blue Shield HMO; Golden West Health Plan, Inc; HealthKeepers, Inc.; HealthLink, Inc.; HealthLink HMO, Inc.; Healthy Alliance Life Insurance Company, d/b/a Anthem Blue Cross and Blue Shield; HMO Colorado, Inc.; HMO Missouri, Inc., d/b/a Anthem Blue Cross and Blue Sheild; Lumenos, Inc.; Machigonne, Inc.; Matthew Thornton Health Plan, Inc., d/b/a Anthem Blue Cross and Blue Shield; Peninsula Health Care, Inc.; Plan of Georgia, Inc.; Priority Health Care, Inc.; RightCHOICE Managed Care, Inc., d/b/a Anthem Blue Cross and Blue Shield; Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield; UNICARE National Services, Inc.; UNICARE Health Insurance Company of Texas; UNICARE Health Insurance Company of the Midwest; UNICARE Health Insurance Company of Kansas, Inc.; UNICARE Health Insurance Company of West Virginia, Inc.; UNICARE Health Insurance Company of Texas, Inc.; UNICARE Health Insurance Company of the Midwest, Inc.; UniCare Life & Health Insurance Company; UNICARE of Texas Health Plans, Inc.; WellChoice Insurance of New Jersey, Inc.; and WellPoint Behavioral Health, Inc. *SAC* ¶ 60.

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

same service." *See id.* ¶ 10. The primary concern in this action is whether WellPoint paid the UCR rate when reimbursing ONS. This question turns on how WellPoint determines what reimbursement rate would be "usual, customary, and reasonable" for a given medical procedure in a particular geographic area.

B.     The Genesis of Ingenix

WellPoint contracts with Defendant Ingenix, Inc. ("Ingenix") to obtain ONS reimbursement data. Ingenix is a wholly owned subsidiary of Defendant UnitedHealth Group, Inc. ("UHG") (together with Ingenix, the "UHG Defendants") and maintains a proprietary database, which compiles ONS reimbursement data provided by various health insurance companies and provides billing rates back to those same insurance companies (the "Ingenix Database"). *See id.* ¶ 117. In 1973, the Health Insurance Association of America ("HIAA"), a trade group for the health insurance industry, developed the Prevailing Health Charges System ("PHCS"), a database used to obtain charging information for various medical procedures. *See id.* ¶¶ 63(c), 105.[2] HIAA members developed and managed the PHCS database, which eventually became the largest pool of charge data for medical services in the country. *See id.* ¶ 105. The PHCS was not intended to set UCR rates, and HIAA included a disclaimer that PHCS data was provided "for information purposes only." *Id.* ¶ 109.

In October 1998, the members of HIAA, including WellPoint, sold the PHCS to Ingenix, which was in the process of acquiring more than 50 medical databases in order to "acquire a dominant position in the market for the provision of data services used to calculate UCR." *See id.* ¶ 110. As part of the PHCS sale, members of HIAA, including WellPoint, were permitted to participate in an ongoing "Ingenix PHCS Advisory Committee," which provided for industry input into how Ingenix acquired and managed its data. *See id.* ¶ 111. HIAA entered into a 10-year Cooperation Agreement, which guaranteed HIAA's continued input into the management of the Ingenix Database in the form of a joint "Liaison Committee" and provided discounts for HIAA members who contributed data to the Ingenix Database. *See id.* ¶ 112. Additionally, upon the PHCS sale, the parent of Ingenix (UHG) agreed to become a member of HIAA without having to pay any membership dues during this period.

C.     Criticism of the Ingenix Database

_____

[2] In September 2003, HIAA merged with the American Associations of Health Plans ("AHIP"), and now exists under the name "HIAA/AHIP." *See SAC* ¶ 59(c).

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | | Date | August 11, 2011 |
|---|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | | |

Ingenix provides participating insurers with uniform pricing schedules that provide billing ranges for given medical procedures in various geographic locations. *See id.* ¶ 116. This information is allegedly calculated according to just four data points: (1) the date of service, (2) the Current Procedural Terminology ("CPT") code, (3) the zip code where the service was provided, and (4) the amount billed by the provider. *See id.* ¶ 119. In addition to this purportedly flawed methodology, Ingenix and the participating insurers allegedly manipulate the data in order to populate the Ingenix Database with deflated UCR figures. First, the participating insurers "scrub" their submissions to Ingenix by removing the highest value claims. *See id.* ¶ 120. This practice allegedly persisted since 2003, when Ingenix began requiring participant insurers to certify that their submissions were complete. *See id.* Second, Ingenix pools all of the claims submissions and removes "high-end" values as statistical outliers. *See id.* ¶ 125. The data provided by Ingenix is further skewed because Ingenix allegedly fails to accurately tabulate data according to geographic area. *See id.* ¶ 126. Ingenix then produces two cycles of pricing schedules for participating insurers. *See id.* ¶ 129. WellPoint uploads these schedules onto its computerized claims platform to determine ONS reimbursement rates. *See id.* ¶ 130. Neither WellPoint nor the other participating insurers independently verify the accuracy of the data received from Ingenix. *See id.* ¶ 133.

This system of ONS reimbursement has become the subject of an investigation by the New York Attorney General ("NYAG"), and an investigative task force of the NYAG determined that health insurers who participate in the Ingenix data collection have an incentive to provide artificially low claims information and, thus, produce a "garbage in, garbage out" effect. *See id.* ¶¶ 142-51. On January 13, 2009, the NYAG issued its "Health Care Report: The Consumer Reimbursement System is Code Blue," which concluded that the Ingenix Database was an "industry-wide problem," "a rigged system," "fraudulent," "and critically ill." *Id.* ¶ 148. In response to the investigation, UHG, WellPoint, and other participating insurers entered into agreements with the NYAG to discontinue use of the Ingenix Database and to establish an independent system to determine UCR reimbursements. *See id.* ¶ 151. Even the United States Congress became involved, with the Senate Committee on Commerce, Science, and Transportation holding two hearings on how the healthcare industry calculates UCR reimbursements for ONS. *See id.* ¶¶ 152-55.

E.    <u>Procedural History</u>

Since early 2009, subscriber, provider and association plaintiffs (collectively, the "MDL Plaintiffs" or "Plaintiffs")) have filed lawsuits against WellPoint, its subsidiaries, UHG, and Ingenix, challenging WellPoint's use of the Ingenix Database and the adequacy of WellPoint's

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

ONS reimbursements. On August 20, 2009, the United States Judicial Panel on Multidistrict Litigation designated this Court as the transferee court for pretrial proceedings in *In re WellPoint, Inc., Out-of-Network "UCR" Rates Litigation*, MDL No. 2074. Since the transfer, several cases have been consolidated with MDL No. 2074.[3]

On July 12, 2010, the Plaintiffs of MDL No. 2074 (collectively, "Plaintiffs") filed a Second Consolidated Amended Complaint ("SAC" or "Complaint") against the WellPoint Defendants and the UHG Defendants (collectively, "Defendants"), asserting claims under the Sherman Antitrust Act, 15 U.S.C. § 1, the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.*, and various state laws. In particular MDL Plaintiffs assert the following 13 causes of action: (1) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) claim for unpaid benefits under group plans governed by ERISA, 29 U.S.C. § 1132(a)(1)(B); (3) breach of fiduciary duty under ERISA, 29 U.S.C. § 1132(a)(2); (4) failure to provide full and fair review as required under ERISA, 29 U.S.C. § 1132(a)(3); (5) failure to provide accurate records under ERISA, 29 U.S.C. § 1132(c); (6) violation of RICO based on predicate acts of mail and wire fraud, 18 U.S.C. § 1962(c); (7) violation of RICO for predicate acts of embezzlement, 18 U.S.C. § 1962(c); (8) conspiracy to violate RICO, 18 U.S.C. § 1962(d); (9) breach of contract; (10) breach of the implied covenant of good faith and fair dealing; (11) violation of California's unfair and deceptive practices statutes, Cal. Bus. & Prof. Code §§ 17200, 17500; (12) violation of the New York General Business Law ("GBL") § 349; and (13) violation of California's Cartwright Antitrust Act.

In asserting their various claims, Plaintiffs are divided into several categories. First, the "Subscriber Plaintiffs" are Michael Roberts ("Roberts") (on behalf of himself and as guardian for his daughter, D. Roberts), J.B.W. (a minor by and through his parent and guardian *ad litem*), Darryl and Valerie Samsell (the "Samsells"), Mary Cooper ("Cooper"), Ivy Seigle-Epstein

---

[3] MDL No. 2074 currently includes the following cases: *Michael Roberts v. UnitedHealth Group, Inc. et al.* (CV 09-1886 PSG (FFMx)), *American Medical Association et al. v. WellPoint, Inc.* (CV 09-2039 PSG (FFMx)), *J.B.W. v. UnitedHealth Group, Inc. et al.* (CV 09-2488 PSG (FFMx)), *S. Higashi v. Blue Cross of California* (CV 09-4223 PSG (FFMx)), *North Peninsula Surgical Center, L.P. v. WellPoint, Inc. et al.* (CV 09-4510 PSG (FFMx)), *Michael Pariser v. WellPoint, Inc.* (CV 09-4783 PSG (FFMx)), *Darryl and Valerie Samsell v. WellPoint, Inc. et al.* (CV 09-6079 PSG (FFMx)), and *American Podiatric Medical Association et al. v. WellPoint, Inc.* (CV 09-6725 PSG (FFMx)).

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

("Seigle-Epstein"), and Ivette Rivera-Giusti ("Rivera-Giusti"). *See id.* ¶¶ 24-29. The Subscriber Plaintiffs each allegedly had an insurance policy with WellPoint or one of its subsidiaries, received ONS medical care, were reimbursed at a depressed rate, and incurred "more out-of-pocket expense than [he or she] would have absent the unlawful conduct alleged." *See id.*

Second, the "Provider Plaintiffs" are as follows: Dr. Stephen D. Henry is a primary care internist, Dr. James G. Schwendig is a trauma surgeon, Dr. James Peck is a clinical psychologist, Dr. Michael Pariser is a licensed psychologist, Dr. Carmen Kavali is a plastic surgeon, Dr. Stephani Higashi is a chiropractic doctor, and the North Peninsula Surgical Center, L.P. ("NPSC") is an ambulatory surgical center. *See id.* ¶¶ 30-37. The Provider Plaintiffs allegedly provided ONS to WellPoint subscribers, were assigned the policies to be reimbursed, and received deflated UCR reimbursements. *See id.* ¶ 80.

Third, the "Association Plaintiffs" are the American Medical Association ("AMA"), the California Medical Association ("CMA"), the Medical Association of George ("MAG"), the Connecticut State Medical Society ("CSMS"), the North Carolina Medical Society ("NCMS"), the American Podiatric Medical Association ("APMA"), the California Chiropractic Association ("CCA"), and the California Psychological Association ("CPA"). *See id.* ¶¶ 38-53. The Association Plaintiffs sue Defendants in their individual and representative capacities to redress injuries sustained by them and their members. *See id.*

On August 6, 2010, WellPoint Defendants filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[4] That same day, UHG Defendants filed their

---

[4] The WellPoint Defendants offer several declarations and exhibits to accompany their Rule 12(b)(1) factual attack on the pleadings. Pursuant to Rule 12(b)(1), a party may move to dismiss a case for lack of subject matter jurisdiction. When a defendant brings a factual attack upon subject matter jurisdiction, the Court may consider extrinsic evidence, weigh the evidence, and resolve factual disputes. *See Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). The plaintiff bears the burden of establishing subject matter jurisdiction. *See Valdez v. United States*, 56 F.3d 1177, 1179 (9th Cir. 1995). Until the plaintiff proves otherwise, federal jurisdiction is presumed to be lacking. *See Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989). In their Objections and Request to Strike, Plaintiffs argue that factual attacks can only be entertained after the filing of an answer. *See Reply to Opp. to Pls.' Objs. and Request to Strike* 2:23-27 (citing *Mortenson v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 892 n.17 (3d Cir. 1977)). However, as noted by WellPoint Defendants, the *Mortenson*

**O**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

own motion to dismiss, joining WellPoint Defendants' motion to the extent that it relates to the claims against the UHG Defendants and offering some additional insight.  *See UHG Mot.* 1:21-27.  On August 31, 2010, Plaintiffs filed an opposition, followed by separate replies filed by the WellPoint Defendants and the UHG Defendants on September 20, 2010.

II.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a cause of action if the plaintiff fails to state a claim upon which relief can be granted.  In evaluating the sufficiency of a complaint under Rule 12(b)(6), the courts must be mindful that the Federal Rules of Civil Procedure require that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Nevertheless, the U.S. Supreme Court has instructed that "a complaint that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

In resolving a Rule 12(b)(6) motion, the Court must first accept as true all non-conclusory, factual allegations made in the complaint.  *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993).  Based upon these allegations, the Court must draw all reasonable inferences in

---

dictum relating to the timing of a Rule 12(b)(1) factual attack has been clearly rejected.  *See Berardi v. Swanson Mem. Lodge No. 48 of the Fraternal Order of Police*, 920 F. 2d 198, 200 (3d Cir. 1990) ("Long before *Mortensen*, the Supreme Court made clear that a facially sufficient complaint may be dismissed before an answer is served if it can be shown by affidavits that subject matter jurisdiction is lacking.").  The gist of these declarations is that the reimbursement rates of several Plaintiffs' ONS were not determined according to UCR rates.  As such, the WellPoint Defendants argue that these Plaintiffs lack standing.  The Court is satisfied that these declarations were made with personal knowledge, that the exhibits were properly authenticated, *see* Fed. R. Evid. 901(a), and that the attached insurance policies are not hearsay, *see Stuart v. UNUM Life Ins. Co. of Am.*, 217 F.3d 1145, 1154 (9th Cir. 2000) (finding that an insurance policy was "excluded from the definition of hearsay and is admissible evidence because it is a legally operative document that defines the rights and liabilities of the parties in this case").  Accordingly, to the extent that the Court relies upon the declarations offered in support of Defendants' motion, the Court OVERRULES Plaintiffs' objections and DENIES their Motion to Strike.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|----------|------------------------|------|-----------------|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

favor of the plaintiff. *See Mohamed v. Jeppesen Dataplan, Inc.*, 579 F.3d 943, 949 (9th Cir. 2009). After accepting as true all non-conclusory allegations and drawing all reasonable inferences in favor of the plaintiff, the Court must then determine whether the complaint alleges a plausible claim to relief. *See Iqbal*, 129 S. Ct. at 1950. In determining whether the alleged facts cross the threshold from the possible to the plausible, the Court is required "to draw on its judicial experience and common sense." *Id.* "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.*

III.    Discussion

        The Court first addresses the standing issues raised in WellPoint Defendant's motion, followed by an evaluation of the individual claims asserted in the Second Consolidated Amended Complaint ("Complaint").

        A.    Plaintiffs' Standing

        Article III standing is a jurisdictional prerequisite to a federal court's consideration of any claim. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). A plaintiff in federal court must show three things: (1) injury-in-fact; (2) causation, and (3) redressibility. *Allen v. Wright*, 468 U.S. 737, 750, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984). "For Article III purposes, an antitrust plaintiff establishes injury-in-fact when he has suffered an injury which bears a causal connection to the alleged antitrust violation." *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1255 (9th Cir. 2008).

        Defendants challenge (1) all Plaintiffs' standing as it relates to "ONS benefit reductions," (2) certain subscriber Plaintiffs' standing generally, and (3) the Association Plaintiffs' standing generally. *See Mot.* 49:6-53:14. The Court addresses each in the order they are raised.

        1.    Standing of Plaintiffs to Assert "ONS Benefit Reduction" Claims

        Plaintiffs Second Consolidated Amended Complaint includes claims based on ONS benefit reductions unrelated to the Ingenix database or UCRs. *See SAC* ¶¶ 16-17, 180-90. Specifically, they allege that ONS Benefits were allegedly reimbursed based on "extremely low and unrepresentative Medicare rates," and "use of in-network provider fee schedules," among others. *Id.* ¶ 16. Defendants argue that Plaintiffs have failed to "allege any facts to establish that they have standing to bring claims for ONS Benefit Reductions, and their allegations regarding

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

ONS Benefit Reductions are conclusory assertions that are not entitled to a presumption of truth." *Mot.* 49:22-25. The Court agrees. Plaintiffs have failed to identify which individuals were affected by the non-Ingenix ONS benefit reductions, and how each was injured. Conclusory statements about faulty reimbursements do not plausibly show that Plaintiffs' have standing to complain about the ONS benefit reductions and the Court GRANTS Defendants' motion to dismiss claims based on non-Ingenix ONS benefit reductions. *See Iqbal*, 129 S. Ct. at 1949 ("naked assertions devoid of further factual enhancement" cannot withstand a Rule 12(b)(6) motion).

> 2.     Certain Subscriber Plaintiffs' Standing

Defendants next identify particular subscriber Plaintiffs and argue that they lack standing in whole or in part. *See Mot.* 50:4-51:25. Specifically, they suggest that Plaintiffs Siegle-Epstein and the Samsells lack standing to assert any claim, and that Plaintiff Cooper lacks standing to seek declaratory and injunctive relief. *See Mot.* 50:4-51:25.

At the outset, the Court notes that this is a factual, rather than facial, attack on Plaintiffs' standing. If a challenge to standing is based only on the insufficiency of the allegations in the complaint on their face, the challenge is said to be a facial attack. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). If, on the other hand, a challenge to standing "disputes the *truth* of the allegations" purportedly conferring standing, the challenge is said to be a factual attack. *See id.* (*citing Morrison v. Amway Corp.*, 323 F.3d 920 n.5 (11th Cir. 2003) (jurisdictional challenge was a factual attack where it "relied on extrinsic evidence and did not assert lack of subject matter jurisdiction solely on the basis of the pleadings")). WellPoint Defendants' attack of Siegle-Epstein, the Samsells, and Cooper's standing is factual because they allege that under no set of facts could those Plaintiffs assert the claims in the Complaint. *See Mot.* 50:4-51:25.

A district court is permitted to review evidence beyond the complaint when resolving a factual attack on jurisdiction. *See Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Id.*

The Ninth Circuit has cautioned, however, that "jurisdictional dismissals in cases premised on federal-question jurisdiction are exceptional, and must satisfy the requirements

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|----------|------------------------|------|-----------------|

| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation |
|-------|-----------------------------------------------------------|

specified in *Bell v. Hood*, 327 U.S. 678, 66 S. Ct. 773, 90 L. Ed. 939 (1946)." *Safe Air for Everyone*, 373 F.3d at 1039. *Bell* warrants dismissal "where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly insubstantial and frivolous." *Bell*, 327 U.S. at 682-83, 66 S. Ct. 773. In fact, where the "jurisdictional issue and substantive issues are so intertwined," or stated somewhat differently, "when a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiffs' substantive claim for relief," a factual attack "is proper only when the allegations of the complaint are frivolous." *Safe Air for Everyone*, 373 F.3d at 1039-40 (*quoting Thornhill Publ'g Co. v. Gen. Tel. Co.*, 594 F.2d 730, 734 (9th Cir. 1979)). If "the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." *Id.* at 1039 n.3 (citations omitted).

At this stage in the litigation, the Court does not dismiss Plaintiffs Seigle-Epstein, Cooper, and the Samsells' claims for lack of standing. Plaintiffs' allege that Seigle-Epstein was insured by WellPoint Defendants and "received . . . artificially depressed reimbursement[s] for ONS." *SAC* ¶ 28; RICO Case Statement at 22-23. Moreover, those injuries were caused by Defendants' unlawful conduct including breach of contract and an illegal agreement to depress UCRs paid to Seigle-Epstein and others. *See SAC* ¶ 72-76. As a remedy, Seigle-Epstein seeks compensation for the difference in what she received as reimbursement and what she should have received if the UCRs were computed correctly. *See SAC Prayer for Relief*, I. Plaintiffs Cooper and the Samsells make similar allegations, *see SAC* ¶¶ 26-27, 339-40; RICO Case Statement at 20-21, 23-25, and seek similar relief. All have pleaded actual injuries (loss of money), caused by WellPoint Defendants, that can be remedied by the Court (compensation). Thus, Article III is satisfied on the face of the Complaint.

That Article III is satisfied by the facial allegations in the Complaint is of no consequence to WellPoint Defendants' "factual attack," however. WellPoint Defendants submitted declarations from its employees challenging the factual basis of Plaintiffs' complaint. See Dkt. ## 135-41. Notwithstanding the factual attack, it is clear from the Complaint that the merits of the claims are intertwined with the standing issues presented by Defendants. Simply stated, the federal claims asserted, including RICO and the Sherman Act, both provide for jurisdiction and the substantive claim itself. *See Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957, 963 (9th Cir. 1999) ("The requirements for standing to maintain a civil action under RICO and the antitrust laws are similar. Both provide a private

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

right of action for damages only to those individuals injured in their business or property by reason of a violation of the law's substantive provisions." (internal citations omitted)).

To the extent that WellPoint Defendants' declarations contest the factual bases for standing other than the merits, the Court notes that Plaintiffs have not had an adequate opportunity to depose Defendants' declarants and the claims in the Complaint are not clearly "frivolous" or "made solely for the purpose of obtaining federal jurisdiction." *See Mortensen v. First Federal Sav. & Loan Ass'n*, 549 F.2d 884, 896 (3rd Cir. 1977) ("because the facts are not fully developed, subject-matter jurisdiction under [the Sherman Act] cannot be conclusively determined at this stage of the proceedings." (internal citations omitted)). Even if Plaintiffs had produced affidavits to counter Defendants' affidavits, the Court would likely still not grant Defendants' motion at this time. *See A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Ass'n*, 545 F.2d 751 (7th Cir. 1973) (reversing a dismissal for lack of subject matter jurisdiction and stating that: "We hold that such a conclusion can better be determined after a thorough exploration of all evidence that either side can produce, rather than by a motion to dismiss, particularly when based on conflicting affidavits."); *see also Berardi*, 920 F.2d at 200 (reversing a district court's dismissal under 12(b)(1) because the "the record must clearly establish that after jurisdiction was challenged the plaintiff had an opportunity to present facts by affidavit or by deposition, or in an evidentiary hearing, in support of his jurisdictional contention.").

For these reasons, WellPoint Defendants' motion to dismiss the claims of Seigle-Epstein, Cooper and the Samsells for lack of standing is DENIED.[5]

3.     Association Plaintiffs

---

[5] WellPoint Defendants also argue that the Samsells cannot assert any of the claims in the Complaint because they are contractually time barred. *See Mot.* 53:16-22. The contract provision attached to Defendants' declaration says that "[n]o action can be brought after three years from the time written proof has been given to [Defendants]." *See Ward Decl.*, Ex. A, Art. VII, ¶ GG. Defendants suggest that the last time the Samsells provided "written proof" was in May 2005, beyond the three year period, *Reply* 27:14, but it is unclear what "written proof" means in the provision provided. As a result, Defendants' motion to dismiss the Samsells' claims as untimely is DENIED. The Court notes that Plaintiffs raise the issue of fraudulent concealment in response to WellPoint Defendants' argument to dismiss the Samsells' claims as untimely. *Opp'n* 60:15-16. That argument is limited to Plaintiffs' Opposition, however, and without factual support in the Complaint, the Court cannot consider it.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

The Association Plaintiffs (the AMA, CMA, APMA, NSPC, CCA, and CPA) assert claims that are (1) direct to injuries they sustained as organizations and (2) derivative of the claims of their members. *See SAC* ¶ 171. WellPoint Defendants argue that the Association Plaintiffs lack standing to sue in either their individual or representative capacities. *See Mot.* 51:23-53:14. The Court finds that the Association Plaintiffs have standing.

### a.    Individual Standing

Defendants' argument focuses on the nature of the injury allegedly suffered by the Association Plaintiffs, claiming that the Association Plaintiffs' "abstract concern" with the issues underlying the complaint and their voluntary expenditures in response to these issues do not rise to a cognizable injury under Article III. The Court finds that the Association Plaintiffs have alleged sufficient injury to themselves as organizations.

The Association Plaintiffs maintain that the alleged scheme has caused "the Association Plaintiffs to expend significant time, energy and money to, *inter alia*, counsel members on how to counteract the practices at issue, monitor the Insurer Conspirators' practices, advocate on their members' behalf, and/or lobby for legislative or other insurance reform." *SAC* ¶ 169. They also allege that these costs would not have been incurred "but for" the Defendants' scheme, *see id.*, which suggests that the alleged activities were not wholly voluntary. WellPoint Defendants are right to observe that an abstract concern with issues facing an association's membership is insufficient to confer individual standing upon that association. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976) ("Since they allege no injury to themselves as organizations, and indeed could not in the context of this suit, they can establish standing only as representatives of those of their members who have been injured in fact.").

However, the Association Plaintiffs have not alleged an abstract concern with ONS reimbursements; rather, they allegedly suffered a financial injury caused by the need to counsel their members in responding to the ONS reimbursements.[6] *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 369, 102 S. Ct. 1114, (finding that an association adequately alleged an injury in fact where "the steering practices of [the defendant] had frustrated the organization's counseling and referral services, with a consequent drain on resources"); *In re Managed Care*

---

[6] WellPoint Defendants further contend that the Association Plaintiffs also lack individual standing to pursue their RICO and Sherman Act claims. *See Mot.* 52:15-20. However, the Association Plaintiffs have alleged a direct injury to their business in the form of increased counseling expenses. *SAC* ¶ 169.

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

*Litig.*, 298 F. Supp. 2d 1259, 1306 (S.D. Fla. 2003) (holding that medical associations suffered injury caused by "systematic practices regarding payments [that] directly affect[ed] medical associations who must deal with the fallout of such behavior."). Such "general factual allegations of injury" are sufficient at this stage. *See In re Managed Care Litig.*, 298 F. Supp. 2d at 1306 (*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). Therefore, the Association Plaintiffs have standing to pursue their individual claims.

        b.    <u>Representative Standing</u>

      The Association Plaintiffs also assert their claims on behalf of their members. An association may have representative standing if (1) its members would have standing to sue in their own right, (2) the interests that the association seeks to protect in the litigation are germane to the association's organizational purpose, and (3) the claims and relief will not require the participation of the association's individual members. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). WellPoint Defendants focus on the third prong, arguing that the representative claims require participation of the individual members to show that they received "valid assignments of benefits, that available administrative remedies had been exhausted for each claim, and that [they] were entitled to additional payments for particular claims." *Mot.* 53:1-6.

      In support of this argument, WellPoint Defendants cite to *Am. Med. Ass'n v. United HealthCare Corp.*, No. CV 00-2800 LMM, 2007 WL 1771498 (S.D.N.Y. June 18, 2007) ("*AMA IV*"), where, on a motion for summary judgment, the court determined that the medical association plaintiffs lacked representative standing to pursue ERISA claims on behalf of their members because individual members were required to show that they exhausted their administrative remedies. *See id.* at *21. That same case, however, expressly held that the medical association plaintiffs could proceed on their non-ERISA claims on a representative basis. *See id.* at 22 n.23. Moreover, that court, in an earlier opinion, allowed the medical association plaintiffs to proceed with its representation "insofar as it relates to claims for injunctive and declaratory relief only." *Am. Med. Ass'n v. United HealthCare Corp.*, No. CV 00-2800 LMM, 2002 WL 31413668, at *3 (S.D.N.Y. October 23, 2002) ("*AMA II*"). In this case, the Association Plaintiffs are pursuing prospective relief, *see SAC* 150:15-24, and they represent to the Court at this time that any particular proof of assignment and exhaustion will be provided after discovery, *see Opp'n* 59:25-28. Therefore, the Court does not dismiss the Association Plaintiffs' claims on this ground. For these reasons, the Association Plaintiffs have standing to pursue their representative claims on behalf of their members.

**O**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|----------|------------------------|------|-----------------|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

B.    <u>Antitrust Claims</u>

1.    <u>Violation of Section 1 of the Sherman Act (Claim 1)</u>

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. Not every agreement that restrains competition violates the Sherman Act. *See McDaniel v. Appraisal Inst.*, 117 F.3d 421, 422 (9th Cir. 1997). Rather, the Sherman Act "prohibits conspiracies and agreements that *unreasonably* restrain trade." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989). Claims under § 1 of the Sherman Act are evaluated under either a *per se* analysis or the rule of reason. *See id.* In this case, Plaintiffs allege that Defendants conspired to fix ONS reimbursement rates, and that the alleged conduct "constitutes both a *per se* and Rule of Reason claim under the Sherman Act." *SAC* ¶ 84.

1.    <u>Whether Plaintiffs State a *Per Se* Claim under the Sherman Act</u>

The Sherman Act prohibits some arrangements as a matter of law, and restraints that fall within certain narrow categories are deemed to be *per se* violations. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886, 127 S. Ct. 2705 ("The rule of reason does not govern all restraints. Some types 'are deemed unlawful *per se*.' The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work." (internal citations omitted)). In order to state a claim for a *per se* violation of the Sherman Act, Plaintiffs must allege sufficient facts that Defendants (1) entered into an agreement (2) to fix prices, rig bids, or divide a market.

a.    <u>Allegations of an Agreement</u>

Plaintiffs must offer particular factual allegations that Defendants entered into an illegal agreement. *See Twombly*, 550 U.S. at 556 ("In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). In order to allege a conspiracy under § 1 of the Sherman Act, a plaintiff must provide the "specific time, place, or person[s]" involved in the alleged conspiracy. *See id.* at 565 n.10. Mere allegations of parallel conduct will not suffice. *See id.*

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

In this case, Plaintiffs have not merely alleged that the WellPoint Defendants and other participating insurers engaged in parallel conduct—*i.e.*, that each participating insurer merely exchanged data with Ingenix and allegedly underpaid ONS reimbursements.  More than just identifying WellPoint Defendants' and other insurers possible motivations to use and manipulate the Ingenix database, Plaintiffs also provide dates, players, purposes, and effects.  Plaintiffs generally allege a conspiracy to fix ONS reimbursements: "WellPoint reached an agreement with the Insurance Conspirators, who are direct competitors, including UnitedHealth *via* its alter ego Ingenix to determine maximum UCRs using primarily the Ingenix Database . . . even while knowing that use of the database would result in artificially low reimbursements to Subscriber and Provider Class members."  *SAC* ¶ 85; *see also id.* ¶ 117 ("All of the [participating insurers] provide raw pricing data to Ingenix and receive UCR pricing data in return.  Ingenix uses the billing data provided by the Insurer Conspirators to create False UCR schedules, and those False UCR schedules are used by the Insurer Conspirators to determine how much to reimburse their members for ONS.").

Plaintiffs also allege that the PHCS was designed by HIAA members in 1973, and sold by the HIAA (including WellPoint) to Ingenix in 1998.  *See id.* ¶¶ 105-10.  Under the terms of the sale, HIAA members (including WellPoint) served on an ongoing Ingenix PHCS Advisory Committee to provide input on what data Ingenix would gather and how that data would be used.  *See id.* ¶ 111.  HIAA members and Ingenix also formed a "Liason Committee" to advise and evaluate Ingenix in its management of the Ingenix Database.  *See id.* ¶ 112.  Additionally, UHG became a member of the HIAA without having to pay any membership dues during the 10-year Cooperation Agreement.  *See id.* ¶ 113.  Ingenix entered into a Confidentiality Agreement to shield the identities of participating insurers who submit information to Ingenix, *see id.*, and participating insurers promised not to provide any UCR data to competing data services, *see id.* ¶ 96.

In addition to the post-1998 connection between participating insurers and Ingenix, Plaintiffs allege that participating insurers have had "ample opportunities to communicate, and have communicated, among themselves about the conspiracy."  *Id.* ¶ 99.  These communications allegedly occurred "routinely" at HIAA/AHIP conferences and board meetings.  *See id.*  While allegations of opportunities to conspire alone are insufficient to infer a conspiracy, *see In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) (noting that allegations of meetings and telephone conversations between competitors was insufficient "to infer participation in the conspiracy from the opportunity to do so"), such opportunities "demonstrate[] how and when Defendants had opportunities to exchange information or make agreements," *In re Static Random Access Memory*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008).  The allegations here

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

amount to more than simple "opportunities to conspire," as Plaintiffs further allege that participating insurers did not compete on ONS reimbursements even though they compete on many other plan provisions, including co-pay levels, deductibles, out-of-pocket maximums, number of covered visits, pre-existing condition coverage, drug benefits, and availability of mental health benefits. *See SAC* ¶ 101.

The Court finds that all the alleged facts, taken as true, sufficiently allege the existence of a plausible conspiracy among Defendants and other participating insurers to use the Ingenix Database to coordinate maximum ONS reimbursements. The WellPoint Defendants argue that the Complaint fails to specifically identify how an "alleged rate suppression agreement was reached." *Mot.* 7:24-26. However, no discovery has occurred in this case which would make Plaintiffs' allegations less plausible. In cases of collusion and conspiracy, it is reasonable to expect that discovery will uncover specific answers to Plaintiffs' fact-based allegations. Furthermore, WellPoint Defendants do not offer sufficient authority to conclude that *Twombly* actually requires concrete answers to each of these questions at the pleadings stage. In light of the Complaint's specific allegations that the participating insurers were involved in the maintenance and design of the Ingenix Database and all maintained depressed levels of ONS reimbursements, Plaintiffs have alleged facts providing circumstantial evidence of a price fixing agreement.

The Court observes that the Southern District of New York found that insurance subscribers and out-of-network providers adequately stated a § 1 claim against other participating insurers, UHG, and Ingenix on the basis of substantially similar allegations:

> Plaintiffs easily satisfy the requisite pleading standard with respect to their allegation of conspiracy. In fact the FAC is replete with factual support—including specific times, places, and persons—for the conspiracies alleged. . . . [T]he FAC alleges that: "an association of health insurance companies created a database in 1973 that it expressly disclaimed for use in making UCR determinations"; in turn, "[t]hese health insurers including United Healthcare, use the database for making UCR determinations in direct violation of their contractual requirements to their respective subscribers to pay the lower of the actual charge or the usual and customary charge; the UCR rates are inaccurate and lower than the actual rate due to the use of flawed data; 'supposedly competing health insurers, comprising the HIAA Group . . . had representatives sitting on the HIAA committees overseeing the development . . . of the PHCS database and made decisions to allow data suppliers to submit flawed and inadequate data'"; and

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

"in 1998 HIAA allowed a health insurer, United Healthcare, to acquire the PHCS database after it had already acquired the only other competing database."

*Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 446-47 (S.D.N.Y. 2008) (internal citations omitted). While *American Medical Association* did not address the pleading requirements of a *per se* violation because the plaintiffs in that case did not defend their *per se* claims, *see id.* at 447 n.6, Defendants do not offer any authority to suggest that the allegations of agreement are subject to more scrutiny in *per se* cases than in typical rule of reason cases. Therefore, the Court finds that Plaintiffs have sufficiently alleged that Defendants and other participating insurers entered into an agreement.

> b.  Allegations of a *Per Se* Violation

As a general matter, agreements to fix prices among competitors is one of the discrete categories of restraints reserved for *per se* treatment. *See Leegin*, 551 U.S. at 887 ("Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices . . . ." (*citing Texaco Inc. v. Dagher*, 547 U.S. 1, 126 S. Ct. 1276, 164 L. Ed. 2d 1 (2006)). Horizontal price fixing is *per se* unlawful "regardless of whether the prices set are minimum or maximum," *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000), and Plaintiffs in this case allege that Defendants and other participating insurers conspired to set maximum ONS reimbursements. That Plaintiffs allege that the Ingenix Database produced "modules" or uniform price schedules specifying a range of ONS reimbursements, *see SAC* ¶ 116, does not necessarily mean that participating insurers did not "fix" a *maximum* ONS reimbursement. Furthermore, WellPoint Defendants claim that UCR information is one factor used in calculating a particular ONS reimbursement, but Plaintiffs allege that participating insurers "adopted a standard formula for making UCR determinations, based on a database that is designed and intended to reduce reported charges artificially." *Id.* ¶ 89.

WellPoint Defendants claim that the alleged conspiracy is inappropriate for *per se* treatment because Plaintiffs fail to allege a horizontal agreement among competitors that "always or almost always" restrains competition. *See Mot.* 5:24-25 (*citing Leegin*, 551 U.S. at 877, 886, 127 S. Ct. 2705, 168 L. Ed. 2d 623 (2007). Even if the restraint alleged was ancillary to some pro-competitive venture, it would be inappropriate to dismiss the *per se* claim at this time. *See Nat. Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Ok.*, 468 U.S. 85, 104 n.26, 104 S. Ct. 2948, ("Indeed, there is often no bright line separating per se from Rule of Reason analysis. *Per se* rules may require considerable inquiry into market conditions before *the evidence* justifies a presumption of anticompetitive conduct." (emphasis added)). While the

**O**

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

question of whether a plaintiff's allegations "comprise a *per se* claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss or for summary judgment," *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1010 (N.D. Cal. 2008), the Court declines to dismiss the *per se* claim at this time, especially considering Plaintiffs' allegations that information was falsified by participating insurers providing information to Ingenix and by Ingenix in compiling the data. *See SAC* ¶¶ 122-24.

In their papers, WellPoint Defendants try to characterize Plaintiffs' allegations as something other than a price fix. At one point in the motion, WellPoint Defendants suggest that the alleged agreement between WellPoint and Ingenix to provide and purchase data is a vertical agreement. *See Mot.* 5:28. Vertical price fixing is not subject to *per se* analysis and must be evaluated according to the rule of reason. *See Leegin*, 551 U.S. 877. While Plaintiffs do allege a vertical dimension to the conspiracy—the participating insurers' agreement to purchase UCR data from Ingenix—the gravamen of the allegation is that the participating insurers conspired amongst themselves to fix ONS reimbursements (something that Ingenix was not in the business of paying because Ingenix is not an insurer). *See SAC* ¶ 85. ("WellPoint reached an agreement with the Insurance Conspirators, who are direct competitors, including UnitedHealth *via* its alter ego Ingenix to determine maximum UCRs using primarily the Ingenix Database."). Moreover, WellPoint Defendant "cannot escape the *per se* rule [for certain horizontal restraints of trade] simply because their conspiracy depended upon the participation of a 'middle-man;'" in this case, Ingenix. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 337 (3d Cir. 2010) (*citing U.S. v. All Star Indus.*, 962 F.2d 465, 473 (5th Cir. 1992)) (finding that a conspiracy between pipe distributor bidders that required coordination through a middle-man bid rigger was still a horizontal conspiracy subjected to the *per se* analysis). Indeed, Plaintiffs clearly allege that the agreement was an "unreasonable *horizontal* restraint on trade." *Id.* ¶ 85 (emphasis added).

Additionally, WellPoint Defendants claim that Plaintiffs' allegations are nothing more than an agreement to exchange information, which can have significant pro-competitive effects in an industry. *See Mot.* 11:28-12:3. For example, WellPoint Defendants suggests that centralizing data collection for determining UCR rates can result in cost savings for participating insurers. *See id.* 12:12. As a general matter, agreements among competitors to exchange information are analyzed under the rule of reason because such exchanges can facilitate competition. *See U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.16, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978) (noting that an exchange of price information among competitors is not a "*per se* violation of the Sherman Act"). The Court, however, will not read into Plaintiffs' allegations as WellPoint Defendants suggest. For these reasons, the Court DENIES Defendants' motion to dismiss Plaintiff's § 1 of the Sherman Act claim for failure to state a *per se* violation.

**O**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

2.    <u>Whether Plaintiffs State a Sherman Act Claim Under the Rule of Reason</u>

In addition to their *per se* allegations, Plaintiffs state a Sherman Act claim against Defendants under the rule of reason.  In order to state a rule of reason claim, a plaintiff must demonstrate the following three elements: "(1) the persons or entities to the agreement intend to harm or restrain competition; (2) an actual injury to competition occurs; and (3) the restraint is unreasonable as determined by balancing the restraint and any justifications or pro-competitive effects of the restraint." *Cal. Dental Ass'n v. FTC*, 224 F.3d 942, 947 (9th Cir. 2000) (*quoting Am. Ad Mgmt. v. GTE Corp.*, 92 F.3d 781, 789 (9th Cir. 1996)).  As discussed with respect to Plaintiffs' *per se* claim, the Complaint adequately alleges that Defendants and other participating insurers conspired to set maximum ONS reimbursements by using the Ingenix Database.  More is required, however, under the rule of reason.

In stating a rule of reason claim, a plaintiff must identify a "relevant market," *see Tanaka v. University of So. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001), which must be defined in terms of both product and geography, *see Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 n.4 (9th Cir. 2008) ("Antitrust law requires allegation of both a product market and a geographic market.").  In addition to identifying a relevant market, a plaintiff must allege that the defendant has "market power" within that market—otherwise the defendant's restraint on trade would not have a substantial anticompetitive effect.  *See Newcal*, 513 F.3d at 1044.  As the Ninth Circuit has observed, "[t]here is no requirement that these [relevant market and market power] elements of the antitrust claim be pled with specificity."  *Id.* (*citing Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996)); *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 993 (N.D. Cal. 2010).

In this case, Plaintiffs allege that the conspiracy to fix maximum ONS reimbursements occurred in the following "linked" markets:

> The relevant product market is the market for data used to calculate UCRs for reimbursements of claims by health insurance beneficiaries for out-of-network, non-negotiated medical services (the "Data Market").  The Data Market is directly and inextricably linked to the market for ONS (the "Linked ONS Market") in that the Data Market constitutes the primary input to the Linked ONS Market, and the Insurer Conspirators use the Data Market to control and depress amounts reimbursed in the Linked ONS Market.

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | | Date | August 11, 2011 |
|---|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | | |

*SAC* ¶ 90. Furthermore, Plaintiffs allege that the "relevant geographic market is the United States." *Id.* ¶ 91.

In their motion, WellPoint Defendants argue that Plaintiffs fail to adequately identify a "relevant market" and that the market allegations lack factual support. *See Mot.* 13:12-15:14. The Court disagrees. First, Defendants claim that Plaintiff must have been injured in the relevant market, and cite *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (9th Cir. 1988) to support this contention. Defendants, however, misread that case because the *McGlinchy* plaintiff failed to allege an injury to the market, rather than a mere injury to himself. *See id.* at 812 ("Thus appellants fail to state an antitrust claim based on defendants' conduct with respect to PB and PB-related products. It is injury to the market or to competition in general, not merely injury to individuals or individual firms that is significant."). Therefore, *McGlinchy* concerned the requirement of antitrust injury, and Defendants argument appears to be directed at Plaintiffs' standing, though standing to assert the Sherman Act claims is not raised in the papers. WellPoint Defendants fail to offer any authority on point to conclude that the relevant market must be the *plaintiff's* market and the alleged injury to Plaintiffs was precisely the intended consequence of Defendants' conspiracy. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 479, 102 S. Ct. 2540, 73 L. Ed. 2d 149 (1982) (stating "[w]here the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations . . . would be likely to cause") (internal citations omitted).

Second, Defendants claim that Plaintiffs fail to make out the alleged "link" between the Data Market and the Linked ONS Market. While detailed factual allegations are not required in defining the market, *see Newcal*, 513 F.3d at 1045, Plaintiffs extrapolate on how the alleged conspiracy in the Data Market affects their rates of ONS reimbursement in the ONS Market. *See SAC* ¶¶ 92-98. Plaintiffs allege that WellPoint Defendants and other participating insurers used the Ingenix Database to coordinate depressed UCR rates for ONS reimbursements, and thus "although the Plaintiffs and Classes were not competitors of the Insurer Conspirators in the Data Market when the False UCRs were set by WellPoint and the Conspirators, the injury they suffered was inextricably linked with the competitive harm arising from the Insurer Conspirators' agreement to use False UCRs to depress and set a ceiling for ONS reimbursements." *Id.* ¶ 92. Plaintiffs were required to pay out-of-pocket to cover the difference between the actual cost and the ONS reimbursement.

Finally, the Court also notes that WellPoint Defendants do not dispute Plaintiffs' allegations of market power. Ingenix is alleged to dominate the Data Market as it has the "majority of major health insurers" contributing data to the Ingenix Database, *see id.* ¶ 95,

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|----------|------------------------|------|-----------------|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

including the three largest health insurers in the country, *see id.* ¶¶ 54, 57, 63. UHG claims that Ingenix's market domination was not a result of any unlawful conspiracy because its market domination was "the result of (a) Ingenix acquiring and combining various competing provider charge databases and (b) natural barriers to entry into the Data Market. *UHG Mot.* 5:24-28. The cause of Ingenix's dominance of the Data Market, however, is irrelevant to Plaintiffs' allegation that it dominates that market and that the alleged conspiracy harmed competition in that market and Plaintiffs' ONS reimbursements. For these reasons, the Court DENIES Defendants' motion to dismiss Plaintiffs' rule of reason claim.

3.     <u>Whether Plaintiffs' Sherman Act Claim is Barred by the McCarran-Ferguson Act</u>

The McCarran-Ferguson Act exempts from federal antitrust laws all conduct that (1) is part of the "business of insurance," (2) is regulated by state law, and (3) is not a "boycott, coercion, or intimidation." 15 U.S.C. §§ 1011-15; *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 207 n.1, 99 S. Ct. 1067, 59 L. Ed. 2d 261 (1979) (quoting the text of the McCarran-Ferguson Act). WellPoint Defendants claim that Plaintiffs allegations satisfy each of these elements. *See Mot.* 12:12-15:2. The Court disagrees.

In order to constitute part of the "business of insurance," the practice must (1) have the effect of transferring or spreading a policyholder's risk, (2) be "an integral part of the policy relationship between the insurer and the insured," and (3) be limited to entities within the insurance industry. *Royal Drug*, 440 U.S. at 210. The Supreme Court instructs that the McCarran-Ferguson exemption was focused on the relationship between the insurer and its agents and the insured. *See id.* at 215-16. Moreover, the statute "exempts the 'business of insurance' and not the 'business of insurance companies.'" *Union Lab. Life Ins. Co. v. Pireno*, 458 U.S. 119, 129, 102 S. Ct. 3002, 73 L. Ed. 2d 647 (1982) (citation omitted). Finally, exemptions from antitrust laws under the McCarran-Ferguson Act are to be narrowly construed. *Id.* at 126.

This case bears many similarities to the facts in *Pireno*, and for many of the same reasons, WellPoint Defendants' use and manipulation of the Ingenix database is not part of the "business of insurance." In *Pireno*, a chiropractor challenged an insurance company's practice of using a peer review committee to determine whether claims submitted were both reasonable and necessary. *See Pireno*, 458 U.S. at 122-23. The Court evaluated the practice under the three-prong *Royal Drug* test and held that the referral practice did not transfer risk, but only reduced costs. More specifically, the Court stated that the practice was "logically and temporally

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|----------|------------------------|------|-----------------|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

unconnected to the transfer of risk accomplished by [the] insurance policies." *Id.* at 130. The
Court agreed with the Second Circuit's determination that the committee determined "only . . .
whether the insured's loss falls within the policy limits"— that is, not whether risk of loss was
transferred, but only the extent to which it was transferred. *Id.* The Court also held that the
insurer's practice of using the peer review committee was neither integral to the relationship
between the insurer and the insured, nor limited to entities within the insurance industry. *See id.*
at 129-33. It was not integral because it was a "separate arrangement between the insurer and
third parties not engaged in the business of insurance," and because the arrangement was
"obviously distinct from [the insurance company's] contracts with its policyholders." *Id.* at 131.
The Court reached its conclusion by analogizing the facts in *Pireno* to the facts in *Royal Drug*,
where an arrangement between an insurance company and a pharmacy about drug pricing was
said to be a "separate contractual arrangement[]"with a company "engaged in the sale and
distribution of goods and services other than insurance." *Id.* (*citing Royal Drug*, 440 U.S. at
216).

     Plainly, Defendants' use of the Ingenix database does not involve the spreading or
underwriting of risk. Like in *Pireno*, the Ingenix database determines whether and to what
extent the "insured's loss falls within the policy limits." *See id.* at 130. Defendants cannot, and
do not, argue that acquiring cost data from the Ingenix database and using it to determine a
reasonable reimbursement transfers risk from the insured to the insurer as contemplated by the
McCarran-Ferguson Act and *Pireno*. It is doubtless the case that each reimbursement
determination varies the *amount* of risk incurred by the insurance companies, but it is clear that
reduction in costs alone is not sufficient for a practice to fall within the "business of insurance."
*See id.* Defendants' use of an outside tool to determine the reasonableness of charges incurred
was insufficient to fall within the "business of insurance" in *Pireno* and is insufficient to fall
within the "business of insurance" here.

     Defendants' only argument that the use of Ingenix falls within the business of insurance
stems from the Supreme Court's decision in *U.S. Dep't of Treasury v. Fabe*, which states that
"[t]here can be no doubt that the actual performance of an insurance contract falls within the
business of insurance." *Fabe*, 508 U.S. 491, 503, 113 S. Ct. 2202, 124 L. Ed. 2d 449 (1993).
Defendants' reliance on *Fabe* overlooks the fact that the Supreme Court expressly squared *Fabe*
with *Royal Drug* and *Pireno*, and involved critically different facts. In *Fabe*, the question was
whether a state law allowing insureds to make claims against bankrupt insurance companies
regulated the "business of insurance," not whether a particular practice of an insurance company
was part of the "business of insurance." *Id.* at 493-94. If the state law did regulate the business
of insurance, then policy holders would have priority over claims against the bankrupt company

**O**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

## CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | | Date | August 11, 2011 |
|---|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | | |

by others, *i.e.* the policy holders' contracts would remain enforceable. *Id.* The distinction between that case and the present facts cannot be overstated. It is a business practice at issue, not a law, and it is the determination of the reasonableness of claim amounts at issue, not the enforceability of a contract as a whole. Defendants' arguments are without merit, and because the use of data from the Ingenix database is not part of the "business of insurance," Plaintiffs' Sherman Act claims are not barred by the McCarran-Ferguson Act.

C.      RICO Claims

Plaintiffs also allege that WellPoint Defendants' conduct violates sections 1962(c) and 1962(d) of RICO. *See* 18 U.S.C. §1962(c)-(d). WellPoint Defendants insist that Plaintiffs insufficiently pleaded their RICO claims and that they should be dismissed. *See Mot.* 17:23.

1.      Participation in a RICO Enterprise – 18 U.S.C. § 1962(c)

Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") states that: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). For a plaintiff to state a claim under § 1962(c), he or she must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985); *Walter v. Drayson*, 538 F.3d 1244, 1247 (9th Cir. 2008). "RICO is to be read broadly" and "liberally construed to effectuate its remedial purposes." *Sedima*, 473 U.S. at 497-98; *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007). WellPoint Defendants' attack each of the RICO elements except the "pattern" requirement.

a.      Associated-in-Fact Enterprise

RICO defines "enterprise" in a fairly pedestrian manner: "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). This seemingly innocuous definition, however, has commanded much attention, particularly with respect to the meaning of "a group of individuals associated in fact." *See Odom*, 486 F.3d at 548. The Supreme Court stepped in early and defined an associated-in-fact enterprise as "an ongoing organization" whose "various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981). Though this is not a stringent standard, an associated-in-fact

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

enterprise "must have three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, ___ U.S. ___, 129 S. Ct. 2237, 2244-45, 173 L. Ed. 2d 1265 (2009).

An enterprise is not wholly defined by its system of governance or one particular structure. In fact, liability is "not limited to those with a formal position in the enterprise," but "some part in directing the enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Direction need not come down through a "hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc." *Boyle*, 129 S. Ct. at 2245. Moreover, "[m]embers of the group need not have fixed roles; different members may perform different roles at different times." *Id.* And "[t]he group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.* Finally, "[w]hile the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by quiescence." *Id.*

### i.    Common Purpose

First, an associated-in-fact must have a common purpose. Plaintiffs allege that Defendants "agreed to utilize the flawed Ingenix Database for their UCR determinations in an effort to depress the prices paid for ONS by the conspiring healthcare companies." *SAC* ¶ 289; *see also* RICO Case Stmt. at 120-24. In other words, Defendants controlled and manipulated the Ingenix database in order to pay less to providers and subscribers. WellPoint Defendants' posit that this is ordinary business outside the reach of RICO, but provide no additional argument as to why manipulating the UCR database is an ordinary business practice. *See Mot.* 19:8-17. To the contrary, Plaintiffs' submit the following allegations, which, if true, establish a common purpose: "the Insurer Conspirators regularly and intentionally excluded certain data points representing higher charges before submitting their data to Ingenix, with the intention and consequence of depressing the resulting UCRs and thus enabling them to under-reimburse for ONS;" and that Ingenix "aggregate[d] and manipulate[d] the data and create[d] False UCR schedules that [were] sold to the same health insurers that provided the data in the first place." *SAC* ¶¶ 74, 76. This common purpose was in WellPoint Defendants' individual interest because as the UCRs went down, WellPoint Defendants paid less and kept more. *Id.* ¶ 298. Defendant Ingenix also profited from the alleged enterprise by "enhancing its ability to earn licensing fees through the sale of the Ingenix Database, including other Ingenix products which used WellPoint

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

and United Health data." *Id*. ¶ 295. Plaintiffs have adequately pleaded that the common purpose of the alleged enterprise was to "reduc[e] the price paid for ONS, and increas[e] the profits of the Enterprise participants and the Insurer Conspirators." *Id*. ¶ 292.

#### ii.    Relationship Among Enterprise Members

Plaintiffs have also sufficiently pleaded the relationship among the members of the purported enterprise. It is clear that a "hierarchical structure or a 'chain of command'" is not required in order for a RICO relationship to be present. *Boyle*, 129 S. Ct. at 2245. And, "[m]embers of the group need not have fixed roles." *Id*. However, "allegations that 'several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates" are not enough to show membership in an enterprise. *Id*. at 2245 n.4. Here, the allegations plausibly establish that the Defendants and conspirators agreed to depress UCRs, and that they would do so collectively. *See SAC* ¶ 12 ("WellPoint and other health insurance companies agreed to manipulate the rates used to reimburse members for ONS."); ¶ 19 ("WellPoint, Inc. controls the actions of the other WellPoint entities, including those which contribute data to the Ingenix Databases."); ¶ 289 ("WellPoint and UnitedHealth knowingly participated in the formation and maintenance of, purchased and utilized the Ingenix Database"). Together, WellPoint Defendants and conspirators contributed "nearly 60%" of the information in Ingenix, which they could not do acting individually. *Id*. ¶ 73. Finally, [d]ecision making within the Enterprise…was consensual…and [t]he members of the Enterprise functioned as a continuous unit." *Id.* ¶ 294. Plaintiffs allegations plausibly show that WellPoint Defendants and conspirators operated together to depress UCRs.

#### iii.    Longevity

WellPoint Defendants do not contest the longevity factor and the Court finds Plaintiffs' assertion that the enterprise began in 1998 sufficient to survive this Rule 12(b)(6) motion. *Id.* ¶ 288; *see also Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007), *cert. denied*, 552 U.S. 985 (2007) (finding the longevity requirement was met by "[a]n almost two-year time span"); *United States v. Cerna*, No. CR 08-0730 (WHA), 2010 WL 1459444, at *2 (N.D. Cal. April 9, 2010) (finding sufficient longevity in complaint alleging that an enterprise existed "since at least the mid-1990's, and continuing up through and including the present" (internal citations omitted)).

Plaintiffs' allegations of the enterprise's common purpose, the relationship between the members and the longevity of the enterprise plausibly show the existence of an associated-in-

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|----------|------------------------|------|-----------------|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

fact enterprise.  The next question is whether WellPoint Defendants participated in the associated-in-fact enterprise's conduct.

        b.      WellPoint Defendants' "Conduct"

      WellPoint Defendants also seek dismissal of Plaintiffs' RICO claims because of "Plaintiffs fail[ure] to allege any facts indicating that WellPoint directed the affairs of the alleged Enterprise."  *Mot.* 21:1-2.  The Court agrees.

      Liability for participating in the "conduct" of a RICO enterprise extends only to those who "have some part in directing [the enterprise's] affairs."  *Reves*, 507 U.S. at 179.  As it is used here, "directing" has a different meaning than commonly understood.  More is required than "simply being involved," *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008), but a defendant need not be in-charge or have "significant control over or within [the] enterprise," *Reves*, 507 U.S. at 179 n.4.

      In this case, Plaintiffs allege that WellPoint and UnitedHealth "knowingly participated in the formation and maintenance" of the Ingenix Database.  *SAC* ¶ 289.  This is as specific as Plaintiffs get with respect to WellPoint Defendants' RICO conduct.  Elsewhere in the complaint are allegations similar to the following:  "WellPoint and UnitedHealth participated [in] and conducted the affairs of the enterprise not only by submitting false and incomplete data to Ingenix, but by being involved in decision making regarding the database and by utilizing the flawed data for [the] illicit purpose of determining UCR[s]."  *Id.* ¶ 301.  The submission of its own data does not plausibly show that WellPoint controlled the other members in the associated-in-fact enterprise.  In fact, all it really establishes is that WellPoint was acting on its own when submitting data to the Ingenix database.  And, the existence of a business relationship between WellPoint, Ingenix, and the Insurance Defendants without more does not show that WellPoint conducted the enterprise.  *See Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 727-28 (7th Cir. 1998) (holding that an established business relationship between the defendants and the enterprise was insufficient to state a claim that the defendants directed the affairs of the alleged fraudulent marketing enterprise).  Finally, Plaintiffs' conclusory statement that "WellPoint and UnitedHealth . . . [were] involved in decision making regarding the database" does suggest RICO conduct, but it is too general to satisfy *Twombly's* pleading instructions.  *See Kearney v. Foley and Lardner*, CV 05-2112 (LSP), 2011 WL 1119020, at *6 (S.D. Cal. Mar. 28, 2011) (dismissing a RICO claim where the Plaintiff failed to allege facts showing that the defendant law firm's legal services constituted participation in the management of an alleged enterprise).

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

Without more, Plaintiffs have failed to adequately allege that WellPoint Defendants were involved in the "conduct" of the enterprise.

c.    Pattern

WellPoint Defendants do not challenge Plaintiffs' allegations with respect to RICO's "pattern" requirement. A "pattern of racketeering activity requires at least two acts of racketeering activity, one of which occurred after 1970 and the last of which occurred within 10 years after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). The Court finds that Plaintiffs adequately allege a "pattern" by stating that the enterprise began around 1998 and that the "racketeering activity is related because it involves the same fraudulent scheme, enterprise, common persons, common out-of-network claim practices, common results impacting upon common victims and is continuous because it occurred over several years." *SAC* ¶ 312; *see also H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989) (establishing a pattern requires showing that the racketeering acts "are related" and "amount to or pose the threat of continued criminal activity").

UHG Defendants, however, do challenge Plaintiffs' allegations of a pattern of conduct as it relates exclusively to them. *See UHG Mot.* 2:4-6. More specifically, UHG Defendants argue that Plaintiffs have not adequately pleaded predicate acts related to UHG or Ingenix, and therefore, they have not adequately pleaded a pattern of predicate acts. *Id.* UHG Defendants are correct. Where RICO is asserted against multiple defendants, a plaintiff must allege at least two predicate acts by *each* defendant. *See United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987), *cert. denied*, 486 U.S. 1022 (1988); *Keel v. Schwarzenegger*, CV 08-7591 RMT (VBK), 2009 WL 1444644, at *6 (C.D. Cal. May 19, 2009). As discussed below, the basis of Plaintiffs' mail and wire fraud RICO claims in the Complaint is WellPoint Defendants' practice of making false and misleading statements related to ONS reimbursement. *See, e.g., SAC* ¶ 78. Moreover, the basis of Plaintiffs' embezzlement RICO claims is that WellPoint Defendants took funds from the individual plans and kept it for themselves. *See id.* ¶ 319 ("WellPoint benefited from the conversion of assets from its ERISA plans" and "WellPoint improperly withheld such funds and maintained them as part of its own assets for WellPoint's own benefit"). Nowhere, however, do Plaintiffs link WellPoint Defendants' RICO conduct to UHG Defendants' RICO conduct. There is no mention that UHG Defendants' had a role in crafting the false or misleading statements, or any other involvement, and there is no mention that UHG Defendants' had access to the health plans' funds, let alone that they converted those funds to their own use. As a result, Plaintiffs have failed to allege at least two acts of the UHG Defendants that qualify as RICO predicate acts.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|----------|------------------------|------|-----------------|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

### 2. Racketeering Activity

Finally, to state a claim under RICO, a plaintiff must allege that the conduct complained of qualifies as racketeering activity. Racketeering activity is defined in RICO by reference to certain predicate acts. *See* 18 U.S.C. § 1961. Included predicate acts are, among others, mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, and embezzlement from pension and welfare funds under 18 U.S.C. § 664. *See* § 1961(1)(B). Plaintiffs' RICO causes of action are based on each of the mentioned predicate acts.

### a. Mail and Wire Fraud (Claim 6)

To state a claim for mail and wire fraud, a Plaintiff must plead, in addition to the other elements of a RICO claim, "(1) a scheme or artifice devised with (2) specific intent to defraud and (3) use of the United States mail or interstate telephone wires in furtherance thereof." *Orr v. Bank of America*, 285 F.3d 764, 782 (9th Cir. 2002). Although RICO itself is not subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standards, predicate acts alleging fraud must be pleaded with particularity. *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004). At a minimum, this requires that the complaint must "state the time, place and specific content of the false representation as well as the identities of the parties to the misrepresentation." *Id.* The plaintiff must also set forth more than neutral facts necessary to identify the transaction; he must explain why the statement complained of was false or misleading. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (superseded by statute on other grounds). In the context of a fraud suit involving multiple defendants, a plaintiff must also "identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989). Although the complaint need not identify false statements made by each and every individual, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to . . . inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Bruhl v. Price Waterhousecoopers Intern.*, CV 03-23044, 2007 WL 997362, at *3 (S.D. Fla. Mar. 27, 2007).

Aside from the RICO elements discussed above, Plaintiffs have adequately pleaded the elements of a RICO mail and wire fraud predicate act, but have failed to adequately plead the minimal degree of reliance for such predicate acts.

### i. Subscriber Plaintiffs

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | | Date | August 11, 2011 |
|---|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | | |

The form and substance of the allegations of mail and wire fraud predicate acts for each Plaintiff are similar and the Court will not go through them individually. To illustrate, however, the Court notes that J.B.W. alleges that after submitting a claim to Anthem Blue Cross Life and Health Insurance Company, WellPoint Defendants sent, through the mail, an Explanation of Benefits indicating that J.B.W. would be responsible for the amount in excess of the "reasonable and customary" charges. *See* RICO Case Statement 15:5-15. That Explanation of Benefits was dated January 26, 2009 and was false or misleading because the reimbursed amount was less than the actual "reasonable and customary" rates.[7] *See id.*; *see also SAC* ¶ 78. J.B.W. and the other Plaintiffs listed above, state the time, place and content of the fraudulent statements and how they were misled. Moreover, the Complaint alleges that the Defendants had the express purpose—specific intent—of depressing ONS payments. *See SAC* ¶ 289; *see also Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) ("the factual circumstances of the fraud itself [must be pleaded] with particularity, [but] the state of mind—or scienter—of the defendants may be alleged generally").

While Plaintiffs Cooper, Seigle-Epstein, and the Samsells have not pleaded the elements of mail fraud as a predicate act with the same degree of particularity as J.B.W., their pleadings are nevertheless sufficient. The only dates alleged by these Plaintiffs are dates of medical treatments and not the time of any specific false or misleading statements by a particular defendant. *See* RICO Case Statement 20-23. Despite these omissions, the allegations that each sought medical treatment on a particular date and then received false or misleading reimbursement information from WellPoint Defendants is more than enough to notify Defendants of the time and place of the alleged fraud. *See Cal. Pharmacy Mgmt., LLC v. Zenith Ins. Co.*, 669 F. Supp. 2d 1152, 1160 (C.D. Cal. 2009) ("factual specificity as to the time and place of the over 800 alleged objections lodged by Defendants" was unnecessary for plaintiff's claim to survive a Rule 9(b) inquiry because "defendants, as the alleged authors of the communications in question, [we]re well aware of their time and place"); *Gonzales v. Lloyds TSB Bank, PLC*, 532 F. Supp. 2d 1200, 1211-12 (C.D. Cal. 2006) (omission of specific dates not fatal where fraud occurred over an extended period of time). Allegations that a Plaintiff

---

[7] In their Opposition to Defendants' Motion to Dismiss, Plaintiffs argue that even if the statements in the explanation of benefits and other mailed documents were not false or misleading themselves, they still satisfy wire or mail fraud because they were part of the larger fraudulent scheme to depress prices. *See Opp'n.* 25:9-26:10. The Complaint, however, only alleges that WellPoint Defendants sent subscribers and providers "materially false and misleading" explanations of benefits or other statements. *See SAC* ¶¶ 305-09. The Court will not read into the Complaint what is not there.

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|----------|------------------------|------|-----------------|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

"underwent surgery" on "June 29, 2006," sought reimbursement, and received explanations in
the mail as to the "reasonable and customary charge" for the services are enough to inform
Defendants of the particular date and time of their own false or misleading statements.  *See*
RICO Case Statement 20-21 (allegations regarding Plaintiff Cooper).  As a result, the Subscriber
Plaintiffs have pleaded, with particularity, the elements of mail and wire fraud as predicate acts
under RICO.

#### ii.   Provider Plaintiffs

Similarly, all of the Provider Plaintiffs have stated, with particularity, the time, place and
content of WellPoint Defendants' false or misleading statements.  Again, the Court will not
explain each Provider Plaintiffs' allegations and why they are sufficient, but will use one to
demonstrate the sufficiency of the mail and wire fraud predicate act claims.  Dr. Henry provided
covered medical services on March 27, 2009 and submitted his claim to WellPoint by electronic
wire.  *See* RICO Case Statement 34.  On June 17, 2009, Dr. Henry received a letter in response,
stating that "[t]his is the amount in excess of the allowed expense for a non-participating
provider.  The Health Plan is not responsible for any amounts in excess of this allowed expense."
*Id.*  According to Provider Plaintiffs, the statement that the reimbursed amount was the actual
"allowed expense" is false.  *See SAC* ¶ 78.  For the same reasons as above, the Provider
Plaintiffs' mail and wire fraud predicate act allegations state the time, place and content of the
false or misleading statements and survive a Rule 12(b)(6) challenge.[8]

#### iii.   Mail and Wire Fraud Reliance

Nevertheless, the Complaint does not contain proper allegations that anyone relied on and
was injured by the racketeering activity.  *See Hemi Group, LLC v. City of New York*, ___ U.S.
___, 130 S. Ct. 983, 989, 175 L. Ed. 2d 943 (2010) (holding to state a claim under RICO "the
plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his
injury, but was the proximate cause as well'").  Plaintiffs cite to the Supreme Court's decision in
*Bridge v. Phoenix Bond & Indem. Co.*, and state that they "are not required to show any reliance
for RICO injury purposes."  *Opp'n* 28:9-23.  Plaintiffs' misunderstand the Supreme Court's

---

[8] The other Provider Plaintiffs provide similarly detailed factual allegations of the alleged false
or misleading statements.  *See* RICO Case Statement 27-114.  Further, the Association Plaintiffs
also assert RICO claims, but neither the WellPoint nor UHG Defendants' make any argument as
to why the RICO mail and wire fraud predicate act allegations are insufficient as to them.  Thus,
the Court need not consider that issue in this Order.

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

holding on RICO reliance in that case.  The Supreme Court did not say that there is no requirement to plead any reliance, but only that "first-party" reliance is not required.  *See Bridge*, 553 U.S. 639, 659, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008).  In fact, the Supreme Court went on to hold that, "[o]f course, none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations."  *Id.* (emphasis in original).

Apparently realizing that the allegations are insufficient, Plaintiffs ask this Court to "infer" reliance—something it cannot do without some facts to support an inference.  *See Opp'n* 28:12.  Having failed to allege reliance in any form, these RICO claims are insufficiently pleaded.

      b.   <u>Embezzlement (Claim 7)</u>

Although Plaintiffs have stated a claim for embezzlement as a predicate RICO act, the RICO claim still fails for the reasons stated above.  WellPoint Defendants' only argument against Plaintiffs' embezzlement-based RICO claim is that "embezzlement is the act of fraudulently converting *another person's* property, and Plaintiffs' allegations fail to show how WellPoint converted anyone's assets."  *Mot.* 28:5-6.

Section 664 of Title 18 of the United States Code reads:

"Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 664.  The statute does not read as restrictively as Defendants' suggest and the case cited by Defendants cuts against them.  In *United States v. Andreen*, the Ninth Circuit recognized that embezzlement traditionally encompassed "the fraudulent appropriation of the property of another."  628 F.2d 1236, 1241 (9th Cir. 1980).  The court went on, however, to say that embezzlement under 18 U.S.C. § 664 "goes beyond traditional [embezzlement] concepts . . . and imposes liability for an intentional breach of special fiduciary duties imposed by other regulatory statutes or governing instruments."  *Id.*

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

In this case, Plaintiffs have alleged breach of fiduciary duties imposed by ERISA. *See SAC* ¶ 383 (Third Claim for Relief). To the extent that ERISA Plaintiffs are asserting claims under RICO with embezzlement as the predicate acts, the Defendants' motion is DENIED. It must be noted, however, that Plaintiffs have not provided any response to Defendants' argument with respect to the Plaintiffs not asserting ERISA breach of fiduciary duty claims. Without opposition, the Court grants Defendants' motion related to the embezzlement-based RICO claims asserted by the non-ERISA Plaintiffs.

### 3.    RICO Conspiracy (Claim 8)

Conspiring to violate RICO is a separate offense under 18 U.S.C. § 1962(d). Defendants insist that there is no plausible allegation that WellPoint Defendants and others agreed to conduct a criminal enterprise through a pattern of racketeering activities. *Mot.* 29:23-27. More specifically, Defendants argue that "for the same reason that their antitrust conspiracy claim fails," their RICO conspiracy claim fails. *Id.* 29:10-13. As the Court has already found that Plaintiffs have plausibly alleged an agreement to fix prices, Defendants' argument linking the two must fail.

In sum, the Court GRANTS WITH LEAVE TO AMEND Defendants' motions to dismiss based on Plaintiffs' failure to adequately allege RICO conduct, a RICO pattern as to UHG Defendants, and the minimal degree of reliance necessary for a mail or wire fraud predicate act.

### C.    ERISA Claims

### 1.    Claim for Plan Benefits under 29 U.S.C. §1132(a)(1)(B) (Claim 2)[9]

The Employee Retirement Income Security Act ("ERISA") was enacted primarily to "protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting . . . of financial and other information" and to establish "standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans." 29 U.S.C. § 1001(b). To meet those goals, Congress empowered participants, beneficiaries, and fiduciaries of qualified ERISA benefit plans, along with the Secretary of Labor, to sue for, *inter alia*, benefits owed. *See* 29 U.S.C. § 1132(a).

---

[9] The parties also refer to this as ERISA §502(a)(1)(B).

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|----------|------------------------|------|-----------------|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

The ERISA Plaintiffs (Roberts, Cooper, Rivera-Giusti, Henry, Schwendig, Peck, Pariser, Kavali, the North Peninsula Surgical Center L.P., and members of the Association Plaintiffs (collectively, "ERISA Plaintiffs")) assert claims against WellPoint for failure to provide benefits under 29 U.S.C. § 1132(a)(1)(B). *See SAC* ¶¶ 376-82. Defendants argue that Plaintiffs' § 1132(a)(1)(B) claims should be dismissed because Plaintiffs fail to allege facts that: (1) Defendants are "administrators" under ERISA; (2) demonstrate the plan provisions at issue; (3) Plaintiffs exhausted their administrative remedies; and (4) the Provider Plaintiffs have ERISA standing. *See Mot.* 31:8-37:15. The Court addresses each of the Defendant's arguments separately.

> a.    Whether WellPoint can be sued as an Insurer

Defendants argue that claims for benefits under 29 U.S.C. § 1132(a)(1)(B) may only be brought against "the plan itself" or "plan administrators in their official capacities" and that Plaintiffs fail to adequately allege that WellPoint is either a plan administrator or the plan itself. Since the pending motions were filed, however, the Ninth Circuit ruled that claims for benefits under 29 U.S.C. § 1132(a)(1)(B) can be asserted against "an entity other than the plan itself or the plan administrator." *Cyr v. Reliance Standard Life Ins. Co.*, 642 F.3d 1202, 1204 (9th Cir. 2011) (en banc). The *Cyr* ruling "expands the set of defendants who may be properly sued under § 1132(a)(1)(B) to include the insurer" and overrules *Ford v. MCI Commc'ns Health & Welfare Plan*, 399 F.3d 1076 (9th Cir. 2005), a case on which WellPoint relies. *See Forest Ambulatory Surgical Assocs. v. United Healthcare Ins. Co.*, No. CV 10-04911 (EJD), 2011 WL 2748724, at *6 (N.D. Cal. July 13, 2011). Because WellPoint is an insurer and falls within the class of potential defendants in a § 1132(a)(1)(B) case, Defendants' argument fails. The Court notes, however, that the WellPoint Defendants are entitled to raise the *Cyr* case at the appropriate time in the future.

> b.    Plan Provisions at Issue

Defendants also assert that "[a] plaintiff who brings a claim for benefits under ERISA must identify a specific plan term that confers the benefit in question" and that Plaintiffs have failed to do so. *See Mot.* 33:18-20 (*citing Steelman v. Prudential Ins. Co. of Am.*, No. CV 06-2746, 2007 WL 1080656, at *7 (E.D. Cal. Apr. 4, 2007)). Plaintiffs sufficiently identify specific plan terms promising medical reimbursement benefits for ONS at the lesser of the billed charged or the UCR, benefits which were denied by Defendants. *See SAC* ¶¶ 9-10 ("Plaintiffs, pay higher premiums in exchange for the flexibility and right to obtain out-of-network benefits" and "WellPoint, promise[s] to reimburse for out-of-network services at a percentage of the lesser of

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

either (i) the actual amount of their medical bills or (ii) the usual, customary and reasonable rate."); *SAC* ¶ 69 ("However, the Insurer Conspirators actually reimburse their members . . . [and] healthcare providers, at a rate that is much lower than the UCR for the services rendered."); *SAC* ¶ 181 ("Although WellPoint healthcare plans represent that ONS will be reimbursed based on UCR determinations, WellPoint does not base its determinations on the usual, reasonable, and customary rates . . . . Instead, WellPoint employs ONS Benefit Reductions to reimburse ONS based on an undisclosed percentage of extremely low and unrepresentative Medicare rates.").

The cases cited by Defendant challenging Plaintiffs' ERISA claim are distinguishable.  In *Midwest Special Surgery*, No. CV 09-646, 2010 WL 716105 (E.D. Mo. Feb. 24, 2010), the court found that the plaintiff failed to allege a specific plan term conferring a benefit when the complaint sought general "reimbursement for medical services provided to Defendants' plan participants under numerous health plans which qualify as employee welfare benefit plans as defined by ERISA, 29 U.S.C. § 1002."  2010 WL 716105, at *2.  In *McDonough v. Horizon Blue Cross Blue Shield of N.J. Inc.*, No. CV 09-571 (SRC), 2009 WL 3242136 (D.N.J. Oct. 7, 2009), the court dismissed the plaintiff's ERISA claim containing the conclusory allegation that the defendant relied on a "flawed database" "that cannot satisfy the contractual definition of UCR."  2009 WL 3242136, at *2 (quotations omitted).  Unlike the plaintiffs in *Midwest Special Surgery* and *McDonough*, Plaintiffs have identified specific plan terms conferring reimbursement benefits and have alleged sufficient facts demonstrating how Defendants deprived Plaintiffs of full UCR medical benefits by supplying Ingenix with flawed and "scrub[bed]" data.  *See SAC* ¶ 10, 122.  As a result, the Court rejects Defendants' argument and notes that the allegations in the Second Amended Complaint go well beyond the general allegations in *Midwest Special Surgery* and *McDonough*.

c.    Exhaustion of Administrative Remedies

WellPoint Defendants also seek dismissal of Plaintiffs' ERISA claim for benefits because they failed to exhaust administrative remedies and failed to adequately allege that it would have been futile to do so.  *See Mot.* 35:5-8.  As a general rule, a plaintiff must exhaust administrative remedies under the relevant benefit plan prior to bringing suit under § 1132(a)(1)(B).  *See Diaz v. United Agric. Employee Welfare Benefit Plan & Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995).  "[F]ederal courts have the authority to enforce the exhaustion requirement in suits under ERISA, and that as a matter of sound policy they should usually do so."  *Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir. 1980).  However, the demonstrated futility of administrative appeals constitutes "an exception[] to the prudential exhaustion doctrine."  *Noren v. Jefferson Pilot*

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | | Date | August 11, 2011 |
|---|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | | |

*Financial Ins. Co.*, 378 Fed. Appx. 696, 698 (9th Cir. 2010). A plaintiff can demonstrate futility by pointing to a similarly situated plaintiff who exhausted administrative remedies to no avail. *See In re Managed Care Litig.*, 595 F. Supp. 2d 1349, 1353-54 (S.D. Fla. 2009) (finding class plaintiffs demonstrated the futility of administrative appeals because another plaintiff had unsuccessfully exhausted administrative remedies). The Court notes, however, that "bare assertions of futility" are not enough to invoke the futility exception, *Diaz v. United Agric. Emp. Welfare Benefit Plan & Trust*, 50 F.3d 1478, 1485 (9th Cir. 1995), and that "a Plan's refusal to pay does not, by itself, show futility." *Foster v. Blue Shield of Ca.*, No. CV 05-03324 (DDP), 2009 WL 1586039, at *5 (C.D. Cal. June 3, 2009). In this case, the Court finds that Plaintiffs have alleged enough facts demonstrating that Plaintiffs' administrative appeals would be futile.

Defendants claim that two ERISA Subscriber Plaintiffs (Cooper and Rivera-Giusti) and four ERISA Provider Plaintiffs (Henry, Pariser, Kavali, and NPSC) are bared from filing ERISA claims because they have failed to exhaust administrative remedies. *Mot.* 35:5-8. Plaintiffs, on the other hand, claim that seeking any administrative remedy would be futile based on the experience of at least one Subscriber Plaintiff. *SAC* ¶¶ 271-83. Plaintiffs allege in detail the experiences of Subscriber X, who was under reimbursed for ONS surgery based on flawed Ingenix UCR data, who appealed the denial of benefits to both her employer and WellPoint multiple times, who requested additional information regarding WellPoint's calculation of UCR, and who was ultimately denied reconsideration of her benefits. *Id.* Plaintiffs conclude from Subscriber X's experience that "it is clear that the pursuit of an administrative appeal to WellPoint of its UCR determinations would be futile." *Id.* at ¶ 283. Plaintiffs also contend that Provider Plaintiffs' administrative appeals would be futile. For example, they allege that Provider Plaintiff Dr. Peck appealed a UCR determination in writing and by phone and Defendant denied his appeal stating the "decision is final and all levels of [its] appeal process have been exhausted." *Id.* at ¶ 237.

The Court finds that the Complaint alleges enough information demonstrating futility for both the Subscriber and the Provider Plaintiffs. *See In re Managed Care Litig.*, 595 F. Supp. 2d 1349, 1353-54 (S.D. Fla. 2009) (finding that a plaintiff's appeal to WellPoint, denial of the appeal, and lack of further instruction from WellPoint to file an additional appeal was "sufficient to satisfy the exhaustion of administrative remedies under ERISA" and therefore "any attempts to file additional appeals by any of the Class Plaintiffs would indeed be futile"). In *In re Managed Care Litigation*, a class of dentists who provided ONS to WellPoint subscribers sued WellPoint for ONS underpayment using data from a flawed Ingenix database. *Id.* at 1350. The *In re Managed Care Litigation* court found that the exhaustion of administrative remedies by one party demonstrated futility for the other class plaintiffs. *Id.* at 1354. And, as noted by the *In*

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | | Date | August 11, 2011 |
|----------|------------------------|---|------|------------------|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | | |

*re Managed Care Litigation Court*, this is not WellPoint's last chance to challenge Plaintiffs' futility allegations: "if further discovery reveals that [Plaintiff] failed to follow proper administrative appeals procedures under the plan, the remaining Plaintiffs' excuse for not filing such appeals will fail on a motion for summary judgment." *Id.* Likewise, if Defendants can demonstrate that either the Subscriber or Provider Plaintiffs failed to adequately allege futility or follow proper procedures for exhaustion of administrative appeals, Defendants may challenge this later in the litigation.

> d.     Whether Provider Plaintiffs have ERISA Standing

"A health care provider with an allegedly valid assignment has the same standing [as the beneficiary]" and may bring suit under ERISA. *Davidowtiz v. Delta Dental Plan, Inc.*, 946 F.2d 1476, 1477 (9th Cir. 1991). Defendants argue that the Provider Plaintiffs have not alleged sufficient facts demonstrating valid assignments from the Subscriber Plaintiffs. *Mot.* 36:15-19. The Court disagrees. Plaintiffs allege specific facts regarding the assignment of benefits from beneficiaries to the Provider Plaintiffs: "To facilitate direct payment from insurers, Dr. Henry's patients sign a form assigning their health benefits to him before treatment." *SAC* ¶ 215. Furthermore, Plaintiffs contend that "Dr. Peck, like other Class Members, obtained assignments from his patients, through which he was paid directly by WellPoint for providing healthcare to its insureds." *SAC* ¶ 232. The alleged facts, when taken as true, demonstrate that the Provider Plaintiffs received valid assignments from beneficiaries.

WellPoint Defendants also argue Provider Plaintiffs lack standing because they have not suffered injuries in fact as evidenced by their failure to bill patients for alleged under-payments by WellPoint. *Mot.* 36:25-37:9. However, healthcare providers with valid assignments are not required to bill the patient when seeking a claim against a defendant. *See Simon v. Value Behavior Health, Inc.*, 208 F.3d 1073, 1081 (9th Cir. 2000). Defendants rely on two cases to support their contention that billing a patient for an insurance company's under-payment is required for a Provider Plaintiff to suffer injury in fact, but these cases do not directly apply. *See Mot.* 37:10-15 (*citing American Med. Ass'n v. United Healthcare Corp.*, No. CV 00-2800, 2007 WL 1771498 (S.D.N.Y. June 18, 2007); *Owen v. Regence Bluecross Blueshield of Utah*, 388 F. Supp. 2d 1318 (D. Utah 2005)). In *American Medical Association*, the court found that provider plaintiffs suffered no injury in fact when the provider "expressly excused the patient from paying the remainder of the claim" through writing off an underpayment and excusing a fellow physician from being billed. *American Med. Ass'n*, 2007 WL 1771498, at *18-19, n.18. In *Owen*, the court held that a *subscriber* lacked standing because she did not suffer an injury in fact when there was no evidence that the ONS provider attempted to collect payment from her.

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

*Owen*, 388 F. Supp. 2d at 1326.  Here, Plaintiffs' alleged assignments are sufficient to withstand dismissal under Rule 12(b)(6), but this in no way precludes a challenge to the assignments later as the facts develop.

Based on the foregoing, the Court DENIES Defendants' Motion to Dismiss Plaintiffs ERISA § 1132(a)(1)(B) claim.

2.   Breach of Fiduciary Duties under ERISA § 1132(a)(2) (Claim 3)[10]

In addition to the ERISA claim for benefits, Plaintiffs also assert claims for breach of fiduciary duties under 29 U.S.C. § 1132(a)(2).  *See SAC* ¶¶ 383-87.

a.   Relief for the Individual v. Relief for the Plan

Section 1132(a)(2) authorizes plan participants to bring suit for relief under section 1109, which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting form each such breach, and to restore to such plan any profits of such fiduciary which have been made through the use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109.  The fiduciary relationship is one with the plan as a whole, and individual beneficiaries bringing a breach of fiduciary duty claim must do so for the benefit of the plan—not to recover solely for individual injuries.  *See LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 254, 256, 128 S. Ct. 1020, 169 L. Ed. 2d 847 (2008) (29 U.S.C. § 1109 "does not provide a remedies for individual injuries distinct from plan injuries"); *Wise v. Verizon Commc'ns, Inc.*, 600 F.3d 1180, 1189 ("The claim for fiduciary breach gives a remedy for injuries to the ERISA plan as a whole, but not for injuries suffered by individual participants.").  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege in the complaint that "the fiduciary injured the benefit plan or otherwise jeopardized the entire plan or put at risk plan assets."  *Wise*, 600 F.3d at 1189.  But, after *Twombly*, merely alleging that an ERISA breach of

---

[10] The parties also refer to this as ERISA §502(a)(2).

**O**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

## CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|----------|------------------------|------|-----------------|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

fiduciary duty claim "is brought on behalf of, and for the benefit of, the plan and all its participants" is not enough. *Id.* (affirming the district court's dismissal of a breach of fiduciary duty claim because plaintiff failed to plead a "plan-wide injury" or that any member other than plaintiff was injured).

As an initial matter, Defendants do not contest their status as fiduciaries. Moreover, Plaintiffs more than adequately plead their fiduciary breach claim. While Plaintiffs do make the bald assertion that the claim is brought "on behalf of plaintiffs and their plans," *see* SAC ¶ 383 (Third Claim for Relief heading), they make up for it elsewhere. Plaintiffs allege a systematic effort by WellPoint Defendants to conceal the depressed UCR and ONS benefits and to knowingly using the depressed rates in Ingenix to compute those benefits. *See id.* ¶¶ 178, 383-85. These actions allegedly injure all plan subscribers by forcing them to pay more for ONS medical services than they would have if a correct UCR was applied. *See id.* ¶ 78. In addition, Defendants' conduct injures all ONS plan providers because they lose patients who cannot pay the inflated out-of-pocket costs, thereby reducing ONS benefits to plan subscribers seeking them, and because providers are often "unable to collect the balance of their market-based fee for services." *See id.* ¶ 80. These theories clearly show harm to more than just the individuals bringing suit, and while they are novel they are not conclusory. *See Spinedex Physical Therapy USA, Inc. v. United Healthcare of Arizona*, 661 F. Supp. 2d 1076, 1092 (D. Ariz. 2009). Finally, although Plaintiffs seek monetary relief for their individual breach of fiduciary duties claims, they also seek injunctive relief which would "inure to the benefit" of the plan and not only the individual Plaintiffs. *See Warth v. Seldin*, 422 U.S. 490, 515, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975).

### b.    Duplicative Claims

Furthermore, WellPoint Defendants contend that Plaintiffs' § 1132(a)(2) breach of fiduciary duty claim should be dismissed because it is "duplicative of the 1132(a)(1)(B) claim for benefits." *Mot.* 38:8-9. There is no Ninth Circuit case law on point and WellPoint Defendants turn to a Third Circuit case for the proposition that "[a] claim for breach of fiduciary duty is actually a claim for benefits where the resolution of the claim rests upon an interpretation and application of an ERISA-regulated plan rather than upon an interpretation and application of ERISA." *Id.* 38:9-12 (*quoting Harrow v. Prudential Ins. Co.*, 279 F.3d 244, 254 (3d. Cir. 2002). WellPoint's argument fails for three reasons.

First, Plaintiffs' claim that WellPoint Defendants breached their fiduciary duties of "loyalty and prudence" by, among others, failing to disclose information about the UCRs. *See*

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

*SAC* ¶ 385.  WellPoint Defendants provide no argument as to why this duty hinges upon the individual plans rather than ERISA itself.  Second, Defendant's reliance on Third Circuit law is incomplete.  Another case from within the Third Circuit allows plaintiffs to bring § 1132(a)(1)(B) claims for benefits and § 1132(a)(2) claims for breach of fiduciary duties in the alternative, even if the claims are "essentially…for benefits."  *See Bamgbose v. Delta-T Group, Inc.*, 638 F. Supp. 2d 432, 442 (E.D. Pa. 2009).  Third, WellPoint Defendants' argument that Plaintiffs' claim for benefits under § 1132(a)(1)(B) should be dismissed negates the current duplicity argument.  Plaintiffs have adequately stated a claim for a breach of fiduciary duties under § 1132(a)(2).

The Court DENIES Defendants' Motion to Dismiss Plaintiffs' ERISA § 1132(a)(2) claim.


3.    <u>Breach of Fiduciary Duties under ERISA § 1132(a)(3) (Claim 4)</u>[11]

WellPoint Defendants also challenge Plaintiffs' § 1132(a)(3) claim on the grounds that they are not "plan administrators" and that a cause of action seeking redress for a breach of fiduciary duty is only proper if no other § 1132 cause of action is applicable.  *See Mot.* 38:8-9.  For the same reasons that the Court rejected WellPoint Defendants' "plan administrator" argument under § 1132(a)(1)(B), the Court rejects the "plan administrator" argument here.  *See Cyr*, 642 F.3d at 1204-06 ( "[Section 1132(a)(3)] makes no mention at all of which parties may be proper defendants," and there is "no reason to read a limitation into § 1132(a)(1)(B) that the Supreme Court did not perceive in § 1132(a)(3)" (*citing Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246, 120 S.Ct. 2180, 147 L. Ed. 2d 187 (2000))).

WellPoint Defendants' generalized assertion that this § 1132(a)(3) claim is only proper if no other § 1132 cause of action exists is correct, but their argument comes too early in the litigation.  The Supreme Court has termed an ERISA breach of fiduciary duty cause of action as a "catchall" provision or a "safety net, offering appropriate equitable relief for injuries caused by violations that [§ 1132] does not elsewhere adequately remedy."  *Varity Corp. v. Howe*, 516 U.S. 489, 515, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996).  The Ninth Circuit similarly held that "when relief is available under § 1132(a)(1), courts will not allow relief under § 1132(a)(3) catch-all provision."  *Johnson v. Buckley*, 356 F.3d 1067, 1077-78 (9th Cir. 2004) (*quoting Varity*, 516 U.S. at 515).  Because WellPoint is an insurer and falls within the scope of defendants that can be sued under § 1132(a)(3), complete dismissal of Plaintiffs' § 1132(a)(3)

---

[11] The parties also refer to this as ERISA §502(a)(3).

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

**CIVIL MINUTES - GENERAL**

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

claim is inappropriate at this stage. Rule 12(b)(6) tests only the sufficiency of the pleaded claims, not necessarily the actual availability of relief. *See Ehrman*, 2007 WL 1288465, at *4; *see also* Fed. R. Civ. P. 8 (allowing parties to plead in the alternative).

Defendants' Motion to Dismiss Plaintiffs' ERISA § 1132(a)(3) claim is DENIED.

4. <u>Failure to Provide Accurate Evidences of Coverage and Summary Plan Descriptions under § 1132(c) (Claim 5)</u>[12]

While an insurer can properly be sued under § 1132(a)(1)(B) and § 1132(a)(3), "only the plan administrator can be held liable for failing to comply with [§ 1132(c)]." *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 633 (9th Cir. 2008); 29 U.S.C. § 1132(c) ("[*a*]*dministrator's* refusal to supply requested information."). ERISA specifically defines an "administrator" as: "(i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe." 29 U.S.C. § 1002(16)(A). Here, WellPoint Defendants are not properly alleged as "administrators" under § 1132(c).

Plaintiffs do not state in the Complaint that the WellPoint Defendants are designated by the operative instruments as ERISA-defined plan administrators. In fact, all that Plaintiffs have alleged is that the WellPoint Defendants assumed "the role of 'Plan Administrator' as that term is defined in ERISA" or, alternatively, that the WellPoint Defendants have "acted as the '*de facto*' Plan Administrator" by evaluating claims, interpreting and applying plan terms, and making reimbursement determinations. *See SAC* ¶¶ 175-76. These allegations are insufficient to state a claim under 29 U.S.C. § 1132(c). With few exceptions, courts in this circuit have consistently concluded that liability cannot attach to a third party insurer that assumes administrative responsibilities under the *de facto* administrator theory. *See Griffith v. Sun Life Assur. Co. of Canada*, 143 Fed. Appx. 8, 10 (9th Cir. 2005) (unpublished) (finding no *de facto* administrator where an insurance company "handled all aspects of enrollment, claim processing, and other tasks an administrator typically is responsible for"); *Turnipseed v. Educ. Mgmt. LLC's Employee Disability Plan*, No. CV 09-03811 (MHP), 2010 WL 140384, at *5 (N.D. Cal. Jan. 13, 2010) ("*Ford* effectively closed the door on *de facto* administrator theory"); *Larson v. Providence Health Plan*, CV 08-929 (JO), 2009 WL 562815, at *5 (D. Or. March 2, 2009). The

---

[12] The parties also refer to this as ERISA §502(c).

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

Ninth Circuit has all but slammed the door on the *de facto* administrator theory advanced by Plaintiffs in this case and it is not alone.  *See Ford*, 399 F.3d at 1081-82; *see also Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079 (8th Cir. 2009); *Mondry v. Am. Family Mut. Ins. Co.*, 557 F.3d 781 (7th Cir. 2009); *Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833 (6th Cir. 2007).

Plaintiffs' allegations that WellPoint Defendants acted as *de facto* administrators are thorough and non-conclusory.  Those allegations, however, do not defeat the fact that a *de facto* administrator is not liable as an actual administrator under ERISA.  As a result, Plaintiffs have not stated a claim for WellPoint Defendants' alleged failure to provide accurate Evidences of Coverage and Summary Plan Descriptions under 29 U.S.C. § 1132(c), and their § 1132(c) claim is DISMISSED WITHOUT LEAVE TO AMEND.

D.    Breach of Contract (Claim 9)

WellPoint Defendants seek dismissal of Plaintiffs' Ninth Claim for relief for breach of contract because the Complaint "fails to identify (i) the contracts and the contractual provisions that allegedly were breached and (ii) the conduct that allegedly breached them."  *Mot.* 41:23-26.

A plaintiff who sues on a written contract is not required to attach a copy of the contract to the complaint, but its existence and how it was breached must be identified.  *See Securimetrics, Inc. v. Hartford Cas. Ins. Co.*, CV 05-091 (CW), 2005 WL 1712008, at *5-6 (N.D. Cal. July 21, 2005) ("The forms appended to the Federal Rules of Civil Procedure note that 'plaintiff may set forth the contract verbatim in the complaint or plead it, as indicated, by exhibit, or plead it according to its legal effect.'") (*citing* Fed. R. Civ. P. 84, Official Form 3, 12); *see also* 2 Moore's Federal Practice, § 10.05[4] (Matthew Bender 3d ed.).  Plaintiffs' breach of contract allegations are sufficient to defeat WellPoint Defendants' motion.

Paragraph 328 of the Complaint asserts that "[t]he Agreements are uniform contracts that utilize the same definitions across different health plans."  *SAC* ¶ 328.  In the very next paragraph, those definitions are fleshed out.  For example, the Agreements promise that for ONSs, "the maximum covered expense for services provided by a non-PPO provider or other healthcare provider will always be the lesser of the billed charge or[,] for a physician, the customary and reasonable charge."  *Id.* ¶ 329.  And, the customary and reasonable charge is defined as "a charge which falls within the common range of fees billed by a majority of physicians for a procedure in a given geographic region."  *Id.*  Those are the terms that

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

WellPoint Defendants allegedly breached by paying the intentionally depressed Ingenix UCRs rather than objective "customary and reasonable charges." *See, e.g., id.* ¶ 335.

If Plaintiffs' allegations are factually incorrect, WellPoint Defendants can prove that later in the litigation. At this stage, however, the question is not whether Plaintiffs' are correct, but rather whether they have pleaded a plausible claim. The Court answers that question in the affirmative and DENIES WellPoint Defendants' motion to dismiss Plaintiffs' breach of contract claims.[13]

E.    Implied Covenant of Good Faith and Fair Dealing (Claim 10)

Related to the breach of contract claim is the claim that Defendants' breached implied covenants of good faith and fair dealing. *See SAC* ¶¶ 438-47. WellPoint Defendants' argument that Plaintiffs have failed to state an implied covenant claim is confusing and inconsistent. In their Motion, WellPoint Defendants maintain that the "breach of the implied covenant of good faith and fair dealing claim fails under the *applicable state law*." *Mot.* 43:14-20 (emphasis added). The motion then perfunctorily explains why the laws of California, Virginia, New York and Georgia prohibit Plaintiffs' claim. *See Mot.* 43:23-44:10. As the Court would expect, Plaintiffs oppose Defendants' motion on the grounds Defendants presented. *See Opp'n.* 44:20-45:12. In the Reply, however, Defendants' curiously insist that Plaintiffs' argument "is besides the point" because it is not state law, but *"[f]ederal case law* [that] requires Plaintiffs to identify the specific policy provisions from which the covenant allegedly arises." *Reply* 21:10-14 (emphasis in original). The Court will not address arguments made for the first time in reply and because the state law issues have not been briefed, the Court DENIES the motion to dismiss Plaintiffs' implied covenant of good faith and fair dealing claim.

F.    California Unfair Competition and False Advertising Claims (Claim 11)

In the eleventh claim for relief, a single subscriber plaintiff, six provider plaintiffs and five association plaintiffs assert claims against WellPoint under each of the three prongs (fraudulent, unfair, and unlawful) of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"), and under California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 ("FAL").

---

[13] The Parties do not address the extent to which state law differs with respect to the breach of contract claim. Because WellPoint Defendants do not move to dismiss on those grounds, the Court does not address them.

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

1. <u>Unfair Competition</u>

The UCL prohibits "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising," as well as any act prohibited by California's false advertising statute. *See Ariz. Cartridge Remanufacturers Ass'n v. Lexmark Int'l, Inc.*, 421 F.3d 981, 985 (9th Cir. 2005) (*quoting* Cal. Bus. & Prof. Code § 17200). An "unlawful" business act under § 17200 is any business practice that is prohibited by law, whether "civil or criminal, statutory or judicially made . . . , federal, state or local." *McKell v. Washington Mutual, Inc.*, 142 Cal. App. 4th 1457, 1474, 49 Cal. Rptr. 3d 227 (2006) (citations omitted). A business act is "unfair" under § 17200 "if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *See id.* at 1473. Finally, a "fraudulent" business practice under § 17200 is "one which is likely to deceive the public," and "may be based on representations to the public which are untrue, and also those which may be accurate on some level, but will nonetheless tend to mislead or deceive." *See id.* at 1471. UCL claims based on fraud are subject to the heightened pleading requirements of Rule 9(b). *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124-25 (9th Cir. 2009). Plaintiffs must plead "the who, what, when, where, and how of the alleged fraudulent conduct" and explain "why [a] statement or omission complained of was false and misleading." *In re Actimmune Mktg. Litig.*, 2009 WL 3740648, at *13 (N.D. Cal. Nov. 6, 2009).

In addition, Plaintiffs must specifically allege that the fraudulent conduct caused them injury. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 327, 93 Cal. Rptr. 3d 559 (2009). This is really an issue of a plaintiff's standing to assert a UCL or FAL claim and requires a "twofold showing: he or she must demonstrate injury in fact and a loss of money or property caused by unfair competition." *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1590, 80 Cal. Rptr. 3d 316 (2008). In cases of fraud, the fraudulent conduct must be an "immediate cause" of injury and that, but-for the fraudulent statements, "the plaintiffs in all reasonable probability would not have engaged in the injury-producing conduct." *In re Tobacco II*, 46 Cal. 4th at 326.

In this case, Plaintiffs' claims sound in fraud, requiring them to be pleaded with particularity. This Plaintiffs do not do. All that Plaintiffs assert are conclusory allegations that do not plausibly show reliance. For example, the Complaint states: "Plaintiffs each relied upon WellPoint to reimburse them the appropriate amount for their services in compliance with WellPoint's legal and contractual obligations." *See SAC* ¶ 449. Nowhere, however, does the complaint allege that any statement about the ONS and UCRs induced reliance.

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

#134/142/147

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

It should be noted that Plaintiffs are generally correct in their assertion that "where . . . a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements." *Opp'n* 46:11-16 (*quoting In re Tobacco II*, 49 Cal. 4th at 328). Notwithstanding that assertion, Plaintiffs wholly fail to allege a long-term advertising campaign. In fact, the closest they get is in paragraph 460 where they state that "WellPoint has disseminated, and continue[s] to disseminate advertising, and other materials to potential customers, their insured and healthcare providers, which they know or should reasonably know is false and misleading." *SAC* ¶ 460. Even if they had adequately pleaded a long-term advertising campaign, it, standing alone, would be insufficient to plead the degree of reliance required in federal court by Rule 9(b). *See In re Actimmune Marketing Litigation*, No. CV 08-2376, 2009 WL 3740648, at *13 (N.D. Cal. Nov. 6, 2009) ("*Tobacco II* cannot rescue plaintiffs' claims under the UCL fraudulent prong" because "the circumstances of the fraud must be stated with particularity"); *see also Kearns*, 567 F.3d at 1126 (citing Rule 9(b) and affirming dismissal because Plaintiff failed to identify "what the television advertisements or other sales material specifically stated . . . when [plaintiff] was exposed to them . . . which ones he found material . . . [and] which sales material he relied upon in making his decision to buy").

That said Plaintiffs' separate claim that "they would not even have purchased had they been adequately informed of [the plans'] true cost," is sufficient to plead the reliance element of a UCL claim, but the earlier UCL pleading shortcomings are fatal as Plaintiffs do not specifically identify what they relied on before purchasing the plans, rather than after. *See SAC* ¶ 463; *Kwikset Corp. v. Superior Court (Benson)*, No. S171845 (Cal. Jan. 27, 2010). Without alleging a fraudulent UCL claim with the degree of specificity required by Rule 9(b), the suggestion that Plaintiffs would "not even have purchased" the insurance is an unfounded conclusion. Thus, Plaintiffs' have failed to state a fraud-based UCL claim.

Plaintiffs' failure to plead a fraud-based UCL claim does not necessarily sink their unfair or unlawful UCL claims, however. As discussed, an "unlawful" business act under § 17200 is any business practice that is prohibited by law, whether "civil or criminal, statutory or judicially made . . . , federal, state or local." *McKell*, 142 Cal. App. 4th at 1474. A plaintiff can establish that a business practice was "unfair" by showing that such conduct "threatens an incipient *violation of an antitrust law*, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Byars v. SCME Mortgage Bankers, Inc.*, 109 Cal. App. 4th 1134, 1147, 135 Cal. Rptr. 2d 796 (2003) (emphasis added). Because Plaintiffs have adequately

**O**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

## CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

stated a claim under the Sherman Act, Plaintiffs have also stated a claim under the UCL's unfair and unlawful prongs.

Thus, the Court GRANTS Defendants' motion to dismiss Plaintiffs' fraud-based UCL claim WITH LEAVE TO AMEND, but DENIES Defendants' motion as to Plaintiffs' unfair or unlawful UCL claim.

2.     False Advertising

California's false advertising statute makes it unlawful for a business to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *See* Cal. Bus. & Prof. Code § 17500. "The law encompasses not just false statements but those statements which may be accurate on some level, but will nonetheless tend to mislead or deceive." *Ariz. Cartridge Remanufacturers Ass'n v. Lexmark Int'l Inc.,* 421 F.3d 981, 985 (9th Cir. 2005) (internal quotations omitted). "District courts in California have consistently held . . . that claims under California's FAL are grounded in fraud." *Yumul v. Smart Balance, Inc.,* No. CV 10-927 MMM (AJWx), 2010 WL 3359663, at *3 (C.D. Cal. May 24, 2010). Accordingly, the pleading requirements of Rule 9(b) apply. *See id.*

Plaintiffs' FAL claim is based on the same allegedly untrue or misleading concerning ONS and UCRs as the UCL claim. For the same reasons set forth above, the claim fails to plead with particularity how Plaintiffs were injured as a result of WellPoint Defendants' untrue or misleading statements. The Court GRANTS the motions to dismiss Plaintiffs' FAL claim WITH LEAVE TO AMEND.

G.     New York General Business Law § 349 (Claim 12)

New York's General Business Law § 349 provides a private right of action to any person injured by a business' deceptive act or practice. *See Riordan v. Nationwide Mut. Fire Ins. Co.,* 977 F.2d 47, 51 (2d Cir. 1992). A plaintiff must prove three elements to recover under § 349: "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank,* 731 N.E.2d 608, 611 (N.Y. 2000). Furthermore, where there is a simultaneous claim for breach of contract, a plaintiff must plead losses "independent of the loss caused by [the] alleged breach of contract." *Spagnola v. Chubb Corp.,* 574 F.3d 64, 74 (2d Cir. 2009).

**O**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

WellPoint Defendants do not contest the first two elements but state that the § 349 fails because "when conclusory allegations of 'unfair' or 'deceptive' conduct are properly disregarded, [the] claim boils down" to a breach of contract claim. *Mot.* 46:24-47:4. Defendants' overlook the other injuries alleged by Plaintiffs. For example, Plaintiffs allege injuries such as having to "forego such ONS entirely to avoid" the added expense of faulty UCRs. *See SAC* ¶ 350. Moreover, courts interpreting New York law have found denial of insurance benefits to be actionable under § 349. *See, e.g., Kurschner v. Massachusetts Cas. Ins. Co.*, No. CV 08-0011, 2009 WL 537504, at *4-5 (E.D.N.Y. Mar. 3, 2009); *Binder v. Nat'l Life of Vt.*, No. CV 02-6411 GEL, 2003 WL 21180417, at *6 (S.D.N.Y. May 20, 2003) ("[t]he allegation that the insurer makes a practice of inordinately delaying and then denying a claim without reference to its viability may be said to fall within the parameters of" § 349). As a result, WellPoint Defendants' motion to dismiss Plaintiffs' N.Y. Gen. Bus. Law § 349 claim is DENIED.

UHG Defendants' separate motion to dismiss the § 349 claim, however, is not denied part-in-parcel with WellPoint Defendants' motion. Pertaining to the § 349 claim specifically, UHG Defendants argue that Plaintiffs do not "allege that Ingenix or UHG made any statements to Plaintiffs, let alone any materially false statements that caused them injury, as required by [N.Y. Gen. Bus. Law] § 349." *UHG Mot.* 6:22-23. The Court recognizes that § 349 "imposes liability for material omissions on co-conspirators," *Opp'n* 49:7-8 (*citing Batas v. Prudential Ins. Co.*, 724 N.Y.S.2d 3, 5 (N.Y. App. Div. 2001), but Plaintiffs' § 349 claim fails to even mention UHG Defendants and expressly disavows any "rel[iance] upon the conspiracy allegations" made earlier in the Complaint. *SAC* ¶ 466. Plaintiffs have thus failed to state a N.Y. Gen. Bus. Law § 349 claim against UHG Defendants, and UHG Defendants motion to dismiss this claim is GRANTED WITH LEAVE TO AMEND.

E.    California's Cartwright Act Claim (Claim 13)

     1.    The Cartwright Act claim by ERISA Plaintiffs

Those Plaintiffs whose claims are based on ERISA plans cannot assert claims under California's Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.* The Cartwright Act was designed to promote free competition, and it, like other antitrust laws, is "about the protection of competition, not competitors." *See Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 783, 111 Cal. Rptr. 3d 666 (2010). Individual damage awards are "a tool by which these precompetitive purposes are carried out," even though the main purpose of the law is to protect the public. *Id.* In this case, Plaintiffs Roberts, Henry, Schwendig, Peck, Pariser and Kavali complain about

**O**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|----------|------------------------|------|-----------------|

| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation |
|-------|-------------------------------------------------------------|

WellPoint Defendants' conduct related to qualified ERISA plans. *See SAC* ¶¶ 377, 379. ERISA, however, preempts state law causes of action and a plaintiff cannot "obtain relief by dressing up an ERISA benefits claim in the garb of" state law. *See Cleghorn v. Blue Shield of California*, 408 F.3d 1222, 1225 (9th Cir. 2005) (citation omitted).

Although the Cartwright Act focuses primarily on anticompetitive conduct while ERISA focuses on benefit plans, it is the nature of the relief sought in this case that is determinative for preemption purposes. ERISA provides that "a civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan." 29 U.S.C. § 502(a). Plaintiffs have done just that in their ERISA claims for relief, *see SAC* ¶¶ 381, 387, 389, but also seek the same relief under the Cartwright Act, *see id.* ¶ 479. The Supreme Court has ruled out Plaintiffs' alternative bases for recovery. Even state law claims that do not "duplicate ERISA remedies" are preempted because "Congress' intent to make the ERISA civil enforcement mechanism exclusive would be undermined if state causes of action that supplement the ERISA § 502(a) remedies were permitted." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 216, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004); *see also Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54, 107 S. Ct. 1549, 95 L. Ed. 2d 39 (1987) ("[P]olicy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA."); *Elliot v. Fortis Benefits Ins. Co.*, 337 F.3d 1138, 1147 (9th Cir. 2003) (holding that state claims that "seek[] non-ERISA damages for what are essential claim processing causes of action[]" are preempted). Plaintiffs' allegations that the subscribers "paid more for ONS services" and that providers "received less for providing ONS services" are claims for benefits under ERISA plans that are preempted by federal law. *SAC* ¶ 479. WellPoint Defendants motion to dismiss the ERISA Plaintiffs' Cartwright Act claim is GRANTED WITH LEAVE TO AMEND.

### 2.     The Cartwright Act Claim by non-ERISA Plaintiffs

Defendants seek dismissal of the non-ERISA Plaintiffs' Cartwright Act claim "for the same three reasons Plaintiffs' Sherman Act claim should be dismissed." *Mot.* 47:23-24; *see also UHG Mot.* 7:9-18. WellPoint Defendants base that argument on the Ninth Circuit's holding that analysis under the Cartwright Act "mirrors analysis under federal law because the Cartwright Act . . . was modeled after the Sherman Act." *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001). For the reasons stated above, the non-ERISA Plaintiffs' have adequately pleaded a Sherman Act violation, and they have also adequately pleaded a Cartwright Act violation. In this respect, Defendants' motion is DENIED.

**O**

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

### CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|----------|------------------------|------|-----------------|
| Title    | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

---

IV.    <u>Conclusion</u>

The Court GRANTS in part and DENIES in part Defendants' Motions to Dismiss as follows:

1.)    GRANTS Defendants' Motion to Dismiss for Plaintiffs' lack of standing to assert claims for non-Ingenix ONS Benefits

2.)    DENIES Defendants' Motion to Dismiss for lack of standing for all other claims

3.)    DENIES Defendants' Motion to Dismiss Plaintiffs' Sherman Act claims

4.)    GRANTS WellPoint Defendants and UHG Defendants Motions to Dismiss Plaintiffs' RICO claims

5.)    DENIES Defendants' Motion to Dismiss Plaintiffs' ERISA § 1132(a)(1)(B), § 1132(a)(2), and § 1132(a)(3) claims.

6.)    GRANTS Defendants' Motion to Dismiss Plaintiffs' ERISA § 1132(c) claim.

7.)    DENIES Defendants' Motion to Dismiss Plaintiffs' Breach of Contract claims

8.)    DENIES Defendants' Motion to Dismiss Plaintiffs' Implied Covenant of Good Faith and Fair Dealing claims

9.)    GRANTS Defendants' Motion to Dismiss Plaintiffs' fraud-based California Unfair Competition and False Advertising claims

10.)    DENIES Defendants' Motion to Dismiss Plaintiffs' unfair and unlawful California Unfair Competition claims

11.)    DENIES WellPoint Defendants' Motion to Dismiss Plaintiffs' N.Y. Gen. Bus. Law § 349 claim

12.)    GRANTS UHG Defendants' Motion to Dismiss Plaintiffs' N.Y. Gen. Bus. Law § 349 claim

---

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**#134/142/147**

## CIVIL MINUTES - GENERAL

| Case No. | MDL 09-2074 PSG (FFMx) | Date | August 11, 2011 |
|---|---|---|---|
| Title | In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation | | |

    13.)    DENIES WellPoint Defendants' Motion to Dismiss Plaintiffs' California Cartwright Act claim for Non-ERISA Plaintiffs

    14.)    GRANTS WellPoint Defendants' Motion to Dismiss Plaintiffs' California Cartwright Act claim for ERISA Plaintiffs

    All dismissed claims are dismissed WITH LEAVE TO AMEND, except for Plaintiffs' ERISA § 1132(c) claim, which is dismissed WITHOUT LEAVE TO AMEND.  Plaintiffs must file a Third Amended Complaint within **60 days** of the date of this Order.  This Order renders the Motion for Partial Stay of Discovery Limited to Non-Ingenix Issues Pending Resolution of Defendants' Motion to Dismiss MOOT.  *See* Dkt. #147.

    **IT IS SO ORDERED.**