1   corresponding to that unmodified CPT code, notwithstanding that the service was
2   provided under altered conditions.

3       119.   Ingenix next edits the pooled data to remove high-end values through a
4   system of "scrubbing." Ingenix does so by using formulaic edits to identify purported
5   statistical outliers and automatically removes them without factual basis or further
6   investigation to determine if they are truly incorrect data points (and should be
7   removed) or are simply valid high charges. Although Ingenix claims to remove or
8   scrub both high and low charges, a higher percentage of high-end charges are removed
9   in an effort to skew the percentiles downward. The incorrect removal of valid high
10  charges further biases the upper portion of the fee schedules downward, the very
11  portion of the fee schedules that most insurers use to set UCR reimbursement caps for
12  ONS. Ingenix also excludes any data it deems "unreliable," but no information is
13  available about what factors Ingenix uses to determine when a billed charge is deemed
14  unreliable.

15      120.   The Ingenix Database does not tabulate data according to the specific
16  geographic area where a UCR actually would apply. Instead, Ingenix divides all
17  states into geo-zips. Geo-zips are not medical service areas amenable to cost
18  comparison. Ingenix makes no effort to determine what areas should be treated as
19  equivalent or comparable medical service market areas, despite repeated consumer
20  complaints, studies and direct objections to specific geozip areas.

21      121.   Ingenix purports to "warn" its customers, including the other Defendants
22  here, that its geo-zips do not represent a medical service market area:

23          Because the fee ranges in the Analyzer are based on the first three digits
24          of your geo-zip, you need to assess where your locale stands in relation
25          to others in this three-digit area. For example, many different three digit
26          areas contain both urban and rural locales with different charging
27          patterns. Use your judgment to determine how to interpret the fee range
28          for your particular community.

122.   As Ingenix is fully aware, WellPoint and the Insurer Conspirators never exercise independent judgment in determining whether the specific geo-zip applicable to a particular UCR determination is valid, including whether it may contain "urban and rural locales with different charging patterns."  Instead, the Insurer Conspirators rely strictly on the False UCRs that reflect the unspecific geographic groupings provided by the Ingenix Database, without taking into account possible different charging patterns within each geo-zip.

123.   Based on these procedures, Ingenix produces two cycles of uniform pricing schedules per year that include medical, surgical, anesthesia and coding system service rates for a given "geo-zip" and applicable CPT code in the form of a price range that shows the charges at various percentage intervals, e.g., 50th, 75th and 90th.  For any CPT code and geo-zip combination with fewer than nine billed charges remaining in the database after deletions by both the contributing insurers and Ingenix, Ingenix instead determines and reports "derived charges," which are offered in a similar percentile price range format, ranging from the 25th to the 95th percentiles.  According to Ingenix, "derived charges" are calculated by pooling billed charges for similar services in the same geographic area, and then adjusting that data using values assigned by Ingenix to account for differences in the complexity and expense of the procedure at issue.  Although the MDR Database, which is released four times per year contains some actual charge data, it primarily consists of "derived charges," which are offered in a similar percentile price range format, ranging from the 25th to the 95th percentiles.  The derived charges in the MDR Database are calculated using a different methodology than used in the PHCS database.  Accordingly, although the exact same underlying data is used to generate the MDR and PHCS products which make up the Ingenix Database, the UCRs for the same CPT code in the same geozip differ between the two products.  In the past, the differences between the two products averaged as much as 6%.

124.   Once WellPoint receives these uniform pricing schedules, they are uploaded onto a computerized claims platform and automatically accessed by WellPoint to determine reimbursement amounts for ONS within the range provided by the Ingenix UCR schedules.   WellPoint's computer systems then automatically generate reimbursement amounts for ONS claims.   In other words, the Ingenix Database is automatically applied and no human intervention is utilized to evaluate the accuracy of the pricing data provided by Ingenix.

125.   Similar to its "warning" about the geo-zips, Ingenix also "warns" its customers, including the other Defendants, here, that it does not formally endorse, approve or recommend the use of the Ingenix data for UCRs.   With each production, Ingenix includes the following disclaimer:

> The Ingenix data are provided to subscribers for informational purposes only.   Ingenix, Inc. disclaims any endorsements, approval, or recommendation or particular uses of the data.   There is neither a stated nor an implied "reasonable and customary charge[.]"

The Insurer Conspirators are well aware of these disclaimers.

126.   Despite this disclaimer, Ingenix explicitly markets the Ingenix Database for adoption by insurers in reimbursing ONS based upon UCRs.   At least one time a year, Ingenix provides WellPoint and the Insurer Conspirators with uniform UCR pricing schedules (*i.e.*, False UCRs) for which the upper portion of the fee range is depressed.   Ingenix knows the Ingenix Database is being used by health insurers for the purpose of determining UCRs and ONS reimbursements.   Indeed, the UnitedHealth Defendants promise that Ingenix Database users will achieve substantial cost savings, including a promised 16:1 return on investment.   This promise makes sense only if the Ingenix Database is being used to determine ONS reimbursement amounts. In the past, MDR database modules were expressly marketed as "UCR" modules and current Ingenix employees have routinely referred to these price ranges as "UCRs."   The only purpose of the uniform pricing schedule is to establish an

48

1   artificially-low range of fees upon which subscribing insurers base their ONS
2   reimbursement.  The False UCR range in the Ingenix schedules thereby serves as an
3   absolute ceiling on the amount the Insurer Conspirators will pay in ONS
4   reimbursement for particular procedures across the country and also as a mechanism
5   to depress ONS reimbursements throughout the insurance industry (*i.e.*, if the entire
6   upper range of fees reflects artificially-low UCRs, then ONS reimbursements based on
7   that range are necessarily artificially-low also).

8   ### The Data Is Received and Distributed Without Verifying Its Accuracy

9    127.   There is no review procedure in place at WellPoint to verify the
10   accuracy of the multiple yearly releases of uniform pricing schedules generated by the
11   Ingenix Database.  Instead, the uniform pricing schedules created by the Ingenix
12   Database are automatically relied upon to determine and establish UCRs.

13    128.   Likewise, Ingenix cannot guarantee that all claims received for a
14   particular CPT code service at any given time have been reported, much less
15   accurately reported, by its contributing insurers.  Nor does Ingenix ascertain if the
16   bills that are listed constitute the unnamed providers' usual and customary charges for
17   the service, or, instead, a discounted rate required by the agreements one or more of
18   the providers may have had with healthcare insurers. Again, during the 2004-05 time
19   period, Ingenix considered employing an audit system.   None of the Insurer
20   Conspirators' data, however, has been meaningfully audited.   In fact, WellPoint
21   *refused* to submit to an audit when suggested by Ingenix. In response, Ingenix turned
22   a blind eye.  Although it  requests that the CPT code billing data be accurate and
23   complete, Ingenix employs no mechanism to enforce or validate accuracy or
24   completeness of the client attestations and billing data.

25    129.   Ingenix does not – and has never – tested its results to determine if its
26   statistical conclusions bear any relationship to the actual high, low, median or any
27   particular percentile of actual marketplace CPT code service rates charged by
28   healthcare providers in any given area, even though the very purpose for its UCR

1   product – indeed, its *raison d'être* – is to determine ONS reimbursements that are
2   consistent with charges for those services by providers in a given area.   In fact,
3   Ingenix never submitted its products to any literature review or academic study.

4       130.    Ingenix and Co-Conspirators know that the data is not statistically valid.
5   And Ingenix knew that the Ingenix Database it distributed to WellPoint and the
6   Insurer Conspirators resulted in artificially-low ONS reimbursements.   It explored
7   enhancing its databases to make them more defensible and accurate, yet no steps were
8   ever taken to do so.   During that process, Ingenix admitted that it knew of serious
9   flaws in its databases. Ingenix knew as early as 2004, for example, that its databases
10  were not statistically valid.   It used the number "9" for the number of occurrences of a
11  CPT code as the cut-off for using actual data for a UCR.   This is to say that if, for a
12  CPT code, there were fewer than 9 occurrences of that medical procedure, Ingenix
13  would use "derived data" to generate UCR.   For those CPT codes that occurred more
14  than 9 times, the actual, contributed, charge data would be used.   Ingenix, however,
15  possessed expert opinion that the number 9 as a cut-off point was far too low and that,
16  in fact, when fewer than 100 occurrences were available, UCRs were subject to
17  volatility and instability.   Ingenix further knew of other serious flaws in the MDR and
18  PHCS databases such as that:   Ingenix had "no control of data and how contributors
19  gather it," the databases were dependent on subjective characteristics, the data was not
20  representative of any denominator, there were illogical charging patterns,   "Geozips
21  are Ingenix derived and not based on any identifiable industry or demographic
22  standards," and documentation surrounding the databases was "insufficient."

23      131.    The result of this cycle of collusion is a database that produces flawed
24  uniform pricing schedules (the False UCRs) that systematically result in the under-
25  reimbursement for ONS by WellPoint and the Insurer Conspirators. The flaws in the
26  Ingenix Database are pervasive and, *inter alia*, include:

27          (a)     no statistically validity and questionable accuracy of underlying
28  data;

50

1    (b) failing to inquire whether all of the contributors are using the same

2 criteria and coding (as well as aggregating) accurately and consistently;

3    (c) aggregating data from similar codes to create a larger sample when

4 there is not enough charge data to provide a statistically valid sample for a CPT code

5 using flawed methods;

6    (d) combining geo-zips to determine what Ingenix considers to be a

7 "sociodemographic region" for which there is no verification;

8    (e) scrubbing data in such a manner that removes outliers in a

9 subjective manner, *i.e.*, Ingenix removes a larger percentage of high-end values as

10 compared to low-end outliers, resulting in the upper end of the fee range being biased

11 downward;

12    (f) failing to incorporate an appropriate statistical methodology

13 (including sampling, data editing or data estimation), resulting in data that is

14 inappropriate and biases downward the upper end of the fee range;

15    (g) using cumulated data that has already been scrubbed by the

16 individual contributors to remove high-end values, thereby further reducing the

17 charges in the upper end of the fee range;

18    (h) including charges for procedures in non-comparable geographic

19 areas;

20    (i) failing to account for the skill, experience, training, or education of

21 providers;;

22    (j) combining ONS charges with "in-network" providers who have

23 already agreed to a discounted contracted rate – thus further skewing the charges

24 reported in the upper end of fee ranges downward;

25    (k) failing to distinguish the data based on the number of healthcare

26 providers whose charges are reflected; and

27    (l) failing to edit any data that reflect negotiated or discounted

28 charges.

51

*The Truth of the Ingenix Database Is Concealed*

132.    As a condition of obtaining uniform UCR pricing schedules from Ingenix, WellPoint and the Insurer Conspirators entered into confidentiality and non-disclosure agreements whereby the Insurer Conspirators agreed not to reproduce data provided by Ingenix in the Ingenix Databases except under very limited and strictly-controlled circumstances.   These confidentiality and non-disclosure agreements restrain potential competition in the relevant market and help conceal the agreement to fix prices as well as the role each Insurer Conspirator has in that agreement.  Indeed, Ingenix has maintained 70%-80% of the market share for UCR pricing products from 2000 to the present and has effectively prevented any new competitors from entering this market.

133.    WellPoint and the other Insurer Conspirators have ample opportunity to, and do, communicate through HIAA/AHIP and regularly share UCR pricing information using Ingenix as a conduit to distribute agreed-upon pricing memos to each Insurer Conspirator for the purpose of artificially lowering ONS reimbursements to Plaintiffs and the Classes.   At least annually, WellPoint and the Insurer Conspirators convene at meetings set up by Ingenix (the conduit) and discuss the Ingenix Database. WellPoint and the other Insurer Conspirators know the data being provided to Ingenix is flawed and have communicated this fact to one another and to Ingenix.  The Insurer Conspirators understand that, as a consequence, the pricing schedules received from Ingenix are flawed and cause them to under-reimburse for ONS.  Nevertheless, the Insurer Conspirators continue to have input into the type of data used by Ingenix and jointly produce provider cost data and utilize Ingenix's False UCRs to coordinate and centrally set a pricing schedule for the purpose of calculating ONS reimbursement.

134.    WellPoint and the other Insurer Conspirators' scheme to manipulate UCRs for the purpose of under-reimbursing for ONS is predicated, in part, on keeping the Ingenix Database, and its inherent flaws, a complete secret from subscribers and

52

providers. As a result, Defendants and the Insurer Conspirators actively conceal the true UCRs, knowing the success of the scheme will be jeopardized if true UCRs are known to the healthcare-purchasing public. To prevent transparency and inhibit price competition, neither WellPoint nor any of the Insurer Conspirators makes its False UCRs available to its insureds or ONS providers until after an ONS has been rendered. Ingenix and the Insurer Conspirators have agreed to limits on the number of procedures/geographic areas for which subscribers can obtain information about UCRs, thus barring subscribers from shopping for better plan terms that may be available from potential competitors. The Insurer Conspirators likewise do not disclose to Plaintiffs or the general public that they contract with Ingenix, provide Ingenix with data, and use False UCRs provided by Ingenix to determine ONS reimbursement amounts. They do not disclose how they and Ingenix arrive at False UCRs, or that Ingenix disseminates the False UCRs they all use for calculating ONS reimbursement. They further do not disclose that they have agreed not to provide data to potential competitors of Ingenix.

135.    Rather than disclose the defective nature of the Ingenix Database and the participation by WellPoint and the Insurer Conspirators in creating False UCRs, the Insurer Conspirators shield these facts from subscribers and providers through misrepresentations and material omissions designed to lead them to believe they are using fair and accurate UCR schedules to reimburse for ONS. Further, as part of the database licensing arrangements between Ingenix and the Insurer Conspirators, those parties have agreed to act together to help the Insurer Conspirators enforce the False UCRs reported in the periodic uniform pricing schedules and used by the Insurer Conspirators in calculating reimbursements, against both provider and subscriber challenges. Ingenix and the insurers regularly communicate about any challenges or questions about UCR, and, in fact, have developed canned and routine responses that serve to obfuscate the mechanism by which they are determined.

136.     None of the Insurer Conspirators has attempted to set up a rival database despite Ingenix's profitability and the fact that it is owned by a competitor (Ingenix's operating profit margins are 20%, compared to 10% for UnitedHealth as a whole). Rather, as members of HIAA/AHIP, the Insurer Conspirators acted together to transfer the Ingenix Database to Ingenix, to administer and maintain it, and agreed among themselves and with Ingenix that none of them would provide billed claims data to a potential competitor database.  By agreeing not to disclose any of the data they have submitted to Ingenix for inclusion in its database to any other potential database developer, the Insurer Conspirators have rendered it entirely impracticable for other members of the cartel to create a competing database for use in determining UCRs for ONS.

## INVESTIGATIONS INTO THE INGENIX DATABASES

### The New York Attorney General's Investigation and Action

137.     During 2007 and 2008, the NYAG performed a preliminary investigation into how health insurers computed ONS reimbursement rates.   On February 13, 2008, the NYAG "Healthcare Industry Taskforce" launched an industry-wide investigation into allegations that insurers were under-reimbursing for ONS. The investigation centered on Defendants and several of the Insurer Conspirators, and particularly on Ingenix.

138.     After six months of investigation that included document review, data analysis, and interviews, the NYAG found that the Ingenix Database systematically reduces the rate at which insurers paid for out-of-network care.  As a result, the NYAG's office expanded its investigation by issuing subpoenas seeking documents from more than a dozen health insurers, including Defendants UnitedHealth and WellPoint as well as several of the Insurer Conspirators.

139.     The NYAG found those documents revealed a shocking lack of transparency and accuracy in the industry's use of the Ingenix Database. The NYAG found insurers such as WellPoint obfuscate their policy language by promising to

1    reimburse based on usual and customary rates but instead reimbursing based on
2    schedules compiled by one of their own:  UnitedHealth *via* Ingenix.

3         140.    The NYAG further found this conflict of interest is entirely hidden from
4    consumers because Defendants and the Conspirators pretend an independent database
5    underlies their UCRs for ONS when, in reality, the schedules themselves, created in a
6    well of conflicts, are unreliable and inadequate.  The result is that consumers are
7    "tricked" into having to pay more for medical care than they had anticipated, leading
8    to unexpected healthcare debts.

9         141.    The NYAG determined that health insurers, who have a financial
10   incentive to do so, first provide flawed data and then receive flawed data to determine
11   UCRs for ONS that are understated and artificially low.  Or, as the head of the
12   NYAG's investigative task force stated, "*garbage in, garbage out*."

13        142.    To test the accuracy of the Ingenix Database, the NYAG's office
14   collected and analyzed millions of healthcare bills from a variety of sources, including
15   over a million bills from ordinary doctors' office visits within the state of New York.
16   It then compared these actual bills to the UCRs produced by the Ingenix Database for
17   that geographic area.  This enabled the NYAG's office to compare the rate that the
18   Ingenix Database indicated should be paid for a particular medical service in a
19   particular region with the rate that the doctors in that region actually charged.  The
20   comparison ultimately revealed that insurers systematically under-reimburse their
21   insured patients for doctors' office visits in New York state by 10%-28%, and that up
22   to 110 million Americans have been harmed by Defendants' conspiracy to the tune of
23   hundreds of millions of dollars in losses for consumers and providers nationwide.

24        143.    Upon completing its investigation, the NYAG's office summarized its
25   central findings in a January 13, 2009 document entitled "Health Care Report:  The
26   Consumer Reimbursement System is Code Blue" ("the NYAG Report").  The NYAG
27   Report found that the Ingenix Database and the insurers' participation in and use of
28   Ingenix was:

1        (a)    "an industry-wide problem";

2        (b)    "a ***rigged system***";

3        (c)    "fraudulent";

4        (d)    used to advance the interests of the insurers;

5        (e)    "critically ill"; and

6        (f)    operated as a "***black box***" to consumers, who are left in the dark as

7 to "what reimbursement rate to expect from the insurer."

8    144.   According to the Attorney General:

9 [T]he responsible consumer reads the plan documents and sees a thicket

10 of words. One term seems intelligible: the "usual and customary rate"

11 of a similar physician for a similar service in a similar area. That sounds

12 reasonable. The consumer makes the leap out-of-network and submits

13 the bill to the insurer, only to be told the consumer will not be fully

14 reimbursed because the doctor's charge exceeded the usual and

15 customary rate. The fog of ignorance continues, thanks to the insurer.

16 The physician-patient relationship is undermined, as the physician has

17 been branded a charlatan whose bills are inflated. No one's interests

18 here are advanced, except perhaps when next time, the consumer decides

19 to stay in network for fear of what bills may accrue for out-of-network

20 care. The interests advanced in that event are those of the insurer,

21 whether by accident or design.

22    145.   The NYAG left little doubt that this industry-wide problem needed an

23 industry-wide solution because all industry members benefitted unfairly and at the

24 expense of consumers over at least the past ten years.

25    146.   Following issuance of its Report, the NYAG entered into several

26 "Assurances of Discontinuance" with UnitedHealth, WellPoint, and certain of the

27 Insurer Conspirators named in this case (Cigna, Aetna, and Health Net). Those

28

1   assurances provided that the Ingenix Database would cease to exist and a new
2   unbiased database would be created.  Specifically, the agreements provided that:

3           (a)     An independent third party that is free from conflicts and uses a
4   fair, objective and reliable database is needed to replace Ingenix;

5           (b)     An independent database would be created and operated through a
6   not-for-profit corporation that will own the new database and collect data from
7   contributors and publish rate information in a public and transparent way;

8           (c)     The not-for-profit corporation will create a website available to the
9   public to disclose out-of-network reimbursement rates.  The website will include a
10  search function that will clearly indicate the prevailing charge in a given area;

11          (d)     Insurers will provide information to their members explaining the
12  method of determining reimbursement rates including that Ingenix is owned by
13  UnitedHealth, and will explain that a new database is being created;

14          (e)     Insurers will contribute to fund the creation of the new database.
15  Defendant UnitedHealth agreed to pay $50 million; Defendant WellPoint agreed to
16  pay $10 million; Conspirator Aetna agreed to pay $20 million; Conspirator Health Net
17  agreed to pay $2 Million and Conspirator Cigna agreed to pay $10 million; and

18          (f)     Once the new database is created, insurers will have 60 days to
19  cease operating and using the Ingenix Database.

20                          ***Congress' Investigation***

21      147.    Congress also is actively investigating the use of the Ingenix Database in
22  setting UCRs.  Early in 2009, the Senate Committee on Commerce, Science, and
23  Transportation held full committee hearings on "Deceptive Health Insurance Industry
24  Practices – Are Consumers Getting What They Paid For?"  The Committee held two
25  such hearings, the first on March 26 and the second on March 31, 2009, examining
26  how the health insurance industry reimburses consumers for out-of-network
27  healthcare services; specifically, how the industry calculates the UCR for out-of-
28  network non-MD healthcare providers.  The statements and archived webcast are

1 available                                                                          at

2 http://commerce.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearin

3 g_ID=4edbd03a-bf22-4783-87db-dfd57d980123 (March 26, 2009 Hearing) and

4 http://commerce.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&

5 Hearing_ID=63b0f558-ec43-4ab8-82f0-070bcc699e38 (March 31, 2009 Hearing)

6 (SR-253).

7      148.    At the March 31, 2009 hearing, Senator and Committee Chairman John

8 D. Rockefeller, IV, speaking for the majority of the Senate Committee, explained why

9 they believed the insurance industry's practices were "deceptive." Mr. Rockefeller

10 noted that more than 100 million Americans paid for health insurance that would give

11 "them the option of going outside of their provider networks for care," but that the

12 insurance companies were not living up to their end of the bargain:

> Let's be very clear about this. The insurers aren't letting their
> policyholders see non-network doctors out of the goodness of their
> hearts. Consumers are paying for this option - through higher premiums
> and higher cost sharing. There are many reasons American consumers
> decide to pay the extra money for health insurance with an out-of-
> network option. One New York consumer we heard from last week, Dr.
> Mary Jerome, said she paid extra for the "peace of mind" that she could
> get the best care available when she really needed it.
>
> What we learned at our first hearing was that while consumers held up
> their side of the bargain, the insurers did not. The insurance industry
> promised to base their out-of-network payments on what they call the
> "usual, customary, and reasonable" cost of medical care in a particular
> area. Thanks to the New York investigation and other lawsuits, we now
> know that the insurance companies were not delivering what they
> promised.

58

149.   Senator Rockefeller specifically addressed the NYAG's findings as to the insurance industry's use of the Ingenix Database to pay far less than the UCR amounts:

> In Erie County, New York, for example, insurance companies were reimbursing their policyholders for doctor visits at rates that were 15 to 25% below the local prevailing rates.   A federal judge recently concluded that the reasonable and customary data insurers used in New Jersey was 14.5% lower than the prevailing market rates.   Everywhere experts have looked at this data, they have found what statisticians call a "downward skew" in the numbers.   For ten years or even longer, this skewed data was used to stick consumers with billions of dollars that the insurance industry should have been paying.   The source of the skewed data was Dr. Slavitt's company, Ingenix.

150.   In light of the insurance industry's fraudulent use of the Ingenix Database in setting UCRs, the Senate Committee is currently evaluating whether more federal oversight and regulation of the insurance industry is necessary.   For now, however, the only avenue of redress for subscribers and providers, such as Plaintiffs and the Classes, is through the courts.

## HARM TO SUBSCRIBERS

151.   By scheming to fix UCRs at below-market levels as a means to artificially depress ONS rates, the Defendants shifted the actual costs of paying for ONS to the subscribers (including Subscriber Plaintiffs and Class), and thus artificially increased the price that subscribers were required to pay for ONS.   Every provider charge for ONS is comprised of two parts: the price the subscriber will ultimately pay for the service and the portion that will be reimbursed by the insurer. By reducing the reimbursement, the price to the subscriber is increased in an equal dollar amount. The Ingenix Database has been used to effectuate this goal in the following manner.   When a health plan subscriber (or his/her healthcare provider

59

pursuant to an "assignment of benefits" when such an assignment has occurred) submits a claim for reimbursement, the Insurer Conspirators use the False UCR schedules produced by the Ingenix Database to pay less than the "usual and customary rate" for the services rendered, thereby requiring the subscriber to make up the difference to the ONS provider by way of out-of-pocket payments, whether or not there has been an assignment of *benefits*. This hidden, undisclosed cost thereby increases the cost of care, and, commensurately, the cost of receiving healthcare pursuant to the Insurer Conspirators' health plans. Subscribers have been economically injured both by paying higher premiums for a plan that allows ONS reimbursement, and by failing to receive the level of reimbursement promised by the plan.

152. The Insurer Conspirators agreed through contracts, licenses, and oral understandings to provide flawed pricing information to Ingenix; to obtain and use the resulting flawed Ingenix uniform pricing schedules to determine ONS reimbursements, thereby depriving subscribers of a competitive market for obtaining ONS; and to keep Ingenix UCR data secret from subscribers, providers, and potential Ingenix competitors. As a result of the structure of the sale of the PCHS database by HIAA and agreements among the leading health insurers that tie them to Ingenix, there is no viable competitor in the market for data services used to calculate UCRs. Defendants' anticompetitive scheme ensured there would be no viable competitor in the market for data services used to calculate UCRs. The absence of such competition prevented subscribers and providers from comparing UCRs and detecting the falsity of the rates created by Defendants and their Co-Conspirators.

153. Due to the agreement by the Defendants and the Conspirators to manipulate a limited number of data points, which are used to set the False UCRs that Ingenix disseminates and WellPoint and others deploy, competition in the market for the provision of data services used to calculate UCRs was harmed and constrained. This had the inevitable and quantifiable effect of increasing the price that subscribers

1   were required to pay for ONS, reducing the amount ultimately recovered by providers

2   for such services, and dramatically reducing the Insurers' own costs.

3       154.    As a result of the Defendants' anticompetitive and deceptive conduct,

4   the Subscriber Plaintiffs and Classes pay increased out-of-pocket costs due to the

5   artificially-low reimbursement amounts, thus, paying a higher price for ONS than they

6   would have in a competitive market free from collusion and price-fixing: each dollar

7   the Insurer Conspirators were able to lower ONS reimbursements is one additional

8   dollar Plaintiffs and Class members were, and are, obligated to pay out of pocket.

9       155.    As discussed herein, the Subscriber Plaintiffs' contractual relationships

10  with WellPoint require that they be ultimately responsible for any payments to

11  Providers.  As such the Subscriber Plaintiffs and the Classes they represent have

12  standing to pursue their claims even if they have assigned their claims for out-of-

13  network benefits to providers.  When subscribers assign their claims for benefits, they

14  are still contractually responsible and financially responsible for full payment to their

15  respective providers.  Moreover, providers generally seek to recoup the balance of any

16  amount beyond what is paid by WellPoint from the subscriber (known as "balance

17  billing').  Because subscribers are ultimately responsible for payment for the services,

18  have paid the difference between what WellPoint reimbursed as UCR and the billed

19  charge by providers' balancing billing, all Subscriber Plaintiffs, including those who

20  have assigned their claims to Providers, have standing and have been injured by

21  WellPoint's conduct.

22                          **HARM TO PROVIDERS**

23      156.    Defendants' scheme to fix UCRs at below-market levels as a means by

24  which to artificially depress rates for ONS injures the Provider Plaintiffs and Class in

25  several ways.

26      157.    By limiting payment to the False UCR, the Defendants cause the

27  Providers financial harm by not paying them the full amount to which they are entitled

28

61

1  – their full billed charge or their actual usual, customary and reasonable rate for their
2  services.

3      158.   When ONS reimbursements are less than the Provider Plaintiffs' usual
4  and customary rate for the service rendered, the Provider Plaintiffs systematically bear
5  the financial loss because they cannot otherwise collect the full amount to which they
6  are entitled.  It has been estimated that approximately 5.5% of non-profit hospital
7  charges and 5% to 10% of private physician charges are written off as non-collectible.

8      159.   WellPoint and the Insurer Conspirators' systematic improper ONS
9  reimbursement determinations also cause Providers to needlessly expend valuable
10  time and resources identifying and then appealing unlawful determinations through a
11  process deliberately designed to deny, delay, and impede providers from obtaining
12  proper ONS reimbursements (providers frequently submit claims for reimbursement
13  themselves when patients execute "assignments of benefits" that make the provider
14  the beneficiary of the ONS reimbursement).  When Provider Plaintiffs and members
15  of the Provider Class submit claims, they typically receive "Explanations of Benefits"
16  ("EOBs") that claim the charge submitted exceeds the UCR, but without any
17  explanation of how the UCR was calculated.  Providers then face a futile appeal
18  procedure, where accurate UCR determinations are impossible as the Insurer
19  Conspirators rely solely upon Ingenix's False UCRs.  The Insurer Conspirators
20  frustrate the purposes and mission of the Association Plaintiffs.

21      160.   These injuries coerce Providers to become participating, "in-network"
22  providers.  By agreeing to be bound by insurer fee schedules that apply so-called
23  "negotiated fees" for services, providers can eliminate the business from patients who
24  receive bills with surprisingly high balances remaining after insurer reimbursement,
25  but only at the cost of significantly lower fees for their services.  Insurer Conspirators
26  then receive the benefit of lower payments to providers on their insureds' claims
27  through the "negotiated fee" schedules to which in-network providers are required to
28  adhere and which strictly cap what providers may charge for their services.  Thus, the

economic pressure on ONS providers to become part of the insurer's network forces them to accept significantly reduced compensation and to modify their patient care and treatment practices in a manner that conforms to the insurer's billing policies. This reduces the provider choice that would otherwise be available to subscribers.

161. The Provider Plaintiffs and the Class have standing to pursue these claims as assignees of their patients' out-of-network benefits and/or as third-party beneficiaries of their patients' out-of-network benefits.

162. WellPoint acknowledges this when they pay the Provider directly or otherwise recognize the Provider's valid assignment of benefits.

**HARM TO THE ASSOCIATIONS**

163. The impact of the Insurer Conspirators' non-transparent ONS reimbursement scheme and pervasive under-reimbursements causes the Association Plaintiffs to expend significant time, energy and money to, *inter alia*, counsel members on how to counteract the practices at issue, monitor the Insurer Conspirators' practices, advocate on their members' behalf, and/or lobby for legislative or other insurance reform. Each of these efforts requires staff, time and money that would not be expended but for Defendants and the Conspirators' fraudulent scheme and price-fixing conspiracy.

164. One of the core missions of the Association Plaintiffs is to advance and safeguard the provider-patient relationship. The Defendants' scheme undermines the relationship between providers and their patients. Subscribers believe they are covered for the "usual and customary" charge for medical services, yet when they receive ONS, they are frequently left with a surprisingly large bill because the ONS reimbursement has covered only a portion of the providers' fees. Because the subscribers do not (and cannot) know that the low ONS reimbursement is due to the Insurer Conspirators' price-fixing scheme, blame is laid at the feet of the provider, whose rates are made to look exorbitant by the Insurer Conspirators' explanation that the charges exceed the "usual and customary rate." The conspiracy thereby introduces

1   mistrust and friction into the relationship between subscribers and their care providers.

2   This phenomenon adversely affects thousands of the Association Plaintiffs' members,

3   including the Provider Plaintiffs.

4       165.   The Association Plaintiffs have standing to pursue these claims both

5   individually and/or on behalf of their members through associational standing.

6                           **ERISA ALLEGATIONS**

7       166.   Under the terms of their healthcare plans, WellPoint is obligated to

8   provide specific healthcare benefits and reimbursements to subscribers. Under federal

9   law, WellPoint is an ERISA fiduciary for the ERISA health plan at issue. As such,

10  WellPoint owes its plan members (including the Subscriber Plaintiffs) the fiduciary

11  duties of care and loyalty, and they must apply their respective plan provisions in

12  good faith and as required under ERISA. When subscribers assign their ERISA

13  benefits to healthcare providers (including the Provider Plaintiffs), WellPoint also

14  owes such fiduciary duties and obligations to act in good faith to the assignee

15  healthcare providers. As set forth below, WellPoint has breached, and continues to

16  breach, its obligations to the Subscriber and Provider Plaintiffs and the ERISA

17  Provider and Subscriber Subclasses, and in so doing has violated ERISA.

18      167.   Under ERISA, WellPoint is required, among other things, to comply

19  with the terms and conditions of its healthcare plans; to afford plan subscribers and

20  assignees an opportunity to obtain a "full and fair review" of any denied or reduced

21  reimbursements; and to make certain disclosures to plan subscribers, such as

22  accurately setting forth plan terms, explaining the specific reasons why a claim is

23  denied and the internal rules and evidence that underlie such determinations,

24  disclosing the basis for their interpretation of plan terms, and providing appropriate

25  data and documentation concerning coverage decisions.

26      168.   The federal common law of trusts, which is applicable to ERISA

27  fiduciaries such as WellPoint, further requires that fiduciaries deal honestly with plan

28

1    subscribers and their assignees, and adhere to certain specific fiduciary standards in
2    their dealings.

3          169.   In offering and administering its healthcare plans, WellPoint assumes
4    the role of "Plan Administrator," as that term is defined under ERISA, in that
5    WellPoint interprets and applies the plan terms, makes all coverage decisions, and
6    provides for payment in the form of medical reimbursements to plan subscribers
7    and/or their assignee-providers.   As the Plan Administrator, WellPoint assumes
8    various obligations specified under ERISA.   These obligations include providing its
9    plan members with a "summary plan description" ("SPD"), a document designed to
10   describe in layperson's language the material terms, conditions and limitations of the
11   healthcare plan.   The full details of the plan, which are summarized in the SPD, are
12   contained in the Evidence of Coverage ("EOC").

13         170.   Alternatively, in those instances where WellPoint has not explicitly
14   assumed the role of "Plan Administrator," it has acted as the "*de facto*" Plan
15   Administrator by, among other things, providing Plan documents to participants,
16   receiving claims for medical reimbursements, evaluating the claims and making
17   medical reimbursement determinations, interpreting the terms of the Plan and making
18   and administering medical reimbursement payments.   In carrying out these Plan
19   Administrator functions, WellPoint has preeminent authority to manage and
20   administer their medical reimbursement Plans.

21         171.   WellPoint is obligated under ERISA to make coverage determinations in
22   a manner consistent with the disclosures contained in their respective SPDs.   To the
23   extent there is a disparity or conflict between the SPDs and an applicable EOC, the
24   SPD governs, so long as the plan member benefits from the application of the SPD.   If
25   the employer, rather than WellPoint, is deemed to be the Plan Administrator,
26   WellPoint, as co-fiduciary, remains responsible for ensuring the SPD complies with
27   the law as provided in ERISA, 29 U.S.C. § 1105.   Such is the case even if the
28   employer prepares or disseminates the SPD.

65

172.    WellPoint breached its fiduciary duties by failing to disclose the actual and true reimbursement rules used to pay ONS benefits by knowingly using inaccurate, flawed and fabricated data from the Ingenix Database to calculate UCRs, by knowingly delegating their duty to collect accurate information regarding UCRs to Ingenix (whom WellPoint knew was collecting inadequate and inaccurate data regarding UCRs), and by failing to fulfill its obligations of good faith, due care and loyalty. Moreover, WellPoint breached its duties by manipulating the data it used to pay ONS so as to artificially depress the data Ingenix relied upon in creating UCR schedules for ONS reimbursements.

173.    WellPoint through the WellPoint Contributors is a contributor of provider charge data to the Ingenix Database.  Following receipt of the data from WellPoint, Ingenix removes valid high charges from all contributors' data.  Ingenix then published the corrupted database.  Simply stated, WellPoint and Ingenix "cooked the books," and the corruption of the data invalidates its use by WellPoint as the basis for determining UCR for ONS.  These actions (among others referenced herein) violated the law.

***Non-Ingenix UCR Methodologies***

174.    In addition to UCR determinations based on the Ingenix Database, Plaintiffs challenge WellPoint's other improper ONS Benefit Reductions, including its use of (1) cryptic internal fee schedules; (2) discounted in-network or Par provider fee schedules rather than valid UCR data; and (3) undisclosed low percentages of CMS rates, oftentimes referred to as a percentage of Medicare (collectively, "Non-Ingenix Methodologies").  These Non-Ingenix Methodologies breach subscribers' contracts and constitute violations of ERISA.

175.    Although WellPoint healthcare plans represent that ONS will be reimbursed based on UCR determinations, WellPoint does not base its determinations on the usual, customary, and reasonable rates based on charges of similar types of providers performing similarly complex procedures in the relevant geographic

66

1   location.  Instead, at times, WellPoint employs ONS Benefit Reductions to reimburse

2   ONS based on an undisclosed percentage of extremely low and unrepresentative

3   Medicare rates.   For example, some health plans state that ONS will be reimbursed

4   based on UCR.  That UCR is determined, though, by an undisclosed percentage of a

5   CMS fee schedule.  In fact, WellPoint entities have used 100% of CMS fee schedules

6   to reimburse for UCR even though those schedules already represent government-

7   driven, below-market rates.

8       176.   WellPoint   also   impermissibly   makes   UCR   reimbursement

9   determinations using flawed or incomplete internal fee schedules.   These fee

10  schedules are wholly cryptic and undisclosed and the methodologies supporting them

11  have never been known.  In addition, the data supporting them is incomplete and does

12  not accurately reflect the amount most often charged for a given service in the same

13  geographic area, or the average price charged for a given service in the same

14  geographic area, as required by the operative WellPoint plans.

15      177.   Certain WellPoint healthcare plans provide that ONS will be reimbursed

16  based on a percentage of the so-called "Negotiated Fee Schedule" used to pay in-

17  network providers.  Contrary to WellPoint's representations, however, the "Negotiated

18  Fee Schedule" is not a product of arms-length negotiations between in-network

19  providers and WellPoint but, rather, is WellPoint's standard, discounted fee schedule

20  that WellPoint unilaterally develops and imposes on a portion of its in-network

21  providers.  WellPoint's standard fee schedule does not reflect the rates applicable to

22  those in-network providers who actually negotiate fees with WellPoint.

23      178.   The use of Non-Ingenix Methodologies (as well as the Ingenix

24  Database) to reimburse for ONS leaves WellPoint's members financially responsible

25  for unpaid amounts that WellPoint is otherwise obligated to pay under the terms of its

26  healthcare plans.  Because the ONS Benefit Reductions are "exclusions" of coverage

27  under the ERISA plans, WellPoint has the burden to demonstrate that its exclusions

28  comply with its plan(s) and its legal obligations.  Plaintiffs allege that WellPoint

67

cannot sustain its burden regarding its ONS Benefit Reductions, and seek a redetermination of their ONS benefits claims and corresponding recalculation and payment of unpaid benefits and other equitable relief for themselves under ERISA.

179.    WellPoint also made numerous UCR and other ONS Benefit Reductions to Plaintiffs based on practices challenged herein as violations of federal law, including UCR based on manipulated and invalid data from the Ingenix Databases and undisclosed, improper criteria such as internal fee schedules, negotiated rates, and CMS-prescribed percentages.

180.    WellPoint is legally obligated to adhere to the specific provisions of its Members' group health plans. WellPoint cannot make ONS Benefit Reductions if they are not authorized or accurately disclosed in their Members' Certificates and SPDs, the latter of which is a document designed to describe in layperson's language the material terms, conditions, and limitations of the healthcare plan. During the Class Period, WellPoint breached the express terms and conditions of Members' Certificates and SPDs when it made ONS Benefit Reductions.

181.    Plaintiffs and Class Members challenge WellPoint's systemic application of rules and policies in making ONS Benefit Reductions that are not authorized by WellPoint Members' Certificates and SPDs; its routine violation of its fiduciary duties; and its failure to comply with ERISA, federal claims procedure regulations, federal common law and other applicable law.

182.    WellPoint's EOBs reflecting ONS Benefit Reductions did not comply with legal requirements, including federal claims procedure regulations. The EOBs failed to advise WellPoint Members of the specific reasons for the denial(s), the specific plan provisions, and their appeal rights. WellPoint's EOBs reflecting UCR determinations failed to advise the Plaintiffs of the data that WellPoint used to calculate UCR.

183.   Various procedural rules that covered Subscriber Plaintiffs' appeals were also violated.  WellPoint's substantive and procedural violations prevent it from relying on defenses to Plaintiffs' claims, such as exhaustion or statutes of limitations.

184.   WellPoint issued EOCs to the Subscriber Plaintiffs and all subscribers and beneficiaries that set forth the benefits that WellPoint promised to pay its subscribers.  According to the Subscriber Plaintiffs' EOCs, benefits were to be conferred to each subscriber and his enrolled family members.

185.   Like most insurance plans, WellPoint's plans typically at issue here differentiate between (i) coverage for medical treatment from "in-network" providers who have negotiated discount rates with the insurer and (ii) coverage for treatment from "out-of-network" providers who charge insureds their usual, non-discounted rates.  WellPoint refers to such providers as "non-participating," "non-contracting," "non-network," and/or "out-of-network" providers (collectively, "out-of-network").  As part of their contracts with WellPoint, in-network providers agree to not bill insured patients or WellPoint more than the contracted amounts for in-network services.  Conversely, out-of network providers have no service contracts with the insurance company and thus are not precluded from billing at their usual rates.  In cases where the out-of-network provider's bills exceed more than the insurance company will pay, the balance is the WellPoint subscriber's responsibility.

186.   Under the Subscriber Plaintiffs' plans, subscribers have an express right to receive treatment from out-of-network providers.  When WellPoint plan members receive ONS, payments are based on a percentage of the lesser of (i) the billed charge or (ii) what WellPoint describes as the "usual and customary" rate for that service. Health insurers, including WellPoint, use the terms "UCR," "usual and customary" "reasonable and customary" and "reasonable charge" interchangeably.

187.   WellPoint often refers to the UCR as the "maximum amount allowed" "allowable expense" or "allowable charge."  WellPoint makes clear in its respective EOCs, as well as in other written communications to its subscribers, that the plan

1   member is financially responsible for the difference between the UCR (amount
2   allowed) and the provider's billed charge for ONS. For example, EOCs state that the
3   amount the ONS provider charged for the service, the amount allowed, the percentage
4   and portion of the amount allowed that WellPoint will pay, and the balance owed by
5   the subscriber, which WellPoint describes as "Your Responsibility." Other EOCs
6   refer to this amount as "What You May Owe Providers" or similar language
7   conveying WellPoint's position that the portion of an ONS that WellPoint has not paid
8   is the plan member's obligation.

9       188.    The portions of ONS charges not paid by WellPoint are not credited
10  toward deductibles or out-of-pocket maximums that limit the total amount a plan
11  member has to pay for medical services over a given time period. Thus, these out-of-
12  pocket expenses are charges wholly in addition to the amount that the subscriber has
13  agreed to pay for healthcare coverage.

14      189.    In processing claims for ONS charges, WellPoint is obligated under
15  ERISA to calculate accurate UCRs and reimburse subscribers accurately UCRs in a
16  manner consistent with the definition of UCR used by WellPoint to describe its health
17  plans to its plan subscribers. WellPoint does not fulfill this obligation because it fails
18  to pay benefits based on accurate UCRs.

19                              ***Plaintiff Roberts***

20      190.    Plaintiff Michael A. Roberts (individually, and as guardian for D.
21  Roberts) alleges that WellPoint breached its fiduciary duties under ERISA. He further
22  seeks unpaid benefits from WellPoint arising from the reduced UCR payment
23  described below for which he exhausted his administrative remedies.

24      191.    Plaintiff Roberts' daughter, D. Roberts, during the Relevant Time
25  Period, was either under the age of 19 or a full-time student attending an accredited
26  college in the state of Massachusetts. Plaintiff Roberts submitted the requisite written
27  certification of student status to WellPoint. Plaintiff Roberts' daughter was thus
28  directly insured under his plan.

192.    Plaintiff Roberts' employer sponsored an "Employee Elect Medical Plan" for its employees, including Plaintiff Roberts, which was directly insured by WellPoint *via* Blue Cross of California. Plaintiff Roberts and his family were thereby directly insured by WellPoint under this plan during the Relevant Time Period.

193.    Upon subscribing to his employer-sponsored plan, Plaintiff Roberts received his "Combined Evidence of Coverage and Disclosure Form" ("Plaintiff's EOC"). Plaintiff Roberts' EOC provides that Plaintiff Roberts and his eligible family members are directly insured under the Plan and lists within "family member" any of Plaintiff Roberts' children including:

> Unmarried children of the Subscriber, the Subscriber's enrolled Spouse, or the Subscriber's enrolled Domestic Partner from the nineteenth (19th) to twenty-fourth (24th) birthday who qualify as dependents for federal income tax purposes and who are full-time students (for twelve (12) or more credits) attending an accredited college, university, vocational or technical school.  Blue Cross requires written proof of student status annually.

194.    Plaintiff Roberts' EOC specifies a set deductible, and that once this deductible is satisfied, WellPoint is required to reimburse its subscribers, including Plaintiff Roberts, according to a chart contained within Plaintiff Roberts' EOC. Pursuant to the chart, medical procedures are classified as either being undertaken by a participating provider or by a non-participating provider.  "Non-Participating Provider" is defined as an entity (hospital, physician or otherwise) "which does NOT have a Prudent Buyer Plan Participating Provider agreement with Blue Cross in effect at the time services are rendered[.]"

195.    The chart in Plaintiff Roberts' EOC contains various medical procedures and corresponding reimbursement amounts/subscriber payment responsibilities. For example, Plaintiff Roberts' EOC lists "Outpatient Hospital and Emergency Room" procedures at a non-participating provider (in or out of the State of California) and

71

1  provides that the consumer, Plaintiff Roberts, must pay "40% of the Customary and

2  Reasonable charge."   WellPoint is obligated to pay the remaining 60% of the

3  Customary and Reasonable charge.

4      196.   The EOC defines "Customary and Reasonable Charge" as "the average

5  price that a majority of providers charge for a particular procedure, supply, piece of

6  equipment or service, based on where the procedure, supply, piece of equipment or

7  service is performed or obtained."

8      197.   On or about December 4, 2007, Plaintiff Roberts' daughter underwent

9  an outpatient hospital procedure at a Non-Participating Provider hospital.  Plaintiff

10  Roberts submitted a claim with WellPoint regarding this procedure.  WellPoint made

11  a UCR determination on this claim, based upon the fee schedules produce by the

12  Ingenix Database,  that reimbursed Plaintiff Roberts less than the stated percentage of

13  the provider's actual charges.  This UCR determination resulted in Plaintiff Roberts

14  being obligated to pay not only his deductible, but also that part of the provider's

15  billed charge that exceeded the UCR amount determined by WellPoint.

16      198.   WellPoint failed to comply with the terms of Plaintiff Roberts' group

17  plan by making a UCR determination that reduced the stated percentage of the

18  provider's charges without valid data to support such a determination.

19      199.   On May 12, 2008, Plaintiff Roberts appealed WellPoint's decision by

20  specifically requesting relief from WellPoint regarding this claim.   WellPoint,

21  however, never provided Plaintiff Roberts with any data or other documentation for its

22  UCR determination. Plaintiff Roberts repeatedly requested, in writing and otherwise,

23  that WellPoint provide specifics about its UCR determination and about why the

24  provider's charges had been determined to exceed the UCR.  Plaintiff Roberts did not

25  receive data, documentation, or adequate redress from WellPoint (or otherwise), and

26  continues to be liable for the remainder of the medical bill (to the tune of thousands of

27  dollars).  He thereby exhausted his administrative remedies.

28

1
***Plaintiff Cooper***

2      200.    Plaintiff Mary Cooper and her (now deceased) husband, Robert Cooper,

3 obtained health insurance from WellPoint, by and through its predecessor and

4 subsidiary company, WellChoice, under a WellChoice Small Group Health Benefits

5 PPO. The Coopers were thereby directly insured by WellPoint/WellChoice during the

6 Relevant Time Period.

7      201.    The Coopers' WellChoice policy provided coverage for services

8 performed by both in-network and out-of-network providers. Thus, under that policy,

9 Mary and Robert Cooper were contractually entitled to choose care from ONS

10 providers.   With respect to services provided by out-of-network providers, the

11 Coopers were obligated under their WellChoice policy to pay a thirty (30) percent co-

12 insurance payment, which they did.

13      202.    WellPoint was to provide reimbursement for services provided by out-

14 of-network providers under the Coopers' WellChoice policy for all "Covered

15 Charges," subject to the co-insurance payment noted above.

16      203.    "Covered Charges" are defined in the Coopers' WellChoice policy as

17 "Reasonable and Customary" charges for services and supplies as so listed in the

18 "Covered Charges" section of the policy.  The "Covered Charges" section of the

19 Coopers' WellChoice policy include all "Covered Charges," such as a practitioner's

20 charges for non-surgical care and treatment, practitioner's charges for surgical care

21 and treatment, dialysis center charges, hospital charges, and pre-admission charges, to

22 name a few examples.

23      204.    "Reasonable and Customary" is defined in the Coopers' WellChoice

24 policy as an amount that is not more than the lesser of "the usual or customary charge

25 for the service or supply as determined by WellChoice Insurance of New Jersey, based

26 on a standard approved by the Board; or the negotiated fee schedule."  The Policy

27 further provides that "[t]he Board will decide a standard for what is Reasonable and

28 Customary" under the policy and that "[t]he chosen standard is an amount which is

73

1   most often charged for a given service by a Provider within the same geographic
2   area."

3       205.   During the Relevant Time Period, the Coopers utilized ONS under their
4   WellPoint policy.  For example, Mary Cooper received cardiology related services
5   from an out-of-network provider on or about February 27, 2003, March 3, 2003, and
6   March 7, 2003.

7       206.   Robert Cooper received numerous medical and laboratory services from
8   out of network providers on or about November 5, 2004, November 18, 2004,
9   November 26, 2004, January 5, 2005, January 10, 2005, January 18, 2005, March 16,
10   2005, November 5, 2005, April 12, 2006, and March 1, 2007, among other dates.

11       207.   In each instance, WellPoint made a determination of the "Reasonable
12   and Customary" amount on these claims based upon the flawed Ingenix Database.

13       208.   WellPoiont's determination and subsequent payment of the so-called
14   "Reasonable and Customary" amount for the Coopers' ONS resulted in the Coopers
15   being obligated to pay, in addition to co-insurance payments, the ONS medical
16   providers' charges that exceeded the "Reasonable and Customary" amount as
17   improperly calculated by WellPoint.

18       209.   WellPoint itself has never provided the Coopers with adequate data,
19   documentation or other information regarding its "Reasonable and Customary"
20   amount determinations or WellPoint's use of the flawed Ingenix Database and the
21   Coopers were otherwise unaware that the "Reasonable and Customary" amount
22   determinations had been improperly calculated by WellPoint based on flawed Ingenix
23   data.

24       210.   WellPoimt breached the terms of the Coopers' health insurance policy
25   by making a "Reasonable and Customary" determination that improperly reduced the
26   stated amount payable by WellPoint for the providers' ONS charges.

27       211.   As alleged below, an administrative appeal to WellPoint of its
28   "Reasonable and Customary" determinations as they pertain to the Coopers and other

74

1   WellPoint/WellChoice subscribers is futile such that demonstrating exhaustion of

2   administrative appeals under ERISA is excused.

3                                  ***Plaintiff Rivera-Giusti***

4        212.    Plaintiff Rivera-Giusti's was enrolled in a  "Preferred Provider

5   Organization (PPO) Plan" through her employer, which was directly insured by

6   WellPoint *via* Empire Blue Cross Blue Shield.  She and her family were thereby

7   directly insured by WellPoint under this plan during the Relevant Time Period.

8        213.    Upon subscribing to her employer-sponsored plan, Plaintiff Rivera-

9   Giusti received her "Plan User Guide" (the "User Guide").  Her User Guide specifies

10  that WellPoint pays for out-of-network benefits once a subscriber meets out-of-

11  network deductible and coinsurance payments.  "Out-of-Network Services" are

12  defined as "services provided by a licensed provider outside Empire's PPO network or

13  the PPO networks of other Blue Cross and/or Blue Shield plans."

14       214.    The User Guide includes a chart that contains various medical

15  procedures and corresponding reimbursement amounts/subscriber payment

16  responsibilities.  For example, the chart lists "Hospital Services" at an out-of-network

17  provider and states that the consumer, Plaintiff Rivera-Giusti, must pay a "Deductible

18  and 20%coinsurance."  WellPoint is obligated to pay the remaining amount.

19       215.    In 2007 and 2009, Plaintiff Rivera-Giusti gave birth  to her two children

20  after receiving prenatal care from an out-of-network certified nurse midwife, who also

21  performed the deliveries.  In each instance, Plaintiff Rivera-Giusti submitted a claim

22  with WellPoint regarding the medical care she received from the nurse midwife.

23  WellPoint made  determinations of "allowed amounts" on these claims, based upon

24  the Ingenix Database, that reimbursed Plaintiff Rivera-Giusti less than the stated

25  charges of the provider's actual charges.  These "allowed amount" determinations

26  resulted in Plaintiff Rivera-Giusti being obligated to pay not only her deductible and

27  coinsurance payments, but also part of the provider's bill charge that exceeded the

28  "allowed amount" determined by WellPoint.

216.    In addition, Plaintiff Rivera-Giusti received counseling services from an out-of-network certified social worker in 2008.  She submitted fourteen claims with WellPoint regarding the fourteen counseling sessions she had with the certified social worker.  WellPoint made a determination of an "allowed amount" on this claim, based upon the Ingenix Database, that reimbursed Plaintiff Rivera-Giusti less than the stated charge of the provider's actual charges.  This "allowed amount" determination resulted in Plaintiff Rivera-Giusti being obligated to pay not only her coinsurance payment, but also part of the provider's bill charge that exceeded the "allowed amount" determined by WellPoint.

217.    WellPoint failed to comply with the terms of Plaintiff Rivera-Giusti's PPO plan by making an "allowed amount" determination that reduced the stated percentage of Plaintiff Rivera-Giusti's providers' charges without valid data to support such a determination.  WellPoint never provided Plaintiff Rivera-Giusti with any data or other documentation for its "allowed amount" determination.

### *Plaintiff Dr. Henry*

218.    Plaintiff Dr. Henry is an internist with a private practice in Pasadena, California.  He is licensed to practice medicine in the State of California, and has been certified by the American Board of Internal Medicine, American Board of Emergency Medicine, American Board of Medical Specialties, Subspecialty in Geriatrics, and American Academy of HIV Medicine, HIV Specialist.  During the relevant time, Dr. Henry provided ONS to WellPoint's subscribers.  ONS fees account for approximately 30%-35% of Dr. Henry's annual revenue.

219.    Because patients find it difficult to pay out of pocket for medical treatment at the time of service, they rely on their health plans to reimburse their physicians for their services.  While this arrangement is generally beneficial for the patient who does not have to pay for his treatment at the time of service, it leaves the Provider Plaintiffs and members of the Provider Class to advance the cost of such medical treatment until they receive payment from their patients' insurers.  To

76

1   facilitate direct payment from insurers, Dr. Henry's patients sign a form assigning

2   their health benefits to him before treatment. This form includes an express

3   authorization by the patient for insurers, such as WellPoint, to remit payment for

4   "professional services otherwise payable to [the patient] or the holder of the policy"

5   directly to Dr. Henry.

6       220. At all relevant times, Dr. Henry utilized a HCFA 1500 form, or more

7   recently, a CMS 1500 form, to submit claims to WellPoint for payment. Dr. Henry's

8   claims are routinely submitted electronically. Once an electronic claim is submitted it

9   passes through a clearinghouse before reaching WellPoint. All of Dr. Henry's claims

10   are submitted to WellPoint using CPT codes, Healthcare Common Procedure Coding

11   System ("HCPCS") and modifiers, as necessary. Dr. Henry does not find out his

12   compensation from WellPoint for services rendered until after a procedure is

13   performed and a claim for payment is submitted.

14       221. At all relevant times, Dr. Henry expected to be reimbursed by WellPoint

15   at the lesser of his billed charges or the current UCR. WellPoint defines UCR as

16   follows:

17       A "usual" charge is the amount that is most consistently charged by an

18       individual physician for a given service. A "customary" charge is the

19       amount that falls within a specified range of usual charges for a given

20       service billed by most physicians with similar training and experience

21       within a given geographic area. A "reasonable" charge is a charge that

22       meets the Usual and Customary criteria, or is otherwise reasonable in

23       light of the complexity of treatment of the particular case. Under a UCR

24       Program, the payment is the lowest of the actual billed charge, the

25       physician's usual charge or the area customary charge for any given

26       covered service.

27       222. On September 8, 2008, Dr. Henry provided covered medical services to

28   a patient subscriber of Blue Cross of California, a plan administered by Defendant

77

1   WellPoint.  Dr. Henry submitted the appropriate CMS 1500 (or its equivalent) to
2   WellPoint for payment for these services.  On September 19, 2008, Blue Cross of
3   California sent an EOB by U.S. mail to Dr. Henry, informing him that for each of the
4   procedure codes that he submitted "[t]his is the amount in excess of the allowed
5   expense for a non-participating provider.  The Health Plan is not responsible for any
6   amounts in excess of this allowed expense."  In other words, out of the $289.00 of
7   billed charges submitted by Dr. Henry, Blue Cross of California did not allow
8   payment of $150.60, leaving Dr. Henry out of pocket for his services.

9        223.   On June 19 and 26 of 2008, Dr. Henry provided covered medical
10   services to a patient subscriber of Blue Cross of California, a plan administered by
11   Defendant WellPoint.  Dr. Henry submitted the appropriate CMS 1500 (or its
12   equivalent) to WellPoint for payment for these services.  On July 7, 2008, Blue Cross
13   of California sent an EOB by U.S. mail to Dr. Henry, informing him that for each of
14   the procedure codes that he submitted "[t]his is the amount in excess of the allowed
15   expense for a non-participating provider.  The Health Plan is not responsible for any
16   amounts in excess of this allowed expense."  In other words, out of the $286.00 of
17   billed charges submitted by Dr. Henry, Blue Cross of California did not allow
18   payment of $129.95, leaving Dr. Henry out of pocket for his services.

19        224.   At various times, WellPoint unlawfully diminished Dr. Henry's
20   compensation by improperly calculating UCRs and then misapplying these rates to his
21   claims. Dr. Henry's EOBs and Remittance Advices often state that his billed charges
22   purportedly are "in excess of the allowed expense for a non-participating provider,"
23   and that the "Health Plan is not responsible for any amounts in excess of this allowed
24   expense."  Nowhere on the EOBs, Remittance Advices or elsewhere in any other
25   correspondence sent to Dr. Henry does WellPoint or its Blue Cross of California
26   subsidiary discuss or identify how it actually calculates UCRs. The EOBs do not even
27   specify whether Ingenix data or other ONS Benefit Reductions are used.

28

225. WellPoint's EOBs are intentionally uninformative, false, and misleading regarding the use of UCRs. This ambiguity has resulted in the inconsistent ONS reimbursements. WellPoint has repeatedly reimbursed Dr. Henry differently for identical procedures performed within the same timeframe, with no explanation for the discrepancy.

### *Plaintiff Dr. Schwendig*

226. Plaintiff Dr. Schwendig is a trauma surgeon at Scripps Memorial Hospital in La Jolla, California. He is licensed to practice medicine in the State of California, and has been certified by the American Board of Surgery and National Board of Medical Examiners. At all relevant times, Dr. Schwendig provided ONS (in the form of emergency and trauma healthcare services) to WellPoint subscribers.

227. As an emergency department-based trauma surgeon, Dr. Schwendig is responsible for the initial resuscitation and stabilization of patients. Under California's Health and Safety Code, emergency room doctors are obligated to treat all emergency room patients without regard to whether they are insured or able to pay. Calif. Health & Safety Code § 1317. The Code further provides that health plans must pay for emergency medical services (by implication and judicial interpretation at UCRs). Calif. Health & Safety Code § 1371.4(b). This is necessary because emergency room patients are in need of immediate care and generally are not in a position to choose their physicians as routine patients do – in other words, in-network or out-of-network considerations do not apply under such circumstances.

228. On September 10 through 18, 2007, Dr. Schwendig provided emergency healthcare services to a patient subscriber of Blue Cross of California, a plan administered by Defendant WellPoint. Dr. Schwendig, through his billing service, submitted the appropriate CMS 1500 (or its equivalent) to WellPoint for payment for these services. On September 29, 2007, Blue Cross of California sent an EOB by U.S. mail to Dr. Schwendig, informing him that for each of the procedure codes that he submitted "[t]his is the amount in excess of the allowed expense for a non-

79

1   participating provider."   In other words, out of the $2,234.00 in billed charges

2   submitted by Dr. Schwendig, Blue Cross of California did not allow $708.23.  On

3   October 19, 2007, Dr. Schwendig appealed this underpayment by letter sent by U.S.

4   mail, which stated that "[t]here is an amount of $708.23, denied as 'over allowed

5   amount', that remains to be paid.  According to our records, no contract exists

6   between Dr. James Schwendig and Blue Cross that would obligate him to accept your

7   "allowed amount" as payment in full for his services.  Please re-process this claim for

8   payment of the full billed charge amount as soon as possible.  Please also keep in

9   mind that this was a Trauma/Emergency situation and the patient had no choice of

10  physicians." On November 19, 2007, Blue Cross of California reprocessed the claims

11  and sent a second EOB by U.S. mail to Dr. Schwendig.  This time, Blue Cross of

12  California paid an additional amount for the patient's co-insurance, but nothing more

13  for the disallowed amounts, stating the same basis for the underpayment

14  determination.   As a result of WellPoint's improper ONS determination, Dr.

15  Schwendig was forced to send his patient to collections to recover the $708.23 of his

16  billed charges, but the patient has not paid this amount and Dr. Schwendig remains out

17  of pocket for this amount.

18          229.   Dr. Schwendig's patients are typically unable to make an "assignment of

19  benefits" prior to treatment.   Nevertheless, WellPoint routinely acknowledges an

20  assignment of benefits by sending EOBs and remitting payment directly to

21  Dr. Schwendig for services rendered. At times, however, and for no apparent reason,

22  WellPoint will send payment to the patient instead, forcing Dr. Schwendig to attempt

23  to recoup his lawful reimbursement from the patient.   This presents a significant

24  hardship for trauma surgeons like Dr. Schwendig who rarely treat their patients on a

25  long-term basis; continued treatment is generally delivered by specialists or the

26  patient's primary care physician. Trauma surgeons like Dr. Schwendig may never see

27  their patients after discharge.

28

230.   At all relevant times, Dr. Schwendig utilized a HCFA 1500 form, or more recently, a CMS 1500 form, to submit claims for payment to WellPoint. Dr. Schwendig's claims are routinely submitted electronically.   Once an electronic claim is submitted, it passes through a clearinghouse before reaching WellPoint.   All of Dr. Schwendig's claims are submitted using CPT codes, HCPCS and modifiers, as necessary.   Dr. Schwendig does not find out his compensation from WellPoint for services rendered until after a procedure is performed and a claim for payment is submitted.

231.   Rather than simply pay Dr. Schwendig the lesser of his billed charges or UCRs, WellPoint routinely and deliberately reimbursed his claims at the False UCR levels or through other improper ONS Benefit Reduction levels – including discounted Par provider fee schedules (in other words, in-network fee schedules) – requiring him to expend significant amounts of time and energy identifying and appealing improperly-reimbursed claims.   As a result, WellPoint unlawfully diminished Dr. Schwendig's compensation by improperly calculating UCRs and misapplying these faulty rates to his claims.   Dr. Schwendig's EOBs and Remittance Advices often state that his billed charges purportedly are "in excess of the allowed expense for a non-participating provider."   Nowhere on the EOBs, Remittance Advices or elsewhere in any other correspondence sent to Dr. Schwendig does WellPoint discuss or identify how it actually calculates UCR. The EOBs do not even specify whether Ingenix data or other ONS Benefit Reductions are used.

232.   Upon identifying improper payment of a claim by WellPoint, Dr. Schwendig – through his medical billing service, Practice Development Strategies ("PDS") – promptly appealed the determination by sending a formal letter asking WellPoint to reprocess the claim for additional payment. Dr. Schwendig has appealed several of WellPoint's claims determinations in this regard. Each appeal letter sent by PDS on Dr. Schwendig's behalf states that "no contract exists between Doctor James Schwendig and Blue Cross that would obligate him to accept WellPoint's 'allowed

81

amount' as payment in full for his services," and further explains that "this was a Trauma/Emergency situation and the patient had no choice of physicians." In addition to sending these appeals letters, PDS made telephone calls on Dr. Schwendig's behalf to WellPoint to appeal the insurer's wrongful determinations. Dr. Schwendig has repeatedly exhausted any administrative appeals available through WellPoint without succeeding in obtaining full and proper reimbursement for his services.

### *Plaintiff Dr. Peck*

233.    Plaintiff Dr. James Peck, Psy.D., is a clinical psychologist who resides in Marina Del Rey, California and maintains a private practice in Santa Monica, California. Dr. Peck also works at UCLA in Los Angeles, California. One of Dr. Peck's areas of focus is in substance abuse treatment. He completed a three-year National Institute of Health/National Institute on Drug Abuse (NIH/NIDA) Postdoctoral Fellowship at UCLA and holds the American Psychological Association/College of Professional Psychology Certificate of Proficiency in the Treatment of Alcohol and other Psychoactive Substance Use Disorders. Dr. Peck is also a member of an internationally-recognized substance abuse research group at the David Geffen School of Medicine at UCLA. He also specializes in HIV prevention for high-risk populations and served as the Principal Investigator of a NIDA-funded study of an intervention for methamphetamine-abusing HIV-positive patients at the UCLA CARE Clinic.

234.    As part of his private practice, Dr. Peck has obtained assignments of benefit payment rights from insureds covered under WellPoint employer sponsored and non-employer sponsored healthcare plans, and for such plans where WellPoint functions as a plan administrator under ERISA.

235.    During the Relevant Time Period, Dr. Peck was an ONS Provider to insureds covered by WellPoint's plans, and remained free to charge his patients his actual charges for medical services rendered. During that time, Dr. Peck had no direct contractual relationship with WellPoint.

82

236.    Because he was not in WellPoint's network of preferred providers, Dr. Peck, like other Class Members, obtained assignments from his patients, through which he was paid directly by WellPoint for providing healthcare to its insureds. These assignments did not alter the legal relationship between WellPoint and its insureds, but rather provided the convenience of allowing its insureds to obtain needed healthcare on the implicit promise of later payment by WellPoint to Dr. Peck.

237.    The assignment of benefit forms that Dr. Peck and Provider Class members obtain from their WellPoint patients are security for future payment by WellPoint and direct WellPoint, as the patient's insurer, to pay the benefit claim directly to the out-of-network healthcare provider.  Dr. Peck could and did check claim coverage and obtain pre-authorization from WellPoint before performing services for WellPoint's insureds, but like other Class Members, Dr. Peck was not told WellPoint's intended UCR reimbursement amount. Payment amount was unknown in advance and payment was frequently not automatic, unlike the services that WellPoint has obtained for its insureds.

238.    Dr. Peck, like other Class Members, submitted his claims to WellPoint using standardized procedural codes such as CPT Codes, HCPCS (Healthcare Common Procedure Coding System) Codes, and modifiers, as needed, on a HCFA form 1500 (n/k/a CMS 1500).  These claims were submitted to WellPoint either in paper form or electronically and may or may not have been immediately processed by an electronic clearinghouse before reaching WellPoint. Dr. Peck could submit larger claims to WellPoint on paper using the U.S. mail.

239.    Dr. Peck received EOBs from WellPoint indicating that his bills and his patients' claims were processed and/or administered by Anthem Blue Cross.  For example, Dr. Peck billed Anthem Blue Cross $150 on April 1, again on April 11 and again on April 29, 2009, for Procedure Code 90806 services he performed on each of those three days.  Anthem Blue Cross did not pay him $150 for each such service. Instead, on May 21, 2009, Anthem Blue Cross issued an EOB indicating that it

1  reduced the allowable amount down to $107.13 on the false premise that it represented
2  the UCR amount for out-of-network providers.

3      240.   With respect to the False UCRs or other ONS Benefit reductions
4  (including discounted Par provider fee schedules) that WellPoint and its subsidiary
5  Anthem Blue Cross imposed on Dr. Peck, any exhaustion of administrative remedies
6  with respect to those UCR determinations would be futile, because WellPoint, as a
7  matter of policy, refuses to alter or reprocess claims that have been processed pursuant
8  to the Ingenix Database. Regardless, Dr. Peck has satisfied any applicable exhaustion
9  requirements.

10     241.   Dr. Peck has called Anthem Blue Cross at the number provided on its
11 EOBs and challenged the $107.13 "allowed amount" as unreasonable and below the
12 UCR amount for the Los Angeles metropolitan area. Anthem Blue Cross advised Dr.
13 Peck that the "allowable amount" was all that he was entitled to be paid as an out-of-
14 network provider in that geographical area. Dr. Peck also submitted a written dispute
15 challenging the UCR determination, which was received by Anthem Blue Cross on
16 June 20, 2009. On August 14, 2009, Anthem Blue Cross sent Dr. Peck a letter
17 denying his appeal, stating that Dr. Peck's claim "was appropriately paid based upon
18 the 'reasonable and customary' value of the services [he] rendered" and that the
19 "decision is final and all levels of [its] appeal process have been exhausted."

20                    ***Plaintiff Dr. Pariser***

21     242.   Plaintiff Michael Pariser is a licensed psychologist and certified
22 psychoanalyst who practices and resides in Los Angeles, California. He previously
23 held teaching positions at the California Graduate Institute and the Institute for
24 Contemporary Psychoanalysis. Currently, in addition to his psychotherapy practice,
25 Plaintiff Pariser supervises psychology interns at the Chicago School Counseling
26 Center. In his private practice, Dr. Pariser specializes in providing individual
27 psychotherapy. Dr. Pariser is, and throughout the Relevant Time Period alleged
28 herein has been, an out-of-network healthcare provider to insureds covered by plans

84

1   insured and/or administered by WellPoint, and remained and continues to remain free
2   to charge his patients his actual charges for medical services rendered.  During the
3   Relevant Time Period, Dr. Pariser has had no direct contractual relationship with
4   WellPoint.  His experience with WellPoint is typical of other Class Members'
5   experience during the Relevant Time Period.

6       243.    Because he has been and continues to be a non-MD healthcare provider
7   not in WellPoint's network of preferred providers, Dr. Pariser, as with other Class
8   Members, typically has, and continues to obtain, a claim assignment from his patients,
9   through which WellPoint has, and continues to, pay him for providing healthcare to its
10  subscribers.  These claim assignments do not alter the legal relationship between
11  WellPoint and its subscribers, but rather provide the convenience of allowing these
12  subscribers to obtain needed healthcare on the implicit promise of later payment by
13  WellPoint. ONS fees from WellPoint subscribers account for approximately 25% of
14  Dr. Pariser's income.

15      244.    The assignment of benefits that Dr. Pariser and Class Members obtain
16  from their WellPoint patients are security for future payment by WellPoint and direct
17  WellPoint, as the patient's insurer or as the administrator of the patient's insurer, to
18  pay the claim directly to the out-of-network healthcare provider.  The assignment of
19  benefits form Dr. Pariser receives from his patients and relied on for the claims he
20  submits to WellPoint has an express authorization by the subscriber for insurers,
21  including Anthem Blue Cross and Blue Cross of California, to assign "any benefits to
22  be received for services performed and submitted on my behalf by Dr. Michael Pariser
23  to be paid directly to Dr. Pariser."

24      245.    As with all other Class Members, Dr. Pariser was not told WellPoint's
25  intended UCR reimbursement amount prior to the completion of his service.  Indeed,
26  as with all other Class Members, WellPoint would not have disclosed or advised
27  Dr. Pariser of the UCR reimbursement amount before he treated the subscriber even if
28  Dr. Pariser verified claim coverage and obtained pre-authorization from WellPoint

before treating WellPoint's subscribers.  Payment was unknown and frequently not automatic – unlike the services that WellPoint obtained for its subscribers.

246.    Dr. Pariser, like other Class Members, submitted and continues to submit his claims to WellPoint using standardized procedural codes such as CPT Codes, as needed, on a HCFA 1500 form (n/k/a CMS 1500).  These claims are submitted to WellPoint either in paper form or electronically and may or may not have been immediately processed by an electronic clearinghouse before reaching WellPoint.  Dr. Pariser could submit larger claims to WellPoint on paper using the U.S. mail.

247.    At all relevant times, Dr. Pariser expected to be reimbursed by WellPoint at the lesser of his billed charge or the current UCR, and relied on WellPoint to determine and pay him the appropriate reimbursement amounts in compliance with WellPoint's legal and contractual obligations, and not to take actions to improperly lower the reimbursement rates.

248.    WellPoint unlawfully diminished Dr. Pariser's compensation by improperly calculating UCRs and then misapplying these rates to his claims, as described herein.  Since at least January of 2007, Dr. Pariser received EOBs and Remittance Advices for at least five separate patients from WellPoint, including Anthem Blue Cross under Provider ID/Sequence number 1699980573 and Blue Cross of California under Provider ID/Sequence number 270111592. Dr. Pariser's EOBs and Remittance Advices often stated that his billed charges purportedly were "in excess of the allowed expense for a non-participating provider," and that the "Health Plan is not responsible for any amounts in excess of this allowed expense." Nowhere in the EOBs, Remittance Advices or any other correspondence sent to Dr. Pariser, however, does WellPoint discuss or identify how it actually calculates UCR.  The EOBs do not even specify whether Ingenix data or some other ONS Benefit Reductions (including discounted Par provider fee schedules). For example, when Dr. Pariser billed WellPoint his usual $200 rate for Procedure Code 90806, WellPoint did

86

1    not pay him $200, but rather imposed an "allowed amount" of $107.13 on the false

2    premise that it represented the UCR amount and then paid him the percentage of the

3    UCR amount provided under the patient's plan. Dr. Pariser's patients are responsible

4    for amounts owed to him in excess of WellPoint's allowed UCR reimbursement

5    amount.

6        249.    With its methods for calculating UCRs shrouded in a veil of secrecy,

7    WellPoint has been able to derive improper rates using faulty methodologies and data,

8    and apply them to out-of-network provider claims to diminish lawful reimbursements

9    to Dr. Pariser and the Classes.

10        250.    Dr. Pariser contacted WellPoint more than one year ago and complained

11    about WellPoint's decreasing the UCR for his service and to learn about his avenues

12    of redress. WellPoint informed Dr. Pariser that the UCR amount stated on its EOBs

13    for his service was correct and was given the impression that there was nothing he

14    could do to further challenge the UCR.

15        251.    With respect to UCR reductions WellPoint imposed on Dr. Pariser, any

16    exhaustion of administrative remedies with respect to the UCR determinations would

17    be futile for several reasons, including: (i) WellPoint, as a matter of policy, refuses to

18    alter or reprocess claims that have been processed pursuant to the Ingenix Database or

19    other faulty data it uses; (ii) other out-of-network providers have already submitted

20    and completed claims through WellPoint's administrative process seeking to increase

21    their reimbursements based on WellPoint's faulty UCRs and WellPoint has denied

22    each of those claims; and (iii) WellPoint, as described herein, has expressed its intent

23    to continue using Ingenix and other improper ONS Benefit Reductions for UCR

24    determinations by expressly agreeing with the NYAG that it will not stop using the

25    faulty data until 60 days after it is notified that a new database has been developed.

26        252.    Alternatively, Dr. Pariser should be deemed to have exhausted any

27    claims that otherwise were not exhausted, due to WellPoint's inadequate disclosure

28    concerning grievance procedures and its violation of ERISA and the applicable

87

1    ERISA regulations.

2                              ***Plaintiff Dr. Kavali***

3         253.    Plaintiff Carmen Kavali, M.D., is a plastic surgeon with a private

4    practice in Atlanta, Georgia. Dr. Kavali is board certified by the American Board of

5    Plastic Surgery and serves on the staff of Northside Hospital and the Center for Plastic

6    Surgery. She is a citizen of the state of Georgia and is licensed to practice medicine in

7    Georgia. Dr. Kavali does not currently participate in the WellPoint physician network

8    and sees WellPoint patients only on a non-participating basis.

9         254.    Dr. Kavali previously entered into a Provider Agreement with WellPoint

10   entity Blue Cross Blue Shield of Georgia and, as a result, became a member of the

11   WellPoint provider network.  On July 25, 2007, Dr. Kavali sent both a fax and a

12   certified letter notifying WellPoint that she was terminating the contract and that she

13   understood the termination would become effective as soon as possible but no later

14   than ninety days after WellPoint's receipt of the letter.  As a result, on or before

15   October 23, 2007, Dr. Kavali was no longer a participant in the WellPoint network

16   and thus, with respect to WellPoint, had the status of a non-participating physician

17   thereafter.

18        255.    Throughout the relevant time, Dr. Kavali provided out-of-network

19   healthcare services to WellPoint plan enrollees.  Dr. Kavali's experience with

20   WellPoint's unlawful business practices is typical of what has happened to the

21   Provider Class as a whole.

22        256.    Before and no later than October 23, 2007, Dr. Kavali treated patients

23   with coverage under plans covered or administered by WellPoint on an out-of-

24   network basis.  In each case, Dr. Kavali has obtained from the patient signed

25   Assignment of Benefits form. Customarily, before Dr. Kavali performs a procedure

26   for these patients, her office staff will contact WellPoint to confirm coverage, the lack

27   of a pre-certification requirement, inquire about the basis upon which payment to her

28   will be made, and ask for the amount of the payment so that the patient's share of the

cost can be calculated. WellPoint, however, customarily refuses to explain the basis upon which payment will be made and will not disclose the amount that Dr. Kavali will receive. The only information that WellPoint typically will disclose is the amount of the patient's co-insurance, the out-of-network deductible, and how much of the deductible has already been met.

257. After receipt of Dr. Kavali's claim for medical services, WellPoint customarily will send to her or to her patient an EOB (such as a "Provider Explanation of Medical Benefits Report," "Remittance Advice" or similar explanation of benefits) that specifies the amount being paid for each of the services that were provided. In each instance, the EOB shows that the amount paid by WellPoint has been less than the billed charge. WellPoint has given various explanations for its decision not to pay the full amount, such as "this charge has been processed based upon the provider's participation status and your contract terms."

258. On November 6, 2007, Dr. Kavali provided covered medical services to patient E.P. Dr. Kavali obtained an Assignment of Benefits from the patient before providing treatment. On December 13, 2007 Dr. Kavali mailed through the U.S. mail to BCBS of Georgia, a WellPoint subsidiary, a complete and clean HCFA form submitting CPT 19357. CPT Code 19357 indicates that the procedure involved a "breast reconstruction, immediate or delayed, with tissue expander, including subsequent expansion." Her submitted charge was $6,240. After applying the patient's $31.82 deductible and $32.01 coinsurance amounts, BCBS reduced Dr. Kavali's $6,240 submitted charge by $4,586.28. BCBS allowed payment of $1,589.89 rather than $6,176.17.

259. On or about January 10, 2008, BCBS sent through the U.S. mail to Dr. Kavali and/or her patient an EOB for services provided on November 6, 2007 for patient E.P. The EOB provided no explanation for the reduction of benefits. Dr. Kavali did not bill patient E.P. for that service.

260.    On December 4, 2007, Dr. Kavali provided covered medical services to patient S.B.  Dr. Kavali obtained an Assignment of Benefits from the patient before providing treatment.  On or about December 4, 2007, Dr. Kavali mailed through the U.S. mail to BCBS of Georgia, a WellPoint subsidiary, a complete and clean HCFA form submitting CPT Code 19370-50.  CPT Code 19370 indicates that the procedure involved an "open periprosthetic capsulotomy, breast."  Modifier 50 was used to indicate that the procedure was bilateral.  Her submitted charge was $6,500.  After applying the patient's $370.31 coinsurance amount, BCBS reduced Dr. Kavali's $6,500 submitted charge by $5,265.65.  BCBS allowed payment of $864.04 rather than $4,550.

261.    On or about January 4, 2008, BCBS sent through the U.S. mail to Dr. Kavali and/or her patient an EOB for services provided on December 4, 2007 for patient S.B.  The EOB did not provide an explanation for the reduction of benefits.  Dr. Kavali did not balance-bill patient S.B. for said service.

262.    By using the Ingenix Database or other ONS Benefit Reductions – including discounted Par provider fee schedules – to calculate the amount that she receives for her services, WellPoint and its subsidiaries improperly and unlawfully diminished the compensation to which Dr. Kavali is entitled.  Because she typically is unable to collect from her patients the full amount of her billed charges, Dr. Kavali has been injured monetarily as a direct and proximate result of WellPoint's improper conduct.

263.    The EOBs issued by WellPoint relating to the out-of-network patients treated by Dr. Kavali do not provide any procedures or process by which to appeal the amount of compensation.  Even if the EOBs are received by Dr. Kavali, which typically they are not, it is unclear if the adjudication may be appealed or if so, how.  The EOB-related documents simply contain a statement that "if you have any questions, please call" and a toll-free telephone number is given.  A website to "view eligibility, benefits or claim details online" is provided.

90

264.   Dr. Kavali understands from the information she does receive from WellPoint that, as an out-of-network provider, it is not necessary to file a written appeal to WellPoint. WellPoint only provides appeal procedures to participating providers. Dr. Kavali or her staff has telephoned WellPoint entities to complain about the amounts of compensation paid for a particular service without any success in obtaining additional payment.

265.   Any further appeal to WellPoint regarding the amount of her compensation would have been futile because WellPoint did not disclose and, indeed, concealed its use of the Ingenix Database or other ONS Benefit Reductions (including discounted Par provider fee schedules) to diminish payments based upon UCRs and routinely asserted that it was paying the proper amount due under the patient's plan. Further, it would have been inconsistent with WellPoint's scheme to disclose to physicians such as Dr. Kavali as part of any appeal process that it was manipulating the calculation of UCRs or to provide additional compensation to physicians as such additional payments would have constituted an admission of its improper conduct.

### *Plaintiff NPSC*

266.   NPSC's surgical facility is located in Torrance, California and is and at all relative times has been accredited by the Accreditation Association for Ambulatory Health Care ("AAAHC").   The AAAHC presently accredits over 4,000 ASCs. According to the Ambulatory Surgery Center Association ("ASC Association"), over 8 million surgeries are performed yearly at ACSs in the United States.

267.   To facilitate direct payment from insurers such as WellPoint, NPSC has all of its patients execute an assignment form that assigns their health benefits to NPSC in advance of any procedure performed at its facility and, further, permits NPSC to communicate directly with the insurer concerning payment of those health benefits and facilities fees. As part of this process, NPSC also attempts to obtain pre-approval of its claims from insurers whenever possible.

268.   All of NPSC's claims for payments are submitted to WellPoint using ICD-9 codes and CPT codes and modifiers, if necessary.  NPSC is not advised of the facilities fees to be paid by WellPoint for services provided until after a procedure is performed and a claim for payment is submitted.

269.   At all relevant times, NPSC expected to be reimbursed by WellPoint at the lesser of its billed charges or the current UCR.  WellPoint defines UCR as follows:

> A "usual" charge is the amount that is most consistently charged by an individual physician for a given service.  A "customary" charge is the amount that falls within a specified range of usual charges for a given service billed by most physicians with similar training and experience within a given geographic area.  A "reasonable" charge is a charge that meets the Usual and Customary criteria, or is otherwise reasonable in light of the complexity of treatment of the particular case.  Under a UCR Program, the payment is the lowest of the actual billed charge, the physician's usual charge or the area customary charge for any given covered service.

270.   At various times, WellPoint unlawfully diminished NPSC's compensation by improperly calculating UCRs and then misapplying these rates to its claims.  NPSC has also expended considerable time and resources dealing with issues concerning Defendants' improper UCR reimbursements and, as a result, has suffered direct and actual harm.  NPSC seeks damages and other appropriate relief on behalf of itself and as a representative of other similarly-situated facilities.

271.   With regard to the specific experiences of Plaintiffs Roberts, Cooper, Henry, Schwendig, Peck, Pariser, Kavali, and the NPSC, WellPoint failed to comply with the terms of the operative healthcare plan by making UCR determinations based on Ingenix's False UCR schedules or other ONS Benefit Reductions, which had the effect of covering less than the percentage of providers' charges that WellPoint had agreed to pay.  As a consequence of these actions, even after some Plaintiffs appealed,

92

they were reimbursed less than what should have been paid under terms of applicable health plans.  WellPoint pursued its standard and uniform policies in making UCR determinations in a fashion that conflicted with its contractual obligations under the relevant plans, and doing so violated its fiduciary obligations to the Provider Plaintiffs.  In addition, WellPoint misrepresented to the Provider Plaintiffs and its subscribers that the UCR amounts were calculated on the basis of valid and accurate data.

### *An Administrative Appeal to WellPoint of Its UCR Determinations Is Futile, Such That Exhaustion under ERISA Is Excused*

272.   The manner in which WellPoint responds to appeals to its UCR determinations establishes clearly that pursuing an administrative appeal of such benefit determinations would be futile.

273.   Plaintiffs Henry's, Schwendig's, Peck's, Pariser's, Kavali's, and NPSC's experiences with WellPoint are typical of the treatment endured by the Class Members and Association Plaintiffs' tens of thousands of members who provide ONS and consistently are not only underpaid, but must expend significant time, cost, and energy fighting an intransigent corporate bureaucracy that purposefully obfuscates and frustrates out-of-network providers into accepting lower fees for their services.

274.   With regard to the specific experiences of Plaintiffs Roberts, Cooper, Henry, Schwendig, Peck, Pariser, Kavali, and the NPSC, WellPoint failed to comply with the terms of the operative healthcare plan by making UCR determinations based on Ingenix's False UCR schedules or other ONS Benefit Reductions, which had the effect of covering less than the percentage of providers' charges than WellPoint had agreed to pay.  As a consequence of these actions, even after appealing, Plaintiffs Roberts, Henry, Schwendig, Peck, and Pariser were reimbursed less than what should have been paid under terms of applicable health plans.  WellPoint pursued its standard and uniform policies in making UCR determinations in a fashion that conflicted with its contractual obligations under the relevant plans, and by doing so violated its

1   fiduciary obligations to the Provider Plaintiffs.  In addition, WellPoint misrepresented
2   to the Provider Plaintiffs and its subscribers that the UCR amounts were calculated on
3   the basis of valid and accurate data.

4       275.   One example is a WellPoint insured (referred to here as "Subscriber X"
5   to maintain confidentiality) who was insured by WellPoint under a self-funded plan
6   based in California.  Pursuant to the Certificate of Coverage provided to Subscriber X
7   by his employer, claims were administered by WellPoint subsidiary Blue Cross of
8   California on behalf of BC Life & Health Insurance Company.

9       276.   Under the terms of the WellPoint plan, Subscriber X was entitled to
10  obtain healthcare services from non-par providers, and benefits would be "the lesser
11  of the billed charge or (1) for a physician, the customary and reasonable charge or
12  (2) for other than a physician, the reasonable charge."

13      277.   "Customary and reasonable charge" was defined in the plan as follows:

14          **Customary and reasonable charge**, as determined annually by the
15          claims administrator, is a charge which falls within the common range of
16          fees billed by a majority of physicians for a procedure in a given
17          geographic region.  If it exceeds that range, the expense must be justified
18          based on the complexity or severity of treatment for a specific case.

19      278.   Subscriber X received complicated surgery from a non-par provider in
20  September 2008.  The non-par provider billed for two services, one for $10,424 and a
21  second for $4,872.  WellPoint (through Anthem Blue Cross) issued an EOB to
22  Subscriber X in December 2008 in which it excluded $9,999.71 from the first bill and
23  $4,014.36 for the second, based on the following explanatory code:

24          This is the amount in excess of the allowed expense for a non-
25          participating provider.  The Health Plan is not responsible for any
26          amounts in excess of this allowed expense.  Refer to your plan of
27          coverage booklet for details regarding the schedule of benefits.

28

94

279.   Based on the healthcare plan covering Subscriber X, it is self-evident that WellPoint reduced the benefits by a total of 91.6% based on its "customary and reasonable charge" exclusion, but used, as its explanation, its reference to "the amount in excess of the allowed expense for a non-participating provider."

280.   After receiving the EOB reflecting such a substantial reduction in benefits, Subscriber X sought to appeal the denial.  She first wrote to her employer, which served as the designated plan administrator, but her administrator denied the appeal.  She also had a telephone conference with the plan administrator as well as with a representative from WellPoint to pursue her appeal, but she was informed that no change would be made.  In that call, WellPoint confirmed that it relied on the Ingenix Database for determining its benefit levels for non-par providers and that it would not reconsider its decision.

281.   When faced with the denials of her appeals, Subscriber X submitted a specific request for additional information to both her employer and WellPoint concerning WellPoint's UCR determinations.  In particular, on January 8, 2009, Subscriber X requested the following information from her employer:

> Documentation you have to support your position that their customary and reasonable determination complies with the terms of my health care plan.  To the extent that Anthem Blue Cross and Stanford relied on the Ingenix database to set customary and reasonable rates, please provide me details concerning how it determines customary and reasonable and, moreover, any back-up data upon which the Ingenix database is based for purposes of my claims.  I therefore want to see what evidence you have (including all supporting or back-up data) which shows that my providers' charges were in excess of what most other providers would charge for similar services or supplies.  I need this information to enable me to facilitate my appeal and to enable me to