1    attempt to demonstrate to you that your customary and reasonable
2    determination is improper.

3    282.   Subscriber X's employer refused to provide further information,
4    explaining on January 9, 2009, that WellPoint was the responsible party, stating:

5    Regarding your request for additional information, . . . [the Plan]
6    has delegated the responsibility for the processing and payment of claims
7    for participants enrolled in the Blue Cross Prudent Buyer Plan to Blue
8    Cross. Furthermore, Blue Cross is the fiduciary for and has the authority
9    and control over benefit determinations and, as such, would be in the
10   best position to respond to your requests.  Toward that end, I will ask
11   them to respond to you directly and to notify me that they have done so.

12   283.   Shortly thereafter, Subscriber X learned that the NYAG had entered into
13   a settlement agreement with UnitedHealth Group, the parent company for Ingenix,
14   pursuant to which UnitedHealth agreed to give up its Ingenix Database and to pay $50
15   million toward funding the creation of a new and independent UCR database.
16   Subscriber X informed her employer of the settlement, which highlighted the
17   problems with the Ingenix Database and how it was being changed in the future.
18   Again, however, Subscriber X's employer took no further action, but continued to
19   defer to WellPoint, stating in an e-mail dated January 20, 2009:

20   We all fully appreciate the frustration you have with what you
21   perceive to be inadequate reimbursement of the providers who supplied
22   services related to your hip surgeries this past summer and your
23   corresponding financial responsibility.  As we know you understand, the
24   reimbursement of providers who render care to our employees and their
25   eligible dependents enrolled in the [Plan] is handled by Anthem Blue
26   Cross, to which the Plan has delegated the responsibility for
27   administering the processing and payment of claims and for determining
28   the disposition of any appeals for denials of benefits under the Plan.  As

a result of the delegation of this fiduciary obligation, [the Plan] has no authority to determine the disposition of any claims . . .

* * * *

Having said this, we also acknowledge the uncertainty surrounding the use of reasonable and customary charge databases and receipt of your email about the settlement of the investigation undertaken by the Attorney General of the State of New York. We have been told by Anthem Blue Cross that they remain committed to appropriately processing all claims, including those for out-of-network services, fairly reimbursing providers for covered services, and protecting members and employers from excessive charges from certain non-participating providers. We are aware that you have contacted Anthem Blue Cross about your database questions and that they will respond to you directly about the information you have requested. Any further concerns you have about the database and how it is used by Anthem Blue Cross to reimburse non-participating providers should be addressed to them.

284.   In light of the employer's response, Subscriber X had to rely entirely on WellPoint (through Anthem) as the sole party that was responsible for making UCR determinations. By letter dated January 29, 2009, WellPoint denied Subscriber X's appeal in full, and refused to provide any further information. In explaining its decision, WellPoint confirmed its use of Ingenix, stating:

A review of your claims history showed that you received services from . . . a non-contracting, non-participating provider with Anthem. The claim and medical records were reviewed by a general surgeon and a board-certified orthopedic surgeon. The review most favorable to you was performed by the general surgeon. . . . Anthem paid [the non-par provider] *using the Professional Customary and Reasonable fee schedule methodology from an internal database known as Ingenix.*

1  (Emphasis added.)

2      285.   WellPoint further explained that it refused to provide any details

3  concerning its UCR determinations or its reliance on Ingenix, stating:

4         Your appeal letter addressed to [the Plan], requesting additional

5         information on how customary and reasonable payments were calculated

6         on your claims, was forwarded to me for response. Your letter requested

7         "all supporting back-up documentation" upon which the Ingenix

8         database is based. I have been advised that the information you

9         requested is proprietary and confidential. Accordingly, Anthem will not

10        be able to release the information to you.

11     286.   Finally, WellPoint made clear that its denial of Subscriber X's appeal

12 was final. It stated that "if you continue to disagree with Anthem's payment on the

13 claims . . . you may have received from a non-contracting provider, your SPD

14 provides for binding arbitration if the amount of the dispute is not within the

15 jurisdictional limits of small claims court." WellPoint then concluded that, "[i]f you

16 wish to pursue arbitration or small claims court, please forward your written demand

17 or small claims action to [the Plan]."

18     287.   Given the experience of Subscriber X, it is clear that the pursuit of an

19 administrative appeal to WellPoint of its UCR determinations would be futile.

20 WellPoint relies exclusively on Ingenix for making UCR determinations and refused

21 to reconsider that reliance, even when confronted with the investigation and settlement

22 reached by the NYAG concerning Ingenix. Moreover, WellPoint precludes an

23 effective appeal of its reliance on Ingenix by refusing to provide any of the

24 "supporting back-up documentation" relating to the Ingenix findings, deeming such

25 information to be "proprietary and confidential." Under these circumstances, the

26 exhaustion requirement under ERISA should be excused.

27

28

**RICO ALLEGATIONS**

288.   All of the factual allegations set forth above are incorporated by reference as though set forth herein.

289.   As described herein, Defendants have undertaken an elaborate fraudulent scheme to underpay for out-of-network services rendered to WellPoint Subscribers by healthcare providers. This scheme has involved the use of the Ingenix Database to provide false, artificially-low reimbursement amounts for ONS, and the use (or causing the use) of the U.S. mails and interstate wire facilities to transmit the flawed data between the Defendants and between Insurer Conspirators and Ingenix, in order to create the false UCR amounts arrived at by the Defendants. The scheme further involved pricing schedules that were transmitted by Ingenix to the Defendants and Insurer Conspirators, through the U.S. mails or electronically over interstate wire facilities (including the Internet), and that were based on the flawed data and that were used by Defendants to reimburse Plaintiffs for ONS claims based on the False UCR rates.

290.   At all relevant times, and as described in this Complaint, Defendants carried out their underpayment scheme to defraud Plaintiffs, the Provider and Subscriber Classes, in connection with the conduct of an "enterprise," within the meaning of 18 U.S.C. § 1961(4).

291.   Plaintiffs allege that the Defendants' fraudulent scheme was conducted through an association in fact enterprise comprised of WellPoint, UnitedHealth and Ingenix (the "WellPoint-Ingenix Enterprise" or the "Enterprise").

292.   The WellPoint-Ingenix Enterprise was formed in or about 1998, at the time of the sale of the PHCS database by HIAA to Ingenix.

293.   Through the Enterprise described above, Defendants undertook a fraudulent scheme to underpay Subscribers and Providers for the ONS provided to WellPoint subscribers. Through the fraudulent underpayment scheme, WellPoint, UnitedHealth and others agreed to utilize the flawed Ingenix Database for their UCR

99

1  determinations in an effort to depress the prices paid for ONS by the conspiring
2  healthcare companies.  WellPoint and UnitedHealth knowingly participated in the
3  formation and maintenance of, purchased and utilized the Ingenix Database with the
4  express purpose of depressing their ONS payments and in fact supplied "scrubbed"
5  and otherwise flawed and incomplete data to Ingenix with the purpose of lowering
6  payments for ONS. Defendants agreed to conceal the flaws in the Ingenix data as well
7  as the scheme to depress ONS payments achieved by use of the Ingenix Database for
8  UCR determinations. In furtherance of the scheme, WellPoint engaged in thousands,
9  if not millions, of acts of mail and wire fraud.

10      294.   WellPoint, UnitedHealth and Ingenix were all participants in the
11  Enterprise.

12      295.   At all relevant times, the Enterprise was engaged in, and its activities
13  affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

14      296.   The WellPoint-Ingenix Enterprise was at all relevant times a continuing
15  unit involving WellPoint, UnitedHealth and Ingenix functioning with a common
16  purpose of reducing the price paid for ONS, and increasing the profits of the
17  Enterprise participants and the Insurer Conspirators. The Enterprise described above
18  was utilized to create a mechanism or vehicle by which Defendants could reduce
19  payments to Plaintiffs and the Classes for ONS through the use of flawed and invalid
20  data that could not be challenged effectively.  In particular, as described herein, the
21  Enterprise was used to create and administer what appeared to be an appropriate and
22  unassailable database which reported actual charge data; the Ingenix Database was
23  designed to appear valid as a basis for UCR when, in fact, it is and was, invalid.

24      297.   Throughout the Class Period, WellPoint, UnitedHealth and Ingenix
25  remained members of the Enterprise, undertaking countless and nearly constant acts of
26  mail and wire fraud for their common purpose reducing the price paid for ONS.

27      298.   The Enterprise had and continues to have an ascertainable structure and
28  function separate and apart from the pattern of racketeering activity in which it has

1   engaged. Decision-making within the Enterprise with regard to the inclusion of data
2   within the Ingenix Database that would reduce ONS payments was consensual. The
3   members of the Enterprise functioned as a continuous unit, and performed roles
4   consistent with this structure. WellPoint, UnitedHealth and Ingenix, and the
5   Enterprise, performed certain legitimate and lawful activities that are not being
6   challenged in this Complaint, including the provision of health insurance and plan and
7   claims administration services by WellPoint, UnitedHealth and Ingenix, which was
8   done for many claims lawfully and without resort to unlawful practices. Ingenix also
9   legally administers and sells a number of other products which are legitimate and not
10  related to the claims described in this complaint. the collection and dissemination of
11  health insurance information by Ingenix, however, was not legitimate when it
12  involved the creation, use and dissemination of invalid data for use in making UCR
13  determinations. Aside from legitimate activities carried out by the members of the
14  Enterprise, its members used the Enterprise's structure to carry out the fraudulent
15  scheme and unlawful activities alleged in this Complaint including, but not limited to,
16  intentional underpayment of benefits to Subscriber Plaintiffs and the Subscriber Class
17  and Provider Plaintiffs and the Provider Class resulting from Defendants' use of
18  flawed and invalid data for UCR determinations.

19      299.    Through its role in the Enterprise and the scheme, Ingenix benefited
20  directly by enhancing its ability to earn licensing fees through the sale of the Ingenix
21  Database. WellPoint and UnitedHealth benefited by reducing the amount they paid to
22  Providers or reimbursed to Subscribers for their ONS through the use of the Ingenix
23  Database to price UCR.

24      300.    In furtherance of the fraudulent scheme, Ingenix provided extensive
25  "litigation support," including vouching for data used to price UCR by its data users.
26  Ingenix employed staff to assist data users, including testifying in court, testifying in
27  depositions, supplying documentation and otherwise bolstering the users' use of
28  Ingenix data to price UCR. WellPoint and UnitedHealth provided data, through the

U.S. mails or interstate wire facilities, to Ingenix which they knew would be edited by Ingenix in a manner which precluded its use for UCR. Ingenix, in turn, sent or caused to be sent, through the U.S. mails or over the interstate wire facilities, the flawed data and related communications and information that were used by Defendants and Insurer Conspirators in reimbursing for ONS.

301. Ingenix not only knowingly sought and accepted WellPoint's and the Insurer Conspirators' incomplete data, through the U.S. mails or electronically through the interstate wires (including the Internet), but also it continued to provide a significant discount (at times a 100% discount) to these data contributors as part of its arrangement with them. Ingenix also failed to conduct any audits or reviews of the data that it received from data contributors, including WellPoint. These actions were taken in furtherance of Ingenix's effort to understate UCR amounts for the benefit of the WellPoint-Ingenix Enterprise.

302. During the Class Period, Defendants participated in the conduct of the Enterprise in order to shift the costs of medical treatment to their Subscribers and Providers and therefore to Plaintiffs and the Classes, to reduce UCR payments and to create an appearance of legitimacy for their out-of-network benefit reductions. Such participation or direction is demonstrated by the circumstances underlying WellPoint's and UnitedHealth's relationship with the Ingenix Database. WellPoint participated in the sale of the PHCS database from HIAA to UnitedHealth. At that point, the then-CEO of WellPoint, Leonard D. Schaeffer, was the Chair-Elect of the HIAA's Board of Directors, the number two official of HIAA. As a result of Schaeffer's positions and WellPoint's roles, WellPoint was one of the primary decision-makers as to the sale and had control over, or participated in, the direction of the Ingenix Database. WellPoint also participated in the oversight by HIAA of the implementation of the Ingenix Database, and had input into its operation and direction through Schaeffer's position as Chairman of HIAA's Board of Directors (a position that he held through at least the first year of the implementation, and which also

102

1  allowed WellPoint to exercise control and direction over the initial stages of the
2  Ingenix Database). In addition, another WellPoint executive, D. Mark Weinberg, was
3  a member of HIAA's Board of Directors.

4      303.   As part of the sale of the PHCS database to Ingenix, UnitedHealth
5  agreed with HIAA to become a member of the HIAA for at least ten years.
6  UnitedHealth also agreed as part of the sale agreement that Ingenix would create an
7  advisory committee composed of HIAA members (which included WellPoint) to
8  exercise control over the PHCS product. Also, as part of the ten-year cooperation
9  agreement entered into in 1998 between Ingenix and HIAA and which stipulated to
10  creation of a liaison committee (as discussed above) HIAA members participated in
11  the continued development, operation, and direction of the database after its sale by
12  HIAA to Ingenix.

13      304.   As discussed above, in or about 2003, HIAA merged with the American
14  Association of Health Plans to become AHIP. AHIP's Board of Directors includes the
15  President and CEO of WellPoint, Angela Braly, and the Chairman and CEO of U.S.
16  Health Group, Inc., Benjamin Cutler. Furthermore, the executive vice president of
17  WellPoint, Samuel Nussbaum, served as Chair of AHIP and a member of its board of
18  directors during the Relevant Time Period. The positions of these WellPoint
19  executives in HIAA's successor organization, and UnitedHealth's membership in
20  HIAA, allowed WellPoint and UnitedHealth to exercise continued control and
21  participation in the direction of the Ingenix Database.

22      305.   The WellPoint and UnitedHealth Defendants' participation in the
23  activities of the enterprise is also reflected by the agreement between the Wellpoint
24  Defendants and Ingenix pursuant to which the former provide scrubbed data to
25  Ingenix and in return obtain a significant discount on the flawed data upon which they
26  base their false reimbursement rates. Specifically, as part of the master licensing
27  agreements entered into between Ingenix and the WellPoint Defendants and Insurer
28  Conspirators, the WellPoint Defendants and Insurer Conspirators all promise to

supply their data (which, as discussed above, is scrubbed or rigged) to Ingenix to allow Ingenix to use the data in the Ingenix Database and, in return, they obtain both a significant discount and the flawed data from Ingenix in order to issue false reimbursement amounts to Plaintiffs. In this respect, using U.S. mail and interstate wire facilities, lower-rung employees of the WellPoint Defendants, operating under the direction of upper management and in collaboration with one another, submit false and misleading information to Ingenix in order to create the Ingenix Database that was used by the Defendants and Insurer Conspirators for the Enterprise's own direct and indirect financial gain. For its part, Ingenix, through its agreements with the WellPoint Defendants and in accordance with the scheme to defraud, directed the submission of the flawed data from the WellPoint Defendants, and similarly used lower-rung employees operating under the direction of upper management to carry out this scheme. Likewise, through its role in the Enterprise, WellPoint exercised decision-making authority with regard to which data was ultimately transmitted to Ingenix and used in the Ingenix Database. WellPoint also selected and intentionally provided through the U.S. mails and/or interstate wire facilities (including the Internet) false and misleading data to Ingenix itself for use in the Ingenix Database, and used (or caused the use of) the U.S. mails or interstate wires for other communications or transmissions that facilitated the sending of the misleading data.

306. The Enterprise benefited from the pattern of racketeering activity through the reduction of UCR costs by WellPoint and other users of the Ingenix Database, which would not have been obtained absent entry into the Enterprise and was, in addition to the conduct of WellPoint alleged above, the shared goal of the Enterprise for which its members functioned as a continuous unit.

307. WellPoint further used the Enterprise to facilitate its goal of reducing out-of-network benefits paid to Plaintiffs and the Classes by submitting incomplete and inadequate data to Ingenix, thereby artificially reducing the numbers that would be reported in the final Ingenix Database and which WellPoint used to make UCR

determinations.  As part of this fraudulent scheme, as alleged herein, WellPoint intentionally submitted (or caused the submission of), *via* U.S. mail and interstate wire facilities, data which it knew would be used to create false databases which, in turn, would be used to price UCR for its members and members of other healthcare plans. Ingenix was aware of the inadequacy of data contributed by data contributors such as WellPoint, but allowed it to occur, since it was consistent with the Enterprise's purpose of reducing the cost of out-of-network healthcare services.

308.    WellPoint's and UnitedHealth's submission of data to Ingenix benefited Ingenix, and users of the Ingenix Database.  The inclusion of WellPoint's and UnitedHealth's data was critical to both the appearance of legitimacy of the Ingenix PHCS database, and the usefulness of that data for depressing the price paid for ONS. Further, WellPoint and UnitedHealth knew the data they contributed to Ingenix was flawed and incomplete and its use by the Enterprise and Ingenix would depress the price of ONS for all the Insurer Conspirators.  WellPoint and UnitedHealth participated and conducted the affairs of the Enterprise not only by submitting false and incomplete data to Ingenix, but also, as discussed above, by participating in, or controlling, the decision-making regarding the database and by utilizing the flawed data for illicit purpose of determining UCR.

309.    If WellPoint had not participated in the conduct of the Enterprise by participating in the decision-making regarding the database, by submitting flawed data to Ingenix, and by using the Ingenix Database, it would not have been able to obtain the benefits it did from the Enterprise.  Ingenix needed sufficient data to allow it to represent to its customers that the Ingenix Database was the largest available and had sufficient numbers to dispel any doubt as to their validity.  WellPoint knew such representations were being made by Ingenix and used Ingenix's representations for the identical purpose of removing doubt as to their validity.  Ingenix needed the data to provide databases to its users to save them money on ONS claims.  Without data from WellPoint, UnitedHealth and other large data contributors, the Ingenix Database could

105

1  not have been successfully marketed as the "industry standard" for UCR pricing.
2  Similarly, WellPoint and UnitedHealth could not have saved the millions of dollars
3  they did if they had not used the Ingenix Database for making UCR determinations
4  even though they knew that they were flawed and invalid.  By using the Ingenix
5  Database for making UCR determinations, WellPoint was able to benefit substantially
6  from its role in participating in the control and direction of the Enterprise, along with
7  Ingenix.

8      310.    Each of the members of the Enterprise benefitted from its successful
9  operation.  Ingenix benefited directly by enhancing its ability to earn licensing fees
10  through the sale of the Ingenix Database.  As the parent company of Ingenix,
11  UnitedHealth benefitted from the Ingenix fees as well as by reducing the amount it
12  paid for ONS reimbursements, incentivizing subscribers to see in-network providers
13  and reducing competition.  WellPoint benefitted from reduced competition and
14  because it also reduced the amount it was required to pay for ONS reimbursements
15  and incentivized its subscribers to see providers in their respective networks. Thus, all
16  members of the Enterprise benefitted from the pattern of racketeering activity at the
17  expense of the Subscriber and Provider Plaintiffs and Classes. Absent participation in
18  the Enterprise, the members of the WellPoint-Ingenix Enterprise would not have so
19  benefitted.

20      311.    Through their wrongful conduct as alleged herein, Defendants, in
21  violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of each of
22  the Enterprise's affairs, directly and indirectly, through a "pattern of racketeering
23  activity," as defined in 18 U.S.C. § 1961(5).  These acts of racketeering activity have
24  continued throughout the Class Period to the present.

25      312.    Defendants, acting through their officers, agents, employees and
26  affiliates, committed numerous predicate acts of "racketeering activity," as defined in
27  18 U.S.C. § 1961(5), prior to and during the Class Period, and continue to commit
28  such predicate acts, in furtherance of their underpayment scheme for ONS, including

(a) mail fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343. Defendants also caused the commission of such predicate acts, knowing that their use would follow in the ordinary course of business or that their use was reasonably foreseen. Each use, or causing of such use, of the mail or wire in furtherance of the fraudulent scheme described above is a predicate act of mail and wire fraud. Such predicate acts include the following:

(a)     using, or causing the use of, the U.S. mails to transmit to Ingenix (1) data (that, as discussed above, was materially false or misleading) for use in the Ingenix Database, or (2) communications or information that facilitated the scheme to defraud involving such data, for the purpose of effectuating the above-described fraudulent scheme, with each such use of the mails constituting a separate and distinct violation of 18 U.S.C. § 1341. Examples of such predicate acts include, but are not limited to,

(i)     a data submission information form, indicating that Empire Blue Cross/Blue Shield, a WellPoint Company in New York had submitted data to L.T., the Ingenix data contribution program manager in Utah, via the U.S. mails on November 24, 2004 on a CD ROM, and listing M.S., an employee of Empire Blue Cross/Blue Shield (a WellPoint Company) in Brooklyn, New York as the contact person for any questions regarding the submission;

(ii)     a July 17, 2009 email transmission from M.S. of Healthlink, a WellPoint subsidiary in Missouri , to Ingenix in Utah (at data.contribution@ingenix.com), in which M.S. confirmed that Healthlink's data contribution to Ingenix for July 2009 had been sent via the U.S. mails on a CD ROM to Ingenix on July 17, 2009;

(iii)     an email exchange between Socha and M.C., an Ingenix employee in Utah, on July 22, 2009, July 30, 2009, and August 4, 21, and 24, 2009, in which M.C., over the course of nine emails, indicated Ingenix's

107

1   receipt of the CD ROM containing the data, requested M.S. to resend the
2   data on at least three more occasions because of problems accessing it
3   from the CD ROM, and in which M.S. indicated that she had mailed via
4   the U.S. mails the data to Ingenix in Utah at least two times on a CD
5   ROM;

6   (b)   transmitting, causing to be transmitted and/or knowingly agreeing to the
7   transmittal via the U.S. mails and/or interstate wire facilities of various materials and
8   information concerning, but not limited to, (1) data (that was materially false or
9   misleading   as   discussed above) for use in the Ingenix Database, or (2)
10  communications or information that facilitated the scheme to defraud involving such
11  data, by means of telephone, facsimile, and the Internet, in interstate commerce, for
12  the purpose of effectuating the above-described false payment schemes, and each such
13  transmission constituting a separate and distinct violation of 18 U.S.C. § 1343.
14  Examples of such predicate acts include, but are not limited to:

15  (i)   a January 26, 2007 email sent at 7:17 p.m. from Ingenix's data
16  contribution department, at Ingenix, 2525 Lake Park Blvd., Salt Lake
17  City, UT 84120 (data.contribution@ingenix.com), to F.C., a WellPoint
18  manager in New York, confirming Ingenix's receipt of data from
19  WellPoint on January 16, 2007;

20  (ii)   a January 8, 2007 12:21 p.m. email from Ingenix's Data
21  Contribution department in Utah (data.contribution@ingenix.com) to
22  F.C. of WellPoint in New York reminding him that Ingenix requires
23  biannual submissions of data contributions from its customers and that
24  WellPoint was behind in its submissions of data to Ingenix (*i.e.*, data
25  that, as discussed above, was misleading);

26  (iii)   a January 23, 2009 exchange of three emails between C.M. of
27  Ingenix in Utah M.S. of Healthlink, a WellPoint subsidiary in Missouri,
28  in which Ingenix confirmed its receipt of data (that was misleading, as

108

discussed above) on January 21, 2009 from Healthlink that was transmitted via email to Ingenix's email address, datacontribution@ingenix.com;

(iv)   an October 25, 2007 email exchange between J.M., an employee of Ingenix in Utah (data.contribution@ingenix.com), and J.A., a New York employee of Empire BlueCross Blue Shield (a WellPoint company), concerning Empire's submission of the misleading data to Ingenix and the proper method of submission of such data to Ingenix in Utah, which included mailing the data on a CD ROM to Ingenix in Utah or uploading it onto Ingenix's website;

(v)   an email exchange between R.P., a Wellpoint employee in Massachusetts and L.T., Ingenix's data contribution program manager in Utah, in which those individuals, in four emails dated May 4, 5, and 8, 2009, discussed WellPoint's submission of data to Ingenix and in which WellPoint's employee, R.P., indicated that he emailed WellPoint's May 2009 data contribution to Ingenix as an attachment to a May 8, 2009 email to Ingenix in Utah;

(vi)   an email exchange between L.P., a WellPoint employee in California, and employees of Ingenix in Utah, including C.C. and S.S., in which C.C., S.S., and L.P., over the course of five emails sent on October 13, 2003, November 14, 2003, December 8, 2003, and December 12, 2003, discussed the availability of Ingenix data via Ingenix's website, and WellPoint's preference of receiving at its California location Ingenix's data on CD ROMs and "cartridges," via the U.S. mails.

(vii)   an Ingenix data submission information form, dated November 20, 2008, in which M.B., an employee of of Blue Cross Blue Shield of Massachusetts (a WellPoint company), attests that this company

109

uploaded its data contribution to Ingenix's Internet website, and that the information contained in the data submission information form accompanying the data is accurate and that the form was sent electronically to Ingenix in Utah;

(viii)  an Ingenix data submission information form, dated July 14, 2006, in which J.A., of Empire Blue Cross/Blue Shield in New York (a WellPoint company), attested that this company had sent its data contribution to Ingenix in Utah, and that the information contained in the data submission information form accompanying the data was accurate and that the form was sent electronically to Ingenix in Utah (at data.contribution@ingenix.com).

There are numerous other examples of use of the telephone, email, and U.S. mail by WellPoint and Ingenix to send, receive, or discuss flawed data.

313.   WellPoint knew that the data that it contributed to Ingenix was inadequate and lacked required data fields essential for Ingenix to evaluate the data and include (or exclude) it in final UCR fee schedules, but WellPoint continued to use the Ingenix Database to make UCR determinations anyway.

314.   In furtherance of their underpayment scheme for ONS, Defendants, in violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962, repeatedly and regularly used, or caused the use of, the U.S. mail and interstate wire facilities to further all aspects of the intentional underpayment scheme to Plaintiffs and the Classes by transmitting and/or receiving, or causing the transmission and receipt of, data and information necessary to carry out the scheme to defraud Plaintiffs and the Classes.  Each Defendant intended, knew and/or should have reasonably anticipated that the U.S. mail and interstate wire facilities would be utilized in furtherance of the scheme. Each use of the mail or wire, or causation of such use, in furtherance of the scheme was a violation of the above statutes.

315. The foregoing acts, involving communications or transmissions, sent *via* U.S. mail and interstate wire facilities, and/or causing of such communications or transmissions, were incident to an essential part of Defendants' scheme to defraud Plaintiffs and the Classes described in this Complaint. Each such use of the U.S. mail and interstate wire facilities, or each instance involving causation of such use, in furtherance of the scheme alleged in this Complaint constitutes a separate and distinct predicate act of "racketeering activity" and, collectively, constituted a "pattern of racketeering activity."

316. The above-described pattern of racketeering activity is related because it involves the same fraudulent scheme, enterprise, common persons, common out-of-network claim practices, common results directly impacting upon common victims, and is continuous because it occurred over several years, and constitutes the usual practice of WellPoint and each of Enterprise, such that it amounts to and poses a threat of continued racketeering activity. WellPoint's scheme to defraud Plaintiffs and the Classes is open-ended and on-going.

317. The direct and intended victims and targets of the pattern of racketeering activity described previously herein were the Providers and Subscribers, whom WellPoint has underpaid for ONS. The Associations were also direct and intended victims of the pattern of racketeering activity, as set forth herein.

318. As a result of Defendants' fraudulent scheme, Plaintiffs and the Classes were directly injured in their business or property by reason of Defendants' RICO violations because ONS reimbursement amounts were the direct targets of the scheme to defraud, with no other, independent intervening cause responsible for their Plaintiffs' injuries; Plaintiffs were underpaid or under-reimbursed for ONS rendered to WellPoint's subscribers as a direct result of the Defendants' pattern of racketeering activity, and thereby suffered direct consequential financial loss flowing from their property (their health insurance plans) by having overpaid for their health insurance coverage (or, in the case of Providers and Associations, having suffered out-of-pocket

111

1    losses due to the failure of Providers and the Associations' members to be properly
2    reimbursed for the ONS rendered by Providers).

3         319.    In addition, to the extent that a showing of reliance is required, Provider
4    Plaintiffs and the Provider Class reasonably relied on the fraudulent scheme by
5    providing ONS to WellPoint subscribers and on the validity of the assignments given
6    to them by Subscriber Plaintiffs and Subscriber Class members.

7         320.    WellPoint also undertook additional predicate acts in violation of 18
8    U.S.C. §664 in addition to the acts of mail and wire fraud alleged above in order to
9    achieve the same ends described above.

10        321.    RICO specifically identifies as a predicate act "any act which is
11   indictable under . . . [§]664 (relating to embezzlement from pension and welfare
12   funds)" as a predicate act. 18 U.S.C. § 1961(l)(B).  Section 664 of Title 18 provides:

13        **Theft   or   embezzlement   from   employee   benefit   plan**
14        Any person who embezzles, steals, or unlawfully and willfully abstracts
15        or converts to his own use or to the use of another, any of the moneys,
16        funds, securities, premiums, credits, property, or other assets of any
17        employee welfare benefit plan or employee pension benefit plan, or of
18        any fund connected therewith, shall be fined under this title, or
19        imprisoned not more than five years, or both.

20        322.    For fully insured healthcare plans, in which WellPoint both administered
21   the plans and paid the benefits from its own assets, WellPoint benefited from the
22   conversion of assets from its ERISA plans.  Whereas these assets should have been
23   held by WellPoint in its fiduciary capacity under ERISA plans and paid to its
24   Members, WellPoint improperly withheld such funds and maintained them as part of
25   its own assets for WellPoint's own benefit.  For self-funded healthcare plans,
26   WellPoint made final appeal decisions and intentionally caused underpayment of
27   benefits to Plaintiffs and the ERISA Subclasses in order to justify its receipt of
28   administrative fees.

112

323.   Defendants acted with specific intent to deprive ERISA Plaintiffs and the ERISA Subclasses of guaranteed benefits, and were sufficiently aware of the facts to know that they were acting unlawfully and contrary to the trust placed in them by the Plaintiffs, the ERISA Subclass (as defined below) members and the plan sponsors whose plans they were administering.

324.   Each false payment on a claim constitutes a separate and distinct predicate act, in violation of 18 U.S.C. § 664, of converting or misappropriating funds specifically earmarked within the applicable plan as a guaranteed benefit for the intended member, for Defendants' direct or indirect benefit.

325.   Plaintiffs' injuries were proximately caused by Defendants' violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended, and natural consequence of Defendants' RICO violations (and commission of underlying predicate acts) and, but for Defendants' RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

326.   The Provider Class and ERISA Subclass allege they have standing to pursue these claims as assignees of their patients' out-of-network benefits and as third party-beneficiaries of their patients' out-of-network benefits.

327.   The Association Plaintiffs have standing to pursue these RICO claims both individually and/or on behalf of their members.

## BREACH OF CONTRACT ALLEGATIONS

328.   During times relevant to the Complaint and continuing through the present, Plaintiff J.B.W. has been, and is, a member of an individual and family health plan issued and administered by defendant WellPoint *via* its Blue Cross of California subsidiary that is not governed by ERISA. Plaintiff J.B.W. enrolled in the Blue Cross Individual PPO $3,500 deductible plan effective November 1, 2008. During the relevant time, Plaintiff J.B.W. paid his plan premiums directly to Blue Cross of California. According to Plaintiff J.B.W.'s Agreement, benefits were to be paid to the subscriber and his enrolled family members.

113

329.    Plaintiffs Darryl and Valerie Samsell have been members of individual and family health plans issued and administered by Defendant WellPoint, by and through Anthem Blue Cross and Blue Shield, Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield, and/or Trigon Blue Cross Blue Shield predecessor and/or subsidiary companies.  During the Relevant Time Period, the Samsells paid substantial premiums to WellPoint and/or the aforesaid predecessor or subsidiary entities.  The Samsells paid higher premiums for their health plans for the benefit of having coverage for ONS services.

330.    WellPoint issues Combined Evidence of Coverage and Disclosure Forms for individual and family plans (the "Agreements") to Plaintiffs J.B.W. and the Samsells and its other members setting forth the benefits WellPoint agrees to provide members as well as the costs to the members of the plans.  For example, upon subscribing to the Individual PPO $3,500 Deductible Plan, Plaintiff J.B.W. received his Agreement from WellPoint.

331.    The Agreements are uniform contracts that utilize the same definitions across different health plans.  The Agreements are one-sided adhesion contracts.  Such contracts are presented on a take-it-or-leave-it basis and are not subject to negotiation or alteration by individual members.

332.    The Agreements provide members like Plaintiffs J.B.W. and the Samsells with an express right to receive treatment from out-of-network providers. WellPoint refers to these providers as "non-participating," "non-contracting," "non-network," "non-PPO" and/or "out-of-network" providers.  Services by "in-network" providers are reimbursed at discounted rates negotiated between the healthcare provider and WellPoint.  WellPoint promises in the Agreements to reimburse its members for services by out-of-network providers at a percentage of the lesser of (i) the actual, billed charge or (ii) the UCR for the services in the geographic area in which the services were performed.  For example, the Agreements state that for "Non-PPO Providers" (*i.e.*, ONS) "the maximum covered expense for services provided by

114

a non-PPO provider or other healthcare provider will always be the lesser of the billed charge or (1) for a physician, the customary and reasonable charge [.]"   The "customary and reasonable charge" is defined by the Agreements as a "charge which falls within the common range of fees billed by a majority of physicians for a procedure in a given geographic region."   WellPoint uses the terms "UCR," "usual and customary," and "customary and reasonable charge" interchangeably.   WellPoint often refers to the amount it will reimburse for ONS as the "amount allowed," "allowed expense," or "allowable charge."

333.   As an example, Plaintiff J.B.W.'s Agreement specifies that there is a set deductible, and that once this deductible is satisfied, WellPoint is required to reimburse its subscribers, including Plaintiff J.B.W., according to a chart contained within the Agreement.   Pursuant to the chart, medical procedures are classified as either being undertaken by a participating or preferred participating provider or by a non-participating provider.   "Non-Participating Provider" is defined as an entity (hospital, physician or otherwise) "which does NOT have a Prudent Buyer Plan Participating Provider agreement with [Blue Cross] in effect at the time services are rendered[.]"

334.   Moreover, the coverage matrix in Plaintiff J.B.W.'s Agreement contains various medical procedures and the corresponding reimbursement amounts and subscriber payment responsibilities. For Medical Emergencies in California, Plaintiff J.B.W.'s Agreement states that, for a non-participating provider, the consumer, Plaintiff J.B.W., must pay "[a]ll charges in excess of Customary and Reasonable charges."   Like the other Agreements, Plaintiff J.B.W.'s Agreement defines "Customary and Reasonable Charge" as a "charge which falls within the common range of fees billed by a majority of physicians for a procedure in a given geographic region."   Other ONS services, such as "Professional Services," are reimbursed at 50% of the "Negotiated Fee Rate."   Plaintiff J.B.W.'s Agreement defines the "Negotiated Fee Rate" as "the rate of payment that Anthem has negotiated with the Participating

115

1  Provider under a Prudent Buyer Participating Agreement for Covered Services."
2  Because, however, out-of-network providers by definition have not negotiated rates
3  under a Prudent Buyer Participating Agreement or any other agreement, there can be
4  no Negotiated Fee Rate for out-of-network providers. Thus, the reimbursement of
5  ONS based on a Negotiated Fee Rate is nonsensical on its face unless there is some
6  reference to a Customary and Reasonable Charge.

7       335.   WellPoint makes clear in its Agreements, as well as in other written
8  communications with its plan members that the plan member is financially responsible
9  for the difference between the allowed expense and the provider's billed charge for
10 ONS. WellPoint's Agreements explicitly state that "You will be responsible for any
11 billed charge which exceeds the customary and reasonable charge" for ONS. Once a
12 member receives ONS, WellPoint and/or Blue Cross of California provide an EOB
13 that describes the division of payment for the service. The EOBs state the amount the
14 out-of-network provider charged for the service, the amount allowed, and after stating
15 the percentage and portion of the amount allowed that WellPoint will pay, states the
16 balance, which the EOBs describe as "Your Responsibility."

17      336.   The portions of ONS charges not paid by WellPoint are not credited
18 toward deductibles or out-of-pocket maximums that limit the total amount a plan
19 member has to pay for medical services over a given time period. Thus, such costs are
20 borne entirely by the plan members.

21      337.   Beginning on or about January 23, 2009, Plaintiff J.B.W. began a series
22 of outpatient medical visits with Non-Participating Providers. Also, on or about
23 October 10 and 11, 2009, Plaintiff J.B.W. received inpatient medical services from a
24 Non-Participating Provider. He submitted a claim with WellPoint regarding these
25 services. WellPoint made reimbursement determinations on Plaintiff J.B.W.'s claims
26 that reimbursed him less than the agreed-upon percentage of either the provider's
27 actual charges or the UCR. Although never disclosed in the Agreement, Plaintiff
28 J.B.W. has learned through the course of this litigation that WellPoint used internal

116

1    fee schedules that it does not make available to its customers to determine the rate at

2    which he would be reimbursed for his ONS services. These fee schedules were

3    derived with reference to Ingenix fee schedules and are not the result of any

4    negotiation between WellPoint and Plaintiff J.B.W.'s providers, let alone any other

5    provider. These reimbursement determinations resulted in Plaintiff J.B.W. being

6    obligated to pay not only his deductible, but also that part of the provider's billed

7    charge that exceeded the reimbursement amount determined by WellPoint.

8       338.   Plaintiffs Darryl and Valerie Samsell's plans covered both themselves

9    and their three minor children pursuant to two policies: (1) The Blue Cross and Blue

10   Shield Comprehensive Major Medical and Dental Policy and the Blue Cross and Blue

11   Shield Comprehensive Major Medical Policy (providing coverage to Valerie Samsell

12   from 1976-2007). These policies also included several endorsements dated July 2001,

13   July 15, 2002, and October 2002.

14      339.   Under the policies, the Samsells were insured for a number of "Covered

15   Services" provided by "Providers" or specifically defined as "Physicians."

16      340.   The Samsells were insured for Covered Services rendered by physicians,

17   whether or not they were "Participating Physicians" or "Non-Participating

18   Physicians." The policies further defined a "Participating Physician" as one who

19   "agrees to accept the Allowable Charge as payment in full for "Covered Services."

20   On the other hand, "[a] Non-Participating Physician means other Physician, including

21   one who participates with another Blue Shield Company."

22      341.   "Allowable Charges" was defined in the Samsells' original policies as

23   follows:

24              This phrase means the allowance for Covered Services, as

25              determined by the Company. Outside the Company's Service

26              Area, Your Allowable Charge will be determined by the Blue

               Cross and/or Blue Shield Company serving the area in which the

27              Covered Service is rendered. If Covered Services are rendered in

28

an area which does not have a Blue Cross and/or Blue Shield Company, the allowance will be determined by the Company."

342. The endorsements to these policies changed this definition of "Allowable Charges" to the following:

**C. ALLOWABLE CHARGES**

1.  With respect to a Provider's charge, the term "Allowable Charge" means the Company's allowance for a specified Covered Service or the Provider's charge for that service, whichever is less.

2.  With respect to a Covered Facility's Charge, the term "Allowable Charge" means:

    ***

    d.  The amount which the Company determines, in its sole discretion, to be reasonable for the Covered Service when the Company pays a claim for services rendered by a Covered Facility located outside of Virginia that does not have a claims reimbursement agreement directly with the Company or with the Blue Cross or Blue Shield plan where the services were rendered.

3.  With respect to charges for Covered Services supplied by other than   Covered Facilities or Providers, the term means the amount which the Company determines, in its sole discretion, is reasonable for the Covered Service provided.

343. The endorsements further provided with respect to the payments by WellPoint/Anthem for Covered Services to "Non-Participating Providers and Non-Participating/Non-Contracting Covered Facilities" as follows:

When a Covered Person receives Covered Services from a Non-Participating Provider or Non-Participating/Non-Contracting Covered Facility, the Company may choose to make payment directly to the Insured, or at the company's sole option, to any

118

person responsible for payment to the Non-Participating Provider or Non-Participating/Non-Contracting Covered Facility. The company only pays under these circumstances after the Company has received an itemized bill and the medical information the Company decides, in its sole discretion, is necessary to process the claim.

Non-Participating Providers and Non-Participating/Non-Contracting Covered Facilities do not accept the Company's Allowable Charge as payment in full. These providers and facilities may charge You the difference between their normal charge and the Company's Allowable Charge. When these providers and facilities are used by the Covered Person, the Covered Person is responsible for any applicable Coinsurance and Deductible, as well as the difference in the amount charged and the Company's Allowable Charge.

344. These provisions of the policies and endorsements in the Samsells' health plans advised the Samsells that, while out-of-network services would be paid based upon an "Allowable Charge" in the discretion of WellPoint, that discretion was not unfettered; instead, it would be based upon the company's "reasonable" determinations based upon actual review of itemized bills submitted by the Samsells' doctors. .

345. The Agreements between WellPoint and the Samsells did not advise them that the "Allowable Charges" for "ONS" would be based upon Anthem Virginia's standard, in-network participating fee schedule. The Agreements also did not advise the Samsells that Anthem Virginia's in-network participating physician schedules were created based upon undisclosed, low Medicare rates multiplied by a "dollar conversion factor" set by WellPoint based upon the desired premium increases the companies wished to pass on to the Samsells. This self-described "top down approach," by which WellPoint/Anthem essentially determined how much money they wanted to make each year in premium increases and passed on those increases to the

1 Samsells – in violation of the explicit provisions of their Agreements – caused the
2 Samsells to pay more in premiums and provider charges for out-of-network services
3 than they otherwise should have paid.

4     346. The Samsells' policies and endorsements both stated explicitly that
5 while their premiums were "subject to change, . . . [p]remium changes will be based
6 only on class. You shall not be singled out for a Premium change. Premiums will go
7 up as your age increases, eligible dependants are added, coverage is increased or there
8 is a change in the area of residence." Premium increases passed onto the Samsells
9 were not based upon any of these factors.

10     347. The Samsells sought medical treatment for their minor dependent
11 children from out-of-network providers who performed oral surgery and other related
12 services. For example, the Samsells' then-minor dependant son received oral surgical
13 services on or about August 6, 2002 from a non-participating provider. The Samsells'
14 minor daughter received oral surgical services on or about July 30, 2004 and May 14,
15 2005 from a non-participating provider.

16     348. WellPoint thereafter made a determination of the "Allowable Charge"
17 on these claims based upon the above described out-of-network payment policy that
18 reimbursed the Samsells less than the stated charge of the provider's actual charge.
19 The determination and subsequent payment of the "Allowable Charge" for the
20 Samsells' "ONS" resulted in the Samsells being obligated to pay, and in fact paying,
21 charges for out-of-network services that exceed the "reasonable" charges for such
22 services in the geographic area.

23     349. In processing claims for ONS charges, WellPoint is obligated by the
24 terms of its Agreements to reimburse plan members for ONS based on either the
25 actual billed charge or the objective criteria for UCRs and other types of ONS
26 reimbursements as set forth in the Agreements. WellPoint, however, fails to honor the
27 terms of the Agreements by basing its reimbursements for ONS on the False UCRs
28 and other ONS Benefit Reductions to diminish ONS reimbursements.

350.     In making ONS reimbursements, WellPoint uses the Ingenix Database and other ONS Benefit Reductions.  As detailed above, the Ingenix Database and other ONS Benefit Reductions used by WellPoint to calculate ONS reimbursements result in the systematic under-reimbursement of Plaintiffs J.B.W. and the Samsells and the Non-ERISA Subscriber Class.

351.     Plaintiffs J.B.W. and the Samsells and the other members of the Non-ERISA Subscriber Class complied with their obligations under their Agreements with WellPoint.

352.     WellPoint failed to comply with the terms of its Agreements with Plaintiffs J.B.W. and the Samsells and the other members of the Non-ERISA Subscriber Class by making reimbursement determinations for ONS that had the effect of covering less than the stated percentage of either the Providers' actual charges or the UCR without valid data to support such determinations.

353.     Rather than reimbursing for ONS based on either the actual charge or the customary and reasonable charge for a particular service as promised in the Agreements, WellPoint reimbursed Plaintiffs J.B.W. and the Samsells and the other members of the Non-ERISA Subscriber Class based on the flawed and artificially-deflated data provided by Ingenix, WellPoint's internal fee schedules,, negotiated fee schedules and other ONS Benefit Reductions.  WellPoint's conduct thus contravenes the express terms of the Agreements and constitutes a breach of its contracts with its members.  Such conduct also, in violation of the covenant of good faith and fair dealing, prevents its members from obtaining the benefits of the reimbursements they reasonably expect to receive pursuant to the terms of the Agreements.

354.     Although Plaintiffs J.B.W. and the Samsells and the other members of the Non-ERISA Subscriber Class are contractually entitled to choose care for ONS, WellPoint inhibited the use of ONS providers by using False UCRs and other ONS Benefit Reductions that increased the unpaid amounts for which Plaintiffs J.B.W. and

121

1  the Samsells and the other members of the Non-ERISA Subscriber Class were liable,
2  thereby deterring their members' use of ONS.

3      355.    As a consequence of WellPoint's and the Conspirators' actions,
4  Plaintiffs J.B.W. and the Samsells and the other members of the Non-ERISA
5  Subscriber Class were reimbursed for ONS in amounts less than what they should
6  have been paid under their Agreements and received a health insurance policy of less
7  value and for which they overpaid.  WellPoint pursued its standard and uniform
8  policies in making reimbursement determinations for ONS in a fashion that conflicted
9  with its contractual obligations under its Agreements and that violated its fiduciary
10  duties to Plaintiffs J.B.W. and the Samsells and the other members of the Non-ERISA
11  Subscriber Class.

12      356.    The Provider Plaintiffs and members of the Provider Class allege they
13  have obtained assignments and otherwise obtained the right to "stand in the shoes" of
14  the Subscriber Plaintiffs and have the right to enforce the contracts with WellPoint.

15                          ***Plaintiff Dr. Higashi***

16      357.    Plaintiff Dr. Higashi is a chiropractor with a private practice in Los
17  Angeles, California.  She is licensed to and does in fact practice in the State of
18  California, and has been certified by the California Chiropractic Board.  During the
19  relevant time, Dr. Higashi provided ONS to WellPoint's subscribers.

20      358.    Because patients find it difficult to pay out of pocket for medical
21  treatment at the time of service, they rely on their health plans to reimburse their
22  physicians for their services.  While this arrangement is generally beneficial for the
23  patient who does not have to pay for treatment at the time of service, it leaves the
24  Provider Plaintiffs and members of the Provider Class to advance the cost of such
25  medical treatment until they receive payment from their patients' insurers.  To
26  facilitate direct payment from insurers, Dr. Higashi's patients sign a form assigning
27  their health benefits to her before treatment.  This form includes an express
28  authorization by the patient for insurers, such as WellPoint, to remit payment for

"professional and medical expense benefits allowable under my current insurance policy for services rendered to me or my dependent" directly to Mar Vista Institute of Health.

359.   At all relevant times, Dr. Higashi utilized a HCFA 1500 form (n/k/a, CMS 1500) to submit claims to WellPoint for payment.  Dr. Higashi's claims are often submitted electronically.   Once an electronic claim is submitted, it passes through a clearinghouse before reaching WellPoint.  All of Dr. Higashi's claims are submitted to WellPoint using CPT codes, HCPCS, and modifiers, as necessary.  Dr. Higashi does not find out her compensation from WellPoint for services rendered until after a procedure is performed and a claim for payment is submitted.

360.   At all relevant times, Dr. Higashi expected to be reimbursed by WellPoint at the lesser of her billed charges or the current UCR.  WellPoint defines UCR as follows:

> A "usual" charge is the amount that is most consistently charged by an individual physician for a given service.  A "customary" charge is the amount that falls within a specified range of usual charges for a given service billed by most physicians with similar training and experience within a given geographic area.  A "reasonable" charge is a charge that meets the Usual and Customary criteria, or is otherwise reasonable in light of the complexity of treatment of the particular case.  Under a UCR Program, the payment is the lowest of the actual billed charge, the physician's usual charge or the area customary charge for any given covered service.

361.   At various times, WellPoint, through both Anthem and Blue Cross of California, unlawfully diminished Dr. Higashi's compensation by improperly calculating UCRs through the Ingenix Database or Non-Ingenix Methodologies (including discounted Par provider fee schedules, *i.e.*, in-network fee schedules) – and then misapplying these rates to her claims.  Dr. Higashi's EOBs often state that her

1   billed charges purportedly are "in excess of the allowed expense for a non-
2   participating provider," and that the "Health Plan is not responsible for any amounts in
3   excess of this allowed expense." Nowhere on the EOBs or elsewhere in any other
4   correspondence sent to Dr. Higashi does WellPoint or its Anthem or Blue Cross of
5   California subsidiary discuss or identify how it actually calculates UCR. The EOBs
6   do not even specify whether Ingenix data or some other methodology was used in
7   these calculations.

8       362.   WellPoint's EOBs are intentionally uninformative, false, and misleading
9   regarding the use of UCRs.

10  **FALSE ADVERTISING AND DECEPTIVE CONDUCT ALLEGATIONS**

11      363.   WellPoint represents through its advertising, promotional pamphlets and
12  plan contracts that it will permit its members to choose between in-network and out-
13  of-network providers and that its members will be reimbursed for ONS based on
14  either the actual billed cost or the UCR. It publishes and widely disseminates on its
15  website and through other media a summary description of its plans entitled "Benefits-
16  at-a-glance" in which it represents that its members will be reimbursed for ONS for
17  certain procedures based on a specified percentage of the "customary and reasonable
18  fees" or "negotiated fee rate."

19      364.   WellPoint does not reimburse for ONS based on either the actual cost or
20  the UCR, instead utilizing reimbursement rates it knows are artificially deflated.
21  Based on WellPoint's advertising, website, SPDs, and plan contracts, Plaintiffs J.B.W.
22  and the Samsells and the other members of the Non-ERISA Subscriber Class
23  reasonably believed that they would be reimbursed for ONS based on valid, objective
24  criteria and that such criteria would result in reimbursements that reflected the actual
25  costs of ONS in their area. For example, prior to becoming a plan member, Plaintiff
26  J.B.W. reviewed WellPoint's SPDs on the WellPoint website and reasonably believed
27  that ONS would be reimbursed based on a percentage of the actual costs of services in
28  his geographic area. The ability to use ONS was extremely important to Plaintiff

1   J.B.W., who was enticed into becoming a member of WellPoint's plan based on his

2   understanding that ONS would be available and affordable.   By affirmatively

3   misrepresenting the extent to which it will reimburse for ONS and the extent to which

4   consumers can choose between in-network and out-of-network providers, failing to

5   disclose that reimbursement for ONS is calculated based on False UCRs, and failing

6   to disclose that the False UCRs are developed pursuant to a secret conspiracy amongst

7   health insurers as detailed above, WellPoint deceived Plaintiff J.B.W. and the

8   Samsells and the other members of the Non-ERISA Subclass. Had Plaintiffs J.B.W.

9   and the Samsells and the other members of the Non-ERISA Subscriber Subclass been

10   made aware of the true cost of ONS, they would have chosen less expensive in-

11   network care instead. On information and belief, Plaintiffs allege that WellPoint also

12   reimbursed Provider Plaintiffs and members of the Non-ERISA Provider Class less

13   than WellPoint was obligated to reimburse them.

14                              **CLASS ACTION ALLEGATIONS**

15            365.   Plaintiffs bring this action on behalf of themselves and all others

16   similarly situated, pursuant to Rule 23(a), (b)(1), (b)(2), and (b)(3) of the Federal

17   Rules of Civil Procedure. Plaintiffs seek to represent the following Classes:

18   **The Subscriber Class**

19            All persons or entities who, between January 1, 1998 and the present,
20            subscribed to a health plan administered by WellPoint or Blue Cross of
     California allowing for the reimbursement of out-of-network services
21            based upon  the usual and customary charges for the same or similar
     services in the same or similar area, and who submitted one or more
22            claims for the payment of such out-of-network services that was
     reimbursed using a usual and customary benchmark that was lower than
23            the amount actually billed by the Subscriber's healthcare provider.

24   **The Provider Class**

25            All non-participating physicians who provided ONS to any member of

26            any health plan administered or insured by WellPoint, other than through

27            the Empire subsidiaries, at any time since September 29, 2006, and were

28            paid less than their billed charges for such services; and all other non-

                                          125

participating healthcare providers who provided ONS, to any member of any health plan administered or insured by WellPoint, who were paid less than their billed charges for such services on or after January 1, 1999.   The Provider Class does not include members of the settlement classes in (i) *Love v. Blue Cross Blue Shield Ass'n*, No. 03-21296-CV (S.D. Fla.) (to the extent the settlement involved Defendant Empire Blue Cross Blue Shield) and (ii) *Shane v. Humana, Inc.*, Master File No. 00-1334 (S.D. Fla.) (to the extent the settlement involved Defendants WellPoint and Anthem), who did not opt out of such settlements, for any claim that arose <u>before</u> the Effective Date of the respective Settlement Agreements of these two class actions.

**The Antitrust Injunctive Relief Class**

All persons or entities currently enrolled in a health plan that includes out-of-network health insurance coverage and which is administered or insured by WellPoint and all non-participating physicians and other non-participating healthcare providers who provide or have provided ONS to any such persons or entities.

**The ERISA Subscriber Subclass**

All persons or entities enrolled in ERISA-governed health insurance plans administered by WellPoint who paid for ONS and received reimbursement in an amount less than the billed charges on or after January 1, 1998.

**The ERISA Provider Subclass**

All Physicians who provided services to and accepted a valid assignment from any person enrolled in an ERISA-governed health insurance plan administered or insured by WellPoint, other than through the Empire subsidiaries, and were paid less than their billed charges for such

1    services on or after September 29, 2006; and Other Healthcare Providers
2    who provided services to and accepted a valid assignment from any
3    person enrolled in an ERISA-governed health insurance plan
4    administered or insured by WellPoint and were paid less than their billed
5    charges for such services on or after January 1, 1999.  The ERISA
6    Provider Subclass does not include members of the settlement classes in
7    (i) *Love v. Blue Cross Blue Shield Ass'n*, No. 03-21296-CV (S.D. Fla.)
8    (to the extent the settlement involved Defendant Empire Blue Cross Blue
9    Shield) and (ii) *Shane v. Humana, Inc.*, Master File No. 00-1334 (S.D.
10   Fla.) (to the extent the settlement involved Defendants WellPoint and
11   Anthem), who did not opt out of such settlements, for any claim that
12   arose before the Effective Date of the respective Settlement Agreements
13   of these two class actions.

14   **The Non-ERISA Subscriber Subclass**

15   All persons enrolled in a non-ERISA individual and/or family health
16   plan administered or insured by WellPoint who paid for ONS from a
17   Physician or Healthcare Provider and received in an amount less than the
18   billed charges on or after January 1, 1998.

19   **The Non-ERISA Provider Subclass**

20   All Physicians who provided services to a member of the Non-ERISA
21   Subscriber Subclass, other than those who were enrolled in a plan
22   administered or insured by an Empire subsidiaries, and who accepted an
23   assignment of benefits and were paid less than their billed charges for
24   such services on or after September 29, 2006; and all other healthcare
25   Providers who provided services to a member of the Non-ERISA
26   Subscriber Subclass, accepted an assignment of benefits and were paid
27   less than their billed charges on or after January 1, 1999.  The Non-

28

127

ERISA Provider Subclass does not include members of the settlement classes in (i) *Love v. Blue Cross Blue Shield Ass'n*, No. 03-21296-CV (S.D. Fla.) (to the extent the settlement involved Defendant Empire Blue Cross Blue Shield) and (ii) *Shane v. Humana, Inc.*, Master File No. 00-1334 (S.D. Fla.) (to the extent the settlement involved Defendants WellPoint and Anthem), who did not opt out of such settlements, for any claim that arose <u>before</u> the Effective Date of the respective Settlement Agreements of these two class actions.

**The California ER Provider Subclass**

All healthcare providers who provided emergency healthcare services in the state of California to members of a Knox-Keene governed health insurance plan administered or insured by WellPoint, and were paid less than the customary and reasonable rate for such services.  The Subclass does not include members of the settlement classes in (i) *Love v. Blue Cross Blue Shield Ass'n*, No. 03-21296-CV (S.D. Fla.) (to the extent the settlement involved Defendant Empire Blue Cross Blue Shield) and (ii) *Shane v. Humana, Inc.*, Master File No. 00-1334 (S.D. Fla.) (to the extent the settlement involved Defendants WellPoint and Anthem), who did not opt out of such settlements, for any clam that arose before the Effective Date of the respective Settlement Agreements of those two class actions.

366.    Excluded from each of the above Classes and Subclasses are the Court and its officers, employees and relatives, each Defendant and Conspirator and any entity in which any Defendant or con-conspirator has a controlling interest, and their respective directors, officers, employees, and relatives; any governmental entities; and counsel for Plaintiffs and the Classes, including their partners, employees, and agents.

367.   The Subscriber and Provider Classes seek compensatory damages against all Defendants, appropriate equitable, injunctive and declaratory relief and treble damages, under the Sherman Act and RICO.

368.   The ERISA Subscriber and Provider Subclasses seek equitable, injunctive and declaratory relief against WellPoint for breaches of its fiduciary duties under ERISA as well as the redetermination and restitution and payment of  the benefits they were owed under ERISA for WellPoint's breach of the terms of its group health plans.

369.   The Non-ERISA Subclasses seek compensatory damages and declaratory relief against WellPoint for breaches of its individual and family health plan contracts as well as restitution and injunctive relief against all Defendants.

370.   Each of the above Classes consists of thousands of individuals and entities throughout the United States, making individual joinder impractical, in satisfaction of Federal Rule of Civil Procedure 23(a)(1). The disposition of the claims in each of the above Classes in a single class action will provide substantial benefits to all parties and to the Court.

371.   Plaintiffs' claims are typical of the claims of each of the above Classes, as required by Federal Rule of Civil Procedure 23(a)(3), in that the representative Plaintiffs, like all members of each of the above Classes, paid premiums or received an assignment for out-of-network health insurance benefits from WellPoint and/or received reimbursement for out-of-network medical services that was based on a UCR provided by Ingenix. Plaintiffs, like all members of the above Classes and Subclasses, have been injured by Defendants' and the Conspirators' misconduct because, among other things, Plaintiffs were misled as to the reimbursement rates for out-of-network health insurance coverage provided by WellPoint and have been under-reimbursed or underpaid for out-of-network medical expenses.

372.   The factual and legal bases of Defendants' and the Conspirators' misconduct are common to the members of each of the above Classes and Subclasses

129

1    and represent a common thread of misconduct resulting in injury to Plaintiffs and
2    members of each of the above Classes and Subclasses.

3       373.   Many questions of law and fact are common to Plaintiffs and each of the
4    above Classes and Subclasses, and those questions predominate over any questions
5    that may affect individuals in each of the above Classes and Subclasses, within the
6    meaning of and fulfilling the requirements of Federal Rules of Civil Procedure
7    23(a)(2) and 23(b)(3). Common questions of law and fact include, but are not limited
8    to, the following:

9          (a)    whether Defendants and the Conspirators engaged in a deceptive
10   scheme by improperly manipulating UCRs and/or using improperly-manipulated
11   UCRs as the basis for out-of-network reimbursement;

12         (b)    whether Defendants and the Conspirators artificially lowered
13   reimbursements for ONS medical services;

14         (c)    whether it was the policy and practice of Defendants and the
15   Conspirators to prepare marketing and sales materials that contained false and
16   misleading information regarding the extent of out-of-network coverage provided
17   under their plans;

18         (d)    whether Defendants and the Conspirators engaged in a pattern and
19   practice that caused Subscriber Plaintiffs and members of the Classes to incur
20   excessive or unwarranted out-of-pocket expenses under their plans;

21         (e)    whether Defendants and the Conspirators engaged in a pattern and
22   practice that caused Provider Plaintiffs and members of the Classes to be underpaid
23   for their ONS;

24         (f)    whether Defendants and the Conspirators engaged in a pattern of
25   deceptive conduct as to Plaintiffs and the members of the Classes;

26         (g)    whether Defendants and the Conspirators engaged in a contract,
27   combination or conspiracy to fix UCRs;

28

1            (h)    the duration and extent of the combination or conspiracy alleged

2    herein;

3            (i)    whether the alleged combination and conspiracy violated Section 1

4    of the Sherman Act;

5            (j)    whether Defendants' and the Conspirators' scheme to use Ingenix

6    as a means by which to depress UCRs violated RICO;

7            (k)    whether WellPoint's ONS adverse benefit determinations

8    ("ABDs") violated ERISA;

9            (l)whether WellPoint violated its fiduciary duties under ERISA;

10           (m)    whether WellPoint's claims review procedures comply with

11   ERISA;

12           (n)    whether WellPoint's use of the Ingenix Database and Non-Ingenix

13   Methodologies to calculate UCRs for ONS breaches its contractual obligations to its

14   plan members in its health plans;

15           (o)    whether WellPoint's use of the Ingenix Database and Non-Ingenix

16   Methodologies to calculate UCRs for ONS contravenes the reasonable expectations of

17   its plan members such as to violate the covenant of good faith and fair dealing;

18           (p)    whether Defendants' conspiracy to depress reimbursement rates for

19   ONS violates California's Unfair Competition Laws as well as New York General

20   Business Law § 349;

21           (q)    whether Defendants misrepresented the extent to which they would

22   reimburse their plan members for ONS costs;

23           (r)    whether Defendants omitted material information regarding the

24   manner in which they calculate ONS reimbursements and regarding the extent to

25   which they will provide such reimbursements; and

26           (s)    whether Plaintiffs and the other members of the above Classes

27   and Subclasses have all suffered harm and damages as a result of the unlawful and

28   wrongful conduct alleged herein.

374.    Plaintiffs will fairly and adequately represent and protect the interests of the above Classes and Subclasses, as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiffs have retained counsel with substantial experience in prosecuting nationwide consumer class actions and having expertise in the subject mater of this litigation and the laws under which the claims herein are asserted. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and Subclasses, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the Classes and Subclasses.

375.    **Rule 23(b)(1) and Requirements**. The prosecution of separate actions by individual members of the ERISA Subscriber and Provider Subclasses would create the risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants and a risk of adjudications which, as a practical matter, would be dispositive of the interests of other members of those subclasses who are not parties.

376.    **Rule 23(b)(2) Requirements**. Defendants have acted and/or refused to act and are likely to act and/or refuse to act on grounds generally applicable to the ERISA Subscriber and Provider Subclasses and the Antitrust Injunctive Relief Class, thereby making appropriate final injunctive and other relief with respect to those subclasses and that Class as a whole. Defendants and the Conspirators have acted and failed to act on grounds generally applicable to Plaintiffs and those subclasses and that Class. Therefore, the Court's imposition of uniform declaratory and injunctive relief is required to ensure compatible standards of conduct toward the ERISA Subscriber and Provider Subclasses and Antitrust Injunctive Relief Class, thereby making appropriate declaratory and injunctive relief to the above Class and Subclasses as a whole.

377.    **Rule 23(b)(3) Requirements**. Questions common to the members of the respective above-defined Classes and Subclasses, numerous examples of which

132

1    are enumerated above, predominate over questions respecting only individual

2    members, and a class action is superior to other available methods for the fair and

3    efficient adjudication of this controversy under Federal Rule of Civil Procedure

4    23(b)(3).  Absent a class action, most members of the above Classes and Subclasses

5    likely would find the cost of litigating their claims to be prohibitive, and would have

6    no effective remedy at law.  The class treatment of common questions of law and fact

7    is also superior to multiple individual actions or piecemeal litigation in that it

8    conserves the resources of the courts and the litigants, and promotes consistency and

9    efficiency of adjudication.

10                                **FRAUDULENT CONCEALMENT**

11

12          378.    Each Defendant and Conspirator concealed its fraudulent conduct

        from Plaintiffs and the members of the Classes and Subclasses by conspiring to
13
        manipulate the process by which reimbursement rates were set.  Defendants and the
14
        Conspirators also prevented Plaintiffs and the members of the Classes and Subclasses
15
        from knowing or discovering the actual methodologies used by Defendants to
16
        determine the ONS Benefit Reductions.  The fraudulent conduct alleged herein was of
17
        such a nature as to be self-concealing.
18

19          379.    Each Defendant's and Conspirator's efforts to conceal its source

20    and methodology of determining the False UCRs indicate that it knew its conduct was

21    fraudulent.

22          380.    Each Defendant and Conspirator participated in the Ingenix

23    scheme by concealing that it was providing flawed data to Ingenix and/or knew the

24    methodology used by the Ingenix Database and Non-Ingenix Methodologies to arrive

25    at False UCRs was inherently flawed.  As a result, each Defendant and Conspirator

26    knew that the False UCRs it used to set its reimbursement rates were lower than the

27    actual costs of medical services.

28
                                        133

381.   Plaintiffs were diligent in pursuing an investigation of the claims asserted in this Complaint.  Through no fault of their own, they did not receive inquiry notice nor learn of the factual basis for their claims in this Complaint and the injuries suffered until the recent disclosures in the press and media.

## TOLLING OF APPLICABLE STATUTES OF LIMITATION

382.   Any applicable statutes of limitations have been tolled by Defendants' and their Conspirators' knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and members of the Classes have been kept in ignorance of vital information essential to knowledge of and the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiffs and members of the Classes could not reasonably have discovered the fraudulent scheme to manipulate the reimbursement rates paid by Defendants and the Conspirators to insureds for out-of-network claims.

383.   Defendants and the Conspirators were, and continue to be, under a continuing duty to disclose to Plaintiffs and the Classes the fact that their reimbursement rates for out-of-network medical expenses were based on False UCRs that bore, and continue to bear, no relationship to the actual charges for those medical expenses.  Because of their knowing, affirmative, and/or active concealment of the fraudulent nature of the False UCRs, Defendants and the Conspirators are estopped from relying on any statutes of limitations.

## FIRST CLAIM FOR RELIEF

### VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT
### 15 U.S.C. § 1
**(Against All Defendants on Behalf of All Plaintiffs, Including the Association Plaintiffs with the limitation for the AMA as well as the Subscriber and Provider Classes and the Antitrust Injunctive Relief Class)**

384.   Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.  Plaintiffs bring this claim on behalf of the Subscriber, Provider, and Antitrust Injunctive Relief Classes, and the

134

1   Association Plaintiffs, except that the AMA is not bringing claims against the
2   UnitedHealthcare Defendants, as a *per se* claim and under the Rule of Reason.

3       385.   From a date unknown, but beginning at least as early as January 1, 1998,
4   and continuing through the present, Defendants and the Conspirators have combined,
5   conspired and/or contracted to restrain interstate trade in violation of 15 U.S.C. § 1.

6       386.   The combination or conspiracy alleged in this Complaint consisted of a
7   continuing agreement, understanding, or concert of action by the Defendants and their
8   other Conspirators, the substantial terms of which were to create, maintain, and use
9   the Ingenix Database to produce artificially-low UCRs for ONS reimbursement.

10       387.   This agreement among horizontal competitors to utilize the same pricing
11   schedule to fix maximum UCR reimbursement amounts is a *per se* violation of
12   Section 1 of the Sherman Act.

13       388.   The conspiracy was intended to directly affect the end payors of the
14   medical services covered by out-of-network insurance plans. The intent, purpose and
15   effect of the conspiracy to cap ONS reimbursement rates, was to cause under-
16   reimbursement for medical services, and thereby minimize reimbursement payments
17   made on such claims among Defendants and the Conspirators.

18       389.   Through the conspiracy, Defendants and the Conspirators have in fact
19   set reimbursement ceilings and caused a decrease in reimbursement or payments for
20   out-of-network medical services that would not have occurred but for their
21   anticompetitive conduct.

22       390.   As a result of the wrongful conduct alleged herein, Plaintiffs who were
23   subscribers and the Subscriber Class paid higher out-of-pocket payments and
24   Plaintiffs who were providers and the Provider Class received lower reimbursements
25   for out-of-network medical services than they would have paid or received but for
26   Defendants' and the Conspirators' anticompetitive conduct. These Plaintiffs and
27   Classes have been injured in their business or property, and have suffered damages in
28   an amount to be determined at trial.

391.    The conduct of Defendants and the Conspirators constitutes a *per se* and Rule of Reason violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs and the Subscriber, Provider and the Antitrust Injunctive Relief Classes are entitled to recover all damages and treble damages allowed under Section 1 of the Sherman Act against Defendants, jointly and severally, together with their costs of suit, including reasonable attorneys' fees, as well as any necessary injunctions to bar or abate Defendants' anticompetitive acts.

Wherefore, Plaintiffs pray for judgment against Defendants, as set forth hereafter.

## SECOND CLAIM FOR RELIEF

### CLAIM FOR UNPAID BENEFITS UNDER GROUP PLANS GOVERNED BY ERISA
### 29 U.S.C. § 1132(a)(1)(B)
**(Against WellPoint on Behalf of the ERISA Plaintiffs, and the ERISA Subclasses and by the Association Plaintiffs on Behalf of Their Members)**

392.    Plaintiffs repeat the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein, except that they are not relying upon the conspiracy allegations.

393.    Where a benefits plan is insured by, funded by or administered by WellPoint, WellPoint must pay benefits plan subscribers, or their assignees, pursuant to the terms of their ERISA plans.

394.    WellPoint violated its legal obligations under ERISA and federal common law when it made the ONS ABDs described in this Complaint. The violations include but are not limited to Wellpoint's reliance on the Ingenix Database and other ONS Benefit Reductions.

395.    WellPoint's lack of disclosure to its respective plan members or their providers, including Plaintiffs Roberts, Cooper, Rivera-Giusti, Henry, Schwendig, Peck, Pariser, Kavali, the NPSC and the members of the Association Plaintiffs, violated WellPoint's legal obligations.

136

396.   WellPoint violated its obligations each time it engaged in conduct that discouraged or penalized plan members' use of ONS providers, such as by making ONS ABDs.

397.   Plaintiffs Roberts, Cooper, Rivera-Giusti, Henry, Schwendig, Peck, Pariser, Kavali, and the NPSC, on their own behalf and on behalf of the members of the ERISA Subscriber and Provider Subclasses, and the Association Plaintiffs, on behalf of their members, seek unpaid benefits, re-calculated deductible and co-insurance amounts and interest back to the date their claims were originally submitted to WellPoint.

398.   In addition, Plaintiffs requests attorneys' fees, costs, prejudgment interest and other appropriate relief against WellPoint.

### THIRD CLAIM FOR RELIEF

**CLAIM FOR BREACH OF FIDUCIARY DUTY UNDER ERISA**
**29 U.S.C. § 1132(a)(2)**
**(Against WellPoint on Behalf of the ERISA Plaintiffs' and their Plans, and the ERISA Subclasses and by the Association Plaintiffs on Behalf of Their Members)**

399.   Plaintiffs incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as if set forth fully herein, except that they are not relying upon the conspiracy allegations. ERISA § 502(a)(2) authorizes a plan participants to bring a suit a suit for appropriate relief under 29 U.S.C. § 1109. 29 U.S.C. § 1132(a)(2). Section 1109 of ERISA provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other

1    equitable or remedial relief as the court may deem appropriate, including
2    removal of such fiduciary.

3    400.    Here, WellPoint served as a fiduciary for the ERISA plans.  As such, it
4    owed the plans and the plans' participants a duty to act with undivided loyalty when
5    managing and administering the plans.  WellPoint also owed the plans and the plans'
6    participants a duty of prudence.

7    401.    WellPoint breached its duties of loyalty and prudence under ERISA by
8    engaging in the conduct described in detail in this Complaint.  Among other things,
9    WellPoint breached its duty of loyalty and prudence by failing to disclose and taking
10   affirmative steps to conceal that its reimbursement rates for out-of-network medical
11   expenses were based on False UCRs or other ONS Benefit Reductions that bore, and
12   continue to bear, no relationship to the actual charges for those medical expenses.  The
13   breaches include but are not limited to when WellPoint relied upon an Ingenix
14   Database and other ONS Benefit Reductions in determining the reimbursement rates
15   for out-of-network medical expenses.

16   402.    Through these actions, WellPoint has set reimbursement ceilings and
17   caused a decrease in reimbursement or payments for out-of-network medical services.

18   403.    As a result of the wrongful conduct alleged herein, (1) Plaintiffs and the
19   Subscriber ERISA Class paid higher out-of-pocket payments; (2) Plaintiffs who were
20   providers and the Provider ERISA Class received lower reimbursement for their out-
21   of-network medical services and suffered other injuries and damages; and (3) the
22   subscribers' ERISA plans paid for health insurance plans of less value than they
23   received for their subscribers, causing them to suffer damages, in an amount to be
24   determined at trial.

25
26
27
28

138

## FOURTH CLAIM FOR RELIEF

### FAILURE TO PROVIDE FULL AND FAIR REVIEW REQUIRED BY ERISA
### 29 U.S.C. § 1132(a)(3)
**(Against WellPoint on Behalf of the ERISA Plaintiffs, and the ERISA Subclasses and by the Association Plaintiffs on Behalf of Their Members)**

404.    Plaintiffs repeat the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein, except that they are not relying upon the conspiracy allegations.

405.    WellPoint functioned, and continues to function, as a "Plan Administrator" within the meaning of such term under ERISA.  During the Class Period, Plaintiffs and the ERISA Subclasses were entitled to receive a "full and fair review" of all claims denied by WellPoint, and are entitled to assert a claim under 29 U.S.C. § 1132(a)(3) for failure to comply with these requirements.

406.    Although WellPoint was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to 29 U.S.C. § 1133 (and the regulations promulgated thereunder) for Plaintiffs and the ERISA Subclasses by making ONS ABDs that are inconsistent with, or unauthorized by, the terms of members' EOCs and SPDs, as well as by failing to disclose data, their methodology and other critical information relating to ONS ABDs.  The failures include but are not limited to when WellPoint relied upon an Ingenix Database and other ONS Benefit Reductions in determining ONS ABDs.

407.    The law and implementing regulations set forth minimum standards for claim procedures, appeals, notice to members and the like.  In engaging in the conduct described herein, including use of an invalid database for calculating UCRs and other ONS Benefit Reductions, WellPoint failed to comply with ERISA, its regulations and federal common law.  As a result, WellPoint failed to provide a "full and fair review," failed to provide reasonable claims procedures, and failed to make necessary disclosures to its plan members.

139

408.    Plaintiffs Roberts, Henry, Schwendig, Peck, Pariser, Kavali, and the NPSC appealed or attempted to appeal their claims review and thus exhausted their administrative remedies. Members of the Association Plaintiffs, including Plaintiffs Henry, Schwendig, Peck, Pariser, Kavali, and the NPSC have pursued extensive claims reviews during the Class Period and exhausted their administrative remedies.

409.    Furthermore, appeal of Plaintiff Roberts', Henry's, Schwendig's, Peck's, Pariser's, Kavali's, the NPSC's, the Association Plaintiffs' and the ERISA Provider and Subscriber Subclasses' claims should be deemed exhausted or excused by virtue of, among other things, WellPoint's numerous and systematic procedural and substantive violations.

410.    During the Class Period, Plaintiffs and the ERISA Provider and Subscriber Subclasses have been harmed by WellPoint's failure to provide a "full and fair review" of appeals under 29 U.S.C. § 1133, and by WellPoint's failure to disclose relevant information in violation of ERISA and the federal common law, entitles them to appropriate equitable relief.

## FIFTH CLAIM FOR RELIEF

**FAILURE TO PROVIDE AN ACCURATE EOC AND SPD**
**29 U.S.C. § 1132(c)**
**(Against WellPoint on Behalf of the ERISA Plaintiffs, and the ERISA Subscriber and Provider Subclasses and by the Association Plaintiffs on Behalf of Their Members)**
**(Dismissed Claim Re-Pleaded for Purpose of Preservation for Appeal)[3]**

411.   Plaintiffs repeat the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein, except that they are not relying upon the conspiracy allegations.

412.   WellPoint's disclosure obligations under ERISA include furnishing accurate materials summarizing its group health plans, known as SPD materials, under 29 U.S.C. § 1022.  WellPoint's failure to supply accurate EOCs, SPDs and other required information is actionable under 29 U.S.C. § 1132(c).

413.   WellPoint's failure to disclose material information about its ONS ABDs including but are not limited to when WellPoint relied upon an Ingenix Database and other ONS Benefit Reductions in determining ONS reimbursement, and its contribution of flawed data to Ingenix and use of such data, violated ERISA, federal regulations and federal common law.

414.   During the Class Period, Plaintiffs and the ERISA Subscriber and Provider Subclasses have been proximately harmed by WellPoint's failure to comply with 29 U.S.C. § 1022, federal regulations, and federal common law, in an amount to

---

[3] The Court dismissed this Count in its August 11, 2011 ruling on Defendants' motion to dismiss the Second Consolidated Amended Complaint.  D.E. 243, at 40-41, 49, The law of the Ninth Circuit is unclear as to whether Plaintiffs are required to re-assert it in this Third Amended Consolidated Complaint in order to preserve any arguments with respect to that dismissal on appeal because the Court's dismissal was without leave to amend, *see Parrino v. FHP, Inc.*, 146 F.3d 699, 704 (9th Cir. 1998) (no obligation to replead dismissed count in amended complaint where count was dismissed on summary judgment), in an abundance of caution, Plaintiffs re-allege it in order to ensure that they are not deemed to have waived it, recognizing that no responsive pleading from Defendants is required as to this Count.

1  be determined at trial, and are also entitled to injunctive and declaratory relief to

2  remedy WellPoint's continuing violation of these provisions.

3  **SIXTH CLAIM FOR RELIEF**

4  **FOR VIOLATIONS OF RICO, BASED ON PREDICATE**
**ACTS OF MAIL AND WIRE FRAUD**

5  **18 U.S.C. § 1962(c)**

6  **(Against All Defendants on Behalf of All Plaintiffs, the Association Plaintiffs**

7  **with the Limitation for the AMA and the Subscriber and Provider Classes)**

8  415.  Plaintiffs incorporate herein by reference each of the allegations

9  contained in the preceding paragraphs of this Complaint. This Claim is brought by all

10  Plaintiffs, the Subscriber and Provider Classes and the Association Plaintiffs on behalf

11  of themselves and their members, except that the AMA does not bring claims against

12  the UnitedHealth Defendants.

13  416.  At all relevant times, Defendants were "persons" within the meaning of

14  RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

15  417.  At all relevant times, and as described in this Complaint, Defendants

16  carried out their underpayment scheme to defraud Plaintiffs and the Class in

17  connection with the conduct of an "enterprise," within the meaning of 18 U.S.C. §

18  1961(4), as described above in the RICO Allegations section.

19  418.  At all relevant times, the enterprise was engaged in, and its activities

20  affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

21  419.  Through the wrongful conduct as alleged herein, Defendants, in

22  violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the

23  Enterprise's affairs, directly and indirectly, through a "pattern of racketeering

24  activity," as defined in 18 U.S.C. § 1961(5).

25  420.  WellPoint, acting through its officers, agents, employees and affiliates,

26  has committed numerous predicate acts of "racketeering activity," as defined in 18

27  U.S.C. § 1961(5), prior to and during the Class Period, and continues to commit such

28  predicate acts, in furtherance of its underpayment scheme for ONS, including (a) mail

142

1   fraud, in violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. §
2   1343. Such predicate acts include the following:

3        (a)   as discussed above, mailing, causing to be mailed and/or
4   knowingly agreeing to the mailing of materially false data for use in the Ingenix
5   Database, and other information or communications that facilitated the transmission of
6   such data and/or the scheme to defraud, with each such mailing constituting a separate
7   and distinct violation of 18 U.S.C. § 1341; and

8        (b)   transmitting, causing to be transmitted and/or knowingly agreeing
9   to the transmittal of materially-false data for use in the Ingenix Database, as well as
10  other information or communications that facilitated the transmission of such data
11  and/or the scheme to defraud, by means of telephone, facsimile and the Internet, in
12  interstate commerce, for the purpose of effectuating the above-described false
13  payment schemes, and each such transmission constituting a separate and distinct
14  violation of 18 U.S.C. § 1343.

15      421.   In furtherance of its underpayment scheme for ONS, Defendants, in
16  violation of 18 U.S.C. §§ 1341, 1343, 1961 and 1962, repeatedly and regularly used
17  the U.S. mail and interstate wire facilities to further all aspects of the intentional
18  underpayment to Plaintiffs and the Subscriber and Provider Classes by delivering
19  and/or receiving materials necessary to carry out the scheme to defraud.

20      422.   The foregoing communications, sent *via* U.S. mail and interstate wire
21  facilities, were incident to an essential part of Defendants' scheme to defraud as
22  described in this Complaint.

23      423.   Each such use of the U.S. mail and interstate wire facilities alleged in
24  this Complaint constitutes a separate and distinct predicate act of "racketeering
25  activity" and, collectively, constituted a "pattern of racketeering activity."

26      424.   The above-described pattern of racketeering activity is related because it
27  involves common persons (namely, Plaintiffs and the Subscriber and Provider
28  Classes), common out-of-network claim practices, common results impacting upon

common victims, and is continuous because it occurred over several years, and constitutes the usual practice of the Enterprise, such that it amounts to and poses a threat of continued racketeering activity. Defendants' scheme to defraud Plaintiffs and class members is open-ended and on-going.

425.    The direct and intended victims of the pattern of racketeering activity described previously herein are Plaintiffs and the Subscriber and Provider Classes, who were underpaid for ONS.

426.    Plaintiffs and the Subscriber and Provider Classes were injured by reason of Defendants' RICO violations because they were under-reimbursed or underpaid for services rendered to WellPoint health plan subscribers and thereby suffered consequential financial loss flowing from their property (health insurance plans) by, in the case of Subscribers, having overpaid for their health insurance coverage and, in the case of Providers, having suffered out-of-pocket losses because they were not properly reimbursed for ONS). As discussed above, their injuries were proximately caused by Defendants' violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of Defendants' RICO violations (and commission of underlying predicate acts) and, but for Defendants' RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

427.    Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiffs and the Subscriber and Provider Classes are entitled to recover threefold their damages, costs, and attorneys' fees from Defendants and other appropriate relief.

144

## SEVENTH CLAIM FOR RELIEF

### FOR VIOLATIONS OF RICO
### 18 U.S.C. § 1962(c)
### FOR PREDICATE ACTS
### 18 U.S.C. § 664
**(Against Defendants on Behalf of All ERISA Plaintiffs and the ERISA
Subscriber and Provider Subclasses and by the Association Plaintiffs with the
Limitation for the AMA on Behalf of Themselves and Their Members)
(Partially Dismissed Claim Re-Pleaded as to Non-ERISA Plaintiffs for
Purpose of Preservation for Appeal)[4]**

428.    Plaintiffs hereby repeat the allegations of the prior paragraphs of the
Complaint as if fully set forth herein.  This claim is asserted by the ERISA Plaintiffs
on behalf of themselves and on behalf of the members of the ERISA Provider and
Subscriber Subclasses and Association Plaintiffs, on behalf of themselves and their
members, except that the AMA does not bring claims against the UnitedHealthcare
Defendants.

429.    Section 1961(1)(B) of RICO specifically identifies as a predicate act
"any act which is indictable under . . . [§]664 (relating to embezzlement from pension
and welfare funds)" as a predicate act. 18 U.S.C. § 1961(l)(B).  Section 664 of Title
18 provides:

---

[4] The Court dismissed this Count as to all Non-ERISA Plaintiffs in its August 11,
2011 ruling on Defendants' motion to dismiss the Second Consolidated Amended
Complaint. D.E. 243, at 31-32, 49.  Because the Court's partial dismissal was with
leave to amend, Plaintiffs re-allege this Count as to all Plaintiffs in order to preserve
any arguments of the non-ERISA Plaintiffs with respect to the Court's dismissal, *see
N.Y. City Employees' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1025 (9th Cir. 2010) ("'If a
plaintiff fails to include dismissed claims in an amended complaint, the Plaintiffs are
deemed to have waived any error in the ruling dismissing the prior complaint.'")
(quoting *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997)), recognizing
that no responsive pleading from Defendants as to the Non-ERISA Plaintiffs is
required as to this Count.