1  Craig A. Hoover, SBN 113965
   craig.hoover@hoganlovells.com
2  E. Desmond Hogan, *pro hac vice*
   desmond.hogan@hoganlovells.com
3  Peter R. Bisio, *pro hac vice*
   peter.bisio@hoganlovells.com
4  Miranda L. Berge, *pro hac vice*
   miranda.berge@hoganlovells.com
5  **HOGAN LOVELLS US LLP**
   555 Thirteenth Street, NW
6  Washington, DC 20004
   Tel: (202) 637-5600
7  Fax: (202) 637-5910

8  Neil R. O'Hanlon, SBN 67018
   neil.ohanlon@hoganlovells.com
9  Robin J. Samuel, SBN 173090
   robin.samuel@hoganlovells.com
10 **HOGAN LOVELLS US LLP**
   1999 Avenue of the Stars, Suite 1400
11 Los Angeles, California 90067
   Tel: (310) 785-4600
12 Fax: (310) 785-4601

13
14 *Attorneys for the WellPoint Defendants*

15             UNITED STATES DISTRICT COURT

16             CENTRAL DISTRICT OF CALIFORNIA

17 | IN RE WELLPOINT, INC. | Master Consolidated Case File No. |
   | OUT-OF-NETWORK "UCR" | 2:09-ml-02074-PSG |
18 | RATES LITIGATION | |

19 | **THIS DOCUMENT RELATES TO** | **THE WELLPOINT** |
   | **ALL ACTIONS** | **DEFENDANTS' AMENDED** |
20 | | **MEMORANDUM OF POINTS** |
   | | **AND AUTHORITIES IN** |
21 | | **SUPPORT OF MOTION TO** |
   | | **DISMISS THIRD AMENDED** |
22 | | **COMPLAINT** |

23 Date:  March 5, 2012
   Time:  1:30 P.M.
24 Ctrm:  880
   Judge: Hon. Philip S. Gutierrez
25
26 [Notice of Motion and Motion To
   Dismiss Complaint, and Proposed
27 Order Filed Concurrently]

28

1

# **TABLE OF CONTENTS**

2
Page

3 MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

4 ARGUMENT ........................................................................................................... 4

5
6 I.      PLAINTIFFS' CLAIMS REGARDING "NON-INGENIX
        METHODOLOGIES" SHOULD BE DISMISSED .............................. 4

7 II.     THE PROVIDER PLAINTIFFS LACK STANDING ........................ 6

8
9      A.  The Provider Plaintiffs' Assignment Allegations Are
            Inadequate ................................................................................ 6

10         1.  The 1132(a)(2) And (a)(3) Claims Fail ............................. 6

11
12         2.  The Antitrust And RICO Claims Should Be
                Dismissed ........................................................................ 8

13      B.  UCL and FAL Claims Cannot Be Based On Assignments ......... 9

14
15      C.  The Provider Plaintiffs Cannot Bring Sherman Act And
            RICO Claims Based On A Third-Party Beneficiary
            Theory ....................................................................................... 9

16
17 III.    THE ASSOCIATION PLAINTIFFS LACK STANDING ................ 10

18 IV.     PLAINTIFFS' SHERMAN ACT CLAIM SHOULD BE
        DISMISSED ...................................................................................... 12

19
20      A.  Plaintiffs Fail To Allege A *Per Se* Sherman Act Claim ............ 12

21      B.  The Horizontal Conspiracy Plaintiffs Allege Is
            Implausible ............................................................................... 15

22
23      C.  Plaintiffs' Rule of Reason Claim Fails ..................................... 18

24         1.  Plaintiffs Have Not Alleged Antitrust Injury ................. 18

25         2.  Plaintiffs Have Failed To Allege A Relevant
                Market ........................................................................... 22

26

27

28

V.    PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED ............. 23

    A.    Plaintiffs' RICO Claims Fail Because Plaintiffs Do Not
          Adequately Allege That WellPoint Directed The
          Enterprise .................................................................................. 23

    B.    Plaintiffs' Mail And Wire Fraud RICO Claims Fail ................. 25

          1.    The TAC Fails To State A Mail Or Wire Fraud
                Claim .......................................................................... 26

          2.    Plaintiffs Still Have Failed To Plead Reliance ............... 27

    C.    Plaintiffs Have Not Adequately Pled Embezzlement ................ 28

    D.    The TAC Fails To Allege Facts Showing A RICO
          Conspiracy ................................................................................ 30

VI.    PLAINTIFFS' ERISA CLAIMS SHOULD BE DISMISSED ............ 32

    A.    The TAC Fails To Allege Exhaustion Or Futility
          Regarding Non-Ingenix Methodologies ..................................... 32

    B.    Plaintiffs' Claims Regarding Alleged Failures To
          Disclose UCR Data Should Be Dismissed ................................ 33

    C.    Plaintiffs' 1132(a)(2) Claim Also Fails For Additional
          Reasons ...................................................................................... 35

VII.    PLAINTIFFS' BREACH OF CONTRACT CLAIM FAILS ............. 38

    A.    WellPoint's Contracts Are Not Uniform ................................... 38

    B.    The J.B.W. And Samsell Contracts Were Not Breached .......... 40

          1.    J.B.W. ......................................................................... 40

          2.    The Samsells ................................................................. 41

VIII.    PLAINTIFFS' IMPLIED COVENANT CLAIM FAILS ................... 42

MEMORANDUM OF POINTS AND AUTHORITIES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IX.   PLAINTIFFS' UCL AND FAL CLAIMS SHOULD BE
      DISMISSED..........................................................................43

      A.   Plaintiffs Fail To Plead Fraud With Particularity.....................44

      B.   Plaintiffs' "Unfair" And "Unlawful" UCL Claims Should
           Be Dismissed For Additional Reasons ......................................46

X.    PLAINTIFFS' CARTWRIGHT ACT CLAIM FAILS .......................47

CONCLUSION...........................................................................48

MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Adams v. Anheuser-Busch Cos.*,
   No. 2:10–cv–826, 2011 WL 1559793 (S.D. Ohio 2011) ................................... 37

*Aetna Health, Inc. v. Davila*,
   542 U.S. 200, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004) ............................... 47

*Am. Dental Ass'n v. CIGNA Corp.*,
   605 F.3d 1283 (11th Cir. 2010) ........................................................... 25, 27, 31

*Amato v. Bernard*,
   618 F.2d 559 (9th Cir. 1980) ....................................................................... 32

*Arizona v. Maricopa Cnty. Med. Soc'y*,
   457 U.S. 332, 102 S. Ct. 2466, 73 L. Ed. 2d 48 (1982) ................................... 13

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ......................... *passim*

*Ass'n of Wash. Pub. Hosp. v. Philip Morris Inc.*,
   241 F.3d 696 (9th Cir. 2001) ....................................................................... 11

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328, 110 S. Ct. 1884, 109 L. Ed. 2d 333 (1990) ............................... 19

*Barix Clinics of Ohio, Inc. v. Longaberger Family of Cos. Grp. Med. Plan*,
   459 F. Supp. 2d 617 (S.D. Ohio 2005) ............................................................ 7

*Beck v. Prupis*,
   529 U.S. 494, 120 S. Ct. 1608, 146 L. Ed. 2d 561 (2000) ........................... 31, 32

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ................... 16, 25, 27

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
   182 F.3d 1096 (9th Cir. 1999) ..................................................................... 22

*Biomed Pharm., Inc. v. Oxford Health Plans (N.Y.), Inc.*,
   775 F. Supp.2d 730 (S.D.N.Y. 2011) .............................................................. 7

*Blue Shield of Virginia v. McCready*,
   457 U.S. 465, 102 S. Ct. 2540, 73 L. Ed. 2d 149 (1982) ........................... 18, 19

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008) .............................. 27

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc. (BMI)*,
    441 U.S. 1, 99 S. Ct. 1551, 60 L. Ed. 2d 1 (1979) ....................................... 13, 14

*Brown Shoe Co. v. United States*,
    370 U.S. 294, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962) ..................................... 22

*Cal. Dental Ass'n v. FTC*,
    224 F.3d 942 (9th Cir. 2000) ...................................................................... 19

*California ex rel. Harris v. Safeway, Inc.*,
    651 F.3d 1118 (9th Cir. 2011) ........................................... 2, 12, 13, 15

*Chang Bee Yang v. Sun Trust Mortg., Inc.*,
    No. 1:10–CV–01541 AWI SKO, 2011 WL 3875520
    (S.D. Cal. Aug. 31, 2011) ............................................................................ 44

*Cleghorn v. Blue Shield of Cal.*,
    408 F.3d 1222 (9th Cir. 2005) ..................................................................... 47

*Coalition for ICANN Transparency, Inc. v. Verisign, Inc.*,
    452 F. Supp. 2d 924 (N.D. Cal. 2006) ......................................................... 11

*Colony Cove Props., LLC v. City of Carson*,
    640 F.3d 948 (9th Cir. 2011) ...................................................................... 39

*Coriale v. Xerox Corp.*,
    775 F. Supp.2d 583 (W.D.N.Y. 2011) ......................................................... 37

*Ctr. for Sci. in Pub. Interest v. Bayer Corp.*,
    No. C 09-05379 JSW, 2010 WL 1223232 (N.D. Cal. Mar. 25, 2010) ............. 12

*DeBartolo v. Blue Cross/Blue Shield of Ill.*,
    No. 01 C 5940, 2001 WL 1403012 (N.D. Ill. Nov. 9, 2001) ........................... 34

*DevTech Mktg. Inc. v. Westfalia-Surge, Inc.*,
    No. ED CV 02-672 RT, 2005 WL 6287929
    (C.D. Cal. Apr. 19, 2005) ............................................................................. 8

*Diaz v. United Agric. Emp. Welfare Benefit Plan & Trust*,
    50 F.3d 1478 (9th Cir. 1995) ...................................................................... 32

*Eden Surgical Ctr. v. B. Braun Med., Inc.*,
    420 F. App'x 696 (9th Cir. 2011) ................................................................. 6

*Edwards v. Marin Park, Inc.*,
    356 F.3d 1058 (9th Cir. 2004) ..................................................................... 26

*Ehrman v. Standard Ins.*,
    No. C06-05454 MJJ, 2007 WL 1288465 (N.D. Cal. May 2, 2007) .................. 36

*EPlus Tech., Inc. v. Nat'l R.R. Passenger Corp.*,
  407 F. Supp. 2d 758 (E.D. Va. 2005) .................................................................. 43

*Franco v. Conn. Gen. Life Ins. Co.*,
  No. 07-cv-6039(SRC)(PS), 2011 WL 4448908, __ F. Supp. 2d __
  (D.N.J. Sept. 23, 2011) ............................................................................. *passim*

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
  No. 10-15978, 2011 WL 1898150 (9th Cir. May 19, 2011) ............................. 22

*Goldsmith v. Allergan, Inc.*,
  No. CV 09-7088 PSG (Ex), 2011 WL 147714
  (C.D. Cal. Jan. 13, 2011) ......................................................................... 45, 46

*Gov't Computer Sales Inc. v. Dell Mktg.*,
  199 F. App'x 636 (9th Cir. 2006) ..................................................................... 39

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*,
  995 F.2d 425 (3d. Cir. 1993) ............................................................................. 9

*Harwood Inv. Co. v. Wells Fargo Bank, N.A.*,
  No. C-09-3410 EMC, 2009 WL 4251650 (N.D. Cal. Nov. 24, 2009) ................. 5

*Hemi Grp., LLC v. City of New York*,
  __ U.S. __, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010) .................................... 27

*Hicks v. Fleming Cos.*,
  961 F.2d 537 (5th Cir. 1992) ............................................................................ 34

*Hosack v. Utopian Wireless Corp.*,
  No. DKC 11–0420, 2011 WL 1743297 (D. Md. May 6, 2011) ......................... 39

*Howard v. Am. Online Inc.*,
  208 F.3d 741 (9th Cir. 2000) ...................................................................... 30, 31

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977) .................................. 10

*Impac Warehouse Lending Grp. v. Credit Suisse First Boston LLC*,
  270 F. App'x 570 (9th Cir. 2008) ...................................................................... 31

*In re Actimmune Mktg. Litig.*,
  No. C 08-02376 MHP, 2009 WL 3740648
  (N.D. Cal. Nov. 6, 2009) .......................................................................... 45, 46

*In re ATM Fee Antitrust Litig.*,
  554 F. Supp. 2d 1003 (N.D. Cal. 2008) ........................................................... 12

*In re GlenFed, Inc. Sec. Litig.*,
  42 F.3d 1541 (9th Cir. 1994) ........................................................................... 26

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ............................................................................ 18

*In re Nat'l Assoc. of Music Merchs., Musical Instruments & Equip. Antitrust Litig.*,
    MDL No. 2121, 2011 WL 3702453 (S.D. Cal. August 22, 2011) ............. 17, 18

*Int'l Healthcare Mgmt. v. Hawaii Coal. For Health*,
    332 F.3d 600 (9th Cir. 2003) ......................................................................... 13

*Kearney v. Foley & Lardner*,
    No. 05-CV-2112-L(LSP), 2011 WL 1119020 (S.D. Cal. 2011) ...................... 25

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
    No. C07-01057 MJJ, 2007 WL 2318906 (N.D. Cal. Aug. 13, 2007) ................. 8

*Krauss v. Oxford Health Plans, Inc.*,
    418 F. Supp. 2d 416 (S.D.N.Y. 2005),
    *aff'd*, 517 F.3d 614 (2d Cir. 2008) ............................................................ 33, 34

*Lerman v. Joyce Int'l, Inc.*,
    10 F.3d 106 (3d Cir. 1993) (Alito, J.) ............................................................. 8

*McGlinchy v. Shell Chemical Co.*,
    845 F.2d 802 (9th Cir. 1988) ......................................................................... 19

*N. Cypress Med. Ctr. Operating Co., Ltd. v. MedSolutions, Inc.*,
    No. H–10–2608, 2010 WL 4702298 (S.D. Tex. Nov. 10, 2010) ...................... 7

*Oregon Laborers-Emp'rs Health & Welfare Trust Fund v. Philip Morris Inc.*,
    185 F.3d 957 (9th Cir. 1999) ......................................................................... 19

*Orr v. Bank of Am., NT & SA*,
    285 F.3d 764 (9th Cir. 2002) ......................................................................... 26

*Ove v. Gwinn*,
    264 F.3d 817 (9th Cir. 2001) ......................................................................... 26

*Palmer v. Dep't of Treasury*,
    53 F. App'x 455 (9th Cir. 2002) ..................................................................... 31

*Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*,
    No. 09 C 5619, 2010 WL 1979569 (N.D. Ill. May 17, 2010) .......................... 11

*Perez v. Wells Fargo Bank, N.A.*,
    No. C–11–02279 JCS, 2011 WL 3809808 (N.D. Cal. Aug. 29, 2011) ............. 40

*Pool Water Prods. v. Olin Corp.*,
    258 F.3d 1024 (9th Cir. 2001) ....................................................................... 12

MEMORANDUM OF POINTS AND AUTHORITIES

*Quaresma v. BC Life & Health Ins. Co.*,
   623 F. Supp. 2d 1110 (E.D. Cal. 2007) ............................................................... 47

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ................................................................................ 22

*Reves v. Ernst & Young*,
   507 U.S. 170, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993) .................................. 24

*Sacramento Valley Chapter of the Nat'l Elec. Contractors Assoc. v.
   Int'l Bhd. of Elec. Workers, Local 340*,
   888 F.2d 604 (9th Cir. 1989) ............................................................................... 11

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
   473 U.S. 479, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985) .................................... 26

*Shred-It Am., Inc. v. MacNaughton*,
   No. CV 10-00547 DAE-KSC, 2011 WL 1842997
   (D. Haw. May 13, 2011) ....................................................................................... 23

*Smith v. Med. Benefit Adm'rs Grp., Inc.*,
   639 F.3d 277 (7th Cir. 2011) ........................................................................ 36, 37

*Stahl v. Tony's Bldg. Materials, Inc.*,
   875 F.2d 1404 (9th Cir. 1989) ............................................................................. 34

*Stearns v. Select Comfort Retail Corp.*,
   No. 08-2746 JF 2009 WL 1635931 (N.D. Cal. June 5, 2009) ............................ 21

*Tanaka v. Univ. of S. Cal.*,
   252 F.3d 1059 (9th Cir. 2001) ............................................................................. 22

*Tarr v. State Mut. Life Assurance Co. of Am.*,
   913 F. Supp. 40 (D. Mass. 1996) ........................................................................... 7

*Taylor v. Reliance Standard Life Ins.*,
   No. C10-1317JLR, 2011 WL 62142 (W.D. Wash. Jan. 7, 2011) ............... 35, 36

*Texaco, Inc. v. Dagher*,
   547 U.S. 1, 126 S. Ct. 1276, 164 L. Ed. 2d 1 (2006) ......................................... 12

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
   546 F.3d 991 (9th Cir. 2008) ......................................................................... 11, 21

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
   536 F. Supp. 2d 1191 (C.D. Cal. 2008) ......................................................... 22, 23

*Toohey v. Wyndham Worldwide Corp. Health & Welfare Plan*,
   673 F. Supp. 2d 1223 (D. Or. 2009) .............................................................. 35, 37

MEMORANDUM OF POINTS AND AUTHORITIES

*United States v. Andreen*,
628 F.2d 1236 (9th Cir. 1980)..................................................................28, 29

*United States v. Wiseman*,
274 F.3d 1235 (9th Cir. 2001)............................................................................29

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003)............................................................................31

*Via Christi Reg'l Med. Ctr., Inc. v. Blue Cross & Blue Shield of Kan., Inc.*,
Nos. 04-1253-WEB, 04-1339-WEB, 2006 WL 3469544
(D. Kan. Nov. 30, 2006)........................................................................................7

*Walter v. Drayson*,
538 F.3d 1244 (9th Cir. 2008)............................................................................24

*Warren v. Fox Family Worldwide, Inc.*,
328 F.3d 1136 (9th Cir. 2003)..............................................................................5

*Watts v. Allstate Indem. Co.*,
No. S-08-1877 LKK/GGH, 2009 WL 1905047 (E.D. Cal. 2009)....................25

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.*,
588 F.3d 659 (9th Cir. 2009)........................................................................16, 17

*Wise v. Verizon Commc'ns, Inc.*,
600 F.3d 1180 (9th Cir. 2010)......................................................................36, 37

**CALIFORNIA CASES**

*Amalgamated Transit Union, Local 1756 v. Superior Court*,
46 Cal. 4th 993, 95 Cal. Rptr. 3d 605 (Cal. 2009) ..............................................9

*ASP Props. Grp. v. Fard, Inc.*,
133 Cal. App. 4th 1257, 35 Cal. Rptr. 3d 343 (Cal. Ct. App. 2005)..................41

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
68 Cal. App. 4th 445, 80 Cal. Rptr. 2d 329 (Cal. Ct. App. 1999)......................40

*Durell v. Sharp Healthcare*,
183 Cal. App. 4th 1350, 108 Cal. Rptr. 3d 682 (Cal. 2010) .............................45

*Gin v. Penn. Life Ins. Co.*,
134 Cal. App. 4th 939, 36 Cal. Rptr. 3d 571 (Cal. Ct. App. 2005)...................40

*Helfand v. Nat'l Union Fire Ins. Co.*,
10 Cal. App. 4th 869, 13 Cal. Rptr. 2d 295 (Cal. Ct. App. 1992).....................40

*In re Tobacco II Cases*,
46 Cal. 4th 298, 93 Cal. Rptr. 3d 559 (Cal. 2009) .......................................45, 46

*Smith v. Int'l Bhd. of Elec. Workers, Local Union 11*,
    109 Cal. App. 4th 1637, 1 Cal. Rptr. 3d 374 (Cal. Ct. App. 2003)..................43

*Transamerica Ins. Co. v. Sayble*,
    193 Cal. App. 3d 1562, 239 Cal. Rptr. 201 (Cal. Ct. App. 1987)....................40

**OTHER STATE CASES**

*Morrell v. Wellstar Health Sys., Inc.*,
    280 Ga. App. 1, 633 S.E.2d 68 (Ga. Ct. App. 2006).........................................43

**FEDERAL STATUTES**

18 U.S.C. § 664 .....................................................................................28, 29, 30

18 U.S.C. § 1961(5)........................................................................................26, 30

ERISA § 102, 29 U.S.C. § 1022 ...........................................................................34

ERISA § 102(b), 29 U.S.C. § 1022(b) ..................................................................34

ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4) ........................................................34

ERISA § 502, 29 U.S.C. § 1132 .............................................................................7

ERISA § 502(a), 29 U.S.C. § 1132(a) ...............................................................6, 47

ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)..........................................3, 7, 46

ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2)......................................................*passim*

ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)......................................................*passim*

ERISA § 502(c), 29 U.S.C. § 1132(c) ................................................................1, 6

ERISA § 503, 29 U.S.C. § 1133 ...........................................................................34

ERISA § 503(1), 29 U.S.C. § 1133(1) ..................................................................34

ERISA § 503(2), 29 U.S.C. § 1133(2) ..................................................................34

**CALIFORNIA STATUTES**

Cal. Bus. & Prof. Code § 17204 ............................................................................9

1

**FEDERAL RULES**

2

Fed. R. Civ. P. 8(a) ........................................................................................27, 31

3

Fed. R. Civ. P. 9(b) ...................................................................................*passim*

4

Fed. R. Civ. P. 12(b)(6) .......................................................................................5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

In its August 11, 2011 Order Granting in Part and Denying in Part Defendants' Motions to Dismiss ("MTD Order") [D.E. 243], the Court dismissed all of the claims in the Second Amended Complaint ("SAC") [D.E. 113-1] relating to non-Ingenix ONS Benefits, along with the RICO claims, ERISA § 1132(c) claim, fraud-based California Unfair Competition and False Advertising claims, and Cartwright Act claim for ERISA Plaintiffs. *See* MTD Order at 48-49. The Court gave Plaintiffs leave to file a Third Amended Complaint ("TAC") [D.E. 274; Corrected, D.E. 279-1], which they did on October 17, 2011, eleven days before the close of fact discovery. The TAC, however, does not cure the deficiencies the Court identified in the SAC. Even with the benefit of more than 23 months of discovery, the defendants' production of more than 3.1 million pages of documents and data containing tens of millions of claims lines, and over four dozen depositions, Plaintiffs still cannot allege facts to support the claims the Court previously dismissed.

For example, although Plaintiffs continue to assert claims relating to non-Ingenix ONS Benefits, they still have not alleged facts showing "which individuals were affected by the non-Ingenix ONS Benefit reductions, and how each was injured." MTD Order at 9. Thus, as before, their non-Ingenix ONS Benefits claims should be dismissed for lack of standing. The one exception relates to the Samsells, who pleaded additional facts showing that their claims were not priced based on Ingenix. The Samsells have not alleged any facts, however, that show that they received less than they were entitled to under their insurance policy. Thus, their claims for Non-Ingenix ONS Benefit reductions should be dismissed as well.

The TAC similarly fails to cure the deficiencies the Court identified with Plaintiffs' RICO claims. Plaintiffs still fail to allege facts showing that WellPoint directed the alleged enterprise. And the new communications the TAC alleges fail to support Plaintiffs' mail and wire fraud claim because, among other things,

1   Plaintiffs again fail to plead facts showing anyone relied on such communications.

2   The Court also should dismiss claims it previously upheld.  In partially

3   denying WellPoint's motion to dismiss the SAC, the Court noted that "no discovery

4   has occurred in this case which would make Plaintiffs' allegations less plausible."

5   MTD Order at 16.  Discovery is now complete, but the TAC does not allege new

6   facts that support Plaintiffs' claims.  To the contrary, the new facts that are alleged

7   undercut them.  And new case law that was not available when WellPoint's

8   previous motion to dismiss was briefed confirms that Plaintiffs' allegations fail to

9   state a claim.

10   For example, the Court denied WellPoint's motion to dismiss Plaintiffs'

11   Sherman Act claim, finding that the SAC stated both *per se* and rule of reason

12   antitrust violations.  In *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118

13   (9th Cir. 2011) (en banc), however, the Ninth Circuit held that "[p]er se treatment is

14   proper only 'once experience with a particular kind of restraint enables the court to

15   predict with confidence that the rule of reason will condemn it.' "  *Id.* at 1133

16   (brackets and citation omitted).  That standard is not met here, as demonstrated by

17   the decision in *Franco v. Connecticut General Life Insurance Co.*, 2011 WL

18   4448908, __ F. Supp. 2d __ (D.N.J. 2011), which held that the same antitrust

19   allegations asserted in the TAC did not state a claim for price fixing "or any other

20   recognized *per se* antitrust violation" against CIGNA.  *Id.* at *30.  The rule of

21   reason claim alleged in the TAC likewise fails.  Among other things, the TAC fails

22   to allege antitrust injury because the injury Plaintiffs complain about – "receiving a

23   lower [ONS] benefit than they would have had accurate prevailing fee schedules

24   been employed . . . – is not one which flows from Defendants' alleged efforts to

25   reduce competition."  *Id.* at *36.

26   The Provider Plaintiffs' Sherman Act, RICO, ERISA § 1132(a)(2) and

27   1132(a)(3), and UCL/FAL claims also fail for an additional reason.  The Provider

28   Plaintiffs base those claims on assignments they allegedly received from their

1  patients.  The allegations of assignments in the TAC, however, are at most

2  allegations of assignments of the right to receive benefit payments from WellPoint.

3  They provide no basis for the Provider Plaintiffs to assert Sherman Act, RICO,

4  1132(a)(2) or 1132(a)(3), or UCL/FAL claims.  *See, e.g.*, *Franco*, 2011 WL

5  4448908, at *9-11.  The deficiencies in the Provider Plaintiffs' allegations are

6  "particularly glaring in light of the fact that in this action, and in the same

7  consolidated class action pleading containing Provider Plaintiffs' allegations, plan

8  *subscribers* also assert" Sherman Act, RICO and ERISA claims based on the same

9  allegations.  *Id.* at *9.  The Provider Plaintiffs allege no facts explaining how it is

10  that they have been assigned claims by WellPoint's members, but those members

11  remain free to assert the same claims against WellPoint.

12      Plaintiffs' 1132(a)(2) and 1132(a)(3) claims similarly fail on multiple

13  grounds.  Among other things, those claims are based on allegations that WellPoint

14  violated ERISA by failing to disclose certain information and to "provid[e]

15  appropriate data and documentation concerning coverage decisions."  TAC ¶ 167.

16  As the *Franco* court held, however, ERISA does not require the disclosures the

17  TAC alleges WellPoint should have made.  *See* 2011 WL 4448908, at *19-20.

18      The Court previously found in its MTD Order that the SAC stated an ERISA

19  benefits claim, *see* MTD Order at 37, and WellPoint does not move to dismiss the

20  1132(a)(1)(B) ERISA benefits claim in the TAC as it relates to claims priced using

21  Ingenix.[1]  However, for all of the reasons stated above and the additional reasons

22  stated below, the TAC fails to allege facts that state any other claim under the

23  applicable pleadings standards and the applicable law.  Thus, all of the other claims

24  in the TAC should be dismissed.

25  _____

26  [1]   WellPoint expressly reserves the right to raise its arguments concerning

27  1132(a)(1)(B), as well as arguments the Court rejected in the MTD Order, at a later

28  time.

1

## ARGUMENT

2  **I.   PLAINTIFFS' CLAIMS REGARDING "NON-INGENIX**

3  **METHODOLOGIES" SHOULD BE DISMISSED.**

4          The Court dismissed the SAC to the extent it was based on "ONS Benefit

5  Reductions" unrelated to Ingenix because Plaintiffs "failed to identify which

6  individuals were affected by the non-Ingenix ONS benefit reductions, and how each

7  was injured."  MTD Order at 9.  The Court held that "[c]onclusory statements about

8  faulty reimbursements do not plausibly show that Plaintiffs have standing to

9  complain about the ONS benefit reductions[.]"  *Id.*  Plaintiffs' non-Ingenix claims

10  in the TAC should be dismissed for the same reasons.

11          The "new" non-Ingenix allegations in the TAC are little more than window

12  dressing and do not cure the core deficiencies that the Court found in the SAC.  For

13  example, Plaintiffs have introduced a new defined term – "Non-Ingenix

14  Methodologies" – to refer to what they previously termed ONS Benefit Reductions:

15  methodologies not involving Ingenix that they deem improper.  *See* TAC ¶¶ 16,

16  174.  They also have revised their list of alleged "Methodologies" to eliminate

17  references to some of the Methodologies referenced in the SAC (e.g., "use of

18  average wholesale price") and to add references to others (e.g., use of "cryptic

19  internal fee schedules").  *Compare* TAC ¶ 174 *with* SAC ¶ 179.  And they have

20  added the phrase "including discounted Par provider fee schedules" in a number of

21  places in the TAC after allegations repeated verbatim from the SAC – that

22  WellPoint improperly paid claims based on the Ingenix Database *or* other ONS

23  Benefit Reductions.  *See* TAC ¶ 231 (Schwendig); ¶ 240 (Peck); ¶ 248 (Pariser);

24  ¶ 262 (Kavali); *see also id.* ¶ 361 (alleging that Dr. Higashi's compensation was

25  reduced "through the Ingenix Database or Non-Ingenix Methodologies (including

26  discounted Par provider fee schedules, *i.e.*, in-network fee schedules)").  None of

27  these changes render Plaintiffs' allegations about faulty reimbursements any less

28  conclusory than the allegations in the SAC the Court found to be deficient.

1    Where Plaintiffs actually have tried to allege new facts about specific claims,

2    those alleged facts expressly reference Ingenix and provide no support for

3    Plaintiffs' claims regarding Non-Ingenix Methodologies.  *See* TAC ¶ 197 (Roberts'

4    UCR determination was "based upon the fee schedule produced by the Ingenix

5    Database"); ¶ 207 (Cooper's claim was priced "based upon the flawed Ingenix

6    Database"); ¶¶ 215-16 (allowed amounts for Rivera-Giusti were "based upon the

7    Ingenix Database"); ¶ 337 (J.B.W.'s claim was reimbursed using fee schedules that

8    "were derived with reference to Ingenix fee schedules").  The one exception relates

9    to the Samsells, who previously alleged they were "under-reimbursed by WellPoint

10   based upon the flawed fee schedules provided by Ingenix," RICO Case Statement

11   [D.E. 20] at 25, but who now claim that they were reimbursed "based upon Anthem

12   Virginia's standard, in-network participating fee schedule."  TAC ¶ 345.  That

13   allegation obviously does not provide any other Plaintiff with standing to assert a

14   claim based on Non-Ingenix Methodologies.  It also does not state a claim for the

15   Samsells because, as discussed below, the TAC fails to allege any facts showing

16   that the Samsells did not receive the reimbursement they were entitled to under

17   their policy.  *See* Section VII.B.2, *infra*.

18   Standing is "an indispensable part of the plaintiff's case" and "must be

19   supported at each stage of litigation in the same manner as any other essential

20   element of the case."  *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140

21   (9th Cir. 2003).  Thus, to survive a Rule 12(b)(6) motion, a plaintiff "must allege

22   facts . . . that, if proven, would confer standing upon him."  *Harwood Inv. Co. v.*

23   *Wells Fargo Bank, N.A.*, 2009 WL 4251650, at *1 (N.D. Cal. 2009) (citation

24   omitted).  As the Court noted in dismissing the claims in the SAC regarding Non-

25   Ingenix Methodologies, " 'naked assertions devoid of further factual enhancement'

26   cannot withstand a Rule 12(b)(6) motion."  MTD Order at 9 (quoting *Ashcroft v.*

27   *Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)).  Because the

28   TAC does not cure the defects the Court identified, Plaintiffs' claims regarding

1   Non-Ingenix Methodologies should be dismissed with prejudice.

2   **II.   THE PROVIDER PLAINTIFFS LACK STANDING.**

3         The TAC alleges that the Provider Plaintiffs have standing to bring

4   1132(a)(2) and (a)(3), Sherman Act, RICO, and UCL/FAL claims based on

5   assignments they receive from their patients.  *See, e.g.*, TAC ¶ 161 (Sherman Act),

6   ¶ 166 (ERISA), ¶ 326 (RICO), ¶ 478 (UCL).  The Court previously considered

7   whether these assignments had been adequately alleged for purposes of bringing

8   claims under 1132(a)(1)(B), *see* MTD Order at 36, but did not address whether the

9   assignment allegations supported other claims.  Because they do not – and because

10  the Provider Plaintiffs cannot base these claims on a third-party beneficiary theory

11  – the Provider Plaintiffs' 1132(a)(2) and (a)(3), Sherman Act, RICO, and UCL/FAL

12  claims should be dismissed.

13        **A.   The Provider Plaintiffs' Assignment Allegations Are Inadequate.**

14            **1.   The 1132(a)(2) And (a)(3) Claims Fail.**

15        The Provider Plaintiffs' 1132(a)(2) and (a)(3) claims should be dismissed for

16  lack of standing because these Plaintiffs do not adequately allege that they were

17  assigned the right to bring such claims.  ERISA expressly provides that 1132(a)(2)

18  and (a)(3) claims may be brought by "a participant, beneficiary or fiduciary."  29

19  U.S.C. § 1132(a)(2), (3).  The Provider Plaintiffs do not allege that they are any of

20  these; they allege only that they are bringing claims based on assignments from

21  their patients.  As recent case law makes clear, however, what the complaint alleges

22  an assignment says matters.  The mere fact that a provider alleges receipt of an

23  assignment does not mean the provider can bring any ERISA claim he or she might

24  wish to bring.  *See Eden Surgical Ctr. v. B. Braun Med., Inc.*, 420 F. App'x 696,

25  697 (9th Cir. 2011) (affirming dismissal of 1132(c) claim because only the right to

26  collect benefits had been assigned); *Franco*, 2011 WL 4448908, at *10 (dismissing

27  1132(a) claims because "the allegations provide only the most ambiguous and

28  conclusory information about what the purported assignments entail").

1    Here, the TAC alleges, at most, that the Provider Plaintiffs were assigned
2    their patients' rights to receive benefits under their patients' ERISA plans.  *See,*
3    *e.g.*, TAC ¶ 219 (Henry); ¶ 234 (Peck), ¶¶ 243-44 (Pariser), ¶ 256 (Kavali), ¶ 358
4    (Higashi).[2]  None of these allegations, however, suggests that these Plaintiffs also
5    were assigned the right to bring an 1132(a)(2) claim for damages and injunctive
6    relief relating to alleged fiduciary breaches or an 1132(a)(3) claim for equitable
7    relief based on WellPoint's alleged failure "to provide a 'full and fair review' of
8    appeals" and "to disclose relevant information." TAC ¶¶ 401, 410.  Because claims
9    for benefits are properly brought only under 1132(a)(1)(B), courts have repeatedly
10   dismissed 1132(a)(2) and (a)(3) claims based on alleged assignments that, as here,
11   only involve assignments of benefits.  *See Biomed Pharm., Inc. v. Oxford Health
12   Plans (N.Y.), Inc.*, 775 F. Supp. 2d 730, 735-36 (S.D.N.Y. 2011) (dismissing
13   1132(a)(3) claims because assignment was limited to the recovery of "damages for
14   services rendered," not "the right to seek 'declaratory and injunctive relief' "); *see
15   also N. Cypress Med. Ctr. Operating Co., Ltd. v. MedSolutions, Inc.*, 2010 WL
16   4702298, at *1 (S.D. Tex. 2010); *Via Christi Reg'l Med. Ctr., Inc. v. Blue Cross &
17   Blue Shield of Kan., Inc.*, 2006 WL 3469544, at *7 (D. Kan. 2006); *Barix Clinics of
18   Ohio, Inc. v. Longaberger Family of Cos. Grp. Med. Plan*, 459 F. Supp. 2d 617,
19   624 (S.D. Ohio 2005); *Tarr v. State Mut. Life Assurance Co. of Am.*, 913 F. Supp.
20   40, 46 (D. Mass. 1996).
21        As the *Franco* court noted, the deficiencies in the Provider Plaintiffs'
22   assignment allegations are "particularly glaring in light of the fact that . . . in the
23   same consolidated class action pleading containing Provider Plaintiffs' allegations,
24   plan *subscribers* also assert ERISA § [1132] claims themselves seeking to recover
25   _____
26   [2]   Dr. Schwendig does not allege that he received assignments, but claims that
27   "WellPoint routinely acknowledges an assignment of benefits by sending EOBs and
28   remitting payment directly to Dr. Schwendig for services rendered."  TAC ¶ 229.

1   for the very same types of injuries[.]" *Franco*, 2011 WL 4448908, at *9.  The TAC

2   alleges that the subscribers' assignments "do not alter the legal relationship between

3   WellPoint and its subscribers, but rather provide the convenience of allowing these

4   subscribers to obtain needed healthcare on the implicit promise of later payment by

5   WellPoint." TAC ¶ 243; *see also id.* ¶ 236.  As a general rule, however, a person

6   who assigns the right to bring a claim loses the right to bring that claim himself.

7   *See, e.g.*, *DevTech Mktg. Inc. v. Westfalia-Surge, Inc.*, 2005 WL 6287929, at *4

8   (C.D. Cal. 2005) ("Once a claim has been assigned, the assignee is the owner and

9   has the right to sue on it and the assignor lacks standing to sue on the claim.")

10  (internal citations omitted).  Thus, there is an "inherent tension in the pursuit of

11  ERISA claims by both plan subscribers and providers who claim standing as

12  assignees of the subscribers," making "the need for the exact language of the

13  applicable assignment provisions that much more crucial to sorting out the standing

14  issue." *Franco*, 2011 WL 4448908, at *9.  Because the Provider Plaintiffs have not

15  alleged any facts that support the simultaneous assertion of 1132(a)(2) and (a)(3)

16  claims by providers and their patients, the Provider Plaintiffs' 1132(a)(2) and (a)(3)

17  claims should be dismissed.

18              **2.      The Antitrust And RICO Claims Should Be Dismissed.**

19          The Provider Plaintiffs' antitrust and RICO claims should be dismissed for

20  lack of standing because they have not adequately alleged they were assigned the

21  rights to bring such claims.  An assignment of the right to bring antitrust or RICO

22  claims is valid only if the assignment is "express."  *Korea Kumho Petrochemical*,

23  2007 WL 2318906, at *3 n.2 (N.D. Cal. 2007); *see also Lerman v. Joyce Int'l, Inc.*,

24  10 F.3d 106, 112 (3d Cir. 1993) (Alito, J.) (holding that the assignment of a RICO

25  claim must be "express").  The TAC does not allege any facts suggesting the

26  Provider Plaintiffs received express assignments of antitrust and RICO claims.  It

27  alleges, at most, that they have been assigned the right to receive benefits under

28  their patients' plans.  Such allegations "fall far short" of the express assignment of

1   antitrust and RICO claims the law requires.  *Franco*, 2011 WL 4448908, at *10.

2        The assertion of antitrust and RICO claims by and on behalf of the members

3   from whom they allegedly received assignments further underscores the

4   insufficiency of the Provider Plaintiffs' allegations.  The primary reason for the

5   express assignment requirement is to eliminate "any problems of split recoveries or

6   duplicative liability."  *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*,

7   995 F.2d 425, 437-40 (3d Cir. 1993).  In the TAC, however, both the Provider

8   Plaintiffs and the members are asserting claims concerning *the same services*.

9   Thus, the very "problems of split recoveries or duplicative liability" that the

10  requirement is intended to prevent are front and center.  The Provider Plaintiffs'

11  antitrust and RICO claims should be dismissed because their cursory assignment

12  allegations do not address – much less resolve – these intractable problems.

13       **B.   UCL And FAL Claims Cannot Be Based On Assignments.**

14       As with the ERISA, Sherman Act, and RICO claims discussed above, the

15  TAC does not adequately allege that the Provider Plaintiffs have been assigned the

16  right to bring UCL/FAL claims.  Further, under California law, only a person "who

17  has suffered injury in fact and has lost money or property as a result of the unfair

18  competition" has standing to bring a UCL/FAL claim.  Cal. Bus. & Prof. Code

19  § 17204.  Thus, such a claim may not be based on an assignment.  *See*

20  *Amalgamated Transit Union, Local 1756 v. Superior Court*, 46 Cal. 4th 993, 1001-

21  02, 95 Cal. Rptr. 3d 605 (Cal. 2009).  The *Franco* court dismissed the provider

22  plaintiffs' UCL claims in that case because they were based on assignments.  *See*

23  *Franco*, 2011 WL 4448908, at *40.  The same result should obtain here.

24       **C.   The Provider Plaintiffs Cannot Bring Sherman Act And RICO**

25            **Claims Based On A Third-Party Beneficiary Theory.**

26       As an alternative to their assignment theory, the Provider Plaintiffs also

27  assert that they can bring Sherman Act and RICO claims as third-party beneficiaries

28  of their patients' health plans.  *See* TAC ¶¶ 161, 326.  This assertion should be

MEMORANDUM OF POINTS AND AUTHORITIES

rejected for two reasons.  First, the TAC fails to allege any facts to support this conclusory assertion.  The Provider Plaintiffs' unsupported legal conclusion that they have standing as third-party beneficiaries is not entitled to a presumption of truth and cannot support their claim.  *See Iqbal*, 129 S. Ct. at 1949-50.  (The TAC does not allege that the Provider Plaintiffs are bringing ERISA or UCL/FAL claims as third-party beneficiaries, but to the extent Plaintiffs tried to make such an argument it would fail for the same reason.)

Second, the Provider Plaintiffs' third-party beneficiary theory is without legal foundation.  WellPoint is not aware of any case that has held that Sherman Act and RICO claims may be premised on the contract rights of a third-party beneficiary, and any such holding would raise the same split recovery and duplicative liability concerns that are behind the requirement that Sherman Act and RICO claim assignments must be express.  Thus, the Provider Plaintiffs' third-party beneficiary Sherman Act and RICO claims should be dismissed.  *See Franco*, 2011 WL 4448908, at *10 (rejecting argument that provider plaintiffs could bring Sherman Act and RICO claims based on a third-party beneficiary theory).

## III.   THE ASSOCIATION PLAINTIFFS LACK STANDING.

The Court held in the MTD Order that the Association Plaintiffs had representative standing to assert claims on behalf of their members.  *See* MTD Order at 13.  For the reasons stated above, the Association Plaintiffs' members lack standing to bring the 1132(a)(2) and (a)(3), Sherman Act, RICO, and UCL/FAL claims alleged in the TAC.  Because an association can only have representative standing if its "members would otherwise have standing to sue in their own right," *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977), the Court should dismiss those claims as to the Association Plaintiffs to the extent they are based on representative standing.  *See Franco*, 2011 WL 4448908, at *11.  The Association Plaintiffs' representative UCL/FAL claims also should be dismissed for the additional reason that they "no longer permit[]

1    associational standing." *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,

2    452 F. Supp. 2d 924, 939 (N.D. Cal. 2006).

3        The Court also should dismiss the Association Plaintiffs' Sherman Act,

4    RICO, and UCL/FAL claims to the extent they assert that they have individual

5    standing to bring them.  In its MTD Order, the Court held that the Association

6    Plaintiffs had individual standing to assert Sherman Act and RICO claims because

7    they "alleged a direct injury to their business in the form of increased counseling

8    expenses."  MTD Order at 12 n.6.  Defendants respectfully submit that the

9    allegations regarding increased counseling expenses in the TAC are, at most,

10   conclusory and do not establish "concrete financial loss to business and property."

11   *Franco*, 2011 WL 4448908, at *12; *see also Penn. Chiropractic Ass'n v. Blue*

12   *Cross Blue Shield Ass'n*, 2010 WL 1979569, at *20 (N.D. Ill. 2010).  But even if

13   the TAC does adequately allege "increased counseling expenses," the Court should

14   dismiss the Association Plaintiffs' Sherman Act, RICO, and UCL/FAL claims

15   because the TAC asserts that the "losses" allegedly resulting from the "insurance

16   reimbursements" at issue in this case are "borne ***exclusively*** by the subscribers and

17   their providers," not by any association.  TAC ¶ 87 (emphasis added).  Those losses

18   allegedly "cause[] the Association Plaintiffs to expend significant time, energy and

19   money to, *inter alia*, counsel members," *id.* ¶ 163, but such alleged injuries are too

20   attenuated to satisfy the Sherman Act, RICO, and UCL/FAL requirements of

21   proximate cause and direct injury.  *See Theme Promotions, Inc. v. News Am. Mktg.*

22   *FSI*, 546 F.3d 991, 1004 (9th Cir. 2008) (antitrust injury " may not be 'derivative

23   and indirect' or 'secondary, consequential, or remote' "); *Ass'n of Wash. Pub.*

24   *Hosp. v. Philip Morris Inc.*, 241 F.3d 696, 703 (9th Cir. 2001) (affirming dismissal

25   of RICO and antitrust claims because "[w]ithout any injury to smokers, plaintiffs

26   would not have incurred the additional expenses" they claim as injury); *Sacramento*

27   *Valley Chapter of the Nat'l Elec. Contractors Assoc. v. Int'l Bhd. of Elec. Workers*,

28   888 F.2d 604, 606, 608 (9th Cir. 1989) (labor union failed to allege antitrust injury

where it "was neither a consumer nor a competitor in the market in which trade was restrained" and its alleged injuries were derivative of its members' injuries); *Ctr. for Sci. in Pub. Interest v. Bayer Corp.*, 2010 WL 1223232, at *4 (N.D. Cal. 2010) (dismissing UCL claim because allegations that plaintiff "react[ed] to Bayer's alleged misrepresentations . . . by disseminating information . . . and by educating its members" did not satisfy injury requirement).  The Association Plaintiffs' injury allegations also fail to satisfy the requirements of antitrust injury for the additional reason that they are not competitive harms that the antitrust laws are intended to address.  *See Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1033 (9th Cir. 2001); *Franco*, 2011 WL 4448908, at *12.  Accordingly, the Association Plaintiffs' Sherman Act, RICO, and UCL/FAL claims should be dismissed.

## IV.   PLAINTIFFS' SHERMAN ACT CLAIM SHOULD BE DISMISSED.

### A.   Plaintiffs Fail To Allege A *Per Se* Sherman Act Claim.

The Court should dismiss Plaintiffs' *per se* Sherman Act claim.  In its MTD Order, the Court noted that "the question of whether a plaintiff's allegations 'comprise a *per se* claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss,' " but declined to dismiss the *per se* claim in Plaintiffs' SAC "at this time."  MTD Order at 18 (quoting *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1010 (N.D. Cal. 2008)).  The Court should dismiss the *per se* claim alleged in the TAC now in light of the Ninth Circuit's recent en banc decision in *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118 (9th Cir. 2011).

In *Safeway*, the Ninth Circuit held that the rule of reason is the "presumptive or default" method of antitrust analysis, and that the *per se* rule should not be applied "where the economic impact of certain practices is not immediately obvious." *Id.* at 1133 (quoting *Texaco, Inc. v. Dagher*, 547 U.S. 1, 5, 126 S. Ct. 1276, 164 L. Ed. 2d 1 (2006)).  It went on to hold that "*[p]er se* treatment is proper only '[o]nce experience with a particular kind of restraint enables the [c]ourt to

1  predict with confidence that the rule of reason will condemn it.' " *Id.* (quoting

2  *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 344, 102 S. Ct. 2466, 73 L.

3  Ed. 2d 48 (1982)).  The Ninth Circuit did not apply the *per se* rule in *Safeway*

4  because the alleged restraint in that case did not foreclose defendants' incentive to

5  compete and had an "uncertain effect" on their competitive behavior.  *Id.* at 1136-

6  39.  The en banc court's decision reaffirmed that *per se* treatment is reserved for

7  practices with which the courts have had "considerable experience," *Broadcast*

8  *Music, Inc. v. Columbia Broad. Sys., Inc. (BMI)*, 441 U.S. 1, 9, 99 S. Ct. 1551, 60

9  L. Ed. 2d 1 (1979), and that "[p]er se categories are not to be expanded

10  indiscriminately to new factual situations," *Int'l Healthcare Mgmt. v. Hawaii Coal.*

11  *For Health*, 332 F.3d 600, 605 (9th Cir. 2003).

12       The decision in *Franco* further demonstrates why the allegations in the TAC

13  do not meet the *per se* standard laid down in *Safeway*.  *Franco* held that a nearly

14  identical set of Sherman Act allegations involving the same antitrust conspiracy

15  alleged here did not state a *per se* claim.  *Franco*, 2011 WL 4448908, at *30.  The

16  court in *Franco* explained that the complaint in that case, like the TAC here, did not

17  contain allegations that ONS constitute a discrete product apart from an insurance

18  policy, that there was no allegation that the insurance premium was fixed, and that

19  "[p]roviding a product that is allegedly worth less to the insureds than the premium

20  they paid does not equate with fixing, pegging or otherwise standardizing the price,

21  or a component thereof, charged to insureds for the insurance coverage."  *Id*.

22  Accordingly, the court held that even if the *Franco* plaintiffs had alleged that the

23  defendants engaged in concerted action, the complaint did not state a claim for

24  price fixing "or any other recognized *per se* antitrust violation."  *Id*.  The *Franco*

25  court dismissed plaintiffs' *per se* claim, stating that "Plaintiffs essentially fill a top

26  hat with facts about how Defendants and various health insurance companies acted

27  together to uniformly lower the quality of their product and thus hold down cost

28  and – presto! – pull out the conclusion that [the] price of the product has been

1  fixed." *Id.*  It concluded that "[s]uch prestidigitation cannot create a plausible

2  antitrust claim." *Id.*

3      The same reasoning applies here.  While there is little doubt that "agreements

4  among competitors to fix prices on their individual goods or services" have been

5  held *per se* illegal, *BMI*, 441 U.S. at 8, the TAC does not actually allege an

6  agreement to fix the price of ***any good or service that WellPoint buys or sells***.  As

7  in *Franco*, "[r]egardless of how frequently Plaintiffs refer to the [ONS] benefit

8  amount as the [ONS] 'price,' there is no indication in the [TAC] that coverage [for]

9  [ONS] – that is, services by providers who are out of [WellPoint's] preferred

10  provider network – is a discrete product available for purchase and sale apart from

11  the rest of a subscriber's insurance policy, at its own price." *Franco*, 2011 WL

12  4448908, at *29.  Instead, Plaintiffs allege an agreement to use a single (allegedly

13  flawed) database to generate rate schedules which resulted in subscribers receiving

14  lower reimbursements for ONS than they believed were due under their insurance

15  contracts.  But WellPoint does not buy or sell ONS; those are bought and sold by

16  subscribers and providers respectively.  WellPoint sells health insurance.  The TAC

17  alleges that the Subscriber Plaintiffs received insurance policies that were worth

18  less than they paid for them because WellPoint reimbursed ONS based on the

19  Ingenix Database, but it does not allege that there was a horizontal conspiracy to fix

20  the prices at which WellPoint and others sold insurance.

21      Plaintiffs have at most alleged an agreement among competitors to use

22  flawed data to depress the extent of a particular benefit to their subscribers.  Like

23  the restraint alleged in *Safeway*, however, the agreement alleged here does not

24  foreclose the ability or incentive of insurers to compete.  It has, at most, uncertain

25  competitive results because the widespread adoption of a single database (even if

26  flawed) could actually increase competition by making it easier for subscribers to

27  compare reimbursement terms across plans without having to compare a

28  multiplicity of different ONS reimbursement calculation methods.  Further, while

1    Plaintiffs assert that the broad use of the Ingenix database has "eliminated the

2    *possibility* that health insurers would compete on the basis of ONS reimbursement,"

3    TAC ¶ 74 (emphasis added), they do not allege that such competition necessarily

4    would exist in the absence of the alleged conspiracy.  Instead, the TAC suggests

5    that any lack of competition results from opaque insurance contract language and a

6    failure to publish UCR schedules, rather than from any agreement among insurers

7    to use a single database for ONS calculations.  *See, e.g.*, *id.* ¶¶ 77, 95.

8          Importantly, the TAC makes clear that any agreement to use "flawed"

9    Ingenix data did not translate into setting specific reimbursement rates.  Plaintiffs

10   allege that Ingenix provides a schedule or array of charges for each service, not a

11   single charge.  *See id.* ¶¶ 123-24.  That schedule might form the basis for what an

12   insurer might pay for ONS.  However, an insurer also might pay ONS based on the

13   actual amount billed by the provider or any number of Non-Ingenix Methodologies.

14   *See id.* ¶¶ 67, 174-77.  And even if an insurer chose to use Ingenix data to

15   determine UCR, it still would have to decide which percentile to use when

16   developing the maximum "allowable charge" for a given service and what

17   percentage of that allowable charge to use for the actual reimbursement.  *See id.*

18   ¶ 67.  Plaintiffs do not allege any agreement among insurers to use only Ingenix

19   data to price ONS, to use the same percentiles of Ingenix data, or to use the same

20   percentage of the allowable charge.  Thus, even accepting Plaintiffs' allegations as

21   true, an insurer who used Ingenix remained free to compete by paying ONS based

22   on a higher percentile on the Ingenix schedule than its competitors or by using Non-

23   Ingenix Methodologies.  Because the competitive effects of the agreement alleged

24   here are far from obvious and the alleged agreement involves a "new factual

25   situation" with which the courts have not had "considerable experience," *per se*

26   treatment is inappropriate.  *See, e.g.*, *Safeway*, 651 F.3d at 1137-39.

27   **B.     The Horizontal Conspiracy Plaintiffs Allege Is Implausible.**

28         Plaintiffs' *per se* antitrust claim also fails because they do not allege facts

1   that make their allegations of a horizontal conspiracy to fix prices plausible.  The

2   Court previously found the allegations of a horizontal conspiracy in the SAC to be

3   plausible, noting that "no discovery has occurred in this case which would make

4   Plaintiffs' allegations less plausible."  MTD Order at 16.  But the Court did not

5   address the inconsistencies between the conspiracy allegations and Plaintiffs'

6   allegations regarding "non-Ingenix ONS benefit reductions," which the Court had

7   dismissed for lack of standing earlier in its decision.  *See id.* at 8-9.  Because

8   discovery has now been completed and Plaintiffs have re-asserted in the TAC that

9   Defendants employ Non-Ingenix Methodologies to reimburse claims, the Court

10  should revisit the issue of whether Plaintiffs have alleged a *plausible* conspiracy to

11  fix ONS reimbursements under the standards of *Bell Atlantic Corp. v. Twombly*,

12  550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and its progeny.

13         While the TAC alleges facts related to agreements to establish the Ingenix

14  database and to buy and sell data, the relevant question for a *per se* claim is not

15  whether the TAC alleges any agreement at all; it is whether it alleges "sufficient

16  facts that Defendants (1) entered into an agreement (2) *to fix prices, rig bids, or*

17  *divide a market*."  MTD Order at 14 (emphasis added).  Moreover, "[o]n a motion

18  to dismiss in an antitrust case, a court must determine whether an antitrust claim is

19  'plausible' in light of basic economic principles."  *William O. Gilley Enters., Inc. v.*

20  *Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (quoting *Twombly*, 550 U.S. at

21  556).  Plaintiffs' conspiracy allegations in the TAC do not pass this test because the

22  theory that Defendants entered into a *per se* unlawful agreement to reduce ONS

23  reimbursements by using Ingenix is undermined by Plaintiffs' other allegations.

24         For example, Plaintiffs allege that WellPoint and other insurers agreed to "fix

25  UCRs and ONS reimbursements through the Ingenix Database."  TAC ¶ 69.

26  Plaintiffs do not allege, however, that WellPoint and the other insurers agreed on

27  what percentiles of the Ingenix Database they would use, much less what

28  deductibles and co-insurance rates they would apply, all of which affect the

amounts insurers pay for ONS.  As the *Franco* court held, the absence of any such allegations "casts doubt on the plausibility of an antitrust conspiracy" to fix prices. *Franco*, 2011 WL 4448908, at *30 n.17.

Plaintiffs render their price fixing conspiracy theory even more implausible by alleging that WellPoint unilaterally used other methodologies that had nothing to do with Ingenix to calculate UCR and reduce ONS reimbursement.  TAC ¶¶ 174-77.  They essentially allege that WellPoint conspired with other insurers to fix one particular methodology of ONS reimbursement while remaining free to use other Non-Ingenix Methodologies.  Plaintiffs provide no facts explaining why such a conspiracy would make economic sense or how it would function when each of the alleged conspirators would have a unilateral and independent incentive to use whatever ONS methodology was in its best interests.  Further, while Plaintiffs allege that "UCR constitutes the critical element in the reimbursement formula applied under each insurance plan and operates as a ceiling to cap the amount that will be reimbursed to subscribers," *id.* ¶ 87, they do *not* allege that WellPoint's use of Ingenix acted as a cap on reimbursement when WellPoint used Non-Ingenix Methodologies.  While the SAC contained the conclusory allegation that "[b]y conspiring to and actually using False UCRs based on Ingenix's depressed fees schedule, Insurer Conspirators implement caps based on ONS reimbursements," SAC ¶ 91, that allegation has been omitted from the TAC.  Indeed, the TAC does not even allege facts showing that Ingenix acted as a cap when claims were reimbursed based on the Ingenix Database because it does not allege that any Provider Plaintiff charged – or any Subscriber Plaintiff was charged – an amount that exceeded the amount that would have been paid under the highest percentile of the applicable Ingenix schedule.  For all these reasons, Plaintiffs have not alleged a plausible horizontal conspiracy claim to fix prices "in light of basic economic principles," and their *per* se antitrust claim should be dismissed.  *William O. Gilley Enters.*, 588 F.3d at 662; *see also In re Nat'l Assoc. of Music Merchs., Musical*

1    *Instruments & Equip. Antitrust Litig.*, 2011 WL 3702453, at \*6 (S.D. Cal. 2011)

2    (dismissing conspiracy claims as "economically illogical" when "the logistics of

3    such a conspiracy would render it impractical").

4         Plaintiffs also allege that it would only be in WellPoint's economic interests

5    to use "flawed" UCR data and refrain from competing on ONS if WellPoint had

6    agreed with other insurers to do so.  *See* TAC ¶¶ 94-96.  The TAC undermines this

7    allegation, however, by also alleging that WellPoint *unilaterally* depressed UCRs

8    and reduced ONS reimbursements using Non-Ingenix Methodologies, such as

9    internal fee schedules and Medicare rates.  *Id.* ¶¶ 174-77.  Taking these allegations

10   as true, Plaintiffs' conclusory allegations regarding WellPoint's economic interests

11   must be rejected because WellPoint allegedly did depress UCR and ONS without

12   any agreement to do so.  The Court should find Plaintiffs' allegations of a

13   horizontal conspiracy to fix prices to be implausible for this reason as well.  *See In*

14   *re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 348-49 (3d Cir. 2010) (refusing to

15   infer agreement when factual allegations undercut conclusion of conspiracy).

16        **C.    Plaintiffs' Rule of Reason Claim Fails.**

17             **1.    Plaintiffs Have Not Alleged Antitrust Injury.**

18        The Court denied WellPoint's motion to dismiss the rule of reason claim in

19   the SAC based on the SAC's allegations regarding a supposed "link" between two

20   distinct markets – (1) a market "for data used to calculate UCRs" (the "Data

21   Market"), and (2) a "market for ONS."  MTD Order at 19-20 (quoting SAC ¶ 90).

22   The SAC conceded that no Plaintiff participated in the Data Market but alleged that

23   the Market was "inextricably linked" to the "market for ONS" in which Plaintiffs

24   did participate.  SAC ¶ 89.  Citing *Blue Shield of Virginia v. McCready*, 457 U.S.

25   465, 479, 102 S. Ct. 2540, 73 L. Ed. 2d 149 (1982), the Court found the allegations

26   in the SAC sufficient to state a rule of reason claim.  *See* MTD Order at 20-21.

27        The TAC alleges that Plaintiffs' "losses" are "the direct, inevitable, and

28   intended consequence of Defendants' Data Market manipulation," but unlike the

SAC, it does not allege that the Data Market and the ONS market are "inextricably linked," and it refers to a "linked ONS market" only in passing.  TAC ¶ 87.  The TAC's allegations fail to identify an injury that confers standing under the antitrust laws because Plaintiffs' alleged injuries stem from the supposedly flawed nature of the data, not from an antitrust violation.  *Franco* rejected nearly identical rule of reason allegations for failure to allege antitrust injury.  2011 WL 4448908, at *36.  It also explained that the plaintiffs' theory does not in fact involve any anticompetitive actions, which distinguishes the case from *McCready*.  *Id.* at *34.  The TAC fails to state a rule of reason claim for the same reasons.  *See Oregon Laborers-Emp'rs Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 967 (9th Cir. 1999) (a "simple invocation" of direct injury does not satisfy "the fundamental requirement for antitrust standing that [the plaintiff] have suffered an injury of the type . . . the antitrust laws were intended to prevent").  And because antitrust injury also is required to state a *per se* claim, Plaintiffs' failure to allege cognizable antitrust injuries is fatal to their *per se* claims as well.

A plaintiff must demonstrate three elements for a rule of reason claim: "(1) the persons or entities to the agreement intend to harm or restrain competition; (2) an actual injury to competition occurs; and (3) the restraint is unreasonable as determined by balancing the restraint and any justifications or pro-competitive effects of the restraint."  MTD Order at 19 (quoting *Cal. Dental Ass'n v. FTC*, 224 F.3d 942, 947 (9th Cir. 2000)).  The second element requires a plaintiff to demonstrate an "antitrust injury" – an "injury of the type the antitrust laws were intended to prevent" that "reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."  *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988).  Because the concern of the antitrust laws is competition, an injury is not an "antitrust injury" unless it is "attributable to an anticompetitive aspect of the practice under scrutiny."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S. Ct. 1884, 109 L. Ed. 2d 333 (1990).  The

MEMORANDUM OF POINTS AND AUTHORITIES

TAC does not allege any such injury.

At bottom, Plaintiffs' allegations boil down to a complaint that data used by WellPoint and other insurers to calculate UCR was flawed and resulted in lower-than-anticipated reimbursements for ONS, and that those flaws were concealed from subscribers. Plaintiffs have erected an elaborate scaffolding of allegations around this basic complaint in an effort to make their claims appear to be antitrust claims. But these allegations cannot hide the fact that Plaintiffs' claims are all about flawed data and not about competition. *See, e.g.*, TAC ¶¶ 95-96.

Plaintiffs' rule of reason claim focuses on allegations that Defendants, through a variety of agreements and mechanisms, have enabled Ingenix to maintain a "virtual monopoly" over the "Data Market." *Id*. ¶¶ 85-86. This "dominant position," according to Plaintiffs, leaves insurers with few alternatives to Ingenix data. *Id*. ¶¶ 86, 104. But this claim "lacks a plausible factual predicate." *Franco*, 2011 WL 4448908, at *35. Plaintiffs' real complaint is not with an agreement to use Ingenix or the supposed lack of competition in the Data Market; it is with the allegedly flawed nature of the data. If Ingenix provided accurate UCR data, "Plaintiffs would presumably have no objection to the use of the data to determine reimbursements" for ONS. *Id*. As *Franco* stated: "Plaintiffs' true claim is the arguable deception and covert manner in which Defendants . . . have allegedly manipulated the UCR data." *Id*. "This alleged misconduct may state a claim for relief under other legal theories . . . but it does not confer antitrust standing upon Plaintiffs to sue for any alleged restraint of trade in the Data Market." *Id*.

While the *Franco* court's analysis applies with equal force here, there is no need to presume that Plaintiffs would not object to an agreement among insurers to create and maintain a single, but "accurate," source for UCR data because the TAC *admits* it. Plaintiffs favorably reference a number of New York Attorney General ("NYAG") settlements pursuant to which the NYAG allegedly is establishing a new, "unbiased," and "industry-wide" database to replace Ingenix. TAC ¶¶ 145-46.

1    This "solution" has nothing at all to do with competition because the NYAG's

2    database will simply replace Ingenix, not open up the Data Market to new

3    competitors.  The only difference between the NYAG's database and Ingenix is that

4    the NYAG's database supposedly will be "reliable" and "transparent" where

5    Ingenix allegedly was flawed.  *Id.* ¶ 146.  Even though this settlement makes no

6    change to the competitive landscape, Plaintiffs claim that it will "free consumers

7    and healthcare provides from the trap of the Ingenix conspiracy."  *Id.* ¶ 91.  These

8    allegations underscore that it is allegedly flawed data that caused Plaintiffs' alleged

9    injuries, not any reduction in competition.

10          Finally, to the extent the TAC alleges that "pressure" on out-of-network

11   providers to become in-network providers has harmed patients, *id.* ¶¶ 75, 88, these

12   allegations are not entitled to a presumption of truth because they are wholly

13   conclusory.  *See Iqbal*, 129 S. Ct. at 1949-50.  And even if taken as true, these

14   allegations do not constitute antitrust injury because the TAC does not allege that a

15   provider's change in network status would have any effect on competition in any

16   relevant market.  *See Franco*, 2011 WL 4448908, at *34 (noting that "there is

17   nothing anticompetitive about the complained-of scheme shifting business to in-

18   network providers").  On the contrary, having access to a greater number of in-

19   network providers at lower cost presumably would be beneficial to subscribers.

20          Because none of Plaintiffs' alleged injuries result from a competition-

21   reducing aspect of WellPoint's alleged behavior, their antitrust claims should be

22   dismissed.  *See Franco*, 2011 WL 4448908, at *35; *see also Theme Promotions*,

23   546 F.3d at 1003 (if injury flows from conduct that is beneficial or neutral to

24   competition, "there is no antitrust injury, even if the defendant's conduct is

25   illegal"); *Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931, at *13 (N.D.

26   Cal. 2009) (antitrust claim failed where injuries were caused by defective mattress

27   parts, not a conspiracy to restrain competition).

28

1    **2.    Plaintiffs Have Failed To Allege A Relevant Market.**

2        Plaintiffs' focus on the Data Market as the only relevant market raises an

3    additional basis for dismissal of their rule of reason claim – that they have failed to

4    allege a relevant market that includes all reasonably interchangeable products.  A

5    plaintiff asserting a rule of reason claim bears the burden of showing that the

6    alleged agreement "produces significant anticompetitive effects within a relevant

7    market," *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th

8    Cir. 2001), the outer boundaries of which "are determined by the reasonable

9    interchangeability of use or the cross-elasticity of demand between the product

10   itself and substitutes for it," *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82

11   S. Ct. 1502, 8 L. Ed. 2d 510 (1962).  The Ninth Circuit has long held that failure to

12   include adequate factual allegations defining the relevant market is fatal at the

13   motion to dismiss stage.  *See Tanaka*, 252 F.3d at 1063 (affirming dismissal when

14   neither the product nor the geographic market was "appropriately defined for

15   antitrust purposes"); *see also Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182

16   F.3d 1096, 1105 (9th Cir. 1999); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,

17   124 F.3d 430, 436 (3d Cir. 1997); *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 536 F.

18   Supp. 2d 1191, 1195 (C.D. Cal. 2008).  It recently reaffirmed this requirement in

19   *Golden Gate Pharmacy Services, Inc. v. Pfizer, Inc.*, 2011 WL 1898150, at *1 (9th

20   Cir. 2011) ("The failure to allege a product market consisting of reasonably

21   interchangeable goods renders the SAC 'facially unsustainable' and appropriate for

22   dismissal.").

23       Contravening this standard, the TAC simply identifies an alleged market –

24   the Data Market – with no factual allegations regarding why it is the proper market,

25   why the boundaries are defined as they are, or whether it includes all reasonably

26   interchangeable substitutes.  It states only that the "relevant product market is the

27   market for data used to calculate UCRs."  TAC ¶ 86.  At the same time, however,

28   the TAC acknowledges that numerous other "methodologies" can be used to

1   calculate UCR, including Medicare fee schedules and a variety of "internal" fee
2   schedules, *id*. ¶¶ 174-76.  Thus, an insurer seeking to determine a UCR amount but
3   facing the lack of competition for "data" Plaintiffs allege, could simply turn to an
4   alternative source to calculate the UCR amount.  Indeed, Plaintiffs expressly allege
5   that WellPoint uses both Medicare and internal fee schedules to determine UCR.
6   *See id.*  Under basic principles of antitrust law, such alternative products are
7   substitutable from the perspective of buyers of Ingenix's data and must be included
8   in the relevant market, even at the pleading stage.  Plaintiffs' failure to include
9   these alternatives in the relevant market, or to offer factual allegations plausibly
10   explaining why they are *not* part of the relevant market is not simply one of form; it
11   renders Plaintiffs' market allegations "facially unsustainable" and requires
12   dismissal of their rule of reason claim.  *See Ticketmaster*, 536 F. Supp. 2d at 1195;
13   *see also Shred-It Am., Inc. v. MacNaughton*, 2011 WL 1842997, at *5 (D. Haw.
14   2011) (dismissing complaint that did not contain "allegations concerning economic
15   substitutes for Shred-it's proposed product market" and failed "to explain why
16   Shred-it defined the relevant market in the way that it did").  And Plaintiffs' passing
17   reference to a "linked ONS Market," TAC ¶ 87, does not help them because, as in
18   *Franco*, Plaintiffs have failed to adequately define a market for out-of-network
19   services.  *See Franco*, 2011 WL 4448908, at *36 n.22 ("There is no allegation, nor
20   can any reasonable inference be drawn, that a provider who is [out-of-network] for
21   one insurance company is also [out-of-network] for all other insurance
22   companies.").

23   **V.    PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED.**

24   **A.    Plaintiffs' RICO Claims Fail Because Plaintiffs Do Not Adequately
25   Allege That WellPoint Directed The Enterprise.**

26   As this Court held in dismissing the RICO claims in the SAC, "[l]iability for
27   participating in the 'conduct' of a RICO enterprise extends only to those who 'have
28   some part in directing the enterprise's affairs.' "  MTD Order at 26 (brackets

1   omitted) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 179, 185, 113 S. Ct. 1163,

2   122 L. Ed. 2d 525 (1993)).  "[S]imply being involved" in an alleged enterprise is

3   not enough.  *Id.* (quoting *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008)).

4   The Court found that the SAC "failed to adequately allege that WellPoint

5   Defendants were involved in the 'conduct' of the enterprise."  *Id.* at 27.  It should

6   dismiss the RICO claims in the TAC for the same reason.

7        The RICO allegations in the TAC were made after more than four dozen

8   depositions were taken and millions of pages of documents were produced by

9   defendants and third parties, yet the TAC does not come close to curing the

10  deficiencies in Plaintiffs' RICO claims.  For example, based on the allegation that a

11  WellPoint executive was on HIAA's Board of Directors at the time of the sale,

12  Plaintiffs now allege that "WellPoint participated in the sale of the [Prevailing

13  Health Charge System ("PHCS")] database from the HIAA to UnitedHealth."  TAC

14  ¶ 302.  But Plaintiffs fail to explain how the *sale* of the database – as opposed to the

15  later use and purported manipulation of the database – had anything to do with the

16  conduct of the enterprise's affairs or the predicate acts of racketeering activity.

17  Plaintiffs also allege that, as part of the sale of the database, "Ingenix would create

18  an advisory committee composed of HIAA members (which included WellPoint) to

19  exercise control over the PHCS product."  *Id.* ¶ 303.  However, Plaintiffs noticeably

20  fail to allege (because they cannot based on the discovery they conducted) that the

21  Ingenix advisory committee included a single representative from WellPoint.

22  Similarly, Plaintiffs allege that *HIAA members* "participated in the continued

23  development, operation, and direction of the database after its sale by HIAA to

24  Ingenix," *id.*, but they do not allege any facts showing that this had anything to do

25  with WellPoint.  Instead, they make the conclusory allegation that "[t]he positions

26  of . . . WellPoint executives in HIAA's successor organization, and UnitedHealth's

27  membership in HIAA, allowed WellPoint and UnitedHealth to exercise continued

28  control and participation in the direction of the Ingenix database."  *Id.* ¶ 304.  This

Court should not "admit as true this unwarranted deduction of fact," particularly when it is made after massive discovery that provides no support for it. *Am. Dental Ass'n v. CIGNA Corp.*, 605 F.3d 1283, 1296 (11th Cir. 2010).

The remaining allegations in the TAC are the same types of allegations the Court found to be deficient in the SAC – i.e., those regarding WellPoint's exercise of decision-making authority over its *own* affairs. *See, e.g.*, TAC ¶ 305. As this Court previously held, such allegations "do[] not plausibly show that WellPoint controlled the other members in the associated-in-fact enterprise." MTD Order at 26. The Court should find that the TAC fails to adequately allege WellPoint was involved in the conduct of the enterprise for the same reasons. *See Kearney v. Foley & Lardner*, 2011 WL 1119020, at *6 (S.D. Cal. 2011) (dismissing RICO claim where "allegations do not provide essential facts showing that counsel acted in any manner outside that of providing legal services"); *Watts v. Allstate Indem. Co.*, 2009 WL 1905047, at *6 (E.D. Cal. 2009) (dismissing RICO claim and stating that a complaint must allege conduct constituting "operation or management of an enterprise" and do so in a manner that involves "more than 'a formulaic recitation of the elements of a cause of action' " (quoting *Twombly*, 550 U.S. at 555)).

## B.  Plaintiffs' Mail And Wire Fraud RICO Claims Fail.

The TAC abandons the mail and wire fraud allegations the Court previously considered and instead premises Plaintiffs' mail and wire fraud claims on communications between WellPoint and Ingenix. *Compare* SAC ¶¶ 305-07 *with* TAC ¶¶ 312-13. Plaintiffs' attempt to re-invent their mail and wire fraud claims does not save them from dismissal.[3] And because Plaintiffs have failed to plead

---

[3]   To the extent the TAC can be read to suggest that Plaintiffs are still relying on WellPoint's communications with its members and providers as predicate acts of mail and wire fraud, such allegations are insufficient because, as before, Plaintiffs have failed to adequately plead reliance. *See* MTD Order at 30-31. Further, the

1   conduct constituting mail or wire fraud, they necessarily have failed to allege the

2   requisite pattern of racketeering activity.  *See* 18 U.S.C. § 1961(5).

3        A plaintiff bringing a claim of mail and wire fraud must allege "(1) a scheme

4   or artifice devised with (2) specific intent to defraud and (3) use of the United

5   States mail or interstate telephone wires in furtherance thereof."  MTD Order at 28

6   (quoting *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 782 (9th Cir. 2002)).

7   Plaintiffs also must plead how they were harmed by the mail or wire fraud.  *See*

8   *Ove v. Gwinn*, 264 F.3d 817, 825 (9th Cir. 2001).  And these allegations "must be

9   pled with particularity" under Rule 9(b).  MTD Order at 28 (citing *Edwards v.*

10  *Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004)).  Thus, Plaintiffs must

11  allege facts showing "the time, place and specific content of the false representation

12  as well as the identities of the parties to the misrepresentation."  *Id.* (quoting

13  *Edwards*, 356 F.3d at 1065-66).  "The plaintiff must also set forth more than neutral

14  facts necessary to identify the transaction; he must explain why the statement

15  complained of was false or misleading."  *Id.* (citing *In re GlenFed, Inc. Sec. Litig.*,

16  42 F.3d 1541, 1548 (9th Cir. 1994)).  The TAC fails to meet these requirements.

17            **1.    The TAC Fails To State A Mail Or Wire Fraud Claim.**

18       The mail and wire fraud claims in the TAC are based on requests by Ingenix

19  for data from WellPoint and confirmations that data was either received by Ingenix

20  or sent by WellPoint.  Plaintiffs declare conclusorily that the data referenced in

21  these communications was "misleading," but plead no facts to support such an

22  assertion.  Plaintiffs likewise do not allege any facts showing that any of these

---

24  mailing of notices of reimbursement or EOB forms is not related to the RICO

25  enterprise Plaintiffs allege.  *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497,

26  105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985) ("the essence of [a RICO] violation is the

27  commission of [predicate] acts *in connection with the conduct of an enterprise*")

28  (emphasis added).

1   communications were fraudulent in any way.  *See* TAC ¶ 312.  Plaintiffs' claims

2   thus fail to satisfy the pleading requirements of either Rule 8(a) or Rule 9(b).

3        Under Rule 8(a), a plaintiff may not merely state a legal conclusion and point

4   to that conclusion as a fact supporting its claim for relief.  *Iqbal*, 129 S. Ct. at 1950.

5   Thus, a declaration that the "defendant engaged in fraud" will not do.  *See id.*  But

6   that is all the TAC offers.  This pleading deficiency becomes even more apparent

7   when the requirements of Rule 9(b) are considered.  As the Court recognized in the

8   MTD order, a RICO "plaintiff must . . . set forth more than neutral facts necessary

9   to identify the transaction; he must explain ***why*** *the statement complained of was*

10  *false or misleading*."  MTD Order at 28 (emphasis added).  The TAC fails entirely

11  to explain why the identified communications were misleading or how they were in

12  furtherance of a fraudulent scheme; it simply declares that they were so.  Rule 9(b)

13  requires more.  *See Am. Dental Ass'n*, 605 F.3d at 1291-92 (quoting *Twombly*, 550

14  U.S. at 570) (dismissing mail and wire fraud claims because plaintiffs did not

15  "allege the manner in which they were misled by the documents, as they are

16  required to do under Rule 9(b)" and accordingly had not "alleged a right to relief

17  that is 'plausible on its face' ").  Dismissal is appropriate here for the same reasons.

18        **2.    Plaintiffs Still Have Failed To Plead Reliance.**

19        Plaintiffs' mail and wire fraud claims also fail because they still have not

20  pled reliance.  *See* MTD Order at 30-31.  As this Court previously recognized,

21  while *first-party* reliance is not required, a plaintiff still must allege that "*someone*

22  relied on the alleged misrepresentations."  *Id.* at 31 (quoting *Bridge v. Phoenix*

23  *Bond & Indem. Co.*, 553 U.S. 639, 658, 128 S. Ct. 2131, 170 L. Ed. 2d 1012

24  (2008)).  A plaintiff also must show that its injuries were proximately caused by the

25  fraud.  *See Hemi Grp., LLC v. City of New York*, __ U.S. __, 130 S. Ct. 983, 989,

26  175 L. Ed. 2d 943 (2010).  The TAC fails to satisfy either requirement.

27        The sum total of Plaintiffs' allegations concerning reliance is as follows:  "In

28  addition, to the extent that a showing or reliance is required, Provider Plaintiffs and

the Provider Class reasonably relied on the fraudulent scheme by providing ONS to WellPoint subscribers and on the validity of the assignments given to them by Subscriber Class members." TAC ¶ 319. This is virtually identical to the previous allegations of reliance (SAC ¶ 315) the Court found to be deficient. *See* MTD Order at 30-31. The only difference is that the TAC includes the phrase: "to the extent that a showing of reliance is required." TAC ¶ 319.

Like the SAC, the TAC does not allege any facts showing that anyone relied on the alleged misrepresentations. Further, if the mail and wire fraud consisted of communications between WellPoint and Ingenix as the TAC alleges, it is unclear how anyone outside of the alleged enterprise would even have had access to them, much less relied upon them, particularly when Plaintiffs allege that they did not even know WellPoint was using Ingenix. *See* TAC ¶¶ 133, 378. Plaintiffs also provide no facts linking their alleged injuries with the purportedly fraudulent communications. Thus, they have failed to show how their alleged injuries were proximately caused by those communications. These deficiencies are fatal to their mail and wire fraud-based RICO claim.

### C.    Plaintiffs Have Not Adequately Pled Embezzlement.

Plaintiffs' Seventh Claim for Relief is a RICO claim based on 18 U.S.C. § 664 and the alleged embezzlement of ERISA plan assets. The Court granted WellPoint's motion to dismiss the § 664 claim in the SAC based on Plaintiffs' failure to show that WellPoint directed the affairs of the alleged enterprise and also to the extent the claim was asserted by non-ERISA Plaintiffs. *See* MTD Order at 31-32. The Court rejected WellPoint's argument that Plaintiffs had failed to plead embezzlement as a predicate RICO act with respect to the ERISA Plaintiffs, however, stating that the statute "goes beyond traditional [embezzlement] concepts . . . and imposes liability for an intentional breach of special fiduciary duties imposed by other regulatory statutes or governing instruments." *Id.* at 31 (quoting *United States v. Andreen*, 628 F.2d 1236, 1241 (9th Cir. 1980)) (alterations by this

1   Court).  Because the TAC realleges the § 664 claim, WellPoint respectfully submits

2   that the Court should revisit this determination in light of the decisions in *United*

3   *States v. Wiseman*, 274 F.3d 1235 (9th Cir. 2001), and *Franco*, which hold that

4   § 664 applies only where ERISA plan funds have actually been stolen.[4]

5        In *Andreen*, an attorney was indicted for violating § 664 by embezzling

6   money from union trust funds.  628 F.2d at 1239.  The Ninth Circuit explained that

7   "[t]he essence of [a § 664 claim] is theft and in the context of union funds or

8   pension plans the offense includes a taking or appropriation that is unauthorized, if

9   accomplished with specific criminal intent."  *Id.* at 1241.  It then went on to say that

10  a "lack of authorization may be shown if the diversion is substantially inconsistent

11  with the fiduciary purposes and objectives of the union funds or pension plan[.]"

12  *Id.*  It was in this context – determining whether the taking of ERISA plans funds

13  was authorized – that the Ninth Circuit stated that § 664 "imposes liability for an

14  intentional breach of special fiduciary duties."  The Ninth Circuit did not intend this

15  statement to expand § 664 to reach conduct that did not involve the theft of ERISA

16  plan funds, as it subsequently made clear in *Wiseman*.  In that case, the Ninth

17  Circuit – quoting *Andreen* – expressly held that " 'embezzlement,' as used in § 664,

18  is to be given its 'accepted definition.' "  *Wiseman*, 274 F.3d at 1241.  WellPoint is

19  unaware of any case that has applied § 664 in a situation in which an actual theft of

20  ERISA plan assets did not occur.

21       *Franco* addressed the scope of § 664 in circumstances almost identical to

22  those present here.  The court in that case held that the plaintiffs failed to allege a

23  _____

24  [4]   The TAC also purports to re-plead an embezzlement claim on behalf of Non-

25  ERISA Plaintiffs, but states that the claim is being re-asserted solely to preserve the

26  issue for appeal and that no responsive pleading is necessary.  *See* TAC 145 n.4.

27  Plaintiffs' RICO embezzlement claim as to Non-ERISA Plaintiffs should be

28  dismissed because the TAC offers no reason for this Court to alter its prior ruling.

1  violation of § 664 because, like Plaintiffs here, they alleged only that the defendant

2  had "paid claims from its *own* assets and, in underpaying, withheld its *own* funds."

3  *Franco*, 2011 WL 4448908, at *25.  It also rejected the embezzlement allegations

4  as they related to self-funded plans on the grounds that "no conversion at all is

5  alleged . . . .  Plaintiffs merely aver that CIGNA underpaid benefits to justify its

6  receipt of administrative fees from the plan."  *Id.*  For the same reasons, the TAC

7  fails to allege facts showing that WellPoint converted ERISA plan assets.  And

8  because Plaintiffs have failed to plead any conduct constituting embezzlement, they

9  have necessarily failed to demonstrate a pattern of racketeering activity.  *See* 18

10  U.S.C. § 1961(5).  Thus, the Seventh Claim for Relief should be dismissed.

11      **D.      The TAC Fails To Allege Facts Showing A RICO Conspiracy.**

12          In its Eighth Claim for Relief, the TAC asserts a RICO conspiracy claim

13  involving WellPoint, Ingenix, and United, "among others."  TAC ¶ 433.  Plaintiffs'

14  RICO conspiracy claim should be dismissed because Plaintiffs' substantive RICO

15  claims fail for the reasons set forth above.  *See Howard v. Am. Online Inc.*, 208

16  F.3d 741, 751 (9th Cir. 2000) (holding that RICO conspiracy claim fails if

17  complaint does not "adequately plead a substantive violation of RICO").  It also

18  should be dismissed because Plaintiffs have not pled any facts to support that claim.

19          The Court stated that the SAC adequately alleged a RICO conspiracy based

20  on its determination that Plaintiffs had "plausibly alleged an agreement to fix

21  prices" as part of their Sherman Act claim.  MTD Order at 32.  That reasoning does

22  not apply to the TAC because the TAC fails to state a Sherman Act claim for the

23  reasons discussed above.  *See* Section IV, *supra*.  Plaintiffs' RICO conspiracy claim

24  also should be dismissed for reasons entirely independent of the TAC's antitrust

25  allegations.  To plead a RICO conspiracy, a plaintiff must allege different facts than

26  those required to demonstrate an antitrust conspiracy.  Specifically, a plaintiff must

27  show "either an agreement that is a substantive violation of RICO or that the

28  defendants agreed to commit, or participated in, a violation of two predicate

1    offenses." *Howard*, 208 F.3d at 751.  In addition, such allegations must satisfy not

2    only Rule 8(a), but also Rule 9(b)'s heightened pleading standard to the extent the

3    alleged predicate acts involve fraud.  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d

4    1097, 1106-08 (9th Cir. 2003); *Palmer v. Dep't of Treasury*, 53 F. App'x 455, 455

5    (9th Cir. 2002).  And a plaintiff may *not* rely on a claim of injury caused by "an

6    overt act that is not an act of racketeering or otherwise wrongful under RICO";

7    instead, the plaintiff must "allege injury from an act that . . . is independently

8    wrongful under RICO."  *Beck v. Prupis*, 529 U.S. 494, 505-06, 120 S. Ct. 1608, 146

9    L. Ed. 2d 561 (2000).

10            Plaintiffs have not alleged an agreement to engage in conduct that, if

11   completed, would constitute a RICO violation or an agreement to participate in two

12   predicate acts.  *Howard*, 208 F.3d at 751.  Beyond allegations regarding WellPoint

13   and Ingenix's business relationship, the TAC contains nothing more than

14   conclusory allegations that WellPoint, United, Ingenix, and "others" somehow

15   conspired to conduct or participate in an unlawful RICO conspiracy.  *See* TAC

16   ¶¶ 444-48.  The TAC refers generally to the "pattern of racketeering activity as

17   described in this Complaint," and the "numerous overt acts . . . alleged above," *id.*

18   ¶¶ 445-46, but it fails to allege facts – as opposed to legal conclusions – that

19   support a RICO conspiracy claim.  *See Impac Warehouse Lending Grp. v. Credit*

20   *Suisse First Boston LLC*, 270 F. App'x 570, 572 (9th Cir. 2008); *Am. Dental Ass'n*,

21   605 F.3d at 1293-94.  Further, the TAC's allegations are inconsistent with

22   Plaintiffs' conspiracy claim.  For example, Plaintiffs allege that WellPoint's data

23   "was critical to both the appearance and legitimacy of the Ingenix PHCS database,

24   and the usefulness of that data for depressing the price paid for ONS."  TAC ¶ 308.

25   At the same time, Plaintiffs allege that only three WellPoint affiliates contributed

26   data to Ingenix.  *See id.* ¶ 72.  The TAC fails explain why, if WellPoint was part of

27   a RICO conspiracy, only three affiliates – out of more than 50 named in the TAC,

28   *id.* ¶ 58 – provided data that supposedly was "critical" to the conspiracy.  The

1    allegation that WellPoint allegedly participated in a conspiracy with other insurers

2    to depress prices paid for ONS but that the overwhelming majority of WellPoint

3    companies did not even contribute data to Ingenix is implausible on its face.

4          Plaintiffs also have not tied their purported injuries to any particular conduct

5    that "is independently wrongful under RICO." *Beck*, 529 U.S. at 505-06. For all

6    these reasons, their RICO conspiracy claim should be dismissed.

7    **VI.    PLAINTIFFS' ERISA CLAIMS SHOULD BE DISMISSED.**

8         **A.    The TAC Fails To Allege Exhaustion Or Futility Regarding Non-**

9                 **Ingenix Methodologies.**

10          Plaintiffs' ERISA claims regarding Non-Ingenix Methodologies should be

11    dismissed for the reasons discussed in Section I, *supra*. They also should be

12    dismissed for the additional reason that Plaintiffs have failed to adequately allege

13    exhaustion or futility.

14          As this Court recognized in its MTD Order, it is a general rule that a claimant

15    must exhaust administrative remedies prior to bringing ERISA claims in federal

16    court. *See* MTD Order at 34; *see also Diaz v. United Agric. Emp. Welfare Benefit*

17    *Plan & Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995); *Amato v. Bernard*, 618 F.2d 559,

18    567 (9th Cir. 1980). Although this rule does not apply where it would have been

19    futile to pursue administrative review, "bare assertions of futility are insufficient to

20    bring a claim within the futility exception[.]" *Diaz*, 50 F.3d at 1485.

21          In its MTD Order, the Court noted that "a plaintiff can demonstrate futility

22    by pointing to a similarly situated plaintiff who exhausted administrative remedies

23    to no avail," and it found that the allegations concerning "Subscriber X" and Dr.

24    Peck sufficiently demonstrated futility for both the Subscriber and Provider

25    Plaintiffs. MTD Order at 35. WellPoint does not ask the Court to revisit that ruling

26    here. The Court's prior ruling should not apply to the TAC's allegations regarding

27    Non-Ingenix Methodologies, however, because the TAC makes clear that all of its

28    allegations regarding exhaustion and futility relate to appeals of Ingenix

1    determinations made by Anthem Blue Cross in California.  *See* TAC ¶¶ 240-41

2    (alleging with respect to Dr. Peck that any exhaustion of administrative remedies

3    would be futile "because WellPoint, as a matter of policy, refuses to alter or

4    reprocess claims that have been processed pursuant to the Ingenix Database"),

5    ¶¶ 280-81, ¶¶ 284-85 (alleging that in denying Subscriber X's appeal, Anthem Blue

6    Cross stated that it "paid [the non-par provider] using the Professional Customary

7    and Reasonable fee schedule methodology from an internal database known as

8    Ingenix") (emphasis omitted).  Because Plaintiffs provide no factual allegations to

9    support their contention that it would have been futile to pursue administrative

10   remedies relating to Non-Ingenix Methodologies, their ERISA claims regarding

11   such Methodologies should be dismissed.

12   **B.    Plaintiffs' Claims Regarding Alleged Failures To Disclose UCR**

13        **Data Should Be Dismissed.**

14        The Court should dismiss Plaintiffs' 1132(a)(2) and (a)(3) claims because

15   they are based on WellPoint's alleged failure to disclose information, but the TAC

16   does not allege any facts showing that WellPoint breached any obligation to

17   disclose information that ERISA imposes.  The TAC alleges, with respect to

18   1132(a)(2) and (a)(3), that WellPoint violated ERISA by "failing to disclose and

19   taking affirmative steps to conceal that its reimbursement rates for out-of-network

20   medical expenses were based on False UCRs or other ONS Benefit Reductions"

21   and "by failing to disclose data, their methodology and other critical information

22   relating to ONS ABDs."  *See* TAC ¶¶ 401, 406.  As the court held in *Franco*,

23   however, "[n]o ERISA provision or implementing regulation requires an insurer to

24   provide every bit of data underlying a claim decision and details about the way in

25   which that data was used."  *Franco*, 2011 WL 4448908, at *20.  This conclusion is

26   consistent with prior case law finding that the "failure to provide more specific

27   information about what the particular UCR limit was or how it was calculated is not

28   a violation of ERISA."  *Krauss v. Oxford Health Plans, Inc.*, 418 F. Supp. 2d 416,

1    418, 430 (S.D.N.Y. 2005), *aff'd*, 517 F.3d 614 (2d Cir. 2008); *see also DeBartolo v.*

2    *Blue Cross/Blue Shield of Ill.*, 2001 WL 1403012, at *1, *7 (N.D. Ill. 2001)

3    ("[I]information concerning how the defendants arrived at their determination of

4    [UCR] . . . is not the type of information an ERISA plan administrator is required to

5    disclose[] under 29 U.S.C. § 1024(b)(4).").

6        The TAC does not allege any facts showing that WellPoint breached any

7    ERISA disclosure requirements.  The only ERISA disclosure provisions the TAC

8    references are Section 1022 and 1133, but Plaintiffs do not provide any factual

9    allegations indicating that either provision has been violated.  *See* TAC ¶¶ 406, 410,

10   412, 414.  Section 1022 of ERISA "sets out with great specificity how the SPD

11   must be written and what information it must contain," *Hicks v. Fleming Cos.*, 961

12   F.2d 537, 540 (5th Cir. 1992), including thirteen specific requirements, none of

13   which includes the disclosure of UCR data.  *See Franco*, 2011 WL 4448908, at

14   *19.  A suit under Section 1022(b) cannot be based on the failure to disclose

15   information that is not specifically identified in the provision.  *See, e.g.*, *Stahl v.*

16   *Tony's Bldg. Materials, Inc.*, 875 F.2d 1404, 1409 (9th Cir. 1989).  Plaintiffs'

17   reference to "the regulations promulgated thereunder" when discussing Section

18   1022, *see* TAC ¶ 412, does not help their claim because any argument that the

19   federal regulations related to SPDs require disclosure of UCR data "lacks legal

20   support."  *Franco*, 2011 WL 4448908, at *19.  Here, as in *Franco*, Plaintiffs can

21   "point to no language in either ERISA § 1022 nor the implementing regulation[s],

22   or to any other authority, that endorses their expansive interpretation."  *Id.*

23       Section 1133 of ERISA requires that a Plan "provide adequate notice" when

24   a claim "has been denied, setting forth the specific reasons for such denial," and

25   "afford reasonable opportunity to [the] participant . . . for a full and fair review."

26   29 U.S.C. § 1133(1) & (2).  Disclosing that 'the allowed amount represented the

27   reasonable and customary rate for the service" or "that a provider's bill exceeded

28   the 'Maximum Reimbursable Charge' " satisfies these requirements.  *Franco*, 2011

1    WL 4448908, at *20 (holding that Section 1133 "does not require that the plan also

2    explain what information the plan considered in arriving at its decision").  The TAC

3    does not allege any facts showing that these requirements have not been met.  And

4    Plaintiffs cannot expand ERISA's disclosure requirements with general references

5    to fiduciary duties.  *See id.*

6          The ERISA Plaintiffs' 1132(a)(2) and (a)(3) claims also fail because the

7    TAC does not allege facts showing how WellPoint's purported failure to disclose

8    methodologies or data was material or caused them injury.  For example, the

9    ERISA Subscriber Plaintiffs do not allege they would have purchased different

10   policies or sought different treatment had they known the information they say

11   should have been disclosed.  The absence of such allegations is fatal.  *Franco*, 2011

12   WL 4448908, at *20 (dismissing 1132(a)(3) claims where complaints did not allege

13   that "knowing such information would have affected the [plaintiffs'] decision as to

14   which ERISA health plan to select" or impacted their "ability to make an informed

15   decision about whether to seek treatment from an in-network provider or Nonpar").

16         Finally, to the extent Plaintiffs' 1132(a)(2) and (a)(3) claims seek benefits

17   that WellPoint allegedly failed to pay them under its plans, those claims should be

18   dismissed because they are not properly brought under those sections.  *See, e.g.*,

19   *Taylor v. Reliance Standard Life Ins.*, 2011 WL 62142, at *2 (W.D. Wash. 2011);

20   *Toohey v. Wyndham Worldwide Corp. Health & Welfare Plan*, 673 F. Supp. 2d

21   1223, 1229 (D. Or. 2009).

22         **C.    Plaintiffs' 1132(a)(2) Claim Also Fails For Additional Reasons.**

23         As the Court recognized in its MTD Order, "individual beneficiaries bringing

24   a breach of fiduciary duty claim must do so for the benefit of the plan – not to

25   recover solely for individual injuries[.]"  MTD Order at 37.  Conclusory allegations

26   that the fiduciary claim is brought for the benefit of the plan are not sufficient to

27   survive dismissal.  *Id.*  The Court allowed the 1132(a) claim in the SAC to survive

28   because it found that (1) Plaintiffs' allegations "show[ed] harm to more than just

the individuals bringing suit"; and (2) Plaintiffs seek injunctive relief which would "inure to the benefit" of the plan in addition to monetary relief.  MTD Order at 38. The TAC makes clear, however, that Plaintiffs are not pursuing claims on behalf of any plan or all of the individuals insured under any plan.  They are only pursuing relief for themselves and those other persons who chose to obtain out-of-network services.  *See* TAC ¶ 22 ("*The Subscriber Plaintiffs*, in being under-reimbursed for ONS benefits, have not received the benefits that WellPoint agreed and promised to pay resulting in consequential financial loss flowing *from their property* by having overpaid for their health insurance coverage.") (emphases added); ¶ 68 ("*These subscribers* (*and the members of the Classes who have procured ONS*) do not view in-network providers as an acceptable substitute, as evidenced by their choice of providers.") (emphasis added); ¶ 178 ("Plaintiffs . . . seek a redetermination of *their ONS benefit claims* and corresponding recalculation and payment of unpaid benefits and *other equitable relief for themselves* under ERISA.") (emphases added).  As recent case law demonstrates, such claims are not brought on behalf of a plan or all plan members.  Thus, Plaintiffs' 1132(a)(2) claim should be dismissed.

For example, the court in *Taylor* recently applied the Ninth Circuit's decision in *Wise v. Verizon Communications, Inc.*, 600 F.3d 1180 (9th Cir. 2010), to require dismissal of a plaintiff's 1132(a)(2) claim because the complaint, despite alleging a systemic conflict based on claims processing incentives, did not adequately allege conduct that "injured the benefit plan as a whole or otherwise 'jeopardize[d] the entire plan or put at risk plan assets.' "  *See Taylor*, 2011 WL 62142, at *1-2; *see also Smith v. Med. Benefit Adm'rs Grp., Inc.*, 639 F.3d 277, 282-83 (7th Cir. 2011) (affirming dismissal of 1132(a)(2) claim even though plaintiff alleged systematic reductions of participants' benefits because injury was not to the plan as a whole); *Ehrman v. Standard Ins.*, 2007 WL 1288465, at *2 (N.D. Cal. 2007) (granting motion to dismiss 1132(a)(2) claim because underpayment of benefits affected a subset of plan participants, not the entire plan).

1       Likewise, in *Adams v. Anheuser-Busch Cos.*, 2011 WL 1559793 (S.D. Ohio

2   2011), another case decided after briefing and argument on WellPoint's motion to

3   dismiss had been completed, the plaintiffs asserted an 1132(a)(2) claim based on

4   allegations that defendant systematically denied benefits promised under the

5   company's pension plan. *Id.* at *6. The Court granted defendant's motion to

6   dismiss, observing that "the allegations in the complaint fail[ed] to show how, in

7   denying benefits to the plaintiffs, the Plan suffered a loss." *Id.* at *7. The same

8   reasoning applies here because it is the Plaintiffs – not any plan – that incurred the

9   losses the TAC alleges. *See Toohey*, 673 F. Supp. 2d at 1229 (finding it

10  "incomprehensible" that an insurance provider's failure to pay insurance proceeds

11  harmed the plan because "[t]here is no pot of money [that] the Plan maintains or

12  invests on behalf of its beneficiaries that has been reduced or otherwise impacted by

13  defendants' actions").

14      That Plaintiffs seek injunctive relief, in addition to unpaid benefits, makes no

15  difference, as demonstrated by *Smith v. Medical Benefit Administrators Group,*

16  *Inc.*, 639 F.3d 277 (7th Cir. 2011), which was decided after this Court took

17  WellPoint's prior motion under submission. In that case, the plaintiff sought both

18  compensatory damages and injunctive relief. Relying on the Ninth Circuit's

19  decision in *Wise v. Verizon Communications, Inc.*, 600 F.3d at 1189, the Seventh

20  Circuit upheld the district court's dismissal of an 1132(a)(2) claim, finding that the

21  plaintiff's complaint was "plainly aimed at obtaining relief for injuries that he,

22  rather than his plan, suffered as a result of [defendant's] alleged actions." *Smith*,

23  639 F.3d at 282. Plaintiffs' claim for injunctive relief here similarly does not

24  convert their claims for individual benefits under § 1132(a)(2) into a claim for relief

25  that inures to the plan. *See also Coriale v. Xerox Corp.*, 775 F. Supp. 2d 583, 597-

26  98 (W.D.N.Y. 2011) (dismissing § 1132(a)(2) claim through which plaintiffs

27  sought to reform plan because the effect of the remedy would be "simply to restore

28  the benefits" to participants); *Toohey*, 673 F. Supp. 2d at 1229 (rejecting 1132(a)(2)

1   claim that sought injunctive and equitable relief, in addition to benefits).

2   **VII.   PLAINTIFFS' BREACH OF CONTRACT CLAIM FAILS.**

3   The Court held in its MTD Order that Plaintiffs stated a breach of contract

4   claim in the SAC because they asserted that the insurance policies allegedly

5   breached by WellPoint were "uniform contracts," and they "fleshed out" the

6   particular "terms" from those contracts that WellPoint allegedly breached.  MTD

7   Order at 41.  Following two years of discovery, Plaintiffs have amended their

8   allegations about the contract terms at issue in the TAC, *see* TAC ¶¶ 328-64, and in

9   so doing have undercut their breach of contract claim in two critical ways.  First,

10  the specific contract provisions they cite are inconsistent with Plaintiffs' conclusory

11  allegation that WellPoint's "Agreements are uniform contracts that utilize the same

12  definitions across different health plans."  *Id.* ¶ 331.  Second, Plaintiffs' new

13  allegations demonstrate that no contract was breached.

14  **A.   WellPoint's Contracts Are Not Uniform.**

15  Although Plaintiffs allege that the "Agreements" that are the subject of their

16  breach of contract claim "are uniform contracts that utilize the same definitions

17  across different health plans," *id.*, the new allegations concerning the J.B.W. and

18  Samsell agreements demonstrate that this is not the case.  (Plaintiffs' other

19  allegations regarding specific contract provisions relate to ERISA plans and

20  Plaintiffs' ERISA claims and, therefore, are irrelevant to Plaintiffs' state law breach

21  of contract claim.  *See, e.g.*, *id.* ¶¶ 190-217.)

22  With respect to J.B.W., the TAC alleges that WellPoint was obligated to

23  reimburse him for non-emergency ONS at 50% of the "Negotiated Fee Rate."  *See*

24  *id.* ¶¶ 334, 337.  With respect to the Samsells, the TAC alleges that WellPoint was

25  required to pay the "Allowable Charge."  *Id.* ¶¶ 341, 344.  According to the TAC, if

26  the service was supplied by a "Provider," the Allowable Charge would be "the

27  Company's allowance for a specified Covered Service or the provider's charge for

28  that service, whichever is less."  *Id.* ¶ 342.  For "Covered Facilities" and "charges

38   <small>MEMORANDUM OF POINTS AND AUTHORITIES</small>

1  for Covered Services supplied by other than Covered Facilities or Providers," the

2  "Allowable Charge" would be "the amount which the Company determines, in its

3  sole discretion, is reasonable for the Covered Service provided." *Id.*

4       As these allegations make clear, the J.B.W. and Samsell contracts are not

5  "uniform" with each other, which the Court can confirm by reviewing the contracts

6  themselves; they are in the record at D.E. 48-2 (Ex. 1) and D.E. 137-1 & 137-2

7  (Exs. A-D).  *See Gov't Computer Sales Inc. v. Dell Mktg.*, 199 F. App'x 636, 638

8  (9th Cir. 2006) ("a court may consider a document on a motion to dismiss if that

9  document is integral to the plaintiff's claims and its authenticity is not in dispute,

10  even if the plaintiff elects not to attach that document to its complaint").  Plaintiffs'

11  allegations also are inconsistent with the allegations of supposedly "uniform"

12  contract language the Court relied upon in denying WellPoint's motion to dismiss

13  the breach of contract claim in the SAC – that " 'the maximum covered expense for

14  service provided by a non-PPO provider or other healthcare provider will always be

15  the lesser of the billed charge or[,] for a physician, the customary and reasonable

16  charge,' " which "is defined as 'a charge which falls within the common range of

17  fees billed by a majority of physicians for a procedure in a given geographic

18  region.' "  MTD Order at 41 (quoting SAC ¶ 326).

19       The Court held that a plaintiff who sues on a written contract must allege "its

20  existence and how it was breached" and that the allegations of uniform contracts in

21  the SAC satisfied these requirements.  *Id.*  Although the TAC contains the same

22  conclusory allegations of uniformity, those allegations are not entitled to a

23  presumption of truth because they are contradicted by the allegations in the TAC

24  describing the different contract provisions in the J.B.W. and Samsell contracts.

25  Courts "need not accept as true conclusory allegations that are contradicted by

26  documents referred to in the complaint."  *Colony Cove Props., LLC v. City of*

27  *Carson*, 640 F.3d 948, 955 (9th Cir. 2011) (citing *Iqbal*, 129 S. Ct. at 1949); *see*

28  *also Hosack v. Utopian Wireless Corp.*, 2011 WL 1743297, at *5 (D. Md. 2011) ("a

1    complaint contain[ing] inconsistent and self-contradictory statements . . . fails to

2    state a claim").  Thus, Plaintiffs cannot rely on conclusory allegations of

3    uniformity, and their breach of contract claim should be dismissed because they

4    have failed to allege any facts showing *how* their contracts were allegedly breached.

5    *See Perez v. Wells Fargo Bank, N.A.*, 2011 WL 3809808, at *18 (N.D. Cal. 2011).

6    **B.    The J.B.W. And Samsell Contracts Were Not Breached.**

7    **1.    J.B.W.**

8        With respect to J.B.W., the TAC alleges that J.B.W. was treated by a number

9    of Non-Participating Providers and that WellPoint was obligated to pay 50% of the

10   "Negotiated Fee Rate" for the services they provided.  *See* TAC ¶¶ 334, 337.  The

11   TAC also alleges that J.B.W.'s policy defines the "Negotiated Fee Rate" to mean

12   "the rate of payment that [WellPoint] has negotiated with the Participating Provider

13   under a Prudent Buyer Participating Agreement for Covered Services."  *Id.* ¶ 334.

14   J.B.W.'s theory of breach is premised on the allegation that this definition should

15   be ignored because it is "nonsensical on its face" and that his contract should

16   instead be interpreted to require WellPoint to pay 50% "of either the provider's

17   actual charges or the UCR."  *Id.* ¶¶ 334, 337.  That allegation carries no weight

18   because the interpretation of a contract is a question of law for the Court.  *See Gin*

19   *v. Penn. Life Ins. Co.*, 134 Cal. App. 4th 939, 943, 36 Cal. Rptr. 3d 571 (Cal. Ct.

20   App. 2005).  Further, a contract interpretation "must be fair and reasonable, not

21   leading to absurd conclusions."  *Transamerica Ins. Co. v. Sayble*, 193 Cal. App. 3d

22   1562, 1566, 239 Cal. Rptr. 201 (Cal. Ct. App. 1987).  Thus, courts "will not strain

23   [contractual] language to create an ambiguity," *Helfand v. Nat'l Union Fire Ins.*

24   *Co.*, 10 Cal. App. 4th 869, 880, 13 Cal. Rptr. 2d 295 (Cal. Ct. App. 1992), but

25   rather will "interpret contractual language in a manner which gives force and effect

26   to *every* provision, and not in a way which renders some clauses nugatory,

27   inoperative or meaningless."  *City of Atascadero v. Merrill Lynch, Pierce, Fenner*

28   *& Smith, Inc.*, 68 Cal. App. 4th 445, 473, 80 Cal. Rptr. 2d 329 (Cal. Ct. App. 1999).

1    Plaintiffs' assertion that the definition of "Negotiated Fee Rate" should be

2    ignored as "nonsensical" runs directly contrary to these principles and should be

3    rejected.  A "fair and reasonable" interpretation of the term "Negotiated Fee Rate"

4    is achieved simply by giving the term its "ordinary and popular sense," *see ASP*

5    *Props. Grp. v. Fard, Inc*., 133 Cal. App. 4th 1257, 1269, 35 Cal. Rptr. 3d 343 (Cal.

6    Ct. App. 2005) (citations omitted) – i.e., that the J.B.W.'s policy required WellPoint

7    to reimburse non-emergency ONS based on the "rate of payment" applicable to a

8    "Participating Provider under a Prudent Buyer Participating Agreement."  TAC

9    ¶ 334.  Because the TAC does not allege that WellPoint failed to provide such

10    reimbursement, it fails to state a claim for breach of J.B.W.'s insurance policy.

### 2.    The Samsells

12    The TAC similarly fails to allege a breach of contract regarding the Samsells.

13    The new allegations in the TAC assert that the Samsells' "minor dependent

14    children" received services from "out-of-network providers" and that Section C.1 of

15    the Samsells' policy provided that "[w]ith respect to a Provider's charge, the term

16    'Allowable Charge' means the Company's allowance for a specified Covered

17    Service or the Provider's charge for the service, whichever is less."  TAC ¶¶ 342,

18    347.  The TAC does not allege, however, that WellPoint paid less than "the

19    Company's allowance" for the services the Samsells received.  It alleges only that

20    WellPoint paid "less than the stated charge of the provider's actual charge" and that

21    this resulted in the Samsells paying "charges for out-of-network services that

22    exceed the 'reasonable' charges for such services in the geographic area."  *Id.*

23    ¶ 348.  But this does not state a claim for breach of contract, because nothing in

24    Section C.1 of the Samsells' policy provided that WellPoint would pay for out-of-

25    network services in whatever amount *the Samsells* deemed to be "reasonable" or

26    the provider charged.  Instead, Section C.1 provided only that WellPoint would pay

27    its "allowance" for the Covered Services that were provided – i.e., amounts "based

28    upon Anthem Virginia's standard, in-network participating fee schedule."  *Id.* ¶ 345.

1       The TAC quotes Sections C.2 and C.3 of the Samsells' policy, which provide

2   that, for Covered Facility charges and other types of charges, WellPoint will pay

3   "the amount which the Company determines, in its sole discretion, is reasonable,"

4   and suggests that WellPoint's payment did not comply with these provisions.  *Id.*

5   ¶¶ 342, 344.  But neither of those Sections applies to the charges for Covered

6   Services the Samsells allege are at issue because those services were allegedly

7   provided by "out-of-network providers."  *Id.* ¶ 345.  As discussed in the preceding

8   paragraph, the Samsells' policy expressly provided that reimbursement "[w]ith

9   respect to a Provider's charge" is governed by Section C.1. – not C.2 or C.3 – and

10   will be based on "the Company's allowance."  Thus, the TAC fails to allege facts

11   showing that WellPoint breached the Samsells' policy.

12       WellPoint notes the TAC's allegations are consistent with the declarations

13   WellPoint submitted in connection with its motion to dismiss the SAC, which

14   confirmed that the Samsells' claims were paid based on the standard, in-network

15   participating fee schedule for Virginia – i.e., "the Company's allowance" – in

16   accordance with Section C.1.  *See* Decl. of Timothy Miller [D.E. 136] ¶ 7, and

17   Decl. of Susan Ward [D.E. 137] ¶¶ 3, 5.  The Court declined to give weight to those

18   declarations because Plaintiffs had not yet completed discovery.  MTD Order at 10-

19   11.  Although Plaintiffs have now completed discovery, and, among other things,

20   deposed Mr. Miller, nothing in the TAC calls into question the facts to which Mr.

21   Miller and Ms. Ward testified in their declarations.  *Compare* Decl. of Tim Miller

22   [D.E. 136] *and* Decl. of Susan Ward [D.E. 137] *with* TAC ¶¶ 338-48.

23   **VIII.  PLAINTIFFS' IMPLIED COVENANT CLAIM FAILS.**

24       The Court denied WellPoint's motion to dismiss Plaintiffs' breach of implied

25   covenant claim because it found that WellPoint had argued in its opening brief that

26   Plaintiffs' claim failed under " '*applicable state law*,' " but "inconsistent[ly]"

27   argued in reply that the same claim failed because " '*federal case law* . . . require[d]

28   Plaintiffs to identify the specific policy provisions from which the covenant

42       MEMORANDUM OF POINTS AND AUTHORITIES

allegedly arises.' "  MTD Order at 42 (quoting WellPoint's briefs).  While WellPoint respectfully disagrees that its earlier arguments were inconsistent, WellPoint argues here that Plaintiffs' implied covenant claim should be dismissed because *none* of the potentially applicable state laws recognizes an implied covenant claim independent of a breach of contract claim, and Plaintiffs have failed to plead facts showing WellPoint breached any contracts.

Under California law, "[a] breach of the [implied] covenant of good faith does not give rise to a cause of action separate from a cause of action for breach of the contract containing the covenant." *Smith v. Int'l Bhd. of Elec. Workers, Local Union 11*, 109 Cal. App. 4th 1637, 1645 n.3, 1 Cal. Rptr. 3d 374 (Cal. Ct. App. 2003) (citation omitted).  Georgia and Virginia law are the same.  *See Morrell v. Wellstar Health Sys., Inc.*, 280 Ga. App. 1, 5, 633 S.E.2d 68, 72 (Ga. Ct. App. 2006); *EPlus Tech., Inc. v. Nat'l R.R. Passenger Corp.*, 407 F. Supp. 2d 758, 762 (E.D. Va. 2005).

The breach of implied covenant claim alleged in the TAC involves the same contracts that are the subject of Plaintiffs' breach of contract claim and shares the same essential allegations.  *Compare* TAC ¶¶ 449-52 *with id.* ¶¶ 453-62.  Plaintiffs' breach of contract claim fails for the reasons stated in Section VII, *supra*.  Because Plaintiffs have not alleged any facts showing that they have a breach of contract claim based on an implied covenant that is separate from the breach of contract claim in the TAC, Plaintiffs' breach of implied covenant claim should be dismissed.

## IX.  PLAINTIFFS' UCL AND FAL CLAIMS SHOULD BE DISMISSED.

The Court found that "Plaintiffs[] . . . failed to state a fraud-based" UCL or FAL claim in the SAC with the "degree of specificity" required by Rule 9(b), but successfully "stated a claim under the UCL's unfair and unlawful prongs" because the SAC "adequately stated a claim under the Sherman Act."  MTD Order at 43-45. Plaintiffs try to resurrect their fraud-based UCL and FAL claims in the TAC, but those claims fail because Plaintiffs still have failed to satisfy Rule 9(b).  Plaintiffs

1    also have purported to re-assert claims under the UCL's "unfair" and "unlawful"

2    prongs, *see* TAC ¶¶ 463-480 (Eleventh Claim for Relief), along with a new UCL

3    claim based on WellPoint's alleged under-reimbursement of emergency physicians

4    in violation of California's Knox-Keene Act, *see id.* ¶¶ 481-92 (Twelfth Claim for

5    Relief).  Those claims should be dismissed because Plaintiffs have failed to allege

6    any facts showing unfair or unlawful conduct and because the only allegations

7    regarding emergency physicians relate to Dr. Schwendig, an ERISA Plaintiff whose

8    state law claims are preempted by ERISA.

9        **A.    Plaintiffs Fail To Plead Fraud With Particularity.**

10           The TAC fails to cure the pleading deficiencies the Court previously

11   identified, and that failure undercuts Plaintiffs' new emergency services-based UCL

12   claim as well because that claim – like Plaintiffs' original UCL claim – is fraud-

13   based.  The TAC makes clear that Plaintiffs' UCL and FAL claims arise from

14   allegations that WellPoint deceived Plaintiffs by misrepresenting in its "advertising,

15   promotional pamphlets and plan contracts that . . . its members will be reimbursed

16   for ONS based on either actual billed cost or the UCR," when, in reality,

17   "WellPoint does not use the actual cost or UCRs to calculate ONS, but, rather,

18   use[s] the False UCRs obtained from Ingenix and other ONS Benefit Reductions to

19   calculate reimbursements for ONS."  *Id.* ¶¶ 363-64, 468; *see also id.* ¶¶ 467-77, 481

20   (incorporating into the Twelfth Claim for Relief all preceding allegations).  Thus,

21   whether described by Plaintiffs as "unfair" or "unlawful," the alleged conduct being

22   challenged in these claims is based on WellPoint's supposedly fraudulent

23   statements or omissions about ONS and its use of "False UCRs."  Such conduct

24   sounds in fraud, which means that Plaintiffs must plead the elements of their claims

25   with particularity.  *See* MTD Order at 43 (holding that "Plaintiffs' claims sound in

26   fraud, requiring them to be pleaded with particularity"); *see also Chang Bee Yang v.*

27   *Sun Trust Mortg., Inc.*, 2011 WL 3875520, at *8 (S.D. Cal. 2011) (holding that

28   because plaintiffs' "unfair" UCL claim was grounded in fraud, it had to meet the

1    heightened pleading standard of Rule 9(b)); *In re Actimmune Mktg. Litig.*, 2009 WL

2    3740648, at *13 (N.D. Cal. 2009) (holding that any UCL claim sounding in fraud

3    must be pled with particularity under Rule 9(b)).

4         Among other elements, Plaintiffs must plead with particularity that WellPoint

5    made fraudulent representations, and that such fraudulent representations caused

6    Plaintiffs injury.  *See In re Tobacco II Cases*, 46 Cal. 4th 298, 327, 93 Cal. Rptr. 3d

7    559 (Cal. 2009); *see also Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350,

8    1363, 108 Cal. Rptr. 3d 682 (Cal. 2010) (holding that the causation requirement

9    "applies equally to the 'unlawful' prong of the UCL when, as here, the predicate

10   unlawfulness is misrepresentation and deception").  Plaintiffs also must plead the

11   specific "names of the persons who made the allegedly fraudulent representations,

12   their authority to speak, to whom they spoke, what they said or wrote, and when it

13   was said or written."  *Goldsmith v. Allergan, Inc.*, 2011 WL 147714, at *6 (C.D.

14   Cal. 2011); *see also Actimmune*, 2009 WL 3740648, at *6 (a plaintiff must

15   "explicitly aver" "the who, what, when, where, and how of the alleged fraudulent

16   conduct" and explain "why [a] statement or omission complained of was false and

17   misleading").  The TAC fails to do so.

18        Despite more than 23 months of discovery, the TAC fails to allege any

19   fraudulent statements with particularity.  It vaguely alleges that "WellPoint

20   advertises, promotes, and sells its health plans based on widely disseminated and

21   uniform [mis]representations on its website, SPDs, and other standard form

22   promotional materials that ONS will be reimbursed based on the actual billed cost

23   or based on UCRs."  TAC ¶ 476; *see also id.* ¶ 468.   But these are virtually the

24   same allegations that this Court previously found to be deficient under Rule 9(b).

25   *Compare id. with* SAC ¶ 349; MTD Order at 43-44.  The TAC also fails to allege

26   with particularity that Plaintiffs relied on fraudulent statements made by WellPoint,

27   that such statements were an "immediate cause" of their injury, and that but-for

28   WellPoint's statements, "the plaintiffs 'in all reasonable probability' would not

1   have engaged in the injury-producing conduct." *In re Tobacco II*, 46 Cal. 4th at

2   326.  For example, the TAC alleges that Plaintiff J.B.W. "reviewed WellPoint's

3   SPDs on the WellPoint website and reasonably believed that ONS would be

4   reimbursed based on a percentage of the actual costs of services in his geographic

5   area."  TAC ¶ 364.  But this new allegation still lacks any of the factual details

6   required under Rule 9(b), such as the name of "who" at WellPoint said exactly

7   "what" in the SPDs, "when" they said it, or "how" WellPoint's unidentified

8   statements in the SPDs were "false and misleading."  Having thus failed again to

9   plead fraud with particularity, Plaintiffs' revamped UCL and FAL claims in the

10   TAC should be dismissed.  *See, e.g.*, MTD Order at 43-44; *Goldsmith*, 2011 WL

11   147714, at *6-7; *Actimmune*, 2009 WL 3740648, at *13-14.

**B.**   **Plaintiffs' "Unfair" And "Unlawful" UCL Claims Should Be**
        **Dismissed For Additional Reasons.**

14        In addition to failing because they are fraud-based claims that lack the

15   particularity required by Rule 9(b), Plaintiffs' "unfair" and "unlawful" UCL claims

16   should be dismissed because the TAC fails to allege any facts to support them.

17        With respect to Plaintiffs' new UCL claim in the Twelfth Claim for Relief,

18   the TAC fails to allege any facts suggesting that any emergency provider was not

19   paid in accordance with California's Knox-Keene Act.  This new claim is based

20   entirely on allegations regarding Dr. Schwendig, the only provider the TAC alleges

21   provided emergency services subject to Knox-Keene.  *See* TAC ¶¶ 226-32.  Dr.

22   Schwendig is an ERISA Provider Plaintiff, however, and all of the allegations

23   regarding emergency services allegedly provided by him involve patients allegedly

24   insured under ERISA plans.  *See id.* ¶¶ 166, 226-32.  These allegations form the

25   basis of Dr. Schwendig's ERISA § 1132(a)(1)(b) claim against WellPoint, and as

26   the Court recognized when it dismissed Dr. Schwendig's Cartwright Act claim

27   based on ERISA preemption, Plaintiffs cannot rely on allegations made in support

28   of a *federal* benefits claim under ERISA to state a claim arising under California

1   *state* law.  *See* MTD Order at 47 (holding that "Congress' intent to make the

2   ERISA civil enforcement mechanism exclusive would be undermined if state

3   causes of action that supplement the ERISA § 502(a) remedies were permitted")

4   (quoting *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 216, 124 S. Ct. 2488, 159 L.

5   Ed. 2d 312 (2004)).  The same reasoning applies to Dr. Schwendig's assertion of a

6   UCL claim based on Knox-Keene.  *See Cleghorn v. Blue Shield of Cal.*, 408 F.3d

7   1222, 1226 (9th Cir. 2005) (holding that UCL claim based on alleged violation of

8   Knox-Keene was completely preempted by ERISA); *Quaresma v. BC Life &*

9   *Health Ins. Co.*, 623 F. Supp. 2d 1110, 1135 (E.D. Cal. 2007) (holding that UCL

10  claim based on alleged violations of California state insurance statutes including

11  Knox-Keene was defensively preempted by ERISA).  Plaintiffs' new UCL claim

12  should be dismissed because it cannot be based on the TAC's allegations regarding

13  Dr. Schwendig, and the TAC does not contain any other allegations that support it.

14      The TAC likewise is devoid of facts that support Plaintiffs' original UCL

15  claim in the Eleventh Claim for Relief.  The Court has previously determined that

16  the SAC stated an "unfair or unlawful claim" in the Eleventh Claim for Relief

17  based on its finding that Plaintiffs stated a Sherman Act claim in the SAC.  *See*

18  MTD Order at 44-45.  For the reasons discussed above, however, the TAC fails to

19  state a Sherman Act claim or any other claim on which Plaintiffs' UCL claim can

20  rest.  The only claim it states is an ERISA claim for benefits, which cannot provide

21  the basis for Plaintiffs' UCL claim.  Thus, the Eleventh Claim for Relief should be

22  dismissed for this reason as well.

23  **X.   PLAINTIFFS' CARTWRIGHT ACT CLAIM FAILS.**

24      In its MTD Order, the Court dismissed Plaintiffs' Cartwright Act claim based

25  on ERISA preemption to the extent it was brought by the ERISA Plaintiffs, and it

26  should do so again here for the same reason.  The Court did not dismiss the "non-

27  ERISA Plaintiffs' Cartwright Act claim" because it found that Plaintiffs had

28  "adequately pleaded a Sherman Act violation, and [thus] also adequately pleaded a

1  Cartwright Act violation." *Id.* at 47.  For all the reasons stated above, the TAC fails
2  to state a Sherman Act claim.  The Court should find for the same reasons that
3  Plaintiffs also have failed to state a Cartwright Act claim in the TAC.

4  **CONCLUSION**

5  For the foregoing reasons, the First and Third through Thirteenth Claims for
6  Relief in the TAC should be dismissed, along with the Second Claim for Relief to
7  the extent it is based on Non-Ingenix Methodologies.

8

9  Dated:  December 22, 2011          HOGAN LOVELLS US LLP
10                                     Respectfully Submitted,
11
12                                     By:   */s/ Robin J. Samuel*
                                          Robin J. Samuel
13
14                                     Neil R. O'Hanlon, SBN 67018
                                       Robin J. Samuel, SBN 173090
15                                     1999 Avenue of the Stars, Suite 1400
                                       Los Angeles, California 90067
16                                     Tel.: (310) 785-4600
17                                     neil.ohanlon@hoganlovells.com
                                       robin.samuel@hoganlovells.com
18
19                                     Craig A. Hoover, SBN 113965
                                       Peter R. Bisio
20                                     E. Desmond Hogan
21                                     Miranda L. Berge
                                       555 Thirteenth Street, NW
22                                     Washington, DC 20004
23                                     Tel: (202) 637-5600
                                       craig.hoover@hoganlovells.com
24                                     peter.bisio@hoganlovells.com
25                                     desmond.hogan@hoganlovells.com
                                       miranda.berge@hoganlovells.com
26
27                                     *Attorneys for the WellPoint Defendants*
28

MEMORANDUM OF POINTS AND AUTHORITIES